JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
East Point Systems, Inc., Thomas Margarido, Jason Margarido, and Paul Taff

## DEFENDANTS
Steven Maxim, S2K, Inc., Maxim Enterprises, Inc., Maxim Field Service Supply, Inc., Edwin Pajemola and Cleveland Field Systems, LLC

**(b)** County of Residence of First Listed Plaintiff   Hartford, CT
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Stark, OH
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Raymond Law Group LLC, 90 National Drive, Suite 3, Glastonbury, CT 06033 and Kahan Kerensky & Capossela, LLP, 45 Hartford Turnpike, Vernon, CT 06066

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☒ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
17 U.S.C. 504
Brief description of cause:
Unlawful and unauthorized use and copying of Plaintiffs' copyright-protected software.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 211,709.12

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE
02/15/2013

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse  (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**  **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.**  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**  **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**  **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.**  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**    Example:    U.S. Civil Statute: <u>47 USC 553</u>
                              Brief Description: <u>Unauthorized reception of cable service</u>

**VII.**  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EAST POINT SYSTEMS, INC., THOMAS MARGARIDO, JASON MARGARIDO, AND PAUL TAFF | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | CIVIL ACTION NO. 13-215 |
| STEVEN MAXIM, S2K, INC., MAXIM ENTERPRISES, INC., MAXIM FIELD SERVICE SUPPLY, INC., EDWIN PAJEMOLA, AND CLEVELAND FIELD SYSTEMS, LLC | ) ) ) ) ) | |
| Defendants. | ) ) ) | FEBRUARY 15, 2013 |

## VERIFIED COMPLAINT

This is a Verified Complaint by East Point Systems, Inc. ("EPS") against Defendants Steven Maxim ("Maxim"), S2K, Inc. ("S2K"), Maxim Enterprises, Inc. ("MEI"), Maxim Field Service Supply, Inc. ("MFSS"), Edwin Pajemola ("Pajemola"), and Cleveland Field Systems, LLC ("CFS") for breach of contract, statutory and common law breach of fiduciary duty, specific performance, tortious interference with business expectancy, violations of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §§ 35-50, *et. seq.*, violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110g, *et. seq.*, computer-related offense, Conn. Gen. Stat. § 53a-251, copyright infringement pursuant to 17 U.S.C. § 501, and for imposition of a constructive trust. The claims arise out of the Defendants unlawful and unauthorized use and copying of EPS's copyright-protected software.

**PARTIES**

1.     At all times, Plaintiff East Point Systems, Inc., was and is a Connecticut domestic stock corporation with a principal place of business presently at 290 Roberts Street, Suite 205, East Hartford, Connecticut.

2.     At all times, Plaintiff Thomas Margarido was and is a natural person and resident of the State of Connecticut.

3.     At all times, Plaintiff Jason Margarido was and is a natural person and resident of the State of Connecticut.

4.     At all times, Plaintiff Paul Taff was and is a natural person and resident of the State of Connecticut.

5.     At all times, Defendant Steven Maxim was and is a natural person and  resident of the State of Ohio with an address of 6314 Glengarry Avenue NW, Canton, Ohio.

6.     At all times, Defendant S2K, Inc., was and is an Ohio corporation with its principal place of business at 7239 Wales Avenue, NW, in North Canton, Stark County, Ohio, 44720.

7.     At all times, Defendant Maxim Enterprises, Inc., was and is an Ohio corporation with its principal place of business at 6781 Lake Cable, in North Canton, Stark County, Ohio 44720.

8.     At all times, Defendant Maxim Field Service Supply, Inc. was and is an Ohio corporation with its principal place of business at 6726 Wales Avenue, NW, in Massilon, Stark County, Ohio, 44645.

9.     At all times, Defendant Edwin Pajemola was and is a natural person and resident of the State of Ohio with an address of 4223 Morley Drive, in Reminderville, Summit County, Ohio, 44202.

10.    At all times, Defendant Cleveland Field Systems, LLC, was and is an Ohio limited liability company with its principal place of business at 4223 Morley Drive, in Reminderville, Summit County, Ohio, 44202.

**JURISDICTION AND VENUE**

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 as this action arises under the Unites States copyright laws.

12.    As set forth more fully below, the amount in controversy in this action exceeds $75,000.00, exclusive of costs and interest, and thus this Court has subject matter jurisdiction of this action pursuant to 28 U.S.C.§ 1332 as there is complete diversity of citizenship.

13.    This Court may further exercise supplemental jurisdiction over the state law claims per 28 U.S.C. § 1367 as they are so related to the other claims within this Court's original jurisdiction that they form part of the same case or controversy.

14.    This Court may exercise personal jurisdiction over all defendants pursuant to Connecticut's Long-Arm Statute, C.G.S. sec. 52-59b(a)(1),(2),(3), & (5).

15.    Venue is proper pursuant to 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred and a substantial part of property that is the subject of the action is situated in the District of Connecticut.

16.     Defendants Maxim, S2K, MEI, and MFSS have consented to the jurisdiction of this Court as well as the venue.  See, Exhibit A, Agreement to Dismiss Arbitration, July 25, 2012.

**COMMON FACTS**

### A. BACKGROUND

17.     EPS designs, manufactures, and licenses software for and/or to the mortgage field service industry.

18.     The mortgage field service industry comprises, among others, the servicing lenders, national service companies, real estate agents, insurance companies,  property preservation contracting companies,   property preservation field workers, field inspectors, inspection companies, and investors, *vis a vis* mortgaged properties in default or in foreclosure.

