UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

EAST POINT SYSTEMS, INC., et al.,    :
    Plaintiffs,    :    CIVIL ACTION NO.
        :    3:13-cv-00215 (VLB)
v.    :
        :
STEVEN MAXIM, et al.,    :    February 7, 2014
    Defendants.    :

MEMORANDUM OF DECISION GRANTING IN PART
PLAINTIFFS' MOTION TO DISMISS [Dkt. #29]

I.    Introduction

The Plaintiffs, East Point Systems, Inc. ("EPS"), Thomas Margarido, Jason Margarido, and Paul Taff, bring this action against Defendants, Steven Maxim, S2K, Inc. ("S2K"), Maxim Enterprises, Inc. ("MEI"), Maxim Field Service Supply, Inc. ("MFSS"), Edwin Pajemola, and Cleveland Field Systems, LLC ("CFS") for breach of contract, statutory and common law breach of fiduciary duty, specific performance, tortious interference with business expectancy, violations of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §§ 35-50, *et seq.* ("CUTSA"), violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 53a-251 ("CUTPA"), copyright infringement pursuant to 17 U.S.C. § 501, and for the imposition of a constructive trust.  The Defendants, Maxim, S2K, MEI, and MFSS (collectively, the "Maxim Defendants" or "Maxim Entities") counterclaimed for breach of contract, fraud, *quantum meruit*, accounting, specific performance, violations of CUTPA, rescission or reformation, punitive

1

damages, injunction, and declaratory judgment.  The Plaintiffs have moved to dismiss all of these counterclaims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  For the reasons that follow, the motion is GRANTED without prejudice.

## II.    Background

The following allegations are taken from the Counterclaim.  [Dkt. #22, Answer of Maxim Entities, Counterclaim and Cross-claim].  MEI is and has been in the property preservation business as an Ohio corporation since April 29, 1999.  [*Id.* at ¶ 275].  S2K is in the business of importing and selling various hardware, including locks, to companies in the property preservation industry.  [*Id.*].  Maxim is the sole shareholder of MEI and owns 91% of the shares in S2K.  [*Id.*].  MEI and numerous other property preservation companies work with clients who have homes in foreclosure that must be maintained.  [*Id.* at ¶ 276].  The maintenance and repairs are generally accomplished through the use of subcontractors.  [*Id.*].

The property preservation business has been driven and has developed its ability to meet the needs of its clients by the use of specialized property preservation software.  [*Id.* at ¶ 278].  The specialized property preservation software allows the client to post information concerning the job that is to be done in the Maxim Entities' system and allows the subcontractor to pull that information and bid on the work.  [*Id.*].  The client, typically a bank, accepts or rejects the bid and provides the time frames in which the work is to be accomplished.  [*Id.*].  Utilizing this software, the contractor performs the work,

generates invoices, and provides pictures before the work commences and after the project is completed. [*Id.* at ¶ 280]. The invoice is then reviewed by the client, entered for payment, and tracked, all in the same software. [*Id.*]. If the work was performed and invoiced timely and satisfactorily, the client pays MEI, and MEI pays the subcontractors, withholding a portion of the payment for its services. [*Id.* at ¶ 281].

Maxim attended a California trade show and met the Plaintiff, Thomas Margarido, president of EPS's predecessor, and ultimately ended up buying a property preservation program from the predecessor entity (hereinafter "Old EPS"). [*Id.* at ¶ 282]. However, Maxim discovered that the program did not perform as promised and contacted Thomas Margarido regarding this issue. [*Id.*]. Thomas Margarido advised that he would need $250,000 to further develop the software that Maxim wanted and that without the investment, his company, Old EPS, would fail. [*Id.* at ¶ 283].

Accordingly, Maxim caused S2K to purchase approximately six percent of EPS's initial stock offering for $250,000. [*Id.* at ¶ 284]. The rest of the stock was purchased by Old EPS's shareholders (hereinafter the "Connecticut Shareholders"). [*Id.*]. The Connecticut Shareholders formed EPS, after which both S2K and Maxim, individually, signed the purported non-compete agreements with EPS. [*Id.* at ¶ 285].

EPS was allegedly not able to produce a computer-based software system that could satisfactorily perform tasks necessary to the property preservation

3

industry.  [*Id.* at ¶ 286].  The EPS software frequently failed and, ultimately, cost the Maxim Entities their contracts with various clients.  [*Id.* at ¶ 287].  The Maxim Entities also lost various subcontractors because the information provided by EPS's computer software system was not up-to-date or was otherwise not workable.  [*Id.*].  Due to the failure of the EPS computer software system, the Maxim Entities overpaid subcontractors in one pay period alone, approximately, $100,000, most of which was not recovered.  [*Id.* at ¶ 288].

