IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

EAST POINT SYSTEMS, INC., et al.      )   CIVIL CASE NO. #3:13-cv-00215-VLB
                                      )
                 Plaintiffs           )
                                      )
vs.                                   )
                                      )
STEVEN MAXIM, et al.                  )
                                      )   FEBRUARY 22, 2014
                 Defendants           )

**ANSWER OF MAXIM ENTITIES AMEND COUNTERCLAIMS AND CROSS-CLAIM**

Now come defendants Steven Maxim (hereinafter "Mr. Maxim"), S2k, Inc. (hereinafter "S2k"), Maxim Enterprises, Inc. (hereinafter "Maxim Enterprises"), and Maxim Field Service Supply, Inc. (hereinafter "Maxim Field Supply") (all of whom sometimes collectively are "Maxim Entities"), through their attorneys, and for their Answer, Counterclaim and Cross-claim state and aver as follows:

1.  Maxim Entities deny, for want of information sufficient to form an opinion or belief, paragraph #1 of the complaint.

2.  Maxim Entities deny, for want of information sufficient to form an opinion or belief, paragraph #2 of the complaint.

3.  Maxim Entities deny, for want of information sufficient to form an opinion or belief, paragraph #3 of the complaint.

4.  Maxim Entities deny, for want of information sufficient to form an opinion or belief, paragraph #4 of the complaint.

5.  Maxim Entities admit paragraph #5 of the complaint

6. **Maxim Entities admit paragraph #6 of the complaint, except to state that the address for S2k is 6726 Wales Avenue, N.W., Massillon, OH 44645.**

7. **Maxim Entities admit paragraph #7 of the complaint, except to state that the address for Maxim Enterprises is 6726 Wales Avenue, N.W., Massillon, OH 44645.**

8. **Maxim Entities admit paragraph #8 of the complaint, except to state that the address for Maxim Field Supply is 6726 Wales Avenue, N.W., Massillon, OH 44645.**

9. **Maxim Entities deny, for want of information sufficient to form an opinion or belief, paragraph #9 of the complaint.**

10. **Maxim Entities deny, for want of information sufficient to form an opinion or belief, paragraph #10 of the complaint.**

11. **Maxim Entities deny paragraph #11 of the complaint, as constituting a legal conclusion to be determined by this court; specifically, but without limiting the generality of the foregoing, Maxim Entities state that a majority of the activities alleged within the complaint took place within the state of Ohio, where an action previously was commenced against the co-defendants herein, Edwin Pajemola and Cleveland Field Systems, LLC, in that action before the Stark County, Ohio, Common Pleas Court, styled <u>Maxim Field Service Supply, Inc. v. Pajemola, et al.</u>, case #2012-CV-03613, which action pre-dates the filing of the complaint in the captioned action, involving the same issues as have been raised herein.**

12. **Maxim Entities deny paragraph #12 of the complaint, as constituting a legal conclusion to be determined by this court; specifically, but without limiting the generality of the foregoing, Maxim Entities state that a majority of the activities alleged within the complaint took place within the state of Ohio, where an action previously was commenced against the co-defendants herein, Edwin Pajemola and Cleveland Field Systems, LLC, in that action before the Stark County, Ohio, Common Pleas Court, styled Maxim Field Service Supply, Inc. v. Pajemola, et al., case #2012-CV-03613, which action pre-dates the filing of the complaint in the captioned action, involving the same issues as have been raised herein.**

13. **Maxim Entities deny paragraph #13 of the complaint, as constituting a legal conclusion to be determined by this court; specifically, but without limiting the generality of the foregoing, Maxim Entities state that a majority of the activities alleged within the complaint took place within the state of Ohio, where an action previously was commenced against the co-defendants herein, Edwin Pajemola and Cleveland Field Systems, LLC, in that action before the Stark County, Ohio, Common Pleas Court, styled Maxim Field Service Supply, Inc. v. Pajemola, et al., case #2012-CV-03613, which action pre-dates the filing of the complaint in the captioned action, involving the same issues as have been raised herein.**

14. **Maxim Entities deny paragraph #14 of the complaint, as constituting a legal conclusion to be determined by this court; specifically, but without limiting the generality of the foregoing, Maxim Entities state that a**

3

majority of the activities alleged within the complaint took place within the state of Ohio, where an action previously was commenced against the co-defendants herein, Edwin Pajemola and Cleveland Field Systems, LLC, in that action before the Stark County, Ohio, Common Pleas Court, styled <u>Maxim Field Service Supply, Inc. v. Pajemola, et al.</u>, case #2012-CV-03613, which action pre-dates the filing of the complaint in the captioned action, involving the same issues as have been raised herein.

15. Maxim Entities deny paragraph #15 of the complaint, as constituting a legal conclusion to be determined by this court; specifically, but without limiting the generality of the foregoing, Maxim Entities state that a majority of the activities alleged within the complaint took place within the state of Ohio, where an action previously was commenced against the co-defendants herein, Edwin Pajemola and Cleveland Field Systems, LLC, in that action before the Stark County, Ohio, Common Pleas Court, styled <u>Maxim Field Service Supply, Inc. v. Pajemola, et al.</u>, case #2012-CV-03613, which action pre-dates the filing of the complaint in the captioned action, involving the same issues as have been raised herein.

16. Relative to paragraph #16 of the complaint, Maxim Entities admit to the authenticity of <u>Exhibit</u> "<u>A</u>" attached thereto, but deny the remaining allegations as constituting a legal conclusion to be determined by this court.

17. Maxim Entities deny, for want of information sufficient to form an opinion or belief, paragraph #17 of the complaint.

4

18. Maxim Entities admit paragraph #18 of the complaint.

19. Maxim Entities deny, for want of information sufficient to form an opinion or belief, paragraph #19 of the complaint.

20. Maxim Entities deny, for want of information sufficient to form an opinion or belief, paragraph #20 of the complaint.

21. Maxim Entities deny, for want of information sufficient to form an opinion or belief, paragraph #21 of the complaint.

22. Regarding paragraph #22 of the complaint, Maxim Entities admit that S2k is an entity owned or controlled by Mr. Maxim, but not by other of the Maxim Entities.

23. Regarding paragraph #23 of the complaint, Maxim Entities admit that Maxim Enterprises is an entity owned or controlled by Mr. Maxim, but not by other of the Maxim Entities.

24. Maxim Enterprises provides property preservation services on behalf of mortgagees, and S2k sells hardware to businesses that service the property preservation industry, but Maxim Entities deny the remainder of the allegations in paragraph #24 of the complaint; specifically, but without limiting the generality of the foregoing, neither Maxim Enterprises nor S2k provide computer-based software systems or related services to field service companies.

25. Maxim Entities deny every allegation contained in paragraph #25 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they

were a customer of East Point Systems, Inc. (hereinafter "East Point"), any related or predecessor companies of East Point, prior to the summer of 2004.

26. Maxim Entities deny, for want of knowledge sufficient to form an opinion or belief, the allegations contained in paragraph #26 of the complaint.

27. Maxim Entities deny every allegation contained in paragraph #27 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that Field-Com.net was the only mortgage field service software in existence at the time Maxim Entities first began their relationship with East Point, any related or predecessor companies.

28. Maxim Entities deny every allegation contained in paragraph #28 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that Mr. Maxim lacked knowledge about software design specific to the mortgage field service industry.

29. Maxim Entities deny every allegation contained in paragraph #29 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that Field-Com.net was the only mortgage field service software in existence at the time Maxim Entities first began their relationship with East Point, any related or predecessor companies.

30. Maxim Entities deny every allegation contained in paragraph #30 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities state it is their understanding that East Point Systems, LLC, went out of business and that East Point was formed as a new entity.

31. Relative to paragraph #31 of the complaint, Maxim Entities admit that S2k was solicited to invest in East Point, and was fraudulently induced to contribute $250,000 in return for an interest as a shareholder and appointment of Mr. Maxim as a board member.

32. Maxim Entities admit paragraph #32 of the complaint.

33. Relative to paragraph #33 of the complaint, S2k was fraudulently induced to contribute $250,000, for which it received shares equal to a 5.8% interest in East Point, and Mr. Maxim was placed on the board of directors.

34. Maxim Entities deny the allegations contained in paragraph #34 of the complaint for want of information sufficient to form an opinion or belief; specifically, but without limiting the generality of the foregoing, while there is a Shareholder Agreement attached to the complaint as <u>Exhibit "L"</u> it is not identified as such within paragraph #34 and Maxim Entities are unsure as to whether plaintiffs are referencing the same document.

35. Maxim Entities admit the authenticity of the document attached as Exhibit "B" to the complaint, as alleged in paragraph #35, but deny its validity as a restrictive covenant against competition.

36. Maxim Entities admit the authenticity of the document attached as Exhibit "C" to the complaint, as alleged in paragraph #36, but deny its validity as a restrictive covenant against competition.

37. Maxim Entities deny the allegations contained in paragraph #37 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that Exhibits "B" or "C" to the complaint are valid restrictive covenants against competition, and further state that East Point allowed and authorized all actions taken by Maxim Entities.

38. Maxim Entities deny the allegations contained in paragraph #38 of the complaint, for want of information sufficient to form an opinion or belief; specifically, but without limiting the generality of the foregoing, while there is a Shareholder Agreement attached to the complaint as <u>Exhibit "L"</u> it is not identified as such within paragraph #38 and Maxim Entities are unsure as to whether plaintiffs are referencing the same document.

39. Maxim Entities admit the authenticity of the document attached as Exhibit "D" to the complaint, as alleged in paragraph #39, but deny its validity.

40. Maxim Entities admit the authenticity of the document attached as Exhibit "D" to the complaint, as referenced in paragraph #40, but deny its validity.

41. Maxim Entities admit paragraph #41 of the complaint.

42. Maxim Entities deny the allegations contained within paragraph #42 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny any inference that Mr. Maxim or S2k received anything "for free", but state they were fraudulently induced to invest $250,000 towards the purchase of shares in East Point through the active solicitation and misrepresentation of plaintiffs.

43. Maxim Entities deny the allegations contained within paragraph #43 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they received value from the use of Field-Comm.net software as the system never was functional.

44. Maxim Entities deny the allegations contained within paragraph #44 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they received value from East Point's labor and support of the Field-Comm.net software as the system never was functional.

45. Maxim Entities deny the allegations contained within paragraph #45 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they received value from Mr. Margarido's services in support of the Field-Comm.net software as the system never was functional but, to the contrary, Maxim Entities state it was Mr. Maxim who spent hours with

9

Mr. Margarido, and others at East Point, attempting to educate them as to what was needed in East Point's field service software system.

46. Maxim Entities deny the allegations contained within paragraph #46 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they received value from East Point's man hours developing and creating specialized functions for the Field-Comm.net software as the system never was functional.

47. Maxim Entities deny the allegations contained within paragraph #47 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they received value from East Point's man hours developing and creating specialized functions for the Field-Comm.net software as the system never was functional but, to the contrary, Maxim Field Systems had to hire a specialist to make said system functional.

48. Maxim Entities deny the allegations contained within paragraph #48 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they received value from use or "specializations" of the Field-Comm.net software as the system never was functional, which resulted in damages and lost revenues to Maxim Entities because of design failures that never were cured.

49. Maxim Entities deny the allegations contained within paragraph #49 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny they used any confidential information of East Point that either possessed commercial value or that was not already known either to Maxim Entities or the public in general, and any information used, even if confidential, was authorized by plaintiffs.

50. Because he is a director of East Point, Mr. Maxim admits he was entitled to access to some of East Point's records, as alleged within paragraph #50 of the complaint, but denies that he ever has been granted access to all East Point's financial records or to accurate financial records, irrespective of his demands.

51. Regarding paragraph #51 of the complaint, because he was a director of East Point, Mr. Maxim admits he attempted to participate in its management but denies that he ever has been granted access to all East Point's financial records or to accurate financial records, which prevented his efforts to be involved in management of the business.

52. Mr. Maxim admits he was re-elected to the Board of Directors, as alleged within paragraph #52 of the complaint, but denies that his participation was "without reservation," or that he was involved in management.

53. Relative to paragraph #53 of the complaint, because he was a director of East Point, Mr. Maxim admits he participated in the business of the

board of directors but denies that he ever has been granted access to all East Point's financial records or to accurate financial records.

54. Relative to paragraph #54 of the complaint, because he was a director of East Point, Mr. Maxim admits he participated on the board of directors but denies that he ever was made privy to all information regarding product enhancement, company growth and development plans; specifically, but without limiting the generality of the foregoing, Mr. Maxim states important information was withheld from him as part of defendants' scheme to defraud S2k out of $250,000.

55. Relative to paragraph #55 of the complaint, because he was a director of East Point, Mr. Maxim admits he participated on the board of directors but denies that he ever was allowed to participate fully in decisions involving the company; specifically, but without limiting the generality of the foregoing, Mr. Maxim states that he was prohibited from participating in such decisions as part of defendants' scheme to defraud S2k out of $250,000.

56. Maxim Entities admit that East Point hired Mr. Bardzilauskus, as alleged within paragraph #56 of the complaint, but deny that his services were of any value; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they received value from use of the Field-Comm.net software as the system never was functional, which resulted in damages and lost revenues to Maxim Enterprises because of design failures that never were cured.

57. Maxim Entities admit that East Point hired Mr. Bardzilauskus, as alleged within paragraph #57 of the complaint, but deny for want of information sufficient to form an opinion or belief what all Mr. Bardzilauskus was hired to do; further, Maxim Entities specifically deny that they received value from use of the Field-Comm.net software as the system never was functional, which resulted in damages and lost revenues to Maxim Entities because of design failures that never were cured.

58. Relative to paragraph #58 of the complaint, Maxim Entities deny for want of information sufficient to form an opinion or belief knowledge as to the reason why Mr. Bardzilauskus services with East Point were terminated, but deny that his services were of any value to Maxim Entities; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they received value from use of the Field-Comm.net software as the system never was functional, which resulted in damages and lost revenues to Maxim Entities because of design failures that never were cured.

59. Maxim Entities admit that Maxim Enterprises hired Mr. Bardzilauskus, but deny the remainder of paragraph #59 of the complaint.

60. Maxim Entities admit paragraph #60 of the complaint, and state that Mr. Bardzilauskus was recommended and authorized by East Point for this function.

61. Maxim Entities deny, for want of information sufficient to form an opinion or belief, the allegations contained in paragraph #61 of the complaint.

62. Maxim Entities admit paragraph #62 of the complaint.

63. Maxim Entities admit paragraph #63 of the complaint.

64. Maxim Entities admit that Maxim Enterprises hired Mr. Pajemola to develop "task tracker", and other items needed to operate its software system, all with the knowledge and approval of plaintiffs, but deny the remainder of paragraph #64 of the complaint.

65. Maxim Entities deny the allegations contained in paragraph #65 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they took any action to develop software specific to its needs without first informing and obtaining the consent of East Point.