19.     EPS's primary software product is marketed under the name "Field-Comm.net".

20.     The purpose of Field-Comm.net is to track and manage the execution of preservation and inspection work orders related to foreclosed properties for contractors and inspectors operating within the mortgage field service marketplace.

21.     A substantial component of Field-Comm.net is a database system developed in the Structured Query Language ("SQL"), consisting of various interrelated tables that organize, among other things, the parties, work orders, field reporting, and invoices relative to the mortgage field service industry.

22.     At all relevant times, S2K was one of many entities owned and operated by Maxim.

23.     At all relevant times, MEI was one of many entities owned by Maxim.

24.    Together, MEI and S2K both provide various field services and related products to field service companies on behalf of mortgagees.

### B. Maxim Joins East Point Systems

25.    Prior to the summer of 2004, Maxim was a customer of EPS's direct predecessor, East Point Systems, LLC, a Connecticut limited liability company.

26.    East Point Systems, LLC, using FileMaker Pro, developed a predecessor mortgage field service software to the present Field-Comm.net system.

27.    Upon information and belief, such predecessor software was the only mortgage field service software in existence at the time Maxim began his relationship with EPS.

28.    Prior to his relationship with EPS, Maxim indicated a lack of knowledge about software design specific to the mortgage field service industry.

29.    Field-Comm.net was the only known mortgage field service software in existence at the time the business relationship between Maxim and EPS was forged.

30.    In July 2004, the owners of East Point Systems, LLC, agreed to convert the company from a limited liability company to a "C" corporation.

31.    At the time of the said, conversion, the said owners agreed to include Maxim, through the S2K entity, as a shareholder and board member of the new "C" corporation.

32.    Plaintiff East Point Systems, Inc., is the said "C" corporation.

33.    S2k  was issued 5.8% of the issued and outstanding shares of EPS and given a minimum 3 year term on Plaintiff's Board of Directors.

34.     On or about July 26, 2004, S2K, acting through Maxim, signed a Shareholder Agreement which incorporated, as Exhibit A thereto, a Non-Disclosure and Confidentiality Agreement signed by Maxim on behalf of S2K and individually.

35.     A true and correct copy of the said July 26, 2004, Confidentiality and Non-Disclosure and Confidentiality Agreement on behalf of S2K, Inc., appears at "Exhibit B", attached hereto and incorporated herein by reference.

36.     A true and correct copy of the said July 26, 2004, Confidentiality and Non-Disclosure and Confidentiality Agreement on behalf of Steven Maxim, individually, appears at "Exhibit C", attached hereto and incorporated herein by reference.

37.     The Non-Disclosure and Confidentiality Agreement precluded S2K and Maxim from sharing EPS's trade secrets disclosed to them.

38.     On or about July 26, 2004, Maxim, on behalf of S2K, also executed a Cross Purchase Agreement, made "Exhibit B" to the aforementioned Shareholder Agreement.

39.     A true and correct copy of the said Cross Purchase Agreement appears at "Exhibit D", attached hereto and incorporated herein by reference.

40.     The Cross Purchase Agreement required S2K to sell its shares of East Point Systems, Inc., upon written request of Thomas Margarido, Jason Margarido, and Paul Taff.

41.     Maxim and S2K were represented by independent counsel in the negotiation and execution of all Agreements referenced above.

42.     In addition to shares of East Point Systems, Inc., Maxim received a free, renewable, license to use EPS's Field-Comm.net software for the exclusive use of MEI.

43.    The value of such license over the years that MEI used the software exceeded $150,000.00.

44.    In addition, Maxim received EPS's support and labor to address issues about specific functionality of Field-Comm.net for MEI.

45.    Thereafter, Thomas Margarido, President of EPS, spent hours with Maxim providing him with a detailed education about software functionality and Maxim gave Thomas Margarido insight into a mortgage field office's practical use of software to improve functionality.

46.    From early 2005, EPS spent numerous man hours developing and creating specialized functions for Maxim.

47.    Such specialized functions were so specific to Maxim that they  were not incorporated into EPS's primary code development for the general market.

48.    These free licenses and specializations were provided by EPS as a courtesy to Maxim as a stockholder and a trusted Board member.

49.    During the course of S2K's share ownership in EPS, Maxim was provided access to EPS's trade secrets and confidential information, including computer programs, vendor lists, marketing strategies, pricing details, marketing plans, future development plans, and customer lists.

50.    As a shareholder, Maxim, through S2K, had access to EPS's financial records.

51.    From the summer of 2008 through the summer of 2010, Maxim requested copies of EPS's financial documents and continued to participate in the decision making of EPS's Board of Directors.

52.     Each said year, Maxim was re-elected to EPS's board of directors and Maxim accepted the position without reservation.

53.     During his tenure as a member of the board, Maxim regularly requested and received EPS's financial statements.

54.     As a director, Maxim participated in confidential discussions regarding, among other things, product enhancement, company growth and development plans.

55.     As a director, Maxim was involved in many critical decisions including the issuing of new shares and discussions on share pricing.


### C. Maxim Lays the Groundwork for Abuse

56.     In or about the spring of 2008, EPS hired a business analyst, Alex Bardzilauskus, to evaluate Maxim's business as a model customer toward improving Field-Comm.net's functionality.