In 2007, Maxim approached Thomas Margarido and shared with him ideas concerning a software system that Maxim could develop in-house that would resolve EPS's shortfalls.  [*Id.* at ¶ 289].  Thomas Margarido confirmed that the Maxim Entities should proceed on their own and provided the name of a potential software expert to be hired, Mr. Alex Bardzilauskus.  [*Id.* at ¶ 290].  After spending two to three years of time and approximately $500,000, the Maxim Entities have developed a software system that meets the needs of the property preservation industry and is successfully being used internally at MEI.  [*Id.* at ¶ 291].

The software developed by Maxim Entities is web-based, while the EPS's computer-based software system is not.  [*Id.* at ¶ 292].  EPS's computer-based software system is not user friendly, and the Maxim Entities' system is cheaper, faster, and more accurate with a much lower failure rate.  [*Id.* at ¶¶ 293, 294].  Thus, it is alleged that the central operating features of Maxim Entities' system are not derived from information obtained from EPS.  [*Id.*].

4

### III.    Legal Standard

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Sarmiento v. United States*, 678 F.3d 147 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (citations omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citations and internal quotation marks omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint.  *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "The plausibility

standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).  The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

Finally, when a party pleads fraud, the alleged fraud must be pled with the particularity required by Rule 9(b).  Fed. R. Civ. Proc. 9(b).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."   In this Circuit, therefore, a complaint based on fraudulent acts must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). "Rule 9(b) [also] provides that '[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally.'  However, to safeguard a

6

defendant's reputation from unsubstantiated charges of wrongdoing or a strike suit, the Second Circuit has instructed that plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.'" *Parola v. Citibank (South Dakota) N.A.*, 894 F. Supp. 2d 188, 200 (D. Conn. 2012 ) (quoting Fed. R. Civ. P. 9(b) and *Gabrielle v. Law Office of Martha Croog*, No. 3:10-cv-1798(WWE), 2012 WL 460264, at *4 (D. Conn. Feb. 9, 2012) (citing *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004))).  "The 'strong inference of fraud' may be established by either alleging facts to show that a defendant had both the motive and opportunity to commit fraud, or facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Parola*, 894 F. Supp. 2d at 200 (D. Conn. 2012) (quoting *Gabrielle*, 2012 WL 460264, at *4 (citing *James F. Canning Agency v. Nationwide Ins. Co. of America*, No. 3:09-cv-1413(MRK), 2010 WL 2698292, at *2 (D. Conn. Mar. 10, 2010))).

### A.  Breach of Contract

The Plaintiffs argue that the Defendants do not sufficiently allege a breach of any contract at issue in this case because none of the allegations in the Counterclaim refer to any specific contractual provisions that were allegedly breached.  [Dkt. #30, Memorandum in Support of Motion to Dismiss Maxim Entities' Counterclaims, p. 6-8].  The Defendants respond by claiming that they have sufficiently alleged that the Plaintiffs have acted in bad faith, which constitutes a breach of contract under Connecticut law because all contracts

7

have an implied duty of good faith.  [Dkt. #51, Maxim Entities' Memorandum in Opposition to Plaintiffs' Motion to Dismiss Counterclaims, p. 7-9].

Neither party disputes that Connecticut law applies to the contracts at issue in this case.  Therefore, this Court will assume without deciding that that is correct and will apply Connecticut law.  The Defendants argue that six different points in their Counterclaim sufficiently plead a claim for breach of contract: (1) "Plaintiffs misrepresented the value of the property they were contributing" to EPS; (2) "Plaintiffs misrepresented that the value of EPS was sufficient to justify S2K's $250,000 investment as being equal to 6% of the stock"; (3) "Plaintiffs misrepresented their ability to create a new computer system"; (4) "Plaintiffs entered into subscription agreements with S2K whereby the Connecticut Shareholders may have their interests in [EPS] purchased through a procedure designed to obtain a far higher price than the interests of S2K"; (5) "Plaintiffs always represented to S2K that the latter would be paid its $250,000 investment in full before other shareholders, and before employees took any raises or bonuses, which representations later proved to be false"; and (6) "Plaintiffs have used the same adhesive buy-sell procedure to force other minority shareholder investors in [EPS] to sell for grossly unfair compensation, far less than the price of their investment."  [Dkt. #51, p. 7-8].  The Defendants argue that each of these points is sufficient to show that the Plaintiffs breached the implied duty of good faith and fair dealing.  [*Id.*].