66. Maxim Entities deny the allegations contained in paragraph #66 of the complaint, and each allegation separately, in that it took no action to develop software specific to its needs without first informing and obtaining the consent of East Point; specifically, but without limitation, Maxim Entities notified and obtained the approval of East Point of the need for system development because of the failure of the Field-Comm.net software.

67. Maxim Entities deny the allegations contained in paragraph #67 of the complaint, and each allegation separately, in that they took no action to

develop software specific to their needs without first informing and obtaining the consent of East Point; specifically, but without limitation, Maxim Entities notified and obtained the approval of East Point of the need for system development required due to the failure of the Field-Comm.net software, and offered to sell to East Point upon terms that were to be forthcoming.

68. Maxim Entities admit paragraph #68 of the complaint.

69. Maxim Entities admit paragraph #69 of the complaint.

70. Maxim Entities admit that both their system and Field-Comm.net purportedly contained features in common, but deny the remainder of the allegations contained in paragraph #70 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that the Field-Comm.net system contained technology that was not known to other software providers within the industry, which already was being used by other vendors of such systems, and deny that Field-Comm.net ever worked satisfactorily in spite of Maxim Entities' investment of $250,000 and considerable time, expense and lost revenue.

71. Maxim Entities deny the allegations contained in paragraph #71 of the complaint, and each allegation separately, in that they took no action to develop software specific to their needs without first informing and obtaining the consent of East Point; specifically, but without limitation, Maxim Entities notified and obtained the approval of East Point of the

need for system development required due to the failure of the Field-Comm.net software, and advised that the product it was developing worked for Maxim Enterprises, where Field-Comm.net did not.

72. Maxim Entities admit that they took no action to develop software specific to their needs without first informing and obtaining the consent of East Point to any such action, as alleged within paragraph #72 of the complaint, and that what was developed was intended for Maxim Enterprises' use only, but they deny the remaining allegations, and each separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that the Field-Comm.net system ever worked satisfactorily in spite of Maxim Entities' investment of $250,000 and considerable time, expense and lost revenue.

73. Maxim Entities admit they obtained the assistance of East Point, as alleged within paragraph #73 of the complaint, but deny the remaining allegations, and each separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that the Field-Comm.net system ever worked satisfactorily in spite of Maxim Entities' investment of $250,000 and considerable time, expense and lost revenue, but that Maxim Entities was required to spend its own money to create the system that had been promised and not delivered by East Point.

74. Maxim Entities admit they obtained the assistance of East Point, as alleged within paragraph #74 of the complaint, but deny the remaining

allegations, and each separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that the Field-Comm.net system ever worked satisfactorily in spite of Maxim Entities' investment of $250,000 and considerable time, expense and lost revenue, but that Maxim Entities was required to spend its own money to create the system that had been promised and not delivered by East Point.

75. As to paragraph #75 of the complaint, Maxim Entities admit the signature of Maxim Enterprises to the document attached to the complaint as <u>Exhibit</u> "<u>E</u>", but deny that same was a conditional requirement; Maxim Entities deny for lack of information sufficient to form an opinion or belief any allegations regarding Mr. Pajemola.

76. Maxim Entities admit paragraph #76 of the complaint; Maxim Entities deny for lack of information sufficient to form an opinion or belief any allegations regarding Mr. Pajemola.

77. Maxim Entities admit the authenticity of the document attached as Exhibit "E" to the complaint; Maxim Entities deny for lack of information sufficient to form an opinion or belief any allegations regarding Mr. Pajemola.

78. Maxim Entities admit the authenticity of the document attached as Exhibit "F" to the complaint; Maxim Entities deny for lack of information sufficient to form an opinion or belief any allegations regarding Mr. Pajemola.

79. Maxim Entities admit the authenticity of the document attached as Exhibit "M" to the complaint.

80. Maxim Entities admit they were granted access to information after signing the agreements, but deny the remaining allegations in paragraph #80 of the complaint; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that the reason for their receiving access was their signature to the said agreements.

81. Maxim Entities deny the allegations contained in paragraph #81 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they obtained or made improper use of any confidential information of East Point.

82. Maxim Entities deny the allegations contained in paragraph #82 of the complaint, for want of information sufficient to form an opinion or belief.

83. Maxim Entities deny the allegations contained in paragraph #83 of the complaint, for want of information sufficient to form an opinion or belief.

84. Maxim Entities deny the allegations contained in paragraph #84 of the complaint, for want of information sufficient to form an opinion or belief.

85. Maxim Entities admit that Mr. Pajemola left its employ at one point during the time of the transactions that are the subject of the complaint, but deny the remaining allegations contained in paragraph #85.

86. Maxim Entities deny the allegations contained in paragraph #86 of the complaint, for want of information sufficient to form an opinion or belief.

87. Maxim Entities admit that they have attempted to obtain the compliance of Mr. Pajemola to his contractual obligations, but deny the remaining allegations contained in paragraph #87 of the complaint.

88. Maxim Entities admit that they have attempted to obtain the compliance of Mr. Pajemola to his contractual obligations, but deny the remaining allegations contained in paragraph #88 of the complaint.

89. Maxim Entities admit that they have attempted to obtain the compliance of Mr. Pajemola to his contractual obligations, but deny the remaining allegations contained in paragraph #89 of the complaint.

90. Maxim Entities admit that Mr. Maxim told Mr. Margarido that Mr. Pajemola agreed to take down the website, and that Mr. Pajemola was hired by Maxim Field Supply, but deny the remaining allegations in paragraph #90 of the complaint.

91. Maxim Entities admit paragraph #91 of the complaint.

92. Maxim Entities deny the allegations contained in paragraph #92 of the complaint, for want of information sufficient to form an opinion or belief.

93. Maxim Entities deny the allegations contained in paragraph #93 of the complaint, for want of information sufficient to form an opinion or belief.

94. Maxim Entities deny the allegations contained in paragraph #94 of the complaint, for want of information sufficient to form an opinion or belief.

95. Maxim Entities deny the allegations contained in paragraph #95 of the complaint, for want of information sufficient to form an opinion or belief;

however, Maxim Entities deny that they, or any one of them, is or ever was an owner of Cleveland Field Systems, LLC.

96. Maxim Entities admit the allegation regarding a demonstration during a webinar of its capabilities, but deny the remainder of paragraph #96 of the complaint; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they separately market the sale or licensing of computer software, but that they supply computer-based processing as part of the package of services they provide to their subcontractors in order to track and account for mortgage field service subcontract operations and invoicing to Maxim Entities' mortgage foreclosure customers.

97. Maxim Entities admit the allegation regarding a demonstration during a webinar of its capabilities, but deny the remainder of paragraph #97 of the complaint; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they separately market the sale or licensing of computer software, but that they supply computer-based processing as part of the package of services they provide to their subcontractors in order to track and account for mortgage field service subcontract operations and invoicing to Maxim Entities' mortgage foreclosure customers.

98. Maxim Entities admit the allegation regarding a demonstration during a webinar of its capabilities, but deny the remainder of paragraph #98 of the complaint; specifically, but without limiting the generality of the

foregoing, Maxim Entities deny that they separately market the sale or licensing of computer software, but that they supply computer-based processing as part of the package of services they provide to their subcontractors in order to track and account for mortgage field service subcontract operations and invoicing to Maxim Entities' mortgage foreclosure customers.

99. Maxim Entities admit the allegation regarding a demonstration during a webinar of its capabilities, but deny the remainder of paragraph #99 of the complaint; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they separately market the sale or licensing of computer software, but that they supply computer-based processing as part of the package of services they provide to their subcontractors in order to track and account for mortgage field service subcontract operations and invoicing to Maxim Entities' mortgage foreclosure customers.

100.   Maxim Entities admit the allegation regarding a demonstration during a webinar of its capabilities, but deny the remainder of paragraph #100 of the complaint; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they separately market the sale or licensing of computer software, but that they supply computer-based processing as part of the package of services they provide to their subcontractors in order to track and account for mortgage field service

subcontract operations and invoicing to Maxim Entities' mortgage foreclosure customers.

101.   Maxim Entities admit the allegation regarding a demonstration during a webinar of its capabilities, but deny the remainder of paragraph #101 of the complaint; specifically, but without limiting the generality of the foregoing, Maxim Entities previously used Field-Comm.net to supply computer-based processing as part of the package of services they provided to their subcontractors in order to track and account for mortgage field service subcontract operations and invoicing to Maxim Entities' mortgage foreclosure customers, which, because the Field-Comm.net software system never was functional, resulted in significant damage to Maxim Entities and its subcontractors because a substantial percentage invoices were refused by the banks for services that actually were performed satisfactorily but that could not be substantiated.

102.   Maxim Entities admit the allegation regarding a demonstration during a webinar of its capabilities, but deny the remainder of paragraph #102 of the complaint; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they separately market the sale or licensing of computer software, but that they supply computer-based processing as part of the package of services they provide to their subcontractors in order to track and account for mortgage field service subcontract operations and invoicing to Maxim Entities' mortgage foreclosure customers, and they no longer could use the Field-

Comm.net software system because its non-functionality had cost Maxim Entities and their subcontractors very significant damages.

103.   Maxim Entities admit that Maxim Field Supply developed and owns the software it now uses with its subcontractors, as alleged in paragraph #103 of the complaint.

104.   Maxim Entities admit the allegation regarding a demonstration during a webinar of its capabilities, but deny the remainder of paragraph #104 of the complaint; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they separately market the sale or licensing of computer software, but that they supply computer-based processing as part of the package of services they provide to their subcontractors in order to track and account for mortgage field service subcontract operations and invoicing to Maxim Entities' mortgage foreclosure customers, and they no longer could use the Field-Comm.net software system because its non-functionality had cost Maxim Entities and their subcontractors very significant damages.

105.   Maxim Entities deny the allegations contained in paragraph #105 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they "partnered" with Mr. Pajemola, but assert they employed Mr. Pajemola to develop a computer-based system to utilize for Maxim Enterprises and its subcontractors.

106.   Maxim Entities admit they claim title to the computer-based system developed through the employment of Mr. Pajemola, as alleged in paragraph #106 of the complaint.

107.   Maxim Entities admit that users of their computer-based system are subcontractors, as licensees, who perform maintenance and weatherization services on foreclosed properties repossessed by mortgage lenders, but deny the remainder of the allegations contained in paragraph #107 of the complaint; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they separately market the sale or licensing of computer software, but that they supply computer-based processing as part of the package of services they provide to their subcontractors in order to track and account for mortgage field service subcontract operations and invoicing to Maxim Entities' mortgage foreclosure customers.

108.   Maxim Entities deny the allegations contained in paragraph #108 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, the computer-based system developed at great expense by Maxim Entities is not a copy of Field-Comm.net.

109.   Maxim Entities deny the allegations contained in paragraph #109 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, the computer-based system

developed at great expense by Maxim Entities is not derivative of Field-Comm.net, or of its major function.

110. Maxim Entities deny the allegations contained in paragraph #110 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, the computer-based system developed at great expense by Maxim Entities is not derivative of Field-Comm.net.

111. Maxim Entities deny the allegations contained in paragraph #111 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, the computer-based system developed at great expense by Maxim Entities is not derivative of Field-Comm.net, but was necessitated because the non-functionality of Field-Comm.net software system had cost Maxim Entities and their subcontractors very significant damages when Maxim Entities' mortgage foreclosure customers failed to pay for services performed that could not be substantiated.

112. Maxim Entities deny the allegations contained in paragraph #112 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that a meeting was properly noticed or conducted.

113. Maxim Entities admit that the Connecticut shareholders have attempted to force S2k to sell its shares in Eastpoint Systems, Inc., but deny the remaining allegations contained in paragraph #113 of the

complaint; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that there is a right to force the sale of S2k's shares that properly was exercised.

114.   Maxim Entities deny the allegations contained in paragraph #114 of the complaint for want of information sufficient to form an opinion or belief.

115.   Maxim Entities admit paragraph #115.

116.   Maxim Entities admit they obtained the valuation attached as <u>Exhibit "J"</u> to the complaint, but deny the remaining allegations contained in paragraph #116 of the complaint; specifically, but without limiting the generality of the foregoing, the foregoing valuation was prepared without performing an audit, which Maxim Entities believe would reveal substantial misrepresentations of material facts by the plaintiffs that improperly suppressed the valuation.

117.   Maxim Entities admit that Atty. Michael Kopsick expressed plaintiffs' desire to purchase the S2k shares in East Point Systems, Inc. for $57,700, but deny the remaining allegations contained within paragraph #117 of the complaint; specifically, but without limiting the generality of the foregoing, the foregoing valuations were prepared without performing an audit, which Maxim Entities believe would reveal substantial misrepresentations of material facts by the plaintiffs that improperly suppressed the valuation.

118.   Maxim Entities admit paragraph #118 of the complaint.

119.   Maxim Entities admit paragraph #119 of the complaint.

120.   As paragraph #120 makes no allegation of material fact, Maxim Entities neither admit nor deny same, other than to restate their responses contained elsewhere herein.

121.   Maxim Entities deny paragraph #121 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities state that this is a legal conclusion that must be determined by the court at  trial.

122.   Maxim Entities deny paragraph #122 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they copied Field-Comm.net.

123.   Maxim Entities deny paragraph #123 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have taken any customer revenue from plaintiffs, specifically denying that they have sold anything they developed to any unrelated entity.

124.   Maxim Entities deny paragraph #124 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have breached the Shareholder Agreement, and further deny that they cost East Point revenue.

125.   As paragraph #125 makes no allegation of material fact, Maxim Entities neither admit nor deny same, other than to restate their responses contained elsewhere herein.

126.   Maxim Entities deny paragraph #126 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities state that this is a legal conclusion that must be determined by the court at trial.

127.   Maxim Entities deny paragraph #127 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they copied the Field-Comm.net architecture and design, or otherwise violated any agreement.

128.   Maxim Entities deny paragraph #128 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have taken any revenue from plaintiffs, and deny that they have sold software to any unrelated entity.

129.   Maxim Entities deny paragraph #129 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have breached the Confidentiality and Non-competition Agreement, and deny that they have done anything to cause plaintiffs to lose revenue.

130.   As paragraph #130 makes no allegation of material fact, Maxim Entities neither admit nor deny same, other than to restate their responses contained elsewhere herein.

131.   Maxim Entities deny paragraph #131 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities state that this is a legal conclusion that must be determined by the court at trial.

132.   Maxim Entities deny paragraph #132 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they copied Field-Comm.net.

133.   Maxim Entities deny paragraph #133 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have taken any revenue from plaintiffs, and deny that they have sold software to any entity not related to Maxim Entities.

134.   Maxim Entities deny paragraph #134 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny they have breached the Confidentiality and Non-competition Agreement, deny copying software and deny selling software to any entity no related to Maxim Entites.

135.   As paragraph #135 makes no allegation of material fact, Maxim Entities neither admit nor deny same, other than to restate their responses contained elsewhere herein.

136.   Maxim Entities deny paragraph #136 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities state that this is a legal conclusion that must be determined by the court at trial.