57.     Mr. Bardzilauskus was also retained to create certain macros for EPS's customers.

58.     Mr. Bardzilauskus failed in the macro creation, and his services were ultimately terminated.

59.     Maxim, individually or through S2K, MEI, or MFSS, subsequently hired Mr. Bardzilauskus.

60.     Maxim disclosed the hiring of Mr. Bardzilauskus to EPS as a business analyst for MEI to automate data uploading into manual websites.

61.     In furtherance therof, EPS created special programming in Field-Comm.net for Mr. Barzilauskus to extract data for such automatic uploading.

62.     Mr. Bardzilauskus introduced Maxim to software designer/programmer Edwin Pajemola.

63.     Upon information and belief, Pajemola's prior experience had nothing to do with the creation of mortgage field services software.

64.     In or about 2008, Pajemola was hired by Maxim, individually or through S2K, MEI, or MFSS, to create a "task tracker", a time tracking software application that tracks how long an office employee of one S2K, MEI and/or MFSS took to perform various tasks.

65.     Upon learning of the task tracker, EPS expressed concerns to Maxim about the relationship of this product to Field-Comm.net.

66.     The task tracker was a source of concern to EPS, as it was capable of creating the same product with better integration to its Field-Comm.net software.

67.     Maxim told Thomas Margarido that the application was for use just by his office and offered to sell it to EPS in exchange for more of EPS's stock.

68.     No such sale occurred.

69.     Shortly thereafter, Maxim engaged Pajemola to create a vendor website for all of Maxim's field vendors to send reports and documentation photos.

70.     Field-Comm.net, like the vendor website, also had field data and photo capture technology built into it.

71.     EPS expressed concerned that Maxim might be developing a competing product.

72.     Again, Maxim told EPS that his motive was to provide more functionality to his vendors than Field-Comm.net was providing, and that what he created was for his office's use only, to give him a competitive edge.

73.     In the summer of 2008, Maxim requested access to the confidential back-end of Field-Comm.net, allegedly to create reports specific to his entity known as MEI.

74.     EPS, considering Maxim as a trusted Board member, provided "read only" access to the confidential back-end through a password.

75.     As a condition of access, EPS requested Maxim and Pajemola sign a Software Source Code Access and Indemnification Agreement.

76.     All related documents were agreed to and executed in late 2008 by both Maxim and Pajemola.

77.     A true and correct copy of the Software Source Code Access and Indemnification Agreement executed by Maxim appears at Exhibit E, attached hereto and incorporated herein by reference.

78.     A true and correct copy of the Software Source Code Access and Indemnification Agreement executed by Pajemola appears at Exhibit F, attached hereto and incorporated herein by reference.

79.     In December 2008, Maxim, for himself and MEI, executed a Confidentiality and Non-Competition Agreement, a true and correct copy of which appears at Exhibit M.

80.     In 2009, subsequent to the execution of the Source Code Access and Indemnification Agreements by Maxim and Pajemola, and the December 2008 Confidentiality and Non-Competition Agreement, they were granted access to the confidential back-end of Field-Comm.net.

81.    Upon information and belief, Maxim and/or Pajemola, individually or through entities controlled by them, did access the confidential back-end of Field-Comm.net.

82.    EPS registered the version of  the confidential back-end of Field-Comm.net published to Maxim and Pajemolawith the United States Copyright Office, Registration Number TX 7-608-779, a copy of which registration is annexed hereto and made a part hereof as "Exhibit G".


**D. Maxim and Pajemola's Abuse of Trust is Discovered**

83.    In July 2010, an EPS developer accidentally discovered a website for Cleveland Field Systems, LLC.

84.    CFS was created by Pajemola.

85.    Upon such discovery, EPS contacted Maxim, who advised EPS that Pajemola had decided to go off on his own and start a software company to compete with EPS.

86.    It appeared that Pajemola had violated his Software Source Code Access and Indemnity Agreement with EPS.

87.    Maxim represented to EPS that he would get Pajemola to shut down his website and comply with the agreements.

88.    Upon information and belief, Maxim did endeavor to do obtain such results from Pajemola.

89.    Upon information and belief, Pajemola initially refused to comply with Maxim's endeavor.

90.   A few weeks later, Maxim called Margarido and stated that the CFS website was removed, he had made a deal with Pajemola to hire him as an employee, and the problem would not resurface.

91.   EPS subsequently confirmed that the site was not publicly available.

92.   However, in February 2011, an EPS marketing vendor, posing as a customer, contacted Pajemola because Cleveland Field Systems was still on an active survey list. See, Exhibit H, Affidavit of John and Jennifer Muller.

93.   Upon information and belief, Pajemola answered the call from the vendor and offered to provide the marketing company with a demonstration of his new mortgage field service software.   See, Exhibit H.

94.   Upon information and belief, Pajemola told the marketing company that Maxim Enterprises would perform the demonstration and it would be scheduled on their timeline.  See, Exhibit H.

95.   Upon information and belief, Pajemola stated that Steve Maxim was one of the owners of Cleveland Field Systems. See, Exhibit H.

96.   On or about April 5, 2011, a demonstration was presented via an internet based "webinar" (online seminar), and members of EPS's Board silently observed.   See, Exhibit H.