The Defendants are correct that under Connecticut law a "duty of good faith and fair dealing is implied into every contractual relationship, and it requires that neither party do anything to injure the other's right to receive the benefits of the contract." *Landry v. Spitz*, 925 A.2d 334, 344 (Conn. App. 2007) (citing *Renaissance Mgmt. Co. v. Conn. Hous. Fin. Auth.*, 915 A.2d 290, 297 (Conn. 2007)).  However, "[t]he covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *Id.*  "To establish that the covenant has been breached, a plaintiff must show that the acts by which a defendant allegedly impeded the plaintiff's right to receive reasonably expected contract benefits were taken in bad faith." *Id.*  Importantly, "the claim [that the covenant has been breached] must be tied to an alleged breach of a specific contract term, often one that allows for discretion on the part of the party alleged to have violated the duty." *Id.* (citations and internal quotation marks omitted); *see also Steiner v. Lewmar, Inc.*, 3:09-cv-1976(DJS), 2013 WL 5755578, at *5 (D. Conn. Oct. 22, 2013) ("The Court notes that a claimed breach of the implied covenant of good faith and fair dealing must be tied to an alleged breach of a specific contract term . . . ." (citations and internal quotation marks omitted)); *Larobina v. Wells Fargo Bank, N.A.*, 3:10-cv-1279(MRK), 2012 WL 1032953, at *4 (D. Conn. Mar. 27, 2012) (the same).

In the Counter-complaint, the Defendants do not cite to any specific provisions of any contract which they allege constituted the basis for the breach of the implied duty of good faith and fair dealing.  Instead, they seem to allege a

nebulous series of misrepresentations that constitute the basis for such relief. These misrepresentations, however, are not tied to any specific term of the contract, but seem to lead to the ultimate conclusion that the Defendants were fraudulently induced into executing the contracts.  This claim is not really one for breach of contract, but really one of fraudulent misrepresentation, which will be discussed later.  Since the Defendants do not allege a breach of a specific contractual provision or tie any of the alleged misrepresentations to provisions that exist in the contracts, they have not fulfilled the requirements under Connecticut law to maintain a claim for breach of the implied duty of good faith. Accordingly, this count is DISMISSED.

### B.  Fraud

The second claim in the Counter-complaint seems to be for fraudulent misrepresentation related to the inducement of the Defendants to execute the shareholder agreement and other related contracts.  [Dkt. #22, ¶¶ 298-304].  The Plaintiffs argue that the Defendants have not pled with sufficient particularity the misrepresentations or omissions that constitute the basis for the fraud-based claims.  [Dkt. #30, p. 8-9].

"A claim for fraudulent misrepresentation requires that: '(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon the false representation to his injury.'"  *Javier v. Deringer-Ney, Inc.*, 578 F. Supp. 2d 368, 374 (D. Conn. 2008)

10

(quoting *Weisman v. Kaspar*, 233 Conn. 531, 539, 661 A.2d 530 (Conn. 1995)). Furthermore, to satisfy the heightened pleading standards of Fed. R. Civ. P. 9(b), as the allegation is based on fraud, "a complaint must 'specify the time, place, speaker, and content of the alleged misrepresentations,' 'explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant[] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.'"  *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013) (quoting *Caputo v. Pfizer, Inc.*, 267 F.3d 101, 191 (2d Cir. 2001)).

Aside from the allegations made as related to the breach of contract claim discussed above, the only other claims relevant to the fraudulent misrepresentation count are that: (1) "the Plaintiffs intentionally and willfully misrepresented the value of the assets of [EPS], [and] the viability of the subject computer software system and the ability of Plaintiffs to write a system to Maxim Entities' satisfaction"; (2) "Plaintiffs intentionally led the Maxim Entities to believe the [EPS] business to be formed was worth a sufficient amount that would make the value of Maxim Entities' investment equal to the [$250,000] paid"; (3) "plaintiffs knew, or had reason to know, that [EPS] was worth nowhere close to an amount sufficient to make the value of Maxim Entities' investment"; and (4) "plaintiffs used the [$250,000] for their own purposes, instead of utilizing the money to advance the business of [EPS]."  [Dkt. #22, ¶¶ 299-304].  These allegations are insufficient as a matter of law to maintain a claim for fraud because they fail to comply with the particularity requirements of Rule 9(b).

11

In *Goudis v. Am. Currency Trading Corp.*, the court held that the defendant's fraud-based allegations did not comply with the rule because the allegations did not specify the date on which the misrepresentations were made, did not specify what was actually said on each date, and did not specify which of the defendants actually made the misrepresentations.  *Goudis v. Am. Currency Trading Corp.*, 233 F. Supp. 2d 330, 333-34 (D. Conn. 2002).  Similarly here, the Defendants have given the content of several material misrepresentations, but failed to identify who actually made the statements, when the statements were made, and to whom they were made.  Without these details, the counterclaims do not comply with Rule 9(b)'s mandate.  *See also Catalano v. Bedford Assocs., Inc.*, 9 F. Supp. 2d 133, 136 (D. Conn. 1998) (granting a motion to dismiss for lack of particularity when the plaintiff's allegations "did not allege who made the alleged misrepresentations on behalf of the Defendant . . . [and] fail[ed] to allege the circumstances under which the statements were made or when and where they were made").