137.   Maxim Entities deny paragraph #137 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they copied Field-Comm.net.

138.   Maxim Entities deny paragraph #138 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have taken any revenue from plaintiffs and deny that they have sold software to any entity not related to Maxim Enterprises.

139.   Maxim Entities deny paragraph #139 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny they have breached the Confidentiality and Non-competition Agreement and deny that they have caused plaintiffs to lose revenue.

140.   As paragraph #140 makes no allegation of material fact, Maxim Entities neither admit nor deny same, other than to restate their responses contained elsewhere herein.

141.   Maxim Entities deny paragraph #141 of the complaint, and each allegation separately; specifically, but without limiting the generality of

the foregoing, Maxim Entities state that this is a legal conclusion to be determined by this court at trial.

142.  Maxim Entities deny paragraph #143 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they copied Field-Comm.net.

143.  Maxim Entities deny paragraph #143 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they created any product derivative of Field-Comm.net.

144.  Maxim Entities deny paragraph #144 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they created any product derivative of Field-Comm.net.

145.  Maxim Entities deny paragraph #145 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have taken any revenue from plaintiffs.

146.  Maxim Entities deny paragraph #146 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny they have breached the Software Source Code and Indemnity Agreement.

147.   As paragraph #147 makes no allegation of material fact, Maxim Entities neither admit nor deny same, other than to restate their responses contained elsewhere herein.

148.   Maxim Entities deny paragraph #148 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities state that this is a legal conclusion to be determined by this court at trial.

149.   Maxim Entities deny paragraph #149 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they copied Field-Comm.net.

150.   Maxim Entities deny paragraph #150 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they created any product derivative of Field-Comm.net.

151.   Maxim Entities deny paragraph #151 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they created any product derivative of Field-Comm.net.

152.   Maxim Entities deny paragraph #152 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have taken any revenue from plaintiffs.

153.   Maxim Entities deny paragraph #153 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny they have breached the Software Source Code and Indemnity Agreement.

154.   As paragraph #154 makes no allegation of material fact, Maxim Entities neither admit nor deny same, other than to restate their responses contained elsewhere herein.

155.   Maxim Entities admit that Mr. Maxim was a member of East Point's board of directors, as alleged in paragraph #155 of the complaint for a period of time.

156.   Maxim Entities deny paragraph #156 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities state that this is a legal conclusion to be determined by this court at trial.

157.   Maxim Entities deny paragraph #157 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they created any product derivative of Field-Comm.net, and denies that S2k ever has developed software of any kind.

158.   Maxim Entities deny paragraph #158 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they created any product

derivative of Field-Comm.net, and deny that any of the Maxim Entities has marketed a competing software package.

159.   Maxim Entities deny paragraph #159 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have taken any revenue from plaintiffs, and deny that they have marketed any software to any entity not related to Maxim Entities.

160.   As paragraph #160 makes no allegation of material fact, Maxim Entities neither admit nor deny same, other than to restate their responses contained elsewhere herein.

161.   Maxim Entities admit that Mr. Maxim was a member of East Point's board of directors, as alleged in paragraph #161 of the complaint, but deny that this was done on behalf of S2k.

162.   Maxim Entities deny paragraph #162 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities state that this is a legal conclusion to be determined by this court at trial.

163.   Maxim Entities deny paragraph #163 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they created, or "suborned" the creation of any product derivative of Field-Comm.net.

164.   Maxim Entities deny paragraph #164 of the complaint, and each allegation separately; specifically, but without limiting the generality of

the foregoing, Maxim Entities deny that they created any product derivative of Field-Comm.net, and deny marketing any competing software package to any entity not related to Maxim Entities.

165. Maxim Entities deny paragraph #165 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have taken any revenue from plaintiffs.

166. As paragraph #166 makes no allegation of material fact, Maxim Entities neither admit nor deny same, other than to restate their responses contained elsewhere herein.

167. Maxim Entities deny paragraph #167 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities state that this is a legal conclusion to be determined by this court at trial.

168. Maxim Entities deny paragraph #168 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities state that this is a legal conclusion to be determined by this court at trial.

169. As previously stated within their response to substantially identical allegations made in paragraph #116 of the complaint, Maxim Entities admit they obtained the valuation attached as <u>Exhibit</u> "<u>J</u>" to the complaint, but deny the remaining allegations contained in paragraph #169; specifically, but without limiting the generality of the foregoing,

the foregoing valuation was prepared without performing an audit, which Maxim Entities believe would reveal substantial misrepresentations of material facts by the plaintiffs that improperly suppressed the valuation.

170. As previously stated within their response to substantially identical allegations made in paragraph #117 of the complaint, Maxim Entities admit that Atty. Michael Kopsick expressed plaintiffs' desire to purchase the S2k shares in East Point Systems, Inc. for $57,700, but deny the remaining allegations contained within paragraph #170 of the complaint; specifically, but without limiting the generality of the foregoing, the foregoing valuations were prepared without performing an audit, which Maxim Entities believe would reveal substantial misrepresentations of material facts by the plaintiffs that improperly suppressed the valuation.

171. Maxim Entities admit they refused to deliver their shares of East Point Systems, Inc. to plaintiffs, but deny the remaining allegations contained within paragraph #171 of the complaint; specifically, but without limiting the generality of the foregoing, Maxim Entities deny there was an obligation to deliver the shares.

172. Maxim Entities deny the allegations contained in paragraph #172 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny there was an obligation to deliver the shares, under the circumstances at bar.

173.   Maxim Entities deny the allegations contained in paragraph #173 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny there was an obligation to deliver the shares.

174.   Maxim Entities deny the allegations contained in paragraph #174 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny there was an obligation to deliver the shares, under the circumstances of their purchase.

175.   As paragraph #175 makes no allegation of material fact, Maxim Entities neither admit nor deny same, other than to restate their responses contained elsewhere herein.

176.   Maxim Entities deny the allegations contained within paragraph #176 of the complaint, for want of information sufficient to form an opinion or belief.

177.   Maxim Entities deny the allegations contained within paragraph #177 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, the relationships with Berghorst Enterprises, A & M Recovery Services, and their contractors and subcontractors, were originally with Maxim Entities, who referred such businesses to plaintiffs only after Maxim Entities were fraudulently induced by plaintiffs into paying $250,000.00 to purchase shares in East

Point Systems, Inc., that plaintiffs now claim are worth a fraction of that amount.

178.   Maxim Entities deny the allegations contained in paragraph #178, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have taken any revenue from plaintiffs and deny that they have interfered with business relationships of plaintiffs.

179.   Maxim Entities deny the allegations contained in paragraph #179, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have taken any revenue from plaintiffs and deny any misrepresentation to customers of plaintiffs.

180.   Maxim Entities deny paragraph #180 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they created any product derivative of Field-Comm.net.

181.   Maxim Entities deny the allegations contained in paragraph #181, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have taken any revenue from plaintiffs and have made no misrepresentations to customers of plaintiffs.

182.   Maxim Entities deny the allegations contained in paragraph #182, and each allegation separately; specifically, but without limiting the

generality of the foregoing, Maxim Entities deny that they have taken any revenue from plaintiffs and further deny that they have interfered with any business relationships of plaintiffs.

183.   Maxim Entities deny the allegations contained in paragraph #183, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have taken any revenue from plaintiffs.

184.   Maxim Entities deny the allegations contained in paragraph #184, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have taken any revenue from plaintiffs.

185.   As paragraph #185 makes no allegation of material fact, Maxim Entities neither admit nor deny same, other than to restate their responses contained elsewhere herein.

186.   Maxim Entities deny the allegations contained in paragraph #186 of the complaint, for want of information sufficient to form an opinion or belief; in addition, Maxim Entities deny that plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry.

187.   Maxim Entities deny the allegations contained in paragraph #187 of the complaint, for want of information sufficient to form an opinion or belief; in addition, Maxim Entities deny that plaintiffs developed a

functioning computer-based system capable of satisfying the needs of the mortgage field service industry.

188.   Maxim Entities deny the allegations contained in paragraph #188 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry, and state that the program developed by plaintiffs was _/_ composed of information generally known to, or readily obtainable by others in the industry.

189.   Maxim Entities deny the allegations contained in paragraph #189 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry, and deny that the program developed by plaintiffs was not comprised of information generally known to, or readily obtainable by others in the industry, but that plaintiffs' ability to sell to contractors and subcontractors within the mortgage field service industry was a direct result of plaintiffs' relationship with Maxim Entities.

190.   Maxim Entities deny the allegations contained in paragraph #190 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that

plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry, and deny that the program developed by plaintiffs was not comprised of information generally known to, or readily obtainable by others in the industry.

191.   Maxim Entities deny the allegations contained in paragraph #191 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry, and deny that the program developed by plaintiffs was comprised of information not generally known to, or readily obtainable by others in the industry.

192.   Maxim Entities deny the allegations contained in paragraph #192 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they used or disseminated any of plaintiffs' confidential information.

193.   Maxim Entities deny the allegations contained in paragraph #193, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have taken any revenue from plaintiffs and deny they are using confidential or proprietary trade secrets.

194.   Maxim Entities deny the allegations contained in paragraph #194, and each allegation separately; specifically, but without limiting the

generality of the foregoing, Maxim Entities deny that they used or disseminated any of plaintiffs' confidential information, deny that they have taken any revenue from plaintiffs, and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

195.   Maxim Entities deny the allegations contained in paragraph #195, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they used or disseminated any of plaintiffs' confidential information, deny that they have taken any revenue from plaintiffs, and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

196.   Maxim Entities deny the allegations contained in paragraph #196, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they used or disseminated any of plaintiffs' confidential information, deny that they have taken any revenue from plaintiffs, and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

197.   Maxim Entities deny the allegations contained in paragraph #197, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they used or disseminated any of plaintiffs' confidential information, deny that they

have taken any revenue from plaintiffs, and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

198.   Maxim Entities deny the allegations contained in paragraph #198, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they used or disseminated any of plaintiffs' confidential information, deny that they have taken any revenue from plaintiffs, and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

199.   As paragraph #199 makes no allegation of material fact, Maxim Entities neither admit nor deny same, other than to restate their responses contained elsewhere herein.

200.   As in their response to the substantially identical allegations within paragraph #186, Maxim Entities deny the allegations contained in paragraph #200 of the complaint, for want of information sufficient to form an opinion or belief; in addition, Maxim Entities deny that plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry.

201.   As in their response to the substantially identical allegations within paragraph #187, Maxim Entities deny the allegations contained in paragraph #201 of the complaint, for want of information sufficient to form an opinion or belief; in addition, Maxim Entities deny that plaintiffs

developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry.

202.   As in their response to the substantially identical allegations within paragraph #188, Maxim Entities deny the allegations contained in paragraph #202 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry, and deny that the program developed by plaintiffs was not comprised of information generally known to, or readily obtainable by others in the industry.

203.   As in their response to the substantially identical allegations within paragraph #186, Maxim Entities deny the allegations contained in paragraph #203 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry, and deny that the program developed by plaintiffs was not comprised of information generally known to, or readily obtainable by others in the industry, but that plaintiffs' ability to sell to contractors and subcontractors within the mortgage field service industry was a direct result of plaintiffs' relationship with Maxim Entities.

204.   As in their response to the substantially identical allegations within paragraph #190, Maxim Entities deny the allegations contained in paragraph #204 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry, and deny that the program developed by plaintiffs was not comprised of information generally known to, or readily obtainable by others in the industry.

205.   As in their response to the substantially identical allegations within paragraph #191, Maxim Entities deny the allegations contained in paragraph #205 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry, and deny that the program developed by plaintiffs was comprised of information not generally known to, or readily obtainable by others in the industry.

206.   Maxim Entities deny the allegations contained in paragraph #206 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they improperly used or disseminated any of plaintiffs' confidential information.

207.   Maxim Entities deny the allegations contained in paragraph #207, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they have made any unauthorized use, disclosure or copy of the data in plaintiffs' computer system, and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

208.   Maxim Entities deny the allegations contained in paragraph #208, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they misused or disseminated any of plaintiffs' confidential computer system information, and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

209.   Maxim Entities deny the allegations contained in paragraph #209, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they misused or disseminated any of plaintiffs' confidential computer system information, and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

210.   Maxim Entities deny the allegations contained in paragraph #210, and each allegation separately; specifically, but without limiting the

generality of the foregoing, Maxim Entities deny that they misused or disseminated any of plaintiffs' confidential computer system information, and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial and deny that any of their actions were willful or malicious.

211. Maxim Entities deny the allegations contained in paragraph #211, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they misused or disseminated any of plaintiffs' confidential computer system information, further deny any irreparable harm or monetary damages, and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

212. Maxim Entities deny the allegations contained in paragraph #212, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they misused or disseminated any of plaintiffs' confidential computer system information, and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

213. Maxim Entities deny the allegations contained in paragraph #213, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they used or disseminated any of plaintiffs' confidential information, deny that they

have taken any revenue from plaintiffs, and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

214.   Maxim Entities deny the allegations contained in paragraph #214, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they used or disseminated any of plaintiffs' confidential information, deny that they have taken any revenue from plaintiffs, further deny any willful or malicious conduct, and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

215.   Maxim Entities deny the allegations contained in paragraph #215, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they used or disseminated any of plaintiffs' confidential information, deny that they have taken any revenue from plaintiffs, and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

216.   As paragraph #216 makes no allegation of material fact, Maxim Entities neither admit nor deny same, other than to restate their responses contained elsewhere herein.

217.   As in their response to the substantially identical allegations within paragraphs #186 and 200, Maxim Entities deny the allegations contained

in paragraph #217 of the complaint, for want of information sufficient to form an opinion or belief; in addition, Maxim Entities deny that plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry.

218.   As in their response to the substantially identical allegations within paragraphs #187 and 201, Maxim Entities deny the allegations contained in paragraph #218 of the complaint, for want of information sufficient to form an opinion or belief; in addition, Maxim Entities deny that plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry.

219.   As in their response to the substantially identical allegations within paragraphs #188 and 202, Maxim Entities deny the allegations contained in paragraph #219 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry, and deny that the program developed by plaintiffs was not comprised of information generally known to, or readily obtainable by others in the industry.

220.   As in their response to the substantially identical allegations within paragraphs #186 and 203, Maxim Entities deny the allegations contained in paragraph #220 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim

Entities deny that plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry, and deny that the program developed by plaintiffs was not comprised of information generally known to, or readily obtainable by others in the industry, but that plaintiffs' ability to sell to contractors and subcontractors within the mortgage field service industry was a direct result of plaintiffs' relationship with Maxim Entities.

221.   As in their response to the substantially identical allegations within paragraphs #190 and 204, Maxim Entities deny the allegations contained in paragraph #221 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry, and deny that the program developed by plaintiffs was not comprised of information generally known to, or readily obtainable by others in the industry.