97.   During the demonstration, Defendant Pajemola described his relationship with Mr. Maxim, spoke of various deficiencies in EPS's software, specifically referencing "Field-Comm", and marketed the web based system he claimed to have created to replace it. See, Exhibit H.

98.     In the course of the demonstration, Maxim pitched the reports/matrix interface features of his software. See, Exhibit H.

99.     During the demonstration, the vendor was directed to do a "walk through" on MFSS's website. See, Exhibit H.

100.    During the course of this walk through, Mr. Pajemola described various screen shots and tabs indicating they were "the same as East Point's" and described various functions for uploads of photographs and documents and downloads of work orders. See, Exhibit H.

101.    On multiple occasions throughout the demonstration, EPS's Field-Comm.net was presented in a negative light.  See, Exhibit H.

102.    Mr. Maxim explained how to sign up for the product and proceeded to described his various other entities, including Maxim Enterprises.  See, Exhibit H.

103.    Mr. Maxim described Maxim Field Services as the "software" element of his operation. See, Exhibit H.

104.    Maxim concluded this presentation by explaining billing procedures and sending a form contract. See, Exhibit H.

105.    Upon information and belief, Pajemola and Steve Maxim had partnered building this program. See, Exhibit H.

106.    Upon information and belief, a claim of title to the program, named "Field Navigator" is currently held by Maxim Field Services, Inc. See, Exhibit H.

107.    Upon information and belief, through the use of a Subcontractor Software License Agreement Maxim attempted to misrepresent his customers as subcontractors.

108.   Upon information and belief, a significant portion of the Defendants' database architecture and design is copied from Field-Comm.net.

109.   Defendants used the education provided to them by EPS, with access to EPS's database and software products, to build a derivative system from EPS's technology, including its database design.

110.   By virtue of the violation of trust placed in them and access given to them by EPS, Defendants have saved themselves development time and cost, at EPS's expense.

111.   In creating a derivative system, Defendants can take EPS's customers by offering them a seamless transition to their system without a complicated and expensive data conversion.

### E. Maxim Refuses to Sell Back his Shares

112.   In light of this information and in conformity with its By-Laws and Shareholder Agreement, EPS held a shareholders' meeting in May 2011 and voted to remove Maxim as a Director.

113.   EPS's Connecticut Shareholders, Plaintiffs Thomas Margarido, Jason Margarido, and Paul Taff have sought to exercise their rights to buy S2K's shares under the Cross Purchase Agreement.

114.   A valuation by the EPS's accountants valued the S2K interest at $33,000.00, as of April 30, 2011.    See, Exhibit I.

115.   On July 1, 2011, S2K made a shareholder inspection demand in accordance with Conn. Gen. Stat.§ 33-946 and various agreements.

14

116.   On August 4, 2011, S2K's accountant determined the value of its shares to be $57,700.  See, Exhibit J.

117.   On or about September 12, 2011, Plaintiffs Thomas Margarido, Jason Margarido, and Paul Taff, by and through their attorney Michael Kopsick, accepted S2K's valuation and agreed to remit $57,700 to S2K in exchange for the shares.  See, Exhibit K.

118.   S2K has refused to deliver its shares.

119.   Arbitration between Plaintiffs and Defendants Maxim, S2K, MEI, and MFSS pursuant to the agreements between them has been dismissed without prejudice by stipulation in favor of the instant litigation.  See, Exhibit A.

## COUNT I

### (Breach of Contract by Maxim and S2K: Shareholder Agreement)

120.   Plaintiffs restate and reallege paragraphs 1 through 119 as if separately set forth herein.

121.   The Shareholder Agreement, a true and correct copy of which appears at Exhibit L  is a binding contract between Plaintiffs and Defendants Maxim & S2K.

122.   By copying EPS's Field-Comm.net architecture and design for commercial gain, Maxim & S2K violated the Shareholder Agreement

123.   Upon information and belief, Plaintiffs have lost customer revenue as a proximate result of customers utilizing Defendants' derivative software products instead of EPS's Field-Comm.net system.

124.   Such lost revenue is a proximate result of the breach by Maxim and S2K of the Shareholder Agreement.

## COUNT II

### (Breach of Contract by Maxim: Confidentiality and Non-Competition Agreement)

125.  Plaintiffs restate and reallege paragraphs 1 through 119 as if separately set forth herein.

126.  The Confidentiality and Non-Competition Agreement of July 26, 2004, at Exhibit C is a binding contract between EPS and Defendant Maxim.

127.  By copying EPS's Field-Comm.net architecture and design for commercial gain, Maxim violated the Confidentiality and Non-Competition Agreement.

128.  Upon information and belief, EPS has lost customer revenue as a proximate result of customers utilizing Defendants' derivative software products instead of Plaintiff's Field-Comm.net system.

129.  Such lost revenue is a proximate result of the breach by Maxim of the Confidentiality and Non-Competition Agreement.

## COUNT III

### (Breach of Contract by S2K: Confidentiality and Non-Competition Agreement)

130.  Plaintiffs restate and reallege paragraphs 1 through 119 as if separately set forth herein.

131.  The Confidentiality and Non-Competition Agreement of July 26, 2004, at Exhibit B is a binding contract between EPS and Defendant S2K.

132.  By copying EPS's Field-Comm.net architecture and design for commercial gain, S2K violated the Confidentiality and Non-Competition Agreement.