The Defendants argue that their allegations are sufficient under this Court's holding in *Javier v. Deringer-Ney, Inc.*, 578 F. Supp. 2d at 373-74.  In that case, this Court denied a motion to dismiss when a plaintiff's allegations for fraudulent misrepresentation included an allegation that the plaintiff's boss, Mr. Langford, told him "You're doing an excellent job don't worry" in response to a negative written performance evaluation.  *Id.* at 371.  The difference between that complaint and the present one is that the former identified the speaker of the misrepresentation, gave a general time frame when the employment assurance

was given, and specifically alleged the exact content of what was actually said. Here, the Defendants have made conclusory assertions of generalized misrepresentations, but have not provided the dates when any statements were made or the identity of the maker of any specific misrepresentations.  Without this information, the pleadings must fail.

In this Circuit, the pleading parties receive leave to re-plead their claims for fraud in order to comply with Rule 9(b)'s requirements.  *See Goudis*, 233 F. Supp. at 334.  Accordingly, the Defendants must file an amended complaint supporting a claim of fraudulent misrepresentation with the requisite particularity under Rule 9(b) within fourteen (14) days of the date of this order.

### C.  *Quantum Meruit*

The Third count in the Counter-complaint is for *quantum meruit*.  The Defendants claim that "[i]f the court should conclude that Maxim Entities may not fully exploit commercially the computer software system they developed [sic] Maxim Entities are entitled to recover from plaintiffs for the fair value of the asset, in the amount of" $750,000, "on the basis of *quantum meruit* for goods had and received, either in contract implied in-fact or at-law."  [Dkt. #22, ¶ 310].  Based on the Defendants response to the Plaintiffs' motion to dismiss, the Defendants seem to be claiming that the Plaintiffs will be unjustly enriched due to their alleged material and fraudulent misrepresentations inducing the Defendants to execute the shareholder agreement if the Court rules in favor of the Plaintiffs. [Dkt. #51, p. 11-12].  The Plaintiffs argue, in response, that the claim for unjust

13

enrichment is really preempted by copyright law because what the Defendants request is that their expenses for creating the new software be offset should this Court find for the Plaintiffs on the copyright infringement claim.  [Dkt. #30, p. 11-12].

While it is nearly impossible to tell from the pleadings the exact nature of the Defendants' claim, it appears that the Defendants are actually alleging two bases for unjust enrichment.  First, the Defendants allege that the Plaintiffs were unjustly enriched by fraudulently misrepresenting the value of the investment in the shares of EPS stock, causing them to receive an artificially elevated financial investment, and second, that the Plaintiffs will be unjustly enriched if they are to receive damages related to the copyright infringement claim because the Defendants invested money in developing the Maximum Entities' software.  [Dkt. #22, ¶¶ 305-310].

As to the first basis, even though a claim for unjust enrichment or *quantum meruit* need not be based on fraud, here the Defendants' allegations are based on fraudulent misrepresentations.  Accordingly, the pleading requirements of Rule 9(b) apply.  *See Ramapo Land Co., Inc. v. Consol. Rail Corp.*, 918 F. Supp. 123, 128 (S.D.N.Y. 1996) ("This counterclaim is subject to the pleading requirements of Rule 9(b) because Conrail's only alleged basis for the claim that the enrichment was unjust lies in the averment that Ramapo fraudulently induced Conrail to execute the Torne Brook Road Agreement by misrepresenting certain facts upon which Ramapo Land knew Conrail would rely."); *Virginia Sur. Co., Inc. v. Macedo*,

14

No. 08-cv-5586(JAG), 2009 WL 3230909, at *11 (D.N.J. Sept. 30, 2009) ("Plaintiff, however, has failed to plead the underlying fraud, which serves as the basis for its unjust enrichment claim, with particularity, as required by Rule 9(b).""). Accordingly, the Defendants are permitted to re-plead this basis for their unjust enrichment claim because it fails for the reasons discussed above.

As to the second basis, the question of whether the Plaintiffs stand to become unjustly enriched depends solely on whether this Court finds for the Plaintiffs on the copyright infringement claim.  However, the applicable copyright statute already contains a provision related to the calculation of damages that accounts for the Defendants' financial investment.  The statute states that "[i]n establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her *deductible expenses* and the elements of profit attributable to factors other than the copyrighted work."  17 U.S.C. § 504(b) (emphasis added).  The "copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." *Id.*  This statute clearly takes into consideration the claim that the Defendants appear to be making in the count for *quantum meruit* because it allows for the infringer to deduct investment expenses.  Since this copyright statute deals directly with the issue presented in the Counter-complaint, the statute preempts the Defendants' state common law claim.  *See Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 304-05 (2d Cir. 2004), cert. denied, 544 U.S. 949, 125 S.