222.   As in their response to the substantially identical allegations within paragraphs #191 and 205, Maxim Entities deny the allegations contained in paragraph #222 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that plaintiffs developed a functioning computer-based system capable of satisfying the needs of the mortgage field service industry, and deny that the program developed by plaintiffs was

comprised of information not generally known to, or readily obtainable by others in the industry.

223.   As in their response to the substantially identical allegations within paragraphs #191 and 206, Maxim Entities deny the allegations contained in paragraph #223 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they improperly used or disseminated any of plaintiffs' confidential information.

224.   Maxim Entities deny the allegations contained in paragraph #224 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that Mr. Maxim breached any duty owed to East Point Systems, Inc.

225.   Maxim Entities deny the allegations contained in paragraph #225 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities state they were in the business of providing field services for mortgage industry long before they were fraudulently induced by plaintiffs to pay $250,000 for stock in East Point Systems, Inc., that plaintiffs now claim is essentially worthless, and throughout the time of the transactions that form the basis of this action.   Mr. Maxim specifically denies being a board member, officer of shareholder of Cleveland Field Systems, LLC, and Maxim Entities deny they received any revenue from sales of computer systems to entities not related to Maxim Entities.

226.   Maxim Entities deny that they employed Mr. Pajemola to compete with plaintiffs, state that Mr. Pajemola was employed during the relevant time period by Maxim Field Supply, and deny the remainder of the allegations in paragraph #226 of the complaint for want of information sufficient to form an opinion or belief.

227.   Maxim Entities deny the allegations contained in paragraph #227 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities state they were in the business of providing field services for mortgage industry long before they were fraudulently induced by plaintiffs to pay $250,000 for stock in East Point Systems, Inc., that plaintiffs now claim is essentially worthless, and throughout the time of the transactions that form the basis of this action, and that their actions do not constitute unfair competition or deceptive acts or practices.

228.   Maxim Entities deny the allegations contained in paragraph #228 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they are in competition with plaintiffs in the "field of field services for the mortgage industry", and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

229.   Maxim Entities deny the allegations contained in paragraph #229 of the complaint, and each allegation separately; specifically, but without

limiting the generality of the foregoing, Maxim Entities deny that they are in competition with plaintiffs in the "field of field services for the mortgage industry," and further deny that any action was with reckless indifference or were willful or wanton.

230.   Maxim Entities deny the allegations contained in paragraph #230 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they are in competition with plaintiffs in the "field of field services for the mortgage industry".

231.   Maxim Entities deny the allegations contained in paragraph #231 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they are in competition with plaintiffs in the "field of field services for the mortgage industry", and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

232.   Maxim Entities deny the allegations contained in paragraph #232 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they are in competition with plaintiffs in the "field of field services for the mortgage industry", further deny that they took, copied or derived any software from plaintiffs, and assert that the allegations regarding the

application of Connecticut statutes are legal conclusions to be determined by this court at trial.

233. Maxim Entities deny the allegations contained in paragraph #233 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they are in competition with plaintiffs in the "field of field services for the mortgage industry", further deny that they took, copied or derived any software from plaintiffs and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

234. Maxim Entities deny the allegations contained in paragraph #234 of the complaint, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they are in competition with plaintiffs in the "field of field services for the mortgage industry", further deny that they took, copied or derived any software from plaintiffs and assert that the allegations regarding the application of Connecticut statutes are legal conclusions to be determined by this court at trial.

235. As paragraph #235 makes no allegation of material fact, Maxim Entities neither admit nor deny same, other than to restate their responses contained elsewhere herein.

236.   Maxim Entities deny the allegations contained in paragraph #236, for want of information sufficient to form an opinion or belief, and state that same are legal conclusions to be determined by this court at trial.

237.   Maxim Entities deny the allegations contained in paragraph #237, for want of information sufficient to form an opinion or belief, and state that the scope and extent of any claimed copyright is a legal conclusion to be determined by this court at trial.

238.   Maxim Entities deny the allegations contained in paragraph #238, for want of information sufficient to form an opinion or belief, and state that the scope and extent of any claimed copyright is a legal conclusion to be determined by this court at trial.

239.   Maxim Entities deny the allegations contained in paragraph #239, for want of information sufficient to form an opinion or belief, and state that the scope and extent of any claimed copyright is a legal conclusion to be determined by this court at trial.

240.   Maxim Entities deny the allegations contained in paragraph #240, for want of information sufficient to form an opinion or belief, and state that the scope and extent of any claimed copyright is a legal conclusion to be determined by this court at trial.

241.   Maxim Entities deny the allegations contained in paragraph #241, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they created derivative works without authorization or permission from plaintiffs.

242.   Maxim Entities deny the allegations contained in paragraph #242, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they created derivative works without authorization or permission from plaintiffs.

243.   Maxim Entities deny the allegations contained in paragraph #243, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they created derivative works without authorization or permission from plaintiffs, and state that the existence of any claimed copyright infringement is a legal conclusion to be determined by this court at trial.

244.   Maxim Entities deny the allegations contained in paragraph #244, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they created derivative works without authorization or permission from plaintiffs, and state that the existence of any claimed copyright infringement is a legal conclusion to be determined by this court at trial.

245.   Maxim Entities deny the allegations contained in paragraph #245, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they created derivative works without authorization or permission from plaintiffs, and deny they have taken any revenue from plaintiffs.

246.   Maxim Entities deny the allegations contained in paragraph #246, and each allegation separately; specifically, but without limiting the

generality of the foregoing, Maxim Entities deny that they created derivative works without authorization or permission from plaintiffs, and state that the existence of any claimed copyright infringement is a legal conclusion to be determined by this court at trial.

247.   Maxim Entities deny the allegations contained in paragraph #247, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they created derivative works without authorization or permission from plaintiffs, and state that the existence of any claimed copyright infringement is a legal conclusion to be determined by this court at trial.

248.   Maxim Entities deny the allegations contained in paragraph #248, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they created derivative works without authorization or permission from plaintiffs.

249.   As paragraph #249 makes no allegation of material fact, Maxim Entities neither admit nor deny same, other than to restate their responses contained elsewhere herein.

250.   Maxim Entities deny the allegations contained in paragraph #250, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they possess property, revenue or proceeds illegally derived from their access to East Point Systems, Inc.'s program or source code without authorization or permission from plaintiffs.

251.   Maxim Entities deny the allegations contained in paragraph #251, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they possess property, revenue or proceeds illegally derived from their access to East Point Systems, Inc.'s program or source code without authorization or permission from plaintiffs, but that they acted in a manner consistent with the agreed purpose to benefit Maxim Entities' business.

252.   Maxim Entities deny the allegations contained in paragraph #252, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they possess property, revenue or proceeds illegally derived from their access to East Point Systems, Inc.'s program or source code without authorization or permission from plaintiffs, and deny they provided wrongful access to the other defendants.

253.   Maxim Entities deny the allegations contained in paragraph #253, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they possess property, revenue or proceeds improperly or derived from their access to East Point Systems, Inc.'s program or source code without authorization or permission from plaintiffs.

254.   Maxim Entities deny the allegations contained in paragraph #254, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they possess

property, revenue or proceeds illegally derived from their access to East Point Systems, Inc.'s program or source code without authorization or permission from plaintiffs and have no property to which they are not entitled.

255.   Maxim Entities deny the allegations contained in paragraph #255, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they hold title to plaintiffs' property in trust, constructive or otherwise, and deny that they have been unjustly enriched.

256.   Maxim Entities deny the allegations contained in paragraph #256, and each allegation separately; specifically, but without limiting the generality of the foregoing, Maxim Entities deny that they hold title to plaintiffs' property in trust, constructive or otherwise, and deny that they have been unjustly enriched.

## AFFIRMATIVE DEFENSES

257.   Plaintiffs' complaint fails to state a claim upon which relief may be granted and should be dismissed under Fed. R. Civ. R. 12(b)(6).

258.   Plaintiffs' actions, or failures to act, prevent them from seeking the relief requested within the complaint on the basis of estoppel or waiver.

259.   Plaintiffs' failures to follow the procedures required within the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. sec.41-110a, *et seq*, prevent them from obtaining the relief requested within complaint.

260.   This court does not possess the subject matter jurisdiction to consider the claims within the complaint, or over the persons who are parties hereto; or, possessing jurisdiction, this court constitutes an improper venue for a full and just resolution of the matters that are the subject hereof, or constitute a forum of non-convenience; specifically, but without limiting the generality of the foregoing, Maxim Field Supply filed a civil action against the co-defendants herein, Edwin Pajemola and Cleveland Field Systems, LLC, in that action before the Stark County, Ohio, Common Pleas Court, styled <u>Maxim Field Service Supply, Inc. v. Pajemola, et al.</u>, case #2012-CV-03613, which action pre-dates the filing of the complaint in the captioned action, involving the same issues as have been raised herein.

261.   Plaintiffs have failed to name a party necessary to the resolution of these proceedings.

262.   Plaintiffs are precluded from seeking the relief requested within the complaint due to the operation of the applicable statute of limitations or laches.

263.   Plaintiffs are precluded from seeking the relief requested within the complaint because the effect of same would be to enforce an anti-competitive restraint of trade.

264.   The clauses cited by plaintiffs within the documents attached as Exhibits to the complaint are not binding because of failure of consideration, and otherwise are contrary to public policy.

265.   The information supposedly taken by Maxim Entities is readily known within the relevant industry, or can be developed using existing technology or software, and is not unique to plaintiffs.

266.   The clauses cited by plaintiffs within the documents attached as Exhibits to the complaint unduly restrict Maxim Entities' ability to pursue his, its or their trade or occupation.

267.   The clauses cited by plaintiffs within the documents attached as Exhibits to the complaint extend for an excessive length of time.

268.   The clauses cited by plaintiffs within the documents attached as Exhibits to the complaint extend to an excessive geographic area.

269.   The clauses cited by plaintiffs within the documents attached as Exhibits to the complaint provide unjustly disproportionate protection to the plaintiffs.

270.   The clauses cited by plaintiffs within the documents attached as Exhibits to the complaint unduly interfere with the public's interest.

271.   The clauses cited by the plaintiffs within the documents attached as Exhibits to the complaint fail for lack of consideration, and are unenforceable because no good will or other property was sold to East Point Systems, Inc., but rather it was S2k who paid $250,000 for shares that have proven to be worth a fraction of that cost, .

272.   The shares of stock in East Point are owned by S2k, and not any of the other Maxim Entities.

273.   The property preservation computer system developed as a result of East Point's failure to produce a system functional to Maxim Enterprises was produced, paid for and owned by Maxim Field Supply, and not any of the other Maxim Entities.

## COUNTERCLAIM

## FACTUAL BACKGROUND

274.   Maxim Entities incorporates by this reference each and every allegation made within paragraphs #1 through 273 hereof as if rewritten.

275.   Maxim Enterprises is and has been in the property preservation business as an Ohio corporation since April 29, 1999.  S2k is in the business of importing and selling various hardware, including locks, to companies in the property preservation industry.  Mr. Maxim is the sole shareholder of Maxim Enterprises and owns 91% of the shares of S2k.

276.   Maxim Enterprises and numerous other property preservation companies work with clients who have homes in foreclosure that must be maintained.  This is accomplished through use of subcontractors, some of whose work is in a localized area, others of whom work in a large geographic area.

277.   Maxim Enterprises uses subcontractors supplying property preservation services from the east coast to the Mississippi River and slightly beyond.

278.   The property preservation business has been driven and has developed its ability to meet the needs of its clients by the use of specialized property preservation software.

279.   The specialized property preservation software allows the client to post information concerning the job that is to be done in the Maxim Entities' system, where the subcontractor pulls the information and bids the work.  The client, typically a bank, accepts or rejects the bid and provides the time frames in which the work is to be accomplished.

280.   Utilizing the aforesaid property preservation software, the contractor performs the work, invoices and provides pictures before the work commences and after the work is completed.  This invoice is reviewed by the client and is entered for payments and is tracked in the same software.

281.   If the work was performed and invoiced timely and satisfactorily, the client pays Maxim Enterprises, and Maxim Enterprises pays the subcontractors, withholding a portion of the payment for its services.

   A.  Maxim Enterprises Meets and Invests in East Point Systems, Inc.

282.   Maxim Enterprises utilized a property preservation program that Maxim purchased from East Point's predecessor, East Point Systems, LLC (hereinafter "Old East Point"), called "Field-Comm", which program was purchased from Old East Point at a trade show and delivered to Maxim Enterprises on a disk format.

283.  Mr. Maxim first met Plaintiff Thomas Margarido (hereinafter "Tom Margarido"), then a member of Old East Point, by telephone conversations regarding installation of the Field-Comm system sometime between 2001 and 2002.

284.  The unique features of the Field-Comm system, although dated, did benefit Maxim Enterprises, and allowed it to expand both its customer base and network of subcontractors.  Maxim Enterprises came to rely upon the Field-Comm software for the continued success and future growth of its business, which reliance was communicated by Mr. Maxim to Plaintiffs.

285.  In the course of operating with the Field-Comm system Mr. Maxim found that this program had some features he felt could be added or improved and various conversations ensued between Mr. Maxim and Tom Margarido regarding same.

286.  Beginning in or around late 2003 Tom Margarido and Mr. Maxim had a series of conversations over the telephone and in person, in which conversations Tom Margarido told Mr. Maxim that because of the relative small size of Old East Point it was unable to provide the service required by Maxim Enterprises without an infusion of cash, in order that Old East Point could become a more solid company upon which Maxim Enterprises could rely.

287.  During the course of the aforesaid personal and telephone conversations in late 2003, Tom Margarido told Mr. Maxim that Old East

Point might go out of business without a significant cash contribution and, if it "went down" because one of the Maxim Entities did not make such investment, Maxim Enterprises would not be able to locate another company that could deliver the necessary computer software system.

288.   At or around the same time, Plaintiffs put together financial projections for the purpose of finding investors to contribute money to Old East Point, which financial projections showed that Old East Point would generate profits in future years sufficient to justify the investment of $250,000.

289.   The financial projections were prepared by a person retained by Old East Point to obtain investors, but who was not an accountant and otherwise possessed no accounting expertise, but was simply "someone who knew something about how to put a document together," with the result that the projections intentionally misrepresented the future financial performance and expectation of profitability.

290.   The financial projections were not part of any registration for the sale of securities with either the United States Securities and Exchange Commission, any other State regulatory agency, or any recognized stock exchange; neither was an application for exemption from registration made or obtained.

291.   In fact, the  written projections of profitability were provided to Mr. Maxim at or around the end of 2003 by Tom Margarido, which

projections Plaintiffs knew or should have known were false, or were made with such reckless disregard for their truthfulness that Plaintiffs should be charged with knowledge; specifically, but without limiting the generality of the foregoing, no financial reports such as balance sheets, profit and loss statements, change in financial position and cash flow had been prepared or maintained by Old East Point from which any kind of accurate projection could have been based.

292.   Tom Margarido advised that he could develop a new and improved software program that would fulfill Maxim Entities' needs for TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00), but that without the infusion of that sum of money his company, Old East Point, would fail.