133.   Upon information and belief, EPS has lost customer revenue as a proximate result of customers utilizing Defendants' derivative software products instead of EPS's Field-Comm.net system.

134.   Such lost revenue is a proximate result of the breach by S2K of the Confidentiality and Non-Competition Agreement.

## COUNT IV

## (Breach of Contract by Maxim and MEI: Confidentiality and Non-Competition Agreement)

135.   Plaintiffs restate and reallege paragraphs 1 through 119 as if separately set forth herein.

136.   The Confidentiality and Non-Competition Agreement of December 2008, at Exhibit M is a binding contract between EPS and Defendants Maxim and MEI.

137.   By copying EPS's Field-Comm.net architecture and design for commercial gain, Maxim and MEI violated the Confidentiality and Non-Competition Agreement.

138.   Upon information and belief, EPS has lost customer revenue as a proximate result of customers utilizing Defendants' derivative software products instead of EPS's Field-Comm.net system.

139.   Such lost revenue is a proximate result of the breach by Maxim and MEI of the Confidentiality and Non-Competition Agreement.

## COUNT V

## (Breach of Contract by Pajemola and MEI: Source Code Access and Indemnity Agreement)

140.   Plaintiffs restate and reallege paragraphs 1 through 119 as if separately set forth herein.

141.   The Software Source Code Access and Indemnity Agreement executed by Pajemola, at Exhibit F is a binding contract between EPS and Defendants Pajemola and MEI.

142.   By copying EPS's Field-Comm.net architecture and design for commercial gain, Pajemola and MEI violated the Software Source Code Access and Indemnity Agreement.

143.   Pursuant to law and Paragraph 9.0 of the said Software Source Code Access and Indemnity Agreement, EPS holds the entirety of the right, title, and interest in any and all works derivative of Field-Comm.net created by Pajemola and/or MEI.

144.   Pajemola and MEI have failed to execute any documents in order to effectuate EPS's right, title and interest in such derivative works as required by the said Paragraph 9.0.

145.   Upon information and belief, EPS has lost customer revenue as a proximate result of customers, including, but not limited to, Berghorst Enterprises, utilizing Defendants' derivative software products instead of EPS's Field-Comm.net system. See, e.g., Exhibit N, Software License Agreement between CFS and Berghorst Enterprises, November 14, 2011.

146.   Such lost revenue is a proximate result of the breach by Pajemola and MEI of the Software Source Code Access and Indemnity Agreement.

## COUNT VI

### (Breach of Contract by Maxim and MEI: Source Code Access and Indemnity Agreement)

147.   Plaintiffs restate and reallege paragraphs 1 through 119 as if separately set forth herein.

148.   The Software Source Code Access and Indemnity Agreement executed by Maxim, at Exhibit E is a binding contract between EPS and Defendants Maxim and MEI.

149.   By copying EPS's Field-Comm.net architecture and design for commercial gain, Maxim and MEI violated the Software Source Code Access and Indemnity Agreement.

150.   Pursuant to law and Paragraph 9.0 of the said Software SourceCode Access and Indemnity Agreement, EPS holds the entirety of the right, title, and interest in any and all works derivative of Field-Comm.net created by Maxim and/or MEI.

151.   Maxim and MEI have failed to execute any documents in order to effectuate EPS's right, title and interest in such derivative works as required by the said Paragraph 9.0.

152.   Upon information and belief, EPS has lost customer revenue as a proximate result of customers utilizing Defendants' derivative software products instead of EPS's Field-Comm.net system.

153.   Such lost revenue is a proximate result of the breach by Maxim and MEI of the Software Source Code Access and Indemnity Agreement.

## COUNT VII

### (Breach of Statutory Fiduciary Duties by Maxim and S2K)

154.   Plaintiffs restate and reallege paragraphs 1 through 119 as if separately set forth herein.

155.   Maxim, on behalf of S2K, acted as a member of EPS's Board of Directors.

156.   Pursuant to Conn.Gen.Stat § 33-756, Maxim and S2K had a duty to Plaintiffs to act in good faith, with ordinarily prudent care, in a manner believed to be in the best interest of Plaintiffs.

157.   By creating or suborning the creation of a derivative version of EPS's software, Maxim and S2K breached their duty to Plaintiffs.

158.   By marketing a competing software package to third parties, Maxim and S2K breached their duty to Plaintiffs.

159.   Upon information and belief, such breaches resulted in monetary damage and loss to Plaintiffs.

## COUNT VIII

### (Breach of Common Law Fiduciary Duties by Maxim and S2K)

160.   Plaintiffs restate and reallege paragraphs 1 through 119 as if separately set forth herein.

161.   Maxim, on behalf of S2K, acted as a member of EPS's Board of Directors.

162.   Maxim and S2K had a duty of loyalty to Plaintiffs, with an obligation to act in Plaintiffs' best interest and in good faith in matters relating to EPS.

163.   By creating or suborning the creation of a derivative version of EPS's software, Maxim and S2K breached their duty to Plaintiffs.

20

164.   By marketing a competing software package to third parties, Maxim and S2K breached their duty to Plaintiffs.

165.   Upon information and belief, such breaches resulted in monetary damage and loss to Plaintiffs.

### COUNT IX

### (Breach of Contract by S2K: Specific Performance of Cross-Purchase Agreement)

166.   Plaintiffs restate and reallege paragraphs 1 through 119 as if separately set forth herein.

167.   The Cross Purchase Agreement executed by Maxim for S2K, at Exhibit D is a binding contract between Plaintiffs Thomas Margarido, Jason Margarido, and Paul Taff, and Defendant S2K.