15

Ct. 1704, 161 L. Ed. 2d 525 (2005) ("The Copyright Act Exclusively governs a claim when: (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106."); *see also Moser Pilon Nelson Architects, LLC v. HNTB Corp.*, No. 05-cv-422(MRK), 2006 WL 2331013, at *10 (D. Conn. Aug. 8, 2006) (finding a claim for unjust enrichment was preempted by the Copyright Act).

Therefore, the Defendants *quantum meruit* or unjust enrichment claim is DISMISSED in so far as it requests relief already provided for in the copyright act, and DISMISSED without prejudice for any claims based on fraud as to the investment in EPS.

### D.  Accounting

The Defendants fourth claim is for an accounting "of the financial affairs of plaintiffs from the date of Maxim Entities' investment through the date of trial." [Dkt. #22, ¶ 312].

An accounting is an equitable remedy defined as "an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due.  An action for an accounting usually invokes the equity powers of the court, and the remedy that is more frequently resorted to [ ] is by way of a suit in equity."  *Mankert v. Elmatco Prods., Inc.*, 854 A.2d 766, 768 (Conn App. 2004); *see*

16

*also Censor v. ASC Techs. of Conn., LLC*, 900 F. Supp. 2d 181, 216-17 (D. Conn. 2012) (quoting the same).  "To support an action of accounting, one of several conditions must exist. There must be a fiduciary relationship, or the existence of a mutual and/or complicated accounts, or a need of discovery, or some other special ground of equitable jurisdiction such as fraud." *Mankert*, 854 A.2d at 769. Here, there was a fiduciary relationship between the Plaintiffs and some of the Defendants because some of the Defendants are board members and minority shareholders in EPS.  *See Pacelle Bros. Transp., Inc. v. Pacelli*, 189 Conn. 401, 407 (Conn. 1983); *see also Datto, Inc. v. Braband*, 856 F. Supp. 2d 354, 375-77 (D. Conn. 2012).  However, "[t]he general rule is that a prior demand by the plaintiff for an accounting and a refusal by the defendant to accounting is a prerequisite to the commencement of an action for an accounting." *Baghdady v. Baghdady*, 3:05-cv-1494(AHN), 2008 WL 4630487, at *9 (D. Conn. Oct. 17, 2008) (quoting *Zuch v. Conn. Bank & Trust Co., Inc.*, 500 A.2d 565, 567 (Conn. App. 1985)). Furthermore, the availability of the equitable remedy is tied to the inadequacy of a legal remedy.  *Datto*, 856 F. Supp. 2d at 375.

There are two issues with the Defendants' claim for an accounting.  First, the complaint does not allege that the Defendants made a request for an accounting that was rejected by the Plaintiffs.  Without the fulfillment of this prerequisite, the claim for an accounting cannot stand.  *See Baghdady*, 2008 WL 4630487, at *9. Second, the Defendants, as minority shareholders, have a right at law to view the corporate records.  *See Datto* 856 F. Supp. 2d at 375-77 ("Braband is a minority shareholder in Datto, entitled to rely on the Connecticut statute allowing for the

inspection of corporate records by shareholders."); *see also Frank v. LoVetere*, 363 F. Supp. 2d 237 (D. Conn. 2005) (applying Conn. Gen. Stat. § 33-946 to a close corporation).  Conn. Gen. Stat. § 33-946(a) provides that "[a] shareholder of a corporation is entitled to inspect and copy, during regular business hours at the corporation's principal office, any of the records of the corporation described in subsection (e) of section 33-945 if he gives the corporation a signed written notice of his demand at least five business days before the date on which he wishes to inspect and copy."  The Defendants have not alleged that they wish to view corporate documents that are not already provided for under Connecticut law or that such records were fraudulently kept.  Accordingly, based on the pleadings, the Defendants have not demonstrated either the ripeness of this claim or that the legal remedy is insufficient to provide for the accounting requested.  The claim for an accounting is DISMISSED.

### E.  Specific Performance

The fifth count in the Counter-complaint is one for specific performance.  The Defendants request that "[i]n the event this court should determine there is no adequate remedy at law available to Maxim Entities, the said defendants demand the subject buy-sell provisions of the documents attached as Exhibits to the complaint be specifically enforced, and that Maxim Entities receive [$750,000] in return for the sale of such shares."  [Dkt. #22, ¶ 318].

"Under the law of Contracts . . . when a contract is breached by the obligee, the obligor may maintain a suit for specific performance of the accord, in addition

18

to any claim for damages for partial breach." *Ackerman v. Sobol Family P'ship, LLP*, 4 A.3d 288, 312 (Conn. 2010) (internal quotation marks and citations omitted).  Here, the Defendants have not alleged a breach of any contract by the obligee, indeed, they have not referenced any specific contract clause at all.  In this claim, it seems that the Defendants seek specific enforcement of the buy-sell provision *should* the Court find for the Plaintiffs.  There is no allegation that the Plaintiffs have refused to comply with the buy-sell provision or even a claim that the Defendants have attempted to enforce that provision.  At most, their claim is only for unjust enrichment if the Plaintiffs prevail.  Clearly, this claim is not ripe for judicial review.  Moreover, the Defendants' request that the Plaintiffs be forced to repurchase the EPS shares for $750,000 does not appear to be based on the terms of any contract.  This Court has not seen, and the Defendants have not cited, any provision in any of the contracts which specifies $750,000 as being the proper repurchase price.  Without sufficient allegations proving that the claim is ripe or supporting that the Defendants' request is based in contract, the Defendants claim for specific performance must be DISMISSED.