293.   This investment amount was not based upon a financial analysis of the needs and uses of funds, and reasonable projections of profits (in fact, Old East Point never made a profit) but was arrived at by the Connecticut Shareholders simply by figuring out how much money Plaintiffs could obtain from the Maxim Entities in return for how little equity they needed to give up, all for the simple purpose of enriching Plaintiffs to the detriment of Mr. Maxim and the Maxim Entities.

294.   A substantial portion of the money raised from Mr. Maxim was not put towards the development of a new and improved software system, or for other appropriate business purposes, but instead was used for the sole benefit and enrichment of the Connecticut Shareholders.

295.   Mr. Maxim relied upon the erroneous financial projections he was provided by Plaintiffs, the threat that Old East Point would go out of business and no longer be available to service the Field-Comm computer program if it "went down," and the assurance that if they received $250,000 Plaintiffs could develop a new system that could service Maxim Enterprises' expanding needs, in making his decision to invest.

296.   Mr. Maxim was told by Plaintiffs that they would form East Point Systems, Inc. (hereinafter "New East Point") as a vehicle for Mr. Maxim's investment, and part of the consideration for his cash contribution would be that Mr. Maxim would receive the return of his investment prior to the Connecticut Shareholders receiving any return on their investment, which promise turned out to be false.

297.   Based upon the inducement represented by each of the aforesaid misrepresentations of material fact separately, and all of them together, and in reliance upon same, Mr. Maxim caused S2k to purchase approximately six percent (6%) of East Point System, Inc.'s initial stock offering for the said TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00).  The rest of the stock was purchased by Old East Point's shareholders (hereinafter the "Connecticut Shareholders") through the transfer Old East Point's software (which did not work as represented) in accordance with the East Point Systems, Inc., Shareholder Agreement attached to the complaint as <u>Exhibit</u> "<u>L</u>".

298.   As a part of the Shareholder Agreement, Mr. Maxim was told by Tom Margarido that S2k and the Connecticut Shareholders would sign a buy-out agreement wherein the Connecticut Shareholders could be bought-out for the amount of the initial "value" of their investment but where, after a period of time, the value of S2k's shares would be allowed to "float" with the market.  The misrepresented profits contained within the faulty projections provided by Tom Margarido to Mr. Maxim created the false impression that the value of S2k's stock would increase, so that S2k would be able to re-sell its shares to the Connecticut Shareholders for a profit.

299.   In fact, after S2k's purchase of New East Point's initial share interest, a person from New York by the name of Robert Kline made a similar purchase of New East Point shares in the approximate amount of $75,000.00 with a similar buy-out agreement.  Upon the death of that shareholder Plaintiffs exercised their opition to purchase his interest in New East Point from his estate based upon an appraisal process similar to that for S2k herein, resulting in payment to Mr. Kline's estate for a fraction of what originally was paid.

300.   The Connecticut Shareholders formed the defendant New East Point, after which both S2k and Mr. Maxim, individually, signed the purported non-compete agreements with New East Point, without consideration.

301.  Maxim Entities would not have made the aforesaid $250,000 investment had they known:

a. The projections given to Mr. Maxim by Tom Margarido were neither prepared by a trained financial professional, nor based upon any objective or generally accepted accounting principles that could provide reasonable support for the predictions of profitability;

b. The Plaintiffs would misuse the money being contributed to benefit personally the Connecticut Shareholders, and that a sufficient amount would not be devoted to the development of the improved Field-Comm system;

c. The determination to sell Maxim Entities 6% equity ownership in return for $250,000 was not based upon any objective investment analysis but, instead, was a number designed to provide the Connecticut Shareholders the most money in consideration for relinquishing the smallest share of interest;

d. The Plaintiffs were not intending to provide a new version of Field-Comm that would be sufficient to satisfy the stated needs of Maxim Enterprises; and

e. The Connecticut Shareholders intended to utilize the $250,000 for their own purposes and, after the business of New East Point proved unprofitable, would exercise the unequal cross-purchase agreements to re-acquire S2k's interest in New East Point for a fraction of what it paid.

**B. New East Point's System Does Not Perform as Represented and Mr. Maxim Proposes a Solution.**

302.   Irrespective of the S2k stock purchase payment, New East Point was not able to produce a computer-based software system that could satisfactorily perform tasks necessary to the property preservation industry.

303.   The Old East Point software for Field-Comm was based upon language and relational database provided on a platform known as FileMaker Pro, which was an Apple-based product; New East Point attempted to create a similar system, also called Field-Comm based upon "dot net" technology provided on a platform known as "SQL", which was a Microsoft product (hereinafter "New Field-Comm dot net")..

304.   In fact, the version of New Field-Comm dot net ultimately developed by New East Point utilizing the SQL technology lacked many of the features that previously was provided by Old East Point in the version of Field-Comm it sold on the old FileMaker Pro language and relational database, and upon which Maxim Enterprises relied for the effective and profitable operation of its business.

305.   The version of New Field-Comm dot net produced by New East Point frequently failed and, ultimately, cost the Maxim Entities their contracts with various clients.  Maxim Entities also lost various subcontractors because the information provided by New East Point's computer software system was not up-to-date or was otherwise not workable.

306.   Due to the failure of the New East Point computer software system, Maxim Enterprises overpaid subcontractors in one pay period alone

approximately ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00), most of which was not able to be recovered, and ultimately resulted in damages to Maxim Enterprises for the breach by Plaintiffs in their implied warranty to provide a usable version of Field-Comm in the total approximate amount of TWO MILLION AND NO/100 DOLLARS ($2,000,000.00).

C. <u>Maxim Entities Attempt to Mitigate Their Damages.</u>

307.   In 2007, Mr. Maxim approached Tom Margarido and shared with him ideas concerning a software system that Mr. Maxim could develop in-house that would resolve the New Field-Comm dot net shortfalls.

308.   Tom Margarido confirmed that Maxim Entities should proceed on their own and provided the name of a potential software expert to be hired, Mr. Alex Bardzilauskus, who is referenced in paragraphs #56, and following, of the complaint.

309.   After expending from two (2) to three (3) years of time and approximately FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00), Maxim Entities have developed an internet-based software system that meets the needs of the property preservation industry, which is successfully being used internally at Maxim Enterprises.

D. <u>Dissimilarity of Software</u>.

310.   The software developed by Maxim Entities is web-based, New East Point's computer-based software system is not.  The central operating

features of Maxim Entities' system are not derived from information obtained from New East Point.

311.   New East Point's computer-based software system is not user friendly.  Maxim Entities' web-based system is cheaper, faster and more accurate, with a much lower failure rate.

### FIRST COUNT – Breach of Coventant of Good Faith and Fair Dealing

312.   For the First Count of Maxim Entities' Counterclaim they incorporate by this reference each and every allegation contained in paragraphs #1 through 311 as if rewritten.

313.   Plaintiffs breached their investment contract with S2k, attached as Exhibit "L" to the complaint, by:

   a. failing to apply sufficient amounts from the proceeds of Mr. Maxim's investment towards the creation of New Field-Comm dot net produced by New East Point;

   b. applying proceeds of the investment to the enrichment of the Connecticut Shareholders rather than the benefit of New East Point;

   c. failing to return Mr. Maxim's investment prior to receipt by the Connecticut Shareholders of dividends or other proceeds from the business; and

   d. misrepresenting New East Point's reasonable ability to attain the profits projected in the pro-forma financial statements.

**All of the aforesaid were reasonably expected contract benefits, and the failure of Plaintiffs to perform same constitutes breach of implied covenants of good faith and fair dealing, resulting in damages for the total loss of defendants' investment.**

314. **In addition to the false representations, as aforesaid, the Connecticut shareholders used coercive sales tactics to threaten that Old East Point would be forced  to shut down, thereby depriving Maxim Enterprises with continued service for the Field-Comm system that now had become necessary to Maxim Enterprises' business unless Maxim Entities paid $250,000 to purchase six percent (6%) of an operation that had never made a profit; thus, Plaintiffs failed to provide promised benefits in violation of an <u>implied</u> covenant of good faith and fair dealing.**

315. **Maxim Entities have hired Atty. Sidney N. Freeman and Robert F. McNamara, McNamara, Demczyk Co., L.P.A., Uniontown, Ohio, and Atty. Brian O'Donnell, Reid and Riege, P.C., as Connecticut local counsel, to represent them in this matter, and have agreed to pay said attorneys a reasonable fee and expenses for their services herein.**

316. **Maxim Entities are entitled to damages for breach of the implied covenant of good faith and fair dealing in the investment contract in the amount of their investment in New East Point, TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00), plus the reasonable fees and expenses of their attorneys, and interest at the maximum rate**

allowable by law from the date the contract was violated and continuing through the date the judgment herein is satisfied.

### SECOND COUNT – Breach of Implied Warranty for Goods and Services

317.  For the Second Count of Maxim Entities' Counterclaim they incorporate by this reference each and every allegation contained in paragraphs #1 through 316 as if rewritten.

318.  Plaintiffs delivered a version of the New Field-Comm dot net computer software system beginning in 2007 containing material defects that caused massive billing errors with established customers of Maxim Enterprises.

319.  A major component of the errors experienced by Maxim Enterprises with the New Field-Comm dot net system involved the reporting of results to the mortgage holder customers of Maxim Enterprises of the results of subcontractor services to secure and maintain foreclosed properties.

320.  The mortgage holder customers of Maxim Enterprises required a system that would download properties for maintenance, obtain and award the bids of subcontractors, who then would use the system to upload results of their services for delivery back to the mortgage holders for payment.

321.  These requirements were being handled in some fashion by the Field-Comm system provided by Old East Point, adequate to permit

Maxim Enterprises to maintain steady growth up to the date in 2007 when it switched to the New Field-Comm dot net system.

322.  Although adequate, Plaintiffs were told by Mr. Maxim in 2002 and 2003 that Field-Comm was becoming obsolete because executable copies had to be loaded onto each individual users' computer servers by disk, which then interfaced with a similar computer at Maxim Enterprises, who then re-entered information that was telefaxed to the mortgage holders, and Mr. Maxim told Plaintiffs of other refinements needed by the system to keep up with developments in the mortgage property preservation industry.

323.  Mr. Maxim was told by Tom Margarido that Plaintiffs could produce a new, integrated system that would conform to Maxim Enterprises' needs, and that representation formed a material part of the consideration for which S2k paid the $250,000 contract price stated within **Exhibit** "**L**" to the Complaint.

324.  By virtue both of the prior vendor/vendee relationship between the Old East Point and Maxim Enterprises, and conversations between Tom Margarido and Mr. Maxim in 2002 and 2003, both by telephone and in-person, Plaintiffs were well aware of Maxim Enterprises' business, the need for the computer system to conform to particular purposes, and the potential consequential damage that Maxim Enterprises would incur if the system did not perform as represented.

325.   After its formation New East Point went to work engineering the New Field-Com dot net system; however, the engineer who had developed Field Comm for Old East Point was Tom Margarido, who worked in the FileMaker Pro language and relational database, while New Field-Comm dot net was being created by another engineer using SQL, sold by Microsoft , which two languages did not communicate with each other; Tom Margarido did not work with, and was not familiar with SQL, and New East Point's engineer did not work with and was not familiar with FileMaker Pro.

326.   As a consequence of the lack of communication between the systems engineered by two separate persons, New Field-Comm dot net did not even possess the same functionality as old Field-Comm, which deficiencies were material to Maxim Enterprises' continued effective operations and cost Maxim Enterprises lost business.

327.   Maxim Enterprises installed New Field-Comm dot net in 2007.

328.   Almost immediately the Maxim Entities saw that the information being returned to Maxim Enterprises' mortgage holder via New Field-Comm dot net was incomplete, inaccurate and untimely

329.   Maxim Entities reported the errors to Plaintiffs, who attempted repairs to New Field-Comm dot net that were unsuccessful.

330.   The defects in Field-Comm dot net caused Maxim Entities to lose significant revenue because of unpaid invoices that could not be supported to their customers with proper information.

331.   One such customer was Countrywide Mortgages, which merged with Bank of America and/or one of its subsidiary or related companies (hereinafter "BANA").

332.   The difficulties experienced with the lack of supporting data in the reports given to BANA resulted in litigation before the Summit County and Cuyahoga County, Ohio, Courts of Common Pleas, that cost Maxim Entities significant lost revenue.

333.   Another problem Maxim Enterprises experienced with New Field-Comm dot net was that because of the inadequate reporting features subcontractors were getting paid for services they either did not perform, complete or complete satisfactorily.

334.   Mr. Maxim told Plaintiffs of the problem it was experiencing with faulty reports that New Field-Comm dot net, that it was causing erroneous payments to subcontractors, which had to be reversed.

335.   Plaintiffs attempted repairs to New Field-Comm dot net that were unsuccessful.

336.   As a result of overpayments to subcontractors that were erroneously supported by the defective information provided to the subcontractors by New Field-Comm dot net, Maxim Entities were forced into litigation with subcontractors in Summit County, Ohio, and Cuyahoga County, Ohio, Common Pleas Courts that cost Maxim Entities significant lost revenue.

337.   Maxim Entities were damaged, as a direct result of the aforesaid breaches of implied warranty of fitness for a particular purpose, under sec. 42a-2-315, Connecticut General Statutes, or comparable common law principles, in the New Field-Comm dot net system an amount of direct, compensatory, consequential and incidental damages in the approximate amount of TWO MILLION AND NO/100 DOLLARS ($2,000,000.00).

### THIRD COUNT - Fraud

338.   For the Third Count of Maxim Entities' Counterclaim they incorporate by this reference each and every allegation contained in paragraphs #1 through 337 as if rewritten.

339.   The following intentional or reckless misrepresentations of material fact were made to Mr. Maxim, regarding:

a.   the unregistered, unqualified, unsubstantiated and erroneous financial projections, prepared by financial non-professionals in or around 2003 for the purpose of attracting investors, not prepared in accordance with any reasonable accounting standards, and provided to Mr. Maxim by Tom Margarido in 2003 for the purpose of obtaining investment by Maxim Entities, which misrepresented projected profitability;

b.   the promises made by Tom Margarido to Mr. Maxim at or around the time the decision to invest was made in 2003, to return Mr.

Maxim's investment prior to receipt by the Connecticut Shareholders of a return on their shares;

c. the assurances made by Tom Margarido to Mr. Maxim at or around the time the decision to invest was made in 2003 that New East Point possessed the capability of providing a computer software program that could satisfy the needs of Maxim Enterprises; and

d. the threat made by Tom Margarido to Mr. Maxim at or around 2002 to 2003 that Field-Comm would not be serviced if Mr. Maxim did not invest TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00) because Old East Point would have to go out of business without such investment, when Mr. Margarido knew that Maxim Enterprises had come to rely upon Field-Comm for the operation of its business and would suffer great harm if that program no longer was serviced.

340. The foregoing misrepresentations of material fact told to Mr. Maxim resulted in the overvaluation of the assets of Old East Point, the unrealistic expectation of potential return to the Maxim Entities, the over-optimistic belief in the viability of the subject computer software system and in the ability of plaintiffs to write a system to Maxim Enterprises' satisfaction.