168.   Pursuant to section 4.B. of the Cross Purchase Agreement, S2K was required to sell its shares of EPS to Plaintiffs Thomas Margarido, Jason Margarido and Paul Taff upon their request.

169.   Defendant S2K, per the Cross Purchase Agreement, commissioned an appraisal of its shares.

170.   Plaintiffs Thomas Margarido, Jason Margarido and Paul Taff accepted the appraised price without condition and communicated their willingness to close.

171.   S2K has refused such purchase and failed to deliver its shares of EPS to Plaintiffs Thomas Margarido, Jason Margarido, and Paul Taff.

172.   Such refusal and failure constitutes a breach of the cross-purchase agreement.

173.   Due to the unique and special nature of the shares, monetary damages are an inappropriate remedy for breach of the cross-purchase agreement.

174.   Defendant S2K must be compelled to specifically perform the cross-purchase agreement and sell and deliver its shares of EPS to Plaintiffs Thomas Margarido, Jason Margarido and Paul Taff upon the agreed terms.


## COUNT X

### (Tortious interference with Business Expectancy)

175.   Plaintiffs incorporate and reallege paragraphs 1-119 as if fully restated herein.

176.   EPS maintains numerous business relationships with clients and prospects, including, but not limited to, Berghorst Enterprises, A & M Recovery Services, and their contractors and subcontractors.

177.   During and after Defendants obtained access to EPS's program and source code, Defendants interfered with business relationships of EPS and potential future contracts and business opportunities of EPS with, but not limited to, Berghorst Enterprises, A & M Recovery Services, and their contractors and subcontractors.

178.   Defendants intentionally interfered with the business relationships of EPS while knowing of the relationships.

179.   Upon information and belief, Defendants misrepresented to the said clients and prospects ownership of a competing software package to EPS's software.

180.   At all relevant times, such competing software was actually a derivative and infringing work to which Defendants had no rights.

181.   Based upon such misrepresentations, the said clients and prospects availed themselves of Defendants' services in lieu of EPS's services.

182.   Defendants had no justification to interfere with the business relationships of EPS, and did so with an improper motive or purpose and by improper means.

183.   Plaintiff estimates that the loss of revenue from, *inter alia,* Berghorst Enterprises, A & M Recovery Services, and their contractors and subcontractors due to Defendants' interference exceeds $211,709.12

184.   As a direct and proximate result of the interference, EPS has sustained actual loss and damages.

## COUNT XI

### (Connecticut Uniform Trade Secrets Act)

185.   Plaintiffs incorporate and reallege paragraphs 1-119 as if fully restated herein.

186.   Plaintiffs confidentially developed EPS's program and source code through substantial business efforts over the years.

187.    Plaintiffs have invested significant money, time, and resources in developing and maintaining confidential information.

188.   Such program and source code generates independent economic value from not being known to others who could obtain value from its disclosure.

189.   If it were known to others, its methods could be easily duplicated and EPS would be unable to sell the use of the compiled program to its clients.

190.   Plaintiffs have taken reasonable measures in the circumstances to protect such confidential and proprietary information.

191.   The information and data was not generally known and available to the public or anyone outside those permitted access by Plaintiffs.

192.   Defendants discovered or obtained such information and data through Maxim and Pajemola, each of whom had a duty to keep such information confidential and or to limit its use for benefit of Plaintiffs.

193.   Defendants used Plaintiffs' confidential and proprietary trade secrets to compete with EPS, including usurping opportunities and soliciting clients and prospects of EPS.

194.   Such use is a violation of the provisions of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §§ 35-50, et seq.

195.   Plaintiffs have suffered irreparable harm and money damages as a direct and proximate result of Defendants' misappropriation of trade secrets.

196.   In consequence of such harm, Plaintiffs are entitled to an injunction to prevent the continued improper use of its trade secrets, per Conn.Gen.Stat. § 35-52.

197.   Plaintiffs are further entitled to recover the monetary damages incurred in consequence of the Defendants' misappropriation of its trade secrets, including actual loss and unjust enrichment caused by misappropriation that is not taken into account in computer damages for actual loss per Conn.Gen.Stat. § 35-53(a).

198.    Plaintiffs may further recover an award of punitive damages of twice the monetary damages awarded, as well as reasonable attorneys' fees, per Conn.Gen.Stat. § 35-53(b).

### COUNT XII

### (Action for Computer-Related Offense)

199.   Plaintiffs incorporate and reallege paragraphs 1-119 as if fully restated herein.

200.   Plaintiffs developed their confidential program and source code through substantial business efforts over the years.

201.   Plaintiffs have invested significant money, time, and resources in developing and maintaining this confidential information.

202.   Such program and source code generates independent economic value from not being known to others who could obtain value from its disclosure.

203.   If it were known to others, its methods could be easily duplicated and EPS would be unable to sell the use of the compiled program to its clients.

204.   Plaintiffs have taken reasonable measures in the circumstances to protect its confidential and proprietary information.

205.   The information and data was not generally known and available to the public or anyone outside those permitted access by Plaintiffs.