### F.  CUTPA

    The Defendants' sixth claim is for violations of CUTPA, which also seem to be grounded in two different bases.  First, the Defendants allege that the Plaintiffs violated the statute by fraudulently misrepresenting the value of EPS stock, telling the Defendants that the "Maxim Entities that they would be paid in full for the . . . investment . . . before any other shareholders and before employees took

any raises or bonuses," and misrepresenting the company's ability to create new computer software.  [Dkt. #22, ¶¶ 319-321].  Second, they allege that the Plaintiffs "misused buy-sell agreements such as those alleged by plaintiffs herein as part of a scheme to force minority shareholders to sell at a price far below that which such minority shareholders paid for their interests in [EPS]," but do not impose similar unfair repurchase terms on the Connecticut-based shareholders.  [*Id.* at ¶¶322-325].

The first basis is comprised of the same fraudulent misrepresentation allegations that have been discussed previously in this order.  Since the fraudulent misrepresentation facts have not been pled with sufficient particularity, the CUTPA claim is DISMISSED on that basis without prejudice.  *See Aviamax Aviation Ltd. v. Bombardier Aerospace Corp.*, 3:08-cv-1958(CFD), 2010 WL 1882316, at *9 (D. Conn. May 10, 2010) ("When a plaintiff in federal court bases a CUTPA claim on fraud allegations, the plaintiff must satisfy the particularity requirement of Federal Rule of Civil Procedure 9(b)."); *Tatum v. Oberg*, 650 F. Supp. 2d 185, 195 (D. Conn. 2009) ("CUTPA claims brought in federal court only must satisfy Rule 9(b) if such claims are based on fraud allegations."); *Phoenix Home Life Ins. Co. v. Greenwich Acupuncture Ctr., Inc.*, 2:92-cv-782(JAC), 1993 WL 298967, at *3 (D. Conn. July 20, 1993) ("In order to sustain a CUTPA claim based on intentional fraud, the plaintiff must plead fraud with particularity.").

The second basis is comprised of general allegations that the terms of the cross-purchase agreement differ between S2K and the Plaintiffs, to the detriment of the Defendants.  However, the complaint does not allege how or why the terms are unfair, instead the Defendants rely on the conclusory statement that the terms are unfair because they will lead to a diminished repurchase price for S2K's shares.  This outcome is not a fact, but a conclusion.  The Defendants have not alleged any facts showing how or why the terms of the cross-purchase agreement, which appears to have been the result of an arms-length negotiation, would be deceptive or unfair as defined in CUTPA.  Without alleging how the cross-purchase agreement violates CUTPA, the Defendants have not sufficiently pled their CUTPA claim.  Accordingly, the claim is DISMISSED on this ground as well.

### G.  Rescission or Reformation

The Defendants' seventh count is for rescission or reformation of the contract. First, the Defendants allege they "were unaware of the unfair and inequitable provisions contained within the documents attached to the complaint, and the attempted enforcement of the terms as expressed by plaintiffs herein constitutes a surprise," rendering the contracts acts of adhesion.  [Dkt. #22, ¶¶ 328, 329]. Second, the Defendants allege that "the deception of plaintiffs in inducing Maxim Entities to purchase what now appear to be virtually worthless shares in [EPS], combined with Maxim Entities' lack of knowledge of facts that rendered the

purchase inequitable, entitled Maxim Entities to rescission or reformation."  [*Id.* at ¶ 330].

"A cause of action for reformation of contract rests upon the equitable theory that the instrument sought to be reformed does not conform to the real contract agreed upon and does not express the intention of the parties and that it was executed as the result of mutual mistake, or mistake of one party coupled with actual or constructive fraud, or inequitable conduct on the part of the other." *Trenwick Am. Reins. Corp. v. W.R. Berkley Corp.*, 54 A.3d 209, 216 (Conn. App. 2012) (quoting *Greenwich Contracting Co. v. Bonwit Constr. Co.*, 239 A.2d 519, 521 (Conn. 1968)).