341. The Maxim Entities were led to believe the New East Point business to be formed was worth a sufficient amount that would make the value

of Maxim Entities' purchase of 6% of the shares of New East Point equal to the TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00) paid when, in fact, the number solely resulted from a selfish motive to maximize the benefits to be received by the Connecticut Shareholders in return for the least amount of stock that was felt Maxim Entities would demand, given that a part of the consideration being purchased was the protection against a disruption in Maxim Enterprises' business.

342.  In fact, Plaintiffs knew, or had reason to know, that each and every one of the aforesaid representations of fact were materially false, that such misrepresentations of material fact were made by the Plaintiffs for their own benefit and that they received such benefit, and that Maxim Entities were relying upon such misrepresentations to make their decision to invest TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00), and that Maxim Entities lost substantially all of their investment as a result.

343.  In fact, such intentional misrepresentations of material fact were part of a scheme to obtain illegally from Maxim Entities the amount they paid for the purchase of New East Point stock.

344.  Additionally, a similar membership purchase agreement to the one that Plaintiffs entered with S2k and containing a buy-back provision similar to the one contained within the contract attached as Exhibit "L" to the Complaint, was entered into with Robert Kline, whereby Plaintiffs

obtained money from Mr. Kline with a buy-back option that unreasonably favored the Connecticut Shareholders and that, as a consequence of Plaintiffs' exercise of such unreasonable buy-back agreement, Plaintiffs obtained the stock of such other investor at an amount far less than his original contribution.

345.   Similar to Maxim Entities, Mr. Kline was the owner of a property preservation company and was relying upon Plaintiffs to provide the New Field-Comm dot net software system as part of his consideration in making his investment.

346.   Such buy-back agreement constituted a part of a scheme to obtain investment contributions, use those contributions for the principal use and benefit of the Connecticut Shareholders, who then completed their scheme to deprive such investors of the substantial value of their contribution by use of the buy-back at an unreasonably low price.

347.   The Plaintiffs are attempting to utilize the same scheme by seeking enforcement of such unequal buy-back, as alleged within their Complaint at bar.

348.   The scheme to deprive Maxim Entities of most of their investment was willful, intentional, and was conceived from a malicious intention to obtain Maxim Entities' money without value.

349.   The actions of plaintiffs aforesaid are unconscionable and show a corrupt state of affairs.

350.   The plaintiffs will continue such activity unless this court imposes a penalty to prevent repetition.

351.   The intentional misrepresentations of material fact aforesaid constitutes a fraud upon the Maxim Entities, entitling them to recover damages in the amount of their investment, TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00); in addition Maxim Entities are entitled to recover from plaintiffs, and each of them separately, punitive damages in an amount designed to deter similar future conduct, plus the reasonable costs and expenses of their attorneys in prosecuting this action.

## FOURTH COUNT – *Quantum Meruit*

352.   For the Fourth Count of Maxim Entities' Counterclaim they incorporate by this reference each and every allegation contained in paragraphs #1 through 351 as if rewritten.

353.   The acts of plaintiffs aforesaid caused Maxim Entities to spend TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00), a substantial part of the consideration for which was for the development by Plaintiffs of New Field-Comm dot net for the benefit and use of Maxim Enterprises.

354.   Plaintiffs never developed New Field-Comm dot net to the point where it was not causing Maxim Enterprises significant damage in terms of lost revenues from its mortgage holder customers and

improperly paid invoices to Maxim Enterprises' subcontractors for 2007, the year it first was installed, through 2009.

355.   As a result and in mitigation of the losses suffered through the continued use by Maxim Enterprises of the improperly designed New Field-Comm dot net, Mr. Maxim approached Tom Margarido and asked if Tom Margarido would allow Maxim Entities to develop their own, web-based system, and whether Tom Margarido would agree to allow Maxim Field Service Supply's software engineer, Defendant Mr. Pajemola, to view the New Field-Comm dot net system source code so that Maxim Entities could modify such software or database for Maxim Entities' business purposes.

356.   Tom Margarido agreed to allow Maxim Entities to develop its own system, waive any and all existing non-competition agreements between Plaintiffs and the Maxim Entities and, in return, in or around late 2008, Mr. Maxim signed on behalf of Maxim Enterprises, Inc. the Software Source Code Access and Indemnity Agreement (hereinafter the "2008 Source Code Access Agreement"), attached to the Complaint herein as Exhibit "E" (Doc. #1-5).

357.   At or around the same time, Mr. Maxim signed personally and on behalf of Maxim Enterprises the East Point Systems, Inc. Confidentiality and Non-competition Agreement (hereinafter the "2008 Non-compete Agreement). Doc. #1-13.

358. Maxim Entities challenge the validity of the 2008 Source Code Access Agreement (Doc. 1-5) because, among other things, no counterpart signed by New East Point has been attached to the Complaint (Doc. #1).

359. Maxim Entities did not violate the 2008 Non-compete Agreement (Doc. #1-13) because they did not copy the New Field-Comm dot net architecture or design.

360. With the full knowledge and support of New East Point, Maxim Field Service Supply developed through the efforts of the computer engineer it hired, Defendant Mr. Pajemola, a completely separate mortgage service industry software package known as Field Navigator, with completely different source code and architecture, and which is not a derivative work of New Field-Comm dot net.

361. Maxim Field Service Supply paid to develop Field Navigator, at a cost of an additional FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00).

362. Plaintiffs seek within Count XV of their Complaint (Doc. #1) to invoke this Court's equitable jurisdiction in order to impose a constructive trust over the Field Navigator system that Maxim Field Service Supply spent FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00) to develop; nowhere within the Complaint does it state that any of the Maxim Entities have any right to use the computer software system they

developed at their cost with the knowledge and support of Plaintiffs for any purpose whatsoever.

363.   If this court should conclude that Maxim Entities may not exploit or use commercially the computer software system they developed due to the imposition of a constructive trust (Complaint, Count XV (Doc. #1)) Plaintiffs will be unjustly enriched both for $250,000, the amount that was obtained from them by Plaintiffs' in partial consideration for the development of the New Field-Comm dot net system that never worked, and in the amount of $500,000 for the money spent by Maxim Field Service Supply as New East Point's *de facto* research and development department.

364.   Plaintiffs have invoked this Court's equity jurisdiction in order to impose a constructive trust over the system that Maxim Entities spent a total of SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($750,000.00) both to purchase and, when that proved futile, to develop, and demand Maxim Entities not be allowed to continue to hold and enjoy Field Navigator; it is a basic precept that one who seeks equity must also do equity if it wants to invoke such jurisdiction of a court.

365.   Should this Court rule that Maxim Field Service Supply, or the other Maxim Entities, are not able to hold and enjoy Field Navigator, and that ownership of all right, title and interest of same is to be held in constructive trust for the sole benefit of New East Point (a result with which Maxim Entities most strenuously disagree), then Maxim Entities

are entitled to recover under principles of contract implied in-fact or at-law to address the resulting injustice.

366.  If this court should conclude that Maxim Entities may not exploit or use commercially the computer software system they developed Maxim Entities are entitled to recover from Plaintiffs for the fair value of the asset, in the amount of SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($750,000.00), on the basis of *quantum meruit* for goods had and received, either in contract implied in-fact or at-law.

<u>**FIFTH COUNT – Specific Performance**</u>

367.  For the Fifth Count of Maxim Entities' Counterclaim they incorporate by this reference each and every allegation contained in paragraphs #1 through 366 as if rewritten.

368.  In the event this Court should find there is no adequate remedy at law, and in the further event that it should be determined the software system developed by Maxim Field Service Supply, or the other Maxim Entities, cannot be commercially exploited by that party, it will result in a financial windfall to Plaintiffs.

369.  The financial windfall to be received by Plaintiffs if Maxim Entities are not permitted to commercially exploit their software system will increase greatly the value of New East Point's stock.

370.  The East Point Systems, Inc. Cross-purchase Agreement (Complaint, <u>**Exhibit "D"**</u>, Doc. #1-4) is invalid for absence of a necessary performance term because, among other things, neither Schedule A-1 -

Purchase Upon Death of a Connecticut Shareholder (Doc. #1-4, p.9), nor Schedule B-1 - Transfer by S2k (Id., pp. 10-11) is signed, which means the Cross-purchase Agreement does not provide a mechanism for the computation of the share price.

371.   However, in the event this Court finds that Cross-purchase Agreement (Complaint, Exhibit "D", Doc. #1-4) is valid and that the share price for the purchase of S2k's interest should be determined by appraisal, then the full appraised value must take into account the value of all assets and business of New East Point.

372.   In the event that this Court finds in favor of Plaintiffs' assertion that Field Navigator, or any part thereof, is the property of East Point and not Maxim Field Service Supply, or one of the other Maxim Entities (a result with which the Maxim Entities most strenuously disagree), then Maxim Entities request the court grant specific performance to enforce the subject Cross-purchase Agreement (Complaint, Exhibit "D", Doc. #1-4), and force the purchase of S2k's stock by Plaintiffs, but with the specific instruction that the appraisers hired by the parties are to take into account the financial and economic value of such ownership interest in Field Navigator as this Court has found is owned by New East Point.

373.   Maxim Entities assert that the increase in stock value resulting from a finding that New East Point owns Field Navigator similarly will increase the appraised value the stock in S2k's hands to SEVEN

HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($750,000.00), which is the amount that Plaintiffs should be ordered to pay.

### SIXTH COUNT – Connecticut Unfair Trade Practices Act

374.   For the Sixth Count of Maxim Entities' Counterclaim they incorporate by this reference each and every allegation contained in paragraphs #1 through 373 as if rewritten.

375.   The following intentional or reckless misrepresentations of material fact were made to Mr. Maxim, regarding:

a.   the unregistered, unqualified, unsubstantiated and erroneous financial projections, prepared by financial non-professionals in or around 2003 for the purpose of attracting investors, not prepared in accordance with any reasonable accounting standards, and provided to Mr. Maxim by Tom Margarido in 2003 for the purpose of obtaining investment by Maxim Entities, which misrepresented projected profitability;

b.   the promises made by Tom Margarido to Mr. Maxim at or around the time the decision to invest was made in 2003, to return Mr. Maxim's investment prior to receipt by the Connecticut Shareholders of a return on their shares;

c.   the assurances made by Tom Margarido to Mr. Maxim at or around the time the decision to invest was made in 2003 that New East Point possessed the capability of providing a computer

software program that could satisfy the needs of Maxim Enterprises; and

d.  the threat made by Tom Margarido to Mr. Maxim at or around 2002 to 2003 that Field-Comm would not be serviced if Mr. Maxim did not invest TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00) because Old East Point would have to go out of business without such investment, when Mr. Margarido knew that Maxim Enterprises had come to rely upon Field-Comm for the operation of its business and would suffer great harm if that program no longer was serviced.

376.  The foregoing misrepresentations of material fact told to Mr. Maxim resulted in the overvaluation of the assets of Old East Point, the unrealistic expectation of potential return to the Maxim Entities, the over-optimistic belief in the viability of the subject computer software system and in the ability of plaintiffs to write a system to Maxim Enterprises' satisfaction.

377.  The Maxim Entities were led to believe the New East Point business to be formed was worth a sufficient amount that would make the value of Maxim Entities' purchase of 6% of the shares of New East Point equal to the TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00) paid when, in fact, the number solely resulted from a selfish motive to maximize the benefits to be received by the Connecticut Shareholders in return for the least amount of stock that

was felt Maxim Entities would demand, given that a part of the consideration being purchased was the protection against a disruption in Maxim Enterprises' business.

378.   In fact, Plaintiffs knew, or had reason to know, that each and every one of the aforesaid representations of fact was materially false, that such misrepresentations of material fact were made by the Plaintiffs for their own benefit and that they received such benefit, and that Maxim Entities were relying upon such misrepresentations to make their decision to invest TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00), and that Maxim Entities lost substantially all of their investment as a result.

379.   In fact, such intentional misrepresentations of material fact were part of a scheme to obtain illegally from Maxim Entities the amount they paid for the purchase of New East Point stock.

380.   Additionally, a similar membership purchase agreement to the one that Plaintiffs entered with S2k and containing a buy-back provision similar to the one contained within the contract attached as <u>Exhibit "L"</u> to the Complaint, was entered into with Robert Kline, whereby Plaintiffs obtained money from Mr. Kline with a buy-back option that unreasonably favored the Connecticut Shareholders and that, as a consequence of Plaintiffs' exercise of such unreasonable buy-back agreement, Plaintiffs obtained the stock of such other investor at an amount far less than his original contribution.

381.   Similar to Maxim Entities, Mr. Kline was the owner of a property preservation company and was relying upon Plaintiffs to provide the New Field-Comm dot net software system as part of his consideration in making his investment.

382.   Such buy-back agreement constituted a part of a scheme to obtain investment contributions, use those contributions for the principal use and benefit of the Connecticut Shareholders, who then completed their scheme to deprive such investors of the substantial value of their contribution by use of the buy-back at an unreasonably low price.

383.   Plaintiffs are attempting in this action to affect the same result on Maxim Entities through the presumed enforcement of a buy-sell agreement that provides grossly unfair compensation to Maxim Entities, in an amount far less than the price paid by Maxim Entities for their interest in New East Point, for the obvious purpose of retaining Maxim Entities' money by deceit.

384.   By the actions aforesaid, plaintiffs have acted in an immoral, unethical, oppressive or unscrupulous manner, in violation of the Connecticut Unfair Trade Practice Act, Conn. Gen. Stat. sec. 42-110a, et seq.

385.   The actions aforesaid caused Maxim Entities to suffer substantial ascertainable damages.

### SEVENTH COUNT – Rescission and Reformation

386.   For the Seventh Count of Maxim Entities' Counterclaim they incorporate by this reference each and every allegation contained in paragraphs #1 through 256, and #272 through 385 as if rewritten.

387.   The following intentional or reckless misrepresentations of material fact were made to Mr. Maxim, regarding:

a.   the unregistered, unqualified, unsubstantiated and erroneous financial projections, prepared by financial non-professionals in or around 2003 for the purpose of attracting investors, not prepared in accordance with any reasonable accounting standards, and provided to Mr. Maxim by Tom Margarido in 2003 for the purpose of obtaining investment by Maxim Entities, which misrepresented projected profitability;

b.   the promises made by Tom Margarido to Mr. Maxim at or around the time the decision to invest was made in 2003, to return Mr. Maxim's investment prior to receipt by the Connecticut Shareholders of a return on their shares;

c.   the assurances made by Tom Margarido to Mr. Maxim at or around the time the decision to invest was made in 2003 that New East Point possessed the capability of providing a computer software program that could satisfy the needs of Maxim Enterprises; and

d.   the threat made by Tom Margarido to Mr. Maxim at or around 2002 to 2003 that Field-Comm would not be serviced if Mr. Maxim did

not invest TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00) because Old East Point would have to go out of business without such investment, when Mr. Margarido knew that Maxim Enterprises had come to rely upon Field-Comm for the operation of its business and would suffer great harm if that program no longer was serviced.