206.   Defendants discovered or obtained such information and data through Maxim and Pajemola, each of whom had a duty to keep such information confidential and or to limit its use for benefit of Plaintiffs.

207.   Defendants, through Maxim's and Pajemola's access to EPS's computer system, have misused computer system information by intentionally making an unauthorized use, disclosure and copy of the data in EPS's computer system, within the meaning of Conn.Gen.Stat. § 53a-251(e)(1).

208.   Defendants, through Maxim's and Pajemola's access to EPS's computer system, have misused computer system information by knowingly receiving and retaining EPS's data, within the meaning of Conn.Gen.Stat. § 53a-251(e)(3).

209.   Defendants, through Maxim's and Pajemola's access to EPS's computer system, have misused computer system information by knowingly using and disclosing EPS's data, within the meaning of Conn.Gen.Stat. § 53a-251(e)(4).

210.   Such conduct by Defendants was willful and malicious.

211.   Plaintiffs have suffered irreparable harm and money damages as a direct and proximate result of Defendants' misuse of its computer system information.

212.   In consequence of such harm, Plaintiffs are entitled to an injunction to prevent the continued improper use of its information per Conn.Gen.Stat. § 52-570b(a) & (b).

213.   Plaintiffs are further entitled to recover the monetary damages incurred in consequence of the Defendants' misuse of its computer system information, including restitution, actual damages, and damages for unjust enrichment not taken into account in computing damages for actual loss, per Conn.Gen.Stat. § 52-570b(c).

214.   Due to the willful and malicious conduct of Defendants, Plaintiffs are entitled to treble damages per Conn.Gen.Stat. § 52-570b(c).

215.   Plaintiffs are entitled to recover reasonable costs and attorneys' fees, per Conn.Gen.Stat. § 52-570b(e)


## COUNT XIII

### (Connecticut Unfair Trade Practices Act)

216.   Plaintiffs incorporate and reallege paragraphs 1-119 as if fully restated herein.

217.   Plaintiffs developed their confidential program and source code through substantial business efforts over the years.

218.   Plaintiffs have invested significant money, time, and resources in developing and maintaining this confidential information.

219.   Such program and source code generates independent economic value from not being known to others who could obtain value from its disclosure.

220.    If it were known to others, its methods could be easily duplicated and EPS would be unable to sell the use of the compiled program to its clients.

221.    Plaintiffs have taken reasonable measures in the circumstances to protect its confidential and proprietary information.

222.    The information and data was not generally known and available to the public or anyone outside those permitted access by Plaintiffs.

223.    Defendants discovered or obtained such information and data through Maxim and Pajemola, each of whom had a duty to keep such information confidential and or to limit its use for benefit of Plaintiffs.

224.    Maxim, individually and as a duly authorized officer of S2K, had a duty not to directly compete with EPS based on the status of being a member of EPS's board of directors.

225.    The actions of Maxim, individually and as a duly authorized officer of S2K, MEI, MFS, & CFS were carried out in the conduct of business(es) in the field of field services for the mortgage industry intended to and do operate in direct competition with EPS.

226.    The actions of Pajemola, individually and as a duly authorized officer of CFS, and employ of Maxim and/or S2K, were carried out in the conduct of his separate business(es) in the field of field services for the mortgage industry intended to and do operate in direct competition with EPS.

227.    Such actions by Defendants constitute unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade and commerce.

228.    Such actions by Defendants violated the Conn.Gen.Stat. § 42-110b(a).

229.   The actions of Defendants were done with a reckless indifference to the rights of Plaintiffs or were an intentional and wanton violation of those rights.

230.   The actions of Defendants caused and will continue to cause Plaintiffs to suffer an ascertainable loss of money and have also negatively affected EPS's proprietary rights and interests in its products, name and goodwill.

231.   In consequence of such harm, Plaintiffs are entitled to an injunction to prevent the continued unfair trade practices per Conn.Gen.Stat. § 42-110g(a).

232.   Plaintiffs are further entitled to recover the monetary damages it incurred in consequence of the Defendants' unfair trade practices, per Conn.Gen.Stat. § 42-110g(a).

233.   Plaintiffs are entitled to recover punitive damages, per Conn.Gen.Stat. § 42-110g(a).

234.   Plaintiffs are entitled to recover reasonable costs and attorneys' fees, per Conn.Gen.Stat. § 42-110g(d).


**COUNT XIV**

**(Copyright Infringement)**

235.   Plaintiffs incorporate and reallege paragraphs 1-119 as if fully restated herein.

236.   EPS is the author of the Field-Comm.net software (hereinafter "the work").

237.   EPS holds a registered copyright in the Field-Comm.net software.  See, Exhibit G.

238.   EPS complied in all respects with the requirements of the Copyright Act and received from the Register of Copyrights a Certificate of Registration bearing the number(s): TX 7-603-779

239.   EPS's copyright in such work is valid.

240.   EPS is the current owner of the copyright in such work.

241.   Upon information and belief, Defendants have created derivative works using a substantial portion of the work without authorization or permission from EPS.

242.   Upon information and belief, Defendants have used the work for commercial gain without the consent of EPS.

243.   Such creation and use constitutes willful infringement of EPS's copyright in the work within the meaning of 17 U.S.C. § 504(c)(2).