As to the claim for reformation, the Defendants have not pled how the contracts at issue are different from what was anticipated.  It appears that the Defendants are alleging that the contracts contained provisions that they had not intended or had provisions that they had not read.  Unfortunately, without pleading the basis for the claim for reformation, meaning the mistakes at issue, it is impossible for this Court to find that the Defendants have sufficiently pled a basis for reformation.  Importantly, there are no allegations that the contracts were forged, and it appears that all of the terms were reviewed by both parties as the contracts were executed by both Plaintiffs and Defendants.  If the basis for the reformation claim is the same fraudulent misrepresentations that have been discussed previously in this order, the claim fails because the allegations do not contain the particularity required by Rule 9(b).

Rescission is different from reformation, even though the Defendants seem to conflate the two.  Rescission is appropriate where a party made "material misrepresentations of fact upon which [the Defendants] had a right to rely and which induced [them] to enter into the contract."  *State v. Hartford Acc. & Indem. Co.*, 70 A.2d 109, 113 (1949).  "As a matter of common law, a party to a contract . . . may rescind that contract and avoid liability thereunder if that party's consent to the contract was procured either by the other party's fraudulent misrepresentations, or by the other party's nonfraudulent [sic] material misrepresentations."  *Munroe v. Great Am. Ins. Co.*, 661 A.2d 581, n.5 (Conn. 1995).  Therefore, the basis for the claim for rescission in this case must be that the Plaintiffs made fraudulent misrepresentations inducing the Defendants to execute the shareholder agreement and other contracts at issue.  However, as before, these fraud-based claims were insufficiently pled pursuant to Rule 9(b).  In *IM Partners v. Debit Direct Ltd.*, the court dismissed a claim for rescission which was based on the same fraudulent misrepresentations previously found to be insufficiently pled under Rule 9(b).  *IM Partners v. Debit Direct Ltd.*, 394 F. Supp. 2d 503, 518-19 (D. Conn. 2005).  Similarly here, the fraudulent misrepresentation allegations were insufficiently pled.  Therefore, this claim is also DISMISSED without prejudice.

### H.  Punitive Damages

The Defendants' eighth count is for punitive damages.  [Dkt. #22, ¶¶ 331-335].
The Plaintiffs have moved to dismiss this count as punitive damages are not an
independent cause of action in Connecticut.  [Dkt. #30, p. 17-18].

A claim for punitive damages "is not a separate count inasmuch as it is a
remedy."  *Supreme Indus., Inc. v. Town of Bloomfield,* No. X03-cv-0340022269,
2007 WL 901805, at *26 (Conn. Super. Ct. Mar. 8, 2007).  "In Connecticut, punitive
damages may be based either on statute or, in the absence of a statutory
provision, common law.  'Punitive damages are a remedy awarded only when the
evidence shows reckless, intentional or wanton violation of the rights of others.'"
*Id.* (quoting *Suffield Dev. Assocs. Ltd. P'ship v. Nat'l Loan Investors, L.P.,* 905
A.2d 1215, 1235 (Conn. App. 2006), cert. denied, 280 Conn. 942, 943 (2006)); *see
also Rose v. City of Waterbury*, 3:12-cv-219(VLB), 2013 WL 1187049, at *10 (D.
Conn. Mar. 21, 2013) (quoting the same).  The Court, therefore, dismisses the
Defendant's independent count for punitive damages, but notes that the
Defendants have included punitive damages as one of the remedies sought.

### I.   Injunction

In the ninth count of the Counter-complaint, it appears that the Defendants
seek an injunction against the Plaintiffs to prevent disclosure of the confidential
information used to develop the Defendants' software.  [Dkt. #22, ¶¶ 336-340].
The Counter-complaint alleges that "Maxim Field Supply has spent substantial

amounts of time and money to develop the programming and engineering of the Field Navigator computer system, in an effort to build a loyal client base, all of which required years of effort in development and $500,000 in development costs, all with the knowledge, approval, and authorization of plaintiffs."  [*Id.* at ¶ 337].

Subsequently, "Maxim Field Supply attempted to test market its system, but halted such efforts when it became aware of plaintiffs' claims of disputed ownership. . . .  Defendants Mr. Pajemola and Cleveland Field Systems, LLC, also claim ownership over the disputed computer system developed at the expense of Maxim Field Supply.  [*Id.* at ¶¶ 338-339].  Finally, the Defendants allege that

> [u]nless defendants Mr. Pajemola, Cleveland Field Systems, LLC, and plaintiffs, and each of them, are enjoined and restrained from using or disclosing, directly or indirectly, Maxim Field Supply Confidential Information [sic] in order to divert customers and profits from Maxim Field Supply to plaintiffs or defendants Mr. Pajemola, Cleveland Field Systems, LLC, during the pendency of this action, and for a period thereafter consistent with the agreements between them, law and equity, Maxim Field Supply will suffer immediate and irreparable injury, including (without limitation) loss of the money it invested in created [sic] the computer-based system, its competitive position in the industry and loss of its customers and potential customers.

[*Id.* at ¶ 340].