388.   The foregoing misrepresentations of material fact told to Mr. Maxim resulted in the overvaluation of the assets of Old East Point, the unrealistic expectation of potential return to the Maxim Entities, the over-optimistic belief in the viability of the subject computer software system and in the ability of plaintiffs to write a system to Maxim Enterprises' satisfaction.

389.   The Maxim Entities were led to believe the New East Point business to be formed was worth a sufficient amount that would make the value of Maxim Entities' purchase of 6% of the shares of New East Point equal to the TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00) paid when, in fact, the number solely resulted from a selfish motive to maximize the benefits to be received by the Connecticut Shareholders in return for the least amount of stock that was felt Maxim Entities would demand, given that a part of the consideration being purchased was the protection against a disruption in Maxim Enterprises' business.

390.   In fact, Plaintiffs knew, or had reason to know, that each and every one of the aforesaid representations of fact was materially false, that such misrepresentations of material fact were made by the Plaintiffs for their own benefit and that they received such benefit, and that Maxim Entities were relying upon such misrepresentations to make their decision to invest TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00), and that Maxim Entities lost substantially all of their investment as a result.

391.   Additionally, a similar membership purchase agreement to the one that Plaintiffs entered with S2k and containing a buy-back provision similar to the one contained within the contract attached as Exhibit "L" to the Complaint, was entered into with Robert Kline, whereby Plaintiffs obtained money from Mr. Kline with a buy-back option that unreasonably favored the Connecticut Shareholders and that, as a consequence of Plaintiffs' exercise of such unreasonable buy-back agreement, Plaintiffs obtained the stock of such other investor at an amount far less than his original contribution.

392.   Similar to Maxim Entities, Mr. Kline was the owner of a property preservation company and was relying upon Plaintiffs to provide the New Field-Comm dot net software system as part of his consideration in making his investment.

393.   Such buy-back agreement constituted a part of a scheme to obtain investment contributions, use those contributions for the principal use

and benefit of the Connecticut Shareholders, who then completed their scheme to deprive such investors of the substantial value of their contribution by use of the buy-back at an unreasonably low price.

394.   Because of the intentional and fraudulent misrepresentations of material fact aforesaid, the purported contract documents attached as Exhibits to the complaint, if found valid, constitute acts of adhesion.

395.   The deception of Plaintiffs in inducing Maxim Entities to purchase what now appear to be virtually worthless shares in New East Point, combined with Maxim Entities' lack of knowledge of facts that rendered the purchase inequitable, entitle Maxim Entities to rescission.

396.   Specifically, but without limitation the 2008 Non-compete Agreement (Doc. #1-13), contains provisions that are so one-sided in favor of New East Point that the document lacks consideration; a review of that document reveals that it grants Mr. Maxim and Maxim Enterprises the right to spend time and money to modify New Field-Comm dot net, but without any corresponding benefit to the Maxim Entities.

397.   When Mr. Maxim approached Tom Margarido in 2008 with a proposal for Maxim Entities to develop their own operating system, Mr. Maxim and Tom Margarido agreed that the system developed by Maxim Entities, now known as Field Navigator, would be used by the Maxim Entities for their business, without any payment to be made to Plaintiffs.

398.   Because the Field Navigator system that was developed by Mr. Pajemola on behalf of Maxim Field Service Supply was web-based,

wholly unlike New Field-Comm dot net, and did not utilize any source code, software design or architecture of New Field-Comm dot net, there is no reasonable rationale to support any requirement contained within the 2008 Non-compete Agreement (Doc. #1-13) to transfer or disclose any code, design, architecture or other proprietary information regarding the programming or operation of Field Navigator to Plaintiffs

399.   Maxim Entities request this Court reform the 2008 Non-compete Agreement (Doc. #1-13) so that it complies with the understanding of the parties and with commercial reasonableness.

## NINTH COUNT – Injunction

400.   For the Ninth Count of Maxim Entities' Counterclaim they incorporate by this reference each and every allegation contained in paragraphs #1 through 402 as if rewritten.

401.   Maxim Field Service Supply has spent substantial amounts of time and money to develop the programming and engineering of the Field Navigator computer system, in an effort to build a loyal client base, all of which required years of effort in development and $500,000 in development costs, all with the knowledge, approval and authorization of Plaintiffs.

402.   Maxim Field Service Supply and the Maxim Entities take all reasonably necessary precautions to ensure that the source code, software design, architecture and engineering of Field Navigator

remains confidential and do not become known to competitors or the public at large.

403.   Defendants Mr. Pajemola, Cleveland Field Systems, LLC, and New East Point also claim ownership over the disputed Field Navigator system developed at the expense of Maxim Field Service Supply.

404.   Unless defendants Mr. Pajemola, Cleveland Field Systems, LLC, are enjoined from disclosing to Plaintiffs the unique source code, software design, engineering or architecture, and Plaintiffs are enjoined from seeking or accepting the disclosure of such confidential information regarding the operation of Field Navigator, whether directly or indirectly, unless pursuant an Order of this Court, Maxim Field Service Supply, and others of the Maxim Entities, will suffer irreparable harm, including (without limitation) loss of competitive position in the industry and loss of its customers and potential customers.

405.   Maxim Field Service Supply, or others of the Maxim Entities, are entitled to an injunction preventing the disclosure of confidential information relating to Field Navigator by Mr. Pajemola, Cleveland Field Systems, LLC, to Plaintiffs, and from Plaintiffs accepting any such information for a reasonable time following the entry of judgment herein.

### TENTH COURT – Declaratory Judgment

406.   For the Tenth Count of Maxim Entities' Counterclaim they incorporate by this reference each and every allegation contained in paragraphs #1 through 408 as if rewritten.

407.   Maxim Field Service Supply attempted to test market its system, but halted such efforts when it became aware of plaintiffs' claims of disputed ownership.

408.   Maxim Enterprises utilizes Field Navigator developed by Maxim Field Service Supply.

409.   Maxim Enterprises, and the other Maxim Entities, are entitled to utilize the Field Navigator system that Maxim Field Service Supply developed at its sole expense, separately and without copying any of the design, engineering, source code or architecture of New Field-Comm dot net, through the services of its employee and contractor, Defendant Mr. Pajemola.

410.   Plaintiffs have alleged within their Complaint that investigators they hired taped a meeting they had with Maxim Enterprises wherein the investigators posed as subcontractors who were interested in doing business with Maxim Enterprises as the general contractor.

411.   Mr. Maxim explained to the investigators how Maxim Enterprises wanted to offer Field Navigator exclusively to such subcontractors as an inducement to employ their services, by giving the subcontractors the use of Field Navigator as an integrated value-added feature of their business relationship with Maxim Enterprises.

412.   Maxim Entities believe that they possess the legal right to make such offers to attract the services of subcontractors, for the exclusive use of Field Navigator for referred business where Maxim Enterprises acts as the general contractor.

413.   Maxim Entities, have stopped trying to market Field Navigator as a feature to attract subcontractors, and is not currently using the system with such subcontractors, because of the uncertainty raised by these proceedings.

414.   Maxim Enterprises, and the other Maxim Entities are being substantially harmed economically by the self-imposed delay in implementing and marketing Field Navigator for use by its subcontractors, which economic harm increases by the day.

415.   Maxim Entities state that the status of the agreements by and among the parties, and the rights and obligations imposed by law and equity are such that the matters require resolution by means of an expedited trial for declaratory judgment, in order that ownership of the computer-based software system that is the subject hereof may be established by this court in a speedy manner so that Maxim Entities may utilize the system as soon as possible, and before final resolution of the instant action, so that its damages may be mitigated.

## CROSS-CLAIM

## ADDITIONAL FACTUAL MATTERS RELEVANT TO CROSS-CLAIM

416.   Maxim Field Supply's success rests in substantial part upon its development and ownership of the "Confidential Information"), which includes, but is not limited to, the designing, developing, programming and maintenance of a web-based computer system known as the Field Navigator, which also includes customer lists, pricing information, profit margins, sources of supply, methods of operation, credit procedures, an architecture for the storage and utilization of data "in the cloud", as well as other proprietary information that is not generally known to the public.

417.   The Confidential Information is valuable in that it provides Maxim Field Supply with a distinct competitive advantage, and the information has independent economic value to Maxim Field Supply because it is not known to Maxim Field Supply's competitors.

418.   Maxim Field Supply has devoted a great deal of time, effort and money into the acquisition, creation and maintenance of its Confidential Information, which expense mandates that the Confidential Information not be made public or Maxim Field Supply will lose the valuable competitive advantage it has developed.

419.   Because Maxim Field Supply possesses Confidential Information, it uses reasonable means to safeguard the confidential and secret nature of such information, including, but not limited to, restricting access to specific customer related lists and requiring that employees sign a confidentiality agreement as a condition of employment.

420.  Mr. Pajemola became employed by Maxim Field Supply on or about August 16, 2010, as a computer programmer, based in Massillon, Ohio.

421.  To fulfill his job duties and responsibilities as a computer programmer, Mr. Pajemola was given regular access to Maxim Field Supply's Confidential Information, including, but not limited to, Maxim Field Supply's existing computer programs, customer lists and information concerning the customers' specific needs and pricing, which Confidential Information was obtained solely by virtue of Mr. Pajemola's employment with Maxim Field Supply.

422.  Understanding that Mr. Pajemola necessarily would access and use the Confidential Information, Maxim Field Supply required him to acknowledge and maintain its secrecy and execute a certain covenant.

423.  Maxim Field Supply and Mr. Pajemola entered into an Employment Agreement (the "Agreement") on or about August 13, 2010, a true and correct copy of which is attached hereto as Exhibit "1".

424.  In exchange for executing the Agreement, and in consideration, Maxim Field Supply provided Mr. Pajemola employment, as aforesaid.

425.  Pursuant to the Agreement, Mr. Pajemola agreed, among other things, not to use or disclose any of the Confidential Information, and not to compete with Maxim Field Supply for the three (3) year period following his separation from employment with Maxim Field Supply:

4.2    In further consideration of this Agreement, Employee agrees that during this Agreement and for a period of three (3) years from Employee's separation from the Company, Employee will not, directly or indirectly, compete with the business of the Company, by

developing, designing, programming or marketing web based management systems, as the business of the Company may then be constituted, within all geographic areas where the Company conducts business. "Direct Competition" shall mean development, production, promotion, or sale of products or services competitive with those of Company. "Indirect Competition" means employment whether as an employee, independent contractor or consultant by any competitor or third party providing products or services which compete with Company's products and services, for whom Employee will perform the same or similar function as he performs for the Company, Employee will not induce or attempt to induce any other employee of the Company to discontinue his or her employment with the Company, nor will Employee initiate discussions, negotiations or contacts with persons known by Employee to be a customer or supplier of the Company at the time of Employee's separation of employment from the Company.

426. On or about June 15, 2011, Mr. Pajemola's employment with Maxim Field Supply was terminated.

427. Upon information and belief, in or around the time Mr. Pajemola's employment was terminated with Maxim Field Supply, he had access to and took from the workplace, in hard copy or electronic form, Confidential Information, including (without limitation) computer programming and design, customer related information and pricing.

428. Maxim Field Supply became aware of Mr. Pajemola's competitive employment with Cleveland Field Systems.

429. Despite assurances to the contrary, Mr. Pajemola has and still continues to violate his Agreement by working for Cleveland Field Systems in a competitive role within the designated restricted area and, upon information and belief, is using and disclosing Confidential Information to perform his work for Cleveland Field Systems.

430.   Based upon information and belief, Mr. Pajemola owns the controlling membership interest in Cleveland Field Systems.

431.   Cleveland Field Systems knowingly has encouraged, directed or permitted Mr. Pajemola to violate the Agreement with Maxim Field Supply, and to use and disclose such Confidential Information in order to solicit Maxim Field Supply's business and customers to benefit itself at Maxim Field Supply's expense.

### FIRST COUNT – Misappropriation of Trade Secrets (Mr. Pajemola and Cleveland Field Systems)

432.   For the First Count of its Cross-claim, Maxim Field Supply restates each and every allegation contained in paragraphs #1 though 358 as if rewritten.

433.   The Confidential Information is the product of years of development and an investment of substantial time and money by Maxim Field Supply, is known only to Maxim Field Supply and those to whom Maxim Field Supply has disclosed such information in confidence, is not generally known to the public and Maxim Field Supply has taken reasonable precautions to maintain the Confidential Information's secrecy.

434.   The Confidential Information has enabled Maxim Field Supply to obtain a fair and lawful competitive advantage over those who do not know or have the right to use that information.

435.   All or part of the Confidential Information constitutes "trade secrets" within the meaning of Ohio Rev. Code sec.1333.61.

436.   Defendants Mr. Pajemola and Cleveland Field Systems, and each of them, misappropriated and made unlawful use of the Confidential Information without Maxim Field Supply's consent, license or authorization.

437.   Defendants Mr. Pajemola and Cleveland Field Systems, and each of them, took, used and disclosed Maxim Field Supply's trade secrets in order to gain an unfair competitive advantage and foster a business without having to make the same investment as that made by Maxim Field Supply, with the intent to use Maxim Field Supply's trade secrets to their commercial advantage so that they can directly compete with Maxim Field Supply in its industry without expending the resources, time and effort necessary to research and develop said Defendants' own proprietary information and trade secrets, in violation of Ohio Rev. Code secs.1333.61 and 1333.81.

438.   Defendants Mr. Pajemola and Cleveland Field Systems acted willfully, intentionally and maliciously in misappropriating the Confidential Information to their financial and competitive advantage.

439.   Maxim Field Supply has suffered damages and loss of business as a result of the misappropriation of its Confidential Information, the total economic harm to be specifically proven at trial, and is entitled to damages pursuant to Ohio Rev. Code sec.1333.63(A).

440.   Maxim Field Supply is entitled to an injunction pursuant to Ohio Rev. Code sec.1333.62 prohibiting Defendants Mr. Pajemola and Cleveland

Field Systems and all others acting in association with them, directly or indirectly, from retaining, using or disclosing the Confidential Information.

441. Maxim Field Supply hired Atty. Sidney N. Freeman, and Robert McNamara, McNAMARA, DEMCZYK CO., L.P.A., to represent it in this matter and has agreed to pay said attorneys a reasonable fee for their representation, plus expenses.

442. Maxim Field Supply is entitled to recover the reasonable fees and expenses of its attorneys in prosecuting this matter, because of the wilfull and malicious acts of the Defendants Mr. Pajemola and Cleveland Field Systems, pursuant to Ohio Rev. Code sec.1333.64, and punitive damages, pursuant to Ohio Rev. Code sec.1333.63(B).

### SECOND COUNT – Breach of Contract (Mr. Pajemola)

443. For the Second Count of its Cross-claim, Maxim Field Supply restates each and every allegation contained in paragraphs #1 though 369 as if rewritten.