244.   Such creation and use does not constitute fair use of the work where the purpose is of a commercial nature.

245.   Upon information and belief, EPS has suffered damages as a result of Defendants' actions.

246.   Each act of infringement constitutes a separate base for statutory damages under 17 U.S.C. § 504.

247.   EPS seeks to recover its damages and the profits earned by Defendants arising from the copyright infringement.

248.   EPS seeks to permanently enjoin Defendants from infringing EPS's copyright in the work and that the work, including all derivative works, be impounded from Defendants.

## COUNT XV

### (Constructive Trust)

249.   Plaintiffs incorporate and reallege paragraphs 1-119 as if fully restated herein.

250.   Upon information and belief Defendants are in possession of property, revenue, and proceeds derived from their access to EPS's program and source code of which EPS is the beneficial owner.

251.   EPS provided access to the program to Defendants with the intent to benefit EPS's business and customers.

252.   Instead of using the property to benefit EPS's business and customers, Defendants retained the property and provided wrongful access to it to the other Defendants.

253.   Defendants have wrongfully failed to use the property to the benefit of Plaintiff's customers and to return the property to its rightful owner.

254.   By virtue of their wrongful acts, Defendants should not in equity and good conscience have obtained nor continue to hold and enjoy said property, revenue or proceeds.

255.   One or more of the Defendants have been unjustly enriched.

256.   By virtue of their wrongful acts, Defendants hold title to the said property in constructive trust for EPS.

Wherefore, Plaintiffs respectfully request this Honorable Court order as follows:

(a) Compensatory Damages;

(b) Treble Damages;

(c) Statutory Damages;

(d) Punitive Damages;

(e) Attorneys' Fees and Costs;

(f) Interest;

(g) An order of specific performance requiring S2K, Inc. to sell its shares of Plaintiff East Point Systems, Inc., to Plaintiffs Thomas Margarido, Jason Margarido, and Paul Taff, at the previously agreed appraised price;

(h) A temporary and permanent injunction against Defendants from engaging in the marketing, manufacture or sale of software for the mortgage field service industry until a demonstration is made by such Defendants that such marketing, manufacture or sale is of software not derived from EPS's work;

(i) An order establishing a constructive trust for the benefit of EPS over the property, revenue or proceeds held by Defendants derived in whole or part from EPS's work;

(j) A complete and accurate accounting of all sales made and income derived from any competing business operated by or from Defendants Maxim and S2K;

(k) A complete and accurate accounting of all sales made and income derived from Defendants' sale, license or use of EPS's work and/or its derivatives; and

(l) Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed.R.Civ.P. 38(b), Plaintiffs hereby demand a jury trial on any and all claims triable of right by a jury, as well as any defenses and counterclaims that may be filed.


Date:      February 15, 2013

Respectfully submitted,
PLAINTIFFS EAST POINT SYSTEMS,
INC., THOMAS MARGARIDO, JASON
MARGARIDO, & PAUL TAFF,

By:
Jay M. Wolman, ct29129
Bruce H. Raymond ct04981
Raymond Law Group LLC
90 National Drive, Suite 3
Glastonbury, CT 06033
P: 860-633-0580
F: 860-633-0438
wolman@raymondlawgroup.com
raymond@raymondlawgroup.com


Michael J. Kopsick, ct03656
Kahan, Kerensky & Capossela, LLP
45 Hartford Turnpike
Vernon, CT 06066
P: 860-487-1744
F: 860-647-8302
mkopsick@kkc-law.com

Their Attorneys

## **VERIFICATION**

I, Thomas Margarido, as President of East Point System, Inc., hereby verify that the

foregoing Complaint is true and correct to the best of my knowledge and belief.

_____
Thomas Margarido, President
For East Point Systems, Inc.

Subscribed & Sworn to before me
this ___ day of February 2013

_____
Commissioner of the Superior Court
Notary Public
My commission expires:

ALEXANDRA S. THOMPSON
NOTARY PUBLIC
STATE OF CONNECTICUT
My Commission Expires Aug. 31, 2013

## **VERIFICATION**

I, Thomas Margarido, individually, hereby verify that the foregoing Complaint is true and

correct to the best of my knowledge and belief.

_____
Thomas Margarido, individually

Subscribed & Sworn to before me
this ___ day of February 2013

_____
Commissioner of the Superior Court
Notary Public
My commission expires:

ALEXANDRA S. THOMPSON
NOTARY PUBLIC
STATE OF CONNECTICUT
My Commission Expires Aug. 31, 2013

## **VERIFICATION**

I, Jason Margarido, individually, hereby verify that the foregoing Complaint is true and correct to the best of my knowledge and belief.

_____
Jason Margarido, individually

Subscribed & Sworn to before me
this 15 day of February 2013

_____
Commissioner of the Superior Court
Notary Public
My commission expires:

ALEXANDRA S. THOMPSON
NOTARY PUBLIC
STATE OF CONNECTICUT
My Commission Expires Aug. 31, 2013

## **VERIFICATION**

I, Paul Taff, individually, hereby verify that the foregoing Complaint is true and correct to the best of my knowledge and belief.

_____
Paul Taff, individually

Subscribed & Sworn to before me
this 15 day of February 2013

_____
Commissioner of the Superior Court
Notary Public
My commission expires:

ALEXANDRA S. THOMPSON
NOTARY PUBLIC
STATE OF CONNECTICUT
My Commission Expires Aug. 31, 2013