Once again, the Court notes that the relief sought, injunctive relief, does "not constitute [a] separate" cause of action."  *Williams v. Walsh*, 558 F.2d 667, 671 (2d Cir. 1977).  Therefore, to the extent that the Defendants are alleging an injunction as a cause of action as opposed to requested relief, the count must be dismissed.  Moreover, the Defendants have not stated clearly for what they are

asking.  It appears that the Defendants want a preliminary injunction against the disclosure of "Maxim Field Supply's confidential information, obtained by Mr. Pajemola while he worked for Maxim Field Supply."  [Dkt. #51, p. 14].  If that is the case, the Defendants' request for an injunction in the Cross-complaint is directed at the wrong parties.  Indeed, there are no allegations that the Plaintiffs ever obtained the private or confidential information for which the Defendants request equitable relief.  On the contrary, the Plaintiffs in this case are alleging that the Defendants violated confidentiality agreements and copyright laws by using the Plaintiffs' proprietary software in developing the Defendants' software.  The argument the Defendants appear to be making is that if the Court rules in favor of the Plaintiffs, then the Defendants would request that the Plaintiffs be enjoined from dispersing confidential information to the public or diverting customers away from the Defendants.  The Court is at a loss as to how this merits a claim for injunctive relief in the Cross-complaint.  Even so, if the Defendants are requesting a preliminary injunction, a motion for that relief must be sought pursuant to Rule 65.

Assuming the that the Defendants' request for injunctive relief was made pursuant to Rule 65, the Defendants have not alleged sufficient facts to establish entitlement to that extraordinary relief.  First, the Defendants do not allege what confidential information was obtained by the Plaintiffs that could cause irreparable injury if disseminated.  And second, the Defendants do not allege or argue that there is no sufficient legal remedy, such as damages, that would redress any potential injury.  *See Forest City Daly Housing, Inc. v. Town of North*

26

*Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) (noting that to prove irreparable harm, a movant must show an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages."); *see also Waterbury Teachers Ass'n v. Freedom of Info. Comm'n*, 645 A.2d 978, 980 (Conn. 1994) (explaining that the four-part test for the issuance of a temporary injunction under Connecticut law involves the following considerations: "(1) the plaintiff ha[s] no adequate legal remedy; (2) the plaintiff would suffer irreparable injury absent [the injunction]; (3) the plaintiff [is] likely to prevail . . . ; and (4) the balance of the equities favor[s the issuance of the injunction]."). Without sufficient facts showing that injunctive relief is warranted against the Plaintiffs, this claim for injunctive relief, or count in the Complaint as it currently stands, must be DISMISSED.

### J. Declaratory Relief

Finally, the Defendants' tenth count is one for declaratory relief. [Dkt. #22, ¶¶ 341-342]. The "Maxim Entities state that the status of the agreements by and among the parties, and the rights and obligations imposed by law and equity are such that the matters require resolution by means of declaratory judgment, in order that ownership of the computer-based software system that is the subject hereof may be established by this court." [*Id.* at ¶ 342]. In arguing this point, the Defendants allege that the Plaintiffs have claimed ownership of the computer-based software system developed by the Defendants.

The Court is again confused as to what the Defendants are requesting.  The Defendants have nowhere cited, and this Court cannot find, any claim of ownership by the Plaintiffs over the software developed by the Defendants.  Instead, the Plaintiffs claim that the Defendants are liable in copyright, tort and contract for developing the software, and further request disgorgement of profits and injunctive relief to prevent future copyright infringement from occurring.  It may be the case that the Cross-plaintiffs are making a claim of ownership, which would require a declaration of rights under the declaratory judgment act, but the Court fails to find any imminent case or controversy with respect to the Plaintiffs over the software's ownership.  Accordingly, the Declaratory Relief request is DISMISSED since the Plaintiffs have not alleged a claim of ownership over the Maxim Entities' software.

Furthermore, to the extent that the ownership of the software is related to the copyright infringement claim, there is no "'clear disassociation' between the claim seeking declaratory relief and the remaining claims that . . . require interpretation of contract."  *Snakepit Auto., Inc. v. Superperformance, Int'l, LLC,* 489 F. Supp. 2d 196, 202 (E.D.N.Y. 2007).  In short, no independent declaration of rights is needed because the rights between the Plaintiffs and Defendants will be completely adjudicated when the Plaintiff's claims are decided.  The independent request for declaratory relief with respect to the Plaintiffs, therefore, is nothing but duplicative of the claims already before this Court.

**IV.      Conclusion**

For the foregoing reasons, Plaintiffs' [Dkt. #29] Motion to Dismiss is

GRANTED without prejudice to the Defendants' right to re-plead with particularity,

as required by the federal rule of civil procedure applicable to their claim, facts

which constitute each of the elements of each cognizable claim they seek to

assert, within fourteen (14) days of the date of this order.

IT IS SO ORDERED.


_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge


**Dated at Hartford, Connecticut: February 7, 2014**