444. Mr. Pajemola entered into the Agreement on or about August 13, 2010.

445. Upon information and belief, Mr. Pajemola has breached the Agreement by taking, retaining, using and disclosing Maxim Field Supply's Confidential Information for his own benefit and the benefit of Cleveland Field Systems.

446.   Mr. Pajemola has breached the agreement by competing directly, or indirectly as a result of working for Cleveland Field Systems, a competing business, within the area restricted by the Agreement and prior to the expiration of three (3) years after his separation from employment with Maxim Field Supply.

447.   Maxim Field Supply has been, and will continue to be harmed by Mr. Pajemola's continued breach of contract, for which Maxim Field Supply is entitled to a remedy.

### THIRD COUNT – Tortious Interference with Contract (Mr. Pajemola and Cleveland Field Systems)

448.   For the Third Count of its Cross-claim, Maxim Field Supply restates each and every allegation contained in paragraphs #1 though 374 as if rewritten.

449.   Cleveland Field Systems knowingly has encouraged, directed or permitted and continues to encourage, direct or permit Mr. Pajemola to violate his Agreement not to compete with Maxim Field Supply, which actions are intentional and made with malice toward Maxim Field Supply, and after Cleveland Field Systems was aware of the restrictions Mr. Pajemola had as a result of executing the Agreement.

450.   Further, both Defendants Mr. Pajemola and Cleveland Field Systems have intentionally interfered with customers of Maxim Field Supply for the purpose, and with the effect of unfairly taking the customers' business from Maxim Field Supply.

451. As a result of Defendants Mr. Pajemola's and Cleveland Field Systems' actions, Maxim Field Supply has been and continues to be injured in its business, has sustained and will continue to sustain expenses and substantial damage to its business, goodwill, reputation and profits in an amount believed to be in excess of $25,000.

452. Maxim Field Supply also is entitled to an award of punitive damages and reasonable attorneys' fees and expenses as a result of Defendants Mr. Pajemola and Cleveland Field Systems' willful and malicious acts.

### FOURTH COUNT – Unfair Competition (Mr. Pajemola and Cleveland Field Systems)

453. For the Fourth Count of its Cross-claim, Maxim Field Supply restates each and every allegation contained in paragraphs #1 though 379 as if rewritten.

454. The conduct of Defendants Mr. Pajemola and Cleveland Field Systems, and each of them, herein constitutes unfair competition, by which said Defendants directly have benefitted by use of the Confidential Information and by violation of the Agreement.

455. The actions of Defendants Mr. Pajemola and Cleveland Field Systems, and each of them, have seriously damaged, and continue to damage Maxim Field Supply in an amount to be proven at trial, in excess of $25,000.00.

456. Maxim Field Supply is entitled to an award of compensatory, consequential, incidental and punitive damages as the result of the willful and malicious conduct of Defendants Mr. Pajemola and Cleveland

Field Systems, and each of them, in unfairly competing with Maxim Field
Supply.

### FIFTH COUNT – Unjust Enrichment (Mr. Pajemola and Cleveland Field Systems)

457.   For the Fifth Count of its Cross-claim, Maxim Field Supply restates
each and every allegation contained in paragraphs #1 though 383 as if
rewritten (except for those paragraphs hereinbefore that contain
allegations of the existence and/or breach of express contract between
Maxim Field Supply, and Mr. Pajemola and Cleveland Field Systems).

458.   Defendants Mr. Pajemola and Cleveland Field Systems, and each of
them, have been unjustly enriched and obtained benefits as a result of
their improper conduct as alleged hereinbefore.

459.   As a consequence of the foregoing, Maxim Field Supply has suffered
and will continue to suffer irreparable harm and loss in an amount to be
proven at trial, in excess of $25,000.00.

### SIXTH COUNT  – Conversion (Mr. Pajemola and Cleveland Field Systems)

460.   For the Sixth Count of its Cross-claim, Maxim Field Supply restates
each and every allegation contained in paragraphs #1 though 386 as if
rewritten.

461.   The acts of Defendants Mr. Pajemola and Cleveland Field Systems in
improperly acquiring the exclusive commercial use of Confidential
Information created for Maxim Field Supply constitute the wrongful
exercise of dominion and control over the Confidential Information of

Maxim Field Supply in denial of the right that Maxim Field Supply possesses to the ownership of same.

462.   Defendants Mr. Pajemola and Cleveland Field Systems, and each of them, are liable to Maxim Field Services in conversion in an amount to be proven at trial, in excess of $25,000.00.

### SEVENTH COUNT – Injunction (Mr. Pajemola and Cleveland Field Systems)

463.   For the Seventh Count of its Cross-claim, Maxim Field Supply restates each and every allegation contained in paragraphs #1 though 389 as if rewritten.

464.   Maxim Field Supply has spent substantial amounts of time and money to develop the programming and engineering of the Field Navigator computer system, and to build the loyalty of its client base, all of which required years of effort in development, and in obtaining and maintaining its relationships with its customers.

465.   Unless Defendants Mr. Pajemola and Cleveland Field Systems, and each of them, are enjoined and restrained from using or disclosing, directly or indirectly, Maxim Field Supply's Confidential Information in order to divert customers and profits from Maxim Field Service to said Defendants during the pendency of this action, and for a period thereafter consistent with the Agreement, Maxim Field Supply will suffer immediate and irreparable injury, including (without limitation) loss of its competitive position in the industry and loss of its customers and potential customers.

**EIGHTH COUNT– Indemnification, Contribution, Reimbursement**
**(Mr. Pajemola and Cleveland Field Systems)**

466.   For the Eighth Count of the Cross-claim, Maxim Entities' incorporate by this reference each and every allegation contained in paragraphs #1 through 256, and #272 through 392 as if rewritten.

467.   In the event that plaintiffs prevail against Maxim Entities the conduct that gave rise to plaintiffs' claims resulted from the misuse of New East Point's confidential information, or from a breach of the non-competition and non-disclosure agreements by the defendants Edwin Pajemola or Cleveland Field Systems, LLC, and not the actions of Maxim Entities.

468.   Maxim Entities took reasonable precautions to ensure that New East Point's confidential information was protected.

469.   Any violation of such non-disclosure and non-competition agreements as alleged within the complaint were because of the actions of defendants Edwin Pajemola or Cleveland Field Systems, LLC, in spite of the reasonable precautions taken by Maxim Entities to prevent any such misuse.

470.   Maxim Entities have hired Atty. Sidney N. Freeman and Robert F. McNamara, McNamara, Demczyk Co., L.P.A., Uniontown, Ohio, and Atty. Brian O'Donnell, Reid and Riege, P.C., as Connecticut local counsel, to prosecute this Cross-claim, and have agreed to pay said attorneys a reasonable fee and expenses for their services herein.

471.   Edwin Pajemola and Cleveland Field Systems, LLC, are liable to Maxim Entities for the payment of any damages that may result from a finding of liability upon the complaint, on the basis of indemnification or contribution.

472.   Further, in the event this court should find that the Maxim Entities may not exploit the computer software system developed by them because it is a copy or derivative of the system developed by East Point, such violations were the result of intentional misrepresentations to Maxim Entities of material facts regarding the use and protection of such confidential information by Mr. Pajemola and Cleveland Field Systems, LLC, who are liable to reimburse Maxim Entities for their development costs and expenses, in the amount of FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00), for breach of contract or fraud.

**NINTH COUNT – Injunction (Mr. Pajemola and Cleveland Field Systems)**

473.   For the Ninth Count of Maxim Entities' Cross-claim they incorporate by this reference each and every allegation contained in paragraphs #1 through 256, and #272 through 399 as if rewritten.

474.   Maxim Field Supply has spent substantial amounts of time and money to develop the programming and engineering of the Field Navigator computer system, in an effort to build a loyal client base, all of which required years of effort in development and $500,000 in

development costs, all with the knowledge, approval and authorization of plaintiffs.

475.   Maxim Field Supply attempted to test market its system, but halted such efforts when it became aware of plaintiffs' claims of disputed ownership.

476.   Defendants Mr. Pajemola and Cleveland Field Systems, LLC, also claim ownership over the disputed computer system developed at the expense of Maxim Field Supply.

477.   Unless Defendants Mr. Pajemola, Cleveland Field Systems, LLC, and each of them, are enjoined and restrained from using or disclosing, directly or indirectly, Maxim Field Supply Confidential Information in order to divert customers and profits from Maxim Field Supply to plaintiffs or defendants Mr. Pajemola, Cleveland Field Systems, LLC, during the pendency of this action, and for a period thereafter consistent with the agreements between them, law and equity, Maxim Field Supply will suffer immediate and irreparable injury, including (without limitation) loss of the money it invested in created the computer-based system, its competitive position in the industry and loss of its customers and potential customers.

**TENTH COUNT – Declaratory Judgment (Mr. Pajemola and Cleveland Field Systems)**

478.   For the Tenth Count of Maxim Entities' Cross-claim they incorporate by this reference each and every allegation contained in paragraphs #1 through 256, and #272 through 404 as if rewritten.

479.   Maxim Entities state that the status of the agreements by and among the parties, and the rights and obligations imposed by law and equity are such that the matters require resolution by means of declaratory judgment, in order that ownership of the computer-based software system that is the subject hereof may be established by this court.

WHEREFORE, having fully Answered, Maxim Entities respectfully request that the captioned action be set for proceedings in accordance with the pleadings.  Regarding their Counterclaim and Cross-claim, Maxim Entities demand the following relief:

I.   Against plaintiffs, jointly, severally and unconditionally, in the amount of TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00) for either breach of covenant of good faith or fraud;

II.   Against plaintiffs, jointly, severally and unconditionally, in the amount of TWO MILLION AND NO/100 DOLLARS ($2,000,000.00) for breach of implied warranty for goods and services.

III.   Against plaintiffs, jointly, severally and unconditionally, for recovery of the sums spent by Maxim Entities to develop its software system, and for loss of its value, in the amount of SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS

($750,000.00) for contract implied in-fact or at-law (*quantum meruit)*;

IV.   In the alternative, against plaintiffs, jointly, severally and unconditionally, for specific performance in the amount of SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($750,000.00)

V.   Against plaintiffs, jointly, severally and unconditionally, for recovery under the Connecticut Unfair Trade Practices Act for substantial and ascertainable damages;

VI.   Against plaintiffs, for rescission or reformation of the Shareholder Agreement;

VII.   Against Defendants Edwin Pajemola and Cleveland Field Systems, LLC, and any persons acting on their behalf, directly or indirectly, for injunctive relief that prevents the disclosure of confidential information relating to Field Navigator by Mr. Pajemola, Cleveland Field Systems, LLC, to Plaintiffs, and from Plaintiffs accepting any such information for a reasonable time following the entry of judgment herein;

VIII.   Against Defendants Edwin Pajemola and Cleveland Field Systems, LLC, for injunctive relief that:

i.   Requires Defendants Edwin Pajemola and Cleveland Field Systems, LLC, and any persons acting on their behalf, directly or indirectly, to return immediately to Maxim Field Services Supply

all Confidential Information that is in Defendants Edwin Pajemola and Cleveland Field Systems, LLCs', possession including, but not limited to, any and all computer software, files, schematics, schemas, or representations of every kind or character relating or regarding the Field Navigator computer system, as well as any and all customer lists, bids, sales information, pricing information, other related financial data, and information concerning the specialized needs of Maxim Field Supply's customers compiled or copied from the records of Maxim Field Supply;

ii.      Enjoins Defendants Edwin Pajemola and Cleveland Field Systems, LLC, and anyone acting in association or concert with them, directly or indirectly, from any further misappropriation, use or disclosure of any of Maxim Field Service's Confidential Information; and

iii.      Enjoins Mr. Pajemola for a period of three (3) years, directly or indirectly (whether as an owner, employee, consultant, officer, director, stockholder, partner, proprietor or otherwise), from engaging in, becoming interested in, consulting with, advising or negotiating for or on behalf of, any business similar to that conducted by Maxim Field Supply (including, without limitation, Cleveland Field Supply) within the protected area;

IX.   Against defendants Edwin Pajemola and Cleveland Field Systems, LLC, for compensatory damages in an amount to be determined at trial, in excess of $25,000.00;

X.   Against defendants Edwin Pajemola and Cleveland Field Systems, LLC, jointly, severally and unconditionally, for any sums found owing to plaintiffs under the complaint, on the basis of indemnification or contribution;

XI.   Against defendants Edwin Pajemola and Cleveland Field Systems, LLC, jointly, severally and unconditionally, for breach of contract or fraud in the amount of FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00);

XII.   Against plaintiffs, jointly, severally and unconditionally, or defendants Edwin Pajemola and Cleveland Field Systems, LLC, jointly, severally and unconditionally, for the reasonable fees and expenses of Maxim Entities attorneys herein;

XIII.   For interest at the maximum rate allowable by law from the date the acts aforesaid were committed and continuing until the date judgment herein is satisfied;

XIV.   For a preliminary and permanent injunction against plaintiffs and defendants Mr. Pajemola and Cleveland Field Systems, LLC, restraining and enjoining each from marketing, exploiting or otherwise using the computer-based system for the property preservation industry developed by Maxim Field Supply;

XV.   For an order in declaratory judgment establishing ownership of the subject computer software system in Maxim Field Supply;

XVI.  For the reasonable fees of Maxim Entities' attorneys and expenses;

XVII.  The costs hereof; and

XVIII.  Such further and additional relief as this court may deem just or equitable.

**Defendants**
**Steven Maxim, S2k, Inc., Maxim Enterprises, Inc.,**
**and Maxim Field Service Supply, Inc.**

**/sSidney N. Freeman**
**Sidney N. Freeman, _pro hac vice_**
**12370 Cleveland Avenue, N.W.**
**P.O. Box 867**
**Uniontown, OH  44685**
**P: 330-699-6703**
**F: 330-699-4803**
**snfreeman@mddattorneys.com**

**Robert McNamara, _pro hac vice_**
**McNamara, Demczyk Co., L.P.A.**
**12370 Cleveland Avenue**
**P.O. Box 867**
**Uniontown, OH 44685**
**P: 330-699-6703**
**F: 330-699-4803**
**rmcnamara@mddattorneys.com**

**/s/ Mary E. Mintel**
**Brian O'Donnell**
**Federal Bar No. ct16041**
**Mary E. Mintel**
**Federal Bar No. ct28994**
**Reid and Riege, P.C.**
**One Financial Plaza**
**Hartford, CT  06103**
**Phone 860.278.1150**

117

**Fax 860.240.1002**
**bodonnell@rrlawpc.com**
**mmintel@rrlawpc.com**


## JURY DEMAND

I hereby demand that the trial of this action be conducted before a jury of twelve (12) persons, as to matters so triable.


**/s/ Mary E. Mintel**
**Mary E. Mintel  (Federal Bar No. ct28994)**


## CERTIFICATE OF SERVICE

I hereby certify that, on this 22d day of February, 2014, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


**/s/ Mary E. Mintel**
**Mary E. Mintel  (Federal Bar No. ct28994)**