UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EAST POINT SYSTEMS, INC., THOMAS MARGARIDO, JASON MARGARIDO, AND PAUL TAFF | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 3:13-cv-215-VLB |
| | ) | |
| | ) | |
| STEVEN MAXIM, S2K, INC., MAXIM ENTERPRISES, INC., MAXIM FIELD SERVICE SUPPLY, INC., EDWIN PAJEMOLA, AND CLEVELAND FIELD SYSTEMS, LLC | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | JULY 25, 2014 |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The Plaintiffs, East Point Systems, Inc. ("EPS"), Thomas Margarido, Jason Margarido and Paul Taff (collectively "Plaintiffs'), hereby submit this Memorandum of Law in support of their Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure and state as follows:

## I.    INTRODUCTION

The undisputed facts establish that the Defendants breached contracts and fiduciary duties and abused the trust placed in them by the Plaintiffs. This action centers on the violation of confidence placed in Defendant Steven Maxim, by and through his related entities, S2K, Inc., Maxim Field Service Supply, Inc., and Maxim Enterprises, Inc. ("Maxim Defendants"), as a shareholder, board member, and valued customer of Plaintiff East Point Systems, Inc. ("EPS"), and its shareholders Plaintiffs Jason Margarido, Thomas Margarido, and Paul Taff.  Steven Maxim hired Defendant Edwin

Pajemola initially to develop original software for the Maxim Defendants, but ultimately they developed competing mortgage field software derived from EPS's software system. Together, Pajemola and the Maxim Defendants marketed and sold the derivative software in direct competition with EPS through Defendant Cleveland Field Systems and the Maxim Defendants.  In addition, Defendant S2k, Inc., has failed to tender its shares of EPS as required by a Cross Purchase Agreement.

Plaintiffs now bring this Motion for Summary Judgment against all Defendants.[1]  Plaintiffs have brought the instant litigation for breach of contract, statutory and common law breach of fiduciary duty, specific performance, tortious interference with business expectancy, violations of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §§ 35-50, *et. seq.*, violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110g, *et. seq.*, computer-related offense, Conn. Gen. Stat. § 53a-251, copyright infringement pursuant to 17 U.S.C. § 501, and for imposition of a constructive trust.  Even when viewing the facts in the light most favorable to the Defendants, the court will find that no questions of material fact exist such that the Plaintiffs are entitled to summary judgment on all counts as a matter of law.

## II.  **FACTUAL BACKGROUND**

See Plaintiffs' Local Rule 56(a)1 Statement.

## III.  **LEGAL STANDARD**

---

[1] Plaintiffs file this motion in advance of the July 25, 2014, date set forth in the Scheduling Order (ECF No. 53) for dispositive motions.  To the extent the Maxim Defendants' Amended Counterclaims (ECF No. 63) survive a pending motion to dismiss (ECF No. 66), Plaintiffs reserve the right to take discovery and move for summary judgment thereon.

The applicable standards for determining a motion for summary judgment are well-established. Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." F.R.C. P. 56(a); D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal citations omitted); Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990) (Immaterial or minor facts will not prevent summary judgment.). A court must grant summary judgment 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 6(c)); accord Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. Stern v. Trs. of Columbia Univ., 131 F.3d 305, 315 (2d

Cir. 1997) quoting W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir.

1990)). Moreover, the "mere existence of a scintilla of evidence in support of the

[nonmovant's] position" will be insufficient; there must be evidence on which a jury could

"reasonably find" for the nonmovant. Anderson, 477 U.S. at 252.

## V. **ARGUMENT**

### A**.** Defendants Violated Their Contracts with Plaintiffs

This dispute largely centers on the enforcement of contracts.  Under Connecticut

law, the elements of a breach of contract action are the "formation of an agreement,

performance by one party, breach of the agreement by the other party and damages."

Am. Express Centurion Bank v. Head, 115 Conn. App. 10, 15-16 (Conn. App. Ct. 2009).

In each instance, the respective defendant or defendants signed, valid, binding,

enforceable contracts with Plaintiffs.  Plaintiffs performed their obligations. Defendants

breached, proximately causing harm to Plaintiffs. Plaintiffs are entitled to summary

judgment as a matter of law on each count of breach of contract against the

Defendants.

### 1. Defendants Maxim and S2K are Liable
for their Breaches of the Shareholder Agreement.

Defendants Maxim and S2K knowingly violated the Shareholder Agreement

which the parties entered into in July, 2004. Plaintiffs and Defendants Maxim and S2K

formed a contract. See, Exhibit A, Verified Complaint, Ex. L ECF No. 1-12; Exhibit B,

Maxim Deposition 112:16-20, 113:1-13.  Defendant Maxim admits to signing the

Agreement as president of S2K and also concedes that the Agreement represents

"the promises and obligations that [he] entered into when [he] became a shareholder

of East Point Systems, Inc." See, Exhibit B, Maxim Deposition 112:23-25; 113:1-4.[2]

Defendants Maxim and S2k were represented by independent counsel in the

negotiation and execution of all contracts related to S2k's purchase of its interest in

EPS. Id., 88:8-10.

Maxim and S2k breached this Agreement.  The relevant language in the contract

provides that:

> 10) Confidentiality and Non-Competition.
> Each Shareholder, Director, and any parent or subsidiary organization,
> employee or agent thereof, shall at all times use reasonable efforts to
> keep confidential any confidential information which they may acquire
> regarding Company clients, business or affairs **and shall not own,
> enter, employ or create a business that competes with the
> Company**.  The rights, duties and limitations of confidentiality and non-
> competition are set forth in the Confidentiality and Non-Competition
> Agreement by and between the parties, the one of which shall be
> substantially similar to the draft annexed hereto as Exhibit A. (Emphasis
> added).

Defendants Maxim and S2K breached the Agreements by directly competing with EPS.

At all relevant times, EPS's primary business was the design, manufacture, and

licensing of software for the mortgage field service industry, with the primary software

product being known as "Field-Comm.net".  See, Exhibit A, Verified Complaint (ECF No.

1) at ¶¶ 17 & 19.  Consistent therewith, "Maxim Entities previously used Field-Comm.net

to supply computer-based processing as part of the package of services they provided

to their subcontractors in order to track and account for mortgage field service

subcontract operations and invoicing to Maxim Entities' mortgage foreclosure

customers[.]"  See, Exhibit C, Maxim Answer at ¶ 101.  Subsequently, the "Maxim

---

[2] The Agreement also incorporated the separately signed Confidentiality and Non-Competition
Agreements appearing at Ex. B & C, made subject of Counts II & III, and the Cross Purchase Agreement
appearing at Ex. M, made subject of Count IX.

Entities [] developed an internet-based software system that meets the needs of the property preservation industry, which is successfully being used internally at Maxim Enterprises." See, id. at ¶ 309.



Pajemola acknowledges that Maxim facilitated his access to and that he did review Plaintiffs' database structure. See, Exhibit H, Pajemola Deposition 151:11-23, 159:14-19, 160:11-21, 179:3-11. The Maxim Defendants further admit to demonstrating the competing software to potential third party purchasers. See, Exhibit C, Maxim Answer, ¶¶ 96-104.

By copying EPS's Field-Comm.net architecture and design for commercial gain, Maxim and S2K violated the Agreement. Plaintiffs have lost customer revenue as a

---



proximate result of customers utilizing Defendants' derivative software products instead of EPS's Field-Comm.net system. Such lost revenue is a proximate result of the breach by Maxim and S2K of the Agreement.

Finally, as a proximate result of the Defendants' breach, EPS has suffered monetary damages from lost customers and revenue.  The competing software the Defendants developed was marketed by the Pajemola Defendants to, *inter alia*, clients of Plaintiff.  For example, in 2011, the Pajemola Defendants licensed the competing software to Berghorst Enterprises, one of EPS's former customers for $100,000. See, Exhibit A, Verified Complaint, Ex. N; Exhibit H, Pajemola Deposition 99:18-100:3, 101:18-21. Similarly, A&M Recovery, a customer of EPS, was diverted by the Pajemola Defendants, with the assistance of the Maxim Defendants, such that $300,000 in revenue was taken.  See, Exhibit H, Pajemola Depostion 17:11-14, 17:25-18:4, 18:7-17, 97:6-21, 182:13-16.   Due to the breach of the Shareholder Agreement, Defendants Maxim and S2k caused Plaintiff not to realize at least $400,000 in revenue. Accordingly, the Court should grant summary judgment to Plaintiffs as to Count 1.

  2.  Defendants Maxim and S2K are Liable for Breach of
       the Confidentiality and Non-Competition Agreements of July 26, 2004.

Defendants Steven Maxim and S2k, Inc., each breached virtually identical Confidentiality and Non-Competition Agreements of July 26, 2004, with Plaintiff, made subject of Counts 2 & 3 of the Verified Complaint.  See, Exhibit A, Verified Complaint, Ex. B & C.  Defendants Maxim and S2k violated their respective Agreements by replicating EPS's Field-Comm.net program and creating a competitive product for commercial gain.  EPS has suffered damages from lost customer revenue as a

proximate result of EPS's customers using Defendants' derivative software products instead of EPS' Field-Comm.net system.  Such lost revenue is a proximate result of the breach by Maxim and S2k of their respective Agreements

Defendants Maxim and S2k were represented by independent counsel in the negotiation and execution of all contracts related to S2k's purchase of its interest in EPS, including the said Confidentiality and Non-Competition Agreements.  See, Exhibit B, Maxim Deposition at 88:8-10.  The said Confidentiality and Non-Competition Agreements constitute valid contracts between the parties. See, Exhibit B, Maxim Deposition, 164:23-165:10; Exhibit C, Maxim Answer  ¶¶ 35 & 36.  The relevant language in the contract provides:

3. Non-Competition,

A.      During  the Non-Competition Period (as hereinafter  defined), MAXIM [or S2K]shall not directly  or indirectly (whether as  shareholder,  partner,  joint venturer,  principal,  agent,  officer,  director,  employee, contractor,  consultant or otherwise, alone or in association with any other person or entity) carry on, share in the profits  of **or be engaged  or take part in any business which is engaged, wholly or partially, in the production,  development, marketing or sales of computer software to the mortgage servicing industry and its independent field contractors  and/or any business closely related to the business  of EPS** in any or all states   and   countries  in   which   the   EPS   is engaged  in such  business  during  the term  of such communications (hereinafter the • prohibited Activities"). (emphasis added).

B.               The "Non-Competition Period" shall mean the period commencing on the execution date of this Agreement and terminating two (2) years after the last effective date of the termination for any reason of MAXIM as an owner, office, director, employee or otherwise of EPS or any of its subsidiaries, as the case may be).

D.      During the Non-Competition Period, MAXIM [or S2K] shall not directly, indirectly (a) hire, solicit or encourage to leave the employment of the EPS or any of its subsidiaries any employee of the EPS or any of its subsidiaries, (b) hire any such employee who has left the employment of EPS or any of its subsidiaries within one year of the termination of such employee's employment with EPS or any of its subsidiaries, as the case *may* be or (c) induce or attempt to **induce any customer, client, supplier, licensee or other business relation of the**

**<u>EPS or any of its subsidiaries to cease doing business with the EPS or such subsidiary or in any way interfere with the relationship between any such customer, client, supplier, licensee or business relation and the EPS or any subsidiary</u>.**  (emphasis added).

Defendants Maxim and S2K's conduct in developing and marketing software for the mortgage field service industry constituted a breach of both sections A and D of the Agreement within the "Non-Competition Period" of Section B. First, Defendants agreed not to engage in any business closely related to the business of EPS, yet Defendants actively created and marketed a mortgage field service software package to existing and/or potential customers of EPS.  See, discussion, Sec. V.A.1., *supra.*  Defendants, individually and through the entity known as Cleveland Field Systems ("CFS") jointly conducted competing marketing efforts of their Field Navigator software. See, Exhibit H, Pajemola Transcript 175:1-20, 176:22-25, 177:1-6, 16-17; Exhibit A, Verified Complaint, Ex. H, Muller Affidavit (ECF No. 1-8).

Maxim's own deposition testimony further shows that Maxim, as an individual and president of S2k, breached the Confidentiality and Non-Competition Agreements. Although Maxim admits that the Task Tracker software, which ultimately was marketed and sold as "Field Navigator", was within the scope of EPS's business to exploit, he felt "entitled" to exploit it himself.  See, Exhibit B, Maxim Deposition 160:14-161:15. Maxim was fully aware that such software would conflict with the business of EPS, even obtaining a legal opinion consistent therewith.  See, <u>id</u>. 147:19-148:5, and Ex. 13 thereto.  Specifically, counsel outlined the potential areas of liability to EPS if "copied enough elements of the Eastpoint software . . .",  <u>id.</u> at Ex. 13  ¶ 1(b)(ii) ,and proposes a strategy to compete, <u>id.</u> at Ex. 13 ¶ 2.

Finally, as discussed in Section V.A.1, *supra*, Plaintiffs have lost customer revenue

as a proximate result of EPS's customers, including A&M Recovery and Berghorst

Enterprises, utilizing Defendants' derivative software products instead of EPS's Field-

Comm.net system.  Such lost revenue is a proximate result of the breach by Maxim and

S2K of the Shareholder Agreement.  Plaintiffs are also entitled to costs and expenses,

including attorneys' fees.  See, Exhibit A, Verified Complaint, Ex. B & C (Section 4

thereof).  Accordingly, this Court should grant Plaintiffs' Motion for Summary Judgment

with respect to Counts 2 and 3.

   3.   Defendants Steven Maxim and MEI are Liable for Breach of the
        Confidentiality and Non-Competition Agreement of December 2008.

   Defendants Steven Maxim and Maxim Enterprises, Inc., breached the

Confidentiality and Non-Competition Agreement of December 2008.  See, Exhibit A,

Verified Complaint, Ex. M (ECF No. 1-13). The said Confidentiality Agreement and Non-

Competition Agreement constitutes a binding contract between EPS, on the one part,

and Maxim and Maxim Enterprises, on the other. See, Exhibit B, Maxim Deposition p..

108:18-109:10; Exhibit C, Maxim Answer at ¶ 79.    The relevant portion of the

Agreement states:

   3.   Non-Competition

   A.    During  the Non-Competition Period (as hereinafter  defined), MAXIM
   shall not directly  or indirectly (whether as  shareholder,  partner,  joint  venturer,
   principal,  agent,  officer,  director,  employee, contractor,  consultant or
   otherwise, alone or in association with any other person or entity) carry on, share
   in the profits  of or be engaged  or take part in any business which is engaged,
   wholly or partially, in the production,  development, marketing or sales of
   computer software to the mortgage servicing industry and its independent field
   contractors  and/loan businesses closely related to the business of EPS in any or
   all states   and countries  in which the EPS is engaged in such  business during
   the term of such communications (hereinafter the "prohibited Activities").

B.      The "Non-Competition Period" shall mean the period commencing on the execution date of this Agreement and terminating four (4) years after the last effective date of termination of the Software Source Code Access and Indemnity Agreement by and between EPS and MAXIM.Source Code Access and Indemnity Agreement by and between EPS and MAXIM.

D.      During the Non-Competition Period, MAXIM shall not, directly or indirectly, (a) hire, solicit or encourage to leave the employment of the EPS or any of its subsidiaries any employee of the EPS or any of its subsidiaries, (b) hire any such employee who has left the employment of the EPS or any of its subsidiaries within one year of the termination of such employee's employment with the EPS or any of its subsidiaries, as the case may be or {c) induce  or attempt to induce  any customer,  client,  supplier, licensee or other business relation of the EPS or any of its subsidiaries to cease doing business with the EPS or such subsidiary or in any way interfere with the relationship between any such customer, client, supplier, licensee or business relation and the EPS or any subsidiary.

Maxim concedes that by signing the Confidentiality and Non-Competition Agreement he promised "[t]hat [he] wouldn't release any information about East Point Systems". Exhibit B, Maxim Deposition 110:3-11.  He further admits that by signing the Agreement he was agreeing not to compete with EPS in the software business for property preservation. Id. 110:25, 111:1-13.

As described more fully in Sec. V.A.1 & V.A.2, *supra*, Defendants Maxim and Maxim Enterprises violated the Confidentiality and Non-Competition Agreement as an by developing, marketing and selling computer software, individually and/or through Cleveland Field Systems, to actual and potential customers of EPS.  Ultimately, Plaintiffs have suffered damages as the proximate result of Defendants' breach due to lost customer revenue, including A&M Recovery and Berghorst Enterprises.  See, Sec. V.A.1, *supra*.  Plaintiffs are also entitled to all costs and expenses, including attorneys' fees.  See, Exhibit A, Verified Complaint, Ex. M, sec. 4.  Accordingly, the Court should grant summary judgment to Plaintiffs with respect to Count 4.

4.  Defendants Maxim, MEI and Pajemola are Liable for
    <u>Breach of the Software Source Code Access and Indemnity Agreements</u>.

Defendants Steven Maxim, Maxim Enterprises, Inc., and Edwin Pajemola have

breached two separate, but virtually identical, Software Source Code Access and

Indemnity Agreements ("SSSCAAIA").  See, Exhibit A, Verified Complaint, Ex. E&F.

EPS performed its obligations under the SSCAAIA, allowing Pajemola to access the

Source Code. See, Exhibit H, Pajemola Depo 150:11-14, 151:11-23, 160:11-21, Exhibit

C, Maxim Answer (ECF No. 63) at ¶ 80.  The relevant provisions, referring to EPS as

Licensor and defendants as Licensee, state as follows:

> E. LICENSEE, in exchange for access to a copy of the Source Code of
> LICENSOR's software for the sole purpose of modifying a copy of such software
> or database for functionality LICENSEE requires, shall make any such
> modifications made available to LICENSOR for incorporation into LICENSOR's
> software.
>
> F. LICENSOR agrees that it shall grant limited access to a copy of the Source
> Code to LICENSEE's Agent for the sole purpose of allowing LICENSEE to make
> the modifications it requires.
>
> G. LICENSEE agrees that any and all modifications made to the Source Code
> software shall become the Intellectual property of LICENSOR.

Sections E & F and 3.0[5] of each SSCAAIA were breached when the subject

defendants accessed EPS's Source Code for purposes other than modifying a copy of

the software solely for MEI's purposes.  As set forth in Sections V.A.1 & V.A.2, *supra*,

---

[5] Section 3.0 states, in relevant part:
   The LICENSEE shall not use, rent, lease, sell, or otherwise dispose of the Source Code, related
   documentation, or any other item made available to them hereunder except as may be provided in
   this Agreement. LICENSEE agrees that it will not misuse .the Source Code which misuse would
   include any disclosure of the Source Code to anyone other than LICENSEE'S Agent, any
   unauthorized use of the Source Code, or any sale, lease, exposure or transfer of the Source Code to
   any third party. LICENSEE, LICENSEE'S Agent, employees, contractors, or agents shall not, under
   any circumstances copy, duplicate, or otherwise reproduce the Source Code in any manner.
See Exhibit A, Verified Complaint, Ex. E & F.

the subject defendants repurposed the access and reproduced, misused, and sold the

source code toward developing derivative software for users other than MEI, without

authorization.  In fact, the subject defendants agreed that the software marketed by the

subject defendants that it must be irrebutably presumed to have been developed using

the EPS Source Code.  See, Exhibit A, Verified Complaint, Ex. E & F, Section 7.0.[6]

Sections G and 9.0[7] of each SSCAAIA were breached when the subject

defendants failed to execute any documents in order to effectuate EPS's right, title and

interest in the derivative works and to pay royalties due and owing to EPS.  To the

contrary, Defendant Pajemola undertook to register copyright in the derivative work.

See, Exhibit H, Pajemola Deposition at p. 19:10-18; Exhibit M, Certificate of Registration

Txu 1-679-516, pp. 1.  In fact, pages 23 & 43 of the Pajemola registration material

makes specific reference to "Fieldcom" [sic].   Further, the cross claims (ECF No. 32 &

63), in which the subject defendants claim ownership of the derivative software,

---

[6] Section 7.0 states, in relevant part:
    Should any dispute arise between LICENSOR and LICENSEE regarding this Paragraph that
    results in an arbitration or proceeding in a court of law, there shall be, for the purpose of any
    arbitration or trial, an irrebuttable presumption that any computer program providing the same or
    similar functionality as the Licensed Programs was developed using LICENSOR's trade secrets
    contrary to the provisions of this Agreement. Should the irrebuttable presumption provided for in
    this Paragraph be held to be contrary to law, then the presumption shall be at the highest level
    allowed by law, and the burden of proof shall rest with LICENSEE.

[7] Section 9.0 states:
    Ownership of Work Product. LICENSEE shall promptly disclose to LICENSOR all modifications,
    improvements, enhancements, documentation, creative works, software, know-how and
    information ("Work Product") created or made or developed in whole or in part by LICENSEE or
    LICENSEE's Agent during the term of this Agreement, whether or not copyrightable, patentable
    or otherwise protectable.LICENSEE. hereby assigns to LICENSOR, without additional
    consideration to LICENSEE or LICENSEE's Agent, the entire right, title and interest in and to all
    Work Product and In and all proprietary rights therein or based thereon. LICENSEE and
    LiCENSEE's Agent shall execute any and all assignments, oaths, declarations and other
    documents as may be required by LICENSOR to effectuate the foregoing.
See Exhibit A, Verified Complaint, Ex. E & F.

demonstrates a refusal by said defendants to cede right, title, and interest to EPS.  See also, Exhibit C Maxim Answer  ¶ 273.

The subject defendants agree that at least $400,000 in revenue was diverted from EPS to Pajemola as a result of the derivative software.  See, Section V.A.1, *supra.* The agreements at issue were breached and EPS is entitled to damages flowing therefrom.  EPS is also entitled to attorney fees and costs of suit.  See, Exhibit  A, Verified Complaint, Ex. E & F (Sec. 4.0 thereof).  Summary judgment for Plaintiffs as to Counts 5 & 6 is appropriate.


5.  <u>Defendant S2k, Inc., Must be Compelled to Tender its Shares</u>

Apart from the other claims at issue in this litigation, Plaintiffs Thomas Margarido, Jason Margarido, and Paul Taff are entitled to summary judgment on their claim for specific performance.  Despite engaging in competitive activity, S2k, Inc., remains a shareholder in EPS.  It is untenable that it remain a shareholder and a claim for specific performance requiring tender appears at Count 9 of the Verified Compliant.

The Cross Purchase Agreement executed by Maxim for S2k, Inc., is a binding contract between Plaintiffs Thomas Margarido, Jason Margarido, and Paul Taff, and Defendant S2K.  See, Exhibit A, Verified Complaint, Ex. D; Exhibit C, Maxim Answer (ECF No. 63) at  ¶¶ 39, 40.   Defendant Maxim intended to be bound by the terms of the Agreement. See, Exhibit B, Maxim Deposition, 164:7-21.  Such Agreement explicitly incorporated by reference Schedules A-1 and B-1, without requirement for

separate signature.  See, Exhibit A, Verified Complaint, Ex. D., Sec. 3(E) &

4(B)(ii)(b).[8]

Pursuant to section 4.B. of the Agreement, S2k, Inc., was required to sell its shares

of EPS to Plaintiffs Thomas Margarido, Jason Margarido and Paul Taff upon their

request.  The operative terms of the Agreement state:

4. B. Transfer Upon Request of Connecticut Shareholders.
(i) If one or more Connecticut Shareholders shall at any time notify S2K in writing that they desire to purchase the shares of the Corporation owned by S2K, then S2K (the "Selling Shareholder") shall offer to sell all of its shares to such Connecticut Shareholders in accordance with the terms and conditions of this Agreement. Any such offer shall be made in writing, by registered or certified mail and shall set forth all proposed terms and conditions thereof.

Plaintiffs Thomas Margarido, Jason Margarido and Paul Taff made such request.  See,

Exhibit C, Maxim Answer, ¶ 113.  Pursuant to the Cross Purchase Agreement,

Defendant S2k, Inc., obtained a valuation of the shares at $57,700.  See, Exhibit A,

Verified Complaint, Ex. J (ECF No. 1-10); Exhibit C, Maxim Answer ¶¶ 116 & 169;

Exhibit B, Maxim Deposition at 124:12-16.  Plaintiffs Thomas Margarido, Jason

Margarido and Paul Taff agreed to purchase S2k's shares for $57,700.  See, Exhibit A,

Verified Complaint, Ex. K (ECF No. 1-11); Exhibit C Maxim Answer ¶¶ 117 & 170;

Exhibit B, Maxim Deposition 127:1-6.. S2k has refused to deliver its shares.  See,

Exhibit C, Maxim Answer ¶¶ 118 & 171; Exhibit B, Maxim Deposition at 127:9-11.

As noted above, the elements of a breach of contract action under Connecticut

law are the "formation of an agreement, performance by one party, breach of the

_____

[8] Plaintiffs anticipate Defendant S2k to claim the lack of signature on the schedules is fatal.  It is not. The Connecticut Statute of Frauds, C.G.S., sec. 52-550, is not applicable.  There is no evidence that the Schedules A-1 and B-1 referenced in the Cross Purchase Agreement is anything other than that appearing at Exhibit A, Verified Complaint, Ex. D. See, Schwarzschild v. Martin, 191 Conn. 316, 321-22 463 A.2d 527 (1983) quoting 17 Am. Jur. 2d, Contracts § 70. ('In the absence of a statute requiring a signature . . . parties may become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated, such as by the acceptance of benefits under the contract.'")

agreement by the other party and damages." <u>Am. Express Centurion Bank v. Head</u>, 115

Conn. App. 10, 15-16 (Conn. App. Ct. 2009).  There is no dispute that the agreement

exists, the subject plaintiffs performed, and there has been a breach. Due to the unique

and special nature of the shares, monetary damages are an inappropriate remedy for

breach of the cross-purchase agreement and therefore there is no adequate remedy at

law except specific performance. <u>Burns v. Gould</u>, 72 Conn. 210, 214, 374 A.2d 193

(1977) (when the stock is that of a closely held corporation, specific performance may

be the only just remedy).  See also, <u>Harbour Pointe, LLC v. Harbour Landing</u>

<u>Condominium Ass'n, Inc.</u>, 300 Conn. 254, 260-61, 14 A.3d 284 (2011)(" Where the

language  is unambiguous, we must give the contract effect according to its terms.")

The language of the Agreement is clear and unambiguous.  Defendant S2k must be

compelled to specifically perform the terms of the Agreement and sell and deliver its

shares of EPS to Plaintiffs Thomas Margarido, Jason Margarido and Paul Taff upon the

agreed terms, *i.e* the tender of $57,700.

In its Answer, S2k speculates that its own expert's valuation was "prepared

without performing an audit, which Maxim Entities believe would reveal substantial

misrepresentations of material facts by the plaintiffs that improperly suppressed the

valuation."  See, e.g., Exhibit C, Maxim Answer, paragraph 116.   In reality, S2k never

intended to rely on any expert report of stock valuation.  See, Exhibit B, Maxim

Deposition, p. 132:3-24.  Mr. Maxim testified that he only disagrees with the valuation

because of the "spirit of the deal".  See, <u>id.</u> at 132:25-133:4.  Such alleged spirit of the

deal was that S2k would recover its initial $250,000 investment.  See, <u>id.</u> at 127:12-

129:11.  The only figure S2k would accept for valuation of the share is the $250,000

figure.  See, id. at 136:20-137:16.

      Although Mr. Maxim, for S2k, desires recovering the initial investment, such does

not excuse breach of the cross purchase agreement.  "Where the language of a

contract is unambiguous, a court 'must give the contract effect according to its terms.'"

Kleban Holding Co., LLC v. Ann Taylor Retail, Inc., 2013 U.S. Dist. LEXIS 168231 *9-10

(D.Conn. Nov. 26, 2013)(Bryant, J.), quoting, Harbour Pointe, LLC v. Harbour Landing

Condominium Ass'n, Inc., 300 Conn. 254, 260-61, 14 A.3d 284 (2011).  Parol evidence

may only be used "[w]here a contract is ambiguous or does not set fort the entire

agreement between the parties."  Id. at *10, citing Murta v. City of Hartford, 3030 Conn.

1, 12 (2011).  The language of the Agreement is clear and unambiguous.  Plaintiffs

Thomas Margarido, Jason Margarido and Paul Taff were only required to repay the

investment during the first three years of the agreement.  See, Exhibit A, Verified

Complaint, Ex. D at 4.B.ii.a.  Thereafter, as was the case at bar, it would be upon the

terms of Schedule B-1, *i.e.* per appraisal.  See, id.  There is no ambiguity in these

terms.  And, by its own terms, the cross-purchase agreement could only be changed in

writing.  See, Exhibit A, Verified Complaint, Ex. D, at sec. 15.  S2k is not entitled to

$250,000 as that was not the appraised value, no matter the alleged "spirit".

      Mr. Maxim had counsel review all of the paperwork relative to S2k's purchase of

EPS stock.  See, Exhibit B, Maxim Deposition, 138:18-139:4.  Mr. Maxim reviewed

financial reports of EPS before causing S2k to purchase EPS stock in 2004.  See,

Exhibit B, Maxim Deposition 128:15, 139:5-8. Mr. Maxim did not rely solely upon the

statements of Plaintiff Thomas Margarido prior to causing S2k to purchase EPS stock in

2004.  See, Exhibit B, Maxim Deposition 128:15, 139:5-8.  Plaintiffs provided to Mr.

Maxim business plans and made available all information regarding EPS that Mr. Maxim

requested prior to the purchase of shares of EPS by S2k.  See, Exhibit B, Maxim

Deposition, 92:21-93:11.  As a result, there is no basis to suggest Mr. Maxim or S2k

were misled.  "[M]isguided optimism is not a cause of action, and does not support an

inference of fraud." Shields v. Citytrust Bancorp, Inc. 25 F.3d 1124, 1129 (2d Cir. 1994),

accord Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999).  S2k had no

basis to refuse the $57,700 valuation in a business tied to the inherent risks of the real

estate market.  Defendants have no evidence that there was any misrepresentation of

fact, substantial, material, or otherwise, that improperly suppressed the valuation.  If

S2k's appraiser failed to obtain certain information, there is no indication of same in his

report.  See, Exhibit A, Verified Complaint, Ex. J.  The reduction in share value is further

consistent with the valuation S2k accepted upon the death of shareholder Robert Kline.

See, Exhibit C, Maxim Answer, at paragraph 299.

   Based on a review of the undisputed record, Plaintiffs have established all elements

of its breach of contract claim and there is no adequate remedy at law, except specific

performance. Accordingly, this Court should grant summary judgment to the Plaintiffs

with respect to Count 9 and order specific performance of the terms of Section B.4 of

the Cross Purchase Agreement, such that S2k must deliver its shares in exchange for

payment of $57,700.

      B.    Defendants Maxim & S2k Breached their Fiduciary Duties

   Defendant Maxim breached both his statutory and common law fiduciary obligations

to EPS.  Maxim, on behalf of S2k, Inc., acted as a member of EPS's Board of Directors

giving rise to a fiduciary obligation to EPS under both statute and common law.  In

general Defendant Maxim was obliged to act in good faith in matters related to EPS.  By

creating or suborning the creation of a competitor to EPS's software, and derivative

thereof, Maxim and S2k breached their duties to the Plaintiffs.  Summary judgment to

Plaintiffs as to Counts 7 & 8 is, therefore, appropriate.

    1.  <u>Statutory Duties were Breached</u>

    Defendant Maxim, on behalf of S2K, served as a member of EPS's Board of

Directors. See, Exhibit B, Maxim Deposition, 23:11-13; Exhibit C, Maxim Answer at ¶¶

51-52; Exhibit A, Verified Complaint, Ex. L, Shareholder Agreement ¶ 5(b)(iv).  Maxim

and S2k owed a duty to EPS, under Connecticut law, to act in good faith, with ordinarily

prudent care, in a manner believed to be in the best interest of EPS. See Conn. Gen.

Stat. § 33-756(a)<u>; AmBase Corp. v. SDG Inc</u>., 2005 U.S. Dist. LEXIS 16164 (D. Conn.

Aug. 3, 2005).

    Usurpation of corporate opportunity constitutes a failure to act in good faith.  See,

<u>Katz Corp. v. T. H. Canty & Co</u>., 168 Conn. 201, 208 (Conn. 1975).[9]  Maxim and S2k

usurped a corporate opportunity in violation of their statutory duties to act in good faith.

To prevail on such claim:

> a plaintiff bears the burden of establishing: (1) a fiduciary relationship between
> the corporation and the alleged wrongdoers; and (2) the existence of a corporate

---

[9] The Connecticut Supreme Court laid out the doctrine of "corporate opportunity" as follows:
[I]f there is presented to a corporate officer or director a business opportunity which the corporation is
financially able to undertake, is . . . in the line of the corporation's business and is of practical
advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by
embracing the opportunity, the self-interest of the officer or director will be brought into conflict with
that of his corporation, the law will not permit him to seize the opportunity for himself. And, if,  in such
circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all of
the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation
upon the property, interests and profits so acquired."
<u>Katz Corp. v. T. H. Canty & Co</u>., 168 Conn. 201, 208-209 (Conn. 1975) quoting Guth v. Loft, Inc., 23 Del.
Ch. 255, 272, 5 A.2d 503 (1939).

opportunity.  Once a plaintiff establishes these predicates to liability, the burden then shifts to the fiduciaries to establish, by clear and convincing evidence, the fairness of their dealings with the corporation.
Ostrowski v. Avery, 243 Conn. 355, 362 (1997).  Here, there is no question that a

director occupies such a fiduciary relationship.  Id.  Further, as set forth in Sections

V.A.1 & V.A.2, supra, a corporate opportunity existed.  Under the "avowed business

purpose test" to determine corporate opportunity:

> [f]actors to be considered are 1) whether the business opportunity was one in which the complaining corporation had an interest or an expectancy growing out of an existing contractual right; 2) whether there is a close relationship between the opportunity and the corporation's business purposes and current activities; and 3) whether the business areas contemplated by the opportunity were readily adaptable to the corporation's existing business.

Giulietti v. Giulietti, 1999 Conn. Super. LEXIS 3416 (Conn. Super. Ct. Dec. 15, 1999),

citing Ostrowski, supra, at 366. EPS was in the business of producing and marketing

software for the field service industry.  Berghorst Enterprises and A&M Recovery were

known customers and EPS had demonstrable ability to sell software to them, thus EPS

had an interest and close relationship.  Yet, the Maxim Defendants caused such

customers to be diverted through the development of Field Navigator, based off Field-

Comm.net. [10]  Such diversion was otherwise readily adaptable to EPS's business.  The

Maxim Defendants cannot show these dealings were fair, especially as they were on

notice that, per the Software Source Code Access and Indemnity Agreements (Exhibit

A, Verified Complaint, Ex. E & F), title to the derived software remained with EPS.

Thus, Plaintiffs have demonstrated usurpation.

---

[10] Even if Defendant Maxim disputes that Field Navigator was derived from EPS's source code, Maxim still breached his fiduciary duty to EPS by supporting the development of a competing product.

Similarly, as part of the statutory duties, a director owes the corporation a duty of

loyalty.  See, Thames River Recycling v. Gallo, 50 Conn. App. 767, 780-781 (1998).  As

set forth by the Appellate Court of Connecticut:

> The general principle for the agent's duty of loyalty according to [2 Restatement
> (Second), Agency, Liability for Loss Caused § 401, comment (b) (1958)] is that
> the agent must act solely for the benefit of the principal in matters connected with
> the agency. "The general duty of loyalty includes . . . the duty not to compete . . .
> and the duty not to disclose confidential information." M. Szto, "Limited Liability
> Company Morality: Fiduciary Duties in Historical  Context," 23 Quinnipiac L. Rev.
> 61, 100-101 (2004).

News Am. Mktg. In-Store, Inc. v. Marquis, 86 Conn. App. 527, 535 (Conn. App. Ct.

2004) aff'd 376 Conn. 310 (2005).  Maxim and S2k competed with and otherwise

suborned competition by Maxim Enterprises and Cleveland Field Systems against EPS.

Such violated the duty of loyalty to EPS, causing financial harm, including the diversion

of revenue.

There are no questions of material fact that Defendants Maxim and S2K

breached their statutory fiduciary duties to the Plaintiffs.  Such actions were not in good

faith nor in the best interests of EPS.  Accordingly, Plaintiffs are entitled to summary

judgment as a matter of law as to Count 7.

### 2.  The Undisputed Facts Prove That Maxim and S2K Breached Their Common Law Fiduciary Duties to Plaintiffs [11]

There are no facts in dispute that Defendant Maxim as an individual and in his role

as president of S2K, breached his fiduciary obligations to EPS as a member of its Board

of Directors.  Under the common law, fiduciary or confidential relationships are

"characterized by a unique degree of trust and confidence between the parties, one of

whom has superior knowledge, skill or expertise and is under a duty to represent the

---

[11] Plaintiffs incorporate by reference their argument in Section V.B.1, supra, as further support of
Maxim and S2K's common law breach of fiduciary duty.

interests of the other…. The superior position of the fiduciary or dominant party affords

him great opportunity for abuse of the confidence reposed in him. . . . "Konover

Development Corp. v. Zeller, 228 Conn. 206, 219, 635 A.2d 798, 806 (1994).  The

elements of a common law claim for breach of fiduciary duty are:

> " (1). That a fiduciary relationship existed which gave rise to (a) a duty of loyalty on
> the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant
> to act in the best interests of the plaintiff, and (c) an obligation on the part of the
> defendant to act in good faith in any matter relating to the plaintiff; (2). That the
> defendant advanced his or her own interests to the detriment of the plaintiff; (3). That
> the plaintiff sustained damages; (4). That the damages were proximately caused by
> the fiduciary's breach of his or her fiduciary duty." (Internal quotation marks omitted.)

Everett v. Everett, 2010 Conn. Super. LEXIS 3253 (December 16, 2010, Adams,

J.) (quoting T. Merritt, 16 Connecticut Practice Series: Elements of an Action (2010-

2011 Ed.) §8:1, p. 534).

An officer and director of a corporation maintains a fiduciary relationship to the

corporation and its shareholders; and "occupies a position of the highest trust and

therefore is bound to use the utmost good faith and fair dealing in all of his relationships

with the corporation." Ostrowski v. Avery, 243 Conn. 355, 362, 703 A.2d 117, 121

(1997) citing Katz Corp. v. T.H. Canty & Co,.168 Conn. 201, 207, 362 A.2d 975, 979

(1975).   The facts are undisputed that Defendant Maxim as the president of S2K was a

shareholder and member of EPS' board of directors, giving rise to his fiduciary duty to

EPS. See, Exhibit B, Maxim Deposition, 23:11-13; Exhibit C, Maxim Answer  ¶¶ 50-52;

Exhibit A, Verified Complaint, Ex. L, Shareholder Agreement  ¶ 5(b)(iv).  As a Board

member, Maxim was trusted with confidential information. See, Exhibit B, Maxim

Deposition 93:4-11, 139:5-8.  He was permitted access to EPS' financial records and

customer lists as well as its source code.  Id.; Exhibit A, Verified Complaint, Ex. E & F.

The Maxim Defendants advanced their own interests to the detriment of Plaintiffs. See, Maxim Deposition at pp. 161-162.  As set forth above, Maxim promoted the development of Task Tracker, which became Field Navigator.  Such was marketed by Maxim and Pajemola to actual and potential customers of EPS, diverting revenue from Plaintiffs.  Such diversion harmed Plaintiffs, and it was proximately caused by the breach.  This violation of the duty of loyalty, failure to act in Plaintiffs' best interests, and failure to act in good faith constitutes a common law breach of fiduciary duties.  Thus, Plaintiffs are entitled to summary judgment as to Count 8.

C.      Defendants Tortiously Interfered with EPS's Business Relationships with Clients and Prospective Clients

The Defendants interfered with EPS' business relationships with Berghorst Enterprises and A&M Recovery Services and their contractors and subcontractors.  In order to recover for a claim of tortious interference with business expectancies, the claimant must plead and prove that:

> (1) a business relationship existed between the plaintiff and another party; (2) the defendant intentionally interfered with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffered actual loss."

Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 32-33, 761 A.2d 1268 (2000). The plaintiff must prove that the defendant's conduct was in fact tortious.  This element may be satisfied by proof that defendant acted maliciously, *i.e.* "not in the sense of ill will, but intentional interference without justification." (internal citations and quotations omitted).  Daley v. Aetna Life & Cas. Co., 249 Conn. 766, 805-806 (1999).

Defendants Pajemola and Maxim both concede that the entities who purchased or leased Field Navigator were EPS's customers and that they were aware of EPS's

relationship with these companies. See, Exhibit H, Pajemola Deposition 128:11-15,

190:16-21, Exhibit B, Maxim Deposition 104:13-17. The Defendants intentionally

interfered with the relationships between EPS and these entities marketing and/or

selling a competitive product, Field Navigator, to them when Defendants knew that

these entities were EPS's customers. Through Mr. Maxim, Mr. Pajemola came to know

Andrew Strickland and his company, A & M Recovery.  Exhibit H, Pajemola Deposition

18:7-17; 182:13-16. A & M Recovery was a customer of EPS immediately prior to

becoming a CFS customer.  Exhibit H, Pajemola Deposition 17:11-14, 17:25-18:4.

CFS licensed Field Navigator to A & M Recovery, achieving $300,000 in revenue.

Exhibit H, Pajemola Deposition 97:6-21. A & M Recovery referred Berghorst

Enterprises, Inc., to CFS.  Exhibit H, Pajemola Deposition 101:22-102:2. Berghorst

Enterprises was a customer of EPS immediately prior to becoming a CFS customer.

Exhibit B, Maxim Deposition 104:6-17; Exhibit H, Pajemola Deposition 101:18-21.

CFS licensed Field Navigator to Berghorst Enterprises, achieving $100,000 in

revenue.  Exhibit H, Pajemola Deposition 99:18-100:3; Exhibit A, Verified Complaint

Ex. N, Software License Agreement, Nov. 14, 2011 (ECF No. 1-14)

In or about February 2011, John and Jennifer Muller, marketing vendors for EPS,

contacted Pajemola and CFS.  Exhibit A, Verified Complaint, ¶ 92 and Ex. H (ECF No.

1-8), Affidavit of John and Jennifer Muller, ¶¶ 3 & 7.   On or about April 5, 2011, Mr.

Maxim and Mr. Pajemola marketed Field Navigator to the Mullers, who were posing as

property preservation businesspersons.  Exhibit H, Pajemola Depo 174:7-178:14;

Exhibit A, Verified Complaint ¶¶ 96-104 and Ex. H, ¶¶ 8-13; Exhibit C, Maxim Answer

¶¶ 96-104; Exhibit J, Pajemola Answer ¶ 26.

As a result of Defendants' licensing, marketing and selling Field Navigator to EPS' customers, the Plaintiffs have suffered actual loss in the form of lost revenue that they otherwise would have received from maintaining their business relationships with these entities. See, Exhibit H, Pajemola Deposition 98:18-100:3. As noted, Cleveland Field Systems received $300,000 from A&M Recovery Services ("A&M") for its use of Field Navigator. See, Exhibit H, Pajemola Deposition, 92:6-21. In 2011, CFS entered into an agreement with Berghorst Enterprises, one EPS's customers, severing its ties with EPS, to use Field Navigator.  See, Exhibit A, Verified Complaint, Ex. N.  CFS earned $100,000 in revenue from Berghorst Enterprises.  See, Exhibit H, Pajemola Deposition  99:17-100:3.  Such properly could have been earned by EPS on an ongoing basis.  Based on the foregoing, the Plaintiffs are entitled to summary judgment as a matter of law as to Count 10.

    D.  <u>The Defendants Violated the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §§ 35-50, et seq.</u>

Defendants violated the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §§ 35-50, <u>et seq.</u> by using Plaintiffs' confidential and proprietary trade secrets to compete with EPS.  Pursuant to Conn.Gen.Stat., sec. 35-53(a), Plaintiffs "may recover damages for the actual loss caused by misappropriation" of trade secrets, in addition to recovery of unjust enrichment and injunctive relief.  If such misappropriation is willful and malicious, punitive damages and attorneys' fees may be awarded.  Conn.Gen.Stat., sec. 35-53(b).

Plaintiffs' source code, including the database back end, constitutes a trade secret within the meaning of Conn.Gen.Stat., sec. 35-51(d).  It is a program not generally known to others who could obtain economic value from its disclosure and

reasonable efforts are utilized to maintain secrecy.  Reasonable efforts to maintain secrecy pursuant to CUTSA often include "requiring employees to sign confidentiality agreements or otherwise advising them of the confidential nature of the process".  Elm City Cheese Co. v. Federico, 251 Conn. 59, 79 (Conn. 1999).  A substantial component of Field-Comm.net is a database system developed in the Structured Query Language ("SQL" or "Source Code"), consisting of various interrelated tables that organize, among other things, the parties, work orders, field reporting, and invoices relative to the mortgage field service industry. See, Exhibit A, Verified Complaint (ECF No.1). ¶ 21. The status as confidential trade secret was agreed to by Mr. Maxim and Mr. Pajemola. See, Exhibit A, Verified Complaint, Ex. E & F, Recitals.  Here, Plaintiffs would not release this information, even to a trusted customer and board member, without the execution of the access agreements.  See, Exhibit A, Verified Complaint, Ex. E & F.  In addition, copyright registration abided the trade secret requirements of 37 CFR 202.20(c)(2)(vii)(A)(2).  See, Exhibit K, Affidavit of Counsel.

The source code was misappropriated.  "Misappropriation" is defined as either the acquisition of a trade secret by someone who knows or has reason to know that the trade secret was acquired by improper means[12]  or the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . or derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." Conn. Gen. Stat. § 35-51(b).  As previously set

[12] Improper means " includes theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means, including searching through trash. ." Conn. Gen. Stat. § 35-51(b).

forth, the Maxim Defendants and Pajemola were granted access to the confidential source code only after signing confidentiality agreements. See, Sec. V.A.4, *supra*.  Such was based on the representation that Plaintiffs would own any derivative software developed.  Id.  Defendants improperly acquired access through such representation, as they both now claim title to the derivative software.  See, generally, *supra*.  They have failed to limit their use, having actively used such access to develop competing software and market same.  Id.

Defendants' theft of EPS Source Code has caused irreparable harm to EPS and caused incalculable damages, loss of business and requires the issuance of permanent injunctive relief.   Under Connecticut law, a trade secret thief can be prevented from disclosure by an injunction. Conn. Gen. Stat. § 35-52. This is true for both actual and threatened misappropriation. Id. When injunctive relief is sought pursuant to a statute, such as CUTSA, the court need not require the party to allege and prove irreparable harm and the absence of an adequate remedy of law. See, e.g., Bauer v. Waste Management of Connecticut, Inc., 239 Conn. 515, 532, 686 A.2d 481 (1996); Rovic, Inc. v. Hanson, 2000 Conn. Super. LEXIS 2591 (September 29, 2000; General Reinsurance Corp. v. Arch Capital Group, Ltd., 44 Conn. L. Rptr. 366, 2007 Conn. Super. LEXIS 2629 (Conn. Super.Ct. Oct. 17, 2007); Avery Dennison Corp. v. Finkle, 2002 Conn. Super. LEXIS 329 (Conn.Super.Ct. Feb. 1, 2002). Considering the extent to which EPS and the Defendants compete for the business of many of the same customers in the same geographic market, there is a sufficient basis on which to conclude that Plaintiffs' trade secrets remain at risk. Therefore, this Court should order an injunction enjoining Defendants from using or disclosing Field Navigator or any other software of which the

Plaintiffs are unaware related to the mortgage field industry that the Defendants have developed.

Plaintiffs are further entitled to recover the monetary damages incurred in consequence of the Defendants' misappropriation of its trade secrets, including actual loss and unjust enrichment caused by misappropriation that is not taken into account in computer damages for actual loss per Conn.Gen.Stat. § 35-53(a).  Plaintiffs' damages include lost revenue from the departure of A&M Recovery and Berghorst Enterprises, and Defendants have been unjustly enriched in the amount of $400,000.  Such misappropriation was willful and malicious.  Compare Lydall, Inc. v. Ruschmeyer, 282 Conn. 209, 245-246 (Conn. 2007) (finding that misappropriation that is recklessly indifferent to the owner of the trade secret warrants punitive damages).  Defendants knew or should have known that taking actual and prospective clients would harm Plaintiffs.  Based on the foregoing, this Court should grant summary judgment to the Plaintiffs with respect to Count 11.


E.    Defendants Misused Computer System Information

In Connecticut, it is unlawful to access a computer system to intentionally make unauthorized use and/or receipt of the data within.  Conn.Gen.Stat., sec. 53a-251(e).  A private right of action for victims of such unauthorized use and/or receipt was created by the legislature.  See, Conn.Gen.Stat., sec. 52-570b.  To recover, a plaintiff must show unauthorized access and injury.  Kopperl v. Bain, 2010 U.S. Dist. LEXIS 89195 (D. Conn. Aug. 30, 2010), citing News Am. Mktg. In-Store, Inc. v. Marquis, 86 Conn. App.

527, 547-48 (Conn. App. Ct. 2004). Defendants exceeded their access to Plaintiffs'
computer system, causing pecuniary loss.

Defendants, through Maxim's and Pajemola's access to EPS's computer system,
have misused computer system information by knowingly receiving and retaining EPS's
data, within the meaning of Conn.Gen.Stat. § 53a-251(e)(3). Defendants, through
Maxim's and Pajemola's access to EPS's computer system, have misused computer
system information by knowingly using and disclosing EPS's data, within the meaning of
Conn.Gen.Stat. § 53a-251(e)(4). Such conduct by Defendants was willful and malicious,
as previously set forth. Plaintiffs have suffered irreparable harm and money damages
as a direct and proximate result of Defendants' misuse of its computer system
information. In consequence of such harm, Plaintiffs are entitled to an injunction to
prevent the continued improper use of its information per Conn.Gen.Stat. § 52-570b(a)
& (b). Plaintiffs are further entitled to recover the monetary damages incurred in
consequence of the Defendants' misuse of its computer system information, including
restitution, actual damages, and damages for unjust enrichment not taken into account
in computing damages for actual loss, per Conn.Gen.Stat. § 52-570b(c). Plaintiffs'
damages include lost revenue from the departure of A&M Recovery and Berghorst
Enterprises, and Defendants have been unjustly enriched in the amount of $400,000.
Due to the willful and malicious conduct of Defendants, Plaintiffs are entitled to treble
damages per Conn.Gen.Stat. § 52-570b(c). Compare Advanced Arm Dynamics of New
Eng. LLC v. Comprehensive Prosthetic Servs. LLC, 2011 Conn. Super. LEXIS 182
(Conn. Super. Ct. Feb. 23, 2011) (punitive damages appropriate where a former
member of the limited liability company (LLC) directed an administrative manager to

transfer some of the LLC's files to a memory stick to be used by the member's new business).   Plaintiffs are further entitled to recover reasonable costs and attorneys' fees, per Conn.Gen.Stat. § 52-570b(e).   Accordingly, this Court should grant summary judgment to the Plaintiffs with respect to Count 12.

      F.    The Defendants Violated the Connecticut Unfair Trade Practices Act,
            Conn. Gen. Stat. §§ 42-110g, et. seq.

Defendants engaged in immoral, unethical, oppressive, or unscrupulous conduct in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), C.G.S. §§ 42-110(a), *et seq.* They breached their contracts with the Plaintiffs, tortiously interfered with Plaintiffs' business relationships, engaged in computer-related offenses, stole Plaintiffs' trade secrets,[13] infringed on Plaintiffs' copyrighted works[14] and breached fiduciary duties, all of which evidences such violation.

The standard for a CUTPA action is that "a plaintiff must establish both that the defendant has engaged in a prohibited act and that, as a result of this act, the plaintiff suffered an injury." Stevenson Lumber Co.-Suffield, Inc. v. Chase Associates, Inc., 284 Conn. 205, 214, 932 A.2d 401 (2007).   In finding a prohibited unfair act, Connecticut has adopted the "cigarette rule", *i.e.*:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons] . . . All three criteria do not need to be satisfied to support a finding of unfairness.

---

[13] CUTSA and CUTPA claims may be pursued in the same action.  See, Milso Indus. Corp. v. Nazzaro, 2012 U.S. Dist. LEXIS 123999 (D. Conn. Aug. 30, 2012).
    [14] The infringement is not the sole basis for the CUTPA claim, as extra elements of breaches of confidential relationships, breaches of fiduciary duties, trade secrets, and passing-off all are present in this matter.  Compare Frontier Group, Inc. v. Northwest Drafting & Design, Inc., 493 F. Supp. 2d 291, 300 (D. Conn. 2007).

A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.)

Centimark Corp. v. Village Manor Associates Ltd. Partnership, 113 Conn. App. 509, 523, 967 A.2d 550 (2009).  "A competitor or other business person can maintain a CUTPA cause of action without showing consumer injury." (Citations omitted; internal quotation marks omitted.) Eder Bros., Inc. v. Wine Merchants of Connecticut, Inc., 275 Conn. 363, 379-80, 880 A.2d 138 (2005).

The first prong has been met.  As set forth above, Defendants have violated multiple contracts with Plaintiffs requiring them to maintain source code confidentiality, not compete with Plaintiffs in the mortgage field service software market, and deliver all right, title and interest in derivative software to Plaintiffs.  "[T]the same facts that establish a breach of contract claim may be sufficient to establish a CUTPA violation . . .." Lester v. Resort Camplands International, Inc., 27 Conn. App. 59, 71, 605 A.2d 550 (1992).  Defendants Maxim and S2k further breached their fiduciary duties to Plaintiffs, which can constitute "reckless indifference" under CUTPA.  See, Smith v. Snyder, 267 Conn. 456, 467 n.9 (Conn. 2004).  And, as noted, Defendants committed tortious interference, computer-related offenses, theft of trade secrets, and infringed on copyright.  Thus, Defendants' practices violate statutes and common law, offending public policy.  Compare, Lodovico v. Mihalcik, 2010 Conn. Super. LEXIS 2150 (Conn. Super. Ct. Aug. 17, 2010).

Such violations also are immoral, unethical, oppressive and unscrupulous, meeting the second prong.  Compare, id.  The Maxim Defendants' conduct was immoral, unethical and unscrupulous in that they knowingly violated the agreements and otherwise sought to circumvent the contracts that he had signed with EPS. See,

Exhibit B, Maxim Deposition 147:19-148:5, 148:18-150:12, and Ex. 13 thereto. Not only did Maxim suborn the creation of the competitive product, he actively marketed it while and owner and shareholder. Similarly, Defendant Pajemola's conduct was immoral and unethical in that he abused the trust placed in him by EPS when it permitted him access to its confidential Source Code by Pajemola copying that Source Code and using it as the architecture for Field Navigator. Without regard for EPS or his obligations under the SSCAAIA, Pajemola formed his own software company and surreptitiously marketed Field Navigator, earning several hundred thousand dollars, none of which was disclosed to the Plaintiffs.

As a result of these breaches and aggravating circumstances, Plaintiffs have sustained an ascertainable loss, including loss of customers and loss of their competitive business edge.   Specifically, Plaintiffs have seen at least $400,000 in revenues diverted to Defendant CFS.  Such injury was substantial.  The actions of Defendants caused and will continue to cause Plaintiffs to suffer an ascertainable loss of money and have also negatively affected EPS's proprietary rights and interests in its products, name and goodwill.  In consequence of such harm, Plaintiffs are entitled to an injunction to prevent the continued unfair trade practices per Conn.Gen.Stat. § 42-110g(a).  Plaintiffs are further entitled to recover the monetary damages it incurred in consequence of the Defendants' unfair trade practices, per Conn.Gen.Stat. § 42-110g(a).  Plaintiffs are entitled to recover punitive damages, including treble damages, per Conn.Gen.Stat. § 42-110g(a). "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights." (Internal quotation marks omitted.)  Gargano v.

Heyman, 203 Conn. 616, 622, 525 A.2d 1343 (1987).  See also Votto v. Am. Car
Rental, Inc., 273 Conn. 478, 486 (Conn. 2005) (upholding award of treble damages for
reprehensible conduct).  As set forth in preceding sections, Defendants' actions were
intentional and recklessly indifferent to the rights of Plaintiffs.  Plaintiffs are entitled to
recover reasonable costs and attorneys' fees, per Conn.Gen.Stat. § 42-110g(d).   In
light of the foregoing, summary judgment should be awarded to Plaintiffs as to Count
13.


      G.     Defendants Infringed Plaintiff's Copyright

Plaintiff East Point Systems, Inc., is the author of the Field-Comm.net software,
bearing Certificate of Registration: TX 7-603-779 from the U.S. Register of Copyrights.
See, Exhibit G to the Verified Complaint (ECF No. 1-7).  Defendants have infringed
upon that copyright in violation of the Copyright Act, 17 U.S.C. sec. 501.  To establish
copyright infringement, "two elements must be proven: (1) ownership of a valid
copyright, and (2) copying of constituent elements of the work that are original." Feist
Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S. Ct. 1282, 113 L. Ed. 2d
358 (1991).

Plaintiff's copyright registration was dated November 20, 2012, less than five
years from the June 30, 2009, date of first publication.  See, Exhibit A, Verified
Complaint, Ex. G.  Thus, the registration constitutes "*prima facie* evidence of the validity
of the copyright and of the facts stated in the certificate."  17 U.S.C. sec. 401(c).
Moreover, East Point Systems is otherwise the author of the Field-Comm.net software
and it is the owner of a valid copyright.  See, Exhibit A, Verified Complaint (ECF No. 1)
at ¶¶ 236-240.  A copy of the submission to the Register of Copyright appears at Exhibit

I.   Defendants have no factual basis to suggest the contrary.  See, Exhibit C, Maxim Answer (ECF No. 63) at paragraphs 236-240; Exhibit J, Pajemola Answer (ECF No. 32) at paragraph 69.  The database structure, *i.e.* the method by which types of data are grouped into tables and constituent columns, and the formatting thereof, is original and copyrightable.  Compare <u>Assessment Techs. of WI, LLC v. WIREdata, Inc.</u>, 350 F.3d 640, 643 (7th Cir. 2003) (program arraigning data into 456 fields grouped into 34 categories was sufficiently original to be afforded copyright protection); see also <u>Key Publications, Inc. v. Chinatown Today Pub. Enterprises, Inc</u>., 945 F.2d 509, 513 (2d Cir. N.Y. 1991) (arrangement of data beyond mere mechanical grouping is sufficiently original).  "Even if the elements used in the work are not protectable standing alone, protection extends to the selection and arrangement of those unprotected elements in the final work, as long as the author's selection and arrangement are original." (Internal citation omitted.)  <u>RBC Nice Bearings, Inc. v. Peer Bearing Co</u>., 676 F. Supp. 2d 9, 20 (D. Conn. 2009) (Bryant, J.).  Thus, Plaintiff East Point Systems owns a valid copyright.

Defendants illegally copied the original elements of the database structure. To prevail on the second element, Plaintiff must demonstrate that "(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's." <u>Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp</u>., 25 F.3d 119, 122-23 (2d Cir. 1994). Copying occurred. ███████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

███████████████ Pajemola acknowledges that Maxim facilitated his access to and that he

did review Plaintiffs' database structure.  See, Exhibit H, Pajemola Depo. 22, 151:11-23, 159:14-19, 160:11-21, 179:3-11. ████████████████████████████████



The Maxim 1.2 database examined by the experts, appearing at Exhibit G, is the same database submitted to the Register of Copyrights as "Maxim Build".  See, Exhibit I; see also, Exhibit K, Affidavit of Counsel.  And there is substantial similarity between the Defendants' work and the Plaintiff's protected structures. ███████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

Per 17 U.S.C. § 504(b), Plaintiff is entitled to actual damages, including the $400,00 in revenue realized by CFS.  Such infringement is otherwise willful within the meaning of 17 U.S.C. § 504(c)(2).  Injunctive relief to preclude the use and distribution of Defendants' derivative works should be issued as well per 17 U.S.C. sec. 502. Finally, Plaintiff is entitled to a reasonable attorney's fee and full costs per 17 U.S.C. sec. 505.  It is, therefore, appropriate for summary judgment to issue in favor of Plaintiff East Point Systems as to Count 14.

H.     A Constructive Trust Should be Imposed Due to Unjust Enrichment

A constructive trust is appropriate in this matter in light of the unjust

enrichment.  A plaintiff seeking recovery for unjust enrichment must prove: (1) that the

defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for

the benefits, and (3) that the failure of payment was to the plaintiff's detriment. Hartford

Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 282-83, 649 A.2d

518 (1994). As set forth above, Defendants are in possession of property, revenue, and

proceeds derived from their access to EPS's program and source code.  This includes

the $400,000 of revenue and the copies of the derivative software. Such was to their

benefit.  The Defendants have not tendered the property or funds to Plaintiff.  Plaintiff

EPS is the beneficial owner and such failure is to their detriment.

In determining whether to impose a constructive trust under Connecticut law:

"A constructive trust arises contrary to intention and in invitum, against one who,
by fraud, actual or constructive, by duress or abuse of confidence, by
commission of wrong, or by any form of unconscionable conduct, artifice,
concealment, or questionable means, or who in any way against equity and good
conscience, either has obtained or holds the legal right to property which he
ought not, in equity and good conscience, hold and enjoy. . . . A constructive trust
arises whenever another's property has been wrongfully appropriated and
converted into a different form . . . [or] when a person who holds title to property
is subject to an equitable duty to convey it to another on the ground that he would
be unjustly enriched if he were permitted to retain it." (Internal quotation marks
omitted.)

Jaser v. Fischer, 65 Conn. App. 349, 359, 783 A.2d 28 (2001).  Here, the Defendants

have been unjustly enriched by their exclusive retention of Field Navigator, the software

derived from FieldComm.net, without payment to EPS of the money the Defendants

received from its sales and licensing of Field Navigator.  Defendant Maxim is a

shareholder and member of EPS' Board of Directors, who has a fiduciary duty not to

self-deal against EPS. He has abused his confidence by allowing his programmer,

Defendant Pajemola, to access EPS's confidential software for the purpose of building a product to compete directly against EPS.  Both Defendant Maxim and Pajemola signed Software Source Code Access and Indemnity Agreement that vest ownership of the software and its derivatives in Plaintiff.   EPS provided access to the program to Defendants with the intent to benefit EPS's business and customers. Instead of using the intellectual property to benefit EPS's business and customers, Defendants retained the property marketed it. Defendants have wrongfully failed to use the property to the benefit of Plaintiff's customers and to return the property to its rightful owner.  By virtue of their wrongful acts, Defendants should not in equity and good conscience have obtained nor continue to hold and enjoy said property, revenue or proceeds. Accordingly, this Court should grant summary judgment to the Plaintiffs with respect to Count 15.

## CONCLUSION

Plaintiffs are entitled to summary judgment on all counts in their Verified Complaint.  Defendants breached contracts and fiduciary duties, tortiously interfered with business, misappropriated trade secrets, access computer systems without authorization, engaged in unfair trade practices, infringed on copyright and have been unjustly enriched.  They have profited at Plaintiffs' expense.  Defendants must be found liable to pay the $400,000 in revenue diverted, along with attorneys' fees, costs, and other damages.  They must be enjoined from further infringement and unfair practices. And Defendant S2k must be compelled to tender its shares of East Point Systems, Inc. A proposed order appears at Exhibit L.

Date:  July 25, 2014

By: /s/ Jay M. Wolman
Jay M. Wolman ct29129
Bruce H. Raymond ct04981
Raymond Law Group LLC
90 National Drive, Suite 3
Glastonbury, CT 06033
P: 860-633-0580
F: 860-633-0438
wolman@raymondlawgroup.com
Raymond@raymondlawgroup.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date a copy of foregoing pleading was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.


Date:  DRAFT                                    /s/ Jay M. Wolman
                                                Jay M. Wolman



KLEBAN HOLDING COMPANY, LLC, PLAINTIFF, v. ANN TAYLOR RETAIL, INC., DEFENDANT.

CIVIL ACTION NO. 3:11-CV-01879 (VLB)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*2013 U.S. Dist. LEXIS 168231*

**November 26, 2013, Decided**
**November 26, 2013, Filed**

**COUNSEL:** [*1] For Kleban Holding Company, LLC, Plaintiff: Richard P. Colbert, LEAD ATTORNEY, Day Pitney LLP-Stmfd, Stamford, CT; Stephan B. Grozinger, LEAD ATTORNEY, Law Office of Stephan B. Grozinger, Weston, CT.

For Ann Taylor Retail, Inc., Defendant: Kevin M. Godbout, Simon I. Allentuch, LEAD ATTORNEYS, Neubert, Pepe & Monteith, New Haven, CT.

For Starwood Ceruzzi LLC, Witness: Andrew M. Zeitlin, LEAD ATTORNEY, Shipman & Goodwin, Stamford, CT.

**JUDGES:** Hon. Vanessa L. Bryant, United States District Judge.

**OPINION BY:** Vanessa L. Bryant

**OPINION**

MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. #111] AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Dkt. #115]

I. Introduction

The Plaintiff, Kleban Holding Company, LLC ("Kleban"), brings this breach of contract action against the Defendant Ann Taylor Retail, Inc. ("Ann Taylor") for Ann Taylor's alleged default under a lease agreement between the two entities. Currently pending before the Court are cross motions for summary judgment. For the reasons that follow, the Defendant's Motion for Summary Judgment is GRANTED and the Plaintiff's Motion for Summary Judgment is DENIED.

II. Factual Background

The following facts relevant to the motions for summary judgment [*2] are undisputed unless otherwise noted. On November 30, 2000, Starwood Ceruzzi Post Road LLC (Starwood Ceruzzi) entered into a lease agreement (the "Lease") with Ann Taylor for retail premises (the "Store") within a shopping center (the "Center") located at 1499 Post Road in Fairfield, Connecticut. [Dkt. 114, D's 56(a)1 Stmt. ¶¶1, 2; *see also* Dkt. 113, Lease, p. 2]. In 2004 this Lease was assigned to Plaintiff Kleban as the successor-in-interest to Starwood Ceruzzi. [Dkt. 114, D's 56(a)1 Stmt. ¶3; dkt. 117, P's 56(a)1 Stmt. ¶¶1, 15]. The initial term of the Lease was ten years. [Dkt. 117, P's 56(a)1 Stmt. ¶2]. On April 11, 2011, Ann Taylor exercised its option to extend the Lease for the period of February 1, 2012 through January 31, 2017; Ann Taylor has one remaining option to extend the Lease for another five years, through January 31, 2022. [*Id.* at ¶3].

The Lease provides that Minimum Annual Rent for the Store shall be paid in equal monthly increments of $14,175.00 during years eleven through fifteen of the Lease, payable "in [*3] advance on the first day of each calendar month of the tenancy without any set-offs or deductions whatsoever and without any prior demand being required therefor." [Dkt. 113, Lease, ¶¶ 5, 5A; *see also* dkt. 117, P's 56(a)1 Stmt. ¶¶4, 5; dkt. 121, D's 56(a)2 Stmt. ¶5].

Paragraph 61 of the Lease, which forms the basis of the dispute in this case, reads as follows:

2013 U.S. Dist. LEXIS 168231, *

61.  CO-TENANCY. (a) Opening: Landlord agrees that the Delivery Date will not occur until Landlord notifies Tenant that eighty percent (80%) of the retail area of the Center is under construction and that Borders, Inc., Banana Republic and Victoria's Secret have executed leases on or before March 1, 2001. If Landlord is unable to enter into such leases by March 1, 2001, Tenant shall have the right to terminate this Lease and Landlord shall reimburse Tenant for its reasonable out-of-pocket legal and architectural expenses. Notwithstanding the foregoing, Landlord may replace Victoria's Secret or Banana Republic with a suitable replacement tenant.

(b) Operating: In the event Borders, Inc. or fifty percent (50%) of the other retail space in the Center, excluding Tenant, are not open and operating, Tenant shall be entitled to abate Minimum [*4] Annual Rent and in lieu thereof pay five percent (5%) of Gross Sales, not to exceed the Minimum Annual Rent otherwise payable in the absence of this paragraph, until the tenants meeting the foregoing requirements are again open and operating.

Within thirty (30) days after the end of each calendar month that this Paragraph 61(b) shall be applicable, Tenant shall provide Landlord a statement showing the Gross Sales for such month and shall pay the amount due as percentage rent for such month. . .

[Dkt. 113, Lease, ¶ 61; *see also* dkt. 114, D's 56(a)1 Stmt. ¶5; dkt. 117, P's 56(a)1 Stmt. ¶¶8, 9].

On April 11, 2000, Borders, Inc. ("Borders") signed a lease to rent space in the Center to operate a book store. [Dkt. 117, P's 56(a)1 Stmt. ¶12]. On May 16, 2011, however, Borders closed its store in the Center in connection with its bankruptcy filing. [Dkt. 114, D's 56(a)1 Stmt. ¶4; dkt. 117, P's 56(a)1 Stmt. ¶17]. On May 18, 2011 Kleban replaced Borders with Book Warehouse, which remained open and operating in the Center until closing on September 10, 2011. [Dkt. 117, P's 56(a)1 Stmt. ¶¶18, 19]. On November 11, 2011 the Fairfield University Bookstore, in partnership with the Follett Higher Education [*5] Group, opened for business in the Center in Borders' former space.[1] [*Id.* at ¶20].

[1]   The Fairfield University Bookstore sells books for the general public, children's books, electronics, university apparel, notebooks, greeting cards, and Vera Bradley purses, and also has a Starbucks coffee shop on premises. [Dkt. 117, P's 56(a)1 Stmt. ¶21]. Kleban alleges that this store is equivalent to Borders.

Since July 2011, approximately two months after Borders vacated its space in the Center, Ann Taylor has paid abated monthly rent in the amount of 5% of Gross Sales pursuant to paragraph 61 of the Lease rather than Minimum Annual Rent pursuant to paragraph 5A. [Dkt. 114, D's 56(a)1 Stmt. ¶6; dkt. 117, P's 56(a)1 Stmt. ¶¶6, 24]. On July 12, 2011, Kleban mailed Ann Taylor a notice concerning non-receipt of Ann Taylor's Minimum Annual Rent for July 2011, and warning that failure to make payment of the full monthly rent within the time allotted in the Lease would result in Ann Taylor's default under the Lease. [Dkt. 116-6, 7/12/11 Letter; dkt. 117, P's 56(a)1 Stmt. ¶23]. Ann Taylor has continued to pay reduced rent since receipt of Kleban's letter.

Kleban initiated this action in Connecticut Superior [*6] Court and Ann Taylor removed it to this court on December 2, 2011. Kleban alleges three causes of action against Ann Taylor. Count one alleges breach of the Lease agreement due to Ann Taylor's failure to fully and/or timely pay Minimum Annual Rent since Borders vacated the Center, which it contends constitutes a default under the Lease. Count two alleges anticipatory breach of the Lease based on Ann Taylor's alleged intention to continuing paying abated rent under ¶ 61(b), and count three alleges unjust enrichment. Both parties have moved for summary judgment.

### III. Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010)*. "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; [*7] *Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986))*. "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,*

2013 U.S. Dist. LEXIS 168231, *

*446 F.3d 313, 315--16 (2d Cir. 2006)* (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch--Rubin v. Sandals Corp., No.3:03cv481, 2004 U.S. Dist. LEXIS 22112, 2004 WL 2472280, at \*1 (D. Conn. Oct. 20, 2004)* (internal quotation marks and citations omitted); *Martinez v. State of Connecticut, 817 F. Supp. 2d 28, 2011 WL 4396704 at \*6 (D. Conn. 2011).* Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, [*8] such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co., 604 F.3d 712 (2d Cir. 2010).*

IV. Discussion

a. Breach of the Lease Agreement

Defendant Ann Taylor contends that the terms of the Lease clearly and unambiguously entitle it to pay reduced rent so long as Borders does not occupy the Center pursuant to paragraph 61(b). Kleban, on the other hand, argues that paragraph 61(b) must be read to forbid Ann Taylor from continuing to pay reduced rent upon Kleban's replacement of Borders with another retailer. Because a lease is a contract and is "subject to the same rules of construction as other contracts," the Court must apply the rules of contract construction to determine whether Ann Taylor has breached the Lease by paying abated rent pursuant to ¶ 61. *David Caron Chrysler Motors, LLC v. Goodhall's, Inc., 304 Conn. 738, 749, 43 A.3d 164 (2012)* (citation omitted). The Court will address the parties' arguments in turn.

"A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties [*9] and the circumstances connected with the transaction." *Murtha v. City of Hartford, 303 Conn. 1, 7-8, 35 A.3d 177 (2011); Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc., 300 Conn. 254, 260, 14 A.3d 284 (2011)* ("[i]n ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction"). "The intent of the parties is to be ascertained by a fair and reasonable construction of the written words and ... the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the [writing]." *Murtha, 303 Conn. at 7* (quoting *19 Perry Street, LLC v. Unionville Water Co., 294 Conn. 611, 623, 987 A.2d 1009 (2010)).* "[I]n construing contracts, we give effect to all the language included therein, as the law of contract interpretation ... militates against interpreting a contract in a way that renders a provision superfluous." *Conn. Nat'l Bank v. Rehab Assocs., 300 Conn. 314, 322, 12 A.3d 995 (2011)* (internal quotation marks and citation omitted).

Where the language of a contract is unambiguous, [*10] a court "must give the contract effect according to its terms." *Harbour Pointe, LLC, 300 Conn. at 260.* A contract is unambiguous when "its language is clear and conveys a definite and precise intent . . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." *Id.* (citation omitted); *Murtha, 303 Conn. at 9* (same). "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Harbour Pointe, LLC, 300 Conn. at 260* (citation omitted). "It is well established that [w]here there is definitive contract language, *the determination of what the parties intended by their contractual commitments is a question of law*." *Id. at 259-60* (citation omitted); *Cruz v. Visual Perceptions, LLC, 136 Conn. App. 330, 334, 46 A.3d 209 (2012), cert. granted on other grounds, 306 Conn. 903, 52 A.3d 730 (2012)* (same); *Murtha, 303 Conn. at 8* ("if a contract is unambiguous within its four corners, the determination of what the parties intended by their contractual commitments is a question of law."); *19 Perry St., LLC, 294 Conn. at 622-23* ("[w]here a party's intent is expressed clearly [*11] and unambiguously in writing, however, the determination of what the parties intended ... is a question of law [over which our review is plenary].") (citation omitted). In other words, "[t]he question is not what intention existed in the minds of the parties but what intention is expressed in the language used." *Barnard v. Barnard, 214 Conn. 99, 110, 570 A.2d 690 (1990)* (citation omitted). Thus,

> courts do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law.... Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, *it is not within its power to make a new and different agreement; contracts voluntarily and fairly made*

2013 U.S. Dist. LEXIS 168231, *

*should be held valid and enforced in the courts.*

*Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P., 252 Conn. 479, 505-06, 746 A.2d 1277 (2000)* (citation omitted). Further, "a presumption that the language used is definitive arises when ... the contract at issue is between sophisticated parties and is commercial in nature." *United Illuminating Co. v. Wisvest-Connecticut, LLC, 259 Conn. 665, 670, 791 A.2d 546 (2002)*; [*12] *Connecticut Nat. Bank v. Rehab Assocs., 300 Conn. 314, 319, 12 A.3d 995 (2011)* (same); *W. Dermatology Consultants, P.C. v. VitalWorks, Inc., 146 Conn. App. 169, 78 A.3d 167, *9 (2013)* (same).

Where the language of a contract is ambiguous, however, a court must construe those ambiguities against the contract's drafter. *Harbour Pointe, LLC, 300 Conn. at 260.* Any ambiguity in a contract "must emanate from the language used by the parties" and "a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." *Id. at 260-61* (citation omitted); *Murtha, 303 Conn. at 9* (same).

> The contract must be viewed in its entirety, with each provision read in light of the other provisions ... and every provision must be given effect if it is possible to do so.... If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous.

*Harbour Pointe, LLC, 300 Conn. at 261* (citation omitted).

Where a contract is ambiguous or does not set forth the entire agreement between the parties, "the court may look to parol evidence to explain the ambiguity or add a missing term." *Murtha, 303 Conn. at 12. See also Hartford Acc. & Indem. Co. v. Ace Am. Reinsurance Co., 284 Conn. 744, 771, 936 A.2d 224, 240 (2007)* [*13] ("extrinsic evidence may be considered in determining contractual intent only if a contract is ambiguous."); *United Illuminating Co., 259 Conn. at 675* (where a contract is ambiguous, the court may properly discern the intent of the parties as to its meaning by considering extrinsic evidence). "[A]ttempting to establish what the contract should have been, rather than what it was, is the exact conduct proscribed by the parol evidence rule." *Stamford Wrecking Co. v. United Stone Am., Inc., 99 Conn. App. 1, 12, 912 A.2d 1044 (2007).* In other words, "[t]he parol evidence rule ordinarily prohibits a court from considering extrinsic evidence in interpreting an agreement when that evidence tends to alter the explicit terms of the

agreement." *Battalino v. Van Patten, 100 Conn. App. 155, 167, 917 A.2d 595 (2007)* (citation omitted). "Parol evidence offered solely to vary or contradict the written terms of an *integrated* contract ... is *inadmissible* not because it is parol evidence, but because it is irrelevant." *Stamford Wrecking Co., 99 Conn. App. at 9* (emphasis added). This parol evidence rule "is not an exclusionary rule of evidence ... but a rule of substantive contract law." *Id.* (citation omitted).

Ann Taylor posits that [*14] paragraph 61(b) unambiguously provides that, where Borders is not open and operating, Ann Taylor is entitled to pay rent in the amount of 5% of Gross Sales in lieu of the Minimum Annual Rent specified in ¶ 5. Ann Taylor further contends that, because Borders permanently closed its doors at the Center (and, indeed, nationally), Borders' departure from the Center may not be remedied by Borders' replacement for purposes of abated rent under ¶ 61, thus entitling Ann Taylor to pay abated rent for the life of the Lease. Kleban, on the other hand, contends that subsection (b) does not allow Ann Taylor to continue paying reduced rent upon Kleban's replacement of Borders with another retailer. The Court will look first to the language of the Lease and will address the parties' arguments in turn.

As an initial matter, the Court notes that there is no dispute that Starwood Ceruzzi and both parties to this case are sophisticated entities or that the Lease at issue is commercial in nature. As such, there is a presumption that the language used in the Lease, including disputed paragraph 61, is definitive. *United Illuminating Co., 259 Conn. at 670.*

As recited above, paragraph 61(b) of the Lease, pursuant [*15] to which Ann Taylor has paid abated rent since July 2011, upon Borders' departure, and which is entitled "Co-Tenancy," provides in essence that in the event Borders, Inc. is not open and operating, Ann Taylor shall be entitled to abate Minimum Annual Rent and in lieu thereof pay five percent (5%) of Gross Sales, not to exceed the Minimum Annual Rent otherwise payable in the absence of paragraph 61, until the tenants meeting the foregoing requirements are again open and operating. It further provides that within thirty (30) days after the end of each calendar month that paragraph 61(b) is applicable, Tenant shall provide Landlord a statement showing the Gross Sales for such month and shall pay the amount due as percentage rent for such month. [Dkt. 113, Lease, ¶ 61].

Ann Taylor contends that this clause unambiguously allows it to pay percentage rent under two conditions: (a) where Borders is not open and operating, or (b) where fifty percent of the remaining retail space, excluding Ann Taylor, is not open and operating. [Dkt. 112, D's MSJ p.

7]. The plain language of ¶ 61 supports Ann Taylor's position. The Merriam Webster Dictionary defines the word "or," among other things, as "a function [*16] word to indicate an alternative." *Or Definition*, m-w.com, http://www.merriam-webster.com/dictionary/or (visited Nov. 20, 2013). The common and natural reading of the "or" clause in ¶ 61(b) reflects that subsection (b) deals with *two* potential events that are separate and independent of one another: *either* Borders *or* fifty percent of the remaining retail space, excluding Ann Taylor, are not open and operating. In other words, the presence of the word "or" in ¶ 61(b) means that both subjects of the "or" clause may function independently of one another. The first portion of 61(b), when severed to demonstrate the two distinct conditions permitting the payment of reduced rent, would read as follows:

> Condition A: In the event Borders, Inc. [ ] [is] not open and operating, Tenant shall be entitled to abate Minimum Annual Rent and in lieu thereof pay five percent (5%) of Gross Sales, not to exceed the Minimum Annual Rent otherwise payable in the absence of this paragraph, until the tenants meeting the foregoing requirements are again open and operating;

> *or*

> Condition B: In the event [ ] fifty percent (50%) of the other retail space in the Center, excluding Tenant, are not open and operating, Tenant [*17] shall be entitled to abate Minimum Annual Rent and in lieu thereof pay five percent (5%) of Gross Sales, not to exceed the Minimum Annual Rent otherwise payable in the absence of this paragraph, until the tenants meeting the foregoing requirements are again open and operating.

Thus, ¶ 61(b) clearly and unambiguously calls for the payment of reduced rent upon *either* of the above two conditions precedent.

Kleban contends that the parties' use of the generic term "tenants" in paragraph 61(b) rather than of specific company names indicates "that any reasonable 'tenant' open and operating in the Border's space would re-trigger Ann Taylor's obligation to pay minimum annual rent under the Lease" and that the parties referred to Borders merely "for convenience purposes in describing that large, single-tenant area of retail space within the Center." [Dkt. 116, P's MSJ p. 7; Dkt. 118, P's Opp. to D's

MSJ p. 3, ¶2]. In other words, Kleban contends that if the parties intended that Ann Taylor's payment of full rent be contingent upon Borders' occupation of the space, the parties would have so specified; instead, paragraph 61(b) "simply says that if Borders or any other tenants are 'not open and [*18] operating,' Tenant (Ann Taylor) may abate minimum annual rent 'until the tenants meeting the foregoing requirements [whoever they may be] are again open and operating.'" [Dkt. 116, P's MSJ p. 7].

First, the parties' choice to name Borders, Inc. specifically rather than to employ a description of the premises Borders occupied militates strongly in favor of a finding that the Lease language is definitive. Had the parties intended to define the term "Borders, Inc." to refer to the *space* that Borders occupied rather than to the retailer itself, or to Borders, Inc. *or an equivalent retailer*, the parties could have done so. Indeed, no defined term in the lease indicates that "Borders, Inc." may refer to anything but Borders, Inc. as a specific retail store occupying space in the Center. In fact, the parties chose to name specific retailers in ¶ 61(a) (ie, Banana Republic, Victoria's Secret, and Borders, Inc.) and neither party now contends that those terms are mere proxies for the *space* occupied by the named entities.

Second, Kleban's interpretation of the term "tenants" as used in ¶ 61(b) is unsustainable based on the plain language of the Lease. When read in light of the "or" clause allowing [*19] for reduced payment upon either of two conditions, the term "tenants" must describe the subjects of the respective conditions, namely Borders or "fifty percent (50%) of the other retail space in the Center, excluding Tenant." Ann Taylor was entitled to pay reduced rent upon either of the two conditions above "until the tenants meeting the foregoing requirements are again open and operating." When the two conditions are severed, it is clear that "tenants meeting the foregoing requirements" are defined as *either* Borders, Inc. *or* fifty percent of the remaining retail space, excluding Ann Taylor. In other words, "tenants" refers to the subject of each individual condition under the "or" clause:

> In the event *Borders, Inc.* [ ] [is] not open and operating, Tenant shall be entitled to abate Minimum Annual Rent and in lieu thereof pay five percent (5%) of Gross Sales ... until the tenants *meeting the foregoing requirements* are again open and operating.

(emphasis added). The requirement of the above condition is that Borders, Inc. be open and operating. The plain language of the Lease dictates that Ann Taylor may pay abated rent until the tenant meeting the foregoing

requirement is again open [*20] and operating. The only tenant who could fulfill such a requirement is Borders, Inc. Kleban's argument that "Borders, Inc." actually means "the retail space currently occupied by Borders, Inc." is illogical based on the plain language of the Lease.

Ann Taylor has offered an interpretation of the phrase "until tenants meeting the foregoing requirements are again open and operating" that differs from both Kleban's and this Court's interpretations. Ann Taylor posits that this phrase does not modify Borders, but instead only modifies the unrented fifty percent of the retail space as, grammatically, "a qualifying clause does not need to modify both 'events' just like an adverb can modify one adjective or more than one adjective in a sentence separated by the word 'or,'" and because the word "or" in ¶ 61(b) is disjunctive. Ann Taylor further explains that if ¶ 61(b) stated "Borders, Inc. or an equivalent tenant," then the above phrase would modify both Borders and "fifty percent of the other retail space." [Dkt. 112, D's MSJ p. 8]. Even if Ann Taylor's interpretation is correct, the consequence of the Lease language is identical: if Borders, Inc. is *not* open and operating, Ann Taylor may [*21] pay reduced rent.

Kleban also argues that, when read as a whole and in conjunction with subsection (a), paragraph 61 demonstrates that Kleban is "not prohibited from replacing Borders and thereby re-activating minimum annual rent." [Dkt. 116, MSJ p. 6]. Subsection (a) reads as follows:

(a) Opening: Landlord agrees that the Delivery Date will not occur until Landlord notifies Tenant that eighty percent (80%) of the retail area of the Center is under construction and that Borders, Inc., Banana Republic and Victoria's Secret have executed leases on or before March 1, 2001. If Landlord is unable to enter into such leases by March 1, 2001, Tenant shall have the right to terminate this Lease and Landlord shall reimburse Tenant for its reasonable out-of-pocket legal and architectural expenses. Notwithstanding the foregoing, *Landlord may replace Victoria's Secret or Banana Republic with a suitable replacement tenant*.

[Dkt. 113, Lease, ¶ 61(a) (emphasis added)]. Kleban notes that while subsection (a) specifically allows for Banana Republic's or Victoria's Secret's replacement by a suitable replacement tenant in connection with the opening of the Center, subsection (a) is silent as to Borders' [*22] replacement, which implies that replacement is not allowed. Thus, Kleban concludes, "[i]f the parties wanted to prohibit the replacement of Borders in connection with both the 'Opening and the 'Operating' phases of the Center, they surely could and would have stated such prohibition in paragraph 61(b), as they seemingly did in paragraph 61(a)." [Dkt. 116, MSJ p. 7].

Kleban's argument warrants no merit. As noted, the language of subsection (b) unambiguously prohibits Borders' replacement for purposes of Ann Taylor's payment of reduced rent. Moreover, even if the Court were to credit Kleban's construction of subsections (a) and (b), Kleban's conclusions are erroneous. Subsection (a) contains a passive prohibition; it explicitly states that Banana Republic and Victoria's Secret may be replaced, and thus the parallel implication is that Borders is not replaceable. While Kleban argues that the parties could and would have specifically stated in subsection (b) that Borders were irreplaceable if that were their intent, Kleban ignores that no such *explicit* prohibition exists in subsection (a). Rather, subsection (a) makes a specific allowance for the replacement of Banana Republic and Victoria's [*23] Secret. Thus, if the Court were to follow Kleban's suggestion that sections (a) and (b) are similarly constructed, the logical conclusion must be that if the parties intended a substitution for Borders, they would have explicitly so stated, as they did for the tenants in section (a).

Alternatively, Kleban argues that any argument based on the language of ¶ 61(a), which contains terms related to the opening of the Center, is unavailing because that paragraph specifically allowed for the replacement of Victoria's Secret and Banana Republic but not of Borders *only* because Borders had already signed a lease while Victoria's Secret and Banana Republic had not. Thus, because prior landlord Starwood Ceruzzi had already satisfied the opening condition that Borders execute a lease by a certain date, there was no need to carve out a right to replace Borders in the event that Borders did not execute a lease in the future. The need remained, however, as to Victoria's Secret and Banana Republic, which had not executed leases at the time Ann Taylor executed its Lease. Thus, Kleban posits, "it would perhaps mean the parties to the Lease did not intend to prohibit the replacement of any tenant, whether [*24] at 'Opening' or during 'Operating.'" [Dkt. 116, P's MSJ p. 8]. This argument must be rejected. Regardless of whether Borders was replaceable for purposes of subsection (a), subsection (b) clearly contemplates that Borders was not replaceable for purposes of Ann Taylor's payment of reduced rent during the operating phase of the Center. Further, that Borders had already executed a Lease at the time that Ann Taylor executed its own lease credits the parties' inclusion of specific language pre-

2013 U.S. Dist. LEXIS 168231, *

cluding Borders' replacement for purposes of reduced rent. Kleban's argument is inapposite.

Although the language of paragraph 61 is clear on its face, the Court must give full meaning and effect to all the language included in a contract, as the law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous. Kleban posits that Ann Taylor's interpretation of ¶ 61(b) directly conflicts with the language of ¶ 54, which states in relevant part that

> Nothing contained in this lease or any Exhibit or Rider attached hereto shall be construed, deemed or interpreted to be a warranty, representation or agreement on the part of Landlord that any department [*25] or regional or national chain store or other merchant shall open or remain open for business or occupy or continue to occupy any premises in or adjoining the Center during the term of this lease or any renewal or extension thereof.

[Dkt. 113, Lease ¶ 54].

Simple analysis of these two paragraphs demonstrates that they are not in conflict and are not mutually exclusive. While ¶ 54 notes that the Lease does *not* warranty that any particular retail tenant will occupy or remain at the Center for any given time, it also does not contain any language prohibiting the parties from contracting for reduced rent if certain retail tenants vacate the property. Ann Taylor's payment of reduced rent and Kleban's agreement to allow payment of reduced rent under ¶ 61 in no way creates any representation or warranty obligations on Kleban's part, nor does it obstruct the parties' understanding that Kleban had no authority to warranty or represent that a retail store over whose finances and management it had no power would remain in business indefinitely.

As to Kleban's contention that "the Lease does not contain any other express provision that says Borders, and only Borders, must be at the Center at all times [*26] after signing its lease," Kleban is correct. [Dkt. 116, P's MSJ p. 16]. Although ¶ 61(b) provides for reduced rent if Borders ceases to be open and operating, nothing in the Lease obligates Borders to remain in occupancy ad infinitum. Rather, the Lease simply provides that in the event that Borders leaves the Center, Ann Taylor will pay reduced rent. Nothing in ¶ 61 obligates Borders to remain at the Center for any amount of time, nor could this Lease legally obligate Borders to remain at the Center as Borders is not a party to the Lease and thus has no obligations under it.

Kleban also argues that Ann Taylor's interpretation of the Lease leads to absurd results and thus is invalid. As an example, Kleban asserts that "if instead of going bankrupt, Border's [sic] was now refusing to pay a penny of rent, intentionally destroying their space and selling illegal drugs, under Ann Taylor's interpretation of the Lease Kleban Holding would not be able to evict Borders to get a new tenant because it would violate paragraph 61 of the Lease and Ann Taylor could then pay 50% less rent." [Dkt. 116, P's MSJ p.15]. Kleban's argument is patently false. Nothing in the Lease prohibited Kleban from evicting [*27] Borders or any other tenant, nor does any reasonable reading of the Lease lead to the conclusion that Kleban would be in violation of ¶ 61 if it evicted Borders. As discussed previously, ¶ 61 merely provides that *if Borders vacates the property, Ann Taylor pays reduced rent.* The Lease does not contemplate this event as constituting a breach. Indeed, it is equally untrue that if fifty percent of the remaining retail space is not open and operating pursuant to ¶ 61(b), Kleban would be in violation of the Lease.

Finally, Kleban argues in passing that Ann Taylor's "$800,000+ windfall," coupled with various inconsistencies Kleban has purported to find based on extrinsic evidence (discussed briefly later in this decision), makes Ann Taylor's interpretation of the Lease illogical as "[n]o reasonable owner ... would have agreed to a clause that would create the result that Ann Taylor claims." [Dkt. 116, P's MSJ p. 17; *see also* dkt. 118, P's Opp. to D's MSJ p. 2]. Kleban, however, wholly ignores the law of contract interpretation and the clear terms of the Lease in making this argument. In fact, the parties -- both of whom were sophisticated commercial entities -- *did* include ¶ 61 in the Lease,  [*28] and ¶ 61 is clear and unambiguous in its meaning. That Ann Taylor has found itself providently situated as a result of ¶ 61(b) is irrelevant; "courts do not unmake bargains unwisely made." *Tallmadge Bros., Inc.,* 252 Conn. at 505-06 (citation omitted). The parties in this case entered into a sophisticated commercial lease. Neither party asserts that it was the victim of fraud or duress, or that the relative positions of the parties were unequal during the Lease negotiation process. In fact, Starwood Ceruzzi, whose leases Kleban assumed, had the benefit of drafting the Lease. Thus,

> [e]ven if the result of the fair and logical enforcement of th[e] unambiguous agreement[] seems unduly to burden one of the parties, [the court] decline[s] to embark a voyage into uncharted waters in which untrammeled and unrestrained judicial revisionism would depart significantly from an aspect of contract law upon which contracting parties reasonably

can be assumed to have relied for many years.

*Id. at 506* (declining to revise an unambiguous settlement agreement upon which sophisticated parties had agreed).

The Court concludes that the language of the Lease is clear and unambiguous in allowing Ann Taylor to [*29] pay reduced rent when Borders is not open and operating in the Center. Paragraph 61(b), when read in conjunction with the rest of the Lease, conveys a definite and precise intent and therefore this Court "will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." *Harbour Pointe, LLC, 300 Conn. at 260*. No ambiguity emanates from the language used by the parties. Although it appears that Kleban now finds itself a party to a "bargain unwisely made," this Court has no authority to unmake a deal agreed upon by two sophisticated parties to a commercial contract whose language is presumed to be definitive. As the Lease language is definitive that Ann Taylor may pay reduced rent and the parties agree that Ann Taylor has been paying reduced rent since 2011 pursuant to ¶ 61, Ann Taylor has neither breached nor anticipatorily breached the Lease.

### i. Parol Evidence

Notwithstanding Kleban's above arguments, the main focus of Kleban's allegation that Ann Taylor is prohibited from paying reduced rent if Kleban has filled the Borders space is the 2012 deposition testimony of two representatives of Starwood Ceruzzi, Ann Taylor's prior Landlord and signatory to the [*30] Lease. Kleban has offered testimony from Louis Ceruzzi, Jr., President of Starwood Ceruzzi LLC and signatory to the Lease on behalf of Starwood Ceruzzi Post Road LLC, and from Cynthia Ellis, senior vice president and associate general counsel of Ceruzzi Properties LLC, and the drafter of the Lease, purportedly supporting its interpretation of ¶ 61 and in which both testified that it was not their intention to draft or enter into a lease that precluded the landlord from substituting a tenant for Borders or restoring Ann Taylor's obligation to pay Minimum Annual Rent. In response, Ann Taylor argues that this parol evidence is irrelevant and thus inappropriate to the Court's analysis given the unambiguous Lease language. Ann Taylor further posits that even if extrinsic evidence may be considered, written documentation contemporaneous with the drafting of the Lease supports Ann Taylor's own interpretation of ¶ 61.

The extrinsic evidence offered by the parties is unpersuasive in light of the clear and unambiguous language of the contract. As the Connecticut Supreme Court has observed, "the mere fact that the parties advance dif-

ferent interpretations of the language in question does not necessitate [*31] a conclusion that the language is ambiguous." *Harbour Pointe, LLC, 300 Conn. at 260* (citation omitted). Because the meaning of the Lease is unambiguous, this Court is prohibited from considering parol evidence. *See Hartford Acc. & Indem. Co., 284 Conn. at 771* ("extrinsic evidence may be considered in determining contractual intent only if a contract is ambiguous."); *Stamford Wrecking Co., 99 Conn. App. at 12* ("attempting to establish what the contract should have been, rather than what it was, is the exact conduct proscribed by the parol evidence rule."). Such evidence is irrelevant.

### b. Unjust Enrichment

Ann Taylor argues that Plaintiff's unjust enrichment claim must fail as a matter of law because the written Lease upon which the claim is based is enforceable. Kleban has neither addressed Ann Taylor's argument nor cited any legal authority in opposition. Further, Kleban does not generally claim that the Lease is unenforceable. Rather, Kleban's theory of recovery is based on its request that the Court enforce the Lease pursuant to its own interpretation of the Lease's terms.

Under Connecticut law Plaintiff's unjust enrichment claim fails. "[Q]uantum meruit and unjust enrichment are common-law [*32] principles of restitution; both are noncontractual means of recovery without [a] valid contract...." *BHP Land Servs., LLC v. Seymour, 137 Conn. App. 165, 169, 47 A.3d 950 (2012)* (quoting *Gagne v. Vaccaro, 255 Conn. 390, 401, 766 A.2d 416 (2001), on appeal after remand, 80 Conn. App. 436, 835 A.2d 491 (2003), cert. denied, 268 Conn. 920, 846 A.2d 881 (2004))*. "[U]njust enrichment relates to a benefit of money or property ... and applies when no remedy is available based on the contract.... The lack of a remedy under a contract is a precondition to recovery based on unjust enrichment." *Id.* (citation omitted). "Proof of a contract enforceable at law precludes the equitable remedy of unjust enrichment; at least in the absence of a breach of the contract by the defendant; or a mutual rescission of the contract." *Feng v. Dart Hill Realty, Inc., 26 Conn. App. 380, 383, 601 A.2d 547 (1992)*.

The commercial Lease at issue is a contract between two sophisticated parties which is unambiguous and enforceable as drafted. Ann Taylor has not breached the Lease, nor have the parties rescinded the Lease. Thus, Plaintiff's unjust enrichment claim -- which Plaintiff has not addressed in either its Motion for Summary Judgment or in its Opposition to Ann Taylor's motion -- [*33] must be dismissed. *See Berman & Sable v. Nat'l Loan Investors, LP, No. X06CV000167145S, 2002 Conn. Super. LEXIS 154, 2002 WL 194528 (Conn. Super. Ct. Jan. 16, 2002)* (declining to revise an express contract

2013 U.S. Dist. LEXIS 168231, *

for attorneys' fees via an unjust enrichment theory because "[a] claim for unjust enrichment is not available in the situation where there is an enforceable express contract between the parties").

c. Legal Fees and Costs

Ann Taylor requests that, if it prevails in this action, it be allowed to present an affidavit describing the costs and fees incurred in this litigation pursuant to ¶ 34 of the Lease, which provides that "[i]n any litigation arising out of this Lease involving Landlord and Tenant, the prevailing party shall be entitled to recover all costs, expenses and reasonable attorney's fees that have been incurred in connection therewith." [Dkt. 113, Lease, ¶ 34(f)]. As Ann Taylor is the prevailing party in this action, it is entitled to reimbursement pursuant to ¶ 34. Ann Taylor may file affidavits and/or other materials demonstrating the reasonable costs, fees, and expenses incurred in this litigation, preferably within 35 days of the date of this judgment.

V. Conclusion

For the foregoing reasons, Defendant's [*34] Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED. The Clerk is directed to enter judgment in favor of the Defendant and to close the case.

IT IS SO ORDERED.

/s/ Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: November 26, 2013



AMBASE CORPORATION and SDG FINANCIAL CORPORATION, Plaintiffs, v. SDG INC., W. BLAIR GEHO, ROBERT GEHO, HANS GEHO, CHARLES FULGRAF, CHARLES BRAIN, NEIL FLANZRAICH, and MALCOM JOZOFF, Defendants.

No. 3:00CV1694(DJS)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*2005 U.S. Dist. LEXIS 16164*

**August 3, 2005, Decided**

**PRIOR HISTORY:** *AmBase Corp. v. SDG, Inc., 2002 U.S. Dist. LEXIS 8817 (D. Conn., Mar. 28, 2002)*

**COUNSEL:** [*1] For AmBase Corp., SDG Financial Corp., Plaintiffs: Ian E. Bjorkman, Wiggins & Dana, New Haven, CT.

For SDG, Inc., Defendant: Christopher S. Williams, Julie A. Harris, Calfee, Halter & Griswold, LLP, Cleveland, OH; Joel B. Casey, McCarter & English, Hartford, CT; John W. Cannavino, Mena J. Bonazzoli, Cummings & Lockwoood, Stamford, CT; Meghan A. Laganza, Finn Dixon & Herling, Stamford, CT.

For W. Blair Geho, Robert Geho, Hans Geho, Charles Fulgraff, Charles Brian, Christopher S. Williams, Henry G. Grendel, Julie A. Harris, Calfee, Halter & Griswold, LLP, Cleveland, OH; Joel B. Casey, McCarter & English, Hartford, CT; John W. Cannavino, Mena J. Bonazzoli, Cummings & Lockwoood, Stamford, CT; Meghan A. Laganza, Finn Dixon & Herling, Stamford, CT.

For Neil Flanzraich, Defendant: Henry G. Grendell, Calfee, Halter & Griswold, LLP, Cleveland, OH; Joel B. Casey, McCarter & English, Hartford, CT; John W. Cannavino, Mena J. Bonazzoli, Cummings & Lockwood, Stamford, CT; Meghan A. Laganza, Finn Dixon & Herling, Stamford, CT.

For Malcolm Jozoff, Defendant: Christopher S. Williams, Julie A. Harris, Henry G. Grendell, Calfee, Halter & Griswold, LLP, Cleveland, OH; Joel B. Casey, [*2]

McCarter & English, Hartford, CT; John W. Cannavino, Mena J. Bonazzoli, Cummings & Lockwoood, Stamford, CT; Meghan A. Laganza, Finn Dixon & Herling, Stamford, CT.

For SDG, Inc., Counter Claimant: John W. Cannavino, Cummings & Lockwood, Stamford, CT.

**JUDGES:** DOMINIC J. SQUATRITO, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** DOMINIC J. SQUATRITO

**OPINION**

*MEMORANDUM OF DECISION*

Plaintiffs, AmBase Corporation ("AmBase") and SDG Financial Corporation ("Financial"), bring this action against defendants SDG, Inc. ("SDG"), W. Blair Geho (hereinafter "Blair Geho"), Robert Geho, Hans Geho, Charles Fulgraf, Charles Brain, Neil Flanzraich, and Malcolm Jozoff alleging breach of contract against defendant SDG (First Claim), breach of the covenant of good faith and fair dealing against defendant SDG (Second Claim for Relief), breach of contract against defendant Blair Geho (Third Claim for Relief), breach of the covenant of good faith and fair dealing against defendant Blair Geho (Fourth Claim for Relief), fraud against all defendants, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), *Conn. Gen. Stat. §§ 42-110a-42-110q*, against all defendants. Counterclaim plaintiff SDG brings [*3] an action for damages against counterclaim defendant Financial alleging breach of fiduciary duty (Count I), breach of written contract

(Count II), breach of unwritten contract (Count III), negligence (Count IV), and promissory estoppel (Count V). From April 28, 2003 through May 2, 2003 and again on May 28, 2003 and May 29, 2003, this case was tried to the court.

## I. SUMMARY

The parties come before this court as participants in a failed business relationship. On December 30, 1997, SDG, which is a start-up biotechnical company, retained AmBase's subsidiary Financial to be SDG's exclusive investment banker by way of an Investment Banking Agreement executed contemporaneously with Financial's purchase of 6.37% of SDG's stock at the price of $ 1.25 million under the terms of a Stock Purchase Agreement. SDG terminated Financial's services on April 11, 2000 for the stated reason that Financial had materially failed to perform its obligations under the Investment Banking Agreement. Financial and AmBase [1] then sued SDG and certain individual directors for damages resulting from, among other things, breach of the Investment Banking Agreement and fraud. SDG counter-sued for damages resulting [*4] from Financial's breach of fiduciary duty, breach of the Investment Banking Agreement, negligence, and promissory estoppel.

> 1   AmBase itself was not a party to the contracts at issue in this case. AmBase's standing to bring claims has not been challenged before this court, and the court therefore does not render any decision on the propriety of AmBase's status as a party to this case.

Financial claims that SDG made false assurances to Financial in an effort to secure Financial's $ 1.25 million investment. Financial claims that SDG knew Financial would not invest money unless SDG retained it as SDG's exclusive investment banker. The value of the Investment Banking Agreement to Financial was that it had the exclusive opportunity to earn commissions from the sale of SDG stock, which Financial believed it could successfully sell at a $ 15 to $ 20 million valuation of SDG. Financial's claim is that SDG did not disclose to Financial that SDG would not accept investment at a $ 15 to $ 20 million valuation of SDG, but [*5]  instead wanted investments at a $ 40 million valuation of SDG. When Financial realized that SDG would not in fact accept investments procured by Financial at a $ 15 to $ 20 million valuation of SDG, it believed that SDG had denied it the opportunity to realize the value of its investment.

What ensued was a stalemate: Financial did not believe in marketing SDG at a $ 40 million valuation, and SDG's management did not understand why Financial had not raised capital. Financial's efforts to raise capital never began in earnest because the parties could never

agree about SDG's value. As a result, Financial claims that it lost the opportunity to earn a fee based upon investments in SDG. SDG's management, however, either had to abandon its belief that SDG was worth $ 40 million so that it could raise capital through Financial or find another investment banker who shared its views and would perform the services for which it had been retained. SDG claims that Financial kept its business in the doldrums for a period of about two years, from which SDG has yet to emerge.

## II. PRELIMINARY MOTIONS

The parties have submitted four motions to the court. First, in their motion to strike (dkt.  [*6]  # 87), plaintiffs seek to strike hearsay statements set forth in paragraphs 38, 52, and 56 of defendant Robert Geho's affidavit, paragraphs 50, 52, 53, and 67 of defendant Blair Geho's affidavit, and paragraph 28 of defendant Hans Geho's affidavit. In addition, plaintiffs seek to strike various portions of the deposition transcript of defendants' witness Jonathan Silverstein. In support of this objection, plaintiffs argue that defendants have failed to designate which specific parts of Silverstein's transcript they wish to offer at trial, and instead have included his entire ninety-page transcript. Plaintiffs do not object to any particular portion of the deposition transcript, but rather to the form in which it was presented to the Court. Plaintiffs' motion to strike (dkt. # 87) is **DENIED** for the reasons set forth in defendants' memorandum of law in opposition thereto (dkt. # 115).

Defendants' Motion to Strike Testimony of Linda Allison (dkt. # 78) is **DENIED** for the reasons set forth in plaintiffs' Memorandum in Opposition to Defendants' Motion to Strike (dkt. # 124).

Plaintiffs object to the admission of the *Rule 30(b)(6)* deposition transcript of plaintiff Financial,  [*7]  which is given by Richard Bianco. Alternatively, plaintiffs ask that, if the court admits the deposition transcript, the court strike several portions of Financial's deposition transcript relating to documents not introduced into evidence during the trial. After reviewing the arguments submitted by both parties on this issue, the plaintiffs' objection to the admission of the transcript as a whole is overruled for the reasons cited by defendants. The court agrees with plaintiffs, however, that the particular portions set forth on page five of plaintiffs' memorandum of law (dkt. # 106) are inadmissible; plaintiffs' objection to the admission of these portions is therefore sustained. Accordingly, plaintiffs' Objection to the Admission of Plaintiffs' 30(b)(6) Deposition Transcript (dkt. # 106) is **SUSTAINED in part** and **OVERRULED in part**.

Finally, Flanzraich has filed a motion for judgment on partial findings (dkt. # 102) pursuant to *Rule 52(c) of*

the Federal Rules of Civil Procedure, which allows the court to enter judgment as a matter of law in the moving party's favor at any point in the proceedings when the court finds that the non-moving [*8] party has been fully heard and cannot maintain a claim under controlling law. Here, the court elected to hear all the evidence before deciding Flanzraich's motion. Because the court finds that plaintiffs have presented sufficient evidence to frame issues of fact for the court's ultimate decision, Flanzraich's motion (dkt. # 102) is **DENIED.**

## III. FINDINGS OF FACT

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the court has considered the admissible evidence offered at trial and finds the following facts.

1. Richard A. Bianco ("Bianco") is, and has been at all relevant times, the Chairman, President, and Chief Executive Officer of AmBase Corporation ("AmBase") and SDG Financial Corporation ("Financial"), and since 1998, has been a Director of SDG.

2. Before joining AmBase in 1991, Bianco was an investment banker and Managing Director at Dillon, Read & Co. Inc., Morgan Stanley & Co., Inc. and Bankers Trust Company for approximately 20 years. Bianco is experienced in investment banking and capital markets finance including work with some companies in the biotech and pharmaceutical industries. Bianco's background is primarily [*9] in investment banking and finance; he is not trained in biological science.

3. AmBase is a Delaware corporation with its principal places of business in Greenwich, Connecticut. AmBase is a publicly traded company listed on the NASDAQ stock exchange.

4. Financial is a wholly-owned subsidiary of AmBase. Financial was formed in December 1997 for the primary purpose of performing investment banking activities for SDG and its subsidiaries as part of an investment deal entered into between it and SDG in December of 1997. Financial is a Delaware corporation with its principal place of business in Greenwich, Connecticut.

5. SDG, Inc. ("SDG") is an Ohio Subchapter S corporation based in the Cleveland, Ohio area. SDG is owned by approximately forty shareholders. SDG is a privately-held biopharmaceutical research and development corporation, which was formed in July of 1993. SDG's primary business purpose is to invent, patent and develop targeted drug delivery systems for pharmaceutical and consumer product applications.

6. In and around December of 1997, the individual defendants and other directors owned 99.3% of SDG's stock: 72.39% of the company was held by Blair Geho, Robert Geho, and [*10] Hans Geho; Malcom Jozoff

held 13.84%; and Neil Flanzraich owned 6.95%. Two other non-party directors owned 4.13% and 2.08% each. Other members of the Geho family also owned small percentages of SDG.

7. As of December of 1997, the individual defendants served in the following capacities at SDG: Blair Geho, Chairman of the Board and Chief Executive Officer; Robert Geho, President and Director; Hans Geho, General Counsel and Director; Malcom Jozoff, Director; Neil Flanzraich, Director; Charles Fulgraf, Director; and Charles Brain, Director. [2]

> 2 During trial, plaintiffs voluntarily dismissed their claims against defendants Charles Fulgraf and Charles Brain without prejudice.

8. Blair Geho is the founder of SDG and the father of Robert Geho, Hans Geho, and Daniel Geho, who was also employed at SDG at various times.

9. Neil Flanzraich is now President and Vice Chairman of IVAX BioSciences in Miami, Florida. During much of the time relevant to this lawsuit, Flanzraich was the Group Executive Vice President of the [*11] Life Sciences Group at the law firm of Heller, Ehrman, White and McAuliffe in Palo Alto, California. Prior to his position with Heller, Ehrman, Flanzraich was an executive at Syntex Pharmaceuticals.

10. Jeffrey Jones was an associate at Heller, Ehrman and served as outside counsel for SDG. Jones later became General Counsel to both SDG and AMDG.

11. Malcom Jozoff became the President, CEO, and Chairman of the Board of SDG at the end of 2000 or the beginning of 2001. Prior to assuming these positions at SDG, he held the identical positions at The Dial Corporation until he retired in 2000.

12. In 1993, while Jozoff was at Procter & Gamble, the SEC filed a complaint alleging insider trading against Jozoff and Ellen J. Millman ("Millman") (who is now Jozoff's wife), which alleged insider trading in connection with Millman's purchase of stock in Noxell. Without admitting or denying the SEC's allegations, Jozoff voluntarily agreed to pay a fine.

13. Bianco was elected a director of SDG at SDG's March 23, 1998 board meeting.

14. Flanzraich, Brain, Fulgraf, and Jozoff resigned as directors of SDG in 2002.

15. In December of 1997, and at all relevant times thereafter, SDG's products and [*12] work have been based on liposome technology. Liposomes are microscopic capsules made of fatty materials that could contain proteins, genes, drugs, or other materials. Liposomes have significant therapeutic value because the body pro-

duces them naturally and they can be loaded with other biological materials, such as drugs, and delivered directly to the cells of specific parts of the human body. Because liposomes are fatty materials, they withstand dilution in the bloodstream, escape destruction by the body's immune system, and are easily received by targeted cells. Blair Geho testified that, as an example, insulin could be loaded into liposomes, which are injected into the bloodstream. The liposomes would be programmed to travel directly through the bloodstream to liver cells. The liver cells would then absorb the liposome and the insulin contents. In theory, using liposomes to deliver insulin could allow for smaller dosages with less side effects because the insulin would only be delivered to liver cells and would not be disbursed throughout the body by way of the bloodstream on their way to the liver. SDG owns patents on several aspects of the liposome delivery system.

16. Defendants [*13] believe that the potential value of SDG's technology is that it allows the delivery of already existing therapies and treatments directly to the afflicted part of the body.

17. According to defendants, the process of bringing technology to the market is complex. Pharmaceutical products must meet rigorous testing, manufacturing, and monitoring standards established by the U.S. Food & Drug Administration ("FDA") and its foreign counterparts. At all times, the studied drug must be manufactured in strict compliance with FDA regulations. From the time of inventive discovery to final approval by the FDA, a developer may spend over $ 100 million during a five to ten year period.

18. As of late 1997, SDG's management and Board had adopted a corporate strategy to use the liposome technology as a platform technology. SDG would then create separate subsidiary companies for various applications of the liposome platform. Specifically, SDG contemplated creating subsidiaries that would develop liposome technology to treat various diseases such as diabetes, hepatitis, and asthma. As part of that strategy, SDG itself was to retain the patents on the delivery system and would concentrate on research [*14] associated with the delivery system. The subsidiaries would concentrate on developing consumer products related to specific applications of the delivery system. Cash would flow to SDG through contract payments from the subsidiaries for research SDG would perform and eventually through licensing fees for the use of the patented technology SDG holds. Thus, SDG's focus would be on research, and the research would be funded by the subsidiaries.

19. AMDG, Inc. ("AMDG") is a Delaware corporation formed on September 12, 1997 and is a subsidiary of

SDG. AMDG has the exclusive license for certain of SDG's technologies to develop therapies for diabetes.

20. The following people were officers and directors of AMDG as of November of 1997: Hubert Huckel, M.D., CEO and Chairman of the Board; Blair Geho, Director and Chief Science Advisor; Louis Pavloff, Director and COO; Hans Geho, Director, Secretary, and VP of Legal Affairs; Robert Geho, Director, Treasurer, and VP of Administration; Victor Bauer, Director; Neil Flanzraich, Director; Patrick McEnany, Director; and William Purcell, Director.

21. Huckel was the CEO of AMDG at the time AMDG was founded. He was the former Chairman of the Board [*15] of Hoechst-Roussel Pharmaceuticals, which is part of The Hoechst Group, a large international pharmaceutical company. SDG's management believed that Huckel had the necessary contacts to take AMDG's technology to the upper managements of each of the prospective buyers.

22. Ingredient Innovations International Co. ("3i") is a subsidiary corporation of SDG, which uses SDG's patented technology to design and produce ingredients for consumer products. Charles Brain was, during the events pertinent to this lawsuit, the CEO of 3i. Blair Geho was Chairman of the Board of Directors, and David Wilson, Robert Geho, and Hans Geho were Directors.

23. SDG Cancer Corporation is a Delaware corporation formed in June of 1998 for the purpose of developing products for the diagnosis and treatment of cancer. During the events pertinent to this lawsuit, this SDG subsidiary corporation was not actively conducting business.

24. SDG also contemplated establishing subsidiary spin-off companies to develop therapeutic products for the treatment of asthma and hepatitis, and also to develop veterinary products.

25. In June of 1997, William Purcell ("Purcell") and Bianco met with Blair Geho, Dr. Huckel, and [*16] other members of SDG's management at the New York City offices of Gruntal & Co., L.L.C. ("Gruntal"), which is a New York investment banking company that was considering assisting AMDG in raising capital.

26. At that time, Gruntal was presenting the AMDG opportunity (i.e., the diabetes technology) to a group of investors, and Bianco was among them. Purcell also attended this presentation.

27. Bianco and SDG contemplated the possibility of Bianco's investing in SDG. There were various communications between SDG, Bianco, and Purcell during the summer of 1997 discussing this possibility, but a trans-

action between the parties did not materialize during the summer of 1997.

28. Purcell was an employee of AmBase until March of 2001. Purcell performed due diligence on behalf of AmBase and Financial prior to the execution of the December 1997 agreements. Purcell served as a Gruntal consultant, an AMDG Director, and as far as the defendants were concerned, he represented the AMDG minority shareholders.

29. At the time Bianco was contemplating investing in SDG, SDG was planning meetings with potential investors in the Seattle area and in Canada with Harvey Hoyt, M.D., a former executive at [*17] a large pharmaceutical company and then a venture capitalist consultant. Those meetings were not successful in raising financing for SDG.

30. SDG also continued to negotiate with Gruntal for possible financing for the diabetes company. Those talks resulted in the issuance of a November 18, 1997 Private Placement Memorandum ("PPM") by which Gruntal invested $ 3.75 million in AMDG. Under the terms of the PPM, AMDG was to use the proceeds of the investment to fund its preclinical studies and human trials for its diabetes therapies and for working capital.

31. When, in December of 1997, SDG could not raise funds through Hoyt's contacts, SDG contacted Bianco to determine his interest in investing in SDG. Bianco indicated that he was interested, and negotiations between SDG and Financial began very quickly after that. These negotiations resulted in the creation of Financial, Financial's investment in SDG, and Financial becoming SDG's exclusive investment banker.

32. Blair Geho, Bob Geho, and Hans Geho were all involved with the negotiations with AmBase as was SDG's counsel, Jeffrey Jones, an associate at the law firm of Heller, Ehrman.

33. During the negotiations, Bianco emphasized his [*18] connections to major investment firms and represented that he was capable of raising the amount of capital SDG needed to execute its business plan.

34. Prior to and during the parties' December 1997 negotiations, SDG's management believed that SDG was worth about $ 40-50 million.

35. Bianco insisted on investing in SDG at a $ 20 million valuation.

36. SDG agreed to sell stock to Financial at a $ 20 million valuation because SDG believed that Bianco had the contacts and expertise to be successful in raising significant funds for SDG and its subsidiaries. SDG ultimately decided that gaining Bianco's involvement at a time when it needed cash to pay debts and fund research was worth selling shares at a lower valuation.

37. Bianco insisted on being made exclusive investment advisor not only to SDG and its proposed subsidiary corporations, but also to certain members of the Geho family.

38. At the time the 1997 agreements were negotiated and executed, SDG and its directors intended to honor all of SDG's obligations under the agreements, including the exclusivity provision.

39. The minutes from SDG's December 1, 1997 board meeting reflect SDG's debt, as reported by Robert Geho, as $ [*19] 840,000.

40. In early December of 1997, Robert Geho initially told Bianco that SDG's debt was about $ 400,000. At that time, Blair Geho also told Bianco that SDG's debt was less than the $ 840,000 reported by Robert Geho at the December 1, 1997 board meeting. Neither Robert nor Blair Geho conveyed this inaccurate information with the intent to deceive Bianco or Financial, but instead because they had expressed their understanding of the relevant priority of SDG's debts.

41. Before and during the negotiations, Bianco knew that defendants, and others, estimated SDG's value to be $ 40 million or more.

42. Bianco was provided with complete and accurate information regarding SDG's financial condition prior to the closing of the deal, including current financial statements and disclosures prepared by outside accountants, the company's most recent business plan, and the AMDG PPM.

43. SDG's complete financial picture, including its debts, the amount of shares and stock options that were held by certain directors, and the amount of loans made to SDG by certain directors, was disclosed to plaintiffs in the Stock Purchase Agreement, AMDG's PPM, and SDG's most recent business plan, and Bianco [*20] was aware of this information before finalizing the deal. Bianco knew the actual amount of SDG's debt prior to December 30, 1997.

44. During the negotiations, the parties thereto discussed SDG's retention of Linda Allison, Ph.D., of Snowdon & Associates to produce a report estimating SDG's value.

45. Bianco did not know that Jozoff had been charged with insider trading while he was an executive at Proctor and Gamble. Jozoff told Blair Geho and Neil Flanzraich about his insider trading charges at some unknown point in time.

46. As part of the transaction, AmBase formed a wholly owned subsidiary, Financial, to perform the investment banking activities for SDG and its subsidiaries.

47. The deal closed on December 30, 1997, and was comprised of three written agreements.

48. First, under the terms of the Stock Purchase Agreement, executed by Financial and SDG, Financial purchased approximately a 6.3% equity interest in SDG for $ 1,250,000. As part of the Stock Purchase Agreement, Bianco became a director of SDG.

49. Second, SDG and Financial entered into an Investment Banking Agreement ("IBA" or "Letter Agreement"), which, to paraphrase, provided that Financial would act as the exclusive [*21] financial advisor and investment banker for SDG, its affiliates or subsidiaries created after December 30, 1997, and the Geho family as long as they held greater than 5% of SDG's stock, for any and all investments in SDG and its subsidiaries created after execution of the IBA.

50. The IBA sets forth the following arrangement regarding proposed investments:

[If SDG] is desirous of engaging in a Transaction[3] ], then [SDG] shall give notice to Financial of such proposed Transaction ("Transaction Notice"). The Transaction Notice shall describe the proposed Investor to the extent applicable, the nature, size and terms of the proposed Transaction, the proposed closing date and all other material terms and conditions of the proposed Transaction. For a period of 30 business days following its receipt of such Transaction Notice, Financial shall have the irrevocable right of first offer to act as the exclusive financial advisor, investment banker, agent, co-agent, co-broker, underwriter, co-underwriter, principal or otherwise with respect to the proposed Transaction. If Financial exercises its option to act in any of the foregoing capacities for [SDG], the parties shall promptly [*22] negotiate the engagement of Financial in good faith terms consistent with those prevailing in the investment banking industry.

(Ex. 9 at 1). "Alternatively, Financial may elect within the 30 business day period . . . to enter into the Transaction as principal for its own account on such terms as the parties may mutually agree; provided that . . . [the IBA] is not an offer or commitment by Financial or any affili-

ated entity to lend, invest, or provide other capital to [SDG]." (Id.).

3   The term "Transaction" is broadly defined to include almost any new venture, investment in SDG, or sale of SDG's assets. (See Ex. 9 at 4).

51. The IBA states the following with respect to other investment bankers or advisors:

[SDG] agrees not to engage any other investment banker or intermediary regarding any possible Transaction without having given Financial the right of first offer described [herein]. If [SDG] is approached independently by a potential investment banker or intermediary regarding [*23] a possible Transaction, [SDG] will promptly notify Financial and will disclose to Financial the substance of all discussions and negotiations, as well as the terms and conditions of any proposal, offer or agreement advanced by such party. [SDG] will consult with and update Financial on a regular basis with respect to any and all such discussions or negotiations. [SDG] understands that Financial will be entitled to a fee with respect to any Transaction with any Investor who independently approaches [SDG] during the term of Financial's engagement hereunder, provided that the amount of Financial's fee in such event shall be mutually agreed upon in good faith.

(Ex. 9 at 2).

52. The IBA provides that, with respect to SDG's existing subsidiaries, AMDG and 3i, SDG's "obligation will be to use its best efforts to cause such subsidiaries to abide by the terms of this [IBA]." (Ex. 9 at 1).

53. AMDG was not a party to the December 30, 1997 Letter Agreement.

54. The IBA reserves to SDG the absolute discretion to reject any deal brought to it by Financial.

55. Third, Financial and Blair Geho executed a Consulting Agreement. Under the Consulting Agreement, Financial paid Blair [*24] Geho a one-time up front fee of $ 150,000 in consideration for the following work that he would perform exclusively for Financial: (i) "promptly advise Financial on a first priority basis, with respect to all investment or financing opportunities" that came to his attention; (ii) provide "scientific and technical analysis of investment and financing opportunities

brought to Financial;" (iii) provide advice with respect to Transactions; and (iv) introduce Financial to investors. (Ex. 10). The parties understood that Blair Geho was to use his contacts to try and present opportunities for Financial to invest in other companies and to assist Financial in developing potential investors in SDG.

56. The $ 1.25 million and $ 150,000 payments to SDG from Financial under the Stock Purchase Agreement and the Consulting Agreement originated from AmBase.

57. One purpose of the investment was to give SDG a clean balance sheet by providing capital to pay SDG's existing debts. SDG used $ 860,573 of the proceeds from the transaction with Financial to pay off existing debt.

58. Bianco knew that SDG's board members disagreed with his view that SDG was worth $ 20 million. Nevertheless, Bianco believed [*25] that SDG's management's would lower their expectations about SDG's value after Financial's investment at a $ 20 million valuation. This belief was unreasonable because there were ample reasons for SDG to give Financial a discount from what its management believed to be SDG's full value. Also, Financial had incentive to buy in at a discount. Further, SDG had commissioned a third party, Allison, to draft a valuation report to be used to market SDG after Financial invested. Finally, and most importantly, Financial's performance of its obligations under the IBA was not conditioned upon marketing SDG at a $ 20 million ceiling.

59. Further investment in SDG at a $ 20 million valuation would have diluted SDG's current shareholders' percentage of holdings twice as much as further investment in SDG at a $ 40 million valuation. By way of illustration, an investor purchasing $ 10 million worth of shares in a company worth $ 20 million would purchase half the company, whereas the same investment of $ 10 million in a company worth $ 40 million would purchase one quarter of the company. In the latter instance those who owned the entire company would still retain three quarters of the company after [*26] the investment, but in the case of the former they would retain half of the company.

60. At a March 1998 SDG board meeting, Bianco suggested, with the endorsement of the board, that Financial would obtain financing for SDG's proposed subsidiaries.

61. On January 1, 1998, SDG, through Robert Geho, Ph.D., retained Linda Allison, Ph.D., of Snowdon & Associates to perform a valuation report on SDG and its subsidiaries, both current and prospective, commensurate with industry-accepted valuation methods. SDG agreed to pay Allison a fixed fee of $ 15,000 for her services. This fee

was not contingent upon Allison concluding that SDG was worth more than a certain value. The report was for SDG, which would then use the report as a basis to raise capital.

62. Allison issued her report in June of 1998 and concluded that SDG was worth $ 44-48 million. In her report, Allison based her conclusions upon analysis of comparable start-up medical companies, comparable technologies in comparable phases of development, and the state of the investment market. Allison assigned value to SDG, 3i, AMDG, and three other potential SDG subsidiaries in reaching her conclusions.

63. Financial had access to Allison during [*27] her valuation work by way of Purcell, who spoke with Allison regarding her report.

64. Financial waived its exclusive right to advise SDG in order to permit Allison to market SDG's shares in Europe and Canada. SDG then engaged Allison for this purpose. Allison contacted more than twenty-five companies, thirteen of which expressed interest in SDG.

65. In early 1998, SDG became aware of a new method of creating fully human monoclonal antibodies through Blair Geho's relationship with Robert Canfield, a research scientist at Columbia University. Monoclonal antibodies are antibodies produced by cloning a class of white blood cells called lymphocytes. Antibodies are produced by the body to bind to foreign proteins, such as bacteria, viruses, and tumors, and destroy the foreign materials. Prior to this discovery, monoclonal antibodies for use in humans were produced by cloning rodent cells, which created a host of problems associated with the human body receiving these antibodies. In theory, an antibody cloned from human white blood cells would be more receptive to the human body than the rodent cells.

66. Blair Geho and Bianco met with Jack Granowitz of Columbia University regarding a [*28] license for the human monoclonal antibodies. The parties discussed SDG's ability to finance its obligations to Columbia at this meeting.

67. SDG entered into two agreements with Columbia University ("Columbia license agreement"), dated June 25, 1998, which required SDG to pay Columbia a minimum fee of $ 500,000 - $ 250,000 within sixty days of executing the agreement and another $ 250,000 on June 25, 1999- together with royalties. SDG also executed a Research Agreement that obligated SDG to pay $ 800,000 annually for a three-year term (for a total of $ 2.4 million) to support the research program of Drs. Ilya Trakht and Robert Canfield. Under these agreements, SDG undertook to pay Columbia not less than $ 1.05 million in 1998, $ 1.05 million in 1999, and $ 800,000 in 2000.

68. Allison believed that SDG had significantly increased its financial obligations when it executed the Columbia license agreement because SDG then had two fledgling platform technologies, the liposome and the human monoclonal antibodies, which needed formidable research and development funding prior to becoming commercially valuable products.

69. Jozoff had reservations about SDG's entering into the Columbia [*29] license agreement.

70. Bianco expressed optimism that Financial could meet SDG's financing needs to fund the Columbia license agreement, but Bianco did not guarantee that Financial would do so.

71. In August of 1998, SDG was concerned about Financial's performance as its exclusive financial advisor.

72. SDG and Financial entered into a new written investment banking agreement on August 6, 1998. The August 6, 1998 agreement required Financial to market SDG shares at a valuation of $ 50 million and stated a target of raising $ 5 million in capital. The agreement provided for an 8% fee of the amount raised and other consideration to Financial.

73. Bianco understood that the IBA and the August 6, 1998 agreement obligated him to work on SDG's behalf to raise financing immediately after the IBA was executed on December 30, 1997.

74. In September of 1998, Allison reported that her efforts to raise financing in Europe had not been successful, and she expressed her belief that deteriorating market conditions and the lack of clinical results from SDG would be an impediment to raising capital at the valuation she indicated in her report.

75. By September of 1998, AMDG had taken the first [*30] steps toward providing clinical results gauging the performance of its initial product, HDV-I, [4] and had begun a human clinical study at Vanderbilt University.

4   Hepatic Directed Vesicle ("HDV") technology is a liposome that is capable of encapsulating insulin for delivery to the liver's metabolic cells in order to treat Type 1 diabetes.

76. By letter dated September 22, 1998, Robert Geho, on behalf of SDG, terminated the August 6, 1998 agreement. By the same letter, Robert Geho requested that Financial waive its rights under the IBA for a period of three months thereafter. Financial did not waive its rights under the IBA.

77. Toward the end of 1998, as the AMDG clinical trials were coming to an end, Huckel and Pat McEnany

("McEnany") (whom Huckel had brought on board at AMDG) decided that, rather than representing AMDG in soliciting funding from pharmaceutical companies themselves, as originally contemplated, they needed to hire an investment bank to market AMDG's new product to pharmaceutical companies. [*31] Further, they decided that, as the AMDG management team, they were going to hire Vector Securities as AMDG's banker.

78. Huckel did not seek AMDG board approval to hire an investment bank, and did not present competing banking offers to the board.

79. Purcell maintained that the board should decide if an investment banker was to be hired, or at the very least, the board had the right to select the board.

80. At a December 1998 AMDG board meeting, the AMDG board fired Huckel and McEnany because of their intransigence related to the investment banking issues.

81. Once Huckel, McEnany, and the other AMDG directors close to Huckel were gone, AMDG's board consisted of Flanzraich, Purcell, Blair Geho, Hans Geho, and Bob Geho (with Mal Jozoff joining shortly thereafter). Robert Geho took over as AMDG's CEO.

82. AMDG completed its clinical trial of the diabetes technology during the late fall and early winter of 1998-1999. The results of the clinical trial were not published until 2001.

83. The next step in AMDG's business plan was to attempt to license the technology to a major pharmaceutical company. This company would then pay the substantial cost of the next step of clinical trials. [*32] AMDG's board decided to solicit bids from several leading advisory groups who would present the technology to major pharmaceutical companies.

84. Purcell requested that AMDG solicit bids from Mehta Partners, OrbiMed Advisors, LLC, Financial, QED Technologies, and Vector Securities, among others.

85. SDG encouraged Financial to submit a written representation proposal to AMDG's board.

86. On May 11, 1999, AMDG hired OrbiMed Advisors, LLC ("OrbiMed") as AMDG's exclusive investment banker and paid OrbiMed a retainer of $ 85,000.

87. Ultimately, AMDG's board decided to retain OrbiMed rather than Financial or any of the other investment bankers that submitted proposals. ADMG believed that OrbiMed appeared to be more experienced, competent, and motivated with respect to the type of work needed by AMDG.

88. AMDG rejected Financial's proposal to co-manage AMDG's investment banking with OrbiMed. AMDG did not attempt to negotiate terms of Financial's participation in OrbiMed's activities.

89. Blair Geho, Neil Flanzraich, Malcom Jozoff, Robert Geho, and Hans Geho believed that Financial was incapable of representing AMDG because Financial had failed to raise any capital for SDG, and, in [*33] particular, Financial had failed to raise capital to support the Columbia license agreement. Further, they believed that Financial lacked the motivation and wherewithal to competently present the intricacies of AMDG's technology to sophisticated pharmaceutical company executives. As a result, these AMDG directors were concerned that hiring Financial might constitute a breach of their fiduciary duties.

90. Financial believed that SDG could cause AMDG to retain Financial as AMDG's exclusive investment banker.

91. Jim Gale of Gruntal, who represented AMDG's largest group of shareholders, made it known that he did not believe that Financial was capable of representing AMDG.

92. OrbiMed compiled a list of approximately seventy-five pharmaceutical companies for AMDG to contact.

93. As AMDG then received interest from certain companies, it entered into confidentiality agreements, gave in-person presentations, made its Scientific Advisory Board member available for diligence discussions, and permitted companies to conduct patent due diligence.

94. AMDG had significant interest from Amgen, Aventis and Insmed Pharmaceuticals. These companies conducted their own internal testing of AMDG's [*34] product, HDV-I.

95. On March 5, 1999, SDG retained Allison to raise capital in Europe. In June and July of 1999, Allison assisted in arranging a meeting with two potential European investors, who suggested that the Frankel Group value SDG's technologies. One investor offered to personally extend a "bridge loan" to SDG so that SDG could finance the due diligence. A transaction never took place between SDG and these entities because SDG was not willing to incur the expense of a second valuation.

96. By letter dated October 15, 1999 Columbia University placed SDG in breach of the Columbia license agreement with $ 1,370,617 owed to Columbia. By letter dated January 20, 2000 Columbia terminated the Columbia license agreement with $ 1,570,617 owed to Columbia.

97. On October 20, 1999, Allison sent a memorandum to SDG's board relating her efforts to raise financing in Europe. Allison summarized the contacts she had arranged and indicated her disappointment in the manner in which Robert Geho handled negotiations with the firms with which Allison had arranged contacts.

98. In January of 1999, Bianco, as trustee of a fund for the benefit of his minor children, invested $ 250,000 in AMDG.

[*35]   99. By early 2000, OrbiMed had reported to AMDG that it was not finding any financing or licensing opportunities for AMDG. OrbiMed had presented AMDG to many investors and some of the biggest pharmaceutical companies in the world for licensing ventures. None were interested enough to sign a deal with AMDG.

100. The consensus regarding AMDG's inability to raise capital was that potential investors wanted AMDG to conduct the next stage of clinical trials, at its own expense, to demonstrate the utility of the technology. AMDG was never able to fund the second stage itself, nor was it able to secure funding from any other source.

101. Between the time Financial invested in SDG and the spring of 2000, the relationship between Financial and SDG soured.

102. Financial and SDG disagreed over the proper valuation for SDG. Financial did not believe that SDG could be successfully marketed and sold to investors at a valuation of $ 40-45 million or more, and Bianco and Purcell communicated this to SDG and all of the individual defendants several times from 1997 on.

103. Bianco, in particular, believed that any attempt to sell SDG shares at a $ 40 million valuation shortly after his investment [*36]  would have been futile. Because Financial was the only significant investor to purchase SDG shares, Bianco thought other investors would demand to know why they must pay twice as much to invest in SDG as Bianco did. According to Bianco, other investors would not accept terms different than those offered to Bianco without a tangible difference in SDG's development of its technology. Bianco believed that he had set the market price for SDG shares and that he could not credibly attempt to sell the shares at twice the price he paid for his shares.

104. Because he believed that tangible results were required from SDG, Bianco limited his solicitation of investors to "soft calls," which he described as preliminary contacts with potential investors to introduce SDG's technology and gauge further interest. Bianco placed twenty to twenty-five soft calls and also kept the potential investors apprized of any developments with respect to SDG's technology. Bianco forwarded written materials

to five of these twenty-five contacts who had expressed an interest in an investment.

105. Subsequent to completing her valuation report dated May of 1998, Allison also believed that SDG's management should [*37] lower its estimate of SDG's value to better reflect market conditions. In her opinion, the investment market as a whole was less active after May of 1998 than it was before May of 1998. Because the state of the market was one variable Allison considered when estimating SDG's value, she believed that the estimate should be reduced when market conditions were less favorable.

106. Bianco disagreed with Allison's valuation, and Financial and SDG were not able to construct terms of a proposed transaction once they received Allison's report in May of 1998.

107. While Bianco and SDG's management disagreed about the value of SDG, the pressure to raise capital was increasing. SDG management expected Financial to produce some fundraising results from March of 1998 through June of 1998, but it had not.

108. SDG's acquisition of the human monoclonal antibodies license during June of 1998 exacerbated SDG's already pressing need for capital.

109. SDG's board members, exclusive of Bianco, were disappointed with Financial's inability to raise funds to support the human monoclonal antibodies license. In an effort to raise capital to fund SDG's deal with Columbia, Financial made less than five phone [*38] calls and talked to an indeterminate number of persons about monoclonal antibodies.

110. Financial did not improve its efforts to raise funding for SDG after the August 6, 1998 agreement was executed because Bianco was frustrated with SDG's management.

111. Following the August 6, 1998 agreement, Financial did not present SDG with a work plan, give SDG any feedback on Financial's efforts, or describe any of its future intentions in raising money for SDG despite being obligated to do so.

112. On September 22, 1998, SDG terminated the August 6, 1998 agreement with Financial.

113. Later in 1999, after AMDG retained OrbiMed as its investment banker, the relationship between SDG and Financial was irretrievably damaged to the point that Financial was preparing to sue SDG.

114. In a letter dated July 28, 1999, Blair Geho asked Bianco to resign from SDG's board and asked Financial to waive its contractual rights with respect to

SDG because, in Blair Geho's view, Bianco and Financial had "done nothing to benefit SDG. . . ." (Ex. 173).

115. Shortly thereafter, in October of 1999, Allison reported her disappointment with SDG's management to the SDG board. Allison also spoke to Bianco regarding [*39] her concerns with SDG's management, and Bianco echoed these concerns.

116. By the spring of 2000, AMDG had been unsuccessful in its effort to license its product, HDV-I, and SDG had been unsuccessful in raising funds through Snowdon and Financial.

117. As a result, SDG's management concluded that SDG's relationship with Financial should end.

118. Financial did not meet SDG's legitimate expectations regarding its obligation to act as SDG's exclusive investment banker and financial advisor. Financial's employees, on an informal basis, spoke to an indeterminate number of potential investors. Financial never brought an offer from an investor to SDG at any valuation. Throughout the tenure of Financial's exclusive appointment, Robert Geho met with one person referred by Financial regarding an investment in SDG. The record demonstrates that Financial never memorialized its efforts nor generated any formal plans or strategies from which the SDG board could evaluate Financial's efforts. Financial did not produce results with respect to the August 6, 1998 agreement. Most importantly, SDG's board members, exclusive of Bianco, did not feel that Financial had worked to create the kind of relationship [*40] with SDG that these board members expected when SDG engaged Financial.

119. Bianco did not make an effort to learn about SDG's technology so that he could approach sophisticated biotechnology investors, despite the opportunity to do so through Blair Geho's agreement to be Bianco's consultant.

120. A substantial reason why the relationship between SDG and Financial never produced results was because Bianco and the members of SDG's board harbored fundamental differences of opinion. First, Bianco believed that SDG was worth no more than $ 20 million, whereas SDG's board members believed that SDG was worth about twice that amount. Second, SDG's board members, especially the Gehos, did not wish to relinquish control over SDG's technology by accepting an investment that would transfer a majority of SDG's shares. The parties were never able to reconcile these differences, and these differences poisoned the relationship between the parties. [5]

5    The court does not endorse either party's views, but rather simply notes that there was a disagreement.

[*41]   121. Robert Geho expected Financial to "work in a very close way with the management of a company to set up the company, to acquire management teams, to set capital structure, to manage the investment process." (5/2/03 Tr. 26:19-23). This type of relationship never developed.

122. At the April 11, 2000 SDG board meeting, the SDG board terminated the IBA with Financial because of Financial's material breach thereof. As of April 11, 2000, SDG hired Capital South Partners, LLC ("Capital South") as SDG's exclusive investment banker for a six-month period.

123. Capital South and SDG presented SDG's technology to approximately thirty or forty leading venture capital firms in the United States.

124. Blair Geho terminated his Consulting Agreement with Financial on June 12, 2000.

125. From December 30, 1997 through June 12, 2000, Blair Geho regularly scanned scientific and medical literature and spoke with various consultants to identify potential investment opportunities for Financial.

126. Blair Geho provided any and all scientific assistance Financial requested.

127. Blair Geho also informed Financial about potential investment opportunities with Cleveland based biotech startups,  [*42]   such as Athersys.

128. Blair Geho introduced Bianco to Phillip Frost, of IVAX Corp., who is one of the world's wealthiest biotech investors.

129. Two weeks after signing the Consulting Agreement, Blair Geho arranged a meeting with the lead scientists in connection with the Columbia technology and representatives of Financial.

130. While the Consulting Agreement was in place, Financial never asked Blair Geho for his advice about a specific project.

131. Financial never asked Blair Geho for a report of his efforts relating to the Consulting Agreement.

132. Blair Geho had no open projects under his Consulting Agreement as of June 12, 2000.

## III. CONCLUSIONS OF LAW

### A. FIRST-PARTY CLAIMS

AmBase and Financial bring the following claims: breach of contract against defendant SDG (First Claim), breach of the covenant of good faith and fair dealing against defendant SDG (Second Claim for Relief), breach of contract against defendant Blair Geho (Third Claim for Relief), breach of the covenant of good faith and fair dealing against defendant Blair Geho (Fourth Claim for Relief), fraud against all defendants, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), *Conn. Gen. Stat. §§ 42-110a-42-110q*, [*43]   against all defendants. The court holds the following with respect to each claim.

### 1. BREACH OF THE IBA BY SDG

AmBase and Financial claim that SDG breached the IBA in two ways. First, plaintiffs allege that SDG breached the IBA by failing to use its "best efforts" to cause AMDG to hire Financial as its exclusive investment banker in May of 1999. Second, plaintiffs contend that SDG also breached the IBA by retaining Capital South Partners as its investment banker in April of 2000 in violation of its obligation to present any financing opportunity to Financial for acceptance in the first right.

The IBA is governed by Connecticut law. The *prima facie* elements of a breach of contract action are the existence of an agreement, breach of the agreement by the defendant, and damages to the plaintiff from the breach. *See   Courtien Comm., Ltd. v. Aetna Life Ins. Co., 193 F. Supp. 2d 563, 566 (E.D.N.Y. 2002)* (applying Connecticut law);   *Chem-Tek, Inc. v. Gen. Motors Corp., 816 F. Supp. 123, 131 (D. Conn. 1993)*; *see also   Fairfield Fin. Mortg. Group, Inc. v. Salazar, No. CV000339752S, 2002 Conn. Super. LEXIS 1352, at *3 (Conn. Super. Ct. Apr. 23, 2002)*. [*44]

a. Failure to Use "Best Efforts" to Cause AMDG to Retain Financial as its Exclusive Investment Banker

SDG did not breach the "best efforts" obligation in the IBA when AMDG hired OrbiMed on May 11, 1999. SDG agreed to use its "best efforts" to cause its then existing subsidiaries, AMDG and 3i, to retain Financial as its investment banker under the same terms as the IBA. SDG was the majority owner of AMDG, and AMDG's board, with the exception of Purcell, was comprised entirely of SDG directors.

The IBA does not define what is meant by "best efforts." A best efforts clause requires a party to "actively" and "in good faith" pursue the goal outlined in the contract, *Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp., 230 F.3d 569, 578 (2d Cir. 2000)*, and "imposes an obligation to act with good faith in light of one's own capabilities," *Bloor v. Falstaff Brewing Corp., 601 F.2d 609, 613 (2d Cir. 1979)* (citing New York law). Although a defendant may "give reasonable

consideration to its own interests" and is not required to "spend itself into [*45] bankruptcy," it cannot "emphasize profit . . . without fair consideration of the effect on" the plaintiff. *Id. at 614.* At the very least, a party must "explore whether steps not involving substantial losses could have been taken to avoid or at least lessen the [negative effect on the other party]." *Id. at 613-14.*

Even though SDG could have caused AMDG to hire Financial, SDG's decision not to do so was consistent with its contractual obligation to Financial. Financial had not raised any capital for SDG, despite SDG's dire need for capital. Financial and SDG continued to disagree about fundamental considerations underlying efforts to raise capital, such as the value of SDG, what level of dilution of the Gehos' stock ownership would be acceptable, and whether Robert Geho should be President of SDG. Financial had not produced any tangible results from its efforts to raise capital, nor had it demonstrated the will to learn the nuances of SDG's technology, which would be even more critical to market AMDG's product to major pharmaceutical companies. Given the deterioration of the relationship between SDG and Financial in 1999, due in no small part to Financial's [*46] inability to produce any tangible results in raising capital for SDG, SDG satisfied its contractual obligation to Financial by encouraging Financial to bid for the AMDG contract, keeping Financial informed about the status of the other bids, and giving Financial a chance to prove it could raise capital for SDG.

The record also demonstrates that SDG gave due consideration to alternatives less damaging to Financial. Financial argues that SDG should have negotiated an arrangement where Financial would share the responsibilities with OrbiMed and would receive a percentage of the fees and commissions paid. SDG did not negotiate with Financial. SDG's decision not to negotiate Financial's involvement was reasonable under the circumstances because the true problem with causing Financial to be retained was that the relationship between SDG and Financial was dysfunctional. SDG was contractually bound to use Financial as its investment banker. By the spring of 1999, Financial had produced no results, nor had it indicated that its performance was likely to improve. Although SDG was bound by contract to an unproductive arrangement, AMDG was not yet so bound. SDG quite reasonably decided that it [*47] would not impose an unproductive and unworkable arrangement upon AMDG, and this decision is consistent with its obligation to use its best efforts to cause AMDG to retain Financial as its exclusive financial advisor. The relationship between SDG and Financial was dysfunctional in May of 1999; therefore SDG reasonably concluded that Financial's involvement, in any capacity, in AMDG's investment decisions would be a detriment to AMDG.

Moreover, because AMDG was an SDG subsidiary, forcing AMDG to retain Financial may have unreasonably compromised SDG's own interests. AMDG had shareholders of its own. Under Connecticut law, directors must discharge their duties (1) in good faith; (2) with the care that an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) in a manner reasonably believed to be in the best interests of the corporation. *See Conn. Gen. Stat. § 33-756(a).* Majority shareholders also have a fiduciary duty to minority shareholders to act in the best interests of the corporation. *See  Yanow v. Teal Industries, Inc., 178 Conn. 262, 281 n.9, 422 A.2d 311 (1979).* Financial's performance in [*48] the bidding process and as SDG's exclusive financial advisor was of such poor quality that selecting Financial to perform services for AMDG may have compromised the ability of SDG, as majority shareholder, and AMDG's directors to discharge their duties to AMDG's shareholders.

Under the circumstances, SDG did not breach the IBA when AMDG retained OrbiMed as its investment banker. Causing AMDG to retain Financial would have been detrimental to AMDG's business and may have exposed defendants to liability to AMDG's shareholders for breach of a fiduciary duty. Judgment shall enter in favor of SDG on this claim.

b. Termination of the IBA

SDG agreed to give Financial the right of first refusal to act as SDG's investment manager for any "Transaction" as that term is defined in the IBA. With regard to any contemplated Transaction, SDG was required to present a "Transaction Notice" to Financial that detailed the terms of the proposed Transaction including the fee arrangement. Financial then had a thirty-day "right of first offer to act as the exclusive financial advisor, investment banker, agent, co-agent, co-broker, underwriter, co-underwriter, principal or otherwise with respect to the [*49] Transaction." (Ex. 9). SDG did not present a Transaction Notice to Financial when SDG retained Capital South Partners as its investment banker on April 11, 2000, and instead SDG terminated the IBA on that same date.

SDG argues that its obligation to perform under the IBA was excused because Financial materially breached the IBA. The court finds the following statement of the law governing this claim persuasive:

"Contract law has always distinguished between material and immaterial breaches. If a breach is immaterial, the existing rights of the parties do not change. The contract remains enforceable although the breach may occasion liability for damag-

es, if any can be proved . . . a material breach, on the other hand, does affect the substantive rights of the parties. A substantive or material breach is one which touches the fundamental purpose of the contract and defeats the object of the parties in making the contract . . . The standard of materiality [of contractual breach] must be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performance . . . A material as opposed to [*50] incidental breach of contract is one that is so important that it vitiates or destroys the entire purpose for entering into the contract."

*Liu v. C. Pierce Enters., 2004 Conn. Super. LEXIS 31, No. CV0210898, 2004 WL 113568, at *7 (Conn. Super. Ct. Jan. 5, 2004)* (alterations and omissions in original) (quoting *Fishman v. Smartserv Online, Inc., 2003 Conn. Super. LEXIS 338, No. X05CV0172810S, 2003 WL 536629, at *9 (Conn. Super. Ct. Feb. 11, 2003)*; *see Bernstein v. Nemeyer, 213 Conn. 665, 672-73, 570 A.2d 164 (1990)* ("It follows from an uncured material failure of performance that the other party to the contract is discharged from any further duty to render performances yet to be exchanged.").

In order to determine whether a breach is material, Connecticut courts rely upon *Section 241 of the Restatement (Second of Contracts*, which provides the following:

In determining whether a failure to render or to offer performance is material, the following circumstances are significant:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party [*51] can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Rest. (Second) of Contracts § 241* (1981). *Section 241* sets forth certain circumstances that the court should consider significant, and takes into account the harm to both parties to the contract if the contract is terminated.

Financial's failure to perform its obligations under the IBA was material, and SDG was permitted to terminate the IBA. As stated previously herein, Financial had not raised any capital for SDG, despite SDG's dire need for capital. Financial and SDG continued to disagree about fundamental considerations underlying efforts to raise capital, such as the value of SDG, what level of dilution of the [*52] Gehos' stock ownership would be acceptable, and whether Robert Geho should be President of SDG. Financial had not produced any tangible results from its efforts to raise capital, nor had it demonstrated the will to learn the nuances of SDG's technology. As a result, the court has found that Financial did not meet SDG's legitimate expectations for its performance under the IBA, (*see, infra, § III., PP 122-23*), thereby depriving SDG of a benefit it reasonably expected. *See Rest. (Contracts) Second § 241(a)*.

The record does not support Financial's argument that its obligation to raise capital is only triggered by SDG's issuance of a Transaction Notice, and, because SDG issued only one Transaction Notice for a six-week period from August 6, 1998 through September 22, 1998, Financial did not have to raise capital at any other time. The testimony of all parties to the IBA belies this argument; even Bianco understood that Financial had to identify potential investors and attempt to negotiate investments. Further, the record indicates that Financial did nothing different during the six-week period when the Transaction Notice was in effect. [*53] Financial had obligations to SDG irrespective of whether a Transaction Notice had been issued, and Financial did not meet its obligations.

The balance of factors listed in *Section 241* tips in SDG's favor. The record supports the conclusion that, by failing to perform at a satisfactory level, Financial did not meet SDG's legitimate expectations. Also, there was little chance that Financial would cure its failure to perform because the relationship between Financial and SDG had deteriorated from dysfunctional in May of 1999 to adversarial in April of 2000. Further, SDG could not be adequately compensated for Financial's failure to

perform because there was really no way to quantify the financial loss to SDG in the form of a lost business opportunity. Although the court notes that Financial's $ 1.25 million investment was substantial, and that there is no evidence that Financial failed to perform in bad faith, the failed business transaction between SDG and Financial was preventing SDG from going forward with its business plan. Therefore, although Financial did make a substantial investment, the cost to SDG of an exclusive arrangement with an unwilling investment banker was greater, [*54] and SDG was justified in terminating the IBA on April 11, 2000.

Because SDG was justified in terminating the IBA on April 11, 2000, judgment shall enter in favor of SDG on this claim.

## 2. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST SDG

Plaintiffs claim that, by allowing AMDG to hire Orbimed as its exclusive investment banker and retaining CSP as its exclusive investment advisor, SDG breached the covenant of good faith and fair dealing implied in every Connecticut contract. *See Habetz v. Condon, 224 Conn. 231, 238, 618 A.2d 501 (1992).* The covenant of good faith and fair dealing requires that neither party to a contract do anything that will injure the right of the other to receive the benefits of the agreement. *See Habetz, 224 Conn. at 238.* To recover under the covenant of good faith and fair dealing, a plaintiff must show that: (1) plaintiff and defendant were "parties to a contract under which the plaintiff reasonably expected to receive certain benefits;" (2) defendant "engaged in conduct that injured the plaintiff's right to receive some or all of those benefits;" and (3) defendant acted in bad faith in committing the acts that [*55] injured the plaintiff's right to receive the benefits it expected from the contract. *ShareAmerica, Inc. v. Ernst & Young, 1999 Conn. Super. LEXIS 1910, No. X02CV930150132S, 1999 WL 545417, at *6 (Conn. Super. Ct. Jul. 2, 1999).* Bad faith "in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Habetz, 224 Conn. at 236-237; see Buckman v. People Express, Inc., 205 Conn. 166, 171, 530 A.2d 596 (1987).*

SDG, and the directors named as defendants, did not breach the covenant of good faith and fair dealing attendant to the IBA. As discussed in the previous section, SDG did not breach the IBA. Therefore, SDG and the defendant directors did not injure Financial's right to receive a benefit from the IBA. Further, SDG and the defendant directors did not act in bad faith at any time during the events of this lawsuit. Therefore, judgment

shall enter in favor of SDG and the director defendants on this claim.

## 3. BREACH OF THE CONSULTING AGREEMENT AGAINST [*56] BLAIR GEHO

Financial claims that Blair Geho breached the Consulting Agreement. On December 30, 1997, Financial entered into a Consulting Agreement with Blair Geho. Under the Consulting Agreement, in exchange for $ 150,000 from Financial, Blair Geho agreed to advise Financial, on a first priority basis, of all investment opportunities of which he became aware. Blair Geho was also required to advise Financial with respect to Transactions as that term is used in the IBA and introduce Financial to potential investors. Blair Geho properly terminated the Consulting Agreement by letter dated June 12, 2000.

The Consulting Agreement with Blair Geho is governed by Delaware law. (*See* Ex. 10 at 4). The prima facie elements of a breach of contract action under Delaware law are the existence of a contractual obligation, the breach of that obligation by the defendant, and resulting damages to the plaintiff. *H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129, No. 19849, 2003 WL 21254843, at *7 (Del. Ch. May 27, 2003).*

Blair Geho did not breach the Consulting Agreement. Rather, he performed his contractual obligations under the Consulting Agreement by providing scientific and technical consulting [*57] services to Financial, upon request. Financial does not allege one instance when Blair Geho did not provide services when requested. He also introduced Bianco to certain investors and brought Bianco to a meeting at Columbia University about human monoclonal technology, which Blair Geho originally thought might present an investment opportunity to Financial. Further, Blair Geho regularly searched through medical resources in an attempt to identify potential investors. Plaintiffs have not proven that Blair Geho breached the Consulting Agreement in any way. Therefore, judgment shall enter in favor of Blair Geho on this claim.

## 4. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST BLAIR GEHO

Plaintiffs argue that Blair Geho breached the Consulting Agreement, and that his breach was part of a scheme to defraud Financial. Pursuant to the standard set forth herein, the court concludes that Blair Geho did not breach the Consulting Agreement and did not act in bad faith at any time alleged in this lawsuit. Therefore, judgment shall enter in favor of Blair Geho on this claim.

## 5. FRAUD AGAINST ALL DEFENDANTS

Case 3:13-cv-00215-VAB   Document 83-1   Filed 07/25/14   Page 63 of 176

Page 15
2005 U.S. Dist. LEXIS 16164, *

Plaintiffs claim that all defendants made misrepresentations of fact and [*58] failed to disclose material information in order to induce Financial to purchase $ 1.25 million worth of SDG stock and to pay Blair Geho a $ 150,000 fee. Specifically, plaintiffs allege that defendants committed fraud by the following actions or omissions: (1) failure to disclose their present intention to market SDG for future investments at a valuation of $ 40 million or more; (2) failure to disclose their present intention not to permit Financial to perform under the IBA; (3) failure to disclose that they intended to permit AMDG to select an investment banker, even though they had the ability to, and had agreed to use their best efforts to, cause AMDG to hire Financial as its exclusive investment banker; (4) misrepresentations concerning the amount of SDG's debt at the time of the transaction with Financial; and (5) failure to disclose that Jozoff had been the defendant in an insider trading case brought by the SEC.

The elements of common law fraud are: (1) a false representation made as a statement of fact; (2) the representation was untrue and known to be untrue by the party making it; (3) the representation was made to induce the other party to act on it; and (4) the other party [*59] acted on the representation to its injury. *Kilduff v. Adams, 219 Conn. 314, 328, 593 A.2d 478 (1991); see Weisman v. Kaspar, 233 Conn. 531, 539, 661 A.2d 530 (Conn. 1995).* "The party asserting such a cause of action must prove the existence of the first three of these elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as 'clear and satisfactory' or 'clear, precise and unequivocal.'" *Weisman, 233 Conn. at 540.*

Fraud encompasses a misrepresentation made recklessly or without belief in its truth, *Clark v. Haggard, 141 Conn. 668, 673, 109 A.2d 358 (1954),* and fraudulent intent may be shown by circumstantial evidence, *see Town Bank & Trust Co. v. Benson, 176 Conn. 304, 308-09, 407 A.2d 971 (1978)* ("The determination of the question of fraudulent intent is clearly an issue of fact which must often be inferred from surrounding circumstances"); *see also Hultman v. Depart. of Soc. Servs., 47 Conn. Supp. 228, 783 A.2d 1265, 1272 (Conn. Super. Ct. 2000)* (stating that fraudulent intent "may be inferred from facts and circumstances"). [*60] A defendant's actual benefit from the misrepresentation or omission is not an element of fraud. *See Kilduff, 219 Conn. at 328; see also Goodman v. Waugh, 882 F. Supp. 64, 65 (S.D.N.Y. 1995)* ("This Court notes that [defendant] need not have benefited financially in order to be liable [for fraud]"); *Polonetsky v. Better Homes Depot, Inc., 97 N.Y.2d 46, 54, 760 N.E.2d 1274, 735 N.Y.S.2d 479 (N.Y. 2001).*

Fraudulent nondisclosure involves (1) the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak; (2) accompanied by an intent or expectation that the other party will make or will continue in a mistake; (3) in order to induce the other party to act to its detriment. *Gelinas v. Gelinas, 10 Conn. App. 167, 173, 522 A.2d 295 (1987).*

a. Failure to Disclose SDG's Present Intention to Market SDG at a Valuation of $ 40 Million andb. Failure to Disclose SDG's Present Intention not to Permit Financial to Perform Under the IBA

Plaintiffs allege that, in December of 1997, each defendant believed that SDG was worth in excess of $ 40 million, and, at the time Financial purchased SDG [*61] stock, each of the defendants had the present intent to require subsequent investments to be made at a valuation of $ 40 million or more. Plaintiffs assert that they reasonably believed that Financial would be permitted to use its business judgment and be able to market the company at a $ 20 million valuation, and that defendants never disclosed that they would insist on a much higher valuation because they knew that Financial never would have purchased SDG stock if SDG would have set a floor on investment valuations of SDG.

Plaintiffs' claim fails because defendants adequately disclosed their true intentions to Financial. SDG, and its directors who spoke to Bianco, were frank and open with Bianco about their business plan and their estimations of SDG's value. Their internal projections, which were disclosed to Bianco, valued SDG at above $ 40 million. Bianco also knew that defendants viewed his investment of $ 20 million as a significant concession to Financial. Therefore, defendants did not fail to disclose the fact that they believed that SDG's value was $ 40 million or greater, and that they expected to accept investments in SDG at that valuation. [6]

6   Defendants' belief about the value of SDG and their willingness to accept investment at a lower valuation cannot be characterized as a known fact, which is subject to disclosure. *See Pospisil v. Pospisil, 59 Conn. App. 446, 451, 757 A.2d 655* ("The mere intention to perform an act in the future cannot be considered a 'known fact' because a party's intention to perform may never materialize into actual performance."), *cert. denied, 254 Conn. 940, 761 A.2d 762 (2000); but see Paiva v. Vanech Heights Constr., Inc., 159 Conn. 512, 515, 271 A.2d 69 (1970)* ("[A] promise to do an act in the future, when coupled with a present intent not to fulfill the promise, is a false representation."). The evidence offered does not support this characterization, but the court will

also base its holding on the grounds discussed herein as well because of the nice distinction between the legal authority cited by the parties. In plain language, there is no reason to split hairs over the precise nature of defendants' intentions when plaintiffs have not proven fraud.

[*62] Plaintiffs' claim also fails because they have not proven that defendants acted with the intent to deceive Financial. First, there is no evidence in the record that defendants took steps to conceal their beliefs about SDG's value. The fact that defendants may have discussed, amongst themselves, a general reluctance to relinquish control of SDG to an investor does not prove that they intended to deceive Bianco and Financial.

Second, in the absence of any direct evidence of an intent to deceive Financial, there is no evidence that defendants had a motive to mislead Financial. Financial argues that SDG's financial need is circumstantial evidence of defendants' intent to deceive Financial. In December of 1997, SDG did need capital, and was actively seeking an investment. SDG's need for capital was dire enough to, at least partially, motivate defendants to accept Financial's investment at a $ 20 million valuation. The evidence offered at trial, however, proves that defendants accepted Financial's investment on what they believed to be less favorable terms both so that they could obtain the capital SDG needed and so they could form a strategic alliance with Financial and Bianco. Defendants [*63] did in fact want SDG's alliance with Financial to succeed. Financial's theory that defendants lured it into investing at a $ 20 million valuation while knowing that they would thwart Financial's efforts to secure investment, and thereby deprive Financial of the benefit of its bargain, is not supported by the record. Rather, the record supports the conclusion that Bianco and defendants disagreed, in good faith, about SDG's value from day one of their relationship, and the parties were never able to overcome this difference of opinion to cultivate a mutually advantageous business arrangement.

Plaintiffs' theory of defendants' fraud is counter-intuitive because it implies that defendants would engage in conduct ultimately harmful to SDG. Plaintiffs assert that defendants lured Financial into investing with the intention of erecting impediments to Financial's ultimate success as SDG's investment banker. If plaintiffs' theory is correct, then defendants would have effectively precluded SDG from raising any capital during the life of the IBA because Financial was its exclusive investment banker. The notion that SDG would deliberately hire an exclusive investment banker with the intention [*64] of not accepting any investment from this investment banker defies logic. Because plaintiffs have not met their burden of proving this fraud claim, judgment shall enter for defendants on this claim.

c. Failure to Disclose that SDG's Board Intended to Permit AMDG to Select an Investment Banker

Plaintiffs argue that defendants had a duty to disclose to Financial that, despite their stated and actual ability to control AMDG, and despite their contractual obligation to use their best efforts to cause AMDG to retain Financial, they had the present intent not to exercise their best efforts to cause AMDG to hire Financial. Plaintiffs contend that defendants made express representations on the issue of investment banking services for AMDG, and therefore were required to make full and fair disclosure to Financial of material facts, including their plan to disregard the "best efforts" clause of the IBA.

Defendants intended to perform their obligations under the IBA to use their "best efforts" to cause AMDG to retain Financial as AMDG's investment banker, and therefore did not commit fraud in this respect. There is no evidence in the record that defendants did not intend to perform under [*65] the IBA. As discussed herein, SDG did satisfy its contractual obligations, and there is no indication that it, or any other defendant, intended otherwise prior to December 30, 1997. As such, plaintiffs' fraud claim fails in this respect.

4. Misrepresentations of SDG's Debt at the Time of the Transaction with Financial

Plaintiffs allege that defendants fraudulently misrepresented the amount of SDG's debt in December of 1997 prior to the closing of Financial's stock purchase. When defendants contacted Bianco in December of 1997 about making an investment in SDG, Bianco inquired about the amount of the SDG's debt. Robert Geho and Blair Geho, on two different occasions, told Bianco that SDG's debt was about four hundred thousand dollars ($ 400,000) less than SDG's actual debt obligation. Further, shortly before the transaction with Financial was to close, Bianco learned the true amount of SDG's debt and asked Robert Geho why he gave Bianco inaccurate information about SDG's debt. Robert Geho informed Bianco that he had made a mistake. Plaintiffs allege that defendants' statements about SDG's debt and Robert Geho's explanation for the inaccurate statements were fraudulent misrepresentations.

[*66] Plaintiffs contend that Robert Geho had to have known the exact amount of SDG's debt because, on December 1, 1997, at and SDG board meeting, Robert Geho had reported that the company had $ 840,000 in debt. This was the largest amount of debt that the company ever carried. Plaintiffs argue that Robert Geho is not credible in suggesting that he somehow forgot this figure or was confused about the information that Bianco was requesting. Robert Geho did not tell Bianco that he did not know the precise amount of debt, or that he was

2005 U.S. Dist. LEXIS 16164, *

confused by the question. Rather, plaintiffs contend, he answered by falsely identifying a materially smaller debt figure that he knew would likely be more acceptable to a potential major investor.

Plaintiffs also contend that Robert Geho's credibility in claiming that he forgot the actual amount of SDG's debt or misunderstood Bianco's question is undermined by Robert Geho's surreptitious conduct. Plaintiffs contend that Robert Geho's deceptive statements to Bianco regarding SDG's debt are consistent with Geho's act of deceptively, and illegally, tape recording telephone conversations with Bianco. Likewise, plaintiffs contend, Robert Geho's confidential May 13, 1998 memo [*67] (Ex. 124) to Jozoff shows his desire to deceive Bianco.

Plaintiffs have not proven fraud because there is no dispute that Bianco knew the true amount of SDG's debt before the closing. There is no dispute that Bianco had access to all of SDG's financial information and that he did in fact know the true figure. Although plaintiffs attempt to shift the focus of their fraud claim away from the misrepresentation of the amount of SDG's debt, the fact that Bianco knew the true amount of SDG's debt before Financial invested its money necessarily precludes finding defendants liable.

Further, plaintiffs have not proven that Robert Geho, or any other defendant, provided the inaccurate information regarding SDG's debt with the intention of deceiving Financial. The facts that Robert Geho taped conversations with Bianco without Bianco's permission and that Robert Geho expressed an interest in an initial public offering of SDG stock instead of a private investment procured by Financial do not prove that Robert Geho intended to deceive Bianco about SDG's debt, nor do they impeach the credibility of Robert Geho's explanation for providing Bianco with inaccurate information. The court credits Robert [*68] Geho's explanation that he did not have SDG's accounting statements handy when he spoke to Bianco, and that he arrived at the figure he stated to Bianco from memory and his personal understanding of the priority of SDG's debts. In other words, Robert Geho made an educated guess about SDG's debt based upon his understanding and not generally accepted accounting principles, and reported to Bianco that SDG had about $ 400,000 in debts he considered to be of the highest priority. The fact that he had reported SDG's debt as $ 840,000 when he had the accounting statements in front of him at SDG's December 1, 1997 board meeting does not necessarily mean that he remembered this figure or that, within the context of his discussion with Bianco, Robert Geho could not have been mistaken about the nature of Bianco's inquiry. As such, even if plaintiffs' claim is not necessarily precluded by Bianco's knowledge of SDG's true debt, plaintiffs

have not proven that Robert Geho acted with the intent to deceive Financial.

Therefore, judgment shall enter in favor of defendants on this claim because plaintiffs have not proven that Robert Geho, or any other defendant, acted with the intention of deceiving [*69] Financial when Robert Geho provided inaccurate information regarding SDG's debt.

5. Failure to Disclose that Jozoff Had Been the Defendant in an Insider Trading Case Brought by the SEC.

Plaintiffs claim that defendants had a duty to disclose Jozoff's 1993 insider trading charge. They contend that, by making representations to Financial about the experience, expertise, and other qualifications of its directors, SDG assumed a duty to fully disclose all material facts about those directors. Plaintiffs claim that, had they learned that Jozoff was charged with insider trading, Financial would not have executed a contract with SDG.

Plaintiffs have not met their burden of proving that any defendant had a duty to disclose the information to Financial or that any defendant failed to disclose the information with the intention of deceiving Financial. Plaintiffs have not proven that SDG knew of the SEC charges against Jozoff prior to the December 30, 1997 closing date. Jozoff told Blair Geho and Neil Flanzraich about his insider trading charges at some point, but there is no indication in the record of when Jozoff told them. Therefore, if no director (except Jozoff) at SDG knew of the charges [*70] prior to the closing, no defendant could have had a duty to disclose this information to Financial. Further, Jozoff himself had no duty to disclose this information to Financial. Therefore, judgment shall enter in favor of defendants on this claim.

6. VIOLATION OF CUTPA AGAINST ALL DEFENDANTS

Plaintiffs contend that, when SDG and Financial were negotiating Financial's purchase of SDG stock, defendants developed and implemented a plan to make a series of misrepresentations that were intended to induce plaintiffs to invest in, and save, their company. Plaintiffs claim that defendants' five material misrepresentations and omissions discussed in the preceding section of this memorandum constitute defendants' plan to say what was required to induce plaintiffs' investment but then revert to a "business as usual" plan after the funds were received. Plaintiffs claim that this plan and series of misrepresentations satisfies each element of CUTPA.

Plaintiffs have not proven that defendants violated CUTPA; their claims fail for two distinct reasons. First, defendants' actions were not undertaken in the conduct of SDG's trade or commerce. Second, as an alternative ground, defendants' actions [*71] do not amount to an unfair trade practice.

a. Conduct of Trade or Commerce

Defendants argue that their actions were not under-taken in the course of trade or commerce, and therefore plaintiffs cannot prevail on their CUTPA claims. [7] CUTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Conn. Gen. Stat. § 42-110b*. "Trade or commerce" is defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." *Conn. Gen. Stat. § 42-110a(4)*. A person need not be a consumer to bring a CUTPA claim, *see  Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480, 496, 656 A.2d 1009 (1995)*, and the Connecticut Supreme Court has repeatedly empha-sized that it is not the type of relationship between the two parties but rather the defendant's actual conduct that is dispositive of whether the actions took place in the course of a trade or commerce, *see, e.g.*  [*72]  , *Fink v. Golenbock, 238 Conn. 183, 213-15, 680 A.2d 1243 (1996)*.

7    Flanzraich has presented this argument in his *Rule 52* motion. The court has denied his motion because he did not clearly demonstrate that there was no properly presented issue of fact framed for decision.

Although the general consensus amongst Connecti-cut courts is that CUTPA does not apply to every single transaction in every single context, there is disagreement over the means of determining CUTPA's scope. Some courts, including a decision adopted by the undersigned, have held that "a CUTPA violation may not arise out of conduct that is merely incidental to the performance of one's trade or commerce." *Cornerstone Realty, Inc. v. Dresser Rand Co., 993 F. Supp. 107, 113 (D. Conn. 1998)*; *see  Arawana Mills Co. v. United Technologies Corp., 795 F. Supp. 1238, 1253 (D. Conn. 1992)*. Other courts have held that "an isolated transaction that occurs outside the ordinary course of the defendant's primary [*73]  business may constitute a CUTPA violation pro-vided it takes place in a business context." *Duncan v. PEH I, 2003 Conn. Super. LEXIS 1020, No. CV020817088S, 2003 WL 1962789, at *3 (Conn. Super. Ct. Apr. 1, 2003)*; *see  Metcoff v. NCT Group, Inc., 2005 Conn. Super. LEXIS 40, No. X04CV040184701S, 2005 WL 288769, at *4 (Conn. Super. Ct. Jan. 10, 2005)*; *Feen v. Benefit Plan Administrators, Inc., 2000 Conn. Super. LEXIS 2415, No. 406726, 2000 WL 1398898, at *5 (Conn. Super. Ct. Sept. 7, 2000)*; *see also  Begelfer v. Najarian, 381 Mass. 177, 191, 409 N.E.2d 167 (1980)* (construing Massachusetts statute closely resembling CUTPA, and stating that "we do not read *§ 11* as requir-ing that a commercial transaction must take place only in the ordinary course of a person's business or occupation before its participants may be subject to liability under *G.L. c. 93A, § 11*."). [8] Defendants urge the court to fol-low the former line of cases, while plaintiffs urge the court to adopt the "business context" line of cases.

8    The court notes that Massachusetts case law from which the "business context" terminology is drawn may not be a perfect analogy to CUTPA. Although CUTPA and Chapter 93A of the Mas-sachusetts General Laws share many nearly iden-tical provisions, Chapter 93A, unlike CUTPA, contains a section that specifically provides for liability for unfair or deceptive acts in connection with a commercial transaction between two busi-nesses. *See Mass. Gen. Laws Ch. 93A, § 11* (1997) ("Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another per-son who engages in any trade or commerce of an unfair method of competition or an unfair or de-ceptive act or practice declared unlawful by sec-tion two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action in the superior court. . . ."); *see, e.g.,  Linkage Corp. v. Trustees of Bos-ton University, 425 Mass. 1, 22-23, 679 N.E.2d 191 (1997)* ("The applicability of *G.L. c. 93A, §§ 2(a)* and *11*, to interaction between two parties requires a dual inquiry: first, the court assesses whether the interaction is 'commercial' in nature, and second, it evaluates whether the parties were both engaged in 'trade or commerce,' and there-fore acting in a 'business context.'"). The Massa-chusetts cases rely at least in part upon the exist-ence of this section in interpreting the provisions of Chapter 93A in effect in Connecticut. *See Lantner v. Carson, 374 Mass. 606, 610-11, 373 N.E.2d 973 (1978)*.

[*74]  Rigid application of either line of cases is not consistent with the purpose of CUTPA and the lan-guage of *Section 42-110a(4)*. Applying the line of cases holding that CUTPA only applies to transactions taking place within the business defendant's primary line of business could limit CUTPA's scope beyond that con-templated by the legislature; this court draws from these cases the proposition that whether the business defendant ordinarily engages in this type of transaction is one factor to consider in determining whether the transaction oc-curred in the conduct of trade or commerce. At the other extreme, the "business context" line of cases holding that "an isolated transaction that occurs outside the ordinary

course of the defendant's primary business may constitute a CUTPA violation provided it takes place in a business context," *Duncan, 2003 Conn. Super. LEXIS 1020, 2003 WL 1962789, at *3*, could be applied to broaden CUTPA's scope beyond that contemplated by the legislature. The fact that a business is a party to a transaction, and therefore the transaction itself takes place in a "business context," does not mean that the business has acted in the conduct of trade or commerce with respect to that [*75] transaction for the purpose of CUTPA liability.

CUTPA does not apply to an action simply because that action was undertaken by a business or businessperson. The Connecticut Supreme Court has recognized limits on extending CUTPA liability to actions taken by businesses. For example, a business's actions in the context of employment fall outside the scope of CUTPA. *See, e.g., Banerjee v. Roberts, 641 F. Supp. 1093, 1108 (D. Conn. 1986)* ("Although an employer may engage employees for the purpose of promoting trade or commerce, the actual employment relationship is not itself trade or commerce for the purposes of CUTPA.") (internal quotation marks omitted); *United Components, Inc. v. Wdowiak, 239 Conn. 259, 264-65, 684 A.2d 693 (1996)* (affirming trial court's conclusion that plaintiff's "claim involved an employer-employee relationship and did not rise to the level of trade or commerce cognizable under CUTPA"); *Quimby v. Kimberly Clark Corp., 28 Conn. App. 660, 670, 613 A.2d 838 (1992)* (same). Also, "purely intracorporate conflicts do not constitute CUTPA violations. . . ." *Ostrowski v. Avery, 243 Conn. 355, 379, 703 A.2d 117 (1997)*; [*76] *see Spector v. Konover, 57 Conn. App. 121, 133, 747 A.2d 39 (2000)*. Although CUTPA applies to transactions between businesses and transactions between businesses and consumers, CUTPA does not apply to transactions a business undertakes for the purpose of managing its own intracorporate affairs.

Here, SDG was not acting in the conduct of trade or commerce when it entered into the transactions with Financial on December 30, 1997. SDG's primary business is to invent, patent and develop targeted drug delivery systems and delivery systems for pharmaceutical and consumer product applications. Negotiating terms of a private investment and exclusive investment banker agreement is incidental [9] to SDG's primary business. Because the transaction was a private investment and services agreement, there is no nexus to the offering of goods and services on unfair terms to the general public or allowing a business in a market to gain a competitive advantage through unscrupulous conduct. Rather, the transaction at issue more closely resembles the formation of a joint venture or intra-corporate activity. As such, SDG, and the other defendants, did not act in the conduct

of trade or [*77] commerce and cannot be held liable for violating CUTPA.

9   Plaintiffs inaccurately equate the use of the phrase "incidental to" in this context to "unimportant to". Pursuant to this argument, because fundraising was essential to SDG's continued operation, the manner in which it raised funds through investment could not be "incidental" to its core business. Many activities that have nothing to do with a company's primary business, such as personnel matters, are absolutely vital to its continued operation, yet are considered beyond the scope of CUTPA's reach. In the context of defining the scope of the term trade or commerce under CUTPA, the term "incidental to" does not mean "unimportant to", but rather "collateral to".

b. Unfair or Deceptive Practices

In the alternative to the holding set forth in the preceding section, the court holds that plaintiffs have not proven that defendants committed an unfair or deceptive trade practice. The Connecticut Supreme Court has adopted the following description of the nature [*78] of an unfair or deceptive trade practice:

"(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]."

*McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 568, 473 A.2d 1185 (1984)* (quoting *Conaway v. Prestia, 191 Conn. 484, 492-93, 464 A.2d 847 (1983)*) (alterations in original). Further, "'a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . .,'" *Cheshire Mortg. Service, Inc. v. Montes, 223 Conn. 80, 106, 612 A.2d 1130 (1992)* (quoting *Web Press Services Corporation v. New London Motors, Inc., 203 Conn. 342, 355, 525 A.2d 57 (1987)*) (citations omitted), and "a party need not prove an intent [*79] to deceive to prevail under CUTPA. . . .," *id.* (citations omitted). A trade practice violates CUTPA when the practice "offends public policy or

comes within some established concept of unfairness," when "the practice is immoral, unethical, oppressive or unscrupulous," or when "it causes substantial injury to consumers, competitors or other businessmen." *Muniz v. Kravis, 59 Conn. App. 704, 713, 757 A.2d 1207 (2000).*

Plaintiffs' CUTPA claim shares the same factual predicate for their fraud claims and fails for chiefly the same reasons when judged by the preponderance of the evidence standard. With respect to plaintiffs' claim that defendants did not disclose their decision to not accept investment in SDG at less than a $ 40 million valuation, plaintiffs' claim fails because defendants adequately disclosed their true intentions to Financial, and therefore did not deceive Financial or otherwise act unfairly. SDG, and its directors who spoke to Bianco, were frank and open with Bianco about their business plan and their estimations of SDG's value. With respect to plaintiffs' claim that defendants intended to breach the IBA before executing the IBA, the court finds that [*80] defendants intended to perform their obligations under the IBA to use their "best efforts" to cause AMDG to retain Financial as AMDG's investment banker, and therefore did not deceive plaintiffs or otherwise act unfairly in this respect. With respect to plaintiffs' claim that defendants misrepresented SDG's debt and misrepresented the reason for conveying inaccurate information, the court finds that Robert Geho made an educated guess about SDG's debt based upon his understanding and not generally accepted accounting principles. Because plaintiffs had access to all of SDG's financial data in advance of the December 30, 1997 closing, and because Robert Geho's explanation for his inaccurate report is true, defendants did not deceive plaintiffs or otherwise act unfairly. Finally, plaintiffs have not proven that SDG knew of the SEC charges against Jozoff prior to the December 30, 1997 closing date, and therefore defendants could not have deceived plaintiffs or otherwise acted unfairly. Further, Jozoff did not act unfairly or unscrupulously by not informing plaintiffs of the SEC charges because he had no duty to plaintiffs to disclose this information. Judgment shall enter in favor of all [*81] defendants on plaintiffs' CUTPA claims.

## B. COUNTERCLAIMS

Counterclaim plaintiff SDG brings an action for damages against counterclaim defendant Financial alleging breach of fiduciary duty (Count I), breach of written contract (Count II), breach of unwritten contract (Count III), negligence (Count IV), and promissory estoppel (Count IV).

### 1. BREACH OF FIDUCIARY DUTY

SDG claims that, as SDG's exclusive investment banker and financial advisor, Financial owed SDG fiduciary duties. A relationship is fiduciary in nature when it is "characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Konover Dev. Corp. v. Zeller, 228 Conn. 206, 219, 635 A.2d 798 (1994)* (quoting *Dunham v. Dunham, 204 Conn. 303, 322, 528 A.2d 1123 (1987)*) (internal quotation marks omitted). "The law will imply fiduciary responsibilities only where one party to a relationship is unable to fully protect its interests or where one party has a high degree of control over the property or subject matter of another and the unprotected party has placed its [*82] trust and confidence in the other." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 41, 761 A.2d 1268 (2000)* (quoting *Ward v. Lange, 1996 SD 113, 553 N.W.2d 246, 250 (S.D. 1996)*) (internal quotation marks, brackets omitted).

Financial and SDG did not have a fiduciary relationship. Their relationship arose from an arm's length transaction between sophisticated business parties. SDG did not rely solely upon Financial to raise capital; the IBA left open the possibility of proposed investments from other sources, and SDG did retain Allison and Snowdon to raise capital outside the U.S. Also, SDG retained the absolute discretion to accept or reject any proposed transaction presented by Financial, and thus did not commit raising capital solely to Financial's expertise and discretion.

Although SDG undoubtedly entered into the transaction with Financial because its principals felt that SDG would benefit from Bianco's expertise, "the fact that one business person trusts another and relies on the person to perform [his or her] obligations does not rise to the level of a confidential relationship for purposes of establishing a fiduciary duty." *Hi-Ho Tower, Inc., 255 Conn. at 41-42 [*83]* (quoting *Garrison Contractors, Inc. v. Liberty Mutual Ins. Co., 927 S.W.2d 296, 301 (Tex. App. 1996)*) (internal quotation marks, brackets omitted). Because SDG's relationship with Financial did not confer "the authority to exercise over [SDG] the control, dominance or influence characteristic of fiduciary relationships," *Hi-Ho Tower, Inc., 255 Conn. at 42*, Financial was not a fiduciary with respect to SDG. Judgment shall enter for Financial on this claim.

### 2. BREACH OF THE IBA

#### a. EXPRESS TERMS

SDG claims, as this court has already found, that Financial breached the IBA by failing to put forth the effort required to raise capital for SDG. SDG, however, has not proven damages with the required specificity.

The Connecticut Supreme Court has articulated the following standard for determining the amount of an award of damages for the breach of a contract:

> The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed. . . . It has traditionally been held that a party may [*84] recover "general" contract damages for any loss that "may fairly and reasonably be considered [as] arising naturally, i.e., according to the usual course of things, from such breach of contract itself." *Hadley v. Baxendale*, 9 Ex. 341, 354, 156 Eng. Rep. 145 (1854). . . . This court has consistently applied the general damage formula of *Hadley v. Baxendale* to the recovery of lost profits for breach of contract, and it is our rule that unless they are too speculative and remote, prospective profits are allowable as an element of damage whenever their loss arises directly from and as a natural consequence of the breach. . . .

*West Haven Sound Development Corp. v. West Haven*, 201 Conn. 305, 319-20, 514 A.2d 734 (1986) (internal quotation marks, citations, and alterations omitted). "Damages for breach of contract are to be determined as of the time of the occurrence of the breach." *Id. at 317*.

SDG's claim for damages is based upon the presumption that, had Financial performed under the terms of the IBA, it would have been able to raise capital for SDG, and SDG would not have been held in breach of the Columbia license agreement. [*85] The claimed damages do not flow naturally as a consequence of Financial's breach because investment in SDG is substantially influenced by a host of factors beyond the control of Financial. Financial had an obligation to market SDG and negotiate investment from other sources in SDG. Financial did not promise to invest its own money, and SDG was not obligated to accept any proposed transaction. Many factors beyond Financial's control influenced its ability to procure investment in SDG, such as market conditions and SDG's willingness to accept terms. SDG has not proven that, had Financial performed, other parties would, as likely or natural consequence, have invested in SDG. Therefore, SDG has not proven that it is entitled to the damages it claims. Judgment shall therefore enter in favor of Financial on this claim.

### b. IMPLIED TERMS

SDG claims that an agreement with Financial arose, by implication, that Financial would provide funding for SDG's proposed subsidiaries, including a subsidiary formed to market the technology licensed from Columbia University. "A contract implied in fact, like an express contract, depends on actual agreement." *Coelho v. Posi-Seal Intern., Inc.*, 208 Conn. 106, 111, 544 A.2d 170 (1988) [*86] (internal quotation marks omitted). This agreement may be manifested by "by words or action or conduct. . . ." *Id. at 112*. "Although both express contracts and contracts implied in fact depend on actual agreement; . . . 'it is not fatal to a finding of an implied contract that there were no express manifestations of mutual assent if the parties, by their conduct, recognized the existence of contractual obligations.'" *Janusauskas v. Fichman*, 264 Conn. 796, 805, 826 A.2d 1066 (2003) (quoting *Rahmati v. Mehri*, 188 Conn. 583, 587, 452 A.2d 638 (1982)).

SDG has not proven that Financial agreed to provide funding for the technology licensed from Columbia University. Although Bianco attended a meeting with Columbia officials and SDG principals, and SDG's management consulted with Bianco prior to entering into the Columbia license agreement, Bianco did not expressly guarantee to raise sufficient funds to support the Columbia license agreement, and Bianco's actions do not reflect his intention to do so. Bianco was present at this meeting to support SDG inasmuch as SDG represented to Columbia that it was serious about raising funds to support [*87] the technology and not for Bianco to make assurances about the likelihood that SDG would in fact raise the funds. The evidence offered at trial proves that Bianco was confident in his ability to raise funds in general, and that he expressed his beliefs, but this vague expression of confidence is insufficient for this court to imply that Financial effectively guaranteed that it would raise sufficient funds to support the Columbia license agreement. Judgment shall enter in favor of Financial on this claim.

### 3. PROMISSORY ESTOPPEL

SDG's promissory estoppel claim fails for the same reason as its implied contract claim. With respect to promissory estoppel, the Connecticut Supreme Court has endorsed the approach set forth in *Section 90 of the Restatement (Second) of Contracts*, which provides the following:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injus-

tice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*Rest. (Second) Contracts § 90* [*88]  (1981). "A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance." *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 214, 520 A.2d 217 (1987).* As discussed in the immediately preceding section, Bianco did not make a clear and definite promise to raise the capital necessary to support SDG's obligations under the Columbia license agreement. Therefore, this court cannot provide relief under *Section 90 of the Restatement,* and judgment shall enter for Financial on this claim.

### 4. NEGLIGENCE

SDG claims that Financial was negligent in performing its duty to act as SDG's exclusive investment banker. To the extent SDG alleges "negligent breach of contract," its claims fail. *See  Dean v. Hershowitz, 119 Conn. 398, 409, 177 A. 262 (1935)* ("[A] mere breach of the contract would not afford a basis for recovery in tort. . . ."). SDG asserts, however, that Financial breached its duty of care by steering SDG into improvidently executing the Columbia license agreement. Even if a duty did exist, Financial did not breach this [*89]  duty. Financial did not steer SDG into executing the Columbia license agreement; although Financial did not oppose the transaction, and supported SDG in its dealings with Columbia officials, SDG's management wanted to acquire the license, and did so cognizant of the risks involved. Bianco's general expressions of optimism regarding Financial's ability to raise funds to support the license agree-

ment cannot be construed as steering SDG into the transaction. Therefore, judgment shall enter in favor of Financial on this claim.

### IV. CONCLUSION

For the foregoing reasons, the court orders the following:

1. Plaintiffs' motion to strike (dkt. # 87) is **DENIED** for the reasons cited in defendants' memorandum of law in opposition thereto (dkt. # 115).

2. Defendants' Motion to Strike Testimony of Linda Allison (dkt. # 78) is **DENIED** for the reasons set forth in plaintiffs' memorandum in opposition thereto.

3. Plaintiffs' Objection to the Admission of Plaintiffs' 30(b)(6) Deposition Transcript (dkt. # 106) is **SUSTAINED in part** and **OVERRULED in part**.

4. Flanzraich's motion for judgment on partial findings (dkt. # 102) pursuant to *Rule 52(c) of the Federal Rules of Civil Procedure* [*90]  is **DENIED**.

5. Judgment shall enter for defendants SDG, Inc., W. Blair Geho, Robert Geho, Hans Geho, Neil Flanzraich, and Malcolm Jozoff on each count of plaintiffs AmBase Corporation and SDG Financial Corporation's complaint.

6. Judgment shall enter for counterclaim defendant SDG Financial Corporation on each count of counterclaim plaintiff SDG Inc.'s complaint.

7. The Clerk of the Court shall close this file.

So ordered this 3rd day of August, 2005.

**/s/ DOMINIC J. SQUATRITO**

**UNITED STATES DISTRICT JUDGE**



James D. Giulietti et al. v. John L. Giulietti et al.

X03CV 980492096S

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF HART-
FORD - NEW BRITAIN, AT NEW BRITAIN

*1999 Conn. Super. LEXIS 3416*

December 15, 1999, Decided
December 16, 1999, Filed

**NOTICE:**        [*1]   THIS DECISION IS UNRE-
PORTED AND MAY BE SUBJECT TO FURTHER
APPELLATE REVIEW. COUNSEL IS CAUTIONED
TO MAKE AN INDEPENDENT DETERMINATION
OF THE STATUS OF THIS CASE.

**DISPOSITION:**    John L. Giulietti is removed as di-
rector of Vernon Village, Inc.

**JUDGES:** Aurigemma, J.

**OPINION BY:** AURIGEMMA

**OPINION**

Memorandum of Decision

Most lawyers provide valuable (albeit often free)
advice and services to members of their families. Unfor-
tunately, Attorney John L. Giulietti is not like most law-
yers. He used his position as the family lawyer to lend
credence to numerous false representations to his parents
and siblings and virtually eradicated his father's simple
plan to transfer his property and business equally to his
four children.

This court has heard evidence in four related cases,
all of which pertain to the personal and business interests
of a Vernon family which for many years trusted one of
its members, an attorney, John L. Giulietti, to look out
for their best interests. Unfortunately, their trust was
misplaced.

This decision applies in each of the following ac-
tions: [1]

1   A duplicate original of this Decision will be
filed in each case.

[*2]   1. *James Giulietti and Joanne Giulietti Hollis
v. John L. Giulietti and Anita Giulietti*, No. X03 CV 98
0492096S--the Partition Action;

2. *John J Giulietti and Alma L. Giulietti v. John L.
Giulietti, et al*, No. X03 CV 98 0492815S--the Legal
Malpractice Action; [2]

2   Between the time of trial and the date hereof,
John J. Giulietti has passed away. Therefore, this
opinion may refer to the Estate of John J. Giuli-
etti as a party to these actions.

3. *James D. Giulietti v. Vernon Village, Inc*., No.
X03 CV 98 0492099S--the Corporate Dissolution Ac-
tion; and

4. *Vernon Village, Inc. v. John L. Giulietti and John
J. Giulietti*, No. X03 CV 98 0492124S--the Usurpation
of Corporate Opportunity Action.

Facts

John L. Giulietti, an attorney and a member of the
Connecticut Bar, admitted in 1972, is the eldest son of
Alma Giulietti and John J. Giulietti, and the brother of
James Giulietti, Joanne Giulietti Hollis, and Anita Giuli-
etti. To avoid confusion between the attorney, John L.
Giulietti,  [*3]  and his father, John J. Giulietti, in this
opinion John L. Giulietti will be referred to as "Attorney
Giulietti" and his father will be referred to as "John J.
Giulietti" or "Mr. Giulietti."

John J. Giulietti never graduated from high school.
He was originally a fireman and contractor in New York

and came to Connecticut with his wife, Alma, and his children in the 1960s.

Attorney Giulietti practiced law in the Vernon, Connecticut area until 1979 when he closed his office. John J. Giulietti felt sorry for his son after his law practice closed, and in 1980 asked Attorney Giulietti to come and work for the family mobile home business located in Vernon. In 1981, Attorney Giulietti's younger brother, James, started working for the family business. James and his father worked in the day-to-day operations, actually running the mobile home park. Attorney Giulietti had an office in the back of a Quonset hut building which served as the main office for the mobile home park. He handled all the legal matters for the family and the mobile home park business.

In December 1983, John J. Giulietti deeded to his four children equally a 25-acre parcel of land in South Windsor. In March [*4]  1984 he also deeded equally to his children a parcel of land located at 990 Hartford Turnpike in Vernon, sometimes referred to as the "Rockledge" Property. Attorney Giulietti prepared the deeds for those transfers.

In 1990 and for a substantial period of time before, John J. Giulietti owned 325 Kelly Road, a 32-acre parcel of land in Vernon, Connecticut. At that time John J. Giulietti and Alma Giulietti were the sole shareholders of a Connecticut corporation known as Vernon Village, Inc., which operated the mobile home park at 325 Kelly Road pursuant to an oral month-to-month lease.

During most of the time referred to herein, Joanne Hollis lived in Warwick, New York, and Anita Giulietti, sometimes also referred to as Anita Giulietti Demoupolos, lived in New Hampshire or Illinois.

In November 1990, John J. Giulietti, James Giulietti, Attorney Giulietti and Bernard Blum, a Certified Public Accountant, met to discuss various estate planning issues including the transfer of John J. Giulietti's assets to his children. Mr. Blum suggested that Mr. Giulietti could avoid estate taxes by gifting a portion of his land and other assets to his children each year. Soon thereafter, [*5]  John J. Giulietti directed Attorney Giulietti to proceed with the gifting program. That program was designed to allow Mr. Giulietti to transfer a portion of his assets to his four children each year in the maximum amount allowable without incurring any gift tax.

Attorney Giulietti prepared the first deed of an interest in 325 Kelly Road. It was a single deed in which John J. Giulietti transferred to his four children an unspecified percentage interest in 325 Kelly Road. Attorney Giulietti also prepared a document entitled "Agreement," commonly referred to throughout this litigation as the "Anti-Alienation Agreement." The Anti-Alienation

Agreement prohibited, *inter alia*, conveyance or encumbrance of 325 Kelly Road by any owner without unanimous consent of the others until 2011, or during their father's lifetime, whichever was longer, and contemplated that any inter-owner buy-out would be at a price which was far less than the fair market value of the property. At the same time Attorney Giulietti prepared a document entitled "Terms of Escrow," hereinafter referred to as the " First Escrow." That document appointed Attorney William G. Reveley as escrow agent and provided that [*6]  the aforementioned deed would be held in escrow until all the Giulietti siblings had signed the Anti-Alienation Agreement. On December 27, 1990, Attorney Giulietti advised his father to execute the deed and the "Terms of Escrow." Attorney Giulietti and his brother, James Giulietti, signed the Anti-Alienation Agreement on December 27, 1990.

On or about March 1, 1991, 325 Kelly Road was appraised by Robert Stewart for $ 410,000. That appraisal was based on the assumption that a long term oral, yet enforceable, lease existed between Vernon Village, Inc. and Mr. Giulietti. Therefore, the fair market value assigned to the property was far below its actual fair market value. [3]  After the appraisal was completed, Attorney Reveley, acting under the direction of Attorney Giulietti, filled in the percentage conveyed by John J. Giulietti to each child by the deed as "4 7/8%."

> 3   At the time of trial Mr. Stewart testified that the real fair market value of the 325 Kelly Road property was $ 2,900,000.

On June 21, 1991, Joanne [*7]  Giulietti Hollis and Anita Giulietti sent a written counterproposal to the Anti-Alienation Agreement to their brothers. Their counterproposal tied the term of the Agreement to their father's lifetime and gave each sibling a buy-out right at fair market value determined by appraiser(s) after January 1, 1996. Attorney Giulietti rejected that counterproposal without consultation with his father. However, he falsely represented to his sisters that their father had rejected their counterproposal.

On December 31, 1991 and December 31, 1992, respectively, John J. Giulietti signed second and third single deeds prepared by Attorney Giulietti. Each deed again transferred 4 7/8% of 325 Kelly Road to each child. On those dates Mr. Giulietti also signed a document entitled "Supplemental Terms of Escrow Agreement" (also prepared by Attorney Giulietti), which imposed the unfulfilled condition from the First Escrow upon the 1991 and 1992 gifts: the execution of the Anti-Alienation Agreement by all siblings.

Attorney Giulietti falsely represented to his siblings that his father had dictated the terms of the First Escrow

and the Supplemental Escrow and that their execution of the Anti-Alienation [*8] Agreement was a condition imposed by his father. In reality the terms of the Agreement were dictated by Attorney Giulietti, apparently in order to prevent any one of his siblings from breaking up the Vernon Village business, which was Attorney Giulietti's sole livelihood.

Mr. Giulietti wanted his children to share equally in the ownership of 325 Kelly Road and to share an equal interest in the business. If one of his children worked in the mobile home business, Mr. Giulietti also wanted that child to receive a salary. However, although Mr. Giulietti surely wanted his children to work together in running the family business, he never expressed any desire 1) to prevent his children from selling the Kelly Road property for a period of 21 years, or 2) that any child who wanted or needed to sell their interest in Kelly Road to their siblings should receive only a fraction of the fair market value of the property. Those are both terms of the Anti-Alienation Agreement of which Mr. Giulietti was completely unaware and to which he never gave his consent.

Attorney Giulietti takes the position that his father at least understood and approved of the basic concept of the Anti-Alienation [*9] Agreement: that it was intended by him to restrict his children's ability to sell or partition the property. There is no evidence to support that position. The court finds that Mr. Giulietti, who had difficulty reading due to failing eyesight, never read the terms of the Anti-Alienation Agreement and signed it only because his son, Attorney Giulietti, told him to. The same is true of all of the other letters and documents which were drafted by Attorney Giulietti for the signature of his father. Mr. Giulietti never read them. He signed them only because his son the lawyer told him to.

Attorney Giulietti took unconscionable advantage of the trust and confidence of his father by falsely representing to his father that the Anti-Alienation Agreement was a partnership agreement and that the Giulietti siblings legally *could not* acquire any interest in 325 Kelly Road unless they signed it.

On March 11, 1993, Anita Giulietti signed the Anti-Alienation Agreement and on April 30, 1993, Joanne Giulietti Hollis signed it. Thereafter, on May 28, 1993, John J. Giulietti's first three deeds to his children and the Anti-Alienation Agreement were released from escrow and were recorded [*10] on the Vernon Land Records by Attorney William G. Reveley, acting at the direction of Attorney Giulietti.

James Giulietti, Joanne Giulietti Hollis and Anita Giulietti signed the Anti-Alienation Agreement with the understanding that their father had required that they sign it as the *only* condition to receiving a one quarter interest

in the 325 Kelly Road property and a one quarter interest in Vernon Village, Inc. Had they known that the signing of the Agreement was a condition imposed by their brother, Attorney Giulietti, and not their father, they would not have signed the Agreement. In addition, they would not have signed the Agreement if they had known that Attorney Giulietti would require them to sign additional documents as a condition to receiving from their father their full 25% interest in the land and business.

On December 31, 1993, John J. Giulietti executed *separate* deeds of 4 7/8% to each child and signed a new escrow agreement (the "Second Escrow"), this time with Attorney Giulietti and Attorney Frank McCoy, Jr. as the other parties to the agreement. These deeds and the Second Escrow were drafted by Attorney Giulietti. The Second Escrow contained a condition [*11] which required the Giulietti siblings to sign various documents relating to Rockledge LLC, a limited liability corporation which Attorney Giulietti intended to form to continue the development and sale of lots located at 990 Hartford Turnpike, Vernon, Connecticut.

In 1984 Mr. Giulietti had deeded the 990 Hartford Turnpike property to his four children, who formed a partnership known as Rockledge Estates for the purpose of developing the property as a mobile home park. In the fall of 1993, the siblings reached a consensus regarding the development of the Rockledge property. This consensus contemplated the transfer of 20 of the 36 lots to a limited liability company in which Vernon Village would have a percentage ownership as consideration for its investments in infrastructure and development, and that the siblings would own the other percentage of this entity equally and receive individual title to four (4) lots each.

The Second Escrow provided that:

> III. If any of the four children refuse or neglect to sign (execute) any of the instruments (including supporting documentation) referred to in the previous paragraphs by February 28, 1994, that child's deed to the 4 7/8 share [*12] shall be destroyed by Frank J. McCoy, Jr. John L. Giulietti may continue this deadline until March 30, 1994, if he feels additional time is needed to complete documentation and signatures and he advises Frank J. McCoy, Jr, of that fact, in which event no such non-signing child's deed shall be destroyed before March 30, 1994.

Neither the formation of an LLC nor the execution of additional documents regarding Rockledge was requested, or even understood by Mr. Giulietti; they were condi-

tions imposed unilaterally by Attorney Giulietti, as was the concept of *separate* deeds to facilitate destruction of a deed to a noncompliant sibling.

Again, Attorney Giulietti falsely represented to his siblings that their father had agreed to the conditions of the Second Escrow. In an effort to obtain his sisters' signatures on the Rockledge documents Attorney Giulietti sent his sisters a series of letters, some ostensibly from his father, but all drafted by Attorney Giulietti without his father's consent to or understanding of their contents. One such letter, dated January 5, 1994, illustrates the manner in which Attorney Giulietti attempted to manipulate his sisters by claiming that [*13] they were not acceding to "Father's" wishes. In that letter Attorney Giulietti misrepresented to his sisters that the terms of the Second Escrow were suggested by their father because he "is not very happy about the 'indecisiveness' of his four children in reaching a formal agreement regarding operations at Rockledge." In reality, the elder Mr. Giulietti did not ever insist on any connection between Rockledge and the deeds of 325 Kelly Road to his children. Such a connection was created by Attorney Giulietti to serve his own interests.

Attorney Giulietti purposefully misrepresented and confused his father by advising him that his sisters had refused to sign "the Agreement," specifically leading his father to believe that his sisters had not yet signed the Anti-Alienation Agreement, the only agreement of which Mr. Giulietti was aware.

On May 13, 1994, Attorney Giulietti and James Giulietti formed Rockledge LLC. They both signed all documents required under the Second Escrow. Thereafter, on June 15, 1994, Attorney Giulietti and James Giulietti began receiving corresponding rent increases for the 325 Kelly Road property as the only siblings allegedly in compliance with the now [*14] outstanding escrow agreement. As of June 15, 1994, the sisters were receiving a lesser rental amount because the deeds to them from their father dated December 31, 1993 were still held in escrow, while those to Attorney Giulietti and James had been released from escrow, at the behest of Attorney Giulietti. At that time each of the sisters was receiving 14.625% of $ 48,000, or $ 7,020, rather than the $ 9,360 that would have reflected the 19.5% ownership now enjoyed by each of the brothers.

On June 16, 1994, an Amendment of and Reinstatement of the December 31, 1993 Escrow Agreement was executed (the "Third Escrow"). This amendment now required that a second LLC be formed regarding 325 Kelly Road to be known as "DOT, LLC." Additionally, this amendment required that all documents referenced in the prior escrow must now be executed by each sibling in order to get their 1993 deed released and rec-

orded, and to receive subsequent equal interests in the 325 Kelly Road land and rent.

Again this second LLC and the Third Escrow were requirements imposed unilaterally by Attorney Giulietti. And again he falsely represented to his sisters that they represented requirements imposed by [*15] John J. Giulietti. As with the first LLC and the Second Escrow, John J. Giulietti had no understanding of the terms, purposes or complexities of these documents.

In an effort to obtain his sisters' signatures on the Rockledge LLC documents and on the new LLC documents which he intended to draft, Attorney Giulietti composed a letter to be signed by his father which told the sisters that their receipt of future gifts from him was contingent on the signing of "agreements submitted to you by your brothers." It invited them to "please tell me to my face if either of you believe that I have a moral or legal obligation to continue making gifts to either of you." This letter was signed by John J. Giulietti and sent on June 14, 1994. As with all the other letters, Mr. Giulietti did not read this one, but signed it because his son the lawyer lied to him, telling him that Joanne and Anita were being difficult and had still refused to sign "the Agreement."

On June 22, 1994, one week after he imposed the new conditions on the receipt of the 1993 deeds, Attorney Giulietti and James Giulietti formed Dot LLC. On July 14, 1994, after Joanne Hollis and Anita Giulietti refused to sign the Rockledge [*16] LLC documents, Attorney Giulietti drafted another letter to his sisters which was signed by himself and his brother which stated, in part, that "Father is instructing Attorney McCoy that there will be no more extensions of time of this escrow agreement and is further instructing Attorney McCoy to destroy his daughters' two individual deeds if his two daughters do not sign *in proper form* the documents presented to Anita during her visit her (sic) this week. Those documents include both Dot LLC and Rockledge Drive LLC." (Emphasis in original.) The foregoing was not true. Mr. Giulietti had made no instructions whatsoever concerning the escrow.

On July 19, 1994, at the behest of his son the lawyer, John J. Giulietti executed a deed, prepared by Attorney Giulietti, granting 9 3/4% interest in 325 Kelly Road to Attorney Giulietti and James Giulietti only. On or about July 25, 1994, the December 31, 1993 and July 19, 1994 deeds from John J. Giulietti to Attorney Giulietti and James Giulietti were recorded on the Vernon Land Records.

On July 26, 1994, Joanne Giulietti Hollis signed all documents required of her under the Third Escrow. However, her deeds were not released to her [*17] and/or recorded on the Vernon Land Records at anytime

thereafter. At this point Attorney Giulietti's manipulations of his parents and siblings took a particularly nasty turn. Apparently realizing how easy it was to withhold the truth from his father, he did not order the recording of the deeds to Joanne that remained in escrow.

Instead, he determined that he would withhold the deeds to Joanne (which would have given her an interest in 325 Kelly Road equal to that of her brothers) in an attempt to secure her assistance in obtaining her sister Anita's signatures on the documents.

Between July 28, 1994 and July 31, 1994 Attorney Giulietti attempted to manipulate Joanne Hollis into pressuring her sister Anita to sign all documents then required by Attorney Giulietti and taking less of a percentage ownership interest in the real estate. In a letter dated July 29, 1994 to his sister Joanne, Attorney Giulietti stated that their father wanted to make a final conveyance of 100% of the Kelly Road property to his children and that, because Anita had not signed the Rockledge and Dot LLC documents that her existing deeds would be destroyed and that "Father" would convey a 28.453% share [*18]  to Attorney Giulietti, James and Joanne. Attorney Giulietti went on to write:

> However, we thought that we should contact you and ask you first before the 28.453% deed was prepared. In the military when a sergeant is reduced in rank from sergeant to private (commonly called "busted") some other corporal or private is promoted to sergeant: in military vernacular this promotion is called a "blood stripe." Some people would decline these promotions for a variety of reasons.

Apparently hoping that Joanne would decline her "blood stripe" additional interest in the Kelly Road property, Attorney Giulietti went on to ask Joanne whether she wanted only a 25% interest, and stated that if she did, then he and James would receive the interest which otherwise would have gone to Anita, leaving James and Attorney Giulietti each with a 30.1875% interest in the property while Joanne would have a 25% interest and Anita only 14.625%.

On August 1, 1994, Attorney Giulietti prepared, and advised John J. Giulietti to sign, a Warrantee Deed transferring his remaining interest in 325 Kelly Road to his sons only, which deed was recorded on that day. Additionally, Attorney Giulietti prepared [*19]  and advised John J. Giulietti to sign a document entitled "Authorization for Destruction of Deeds, Continued Retention of Dot LLC Documents, and Recordation of Final

Deed." Thereafter, between August 1, 1994 and December 1994, Attorney Giulietti continued to tell his sisters that they could receive a 25% ownership interest in Dot LLC and 25% of the 325 Kelly Road land rent if they would sign all documents required under the Third Escrow.

John J. Giulietti continued to believe, right up to the time he filed suit against his son, Attorney Giulietti, that: there was only one "agreement"; it was a four-way equal "partnership" agreement among his four children; Anita had not signed it; but that if she did, all four children would own 325 Kelly Road and Vernon Village, Inc. in equal shares.

On December 19, 1994, Vernon Village rent to owners was reduced from $ 48,000 to $ 2,735 per annum. Said rent reduction was initiated by Attorney Giulietti in an effort to force his sisters to accede to his wishes and control. He misrepresented to his siblings that his father had requested this reduction, drafting a letter for John J. Giulietti's signature which stated, in pertinent part, "I [*20]  want you, Anita, to sign *all* the papers concerning 'Dot LLC' . . . until *all* those papers are signed by Anita, I am reducing the rent Vernon Village pays you two and your two brothers . . . I am directing Johnny and Jim to mail each of you checks for $ 200 which covers the rental period for 325 Kelly Road from July 31 to December 31, 1994." Thus, Attorney Giulietti himself reduced the rental payments to his sisters from $ 7,020 to $ 200, while misrepresenting to them that the reduction in rental had been requested by their father.

Thereafter, Attorney Giulietti prepared a letter for his father's signature instructing Attorney McCoy to destroy the deeds being held in escrow for Joanne and Anita. At the time the deeds were destroyed, John J. Giulietti still believed that Joanne and Anita had failed to sign the "Agreement" which would enable them to legally receive interests in 325 Kelly Road. He did not authorize the destruction of the deeds.

The testimony of Mr. Giulietti taken at a deposition [4] noticed by his son, Attorney Giulietti, on April 15, 1999 expressed his previous trust in his son and his inability to understand why his own son did not do what he asked [*21]  him to do with respect to the transfers of land and business to his children. Attorney Giulietti showed his father a letter dated August 4, 1994 to Joanne Hollis and Anita Giulietti. As with all letters signed by Mr. Giulietti, this letter had been authored by Attorney Giulietti. The letter gave Anita 30 days to reconsider her refusal to sign the Dot LLC documents. Although he knew that he, and not his father, had authored this letter, Attorney Giulietti took the position at the deposition (as he did during the trial) that this letter was evidence of his *father's* in-

tentions. When he confronted his father with the letter, Mr. Giulietti responded:

4   Between the time of his depositions and the time of trial Mr. Giulietti suffered a stroke, which rendered him physically unable to testify at trial. The parties agreed that the transcripts of his depositions would be admitted into evidence in lieu of his testimony.

But you see, you don't understand. I understand if I'm talking to my son and I tell him--I [*22]  don't care what you put down on the piece of paper. When you trust your son and he's an attorney and you tell him "Look, this is what I really want," whether I said it originally or say it later or say it now, "This is what I want," why my son, who's an attorney, can't do as I say. I don't understand it.

Deposition of April 15, 1999, at p. 102.

Once he had secured majority ownership of 325 Kelly Road for himself and his brother, Attorney Giulietti turned his attention to acquiring stock in Vernon Village, Inc. Although his father trusted him completely, Attorney Giulietti did not have a good relationship with his mother. However, his brother did. Therefore Attorney Giulietti enlisted his brother's aid to bring up the subject of the Vernon Village stock with their mother. On February 3, 1995, James Giulietti convinced Alma Giulietti, their mother, to transfer her stock in Vernon Village to him and Attorney Giulietti. Attorney Giulietti convinced John J. Giulietti to sell them all of his shares in Vernon Village, Inc. without payment of any cash up front, but for a promissory note with a purchase price totaling $ 100,000. When Attorney Giulietti first [*23]  broached the subject of Vernon Village, Inc., which Mr. Giulietti referred to as "the business," Mr. Giulietti was surprised, because he believed that at the time he transferred the 325 Kelly Road real estate to his children, that he had also transferred "the business" to them.

Attorney Giulietti knew that his father wanted his four children to share equally in the 325 Kelly Road property and in the business, Vernon Village, Inc., but he took advantage of his father's mistaken belief that his daughters were being uncooperative (which mistaken belief Attorney Giulietti himself had created) in order to secure sole ownership of the shares of Vernon Village, Inc. for himself and his brother. At the time Alma and John Giulietti made the transfer of stock to their sons,

they believed that when Anita signed the "Agreement," then all the children would have equal ownership of Vernon Village, Inc. and 325 Kelly Road. This belief was based on representations made to them by Attorney Giulietti.

Attorney Giulietti acted as draftsman and counsel to all involved in the stock transfer. He brought the documents necessary for the stock transfer to his parents house and had his parents sign [*24]  them while the dinner dishes were being cleared. He did not advise his parents as to his conflict of interest and did not recommend that any other attorney represent them in connection with the stock transfer. He did not advise his parents to retain an appraiser to value the shares of Vernon Village, Inc. Instead he arbitrarily picked the value of $ 100,000 as the value of the corporate shares. Attorney Giulietti drafted four promissory notes for the purchase price of the stock to be signed by himself and his brother. These notes did not contain default or acceleration provisions, did not provide for interest, and did not include a provision for the payee's recovery of attorneys fees and collection costs in the event of a default. Attorney Giulietti did not recommend that his parents seek any security for the notes.

Although Mr. Giulietti wanted to give the stock in Vernon Village, Inc. to his children as a gift, Attorney Giulietti structured the transaction as a sale in order to avoid the payment of gift tax. Attorney Giulietti made payments on the notes to his parents, but only after giving himself a raise to cover the payments.

On February 6, 1995, Attorney Giulietti advised [*25]  his sisters for the first time that he and his brother now owned all the issued and outstanding Vernon Village stock. Prior to that date the sisters believed, correctly, that their father wanted them to share equally with their brothers in the ownership of Vernon Village, Inc. Neither sister would have signed the Anti-Alienation Agreement or any other documents had they known that Attorney Giulietti and James intended to become sole owners of Vernon Village, Inc.

Attorney Giulietti and James Giulietti's ownership of the shares of Vernon Village allowed them thereafter to dictate if and when rent would be paid to their sisters. Further, the brothers' ownership of Vernon Village gave them additional ownership interest in Rockledge LLC, as Vernon Village was a 32% owner of Rockledge.

After February 1995, the sisters received less annual rent from 325 Kelly Road and less from each Rockledge lot sale than their brothers by virtue of disparate ownership interests. Mr. Giulietti never authorized the reduction in rent from $ 48,000 per year. If the rental had stayed at that amount through August 31, 1996, then

each sister should have received $ 26,701 in rental more than she actually [*26] received.

In September 1996 the rental to Joanne and Anita was increased to $ 6000 per year. The reason for the increase as stated in a letter authored by Attorney Giulietti but signed by both of his parents, was to encourage Joanne and Anita to sign the agreements related to the Rockledge development.

During the period between 1991 and 1996 James Giulietti signed the documents that Attorney Giulietti put before him because he believed that his brother was looking out for his best interests and to some extent in order to placate his brother so that he, James, could attend to the business of running the mobile home park. There is no evidence that during the foregoing time period James declined to accept the deeds or stock from his father. But James did believe that Attorney Giulietti would ultimately carry out his father's wishes of an equal distribution of 325 Kelly Road and Vernon Village, Inc. stock to all of his children.

Sometime in 1996 or 1997 the relationship between Attorney Giulietti and his brother James began to deteriorate due to disagreements about how to run the mobile home business and James' unhappiness at Attorney Giulietti's persistent badgering of [*27] their sister Anita about signing documents. Sometime in 1997 James told Attorney Giulietti that he would not sign any further documents.

Attorney Giulietti apparently feared that interfamily litigation would soon occur. In a desperate attempt to maintain his domination and control over his family on March 25, 1998, he filed a conservatorship petition with the Probate Court in Vernon in which alleged that his mother, Alma, was incompetent. His real purpose in filing the petition was to prevent his mother from using the money she held in her own name to fund his siblings' litigation against him. The Probate Court did not find Mrs. Giulietti to be incompetent.

The conservatorship petition did cause Mr. Giulietti to finally realize that his son the lawyer had not carried out his wishes. On April 23, 1998 he sent a letter to his two sons in which he stated, in part:

It has come to my attention that the land known as 325 Kelly Road was not given to my four children by me equally, as was my intention and understanding. It has also come to my attention that the company stock of Vernon Village Inc. I owned was not "sold" equally to my four children as I wished and understood. [*28] Since my understanding of the current situation reveals to me that my in-

tentions were not executed, I feel misrepresented and misled. Therefore, I now demand to both of you that you convey the part of your interest in the land at 325 Kelly Road to your two sisters, so there is equal land ownership among my four children. I also demand that you sell part of your stock interest in Vernon Village, Inc. to each of your sisters at the same favorable terms and price I gave to the both of you.

If Joanne and Anita had received a full 25% of the rental for the period from September 1996 to the present, then they would have received an additional $ 24,143. The total amount that Joanne and Anita should have received if they had been treated as equal owners of the property, as they should have been, was $ 50,844 each.

At approximately the same time period in which Attorney Giulietti authored the Second Escrow, he began representing his siblings and his parents in a lawsuit. This lawsuit arose out of a dispute between the Giuliettis and Max Javit, who owned property abutting 325 Kelly Road. In the lawsuit the Giuliettis alleged contamination by Javit of some of the wells which provided [*29] water to the mobile home park. In the spring of 1993, Attorney Giulietti commenced the lawsuit, entering appearances as attorney for his parents and siblings. During the several year duration of that lawsuit, Attorney Giulietti acted as counsel and rendered legal advice to each family member concerning various aspects of the suit.

At no time during the course of the transactions described above did Attorney Giulietti ever advise his family members to obtain counsel. He did not disclose to anyone in his family that he had a potential conflict of interest under the Rules of Professional Conduct (the "Rules") and never notified his siblings of said conflict, in writing, as required by the Rules, or advised them to engage separate counsel. Ironically, Anita Giulietti, who is not an attorney, suggested that Attorney Giulietti should refrain from drafting documents concerning the Rockledge Development because he was "too close" to the situation. Attorney Giulietti "hired" Attorney McCoy to prepare the Rockledge documents. However, not wanting to incur legal fees, Attorney Giulietti ended up drafting all the Rockledge documents anyway.

Discussion of Law and Ruling

Malpractice Action

Despite [*30] the pain that their son Attorney Giulietti has caused them, John and Alma Giulietti have brought an action against him not from any desire for vengeance or damages, but in order to attempt to effec-

tuate Mr. Giulietti's intent to distribute his land and business equally to his children. This action has been referred to as the "Malpractice" action, but it also alleges that Attorney Giulietti engaged in fraudulent conduct. Count One alleges that Attorney Giulietti fraudulently induced his parents to transfer the stock in Vernon Village, Inc. to their two sons and Count Six alleges that Attorney Giulietti fraudulently induced John J. Giulietti to transfer a disproportionately large interest in 325 Kelly Road to his sons.

"Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment." (Citations [*31] omitted; internal quotation marks omitted.) *Billington v. Billington, 220 Conn. 212, 217, 595 A.2d 1377 (1991).* The party asserting such a cause of action must prove the existence of the first three of these elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as "clear and satisfactory" or "clear, precise and unequivocal." *Rego v. Connecticut Ins. Placement Facility, 219 Conn. 339, 343, 593 A.2d 491 (1991); Kilduff v. Adams, Inc., 219 Conn. 314, 327, 593 A.2d 478 (1991).* [5]

> 5  This may be a greater burden than the plaintiffs in the Malpractice action are required to meet because once the plaintiffs prove a fiduciary relationship between themselves and the defendant, then the burden shifts to the defendant to prove by clear, convincing and unequivocal evidence that he has dealt fairly with the plaintiffs. *Dunham v. Dunham, 204 Conn. 303, 323, 528 A.2d 1123 (1987).*

The court [*32] finds that the plaintiffs have proven by clear and convincing evidence that Attorney Giulietti fraudulently induced his father to transfer the 325 Kelly Road property in disproportionate amounts to himself and his brother and to fail to transfer equal portions of that property to his sisters, Joanne Giulietti Hollis and Anita Giulietti and fraudulently induced his father to transfer the stock in Vernon Village, Inc. and to cause his wife to transfer her stock in Vernon Village, Inc. to himself and his brother to the exclusion of his sisters.

The Second Count of the Complaint sounds in legal malpractice and alleges in pertinent part:

1. At all times hereinafter mentioned the Defendant was an attorney at law admitted to the Bar of the State of Connecticut and engaged in the practice of his profession.

2. On or about February of 1995 the Plaintiffs retained and employed the Defendant to advise the Plaintiffs in certain transactions involving the transfer of the corporation known as Vernon Village, Inc to their children. Prior thereto the Defendant had acted as Plaintiffs' attorney in many matters and Defendant knew that Plaintiffs relied upon him as their attorney. [*33]

3. Prior to February of 1995, the Defendant had accepted such employment and entered into a long standing attorney/client relationship with the Plaintiffs.

4. When it appeared that the Defendant was to be one of the purchasers/transferees of the stock in Vernon Village, the Defendant failed in his duty to advise the Plaintiffs that the Plaintiffs should obtain independent counsel with respect to the transfer of the business or other assets.

5. Instead, the Defendant presumed to handle the entire transaction. The Defendant carelessly and negligently caused their stock to be transferred to only two of the Plaintiffs' four children and drafted four (4) Notes to represent the consideration for the transaction. The Notes did not contain a default provision, a cost of collection provision, an acceleration provision; and Defendant failed to provide a security interest in the event of any default. The absence of these terms was highly favorable to the Defendant and unfavorable to the Plaintiffs. The Defendant failed to disclose and/or failed to explain the effect of the lack of these terms in the Notes and the Plaintiffs would not have accepted said Notes [*34] in exchange for their interests in Vernon Village had the Defendant fully explained

the effect of the documents which he prepared and had the Plaintiffs sign. The Defendant by these actions failed to utilize the skill and care which a reasonably competent lawyer in the area should have possessed.

The Fourth Count of the Complaint alleges in pertinent part:

> 2. On or about December 1990 the Plaintiffs retained and employed the Defendant to effectuate the transfer of certain real property owned by the Plaintiffs to the Plaintiffs' four children; namely the Defendant John L. Giulietti, James Giulietti, Anita Giulietti, and Joanne Giulietti Hollis. It was the Plaintiffs' expressed intent that their interest in said real property be transferred in equal portions to their four children over the course of several years.

This Count further alleges that Attorney Giulietti misrepresented the contents of deeds he prepared for his father's signature in 1993, and 1994 and negligently failed to advise his parents of the conflict of interest inherent in his preparations of deeds of which he was a beneficiary.

In *American National Fire Ins. Co. v. Schuss, 221 Conn. 768, 777, 607 A.2d 418 (1992)* [*35] the Connecticut Supreme Court stated that "intentional tortious conduct will ordinarily also involve one aspect of negligent conduct, namely, that it falls below the objective standard established by law for the protection of others against unreasonable risk of harm." Thus it goes without saying that an attorney who fraudulently induces a client to act in a manner inconsistent with the client's wishes, has deviated from the applicable standard of care.

The court finds that the plaintiffs have proved by clear and convincing evidence that there was an attorney-client relationship between Attorney Giulietti and his parents and that Attorney Giulietti deviated from the standard of care applicable to an attorney practicing law in similar circumstances when he fraudulently induced his father to transfer the 325 Kelly Road property in disproportionate amounts to himself and his brother and to fail to transfer equal portions of that property to his sisters, Joanne Giulietti Hollis and Anita Giulietti and fraudulently induced his father to transfer the stock in Vernon Village, Inc. and to cause his wife to transfer her stock in Vernon Vil-

lage, Inc. to himself and his brother to the exclusion [*36] of his sisters.

The plaintiffs have also alleged that Attorney Giulietti committed malpractice in that he undertook to represent his parents notwithstanding the clear conflict between the interest of his father in transferring the 325 Kelly Road land and Vernon Village, Inc. stock equally to his four children, and the interest of Attorney Giulietti in obtaining more of the land and business than his sisters and in controlling the Giulietti family's business enterprises. Lawyers can be guilty of malpractice for merely failing to disclose potential conflicts of interest without engaging in any fraud or self dealing, *S.M.S. Textile Mills, Inc. v. Brown, Jacobson, Tillinghast, Lahan & King, 32 Conn. App. 786, 796-97, 631 A.2d 340 (1993)*; *Woodruff v. Tomlin, 616 F.2d 924, 936-937 (6th Cir. 1980)*, cert. denied *449 U.S. 888, 66 L. Ed. 2d 114, 101 S. Ct. 246 (1980)*; *Schmidt v. Frankewich, 819 P.2d 1074, 1079* Col.Ct.App. (1991); *Wick v. Eismann, 122 Idaho 698, 838 P.2d 301, 303 (1992)*; *Crest Investment Trust, Inc. v. Comstock, 23 Md. App. 280, 327 A.2d 891, 904 (1974)*. Therefore, where the [*37] attorney has acted fraudulently, a discussion of his ethical violations as a basis for relief seems somewhat superfluous.

In this case Attorney Giulietti not only failed to disclose a potential conflict of interest, *he created an actual conflict of interest in which he benefitted and his clients suffered*.

*Rule 1.7* of the Code of Professional Conduct provides, in part:

> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

> (1) The lawyer reasonably believes the representation will not be adversely affected; and

> (2) The client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Attorney Giulietti violated *Rule 1.7* because the moment he realized that his sisters' interests were prejudiced, while his own interests were enhanced, he knew that his representation of his parents with respect to [*38] their transfer of the 325 Kelly Road land and the stock of Vernon Village, Inc. was materially limited by his own interests.

The Third and Fifth Counts of the Complaint allege that the plaintiffs contractually engaged Attorney Giulietti to transfer the stock in Vernon Village, Inc. (Third Count) and to transfer the 325 Kelly Road land (Fifth Count) in equal shares to their children. The plaintiffs have not addressed the breach of contract claims in their Post Trial Brief. The court would find in favor of the plaintiffs on the contract counts if those counts alleged merely that in 1990 Mr. Giulietti and Attorney Giulietti agreed that Attorney Giulietti would handle his parents' affairs and see that the 325 Kelly Road and the stock in Vernon Village, Inc. was transferred in equal shares to the Giulietti children. However, those counts go further than that. For example the Fifth Count contains the allegation that, "In the years of 1993 and 1994, the defendant was contractually engaged to transfer the plaintiff's remaining interest in the land to plaintiff's four children equally as before." However, the evidence showed that in those years Mr. Giulietti deeded the 325 Kelly Road land [*39]  to his sons only in reliance on the misrepresentations of Attorney Giulietti as set forth above. Such evidence is inconsistent with the aforementioned contract claims. The court finds in favor of the defendant Attorney Giulietti on the Third and Fifth Counts.

Remedies with respect to Malpractice Complaint

In their Claims for Relief the plaintiffs seek attorneys fees and costs for bringing the action and they also seek an order voiding all transactions made by Attorney Giulietti with respect to the stock of Vernon Village, Inc. and a return of that stock to the plaintiffs. The plaintiffs also seek an order that each of their children, who were made defendants to this action by the Substituted Complaint dated February 9, 1999, deed back their interests in 325 Kelly Road to the plaintiffs.

In argument to the court after trial and in their Post Trial Brief, the plaintiffs have indicated that the return of all the land and all the stock to them would cause estate planning complications and have indicated a preference for judicial intervention such that each of their four children end up owning 25% of the stock in Vernon Village, Inc. and a 25% interest in the Kelly Road land.  [*40] Under *Connecticut General Statutes 52-22* the superior court "in the exercise of its equitable jurisdiction may pass title to real property by decree, without any act on the part of any party holding title to the real property, when in its judgment it is the proper mode to carry the

decree into effect." The superior court also has the power to order reformation of deeds and contracts in the case of mistake of one party coupled with actual or constructive fraud, or inequitable conduct on the part of the other. *Lopinto v. Haines, 185 Conn. 527, 531-532, 441 A.2d 151 (1981); Moffett, Hodgkins & Clarke Co. v. Rochester, 178 U.S. 373, 385, 20 S. Ct. 957, 44 L. Ed. 1108 (1900); Patalano v. Chabot, 139 Conn. 356, 359, 94 A.2d 15 (1952); Home Owners' Loan Corporation v. Stevens, 120 Conn. 6, 9, 179 A. 330 (1935);* 27 Am.Jur.2d 555, Equity, 33; 45 Am.Jur., Reformation of Instruments, 30; *Greenwich Contracting Co. v. Bonwit Construction Co., 156 Conn. 123, 126, 239 A.2d 519 (1968).*

The Warrantee Deed from John J. Giulietti dated August 1, 1994 and recorded at volume 992, page 329 of the Vernon Land Records,  [*41]  transferred the remainder of Mr. Giulietti's interest in 325 Kelly Road to Attorney Giulietti and James Giulietti. That deed was certainly the product of fraudulent misrepresentations by Attorney Giulietti and a mistaken belief by Mr. Giulietti that his daughters were refusing to sign the "Agreement" and therefore, could not legally receive any further interests in the Kelly Road property. Therefore, it is subject to reformation by the court.

The plaintiffs and their children James, Anita, and Joanne, wish to see the property deeded equally to the four children of the plaintiffs. Even Attorney Giulietti has conceded that if the court does change the present ownership of 325 Kelly Road, it should do so by reformation of the deed. Based on the foregoing, that aforementioned deed is hereby ordered reformed such that it transfers a .625% interest to James Giulietti, a .625% interest to John L. Giulietti, a 10.375% interest to Joanne Giulietti Hollis and a 10.375% interest to Anita Giulietti. The plaintiffs should prepare the appropriate notice of the reformation for the land records which should contain the following: 1) the volume and page, grantor and grantees of the original deed, [*42]  2) percentage interest granted to each grantee under this order, 3) that James Giulietti, John L. Giulietti, Joanne Giulietti Hollis, and Anita Giulietti each now have a 25% interest in the 325 Kelly Road property, 4) that the interest of John L. Giulietti is encumbered by a constructive trust in the amount of $ 120,858 in favor of Joanne Hollis and Anita Giulietti, and 5) the title, docket number, judicial district of this action, the partition action and the date of this order.

The assignments of the stock in Vernon Village, Inc. dated February 3, 1995 were also procured by the fraudulent misrepresentations of Attorney Giulietti and mistake on the part of Mr. Giulietti and his wife. They are also subject to reformation. At the time of the assignments, John J. Giulietti owned 6 shares of stock and transferred three shares each to his sons, and his wife,

Alma, owned four shares and transferred two shares each to her sons. Those assignments are hereby ordered reformed as follows: 1) one and one half shares owned by Mr. Giulietti are transferred to each of his children, and 2) one half share owned by Alma Giulietti is transferred to each of her children. The result of the foregoing [*43] reformed assignments is that James Giulietti, John L. Giulietti, Joanne Hollis and Anita Giulietti each own 2.5 shares in Vernon Village, Inc.

The plaintiffs have listed attorneys fees among their Claims for Relief. This court would award such fees as punitive damages based on the fraudulent conduct of Attorney Giulietti. Even parental affection might be insufficient to effect the plaintiffs' forgiveness of Attorney Giulietti for the familial and legal crisis he has caused. Apparently, it is not. The plaintiffs do not seek to recover their attorneys fees from Attorney Giulietti. They request only that Attorney Giulietti pay for the taxes and transfer fees that may be incurred as a result of the recording of the reformed deeds. The court hereby orders that Attorney Giulietti make payment of such amounts to the plaintiffs within 15 days after the plaintiffs or their agents or attorneys advise him in writing of the amount of such taxes and transfer fees.

Partition Action

In the Partition action the plaintiffs James Giulietti and Joanne Giulietti Hollis seek to void the Anti-Alienation Agreement because it was procured by fraud, undue influence and in violation of *Rule 1.8* of [*44] the Code of Professional conduct. They further seek a reformation of the deeds from Mr. Giulietti to his children such that each child obtains a 25% ownership in the 325 Kelly Road property. Finally they seek an appointment of a committee to sell the property at private auction.

The right to partition is within the penumbra of rights a landowner derives by virtue of the record deed. *Scovil v. Kennedy, 14 Conn. 349, 361 (1841)*; *Johnson v. Olmsted, 49 Conn. 509, 517 (1882)*. This common law right has been codified in Connecticut by *Connecticut General Statutes 52-495* which states: "courts having jurisdiction of actions for equitable relief may, upon the complaint of any person interested, order the partition of any real property held in joint tenancy, tenancy in common, co-tenancy or tenancy in tail." Parties may enter into reasonable agreements which will expressly or impliedly debar them from seeking a partition. See *Rayhol Co. v. Holland, 110 Conn. 516, 148 A. 358 (1930)*. The *Rayhol* Court's rationale is consistent with the law of other jurisdictions; written agreements not to partition are sanctioned if they are: "fair and [*45] equitable"; in writing; and for a reasonable period of time. See e.g. *Levy v. Herson, 127 Misc. 2d 634, 486 N.Y.S.2d 860 (1985)*;

*Kuck v. Cropper, 1978 Del. Ch. LEXIS 689 (1978)* WL 22465 (Delaware Chancery); and *Goodpasture v. Goodpasture, 115 N.J. Super. 189, 278 A.2d 531 (1971)*.

As more fully set forth above, the Anti-Alienation Agreement was not "fair and equitable" and was not for a reasonable period of time. But, more to the point, the Anti-Alienation Agreement was procured by fraud in the inducement and, therefore, voidable. *Dorsey v. Mancuso, 23 Conn. App. 629, 635, 583 A.2d 646 (1990)*. The elements of fraudulent misrepresentation are as follows: (1) a false representation must be made as to a statement of fact; (2) the statement was untrue and known by the defendant to be untrue; (3) the statement was made to induce the plaintiff to act; and (4) the plaintiff acted on the false representation to her detriment. *Kavarco v. T.J.E., Inc., 2 Conn. App. 294, 295-96, 478 A.2d 257 (1984)*; *Dorsey v. Mancuso, supra*.

In this case Attorney Giulietti falsely represented to his siblings that 1) the terms of the Agreement [*46] had been dictated by Mr. Giulietti, 2) Mr. Giulietti required that they sign the Agreement as a condition of receiving their gifts of the 325 Kelly Road land, and 3) the signing of the Agreement was the only condition of their gifts of land. The foregoing statements were known by Attorney Giulietti to be untrue at the time he made them. They were made to obtain his siblings' signatures on the Agreement and in reliance on those representations the siblings did sign the Agreement.

"Rescission of a contract is an appropriate remedy if there has been a material misrepresentation of fact upon which a party relied and which caused [her] to enter the contract." *Kavarco v. T.J.E., Inc., supra, 298*. "Rescission, simply stated, is the unmaking of a contract. It is a renouncement of the contract and any property obtained pursuant to the contract, and places the parties, as nearly as possible, in the same situation as existed just prior to the execution of the contract." *Id., 299. Dorsey v. Mancuso, supra, at 635*.

The Anti-Alienation Agreement is hereby ordered void and of no effect.

The plaintiffs have argued that Attorney Giulietti's [*47] violation of the Rule of Professional Conduct provides an alternate basis to void the Anti-Alienation Agreement. *Rule 1.8(a) of the Rules of Professional Conduct* requires that a lawyer with a pecuniary interest in a transaction disclose, in writing, such interest before engaging in said transaction. John L. Giulietti had a vital pecuniary interest in the Agreement. The 325 Kelly Road land was the site of the family business, virtually his sole source of income. Attorney Giulietti has readily admitted that he did not disclose his pecuniary interest to any of

his siblings or alert them that that interest created a conflict of interest. Instead, he has denied that an attorney/client relationship existed. This is rather astounding considering that the other parties interested in the Agreement were his own siblings, whom he represented in pending litigation.

The Preamble of the Rules of Professional Conduct provides that "A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs. A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. [*48]  " The foregoing language clearly implies that a lawyer who violates the spirit, letter, and intent of those rules should not prosper therefrom. The plaintiffs argue that it would be grossly inequitable to acknowledge John L. Giulietti's violation of *Rules 1.8* and *1.7*, yet allow him to retain the benefit of the very agreement he procured from his siblings as a result of those violation(s).

As was stated above with respect to the claims of malpractice, in light of Attorney Giulietti's fraudulent conduct, there is no real need to rely on his clear violations of the Rules of Professional Conduct as a basis for relief. However, this court is deeply concerned both by those violations and by Attorney Giulietti's apparent failure to acknowledge or appreciate their seriousness. He not only violated the rules, he did so from an apparent pathological need to control his family while furthering his own interests.

The right to partition is founded on the principle that no person can be compelled to remain the owner with another of real property, even if the party seeking partition willingly entered into the joint ownership. *Johnson v. Olmsted, 49 Conn. 509, 517 (1882).* [*49]   *General Statutes 52-495 [fn4]* confers an absolute right of partition upon any person holding real property as a tenant in common with others. *Delfino v. Vealencis, 181 Conn. 533, 536-37, 436 A.2d 27 (1980).* In those cases where the court finds that a sale of the property would better promote the interests of the owners, the court may order such a sale. *General Statutes 52-500*; [fn5] *Delfino v. Vealencis, supra, 536.* This jurisdiction has long favored partition in kind or physical division, over partition by sale. *Borzencki v. Estate of Stakum, 195 Conn. 368, 372, 489 A.2d 341 (1985); Delfino v. Vealencis; Harrison v. International Silver Co., 78 Conn. 417, 420, 62 A. 342 (1905); John-*

son v. Olmsted, supra.* Because we presume that partition in kind is in the best interests of the owners, the burden of proof rests on the party seeking a sale to demonstrate that it is the better remedy. *Borzencki v. Estate of Stakum, supra; Delfino v. Vealencis, supra, 538.* This burden may be carried by satisfying two conditions: (1) the physical attributes [*50]   of the property make partition in kind impracticable or inequitable; and (2) the interests of the owners would better be promoted by partition by sale. *Borzencki v. Estate of Stakum, supra; Delfino v. Vealencis, 181 Conn. at 537-38.* A plaintiff in an action for partition seeks to sever or dissolve involuntary joint ownership in real property. In furtherance of that objective, a court is limited to rendering a judgment of either partition in kind or by sale of the real property; *Klaus v. Klaus, 143 Conn. 218, 221, 121 A.2d 283 (1956)*; thus terminating the ownership relationship between the parties.

*Wilcox v. Willard Shopping Center Associates, 208 Conn. 318, 325-26, 544 A.2d 1207 (1988).*

The court finds that the 325 Kelly Road property has physical attributes which make partition in kind impracticable or inequitable. There are approximately 212 mobile homes currently located on the 325 Kelly Road property. Two thirds of those mobile homes are owned by tenants and one third by Vernon Village, Inc. Vernon Village, Inc. is the corporation which operates the mobile home park business with no written lease. It would [*51]   be impossible to divide the real estate and the mobile homes located on it into quarters. The source of drinking water for the mobile home park is located on a contiguous piece of property also owned by the four Giulietti siblings jointly and severally. Several years ago that source of water became temporarily contaminated, which required the acquisition of an alternate source of water. It is not probable that the four siblings could cooperate to resolve a similar problem if it arose while they each owned a 25% portion of the property. Moreover, it is not known whether the Department of Consumer Protection, which issues licenses to owners of mobile home parks, would convert the existing license for the Vernon Village mobile home park into four separate licenses. Without a license, no sibling could operate his or her quarter of the mobile home park. Finally, four small mobile home parks might each require the creation of separate roadways through which to gain access to each park.

1999 Conn. Super. LEXIS 3416, *

The court also finds that the plaintiffs have proved that a partition by sale would better serve the interests of the owners, than a partition in kind. Given the actions taken by Attorney Giulietti, it [*52] is probable that his siblings do not wish to continue to deal with him as a contiguous quarter owner of the mobile home park. The sale would permit Attorney Giulietti to buy the 325 Kelly Road property himself, and in the process, buy out his siblings' interest in that property, or it would permit James Giulietti, Joanne Hollis and/or Anita Giulietti to purchase the property, buying out Attorney Giulietti's interest therein in the process.

All parties have requested that the court order the property to be sold by private sale. While this is an unusual occurrence, it is warranted in light of the circumstances. The Giulietti family wishes to continue to operate Vernon Village, and their family-controlled corporation, Vernon Village, Inc. owns trailers and operates a business on the land. Based on the foregoing, the court appoints Attorney Thomas FitzGerald of 773 Main Street, Manchester, Connecticut to act as committee to sell the 325 Kelly Road land at a private auction wherein the only permitted bidders will be James Giulietti, John L. Giulietti, Joanne Hollis, and Anita Giulietti. For the purposes of the partition sale, the court finds that the property has a fair market value [*53] of two million nine hundred thousand dollars ($ 2,900,000). The committee will sell the property to the highest bidder who presents a seventy-five thousand dollar deposit in cash or certified check. The buyer will be required to close on the purchase of the property within thirty days of this court's approval of the sales price, committee fee and the committee deed. Failure to close within said thirty-day period will result in a forfeit of the deposit and the committee will then sell the property to the next highest bidder on the same terms as those set forth above.

Joanne Hollis has requested that the court should impose a constructive trust upon the interest of the defendant John L. Giulietti in the 325 Kelly Road property, and surcharge and deduct from that interest the amount of $ 120,858, which amount is composed of $ 50,844, the amount of rental which Joanne Hollis and Anita Giulietti each would have received if they had received rental on an equal ownership basis with their brothers from July 1, 1993 through June 30, 1997, $ 19,143, the amount each sister would have received if she had received rental on an equal ownership basis with her brothers from July 1, 1997 to October [*54] 1999 and $ 19,170, the amount of rental in excess of 25% which Attorney Giulietti received from July 1, 1997 to October 1999.

Courts of equity have often resorted to various creative solutions in order to avoid unjust enrichment of a given

litigant. One of the devices employed is that of a constructive trust created for the benefit of the party whose interests would otherwise be prejudiced.

The requirements for imposition of a constructive trust were set out very well in *CBS Surgical Group, Inc. v. Holt, 37 Conn. Supp. 555, 559, 426 A.2d 819 (1981)*:

> Before the constructive trust can be created, however, there must be a duty owed, or a fiduciary or otherwise special relationship between the parties. "Where there is no proof of an actual confidential relationship and the law looks only to a presumption of fraud arising out of the relationship of the parties to each other, that relationship must be one where there is ordinarily a special trust and confidence and the likelihood of the exercise of personal influence and control such that one would expect of the other fair dealing and mutual consideration." *Worobey v. Sibieth, supra* [136 Conn. 352, [*55] 71 A.2d 80 (1949)]. "A constructive trust arises 'when the legal title to property is obtained by a person in violation, express or implied, of some duty owed to the one who is equitably entitled . . .' 3 Pomeroy, Eq.Jur. (4th Ed.) p. 2370." *Van Auken v. Tyrrell, 130 Conn. 289, 291-92 33 A.2d 339 (1943)*; see *Hieble v. Hieble, supra* [164 Conn. 56, 316 A.2d 777 (1972)].

Here, it is quite clear that the defendant-son-attorney had an attorney-client relationship in several different matters with his sisters, Joanne Hollis and Anita Giulietti. He also had a fiduciary duty to them in his distribution of his father's real estate. As set forth above, the defendant Attorney Giulietti made various false representations to his sisters concerning the wishes of their father with respect to the 325 Kelly Road land. If the sisters had known that the signing of the Anti-Alienation Agreement and other conditions imposed on their receipt of interest in the Kelly Road property were unilaterally imposed by Attorney Giulietti and not their father, they could have alerted their father earlier that his son was not following the father's wishes or instructions. By the same [*56] token, if Mr. Giulietti had known that Attorney Giulietti was lying to him when he stated that his sisters were not "cooperating" or not signing the "Agreement," he would have taken action to insure that his daughters shared equally in the real estate and in the rental income therefrom. In short, Attorney Giulietti's fraudulent misrepresentations, and unilateral actions in drastically lowering

the rental received by his sisters from 325 Kelly Road caused his sisters to lose rental they otherwise would have received, and caused Attorney Giulietti to receive more rental than he should have as a 25% owner of the real estate.

Plaintiff Hollis has not asked for the imposition of a constructive trust upon the interests of her brother, James Giulietti because James was never the active party in any of the misrepresentations made, was not an attorney and not acting as a fiduciary. Ms. Hollis argues that James was largely unaware of exactly what Attorney Giulietti was trying to do because James was extremely busy conducting virtually all of the business of Vernon Village, Inc. as well as that of Rockledge while his brother drafted meaningless corporate minutes and mischievous correspondence. [*57] While James is not completely free of blame, it is true that he is not an attorney and the misrepresentations made by Attorney Giulietti to his sisters were also made to James.

Moreover, James first initiated the real estate partition action even though it necessarily involved his giving up a percentage of ownership because he realized it was the only direct legal tool available in which he could attempt, along with his siblings, to reconstruct the plan his parents had intended all along.

Based on the foregoing, equity requires that a constructive trust be imposed on John L. Giulietti's share of the 325 Kelly Road property in the amount of $ 120,858 plus interest at the rate of 10% from the date hereof with respect to back rent owing each of his sisters, and excess rent taken, and that Joanne Hollis and Anita Giulietti each receive $ 60,429 from Attorney Giulietti's share of the 325 Kelly Road land upon the sale thereof.

Corporate Dissolution Action

The Court makes the following additional findings with respect to the corporate dissolution action. As of the date this action was commenced James Giulietti and Attorney Giulietti each owned five shares of the issued and [*58] outstanding common stock of Vernon Village, Inc., a Connecticut corporation in good standing with the Connecticut Secretary of State. As of the date this action was filed the Board of Directors of Vernon Village, Inc. was comprised of James Giulietti and Attorney Giulietti and there was a deadlock between them, which deadlock could not be resolved by a vote of the shareholders.

In response to the complaint seeking a dissolution of Vernon Village, Inc., which was filed by James Giulietti, Attorney Giulietti raised three special defenses and one counterclaim. In his first special defense, Attorney Giulietti asserted his alleged right to purchase the shares of James Giulietti pursuant to *Connecticut General Statutes 33-900*. The second special defense alleged that James

Giulietti should be removed as an officer/director for various breaches of fiduciary duty including, but not limited to, malfeasance in connection with various accounting practices, misuses of Vernon Village resources, etc. In his third special defense, Attorney Giulietti alleged specific performance of an agreement of James Giulietti to sell his shares in Vernon Village, Inc. and interest in the 325 Kelly Road land [*59] to Attorney Giulietti. The counterclaim mirrored the allegations of the second special defense, that is, that James Giulietti had breached fiduciary duties as set forth in his second special defense.

James Giulietti claims that he incurred legal expenses in the amount of $ 25,000 in defense against the counterclaim which sought his removal as an officer and director of Vernon Village. Attorney Giulietti withdrew (without receiving any consideration) all special defenses and counterclaims in the course of the trial of the corporate dissolution action.

James Giulietti argues that since Attorney Giulietti withdrew his counterclaim, James was wholly successful in the defense of the counterclaim, and seeks indemnification from Vernon Village, Inc. pursuant to *Connecticut General Statutes 33-772*, which provides:

> A corporation shall indemnify a director who was wholly successful, on the merits or otherwise, in the defense of any proceeding to which he was a party because he was a director of the corporation against reasonable expenses incurred by him in connection with the proceeding.

Since Attorney Giulietti did withdraw his counterclaim, James Giulietti was wholly [*60] successful in the defense of the counterclaim "on the merits or otherwise." *Sicaras v. City of Hartford, 44 Conn. App. 771, 775-76, 692 A.2d 1290 (1997)* (a withdrawal of action has the same effect as a final judgment); *H.G. Bass Associates, Inc. v. Ethan Allen, Inc., 26 Conn. App. 426, 431, 601 A.2d 1040 (1992)*; see also *Baker v. Cordisco, 37 Conn. App. 515, 520, 657 A.2d 230 (1995). Connecticut General Statutes 33-770* defines "expenses" as including legal fees. Therefore, the court finds that James Giulietti reasonably expended $ 19,866.66 in defense of the counterclaim interposed by Attorney Giulietti, which counterclaim was withdrawn without consideration during trial and enters judgment in favor of James Giulietti against Vernon Village, Inc. in that amount on the Second Count of the Amended Complaint dated July 7, 1999.

When James Giulietti filed this action, Attorney Giulietti filed an election pursuant to *Connecticut General Statutes 33-900*, which provides that "(a) in a proceeding by a shareholder under subdivision (1) of subsection (a) or subdivision (2) of subsection (b) of section 33-896 to dissolve a corporation that [*61]  has no shares listed on a national securities exchange . . . the corporation may elect or, if it fails to elect, one or more shareholders may elect to purchase all shares owned by the petitioning shareholder at the fair value of the shares. An election pursuant to this section shall be irrevocable unless the court determines that it is equitable to set aside or modify the election." The statute also provides that the court will determine the value of the shares after a hearing if the parties are unable to agree upon a value.

Based on the court's reformation of the ownership of Vernon Village, Inc. stock, this action is moot. Since the four siblings will each own 25% of the stock of Vernon Village, Inc., as a result of this decision, the deadlock alleged in the complaint does not exist.

Even if the dissolution action were not moot, Attorney Giulietti's election to purchase the corporate shares should fail. It would be inequitable to allow Attorney Giulietti to exercise any election because his fraudulent conduct was responsible for creating the corporate deadlock situation. Moreover, his brother James has actually operated the corporation's mobile home business during the [*62]  pendency of this litigation and for many years prior thereto. In addition, Attorney Giulietti has failed to introduce any evidence as to the value of the Vernon Village stock as required by 33-900. Judgment may enter in favor of the defendants on the first count of the complaint.

Usurpation of Corporate Opportunity Action

In the so-called usurpation of corporate opportunity case, Vernon Village, Inc. ("Vernon Village") claims that while Attorney Giulietti was acting as an officer and director of the corporation, he learned of an opportunity to purchase two parcels of property adjacent to Vernon Village, one of which contained two mobile homes, formerly owned by Neva Capo, who was an aunt of Attorney Giulietti, and his siblings, James, Anita and Joanne. The complaint further alleges that Attorney Giulietti failed to present this opportunity to Vernon Village and ultimately purchased the property himself over the objections of his brother, James, who at the time owned 50% of the stock of Vernon Village, and Joanne Hollis, who was then a director of Vernon Village.

The court makes the following additional findings of fact with respect to this action. When Vernon Village was [*63]  incorporated Alma and John J. Giulietti appointed their son John L. Giulietti as secretary of the corporation, a position which he has held continuously since 1966. Vernon Village consists of approximately 212 mobile homes. Some of the mobile homes are owned by the corporation which then leases the units to tenants in exchange for rent. Other mobile homes are owned by individuals who pay Vernon Village a service fee for the use of water, sewer, and electricity. Around the time the Giulietti parents transferred their stock to their sons (February 1995), Vernon Village elected a new Board of Directors consisting of the two Giulietti brothers and their sister, Joanne Hollis. On March 7, 1998 Mrs. Hollis resigned as a director due to the infighting between her brothers.

Sometime in early to mid 1997 James Capo, a cousin of Attorney Giulietti and his siblings, visited the corporate office of Vernon Village located at 325 Kelly Road. He told only Attorney Giulietti that the Capo family wanted to sell two parcels of land located adjacent to Vernon Village which had been owned by Neva Capo and that the executors of Neva Capo's estate intended to list the parcels for sale with Matthew [*64]  Island Realty. At all times relevant to this action, two mobile homes were located on one of the Capo parcels. They obtained water, electricity and sewer connections from Vernon Village.

At the time Attorney Giulietti learned that the Capo properties were available for sale he was both an officer and director of Vernon Village. Upon learning that the Capo properties were for sale, Attorney Giulietti contacted his father and told him that the property was for sale and suggested that he and his father purchase the property. Attorney Giulietti then began negotiating with the Capo family and ultimately reached an agreement to purchase both parcels and the mobile homes located thereon for $ 22,500.

Mr. Giulietti contributed $ 20,700 to the purchase price, while Attorney Giulietti paid only $ 1,800. Notwithstanding his minimal financial contribution, Attorney Giulietti virtually insured that within a short period of time, he would be the sole owner of the two parcels. Attorney Giulietti instructed the attorney who prepared the deeds to designate the grantees as "John J. Giulietti and John L. Giulietti as joint tenants with a *right of survivorship*." Mr. Giulietti was 82 years [*65]  old at the time. (Emphasis added.)

Sometime prior to the closing on the Capo properties, Attorney Giulietti contacted his sister, Joanne Hollis, and told her that he was purchasing the properties. At the time of the conversation, Mrs. Hollis was a member of the Vernon Village, Inc. Board of Directors. Mrs. Hollis told Attorney Giulietti that the properties and the mobile home located thereon should "go to Vernon Village." Attorney Giulietti responded that "that is not going to happen because then James will get his mitts on it."

It was not until the morning of the closing, December 23, 1997, that Attorney Giulietti disclosed to his brother James that the properties were for sale and that he was purchasing them. James Giulietti also objected to the purchase and advised Attorney Giulietti that Vernon Village should purchase the Capo properties.

The acquisition of the Capo properties was a favorable opportunity for Vernon Village, which would have purchased the properties to add to its existing mobile home park business. While Vernon Village does not own the 325 Kelly Road property, it did own other real estate.

In its Complaint [6] Vernon Village alleges that Attorney [*66] Giulietti's purchase of the Capo properties without first offering the opportunity to the corporation and without obtaining approval of the shareholders or directors of Vernon Village constitutes the following: a breach of his common law fiduciary duties as an officer and director of the corporation (Count One); a breach of his statutory duties as an officer of the corporation under *Connecticut General Statutes 33-765* (Count Two); and a breach of his statutory duties as a director of the corporation under *Connecticut General Statutes 33-756* (Count Three). In the Fourth Count, Vernon Village seeks the imposition of a constructive trust on the Capo properties. Finally, in the Fifth Count, the corporation requests the removal of Attorney Giulietti as a director of Vernon Village pursuant to the powers vested in this court under the provision of 33-743 of the Connecticut General Statutes.

> 6    The operative Complaint is the Amended Substituted Complaint dated September 9, 1999.

An officer and director occupies [*67] a fiduciary relationship to the corporation and its stockholders. *Katz Corporation v. T.H. Canty & Co., 168 Conn. 201, 207, 362 A.2d 975 (1975).* The fiduciary relationship imposes a position of the highest trust and, therefore, the officer or director is bound to use the utmost good faith and fair dealing in all his relationships with the corporation. *Id.* "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Pacelli Bros. Transportation, Inc. v. Pacelli, 189 Conn. 401, 407, 456 A.2d 325 (1983)* quoting *Adams v. Williamson, 150 Conn. 105, 112, 186 A.2d 157 (1962)* (citation omitted).

In addition to common law fiduciary duties, officer and directors also have statutory duties. *Connecticut General Statutes 33-756(a)* (directors) and 33-765(a) (officers) require that officer and directors discharge their duties "(1) In good faith; (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) in a manner he reasonably believes to be in the best interests of the corporation."

In a case where a claim of usurpation [*68] of a corporate opportunity is made, the plaintiff bear the burden of establishing: 1) a fiduciary relationship between the corporation and the alleged wrongdoer; and 2) the existence of a corporate opportunity. *Ostrowski v. Avery, 243 Conn. 355, 362 703 A.2d 117 (1997); Katz Corp v. T.H. Canty & Co., 168 Conn. 201, 207-08, 362 A.2d 975 (1975).* Once the plaintiff establishes these predicates to liability, the burden then shifts to the fiduciary to establish, by clear and convincing evidence, the fairness of his dealings with this corporation. *Ostrowski, supra; Konover Development Corp. v. Zeller, 228 Conn. 206, 229-30, 635 A.2d 798 (1994); Oakhill Associates v. D'Amato, 228 Conn. 723, 726-27, 638 A.2d 31 (1994).*

Since Attorney Giulietti admitted that he was both an officer and a director of Vernon Village from 1966 through the time he purchased the Capo properties, the existence of a fiduciary relationship between him and Vernon Village is beyond dispute.

The next predicate to liability is the existence of a corporate opportunity. The dominant inquiry with respect to whether a cause of action [*69] for usurpation of a corporate opportunity exists depends on whether the corporate opportunity at issue falls within the corporation's "avowed business purpose." *Ostrowski v. Avery, supra, at 367.* "The avowed business purpose test . . . is a variant of the 'line of business' test, one of the leading tests of corporate opportunity." *Ostrowski, supra, at 366.* Under this analysis, the court must consider whether the opportunity is "closely associated with the existing and prospective activities of the corporation." *Id.* quoting *Rosenblum v. Judson Engineering Corp. 99 N.H. 267, 273, 109 A.2d 558 (1954).* Factors to be considered are 1) whether the business opportunity was one in which the complaining corporation had an interest or an expectancy growing out of an existing contractual right; 2) whether there was a close relationship between the opportunity and the corporation's business purposes and current activities; and 3) whether the business areas contemplated by the opportunity were readily adaptable to the corporation's existing business. *243 Conn. at 366.* The Supreme Court in *Ostrowski* noted that "the importance [*70] of a proper definition of the avowed business purpose test is underscored by the observation of legal scholars that the economic rationale for this test is that, for a small firm in particular, it may well be more efficient to expand its operations than to enter new fields." *243 Conn. at 366,* citing V. Brundey & C. Clark, "A New Look At Corporate Opportunities," 94 Harvard L. Rev. 998, 1012-13 (1981).

The ability to purchase the Capo properties was clearly a corporate opportunity. It involved not merely a close relationship, but an identical relationship between the opportunity and Vernon Village's business. The corporation owned mobile homes and operated on land adjacent to the Capo land. The corporation's employees, tools and materials located on the site were readily available to service and repair the mobile homes located on the Capo land. Moreover, the utilities which service the Capo mobile homes run through the 325 Kelly Road land on which Vernon Village operates. If Vernon Village had purchased the properties it could have immediately expanded its operations to those properties and could have begun leasing the two mobile homes thereon with minimal [*71] time and expense.

In arguing that the potential acquisition of the Capo properties did not constitute a corporate opportunity, Attorney Giulietti relies on two theories. First he claims that Vernon Village operates an age restricted mobile home park, but there are no restrictions on the age of the residents of the Capo mobile homes. This argument fails because the age restriction is a voluntary restriction which has been imposed by Vernon Village. It would be free to impose the restriction on any other land it added to its existing mobile home park. Second, he argues that Vernon Village does not own the land on which it operates its mobile home park, is not in the business of owning land and, therefore, should have no interest in purchasing the Capo property.

The evidence established that Vernon Village does own land. However, even if Vernon Village did not own land, the opportunity at issue need not present the exact activities in which Vernon Village was engaged in order to constitute a corporate opportunity. It need only be closely associated with the existing and prospective activities of the corporation. *Ostrowski, supra, at 366.*

The court finds [*72] that the defendant, Attorney Giulietti, breached his common law fiduciary duties and his statutory duties to Vernon Village. Vernon Village has elected to claim all the benefits of the transaction for itself and has requested the court to "impress a trust in favor of the corporation upon the property, interests and profits so acquired." See *Katz Corporation v. T.H. Canty & Co., 168 Conn. 201, 209, 362 A.2d 975 (1975)* quoting *Guth v. Loft, Inc. 23 Del. Ch. 255, 272, 5 A.2d 503 (1971).* In the Fourth Count Vernon Village seeks to have a constructive trust imposed on the former Capo properties. It also seeks an order requiring John J. Giulietti and John L. Giulietti to transfer the properties to Vernon Village. John J. Giulietti agreed to such a transfer at the time of trial.

The court hereby imposes a constructive trust on the Capo property [7] for the benefit of Vernon Village, Inc. The trust will continue until such time as 1) John J. Giulietti, or his estate, transfers the property to Vernon Village in exchange for $ 20,700, plus interest at the rate of 10% from the date hereof to be paid by Vernon Village, Inc. to John J. Giulietti, or his estate, [*73] and 2) $ 1,800 plus interest at the rate of 10% per annum from the date hereof to be paid by Vernon Village, Inc. to John L. Giulietti.

7  Parcel one, Vernon Land Records, v. 1127, p. 207.

That certain piece or parcel of land situated on the northerly side of Kelly Road in the Town of Vernon, County of Tolland and State of Connecticut, more particularly bounded and described as follows:

Commencing at a point in the northerly line of Kelly Road which is the southwesterly corner of the parcel herein described, which point is Four Hundred Eighty-eight (488) feet, more or less, easterly from the southeast corner of land now or formerly of one Phillip, the line runs thence generally northerly at a distance of fifteen (15) feet, more or less, easterly of and parallel to the easterly line of the Hockanum River, along land now or formerly of John J. Giulietti, to land formerly of Svea L. Swanson; thence southeasterly, along land formerly of said Swanson to the southeast corner of lot formerly of said Swanson; thence continuing southeasterly along land now or formerly of Raymond C. and Stella Weston, 125 feet, more or less, to a stake and stones at the westerly bank of a canal; thence generally southerly, Four Hundred Six (406) feet, more or less, on the westerly bank of said canal to the northerly line of Kelly Road; thence westerly in the northerly line of Kelly Road, two hundred Sixty-Seven and 4/10 (267.4) feet, more or less, to the point of beginning.

Being the remaining portion of the First Piece described in a deed dated January 21, 1937, recorded in Volume 69, page 289 of the Vernon Land Records.

EXCEPTING THEREFROM that certain parcel of land situated in the Town of Vernon, County of Tolland and State of Connecticut, on the northerly side of Present Kelley Road, containing 0.16 of an acre, more or less, bounded and described as follows:

NORTHERLY by remaining land of the Releasor herein, 187 feet, more or less, by a line

designated "Taking Line & Non Access Highway Line," as shown on the map hereinafter referred to;

EASTERLY by land now or formerly of The Southland Corp., 37 feet, more or less;

SOUTHERLY by Present Kelley Road, 204 feet, more or less;

WESTERLY by land now or formerly of John J. Giulietti, 37 feet, more or less, by the Hockanum River.

Together with rights of access appurtenant to said remaining land, specifically across the above-mentioned "Taking Line & Non Access Highway Line" having a distance of 187 feet, more or less, to and from Kelley Road and the Relocation thereof, from and to said remaining land, as more particularly shown on said map.

The land herein conveyed comprises a portion of the premises contained in a Quit-Claim Deed dated December 4, 1975, and recorded in Volume 279 at Page 353 of the Vernon Land Records.

ALSO EXCEPTING THEREFROM a full and perpetual easement under, over and across a portion of said remaining land, consisting of a Drainage Right of Way 30 feet in width, 187 feet, more or less, in length, containing proposed 15" A.C.C.M. pipe, 15" culvert end, 24" culvert end, and 24" R.C. pipe, and bounded and described as follows:

NORTHERLY by remaining land of the Releasor herein, by a line 30 feet northerly from and parallel with the above-mentioned "Taking Line & Non Access Highway Line," as shown on said map;

EASTERLY by land now or formerly of The Southland Corp.;

SOUTHERLY by said "Taking Line & Non Access Highway Line," 187 feet, more or less;

WESTERLY BY LAND NOW OR FORMERLY OF John J. Giulietti, by the Hockanum River.

Together with the easement to discharge water through said drainage facility and into the Hockanum River, and including the further right to maintain said facility.

Parcel two, Vernon Land Records, v. 1127, p. 202

That certain piece or land located on the northerly side of Kelly Road in the Town of Vernon, County of Tolland and State of Connecticut, more particularly bounded and described as follows:

NORTHERLY by land now or formerly of John J. Giulietti;

EASTERLY by land now or formerly of one Phillip, One Hundred Fifty-Three and 1/10 (153.1) feet, more or less;

SOUTHERLY by Kelly Road, Fifty and 8/10 (50.8) feet; and

WESTERLY by land formerly of Olcott Coleman, being the approximate Vernon-South Windsor Town Line.

Being a portion of the premises conveyed to John and Luta Giulietti by Deed dated March 23, 1938 and recorded in Volume 61, Page 141 of the Vernon Land Records, and by Deed dated July 14, 1950, and recorded in Volume 83, page 23 of the Vernon Land Records.

Together with and subject to rights of way, easements and a caveat as of record appear, and specifically a slope easement to the State of Connecticut recorded January 18, 1977 in Volume 304, at Page 207 of the Vernon Land Records.

Together with all improvements thereon, including a 1961 12' x 55' mobile manufactured home, but excepting from this conveyance the mobile manufactured home as set out in a bill of sale to Vernon Village, Inc. recorded in Volume 840, at Page 43 of the Vernon Land Records.

[*74] *Connecticut General Statutes 33-743* vests this court with the authority to remove John L. Giulietti as a director of Vernon Village, Inc. if the court finds 1) that he engaged in fraudulent or dishonest conduct or gross abuse of authority or discretion, with respect to the corporation and 2) removal is in the best interests of the corporation.

The court finds that Attorney Giulietti engaged in dishonest conduct with respect to the corporation by virtue of his usurpation of the corporate opportunity. The court further finds that it would be in the best interests of Vernon Village, Inc. if Attorney Giulietti is not a director thereof. During the course of the trial of this action, the court heard evidence that Attorney Giulietti had refused to sign corporate checks in accordance with his obligations as the self proclaimed "de facto treasurer" of the corporation. This court, L. Sullivan, J., barred Attorney Giulietti from entering upon the corporate premises in

1999 Conn. Super. LEXIS 3416, *

April of 1997, but permitted him to retain his check signing authority. The undersigned terminated that authority because Attorney Giulietti attempted to frustrate Vernon Village's litigation against him by refusing to [*75] sign corporate checks which he should have signed. He was also disruptive at Board of Directors meetings, and had never been involved in operating Vernon Village. Prior to April of 1997 James Giulietti and his father operated the mobile home park and after that date James Giulietti and his wife did so.

For the reasons set forth above, it is hereby ordered that John L. Giulietti is removed as a director of Vernon Village, Inc.

By the court,

Aurigemma, J.



**Mark S. Everett et al. v. Montague N. Everett, Individually and as Trustee of the T.E. Montague Everett Trust et al.**

**FSTCV106004013S**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF STAM-FORD-NORWALK AT STAMFORD**

***2010 Conn. Super. LEXIS 3253***

**December 16, 2010, Decided
December 16, 2010, Filed**

**NOTICE:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**JUDGES:** [*1] Taggart D. Adams, SUPERIOR COURT JUDGE.

**OPINION BY:** Taggart D. Adams

**OPINION**

*MEMORANDUM OF DECISION RE MOTION TO DISMISS (104.00)*

I. FACTS

On March 10, 2010, the plaintiffs, Mark Everett and Robert Everett, filed a six-count complaint against the defendants, Montague Everett and Louann Cartiglia, [1] alleging the following facts. The decedent, T.E. Montague Everett, executed a trust instrument in 1996, naming himself as trustee, his spouse as successor trustee and his four sons as co-successor trustees. [2] The trust provided that upon the decedent's death the trust assets would be distributed in equal shares to the decedent's four sons. The decedent's last will and testament provided that any of his assets not owned by the trust at the time of his death were bequeathed to the trustee of the trust, which made the decedent's entire distributable estate governed by the trust. On February 19, 2003, the decedent executed the first amendment to the trust, appointing Mark Everett as the successor trustee. While serving in the trustee capacity in 2003, Mark Everett obtained information from the decedent's investment advisor indicating that investments owned by the trust at that time had a cash value of $820,000 and death [*2] benefits of approximately $1.75 million. On January 2, 2004, the decedent executed a second amendment to the trust, which removed Mark Everett as successor trustee, named the defendant as a co-trustee with the decedent, and gave both co-trustees the power to act alone with respect to trust transactions. The decedent and the defendant amended the trust on December 29, 2004, and March 10, 2005, to delete provisions designating the decedent's spouse as a potential trust beneficiary.

1   Montague Everett filed the motion to dismiss in the present matter; therefore, he will herein be referred to as the "defendant."
2   The decedent's four sons are the two plaintiffs, the defendant, Montague N. Everett, and Richard Everett, who is not a party to this suit.

The plaintiffs further allege that on or about May 20, 2005, the defendant exercised his power of attorney over the decedent to have the decedent cosign a mortgage loan for a New Milford, Connecticut property, in order for the defendant to acquire title to the property. In late 2005, the decedent sold his home in California and moved with his spouse from California to an assisted living facility in Stamford, Connecticut. While the decedent was living in Stamford, the defendant improperly used the decedent's personal credit card. According to account statements, as of December 2007, there was over $1 million in death benefits payable under investment accounts owned by the trust. [3] The decedent passed away on March [*3] 26, 2008, in Stamford, Connecticut.

2010 Conn. Super. LEXIS 3253, *

3    These account statements were obtained through the efforts of Richard Everett, who became the successor trustee after the defendant was removed as the fiduciary of the trust.

During the subsequent Connecticut Probate Court proceedings, the defendant's attorney provided the plaintiff's with a document estimating that the total taxable estate of the decedent was $1.5 million. No further documentation was provided by the defendant concerning this estimate. The defendant failed to file an inventory with the Probate Court nor provide the plaintiffs with any information regarding trust transactions since January 2004. The plaintiffs filed an application that was granted by the Stamford Probate Court requiring the defendant to account for the trust estate. Despite that order, the defendant failed to provide an accounting. The defendant was removed as the fiduciary for the trust because of his failure to account, and Richard Everett became the successor fiduciary. After his removal, the defendant indicated to the plaintiffs that there was only about $125,000 in trust assets, consisting of a loan of $75,000 from the decedent to Robert Everett, and a loan of $49,500 to the daughter of the decedent's spouse.

In the complaint, the plaintiffs also allege that the defendant "never adequately explained" the difference between his attorney's  [*4] estimate of $1.5 million in trust assets and the later estimate of $125,000, nor did he provide information regarding how trust assets were used for the benefit of the decedent during his lifetime that would explain how trust assets in excess of $1 million disappeared during the period that the defendant served as trustee. After the decedent's death, the defendant had control over the assets belonging to the decedent's estate, including proceeds from the sale of real estate and approximately $450,000 that was withdrawn from an annuity account owned by the decedent. The plaintiffs maintain that the defendant improperly used assets belonging to the decedent's estate for the benefit of himself and the defendant Cartiglia.

In count one of the complaint, the plaintiffs allege that the defendant, as trustee, breached the fiduciary duties owed to them as beneficiaries of the trust, including the duty to refrain from self-dealing. In count two, the plaintiffs allege that the defendant, as an individual in control of assets belonging to the decedent's estate, breached the fiduciary duties owed to the plaintiffs as beneficiaries of the estate, including the duty to refrain from self-dealing.  [*5] In count three, the plaintiffs allege that the defendant, in his individual capacity and as trustee, unjustly enriched himself through misuse of the trust and estate assets totaling approximately $2 million, to the detriment of the plaintiffs as beneficiaries of the trust and estate. In count four, the plaintiffs allege

that the defendant, in his individual capacity and as trustee, converted trust and estate assets totaling approximately $2 million, to the detriment of the plaintiffs as beneficiaries of the trust and estate. In count five, the plaintiffs allege that the defendant, in his individual capacity and as trustee, stole trust and estate assets totaling approximately $2 million, which entitle them to treble damages under *General Statutes §52-564*. In count six, the plaintiffs allege that the defendant is obligated to provide an accounting for the period he served as trustee of the trust pursuant to *General Statutes §52-401 et seq.*

On May 14, 2010, the defendant filed a motion to dismiss accompanied by a memorandum of law on the ground of lack of jurisdiction, or alternatively, that Connecticut is a forum non conveniens. Subsequently, the plaintiffs filed an objection and memorandum  [*6] of law in opposition to the motion dismiss, and the defendant filed a reply memorandum. The motion was argued at the September 20, 2010 short calendar.

II. DISCUSSION

"A motion to dismiss . . . properly attacks the jurisdiction of the court, essentially asserting that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by the court." (Internal quotation marks omitted.) *Bacon Constr. Co. v. Dep't of Pub. Works, 294 Conn. 695, 706, 987 A.2d 348 (2010).* "The grounds which may be asserted in [a motion to dismiss] are: (1) lack of jurisdiction over the subject matter; (2) lack of jurisdiction over the person; (3) improper venue; (4) insufficiency of process; and (5) insufficiency of service of process." *Zizka v. Water Pollution Control Authority, 195 Conn. 682, 687, 490 A.2d 509 (1985),* citing Practice Book §143, now *§10-31.* "Because a lack of personal jurisdiction may be waived by the defendant, the rules of practice require the defendant to challenge that jurisdiction by a motion to dismiss." (Internal quotation marks omitted.) *Golodner v. Women's Center of Southeastern Connecticut, Inc., 281 Conn. 819, 825, 917 A.2d 959 (2007).*

"When a trial  [*7] court decides a jurisdictional question raised by a pretrial motion to dismiss on the basis of the complaint alone, it must consider the allegations of the complaint in their most favorable light . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks omitted.) *Conboy v. State, 292 Conn. 642, 651, 974 A.2d 669 (2009).* "The motion to dismiss . . . admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone . . . Where, however . . . the motion is accompanied by supporting affidavits containing undisputed facts, the court may look to their con-

2010 Conn. Super. LEXIS 3253, *

tent for determination of the jurisdictional issue and need not conclusively presume the validity of the allegations of the complaint." (Internal quotation marks omitted.) *Ferreira v. Pringle, 255 Conn. 330, 346-47, 766 A.2d 400 (2001).*

"If the defendant challenging the court's personal jurisdiction is a foreign corporation or a nonresident individual, it is the plaintiff's burden to prove the court's jurisdiction." *Cogswell v. American Transit Ins. Co., 282 Conn. 505, 515, 923 A.2d 638 (2007).* [*8] In this context, "the court must undertake a two-part inquiry to determine the, propriety of its exercising such jurisdiction over the defendant. The trial court must first decide whether the applicable state long-arm statute authorizes the assertion of jurisdiction over the [defendant]. If the statutory requirements [are] met, its second obligation [is] then to decide whether the exercise of jurisdiction over the [defendant] would violate constitutional principles of due process." (Internal quotation marks omitted.) *Kenny v. Banks, 289 Conn. 529, 533, 958 A.2d 750 (2008).*

A. Personal Jurisdiction.

The defendant argues that as a nonresident individual he is not subject to the court's jurisdiction because the Connecticut long-arm statute does not authorize the assertion of personal jurisdiction over him as either an individual or as a trustee, and that even if the statutory requirement is met the exercise of jurisdiction over him would violate constitutional principles of due process. The defendant argues that since he has challenged whether the court has personal jurisdiction it is the plaintiffs' burden to prove the court's jurisdiction, and that the plaintiffs have failed to establish [*9] the factual allegations necessary for the long-arm statute to apply. The plaintiffs counter that the defendant is subject to personal jurisdiction under the state long-arm statute, *General Statutes §52-59b,* because the complaint contains sufficient factual allegations to establish that the plaintiffs' claims arise out of the defendant (1) transacting business in Connecticut, and (2) committing tortious acts in Connecticut. The plaintiffs argue that the court's exercise of personal jurisdiction over the defendant comports with due process because the defendant has sufficient minimal contacts with the state of Connecticut.

1. Personal Jurisdiction under *General Statutes §52-59b.*

*Section 52-59b(a)* provides, in relevant part, that "as to a cause of action arising from any of the acts enumerated in this section" jurisdiction may be exercised over a nonresident individual who: "(1) Transacts any business within the state; (2) commits a tortious act within the state . . . [or] (4) owns, uses or possesses any real property situated within the state . . ." *General Statutes*

*§52-59b(a).* For the court "to find [personal] jurisdiction over a nonresident defendant, only one of the provisions of *§52-59b* [*10] needs to be satisfied." *Pro Performance Corporate, Inc. v. Goldman, 47 Conn. Supp. 476, 483, 804 A.2d 248 [32 Conn. L. Rptr. 404] (2002).*

The long-arm statute does not define what constitutes "transacts any business," but the Connecticut Supreme Court has "construe[d] the term 'transacts any business' to embrace a single purposeful business transaction." *Zartolas v. Nisenfeld, 184 Conn. 471, 474, 440 A.2d 179 (1981).* "A 'purposeful business transaction' is one in which the defendant has engaged in some form of affirmative conduct allowing or promoting the transaction of business within the forum state." *Zemina v. Petrol Plus, Inc., Superior Court, judicial district of New Haven, Docket No. CV 97 128590 (March 3, 1998, Levin, J.) (22 Conn. L. Rptr. 94, 95, 1998 Conn. Super. LEXIS 1370, *6).* "In determining whether the plaintiffs' cause of action arose from the defendants' transaction of business within this state we do not resort to a rigid formula. Rather, we balance considerations of public policy, common sense, and the chronology and geography of the relevant factors." *Zartolas v. Nisenfeld, supra, 184 Conn. 477.*

The plaintiffs' argument that the defendant transacted business in the state is based on the following [*11] allegations: that the defendant used his power of attorney over the decedent "to cosign a mortgage loan for a New Milford, Connecticut property thereby making it possible for Defendants to acquire title to said property;" that the defendant improperly used the decedent's personal credit card while the decedent was living within the state; that the defendant failed to provide an accounting in violation of an order issued by a Connecticut Probate Court; and that the defendant misused "[e]state assets having a situs in Connecticut."

The allegation that the defendant acquired property in Connecticut by having the decedent cosign a mortgage most closely resembles the "single purposeful business transaction" analysis formulated in *Zartolas.* The plaintiffs argue that by having the decedent cosign for a mortgage loan the defendant engaged in self-dealing, which supports counts one and two of the complaint alleging that the defendant breached his fiduciary duty as both a trustee and as an individual. The defendant, however, argues that this allegation does not actually state that the defendant was acting in his capacity as trustee or that the alleged transaction affected the trust.

As stated [*12] in the complaint, the allegation concerning the purchase of the New Milford, Connecticut property does not set forth that the defendant was acting in his capacity as a trustee when he had the decedent cosign the mortgage or that the mortgage was

signed in the name of the trust rather than the decedent himself. The complaint also fails to state that the defendant used trust assets in order to secure the mortgage, to pay for any portion of the mortgage or to pay any other costs associated with the property. [4] Ultimately, this allegation merely asserts that the defendant had the decedent cosign for a mortgage by exercising his power of attorney and does not implicate any misuse of the powers granted to the defendant as a trustee. The plaintiffs' cause of action does not arise from the defendant's alleged purchase of the New Milford, Connecticut property; therefore, this factual allegation does not support the argument that the defendant is subject to personal jurisdiction under the transacting business prong of the long-arm statute.

4   Despite the allegation that the defendant used his position of having a power of attorney for the decedent in order to purchase property in Connecticut, the plaintiffs do not assert that the defendant is subject to personal jurisdiction under *General Statutes §52-59b(a)(4)*, which provides that jurisdiction may be exercised over a nonresident individual who: "owns, uses or possesses any real property situated within the state . . ." Based on the allegation in the complaint, the defendant's ownership of property in Connecticut could be sufficient to exercise personal jurisdiction over the defendant, even if the property was no longer in the defendant's possession at the time the suit was commenced. In paragraph five of the defendant's affidavit attached to the motion to dismiss, however, the defendant asserts: "I do not own any real estate in the State of Connecticut." The defendant does not address whether he ever owned the New Milford property in his memorandum of law in support of the motion to dismiss, the affidavit, or the reply memorandum in response to the plaintiffs' objection to the motion to dismiss. The following, from a footnote in *Zartolas v. Nisenfeld, supra, 184 Conn. 477 n.5*, suggests that past ownership, use, or possession of real property in Connecticut may be sufficient to establish personal jurisdiction over a nonresident: "Although the plaintiffs have ignored [§]52-59b(a)(4), we note that under the New York long arm statute [on which the Connecticut statute is modeled] . . . courts have based jurisdiction upon a nonresident defendant's ownership, use, or possession of real property situated within the state, although at the time of suit the defendant's ownership, use or possession had ceased." (Citation omitted.)

The allegation that the defendant transacted business in Connecticut by misusing the decedent's personal credit

card fails to assert that the defendant's conduct  [*13] was improper in his capacity as trustee, or that trust assets were affected by his use of the personal credit card. Based on the facts presented in the complaint, the credit card was the decedent's personal card and not one connected directly to any trust-related accounts. The complaint fails to allege that the defendant used trust assets to pay for the expenses incurred on the personal credit card. Pursuant to *§52-59b*, the alleged improper use of the credit card provides an insufficient basis for finding that the defendant transacted business in Connecticut.

With respect to the plaintiffs' allegation that the defendant's failure to comply with a Connecticut Probate Court order constituted the transaction of business, the defendant did not choose to direct any action towards the state in his contact with the Connecticut Probate Court. Further, the fact that the decedent's estate was probated in Connecticut was determined by the decedent's domicile in an assisted living facility in Connecticut at the time of his death, not by any affirmative action by the defendant. The defendant's contact with the probate court does not constitute transacting business pursuant to *§52-59b*.

The allegations  [*14] that the defendant misused estate assets having a situs in Connecticut are not supported by any specific factual allegations. Reading the allegations in the light most favorable to the plaintiffs, they seem to be alleging that the decedent had assets in Connecticut at the time of his death, that these assets were therefore part of the decedent's estate and should have poured over into the trust, but that the defendant misused these assets. The defendant argues that these allegations are devoid of facts regarding the administration of the trust in Connecticut. The question whether these estate assets were properly placed in the trust by the defendant is a critical factual dispute that must be determined by an evidentiary hearing. [5] If it was determined that the defendant did conduct business transactions with estate assets in the state of Connecticut, then the defendant would be subject to personal jurisdiction pursuant to *General Statutes §52-59b(a)(1)*. An evidentiary hearing is necessary to determine whether the defendant's use of estate assets rises to the level of transacting business in Connecticut. Without such a hearing, the court cannot conclude there is jurisdiction based on *General Statutes §52-59b(a)(1)*.

5   "[W]here a jurisdictional determination is dependent on the resolution of a critical factual dispute, it cannot be decided on a motion to dismiss in the absence of an evidentiary hearing to establish jurisdictional facts . . . Likewise, if the question of jurisdiction is intertwined with the merits of the case, a court cannot resolve the ju-

risdictional question without a hearing to evaluate those merits . . . An evidentiary hearing is necessary because a court cannot make a critical factual [jurisdictional] finding based on memoranda and documents submitted by the parties." (Citations omitted; internal quotation marks omitted.) *Conboy v. State, supra,* 292 Conn. 652-54.

The  [*15] plaintiffs also argue that the defendant is subject to personal jurisdiction in Connecticut under *General Statutes §52-59b(a)(2)* for committing tortious acts within the state. The primary basis of the allegations in the plaintiffs' complaint is that the defendant improperly used his position as trustee and his power over the decedent's estate to appropriate assets that should have been distributed equally to all four sons of the decedent. The plaintiffs do not set forth how the defendant managed to carry out the alleged misappropriation. The facts in the complaint allege that the trust had a value of at least $1 million as late as four months before the decedent's death, but that upon administration of the trust after the decedent's death there was essentially no money remaining in the trust. The plaintiffs allege that the defendant breached his fiduciary duties by "diverting assets belonging to the Estate" and by "fraudulently concealing misuse of Estate assets," that the defendant unjustly enriched himself through misuse of estate assets, and that the defendant converted estate assets. Nonetheless, these allegations do not specify what actions the defendant took to carry out the  [*16] alleged misappropriation and which actions specifically occurred in Connecticut that would give rise to personal jurisdiction over the defendant under *§52-59b(a)(2)*.

The causes of action asserted in counts three, four and five for unjust enrichment, conversion and statutory theft are based upon the alleged misuse and misappropriation of trust and estate assets and are not supported by specific factual allegations. Read in the light most favorable to the plaintiffs, the allegations assert that the decedent had assets in Connecticut at the time of his death, that these assets were therefore part of the decedent's estate and should have poured over into the trust, but that the defendant misappropriated these assets. As was the case in determining whether the defendant's use of estate assets constituted *transacting business* under *§52-59b(a)(1),* an evidentiary hearing would be necessary to determine and whether the defendant misused these estate assets in a manner that would constitute *committing a tortious act* within the state under *§52-59b(a)(2).* If it was determined that the defendant did commit a tortious act in the state of Connecticut through the misuse or misappropriation of trust  [*17] or estate assets, then the causes of action of unjust enrichment, conversion and statutory theft would arise from the commission of a tortious act within the state and the de-

fendant would be subject to personal jurisdiction pursuant to *§52-59b(a)(2)*. The question of whether the decedent had any assets in Connecticut at the time of his death and whether these estate assets were misused or misappropriated by the defendant is a critical factual dispute that must be determined by an evidentiary hearing. In order to determine whether the court has personal jurisdiction over the defendant for the causes of action in counts three, four and five, an evidentiary hearing must be held to determine whether the defendant's use of estate assets constitutes committing a tortious act in Connecticut under *§52-59b(a)(2)*.

Counts one, two and six, however, do include factual allegations that the defendant committed tortious acts in the state of Connecticut by breaching his fiduciary duties to the plaintiffs, as both a trustee and individual, based upon his failure to provide an accounting of trust assets in compliance with the Stamford Probate Court, and by failing to provide the beneficiaries of the trust [*18] with information regarding estate assets alleged to be located in the state of Connecticut. "The requisite elements of a valid and enforceable trust are: (1) a trustee, who holds the trust property and is subject to duties to deal with it for the benefit of one or more others; (2) one or more beneficiaries, to whom and for whose benefit the trustee owes the duties with respect to the trust property; and (3) trust property, which is held by the trustee for the beneficiaries." (Internal quotation marks omitted.) *Palozie v. Palozie,* 283 Conn. 538, 545, 927 A.2d 903 (2007). "A fiduciary . . . relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Dunham v. Dunham,* 204 Conn. 303, 322, 528 A.2d 1123 (1987), overruled on other grounds by *Santopietro v. New Haven,* 239 Conn. 207, 213 n.8, 682 A.2d 106 (1996).

There is no dispute that the trust in question existed or that the defendant, as trustee, had a fiduciary relationship with the plaintiffs. The dispute arises from the plaintiffs' allegation that the defendant breached his fiduciary  [*19] duties to the plaintiffs within the state of Connecticut. "The essential elements to pleading a cause of action for breach of fiduciary duty under Connecticut law are: (1) That a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in any matter relating to the plaintiff (2). That the defendant advanced his or her own interests to the detriment of the plaintiff; (3). That the plaintiff sustained damages; (4). That the damages were proximately caused by the fiduciary's breach of his or her fiduciary

duty." T. Merritt, 16 Connecticut Practice Series: Elements of an Action (2010-2011 Ed.) §8:1, p. 534.

Upon the decedent's death in Connecticut in 2008, his last will and testament was probated in the state of Connecticut. According to the complaint, the defendant failed to file an inventory of the decedent's estate with the Probate Court, refused to provide the plaintiffs, as beneficiaries, with information regarding trust transactions, and failed to comply with [*20] a Probate Court order to provide an accounting of trust assets. The defendant was removed as the fiduciary of the trust based on the failure to provide the accounting of trust assets. "[T]he existence of a trust relationship is accompanied as a matter of course by the right of the beneficiary to demand of the fiduciary a full and complete accounting at any proper time . . . The scope of such accounting depends of course upon the circumstances of the individual case, and, as a general rule, should include all items of information in which the beneficiary has a legitimate concern." (Citations omitted; internal quotation marks omitted.) *Zuch v. Connecticut Bank & Trust Co., 5 Conn.App. 457, 462-63, 500 A.2d 565 (1985).* Based on the fiduciary relationship between the defendant and the plaintiffs, the defendant had an obligation to provide the plaintiffs with information relating to the trust and any estate assets that would be bequeathed to the trust upon the decedent's death.

According to the allegations of the plaintiffs' complaint, the defendant breached his fiduciary duty to them, as beneficiaries of the decedent's trust and estate, by failing to provide (1) an inventory and accounting [*21] during the course of the Probate Court proceedings, and (2) information regarding estate assets alleged to be located in the state of Connecticut. This alleged breach of fiduciary duty constitutes the commission of a tortious act within the state because a fiduciary relationship existed between the parties, the defendant advanced his own interests at the expense of the plaintiffs' interests, and the plaintiffs sustained damages due to the defendant's breach of his fiduciary duty. Therefore, the defendant is subject to personal jurisdiction under *§52-59b(a)(2)* on counts one, two and six.

B. Due Process.

The defendant argues that even if the court finds that the long-arm statutory requirement is satisfied this matter should be dismissed on the ground that it would violate constitutional principles of due process to assert personal jurisdiction over him, because he lacks the required minimum contacts with the state of Connecticut. In response, the plaintiffs counter that the defendant has sufficient minimum contacts with Connecticut that comport with the principles of due process. Specifically, they argue that the defendant has purposefully directed his ac-

tivities at residents of this state, [*22] availed himself of the benefits and burdens of Connecticut law and could reasonably anticipate facing litigation here.

"[T]he constitutional due process standard requires that, in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice . . . The due process test for personal jurisdiction has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry. The court must first determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction . . .

"For the purposes of this initial inquiry, the Supreme Court of the United States has articulated, and this court has recognized, two types of personal jurisdiction. Either specific jurisdiction or general jurisdiction can satisfy the constitutional requirement of sufficient minimum contacts between the defendant and the forum. A state court will have specific jurisdiction over a nonresident defendant whenever the defendant has purposefully directed [*23] [its] activities at residents of the forum . . . and the litigation [has] result[ed] from alleged injuries that arise out of or relate to those activities . . . Whether a given defendant has contacts with the forum state sufficient to satisfy due process is dependent upon the facts of the particular case. Like any standard that requires a determination of reasonableness, the minimum contacts test . . . is not susceptible of mechanical application; rather the facts of each case must be weighed to determine whether the requisite affiliating circumstances are present . . .

"Once minimum contacts have been established, [t]he second stage of the due process inquiry asks . . . whether it is reasonable under the circumstances of the particular case." (Citations omitted; internal quotation marks omitted.) *Cogswell v. American Transit Ins. Co., 282 Conn. 505, 523-25, 923 A.2d 638 (2007).* "The twin touchstones of due process analysis under the minimum contacts doctrine are foreseeability and fairness. [T]he foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled [*24] into court there." (Citations omitted.) *United States Trust Co. v. Bohart, 197 Conn. 34, 41, 495 A.2d 1034 (1985).*

The complaint sets forth a number of factual allegations that are relevant in analyzing the defendant's contacts with Connecticut. From January 2, 2004 until the decedent's death in 2008, the defendant and the decedent served as cotrustees of the trust. The decedent was a res-

ident of Connecticut from late 2005 until his death. The trust provided that trust assets would be distributed to the trust beneficiaries upon the decedent's death, meaning the defendant knew there was a strong likelihood that the estate of the decedent would be probated in Connecticut, where the decedent was a domiciliary. The defendant participated in the Connecticut Probate Court proceeding, but failed to provide either an inventory or an accounting to comply with the Probate Court order. In addition, the alleged acquisition of title to the New Milford property and the use of the decedent's personal credit card while the decedent resided in Connecticut are evidence of further contacts with the state that are, at least tangentially, related to the defendant's role in managing the trust and the affairs   [*25] of the decedent.

These factual allegations demonstrate that the defendant purposely directed activities towards residents of the state of Connecticut and had sufficient contacts with the state, such that he could reasonably anticipate being haled into court within the state. The allegations in the complaint are based entirely on the actions of the defendant in managing the decedent's affairs in the years before his death and, more importantly, the alleged tortious actions of the defendant in carrying out his duties to the plaintiffs following the decedent's death. The alleged tortious actions either occurred, or came to light, when the defendant was involved with the Connecticut Probate Court in the aftermath of the decedent's death. The court determines that the defendant has the required minimum contacts with Connecticut, that he could reasonably anticipate facing suit in the state, and that it comports with the principles of due process for the court to assert personal jurisdiction over the defendant.

C. In Rem Jurisdiction Over the Trust and Corpus of the Trust.

The defendant argues that the court lacks in rem jurisdiction over the trust and the trust corpus and therefore cannot render   [*26] any decision that will directly affect the trust or trust assets. The plaintiffs argue that consideration of in rem jurisdiction is unnecessary because where a court has personal jurisdiction over the trustee of a trust, the court likewise has the jurisdiction to order the trustee to distribute trust assets. The plaintiffs further argue that in rem jurisdiction is not relevant to the present matter because "[t]his action is about wrongful conduct by [the defendant] not the interpretation or validity of the trust."

"If a court's jurisdiction is based on its authority over the defendant's person, the action and judgment are denominated 'in personam' and can impose a personal obligation on the defendant in favor of the plaintiff. If jurisdiction is based on the court's power over property within its territory, the action is called 'in rem' or 'quasi

in rem.' The effect of a judgment in such a case is limited to the property that supports jurisdiction and does not impose a personal liability on the property owner, since he is not before the court." *Shaffer v. Heitner, 433 U.S. 186, 199, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).* The defendant relies on *Hanson v. Denckla, 357 U.S. 235, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958),*   [*27] in support of his argument that, since the court does not have jurisdiction over the trust or the trust corpus, it should not exercise jurisdiction over the present action.

The decision in *Hanson* addressed an action seeking a declaration of who was entitled to disputed trust assets. The Supreme Court ruled that the Florida state courts did not have in rem jurisdiction over the corpus of the disputed trust, and did not have personal jurisdiction over the trustee, a nonresident trust company situated in Delaware, because the trustee did not have sufficient contacts with Florida. The present case differs from *Hanson*, however, in two significant respects. First, the court's jurisdiction is based on authority over the defendant's person, not the property of the trust. Analysis of the allegations has already established that the court has personal jurisdiction over the defendant. Second, the causes of actions set forth by the plaintiffs do not ask the court to determine who is entitled to trust assets. Rather, the allegations assert that the defendant is personally liable for engaging in tortious conduct based on the administration of the trust and the fiduciary obligations he owed to the   [*28] plaintiffs, and the issue of whether the court has in rem jurisdiction over the trust and trust corpus is not relevant to the court's exercise of jurisdiction over the present case.

D. Forum Non Conveniens.

Lastly, the defendant, in the alternative, argues that even if the court finds jurisdiction over this matter, the court should dismiss the case on the ground that Connecticut is a forum non conveniens. The defendant argues that application of the four-step process articulated by the Connecticut Supreme Court in *Durkin v. Intevac, Inc., 258 Conn. 454, 480, 782 A.2d 103 (2001),* for analyzing forum non conveniens claims favors dismissal of the case, because New York or California is a better situated forum. The plaintiffs contend that Connecticut is an appropriate forum for the case to be heard and that the *Durkin* factors do not favor either New York or California significantly enough to overcome the presumption in favor of a plaintiff's choice of forum.

"A court that decides to dismiss a case on the ground of forum non conveniens has jurisdiction but elects to dismiss the case and defer to another forum." *Durkin v. Intevac, Inc., supra, 258 Conn. 480.* "The common law doctrine of forum   [*29] non conveniens is an exception to the general rule that a court must hear and decide cas-

2010 Conn. Super. LEXIS 3253, *

es over which it has jurisdiction by statute or constitution, and recognizes the discretion of a court, in some few instances, where jurisdiction and venue are proper . . . to dismiss a suit because the court has determined that another forum is better suited to decide the issues involved." (Citations omitted.) *Sabino v. Ruffolo, 19 Conn.App. 402, 405-06, 562 A.2d 1134 (1989).* "The overriding inquiry in a forum non conveniens motion is not whether some other forum might be a good one, or even a better one than the [plaintiffs'] chosen forum. The question to be answered is whether [the plaintiffs'] chosen forum is itself inappropriate or unfair because of the various private and public interest considerations involved . . . Accordingly, the trial court, in exercising its structured discretion, should place its thumb firmly on the [plaintiffs'] side of the scale, as a representation of the strong presumption in favor of the [plaintiffs'] chosen forum, before attempting to balance the private and public interest factors relevant to a forum non conveniens motion.

"When . . . the plaintiffs are foreign [*30] to their chosen forum, the trial court must readjust the downward pressure of its thumb, but not remove it altogether from the plaintiffs' side of the scale. Even though the plaintiffs' preference has a diminished impact because the plaintiffs are themselves strangers to their chosen forum . . . Connecticut continues to have a responsibility to those foreign plaintiffs who properly invoke the jurisdiction of this forum . . . The defendants . . . continue to bear the burden to demonstrate why the presumption in favor of [the plaintiffs'] choice . . . should be disturbed . . .

"With these principles in mind, we turn to the four step process for examining forum non conveniens claims . . . First, the court should determine whether an adequate alternative forum exists that possesses jurisdiction over the whole case . . . Second, the court should consider all relevant private interest factors with a strong presumption in favor of--or, [where plaintiffs are foreign to their chosen forum,] a weakened presumption against disturbing--the plaintiffs' initial choice of forum . . . Third, if the balance of private interest factors is equal, the court should consider whether any public interest factors [*31] tip the balance in favor of trying the case in the foreign forum . . . Finally, if the public interest factors tip the balance in favor of trying the case in the foreign forum, the court must . . . ensure that [the] plaintiffs can reinstate their [action] in the alternative forum without undue inconvenience or prejudice." (Citations omitted; internal quotation marks omitted.) *Durkin v. Intevac, Inc., supra, 258 Conn. 465-66.*

Under the first *Durkin* factor, the defendant argues that there are two adequate alternative forums: the state of New York, because all the parties are residents there, and the state of California, because it is the situs of the

trust. In arguing that California is more appropriate, the defendant asserts that it is "the court of primary supervision and the state of administration of the Trust" and that the decedent intended the trust to be governed by California law, as shown by the trust's choice of law provision. The plaintiffs concede that New York would be an adequate alternative forum, but argue, without providing any support or explanation, that California would not be adequate.

The threshold determination in applying the first *Durkin* factor is whether the alternative [*32] forum "possesses jurisdiction over the whole case." *Durkin v. Intevac, Inc., supra, 258 Conn. 465.* "[I]n rare circumstances, where the remedy offered by the other forum is clearly unsatisfactory, such as where the alternative forum does not permit any litigation of the subject matter of the legal controversy, the other forum may not meet the threshold requirement of an adequate alternative." *Picketts v. International Playtex, Inc., 215 Conn. 490, 504 n.13, 576 A.2d 518 (1990).* In *Durkin*, the court granted the motion to dismiss for forum non conveniens subject to the defendant's stipulation that they would submit to the jurisdiction of the alternative forum. [6] *Durkin v. Intevac, Inc., supra, 258 Conn. 480-81.* "Ordinarily, [the adequate alternative forum] requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction . . . Both state and federal decisions have accepted such a stipulation as satisfying the 'amenable to process' requirement." *Vargas v. General Electric Co., judicial district of Stamford-Norwalk at Stamford, Docket No. 08 5007137, 2010 Conn. Super. LEXIS 1071 (April 30, 2010, J. Jennings).* Under the assumption that the defendant in the present case would consent to [*33] a similar stipulation agreement for the alternative forums he has suggested, and in the absence of any suggestion that, the New York or California courts could not provide an adequate remedy for the plaintiffs' allegations, both New York and California would be adequate alternative forums.

6   The court granted the forum non conveniens claim subject to the following: The defendants agreed to: "(1) consent to jurisdiction in Australia; (2) accept service of process in connection with an action in Australia; (3) make their personnel and records available for litigation in Australia; (4) waive any applicable statutes of limitation in Australia up to six months from the date of dismissal of this action or for such other reasonable time as may be required as a condition of dismissing this action; (5) satisfy any judgment that may be entered against them in Australia; and (6) consent to the reopening of the action in Connecticut in the event the above conditions are not met as to any proper defendant in this action."

*Durkin v. Intevac, Inc., supra, 258 Conn. 481 n.23.*

Under the second *Durkin* factor, the court must weigh the relevant private interest factors, which are identified as the following: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process for the attendance of unwilling witnesses, and the cost of obtaining attendance of willing witnesses; (3) the possibility of viewing the accident scene if such viewing is appropriate to the action; (4) the enforceability of a judgment; (5) the relative advantages and obstacles to a fair trial; and (6) all other practical problems that make the trial of a case easy, expeditious and inexpensive." *Durkin v. Intevac, Inc., supra, 258 Conn.* 467.

Here, the defendant argues that a balancing of the private interest factors weighs in favor of his forum non conveniens claim. The defendant argues that private interest factors number one and two weigh in his favor because "most of the physical [*34] evidence and fact witnesses are located in California . . . [and that] the witnesses who can attest to the making of the Trust and Trust-related transactions are located in California" and that the cost of these witnesses appearing in Connecticut would be prohibitively expensive. "The defendants . . . [bear] the burden of persuasion that the chosen forum is inconvenient to potential witnesses for the defense . . . When a dismissal is premised on the convenience of witnesses, more than a mere allegation to that effect is required . . . Rather, the defendant[s] must establish, with specificity, inconvenience to witnesses that is sufficiently prejudicial to justify dismissal . . . A party seeking to transfer a case . . . for the convenience of witnesses must identify the key witnesses to be called and must make a general statement of what their testimony will cover . . . The burden is upon it to give the names and locations of potential witnesses and the substance of their testimony . . . Sufficient information must be included in the affidavits to establish that the named witnesses are key witnesses who need to be called and that their testimony is material." (Citations omitted; internal [*35] quotation marks omitted.) *Picketts v. International Playtex, Inc., supra, 215 Conn.* 509-10.

The defendant in the present case has not provided any information identifying the specific witnesses necessary to this action, why their testimony is necessary, or why it will be inconvenient for the witnesses to appear before a Connecticut court (other than the implied inconvenience of California being far from Connecticut). Although the cost of witnesses traveling from California to Connecticut may be expensive, in the absence of any specific information regarding who these witnesses are and why they are necessary to the case, there is no way for the court to weigh the inconvenience of California witnesses *potentially* having to travel to Connecticut

versus the more certain inconvenience of having all the parties who reside in New York travel to California. The defendant's argument that physical evidence is located in California is similarly insufficient based on the lack of specificity provided. Other than the relevant trust documents, portions of which have already been submitted to the court, and documents related to transactions involving trust and estate assets, it is not apparent what [*36] additional physical evidence will be necessary for the court's determination, and the defendant has not specifically identified any such evidence. Further, the defendant has not explained why such evidence, whether currently in California or elsewhere, could not easily be produced in Connecticut. The defendant's assertion that necessary witnesses and physical evidence are located in California is not adequate to support his argument that this private interest factor weighs in favor of dismissal for forum non conveniens.

The defendant further argues that private interest factor number four, concerning the enforceability of a judgment, weighs in his favor because a New York or California judgment will be easier to enforce in those states. Since the parties are all residents of New York, the defendant maintains that a judgment rendered in New York will be more easily enforced in the event that attachment of the parties' personal assets is necessary. The defendant also contends that California is best suited for any claims involving the trust or trust assets, presumably under the logic that California is the forum best suited in the event that attachment of the trust of trust assets is [*37] necessary.

Where a court renders a judgment in a matter over which it has personal and subject matter jurisdiction "[t]he *full faith and credit clause of the United States constitution* provides . . . that 'Full Faith and Credit shall be given in each State to the . . . judicial Proceedings of every other State . . .' *U.S. Const., art. IV, §1.*" *Business Alliance Capital Corp. v. Fuselier, 88 Conn.App. 731, 736, 871 A.2d 1051 (2005).* As previously discussed, jurisdiction in the present case is based on personal jurisdiction over the defendant and not in rem jurisdiction over the trust or trust corpus, therefore any judgment rendered by a Connecticut court would be based on the personal liability of the defendant and enforceability of the judgment would not be contingent on jurisdiction over the trust or trust assets. As full faith and credit would be given to any decision rendered by the Connecticut court in the present case, the enforceability of a judgment is not a private interest factor that weighs in favor of dismissal for forum non conveniens.

Concerning the relative advantages and obstacles to a fair trial, the defendant asserts, that private interest factor number five, weighs [*38] in favor of dismissal under forum non conveniens because the "[t]rust is gov-

erned by California substantive law." The defendant points out that this would be an obstacle to a fair trial in Connecticut because the defendant would "be inclined to hire both California and Connecticut legal counsel . . . [which] would be inefficient and costly . . . [However] due to the limited resources of the parties, it is highly likely that some or all parties will forgo hiring California counsel . . ." Although the cost considerations that the defendant describes may be significant, these strategic decisions that must be made by the parties do not rise to the level of being an obstacle to a fair trial. Since both parties are New York residents who live in relatively close proximity to Stamford, Connecticut, they are similarly situated in terms of their relationship to both California and Connecticut, so neither party would have a relative advantage concerning issues relating to the application of California law. The potential need for the parties to interpret California substantive law does not create the relative advantages and obstacles to a fair trial that weighs in favor of dismissal for forum non [*39] conveniens.

The balance of the private interest factors do not weigh in favor of dismissal. At most the balance of these factors is equal, in which case the third *Durkin* factor directs that the court should consider whether any public interest factors tip the balance in favor of trying the case in the foreign forum. Although the defendant did not argue that the public interest factors favor a finding of forum non conveniens, [7] the plaintiffs did argue that this factor favors the Connecticut forum because the action grew out of the tortious acts committed by the defendant in Connecticut.

> 7   The defendant argued that since the private interest factors were not equal, but weighed in favor of dismissal, the public interest factors did not need to be addressed.

The public interest factors identified in *Durkin* are the following: "(1) administrative difficulties for the courts, i.e., court congestion and the court's familiarity with the applicable law; (2) imposing the burden of jury duty on [the] people of a community with no relation to the litigation; (3) holding trial in the view of interested persons; and (4) having matters decided in their local

forum." (Internal quotation marks omitted.) *Durkin v. Intevac, Inc., supra, 258 Conn. 462*. Since all the parties are residents of New York, public interest factors two, three, and four provide some support for New [*40] York as an alternative forum so that the burden of jury duty is imposed on those persons most interested in the trial who can decide the matters in their local forum. The forum of Connecticut does, however, have a relationship to the litigation since the alleged tortious actions committed by the defendant in Connecticut arise from his actions before the Connecticut Probate Court, and the forum includes persons who may have an interest in the trial. For these reasons, the public interest factors weigh slightly in favor of the New York forum.

Consideration of all the private and public factors shows that the defendant has failed to meet the burden necessary to demonstrate why the presumption in favor of the plaintiffs' choice of forum should not be honored. The court concludes the defendant's motion to dismiss the action on the ground of forum non conveniens should be denied.

## III. Conclusion

The defendant's motion to dismiss is denied in part because: (1) the court has personal jurisdiction over the defendant under *§52-59b(a)(2)*, on counts one, two and six and the exercise of personal jurisdiction by the court does not offend constitutional principles of due process; (2) an evidentiary [*41] hearing is required to rule on the motion to dismiss as to counts three, four and five; (3) the issue of whether the court has in rem jurisdiction over the trust and trust corpus is not relevant to the court's exercise of jurisdiction over the present case; and (4) the defendant has failed to meet the burden necessary to warrant dismissal on the ground of forum non conveniens.

The parties shall work cooperatively with each other and with court, through its civil caseflow office, to schedule a hearing on the unresolved factual issues involving counts three, four and five.

TAGGART D. ADAMS

SUPERIOR COURT JUDGE



**Rovic, Inc. v. Gary Hanson et al.**

**CV000599617S**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF HART-
FORD - NEW BRITAIN, AT HARTFORD**

*2000 Conn. Super. LEXIS 2591*

**September 29, 2000, Decided
October 2, 2000, Filed**

**NOTICE:** [*1] THIS DECISION IS UNRE-
PORTED AND MAY BE SUBJECT TO FURTHER
APPELLATE REVIEW. COUNSEL IS CAUTIONED
TO MAKE AN INDEPENDENT DETERMINATION
OF THE STATUS OF THIS CASE.

**DISPOSITION:** The motion for temporary injunc-
tions is denied.

**JUDGES:** Beach, J.

**OPINION BY:** Beach

**OPINION**

MEMORANDUM OF DECISION

The plaintiff Rovic, Inc. ("Rovic") employed the
defendant Gary Hanson for approximately seventeen
years. In June 2000, Hanson left the employ of Rovic
and went to work for a competitor, the defendant C&C
Janitorial Supplies, Inc. ("C&C"). Rovic instituted the
present action against Hanson, C&C and Laura Taranti-
no, [1] another former Rovic employee who left to work
for C&C. Rovic alleges that it has been damaged as a
result of the defendants' use of its trade secrets and it
seeks injunctive and declaratory relief. The question of
whether one or more temporary injunctions should be
issued to enjoin the defendants from using certain
claimed trade secrets and from contacting certain cus-
tomers during the pendency of the action is currently
before the court.

1    The immediate controversy between the
plaintiff and Ms. Tarantino has been resolved by
the parties and will not be addressed here.

[*2] The following facts were developed over
portions of two days of testimony. Gary Hanson was a
sales person for Rovic. Rovic is in the business of selling
cleaning supplies and ancillary equipment to commercial
customers. Over the years Hanson successfully devel-
oped a number of accounts, and by all accounts was an
accomplished salesman. Over the years he developed
friendly relationships with various customers, and he of
course knew the appropriate people to contact at the
businesses. Hanson knew the sales practices and, to an
extent, the pricing procedures, at Rovic, and he had ac-
cess to computerized information which, *inter alia*, en-
capsulated the customers' buying history.

Toward the end of 1999, Rovic instituted changes in
its compensation program, and Hanson felt that he was
making less money as a result of the changes. He dis-
cussed the issues with managers at Rovic, and they were
unable to resolve their differences. Hanson then wrote a
letter of resignation dated June 9, 2000, which purported
to be effective June 23, 2000. He indicated in the letter
that he was planning to work for C&C Janitorial Sup-
plies. On June 9, he had a discussion with management
at Rovic, and he was [*3] asked to reconsider. Perhaps
as a precaution, Hanson's access to voice mail and his
computer password were terminated on June 9.

On June 14, 2000, Hanson met with Damon Pelle-
tier, Rovic's general manager; for some of the time Ex-
ecutive Vice President Reichelt was present. At this
meeting Hanson indicated that he had not changed his
mind about leaving. June 14 was a Wednesday. On the
preceding Monday and Tuesday, Hanson had called

some of his customers and told them he was leaving. At the June 14 meeting, Hanson and Pelletier signed a handwritten document which listed the eight accounts which Hanson had contacted; the document further states that "the customers will decide who they will buy from and we will decide how to communicate to the customers what their best interests are." The memo also stated that Hanson had returned all computer files "pertinent to Rovic" and had "removed" them from his own computer, and that he had returned all software and sales information to Rovic. On June 14, Hanson left Rovic's employ and virtually simultaneously began employment with C&C, which is a competitor of Rovic in regard to many, but not all, of the services offered by Rovic.

On the basis [*4] of these facts, [2] Rovic seeks two temporary injunctions. First, it seeks an order prohibiting Hanson or C&C from soliciting business from any of the customers named in the June 14 memorandum. Second, it seeks a more general injunction prohibiting the disclosure of confidential information, which requested injunction apparently would prevent Hanson and C&C from soliciting any customers with whom Hanson dealt while at Rovic.

> 2   Additional facts will be discussed in connection with the more specific discussion to follow.

The standards for issuing a temporary injunction are well established. Factors to be considered include a balancing of the benefits and harm to the parties if a temporary injunction is imposed, the consideration of irreparable loss if an injunction is not issued, the effect on any public interest, and the relative likelihood of success on the merits. See, e.g., *Griffin Hospital v. Commission on Hospitals and Health Care, 196 Conn. 451, 457-58, 493 A.2d 229 (1985)*. [3] Where, as [*5] here, [4] injunctive relief is a specific statutory remedy, the requirements for a permanent injunction are relaxed to the extent that showings of irreparable harm and no adequate remedy at law are not inflexibly required. *Conservation Commission v. Price 193 Conn. 414, 429, 479 A.2d 187 (1984)*, and authority cited therein. It follows that the requirements for issuing a temporary injunction should similarly be relaxed, but equitable principles nonetheless govern the issue and trial courts are vested with discretion in the determination of whether a temporary injunction should issue. See, e.g., *Conservation Commission v. Price. supra, 430.* "Decisions of our trial courts have frequently referred to the burden of an applicant (for a temporary injunction) to show reasonable degree of probability of success before a temporary injunction to preserve the status quo may be granted." *Environmental Products Corporation v. Lincoln, 1995 Conn. Super. LEXIS 1476, 1995 Ct. Sup. 5264* (Levin, J.) (1995). The statutory framework governing the confidentiality of trade secrets

is set forth in the Uniform Trade Secrets Act, *§§ 35-50 of the General Statutes.* A "trade secret," as the definition may be pertinent [*6] here, includes "information, including a . . . compilation, program, . . . cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Section 35-51(d) of the General Statutes.* As pertinent to the case at hand, "misappropriation" means ". . . disclosure or use of a trade secret of another . . . by a person who . . . (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . ." *Section 35-51(b) of the General Statutes.* Pursuant to *§ 35-52(a) of the General Statutes*, "actual or threatened misappropriation may be enjoined upon application to any court of competent jurisdiction."

> 3   *Griffin Hospital* was specifically concerned with the issue of a stay of an administrative order pending appeal; the court determined that the factors were largely the same as in the case of a temporary injunction pending the disposition of the case. *196 Conn. at 457.*

[*7]

> 4   See *§ 35-52 of the General Statutes.*

Connecticut enacted the Uniform Trade Secrets Act in 1983. The common law had created a body of law which is largely consistent with the Act. *Town & Country House & Homes Service v. Evans, 150 Conn. 314, 189 A.2d 390 (1963)*, for example, involved a factual situation fairly similar to that presented in the present case. The defendant Evans had been employed by the plaintiff in the house cleaning business. Before he left the plaintiff's employ, he told a number of the customers for whom he provided service that he was planning to leave and he solicited business from them. The trial court had held that there had been no particular confidentiality in the relationship between the plaintiff and the defendant and that customer list was not secret; that court decided, then, that, in the absence of an agreement not to compete, the defendant was free to start his new business and to solicit customers from the plaintiff.

The Supreme Court reversed. It stated that an employee has a duty to exercise good faith and loyalty to his employer during the [*8] term of employment, such that he has a duty not to compete with the employer during the term of the employment and may not solicit the

2000 Conn. Super. LEXIS 2591, *

employer's customers for another enterprise at that time. But in the absence of a covenant not to compete, he is entitled to plan a new business during the time of employment and to solicit his former employer's customers immediately after terminating employment. [5] "Knowledge acquired by an employee during his employment cannot be used for his own advantage to the injury of the employer during employment." *Town & Country House & Homes Service, supra, 317.* Because the defendant had solicited customers of his employer while he was still in the course of that employment, the employer was entitled to injunctive relief prohibiting him from performing any service for any customer who was solicited during the term of employment.

> 5    In this context, it is assumed that the customer list is not a trade secret. As will be discussed below, the duty not to solicit employer's customers during employment is a slightly different concept analytically from the duty not to misappropriate trade secrets.

[*9]   A second issue was whether the names of the customers were a trade secret of the employer. The court stated the common law definition of a trade secret, which is very similar to the statutory definition appearing in *§ 35-51 of the General Statutes.* A trade secret "may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a . . . list of customers." *Id., 318.* Matters of public knowledge or of general knowledge are not trade secrets; a "substantial element of secrecy must exist" so that it would be difficult to obtain the secret except by improper means. *Id., 319.* Factors which may be considered in determining whether certain information is a trade secret include "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount [*10]   of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Id.* The common law imports into every contract of employment an obligation not to use an employer's trade secrets to the detriment of the employer. A list of customers may be a trade secret; but if the identity of customers is readily ascertainable through ordinary business channels or through classified business or trade directories, the courts refuse to accord to the list the protection of a trade secret. *Id., 320.*

The Supreme Court concluded that if the plaintiff's list of customers was a trade secret, then the defendant would properly be restrained from doing business with any of the customers on the list, regardless of whether he had solicited them for a competing business during the term of his employment. Because the facts of this case were not sufficiently developed to form a proper conclusion on this issue, the case was remanded for a new trial.

In *Holiday Food Co. v. Munroe, 37 Conn. Supp. 546, 426 A.2d 814 (App.Sess. 1981)*, the Appellate Session used a similar [*11]   analysis in an analogous factual pattern, though the result was considerably different. The first question was whether the employee had solicited customers during the term of the former employment. The facts in *Holiday Food*, however, were that even though the former employee had developed significant relationships with various customers during the term of employment and had become personal friends with a number of them, he did not actually solicit their business for another enterprise during the course of employment. The court held that, in the absence of acts of actual solicitation for a competing business during the former employment, an employee is not barred after employment from soliciting customers of the employer, unless the knowledge of the customer is a trade secret. *Id. at 549-50.*

Turning to the issue of whether knowledge of the customers was a trade secret, the court noted first that the question was one of fact and, although various factors could be used to help in the determination of whether particular information was a trade secret, there is no talismanic weighting or balancing of the various factors. Each case will be resolved on its own facts and [*12]   circumstances.

The facts in *Holiday Food* compelled a conclusion that the list was not a trade secret. Among the considerations were facts that (1) the defendant took the list with the knowledge of the employer; (2) there was no covenant not to compete; (3) the list was not hidden; (4) the list was not critical to the continued operation of the plaintiff's business; (5) customers who were solicited after termination of employment were friends of the defendant; (6) the identity of the customers could have been determined simply by watching the plaintiff's trucks making deliveries; (7) no detailed information regarding buying habits or preferences were involved; and (8) there was no especially confidential relationship between the plaintiff and the defendant during the term of the employment. *Id. at 553-54.* The determination of the trial court that no misappropriation of a trade secret had occurred was upheld. Justice Shea concurred in the result; he stated that there was little need to undertake a detailed analysis of considerations regarding trade secrets because the employee had, essentially, taken only his

memory from the employer, and in the absence of a noncompetition [*13] agreement, an employee ought to be able to think he could later solicit business from friends that he had made during the course of a former employment.

A Superior Court case, *Transam Inc. v. Zhawred, 1990 Conn. Super. LEXIS 330*, 1 Conn. L. Rep. 672 (1990), further examines some of the criteria in the consideration of whether a customer list is a trade secret. It noted that in Connecticut, under the Uniform Trade Secrets Act, the party sought to be enjoined does not have the burden of showing that he actually relied on "innocent" sources to discover the information in question, but only that the information be readily ascertainable by proper means. It stated that if the list in question could have been obtained by consulting the Yellow Pages or walking down the street, it would not be accorded the protection of a trade secret. "In perhaps an even more striking example, physical customer files which contained customer names in combination with other information such as financial and family date, insurance history, current insurance coverage, policy renewal dates, claims information, and correspondence were not given trade secret status in an action for a preliminary injunction." *1990 Conn. Super. LEXIS 330*, *14, 1 Conn. L. Rep. 672 at 675.

I first apply [*14] the above considerations to the question of whether the defendant is to be enjoined from contacting or soliciting business from the specific customers whom he contacted just before leaving Rovic. The determination of this question does not directly require the resolution of the trade secret issue; rather, under authority such as *Town & Country Homes*, the sole issue on the merits is whether Hanson solicited their business for C&C before he left Rovic. Hanson called approximately eight customers in the two days before he left Rovic to tell them he was leaving. Hanson testified that he did not solicit their business, but only called them as a courtesy and told them that someone else from Rovic would be handling their account. Letters from three of the customers state that Hanson did not solicit their business. It is not entirely clear that Hanson told them where he was going. All or most of the people with whom Hanson spoke were people with whom he had become quite friendly over the years. In its brief, Rovic argues that it strains credulity to think that there was no effort to solicit business, regardless of the explanations. It may well be that behind every courtesy there is a marketing [*15] effort, but, although it is a fairly close question, I do not find that success on the merits is probable, especially in light of the plaintiff's burden of proof.

The other factors to consider in determining whether to grant a temporary injunction do not tip the scales in favor of the plaintiff. Although some harm may inure to the plaintiff if an injunction does not issue, some harm may inure to the defendant if it does. So far as the public interest is concerned, it is true that the fiduciary duty owed to employers is an important consideration. But the granting of a temporary injunction would also, to an extent, have a negative impact on the free marketplace, which would certainly seem to be a value of some weight. In sum, I do not find that the equities support the issuing of a temporary injunction.

The second issue is whether the customer list information constitutes a trade secret, such that solicitation of all customers ought to be enjoined. Several additional facts should be considered in this regard. First, the defendant signed at least three confidentiality agreements over his years of employment with the plaintiff and its predecessor entities. These agreements recognized [*16] that information regarding Rovic's customers was considered confidential, and the employee agreed not to disclose or use such information. The employee agreed to return all software and files regarding customers and all other information of Rovic. The employee agreed not to use any of Rovic's materials or information gained from them to solicit any Rovic customer. (Exhibit 1.) Further, the customer information in Rovic's computer system was protected by use of passwords. Without reciting all of the evidence on the efforts of Rovic to keep such information secret, I found that sufficient efforts were made to satisfy the requirements of *§§ 35-51(d)(2)* and the corresponding element of the common law cause of action.

The difficulty is whether the evidence supports a finding of probable success on the merits regarding subsection (1) of *§ 35-51(d)*: more specifically, whether the customer list is not readily ascertainable by proper means. The accounts were overwhelmingly commercial institutions whose identities would be available through common knowledge of the area, rides through town, reference to journals, directories and cybersources, some of which were entered into evidence by the [*17] defendant, and undoubtedly many other ways. In reference to the several factual situations chronicled in *Zhawred, supra*, the ease of ascertainment of customers through proper means in this case is apparent. Further, there was evidence that many of the contacts were personal friends of Hanson, and there is no requirement that an employee leave his memory with a former employer. In the spectrum of cases concerning customer lists, the facts of this case fall rather decidedly on the side of those not receiving the status of trade secret.

I find, then, that the probability of success on the merits is not a factor favoring a temporary injunction. Other factors also do not militate in favor of such an injunction. The harm to the plaintiff in not ordering an

2000 Conn. Super. LEXIS 2591, *

injunction is conjectural: we have no way of knowing whether customers will flee Rovic. We also, of course, have no way of knowing whether Hanson would be harmed by the imposition of an injunction, because we cannot predict that Hanson will attract any of the customers without an injunction.

Finally, the plaintiff has suggested that the information about various customers, including buying history and other pertinent material, [*18] should be protected as a trade secret. Even if such information is considered a trade secret--and much of it probably is protected--there has been no showing that Hanson would use such material [6] and, in any event, its value is substantially ephemeral. Pricing information and costs to Rovic change over time, as do customer needs and preferences.

6   Hanson turned in his materials and his computer access was terminated prior to leaving Rovic. The plaintiff suggests that he may have kept some materials, at least in the form of copies or on disks or CD-ROMs. There is no substantial evidence of this, however, and injunctions should not issue merely because of temptations or the opportunities to do wrong. See *Environmental Products Corp., supra.(*

In light of all of the relevant considerations, the motion for temporary injunctions is denied.

Beach, J



**General Reinsurance Corporation v. Arch Capital Group, LTD. et al.**

**X05CV074011668S**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF STAM-
FORD-NORWALK, COMPLEX LITIGATION DOCKET AT STAMFORD**

*2007 Conn. Super. LEXIS 2629*

**October 17, 2007, Decided**

**NOTICE:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**JUDGES:** [*1] TAGGART D. ADAMS, SUPERIOR COURT JUDGE.

**OPINION BY:** TAGGART D. ADAMS

**OPINION**

*MEMORANDUM OF DECISION RE MOTION FOR PRELIMINARY INJUNCTION*

*I. Background*

On April 17, 2007 the defendant Steven Franklin, an employee of the plaintiff General Reinsurance Corporation (Gen Re) for almost thirty years, resigned his position there and began employment with defendant Arch Re Facultative Underwriters, Inc., a subsidiary of defendant Arch Capital Group Ltd. [1] Before his resignation Franklin had been a senior vice president of Gen Re and head of North American operations for Gen Re's Global Property Facultative reinsurance division (GPF). Defendants Philip Augur and Jennifer Apgar, two other high officials of GPF, also resigned on April 17 to take positions with Arch, and the next day defendant Kenneth Vivian, second in command of GPF's North American operations, followed suit. Within a week twenty-six other GPF employees resigned and joined Arch. The defendant Arch Re Facultative Underwriters, Inc., (Arch Re Fac) was established with Franklin as chief executive, Apgar as chief underwriter, Vivian as second-in-command, and

Augur as chief operations officer. The other Gen Re employees also became Arch Re Fac employees as [*2] underwriters, managers, and branch managers.

> 1   The three corporate defendants will occasionally be referred to collectively as "Arch."

Property facultative reinsurance provides coverage on an individual risk or policy basis and is often used when an insurance company seeks to protect itself against claims arising from specific high risk, high value or unique properties such as an office building, manufacturing facility or power plant. Property facultative reinsurance is distinct from treaty reinsurance which covers against loss on a portion of an insurance company's portfolio of insurance policies. Historically, Arch has done very little property facultative (prop fac) reinsurance. Gen Re has offered prop fac reinsurance for over fifty years and is the largest writer of such insurance in North America.

None of the four individual defendants had an employment contract with Gen Re; none had any agreement not to compete with Gen Re or not to solicit Gen Re customers or employees. There is no evidence any of the other former GPF employees now at Arch had any such agreements or prohibitions.

*II. The Case and Developments Therein*

Following the departure of its former employees to Arch, Gen Re [*3] undertook an internal investigation and on May 23, 2007 filed a complaint against the defendants and obtained an *ex parte* restraining order. Among other things, the complaint made claims of breach of fiduciary duty, tortious interference with contract and business expectancies and alleged violations of the Connecticut Uniform Trade Secrets Act, *General*

*Statutes §§35-50 et seq.* and the Connecticut Unfair Trade Practices Act, *General Statutes §§42-110a et seq.* Essentially Gen Re charged the individual defendants plotted to move a substantial portion of GPF's business to Arch along with GPF personnel, trade secrets, proprietary information and business plan and charged that all were, and are, planning to use these assets to unfairly create and operate out of whole cloth a business competitive to Gen Re's GPF division.

The *ex parte* temporary restraining order obtained by Gen Re on May 23, 2007 enjoined the defendants from using or disclosing any Gen Re trade secrets or confidential or proprietary information, business strategies, client information or employee information and from soliciting Gen Re property facultative reinsurance renewals. There was no prohibition against competing with  [*4] Gen Re, or otherwise doing business. A hearing on Gen Re's request for a temporary injunction was scheduled for June 19, 2007.

The defendants vehemently denied any violations of law or otherwise wrongful activity. They have alleged from the outset that they have not taken or used any Gen Re proprietary information or trade secrets and have claimed they are free to establish a competing business. In addition, they have asserted several counterclaims including tortious interference with business expectancies and trade libel and defamation based on the actions of Gen Re in obtaining an *ex parte* restraining order and the allegations of wrongdoing in the complaint. These claims as well as Gen Re's monetary damage claims are not at issue with respect to this ruling on a preliminary injunction.

On June 19, 2007 the parties, at the urging of the court and after extensive negotiations, reached an agreement on an order to remain in effect until further proceedings, discovery and an evidentiary hearing on the request for a temporary injunction scheduled for September 6, 7, 10 and 11, 2007 could occur. That order signed June 21, 2007 is set out in full herein.

1. Defendants will preserve any and [*5] all documents or other information, however stored or accessed, taken from Gen Re or otherwise owned by Gen Re, including any and all copies thereof, as well as any other property taken from Gen Re including computer hardware and software.

2. Defendants will preserve any and all documents or other information, however stored or accessed, relating to the allegations, claims and subjects referenced in the Verified Complaint, including without limitation any databases that contain in whole or in part Gen Re confidential information, including any and all copies thereof.

3. Defendants will return to Gen Re any and all documents or other information, however stored or accessed, taken from Gen Re or otherwise owned by Gen Re, including any and all copies thereof, as well as any other property taken from Gen Re including computer hardware and software.

4. Defendants will not disclose, divulge, furnish, use or make accessible to anyone any knowledge or information of a confidential or proprietary nature with respect to any of Gen Re's trade secrets, proprietary business or marketing strategies or plans, client requirements or other proprietary client information, business operations or techniques,  [*6] employee compensation and performance information and proprietary tools and data, and will not misappropriate trade secrets and other confidential and proprietary information of Gen Re.

5. Defendants will not use Gen Re's confidential and proprietary compensation history, performance evaluations, job responsibilities or client relationships in soliciting or recruiting Gen Re employees.

6. Defendants shall develop their own independent underwriting guidelines, pricing analyses and tools and shall price and assess risks independently. Defendants are prohibited from relying on information derived directly from Gen Re and alleged by Gen Re to be confidential or proprietary as follows:

a. Information about Gen Re's clients, including renewals and renewal pricing; historical claims and profitability experience; the types and classes of each client's risks; client practices, policies and guidelines;

b. Employee information regarding current responsibilities, salaries, bonuses, employment his-

tory, career development plans and performance evaluations;

c. GPF business plans and initiatives, including detailed marketing plans by client and territory;

d. Underwriting guidelines concerning the types [*7] of risks Gen Re will accept and the terms and conditions under which Gen Re will accept them;

e. Advanced statistical models (including proprietary computer applications), largely based on Gen Re's own proprietary data and other non-public information, used to analyze, assess, underwrite and price property facultative reinsurance contracts;

f. Gen Re's claims loss distribution models, actuarial curves and related research;

g. Gen Re's methodologies, models and tools to manage aggregation of risk (i.e., controls to limit exposure to loss under a single reinsurance contract, group of contracts or portfolio)l and

h. Information concerning produce development and new underwriting methodologies, tools and models.

7. Nothing set forth herein shall be deemed to limit the defendants' ability to utilize information in the public domain or known generally in the industry. In addition, nothing herein shall prohibit defendants from relying on their general underwriting judgment.

8. Nothing herein shall constitute an admission by any party and the parties reserve all rights with respect to arguments to be made at the trial. This reservation of rights shall include the ability to argue what is or is not  [*8] a trade secret, including with respect to the information set forth in Paragraph 6 above.

The most significant difference between the May 23, 2007 *ex parte* order and the June 21, 2007 agreed-upon order was the lifting of the prohibition on the defendants from soliciting business from Gen Re's prop fac reinsurance clients.

Since the commencement of the case Gen Re and the individual and Arch defendants have undertaken substantial discovery. In light of this discovery, Gen Re has significantly reduced the breadth of its factual claims of wrongdoing. For instance, it now concedes it has no evidence that the individual defendants took, physically or electronically, any Gen Re trade secrets or proprietary information on their departure. Nevertheless, the parties remain seriously at odds. The defendants contend that without any contractual restrictions the individual defendants were, and are, free to seek employment with and be employed by Arch in the prop fac business, that they took no trade secrets or proprietary information from Gen Re, and have not and are not using such information. Gen Re contends that while they cannot prove the physical or electronic taking of any confidential information [*9] or trade secrets by the individual defendants the defendants have used Gen Re trade secrets and threaten to do so in the future to its detriment. Gen Re seeks a preliminary injunction containing the substantive terms of the June order. The defendants contend no injunction should issue.

*III. Legal Standards for a Temporary Injunction*

The provisions of the Connecticut Uniform Trade Secrets Act (CUTSA) empower a court to order injunctive relief to stop "actual or threatened" wrongful misappropriation of trade secrets. *General Statutes §35-52(a)*. Generally, the primary purpose of a temporary injunction is to preserve the status quo and protect the moving party from immediate and irreparable harm until the merits of the case have been determined after a full trial. *Olcott v. Pendleton, 128 Conn. 292, 295, 22 A.2d 633 (1941)*. To be entitled to the equitable relief of a temporary injunction, the moving party must show that: (1) it is likely to prevail on the merits of its claim after trial; (2) it faces immediate and irreparable harm absent an injunction; and, (3) the harm it faces without the injunction is greater than the harm an injunction would do to the defendants.

*Griffin Hospital v. Commission on Hospitals & Health Care, 196 Conn. 451, 456-58, 493 A.2d 229 (1985)*; [*10] see generally *Fleet National Bank v. Burke, 45 Conn.Sup. 566, 570, 727 A.2d 823 (1998) [23 Conn. L. Rptr. 516]*; *POP Radio v. News-America Marketing In-Store, Inc., 49 Conn.Sup., 566, 569, 898 A.2d 863 (2005) [40 Conn. L. Rptr. 332].*

*IV. Facts*

*A. Prior to April 17, 2007*

The court finds the following facts from the testimony and exhibits offered during the preliminary injunction hearing held in the first and second weeks of September. The four individual defendants were aware for at least a year before their departure from Gen Re that each of the others had a certain level of unhappiness or frustration with his or her work circumstances at Gen Re and was looking for other opportunities. There was general agreement among them that their future careers would benefit if they continued to work together at another reinsurance company interested in their area of expertise which was, of course, property facultative reinsurance.

Steven Franklin took the lead in discussing employment possibilities for himself and the other individual defendants with other reinsurance entities. He prepared a business plan and made presentations apparently beginning in late 2005 to at least five prospective employers. He kept Apgar, Vivian and [*11] Augur advised of developments by e-mail. For instance, in a February 3, 2006 e-mail (Pl. Ex. 12) Franklin recounted his conversations with and presentations to executives of Harbor Point Ltd., a Bermuda based reinsurance company which had received his business plan (Pl. Ex. 13). The e-mail mentioned plans for "extracting 40 people from Gen Re and the legal challenges around that action" and Franklin's observation that "I don't think we need to talk to anyone [at Gen Re] before we leave to entice people to call us. I am confident the phone will ring." Franklin also recounted he told Harbor Point that Gen Re's GPF division had "stats that no one else had" referring to information GPF had to assess insurance risk. See Pl. Exs. 12 and 13.

Discussions with other reinsurers took place. On November 17, 2006 Franklin met with Mark Grandisson, the chief executive of Arch Worldwide Reinsurance Group. Following that meeting Grandisson e-mailed a memorandum to the head of Arch Capital Group Ltd., Dinos Iordano, about the meeting and a "Property Fac opportunity." Pl. Ex. 17. In that memorandum Grandisson told of Franklin's "Proposal to Arch" which consisted of a group of 50 underwriters at ten locations [*12] which "would target the same list of clients as now."

In both the discussions with Harbor Point and Arch, Franklin divulged confidential and proprietary information about Gen Re, the market's largest competitor. To Harbor he related that GPF had the ability to put up a certain amount of money on any single risk, a figure Franklin said "shocked" the Harbor Point executives. In addition Franklin shared with Harbor Point the substance of a very recent conversation with Gen Re's CEO about a portion of the company's reinsurance business strategy. Pl. Ex. 16. According to Grandisson's memorandum Franklin divulged statistics about GPF's historical and recent profit ratio, employee productivity, its maximum and average risk size, salary and compensation structure, the number of outstanding certificates (policies) total annual premiums, its five largest customers and the number of certificates which were uncontested, i.e. not put out for bid by client insurance companies. Franklin testified that providing Grandisson with the information about GPF was to incent Arch to enter the prop fac business and to hire him to run that business. Tr., 9-10-07, 42. [2] While there was some evidence and much [*13] argument that none of this was confidential information the court concludes that if most or all of this information were suddenly made public the upper echelon of Gen Re management would collectively blanch. This information appears to be new to Grandisson and particularly valuable to Arch or any reinsurer considering entering the prop fac business. In a portion of his video deposition played at the hearing, the defendant Augur agreed that giving this information to Arch was "not appropriate." Pl. Ex. 180 (Augur Deposition Tr., 239). [3]

> 2   References to "Tr." reflect the hearing transcript for a certain date and page number.
> 3   The testimony in the video-taped depositions was not included in the hearing transcripts. The testimony can be found on a DVD marked as Pl. Ex. 180 and in the Augur deposition transcript.

The four individual defendants chose to ally themselves with Arch. Compensation, equity participation and contract terms were negotiated apparently some time in March 2007, and the signed contracts specified that the individual defendants would not take client lists or proprietary information from Gen Re on departure, and they would not solicit Gen Re customers or employees on behalf [*14] of Arch while still working at Gen Re. Df. Exs 249, 261, 262.

A critical factor in the success of any insurance, reinsurance or property facultative reinsurance business is the proper assessment of the risk including the decision whether to take it on and if so at what price, i.e., whether to insure it and what premium to charge. The evidence at the temporary injunction hearing showed that in recent years prop fac reinsurance companies had developed

several pricing and risk assessment tools based on historical statistics to supplement, and in some ways constrict, the use of the judgment of one or more underwriters in assessing and pricing risk. While at the GPF division of Gen Re both Apgar and Augur were heavily involved and responsible for developing risk assessment and pricing tools for GPF's underwriters' use. These tools eventually became part of what was known at GPF as the Underwriting Desktop. Included in the Underwriting Desktop were the risk assessment and pricing tools developed by GPF for its underwriters to assess and price various fire reinsurance contracts. According to the business plan prepared by Franklin and the conversations with various suitors it was always the [*15] plan of the individual defendants, and the plan Arch accepted, that approximately 80 percent of the prop fac risk undertaken would be fire risk. Pl. Exs. 13, 15.

The Gen Re fire reinsurance tool essentially worked as follows. Various types of risk exposure were classified into type or occupancy groups, e.g., "cloth making-wool," "liquor stores" "bowling alleys" and these classifications were "mapped to" a fire occupancy rating deemed to be most closely associated with the type of occupancy. More than one fire occupancy rating might be deemed applicable to a single type of occupancy group. The fire occupancy rating contained a "base loss cost" for that particular type of risk. "Loss cost" is a prediction of average annual loss per one hundred dollars of certain assumed risk and is expressed in a dollar and cents figure which at General Re was carried out to four decimals, e.g., $ 0.1792. After adjusting for perceived greater or lesser risks associated with a specific building and adjusting for what level of risk is being assumed (i.e. is the last two million dollars of a building's value being covered, or the first two million) factoring in allocated expenses and hoped for profit, then [*16] a "technical price" is arrived at. See Pl. Ex. 49, 7-3. The "technical price" was described as GPF's "walk away" price beneath which the company would not assume the reinsurance certificate. Pl. Ex. 13; see also Tr., 9-10-07, 146 (Franklin).

The evidence showed that the loss cost figures were developed over several years by GPF. Mark Schmidtz testified credibly that he, Augur and Apgar worked on this project for about three years, approximately 1998 to 2001. The loss costs for fire risks were in part based initially on data from two sources one from Germany and one from Europe. This data was considered superior to other available data because it arose from risk experience on commercial and manufacturing facilities more akin to a prop fac insurance experience. The data was then combined with Gen Re's own prop fac experience to arrive at base loss cost figures.

In connection with assessing risk at various excess layers of coverage GPF has utilized what are known as loss distribution curves. These curves were developed by Dan Gogol, a Gen Re actuary with a Ph.D in mathematics, after receiving considerable input from Franklin, Augur, Apgar and Schmitz. Initially, Gogol had developed loss [*17] distribution curves based on publicly available data from Insurance Service Office (ISO), but according to Schmidtz these curves were substantially altered when GPF's own claims history was factored in.

B. April 17, 2007 and After

There is no disagreement that almost immediately after leaving Gen Re and becoming employed by Arch, Apgar and other underwriters began an expedited process to develop a means and mechanism to assess risk and establish premium prices for prop fac certificates. The goal of the defendants was to get Arch Re Fac underwriters to hit the ground running. A significant amount of credible evidence shows that the defendants and others intended to use as much information about Gen Re's price and risk assessment process as possible absent physically taking the Underwriting Desktop. While efforts to recall specific information about loss costs for wind and earthquake risks were undertaken, the major effort was directed toward developing a fire risk tool for Arch Re Fac since this was to be the most substantial portion of the business. In this connection the court finds there was a concerted effort among the individual defendants and other former GPF employees at Arch to [*18] remember and apply specific loss cost statistics used at Gen Re in the underwriting process at Arch Re Fac. This effort involved meetings and communications intended to collect what the new Arch employees called "tribal" memory of loss cost rates from "Old Co." (meaning Gen Re). Sean Donnelly, a former GPF employee who moved to Arch in April, testified in a video-taped deposition at the September hearing, that the new Arch employees at the onset tried to figure out what the loss cost figures were that GPF used in assessing risk. Pl. Ex. 180, Donnelly Deposition Tr., 132, 134. Another ex-GPF employee, Sergio Hernandez, now the second most important underwriter at Arch Re Fac, participated in meetings and wrote several e-mails in part of the effort to remember, share and utilize GPF's lost cost figures. Pl. Exs 53, 142, 147, 154, 177.

The upshot of all this was that Apgar recorded this "tribal" recollection of GPF's loss costs for a number of fire occupancy ratings on notes made in May. Pl. Ex. 46. She also testified that she remembers certain individual loss costs and she did not think those were confidential. Tr., 9-11-07, 42, 47-48. The evidence shows that these remembered loss costs [*19] were put into the fire tool she was developing for Arch. Pl. Exs. 44, 45. The evi-

dence also shows that the tribal memory and Apgar's memory were exceedingly accurate, and the loss costs in Apgar's notes and in the new Arch fire tool replicated the loss costs used by GPF for the same categories to the penny in at least a dozen instances. [4]

> 4   In some cases GPF's loss costs are computed to hundredths of a cent, e.g. $ 0.0716 while Arch uses two numbers to the right of the decimal point, e.g. $ 0.07.

Franklin, Apgar and Augur met with an Arch actuary, David Gansberg on May 9, 2007 to discuss the development of loss distribution curves for Arch Re Fac. At that meeting the individual defendants disclosed information concerning the Gogol curves being used at Gen Re and Gansberg notes of this meeting appear to record at least some of this information. Pl. Ex. 134.

The hearing evidence discloses that by mid-August Arch Re Fac had written a fairly substantial amount of property facultative certificates with about a third of the business coming from what Franklin had identified to Arch as Gen Re's five largest clients. Pl. Ex. 34.

*V. Discussion*

The injunctive relief sought by Gen Re is the continuation   [*20] of the restrictions contained in the agreed-upon order issued in June. As such, Gen Re has argued that the issue is not whether a temporary injunction should be ordered but whether the court should grant the defendants' motion to vacate the order consented to by the defendants. In this regard Gen Re presents certain arguments concerning contract principles. The court agrees with the defendants that the plaintiff's arguments lack merit, and regardless of the posture of the case at present, the plaintiff bears the burden of proving every element required for the issuance of a temporary injunction. [5]

> 5   The parties and counsel are to be commended for reaching agreement on the June 2007 order. While the court hoped that two trial-like proceedings could be avoided in this case, those hopes were dashed by the plaintiff's demand for a jury trial on its damages claims, and the defendants' demand for an expedited hearing on the temporary injunction issue, regardless of their agreement on the June order.

*A. Likelihood of Success on the Merits - Trade Secret.*

Gen Re contends that the defendants have misappropriated and improperly used Gen Re trade secrets in violation of the Connecticut Uniform Trade   [*21] Secrets Act, *General Statutes §§35-50 et seq.* (CUTSA).

Specifically, Gen Re contends that its loss cost information, the Gogol curves, confidential employee information and elements of its business plan have been misappropriated. The defendants controvert the Gen Re contentions and strenuously argue that they have not misappropriated any trade secrets, are not improperly using any Gen Re confidential information and are free to set up a competing business and hire Gen Re employees.

CUTSA defines a trade secret as:

> information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*General Statutes §35-51(d).*

The court is persuaded that GPF's loss cost information meets the definition of a trade secret. It is clearly a compilation of data which derives actual and potential independent economic   [*22] value by not being generally known or readily available in the reinsurance industry. Franklin was referring to GPF's loss cost data when he bragged to potential employers that GPF had "stats that no one else had" and Franklin admitted that GPF's loss cost data arising from the German and European data as well as Gen Re's own experience and judgment and the Gogol curves were trade secrets. Tr., 9-10-07, 131-32. Apgar also agreed that GPF's loss costs were confidential. Tr., 9-11-07, 42. Furthermore, Franklin started the development of GPF's loss cost information beginning in 1998 as part of the foundation for pricing prop fac certificates, and he was instrumental in developing GPF's approach to pricing on a more statistically based, more scientific enterprise which gave its pricing more consistency and, it was hoped, better quality. This was the goal of developing a technical price. One of the biggest reasons for this approach was to give the GPF underwriters more confidence in what was the right price, and more confidence to walk away from a risk, rather than to buckle on price. Tr., 9-10-07, 145-47. In discussing GPF with another potential employer Franklin said "[t]he key to our   [*23] success is knowing the right price to charge and getting something north of that number"; *Id.* 27; and Franklin stated that just about every

price quoted by GPF in the last five years was "north" of the technical price. *Id.;* Pl. Ex. 18.

The evidence concerning the workings of the GPF Underwriting Desktop made clear that a critical variable underlying the development of a "technical price" was the loss cost developed for the fire occupancy involved. While an underwriter could exercise judgment by adding or subtracting credits or debits for different or unique factors disclosed in the underwriting process the starting point for all of this was the loss cost. While other prop fac businesses used loss costs, those used by GPF were considered by the individual defendants as the best and most reliable. The loss costs therefore are a compilation of data giving GPF a competitive advantage and creating independent economic value. See *Elm City Cheese Co. v. Federico, 251 Conn. 59, 752 A.2d 1037 (1999).*

Similarly, the Gogol curves which help arrive at a technical price at various levels of excess insurance have the same independent economic value.

Both the loss costs and Gogol curves were subject to Gen Re's strict  [*24] efforts to maintain their confidentiality. While Gen Re did not require non-compete agreements from its employees, there was evidence that they were obligated annually to acknowledge the strictures of Gen Re's Code of Business Conduct which stated that Gen Re business operations and client information were confidential and must be kept secure and protected. In addition, the information in the Underwriting Desktop requires a special password and can only be accessed by GPF employees using GPF computers. Tr., 9-6-07, 244. Moreover, the Underwriting Desktop user's manual is kept confidential and distribution is limited to numbered copies. *Id.,* 246. In fact, Schmidtz testified that GPF did not even make the Underwriting Desktop available to other Gen Re affiliates because of security concerns. *Id.,* 243-44.

Both Robert Giddings, an expert presented by the defendants, and several former GPF employees, testified that one reinsurance company did not make available or give its loss cost data to a competitor. Tr., 9-11-07, 207, 209 (Giddings) Pl. Ex. 180, Pl. Ex. 178, Apgar Dep. Tr., 199, Hernandez Dep. Tr., 106, 124-25.

The defendants argue that individual loss costs, as distinct from the full  [*25] range of all GPF's loss cost data, do not qualify as a trade secret. Giddings supported this contention by opining that he did not believe there was independent value in a single or handful of loss costs. Tr., 9-11-07, 212, 222-23. The court, however, cannot place too much weight on this opinion. First, it is belied by the defendants themselves who spent, and encouraged others to spend, considerable time and effort to recollect these individual loss costs evidencing strong belief in their value. Second, it doesn't seem logical that

full lists of loss cost data are trade secrets but partial lists are not. [6] While individual loss costs may not be as valuable as a full list, each has an independent, albeit a smaller value. Each time an Arch Re Fac underwriter could use a loss cost from GPF it enabled Arch Re Fac to have considerable confidence in the "technical" or walk away price engendered and reduced the need to substitute an underwriter's untrammeled judgment or a less reliable loss cost from a public source. The court concludes that even though the number of GPF loss costs remembered might only be a dozen, they have an independent economic value.

> 6   Apgar testified that there were  [*26] close to 200 loss costs utilized by GPF for fire risk Tr., 9-11-07, 28. Gen Re contends that the fire tool now being used by the defendants contains about 68 loss costs.

*B. Likelihood of Success on the Merits - Misappropriation*

CUTSA defines misappropriation as:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, . . . or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (c) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

General Statutes §35-51(b).

Connecticut  [*27] law is quite clear that former employees remain under the duty not to use trade secrets acquired during their former employment for the benefit of a competitor of the former employer. Almost fifty

years ago the Connecticut Supreme Court found the law to be "well settled" that:

> after the employment has ceased the employee remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that a competitor to the detriment of his former employer . . . It matters not that there is no specific agreement on the part of the employee not to disclose the knowledge he has so acquired . . . [T]he law will import into the contract [of employment] a prohibition against a betrayal of [the employer's] trust and confidence and against imparting confidential information to others. In fact, such a stipulation probably is a part of every employment, whether actually expressed or not. Employees are bound by such an implied obligation even though they be not under contract at all.

*Allen Mfg. Co. v. Loika, 145 Conn. 509, 514, 144 A.2d 306 (1958)* (citing Williston, *Contracts* and other authorities, and quoting Nims, *Unfair* [*28] *Competition & Trademarks).* The lack of both a covenant not to compete and confidentiality agreement does not entitle a former employee to use a former employer's trade secrets in a competing business. *Town & Country House & Homes Service, Inc. v. Evans, 150 Conn. 314, 319, 189 A.2d 390 (1963).* These principles were reaffirmed by the Connecticut Supreme Court in *Elm City Cheese Co. v. Federico, supra 251 Conn. 69.*

The defendants have asserted and testified that they are not using loss cost data from GPF. E.g. Tr., 9-11-07, 19, 21, 23. In affidavits sworn to on June 15, 2007, the individual defendants stated in unison that they were quoting prices based on "publicly available information," information from customers and their "own general industry knowledge, judgment and experience" and that they planned to use this "rudimentary system" until a new system was developed using public information. [7] The more persuasive evidence is to the contrary. The identicality of the loss costs for certain fire rating categories between GPF's fire tool (Pl. Ex. 43), the tribal information collected by the former GPF employees including Apgar and her husband (Pl. Ex. 46) and what went into Arch's fire tool (Pl. Exs. [*29] 44, 45) is too striking to be ignored. Hernandez testified that the Arch Fire tool has been distributed to Arch Re Fac underwriters, and Apgar conceded at the hearing that while the fire tool has not been officially rolled out, it is in unofficial

use. Tr., 9-11-07, 60-61. It is also important to note that Apgar had a strong recollection of GPF loss costs (*Id.,* 47-48) and the conviction that what was in her head was not proprietary to GPF, *Id.,* 42-47; and that she was not prohibited from using that information by the agreed-upon order. Pl. Ex. 180 (Apgar Dep. Tr., 464). Hernandez also believed he was free to use any loss cost information in his head including GPF lost costs which he remembered even though he understood that such information was not disclosed to competitors. Pl. Ex. 180 (Hernandez Dep. Tr., 125, 130-31, 132-33).

> 7   According to Arch's interrogatory responses, the new system would not be available until September 2008, but Apgar corrected this erroneous information in her hearing testimony by stating that the date in the interrogatory answers should have been September 2007, and the actual roll out date would be October 1, 2007. Tr., 9-11-07, 24, 58.

As noted, the individual [*30] defendants contend that they did not physically take any loss cost information but testified to their belief that they were legally entitled to use for their benefit information which they retained in the memory about GPF loss cost data. The court agrees that plaintiffs have offered no evidence that trade secrets were taken by physical or electronic means. The court disagrees, however, that trade secret information retained in one's memory is not subject to general trade secret law. See Tr., 9-10-07, 22-23. As an initial matter no such exception appears in CUTSA. *General Statutes §35-51(b)* and *(d).* Additionally, in *Avery Dennison Corp. v. Finkle,* Superior Court, judicial district of Ansonia-Milford at Milford, CV 01 0757706 (February 1, 2002, Moran, J.) the court enjoined a former employee of Avery Dennison from even working for a competitor in certain capacities because of his knowledge of Avery Dennison trade secrets without any proof that he would take or had physically taken such information. Finally, this position is in accord with that taken by a well respected commentator. Roger M. Milgrim, 4 *Milgrim on Trade Secrets §15.01[1][e]* (2007) (citing cases construing the Uniform Trade [*31] Secrets Act). It may well be a thin line between the generalized experience that a former employee may use on his next job and the certain specific information which he may not. For instance, in *Robert S. Weiss & Associates, Inc. v. Wiederlight, 208 Conn. 525, 546 A.2d 216 (1988)* the Connecticut Supreme Court upheld the use of a former employer's customer list and certain account information. However, this outcome was specifically based on the holding that such information which could be acquired independently through public channels was not a trade secret. *Id.,* 539-40. In this case, the court finds the loss costs are trade secrets and that they have been misappropriated.

The evidence is not persuasive that Gen Re trade secrets in the form of the Gogol curves were misappropriated. As noted above several individual defendants met with Gansberg of Arch and appear to have disclosed to him some information about what the Gogol curves did and some of the concepts behind the curves. However, there is no evidence that any of the mathematical computations behind the curves were disclosed, or indeed could have been disclosed by the non-mathematically trained defendants. The plaintiffs have not proved that [*32] what was disclosed abut the Gogol curves amounts to a trade secret. The evidence showed that various types of mathematical curves were in use in the industry to assess risk at various layers of insurance coverage and some evidence to show that the factors considered by these curves were fairly commonly known. As a final matter even though some testimony of the defendants has lacked credibility, the defendants testified that they were developing their own curves, and unlike the situation with the loss costs, there was no evidence to controvert this assertion.

The court finds that there has been misappropriation of Gen Re trade secrets, and there is at the least a threat such misappropriation will continue in connection with Gen Re's business plan and financial information. The evidence, recounted above, also shows that Franklin's efforts to sell himself, his fellow individual defendants and GPF's mode of doing prop fac reinsurance resulted in wrongful misappropriation of Gen Re's proprietary and confidential information. Some of the individual defendants have conceded this in part. Augur described it as not appropriate, and even Franklin later had serious qualms about some of his disclosures [*33] in this regard. Tr., 9-10-07, 36. While there was lack of evidence of any similar disclosures recently, and the individual defendants no longer have the same incentive to sell themselves, the court concludes on the basis of pre-April 17, 2007 disclosures there remains a sufficient threat of future disclosures to provide a basis for injunctive relief.

### C. Irreparable Harm.

As a general rule, a party seeking a preliminary injunction must prove the lack thereof will cause irreparable harm. See authorities cited *supra* at 6-7. There is however authority that when an injunction is authorized by statute a finding of a violation of the statute is sufficient grounds for granting the relief authorized by that statute. See *Avery Dennison Corporation v. Finkle, supra,* (holding that a finding of misappropriation of trade secrets under CUTSA is sufficient grounds for issuing an injunction). Defendants contend plaintiff must, but cannot, show irreparable harm in this case. Gen Re contends otherwise, but also responds that whatever the rule in

Connecticut it will suffer irreparable harm absent an injunction.

This court agrees with Judge Moran in *Avery v. Dennison* that the authorization of injunctions [*34] in CUTSA is a legislative acknowledgment that a damage remedy alone is not sufficient. Therefore, this court finds that Gen Re does not have to prove irreparable harm to obtain injunctive relief. *Bauer v. Waste Management of Connecticut, Inc.,* 239 Conn. 515, 532-33, 686 A.2d 481 (1996); *Burns v. Barrett,* 212 Conn. 176, 193, 561 A.2d 1378 (1989). Notwithstanding this holding, Gen Re has established the element of irreparable harm, as shown in the following paragraph.

The stated goal of Arch Re Fac was to enter the prop fac business quickly and to target the clients of the largest prop fac reinsurer in North America. The use of GPF's loss cost data, or threatened use, gives Arch and the individual defendants a significant head start toward being able to formulate competitive premium bids in a fashion that is more risk averse them simply undercutting prices. How much business this will mean GPF loses to Arch Re Fac from existing clients and potential new clients is impossible to ascertain at this point and likely to be impossible to quantify in the future. It is likely that damages will not be ascertainable with any degree of certainty, and will therefore be irreparable.

### D. Balance of Hardships.

The injunctive relief [*35] sought by Gen Re will cause little harm to Arch and the individual defendants. In essence, the relief requested, which is set forth largely in the agreed-upon order, only requires the defendants to obey the existing law which, as set forth above, prohibits misappropriation of trade secrets. The defendants have stated more than once that their goal is to build a better prop fac business, including risk and pricing tools, from the ground up. Tr., 9-10-07, 124; Tr., 9-11-07, 143. An injunction barring them from employing Gen Re trade secrets would have no effect in this endeavor. There was testimony from Franklin that the agreed-upon order of June was having an adverse impact on Arch Re Fac, but the testimony appeared to relate more to the effect the allegations in Gen Re's complaint were having than the impact of the order. Tr., 9-10-07, 15-118. The individual defendant Vivian testified, through a deposition in evidence that any hardships the defendants were experiencing arose from the litigation itself, and not the existence of the agreed-upon order. Pl. Ex. 178, Vivian Dep. Tr., 499-500, 506-09.

To be sure, the defendants presented evidence tending to show that Gen Re and its GPF division [*36] had not suffered harm from the activities of the defendants. Sandra Bell of the Gen Re Human Resources Depart-

ment testified that it was not against any conflict of interest rules for employees to seek other employment, and Mr. Imre John Cholnoky head of GPF testified that he had no information that GPF had lost any clients or contracts. Tr., 9-6-07, 166. Based on the evidence discussed above, however, to the effect that there was a concerted effort to remember GPF loss costs and use them in pricing and assessing risks on prop fac business being sought and quoted on by Arch Re Fac, the court concludes there has been harm and continues to be the potential of harm to GPF's business. If nothing more, the loss costs have been incorporated into the tools now being used by the defendants to assess and price risks they are seeking to insure. This gives them an ability different from, and certainly more than the defendants would have had without the misappropriation and a greater ability to compete with GPF than otherwise would have occurred. The court concludes that the balance of hardships tips in favor of the plaintiff's application.

*IV. Conclusion and Orders*

*A. Temporary Injunction.*

For the [*37] reasons stated above, the court concludes a temporary injunction should issue and therefore, makes the following order, to remain in effect until further order of this court.

1. It is *ORDERED* that the defendants are temporarily enjoined from disclosing, divulging, using or making accessible to anyone, any knowledge or information of confidential or proprietary nature with respect to Gen Re's trade secrets, proprietary business or marketing strategies, plans, client requirements or other proprietary client information, business operations or techniques, employee compensation and performance information and proprietary tools and data; it is further *ORDERED* that defendants are temporarily enjoined from misappropriating Gen Re trade secrets and other proprietary and confidential information. This order includes, but is not limited to, plaintiff's loss cost data, individual loss cost figures, loss distribution curves and confidential and proprietary information related to or contained in risk

assessment and pricing tools used in assessing, pricing and underwriting property facultative reinsurance contracts.

2. It is *ORDERED* that defendants will preserve any and all documents or other information, [*38] however stored or accessed, taken from Gen Re or otherwise owned by Gen Re, including any and all copies thereof, as well as any other property taken from Gen Re including computer hardware and software.

3. It is *ORDERED* that defendants will preserve any and all documents, or other information, however stored or accessed, relating to the allegations, claims and subjects referenced in the Verified Complaint, including without limitation any databases that contain in whole or in part Gen Re confidential information, including any and all copies thereof.

*B. Miscellaneous Orders.*

During the September hearing Gen Re filed a motion asking this court to (1) apply adverse inferences based on allegations of spoilation of evidence by certain individual defendants, and (2) reverse certain decisions concerning the application of the attorney-client privilege. The defendants opposed the motion, and sought and were granted until September 26, 2007 to respond in writing. The plaintiff's motion is denied without prejudice to renewal at a later date when there is more adequate time to assess the facts and issues.

A few days after the conclusion of the preliminary injunction hearing, the plaintiff sought [*39] to reopen the record to introduce newly discovered evidence that apparently became available from a third party by means of a subpoena. The defendants have objected in writing. The motion to reopen is denied. However, the plaintiff is free to introduce such evidence, if relevant, at future proceedings.

IT IS SO ORDERED.

TAGGART D. ADAMS

SUPERIOR COURT JUDGE



**Avery Dennison Corporation v. Donald Finkle et al.**

**CV010757706**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF ANSONIA - MILFORD, AT MILFORD**

*2002 Conn. Super. LEXIS 329*

**February 1, 2002, Decided**
**February 1, 2002, Filed**

**NOTICE:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**JUDGES:** MORAN, J.

**OPINION BY:** MORAN

**OPINION**

*MEMORANDUM OF DECISION*

The plaintiff, Avery Dennison Corporation, is a Delaware corporation with its principal place of business in California. The plaintiff is a manufacturer and distributor of office products and writing instruments, including high-lighters and pens. On September 17, 2001, the plaintiff brought this action against the defendants, Donald Finkle and Bic Corporation. Donald Finkle was employed by Avery Dennison as director of product development and engineering [1] from January 29, 1998 until he resigned from the position in early September 2001. Donald Finkle had accepted an offer of employment with Bic Corporation. [2] Bic Corporation has its principal place of business in Connecticut. Bic is a manufacturer and distributor of lighters, shavers and writing instruments, including high-lighters and pens.

———

1 The defendant's actual job title changed from technical director of markers and adhesive business to director of product development, but the job description remained constant.

[*2]

2 The defendants assert that Donald Finkle is not employed by the named defendant, Bic corporation, located in Milford, Connecticut. They further claim, in their memoranda and in the affidavit of Donald Finkle, that he is employed by Bic International, which is located in New York. At the evidentiary hearing on this motion, however, Steven Raskin testified that Donald Finkle told him that he was leaving Avery Dennison to work in Milford, Connecticut for Bic corporation. Donald Finkle also stated to Raskin that he was going to relocate to the Fairfield, Connecticut area. This testimony was unchallenged during cross examination and no contradictory evidence was introduced by the defendants. In addition, the defendants submitted, as an exhibit to their memorandum in opposition to the motion for temporary injunction, the business code of ethics signed by Donald Finkle issued by Bic corporation and written on Bic corporation stationery explicitly stating the location as 500 Bic Drive, Milford, Connecticut. For the purposes of this motion, the court finds that the defendant, Donald Finkle, is employed by the defendant, Bic Corporation.

[*3] The complaint is in four counts. Count one alleges that Donald Finkle breached his written employment agreement with Avery Dennison by accepting the position with Bic, a direct competitor of Avery Dennison. [3] Count two alleges that Donald Finkle's employment with Bic will cause misappropriation of Avery Dennison's trade secrets in violation of *General Statutes § 35-51 et seq.* [4] Count three alleges that Bic has tortiously interfered with the contractual relationship between Avery Dennison and Donald Finkle by employing him in a capacity similar to the one he held with Avery

Dennison and by inducing him not to comply with the noncompetitive employment provision of his written employment agreement with Avery Dennison. Count four alleges that Bic's employment of Donald Finkle will cause misappropriation of Avery Dennison's trade secrets in violation of *General Statutes § 35-51 et seq.*

> 3    Paragraph eight of the employment agreement restricts the employee, for a period of two years after leaving Avery Dennison, from accepting employment with any business engaged in the manufacture or sale of products similar to those on which the employee worked while at Avery Dennison.

[*4]

> 4    The section, known as the Uniform Trade Secrets Act, permits a court to enjoin the improper misappropriation of trade secrets and to award damages therefor.

Simultaneous with the filing of the complaint, the plaintiff moved for a temporary injunction. [5] The application requests, pursuant to the employment agreement and *General Statutes § 35-52*, that Donald Finkle be enjoined from accepting employment from Bic, or from acting in an advisory capacity dealing with the manufacture or sale of writing instruments. The application also requests, pursuant to *General Statutes § 35-52*, that Bic be enjoined so employing Donald Finkle or from using trade secrets improperly obtained. In support of the application for temporary injunction, the plaintiff has filed a memorandum of law and a post-hearing memorandum. In opposition, both defendants have filed a memorandum of law containing the affidavit of Donald Finkle, the employment agreement, Avery Dennison's employee check out form and Bic Corporation's business code of ethics, as well as a post-hearing [*5] memorandum. Donald Finkle has filed a supplemental memorandum. An evidentiary hearing was held on October 1, 2001, when the court heard the testimony of Steven Raskin, the director of marketing for the writing instrument business of Avery Dennison. The defendants presented no witnesses.

> 5    The court notes that a motion to dismiss has been filed by Donald Finkle to address claimed deficiencies in the service of process. Any jurisdictional claims will be addressed in that venue.

"A temporary injunction is a preliminary order of the court, granted at the outset or during the pendency of an action, forbidding the performance of the threatened acts described in the original complaint until the rights of the parties respecting them shall have been finally determined by the court . . . The plaintiffs, to be entitled to such relief, must show: (1) probable success on the mer-

its of their claim; (2) irreparable harm or loss; and (3) a favorable balancing of the results or harm which may be caused to one party or the [*6]  other, as well as to the public, by the granting or denying of the temporary relief requested." (Citations omitted; internal quotation marks omitted.) *Fleet National Bank v. Burke, 45 Conn. Supp. 566, 570, 727 A.2d 823 (1998).* Our Supreme Court has impliedly acknowledged that the requirements for a temporary injunction are (1) the plaintiff had no adequate legal remedy; (2) the plaintiff would suffer irreparable injury absent an injunction; (3) the plaintiff was likely to prevail on the merits; and (4) the balance of the equities favored an injunction. See *Waterbury Teachers Assn. v. Freedom of Information Commission, 230 Conn. 441, 446, 645 A.2d 978 (1994).* The primary purpose of a temporary injunction is to preserve the status quo and protect the moving party from immediate and irreparable harm until the rights of the parties can be determined after a full hearing on the merits. *Rustici v. Malloy, 60 Conn. App. 47, 56, 758 A.2d 424*, cert. denied, *254 Conn. 952, 762 A.2d 903 (2000).* A trial court is afforded broad discretion in deciding whether to issue an injunction. *Bauer v. Waste Management of Connecticut, Inc., 239 Conn. 515, 534, 686 A.2d 481 (1996).*

[*7]    The application for a temporary injunction requests, pursuant to *General Statutes § 35-52*, that Donald Finkle be enjoined from accepting employment from Bic, or from acting in an advisory capacity dealing with the manufacture or sale of writing instruments and that Bic be enjoined from so employing Donald Finkle or from using trade secrets improperly obtained. [6] *General Statutes § 35-52* provides, in part, "actual or threatened misappropriation [of trade secrets] may be enjoined upon application to any court of competent jurisdiction." The question whether information sought to be protected by the trade secrets act is, by definition, a trade secret under the act is "one of fact for the trial court." *Allen Mfg. Co. v. Loika, 145 Conn. 509, 516, 144 A.2d 306 (1958).* Although a former employee can, absent a restrictive covenant, compete with a former employer, "the employee remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer." *Id. at 514.* [*8]    *General Statutes § 35-51(d)* defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." A trade secret has also been defined as a "formula, pattern, device or com-

pilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Robert S. Weiss & Associates, Inc. v. Wiederlight, 208 Conn. 525, 538, 546 A.2d 216 (1988).* The court must, therefore, determine whether the information sought to be protected by the plaintiff falls within the statutory definition of a trade secret.

6    This aspect of the plaintiff's claim is brought pursuant to a Connecticut statute seeking to enjoin a threatened or ongoing misappropriation of trade secrets occurring in Connecticut. This claim is not based on enforcement of the employment agreement or on common law. Arguments by the defendants that this claim, brought pursuant to a Connecticut statute, should be governed by California law are not accepted by the court. Therefore the argument by the defendants that California does not recognize the "inevitable disclosure doctrine" is irrelevant, as the Connecticut statute expressly forbids the "actual or threatened misappropriation" of trade secrets. (Emphasis added.) See *General Statutes § 35-52.*

[*9]    The court finds that as a result of the management level and leadership position of Donald Finkle at Avery Dennison, he had direct access to, and in some instances contributed to the formulation of, procedures and information relating to concept testing data, including "dead ends," pertaining to writing instruments being developed during his employment at Avery Dennison. [7] Concerning product development, Donald Finkle also had access to the business plan of Avery Dennison, including projected product revenues, marketing support and profitability estimates, component part suppliers and original equipment manufacturers, as well as capital investment information. All of this knowledge would comprise trade secret information as defined in *General Statutes § 35-51(d)*, as long as the other requirements of the statute are satisfied. [8]

7    Steven Raskin testified as to one current innovation to ink technology soon to be launched by Avery Dennison of which Donald Finkle has knowledge.
8    The court finds that the usage and attitude studies, being easily duplicated, are not trade secrets.

[*10]    The independent economic value requirement of the statute has been interpreted to be something which gives the owner of it a competitive advantage. See *Elm City Cheese Co. v. Federico, 251 Conn. 59, 88 n.27, 752 A.2d 1037 (1999).* The court finds that the knowledge of these areas of Avery Dennison's product

development and concept testing would have actual or potential independent economic value to its competitors in the writing instrument area, including Bic, due to "innovator's premium," or the likelihood of increased distribution of, and being able to charge a premium price for, a new, innovative product.

As to the use of reasonable efforts by Avery Dennison to maintain the secrecy of the information, "reasonable efforts to maintain secrecy often include some of the following techniques: requiring employees to sign confidentiality agreements or otherwise advising them of the confidential nature of the process; posting of warning or cautionary signs, or placing legends on documents; taking precautions regarding visitors, by requiring them to sign confidentiality agreements, having them sign in, and shielding the process from their view; segregating information, [*11] so that no one person or written source discloses the entire manufacturing process; and using unnamed or coded ingredients." (Internal quotation marks omitted; citations omitted.) *Elm City Cheese Co. v. Federico, supra, 251 Conn. at 79.* The court finds that Avery Dennison, by having employees such as Donald Finkle sign non-competition provisions as contained in paragraph eight of their employment agreement, by having suppliers, where possible, sign nondisclosure agreements, [9] by having workers keep logs as to the products on which they work, by giving employees yearly refresher courses in intellectual property and trademarks, by using "read only" files to prevent printing of the business plan and by having employees such as Donald Finkle sign the employee check out form when they end their employment, [10] has used reasonable efforts under the circumstances to maintain the secrecy of its trade secret information.

9    Steven Raskin testified that, although it is difficult to have suppliers in Asia sign nondisclosure agreements, they have a working relationship with the Asian suppliers who are supposed to maintain confidentiality.
[*12]
10    The employee check out form signed by Donald Finkle, appended as an exhibit to the defendant's memorandum in opposition to motion for temporary injunction, by its terms provides that there is confidential information which the employee agrees not to disclose.

The court finds that the procedures and information relating to concept testing data, including "dead ends," pertaining to writing instruments being developed, the product development information, the business plan, including projected product revenues, marketing support and profitability estimates, component part suppliers and original equipment manufacturers, as well as capital in-

2002 Conn. Super. LEXIS 329, *

vestment information comprise trade secret information of Avery Dennison as defined under *General Statutes § 35-51(d)*.

*General Statutes § 35-52* permits a court to enjoin actual or threatened misappropriation of trade secrets. Acquisition of Avery Dennison's trade secret information by Bic and disclosure of the information by Donald Finkle would constitute misappropriation, in that the information was [*13] obtained by Donald Finkle while he was employed by Avery Dennison and in which he had a duty to Avery Dennison to maintain its secrecy. [11] However well intentioned the defendants may be, it seems virtually impossible for Avery Dennison's trade secret information, particularly as to "dead ends," to not affect the employment relationship of Donald Finkle while in the employ of Bic. From the evidence submitted, the court finds that it is likely or probable that the plaintiff will be successful in showing, at a minimum, a threatened misappropriation of trade secrets by the defendants in Bic Corporation's employment of Donald Finkle in a capacity dealing with the manufacture or sale of writing instruments. The plaintiff has no adequate legal remedy and will suffer irreparable harm if the temporary injunction were not to issue at this time. Balancing the equities, the court finds that more harm would be suffered by Avery Dennison not to issue the temporary injunction sought at this time, than the harm that would be suffered by the defendants should the remedy sought be issued. [12] This is particularly true in light of the contractual provision between Avery Dennison and Donald Finkle, wherein [*14] Avery Dennison is obligated to compensate Donald Finkle at a rate of two thirds of his base monthly salary. This compensation should continue at least during the period covered by the order of the court, not to exceed the contractual two-year period. [13]

[11] Donald Finkle expressly acknowledges that he possesses Avery Dennison's. trade secret information. In his affidavit submitted to the court, appended to his memorandum in opposition to motion for temporary injunction, he states: "I am capable of partitioning in my mind what information is Avery's and what is BIC's so that any Avery information that I am able to recall is not revealed during my daily activities with BIC . . . I will not use or disclose any of Avery's proprietary or trade secret information. I have discussed this topic with representatives of BIC and we have agreed that I will not use or disclose, and that BIC will not permit me to use or disclose, any of Avery's proprietary or trade secret information."

[12] The court notes that where a party seeks injunctive relief pursuant to a statute, the party need not be required to allege and prove irreparable harm and the absence of an adequate remedy at law. See *Bauer v. Waste Management of Connecticut, supra, 239 Conn. at 532*. "The rationale underlying [the] rule that the complainant is relieved of his burden of proving irreparable harm and no adequate remedy at law is that the enactment of the statute by implication assumes that no adequate alternative remedy exists and that the injury was irreparable, that is, the legislation was needed or else it would not have been enacted." *Conservation Commission v. Price, 193 Conn. 414, 429, 479 A.2d 187 (1984)*. As such, the finding by the court of an actual or threatened misappropriation of trade secrets, pursuant to statute, should be sufficient grounds for granting the relief requested under the statute.

[*15]

[13] The plaintiff's intention to comply with this contractual provision was repeated at the hearing on October 1, 2001 and in the plaintiff's memorandum of law. Implicit in the decision of the court is the order that Donald Finkle be so compensated. Noncompliance by the plaintiff with this contractual provision will be grounds for an immediate review by the court of the continued propriety of the temporary injunction as well as possible sanctions by the court.

The court, therefore, orders that Donald Finkle be temporarily enjoined from continuing employment with Bic in any capacity dealing with the manufacture, product development or engineering of writing instruments. Bic is also temporarily enjoined from so employing Donald Finkle and from using any trade secrets which may have been obtained from Donald Finkle prior to the order of the court. This order does not affect the ability of either defendant to enter an employment relationship in any other aspect of Bic's business, including, but not limited to, the production of shavers and lighters. The temporary injunction shall continue until [*16] a full decision on the merits of this matter is entered, or until further order of the court, but in no event shall the order continue any later than two years from the date Donald Finkle terminated his employment with Avery Dennison. [14] As it is the decision of the court that a temporary injunction shall issue pursuant to the trade secrets act, no decision is made as to the claims of the plaintiff under paragraph eight of the employment agreement.

[14] September 11, 2001.

The plaintiff is ordered to post a bond in the amount of (One-hundred fifty thousand dollars) $ 150, 000 with sufficient surety.

MORAN, J.



ANDREW D. KOPPERL, Plaintiff, v. KENT S. BAIN, AUTOMOTIVE RESTO-
RATIONS, INC., VINTAGE RACING SERVICES, INC., JOHN ROLLS, and
LAWRENCE A. NEVIASER, Defendants.

CIVIL ACTION NO. 3:09-CV-1754 (CSH)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*2010 U.S. Dist. LEXIS 89195*

August 30, 2010, Decided
August 30, 2010, Filed

**SUBSEQUENT HISTORY:** Adhered to, Reconsidera-
tion denied by *Kopperl v. Bain, 2014 U.S. Dist. LEXIS
62323 (D. Conn., May 6, 2014)*

**PRIOR HISTORY:** *Kopperl v. Bain, 2009 U.S. Dist.
LEXIS 104354 (D. Conn., Nov. 9, 2009)*

**COUNSEL:**  [*1] For Andrew D. Kopperl, Plaintiff,
Counter Defendant: David A. Ball, Stewart I. Edelstein,
LEAD ATTORNEYS, Cohen & Wolf, P.C., Bridgeport,
CT.

For Kent S. Bain, Vintage Racing Svc, Inc, Automotive
Restoration, Inc, Defendants, Counter Claimants: David
W. Case, James G. Green, Jr., LEAD ATTORNEYS,
McElroy, Deutsch, Mulvaney & Carpenter/PH, LLP,
Hartford, CT.

For John Rolls, Lawrence A. Neviaser, Defendants: Da-
vid W. Case, James G. Green, Jr., LEAD ATTORNEYS,
McElroy, Deutsch, Mulvaney & Carpenter/PH, LLP,
Hartford, CT.

**JUDGES:** CHARLES S. HAIGHT, JR., SENIOR
UNITED STATES DISTRICT JUDGE.

**OPINION BY:** CHARLES S. HAIGHT, JR.

**OPINION**

**RULING ON PLAINTIFF'S MOTION TO DISMISS
AMENDED COUNTERCLAIMS OF CERTAIN
DEFENDANTS**

HAIGHT, Senior District Judge:

In this diversity action arising out of a failed com-
mercial relationship, plaintiff moves pursuant to *Rule
12(b)(6), Fed. R. Civ. P.*, to dismiss certain counter-
claims asserted by certain defendants for failure to state
claims upon which relief can be granted.

**I. BACKGROUND**

According to his original Complaint [Doc. 1] and
Amended Complaint [Doc. 29], Plaintiff Andrew D.
Kopperl is a citizen of Massachusetts and an experienced
auto racer, having participated in a number of seasons of
[*2] professional Grand Am racing, and is technically
proficient and knowledgeable about classic cars and rac-
ing cars.

Defendant Kent S. Bain is a citizen of Connecticut
and the principal shareholder in the two corporate De-
fendants, Automotive Restorations, Inc. ("ARI") and
Vintage Racing Services, Inc. ("VRS") (sometimes col-
lectively, "the Bain Defendants"). ARI and VRS are
Connecticut corporations with their principal places of
business within the state. ARI sells and services classic
cars and car parts to automobile collectors and enthusi-
asts. VRS restores, maintains and services classic racing
cars.

The case has not progressed beyond the pleading
stage. The parties' factual allegations are contained in
Kopperl's original Complaint and Amended Complaint,
the Bain Defendants' Answer, Affirmative Defenses, and
Counterclaim [Doc. 14], and their Amended Counter-
claim [Doc. 18]. Reading them, one would not think that

Case 3:13-cv-00215-VAB   Document 83-1   Filed 07/25/14   Page 121 of 176

Page 2
2010 U.S. Dist. LEXIS 89195, *

these parties are inhabiting the same planet, let alone discussing the same case.

But it does appear to be common ground that in early 2006, Kopperl and Bain discussed the possibility of Kopperl becoming a partner in the business conducted by ARI and VRS. Kopperl alleges that Bain [*3] told him he owned controlling shares in ARI and VRS; Kopperl and Bain agreed that Bain would convey to Kopperl 50% of his ownership interest in the companies; Kopperl paid Bain $50,000 in March 2006 and $150,000 in September 2006 as "good faith deposits" toward his acquisition of 50% of Bain's interests in the companies; on November 1, 2006, Bain sent Kopperl a Letter of Agreement Bain had drafted to finalize that acquisition, which Kopperl signed and returned unchanged; and, in accordance with that letter agreement, on December 19, 2006 Kopperl paid Bain an additional $225,000 as a cash payment for Kopperl's acquisition of 50% of Bain's ownership interest in ARI and VRS.

To these allegations, the Bain Defendants enter a general denial. It would appear, however, that they acknowledge the existence of the letter agreement Kopperl signed and returned to Bain, since their first affirmative defense asserts that the contract Kopperl alleges is barred by the Statute of Frauds because Bain, the party sought to be charged, did not sign it. For their part, the Bain Defendants allege that on March 10, 2006, Bain and Kopperl signed a Letter of Intent and Agreement in Principle dated February 27, [*4] 2006, reciting their agreement that Kopperl would acquire 50% of Bain's interest in ARI and VRS, with the purchase price, Kopperl's payment of it, and the structure of the transaction to be contained in a subsequent "Definitive Agreement," the Letter further providing that both Bain and Kopperl would "make a good faith effort" to come to such agreement, which Kopperl thereafter failed and refused to do.

It also appears to be common ground that Kopperl began employment at ARI and VRS, which was terminated on October 13, 2009, amid a welter of mutual ill will, charges and counter-charges, amply reflected by the pleadings' exchanges of broadsides.

Kopperl's Amended Complaint [1] contains these counts against the Bain Defendants: First, injunctive relief, ordering the Bain Defendants to reflect Kopperl's interest in the companies and issue stock certificates to him; Second, declaratory relief; Third, fraudulent misrepresentation; Fourth, negligent misrepresentation; Fifth, violations of the Connecticut Uniform Securities Act, *Conn. Gen. Stat. § 36b-29(a)*; Sixth, breach of contract - stock; Seventh, breach of contract - amounts due; Eighth, violation of *Conn. Gen. Stat. § 31-72* as to ARI and [*5] VRS; Ninth; violation of *Conn. Gen. Stat. § 31-72* as to Bain; Tenth, breach of fiduciary duty; Elev-

enth, breach of contract implied in fact; Twelfth, promissory estoppel; Thirteenth, conversion as to personalty; Fourteenth, conversion of ownership interests; Fifteenth, violation of *Conn. Gen. Stat. § 52-564*; and Nineteenth, unjust enrichment. Counts Sixteen, for tortious interference with contractual relations, Seventeen, for tortious interference with business expectancy, and Eighteen, for civil conspiracy, are brought against Defendants Rolls and Neviaser only.

1   Plaintiff's Amended Complaint [Doc. 29], originally titled a Third Amended Complaint, was filed by consent on July 16, 2010. That filing mooted Plaintiff's earlier motion to file a Second Amended Complaint, which had not been responded or objected to. The principal purpose of the Amended Complaint is to add two additional defendants, John Rolls and Lawrence A. Neviaser, citizens of New York and Maryland respectively, who alone or together with Bain are charged in several counts with interfering with or depriving Kopperl of contract rights and property interests that Kopperl anticipated acquiring as the result of his relationship [*6] with the Bain Defendants. Rolls and Neviaser have been served and appeared through counsel, but not yet answered. These additional allegations and parties are not relevant to Kopperl's present motion to dismiss certain of the Bain Defendants' counterclaims against him.

The Bain Defendants' Amended Counterclaim contains these counts against Kopperl: First, breach of duty to negotiate in good faith; Second, declaratory relief; Third, fraudulent misrepresentation; Fourth, negligent misrepresentation; Fifth, breach of fiduciary duty; Sixth, breach of loyalty; Seventh, civil theft; Eighth, conversion; and Ninth, computer crime in violation of *Conn. Gen Stat. § 53a-251*.

Kopperl now moves under *Rule 12(b)(6)* to dismiss all the Bain Defendants' counterclaims except the Second, for declaratory relief. The Bain Defendants oppose the motion and argue for the legal viability of the challenged counterclaims.

## II. DISCUSSION

### A. Standard of Review

A motion to dismiss under *Rule 12(b)(6)* tests whether a pleading alleges a legally viable claim. In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 173 L. Ed. 2d 868 (2009), the Supreme Court clarified the pleading standard required to withstand [*7] a motion to dismiss. Only a complaint or counter-

2010 U.S. Dist. LEXIS 89195, *

claim that states a plausible claim for relief survives a motion to dismiss. Determining whether a pleading states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. While legal conclusions can provide the framework of a claim, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court must assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Although a court must accept as true all of the well-pleaded factual allegations in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.

The Supreme Court articulated these standards in *Twombly* and *Iqbal*. The Second Circuit has reiterated and applied them in cases such as *Ruston v. Town Board for the Town of Skaneateles, 610 F.3d 55, 58-59 (2d Cir. 2010)*, and *Harris v. Mills, 572 F.3d 66, 71-72 (2d Cir. 2009)*. Where a viable claim is comprised of several necessary elements, a claimant must [*8] allege facts sufficient under *Twombly* and *Iqbal* to satisfy each element. See, *e.g., RSM Production Corp. v. Fridman, No. 09-1202-cv, 387 Fed. Appx. 72, 2010 U.S. App. LEXIS 14970, 2010 WL 2838582, *1 (2d Cir. July 21, 2010)* (claims for tortious interference with contract and prospective economic advantage requiring plaintiff to allege that defendants' conduct caused the complained-of injury properly dismissed where "[l]ike the district court, we conclude that plaintiffs have failed plausibly to plead this element.") (citing *Iqbal* and *Twombly*).

In cases where, as here, a federal court's subject matter jurisdiction is based upon the diversity of the parties' citizenship, the governing substantive law is that of the state where the court sits. Accordingly, the elements of the Bain Defendants' counterclaims are governed by the law of Connecticut.

**B. Analysis of the Bain Defendants' Counterclaims**

**1. *The Manner in which the Bain Defendants Plead their Counterclaims***

The Bain Defendants assert their counterclaims against Kopperl in a pleading captioned "Amended Counterclaim" in the singular, but comprised of nine separately numbered and captioned counterclaims, designated as Counts One through Nine.

The pleading prefaces the nine counterclaims [*9] with 40 paragraphs of allegations, some factual and some conclusory, which describe a number of negligent, bad faith, or fraudulent acts on Kopperl's part constituting negligence, fraud, breach of contract, or violations of Connecticut statutes. The counterclaims themselves fol-

low a formula. With the exception of Count Two, which demands declaratory relief, each counterclaim is given a caption describing its nature; the 40 prefatory paragraphs are incorporated by reference; some additional allegations are made in some of the counterclaims; a violation of the particular legal duty is asserted; and each counterclaim concludes with the allegation that ARI, VRS, and Bain "suffered damages." The nature and amount of the damages suffered are not pleaded with respect to any counterclaim.

Plaintiff moves under *Rule 12(b)(6)* to dismiss all the counterclaims except Count Two, which seeks declaratory relief.

**2. *The Counterclaims' Allegations of Damages***

As noted, each of the Bain Defendants' counterclaims seeking monetary relief does nothing more than allege that as the result of Kopperl's conduct, as summarized in the counterclaim, the Bain Defendants have "suffered damages." There are no specific [*10] allegations, on any theory of recovery, with respect to the nature of those damages or their amount.

The Bain Defendants' brief appears to argue that the 40 paragraphs preceding the enumerated counterclaims contain all the necessary averments, leaving it to the Plaintiff (and to the Court) to match up the relevant paragraphs with each counterclaim's allegation of "damages." But the Bain Defendants' obligation to plead damages adequately may not be shifted in this fashion.

Damages are an essential element of a claim at law for monetary loss. A defendant's conduct, however reprehensible, is not actionable unless the plaintiff pleads and proves (1) that plaintiff's conduct caused him damage (the *causation* element) and (2) the amount of the damage with reasonable certainty, not left to surmise or speculation (the *quantum* element). If one prefers to state the proposition in Latin, the maxim *damnum absque injuria* comes to mind.

At the pleading stage, governed by *Rule 12(b)(6)*, a plaintiff's demand for money damages must satisfy the *Twombly* and *Iqbal* requirement of factual, non-conclusory allegations stating a plausible claim that defendant's conduct caused specific economic harm in a quantifiable [*11] amount. *See Fink v. Time Warner Cable, No. 08 Civ. 9628, 2009 U.S. Dist. LEXIS 63708, 2009 WL 2207920 at *4 (S.D.N.Y. July 23, 2009)* (where plaintiff claimed defendant's violation of Computer Fraud and Abuse Act "causes damage by impairing the integrity or availability of data and information, as well as certain communications and protocols," complaint dismissed because "[t]his allegation merely parrots the statutory language and is thus insufficiently factual to

frame plausibly the damages element of plaintiff's CFAA claim.") (citing *Iqbal*).

Similarly, in the case at bar, the Bain Defendants' formulaic repetition in each counterclaim of the mantra that they "suffered damages" as the result of Kopperl's conduct does not satisfy the pleading requirements of *Twombly* and *Iqbal*. Nor is the deficiency cured by reference to the 40 prefatory paragraphs. Their inadequacy in this respect is illustrated by the Bain Defendants' argument in their brief at 6 that their damages caused by Kopperl's fraudulent misrepresentation are sufficiently pleaded by the allegation that "in reliance on Kopperl's representations, Bain, ARI and VRS wasted several years during which time they could have sought a partner and co-manager in the [*12] business who would execute a definite agreement and who had the financial wherewithal to do so." One can only speculate what the Defendants may or may not have achieved if during those years they had sought other business partners. Such allegations do not state a plausible claim for an identified and quantified economic loss.

All the counterclaims challenged by Plaintiff's motion will be dismissed for failure to sufficiently allege damages. Leave will be given to replead damages for counterclaims which in all other respects state a viable claim. In repleading damages, the Defendants must state separately as to each counterclaim the nature of the injury or damages claimed and the amount as can best be calculated or estimated, coupled with factual allegations sufficient to state a plausible claim that the Plaintiff's alleged conduct giving rise to the particular counterclaim caused the complained-of injury.

In drafting any amended counterclaim pursuant to this Ruling, the Bain Defendants and counsel must keep in mind the provisions of *Rule 11, Fed. R. Civ. P.*

### 3. *Count One: Breach of Duty to Negotiate in Good Faith*

Plaintiff moves to dismiss this counterclaim on the ground that the alleged [*13] "cause of action for breach of a duty to negotiate in good faith is not a cognizable claim" under Connecticut law. Main Brief at 4.

In opposing that motion to dismiss, the Bain Defendants point out that the Letter of Intent signed by both Kopperl and Bain provided that the parties will "make a good faith effort to come to an agreement," and contend that "Plaintiff ignores the distinction between a preliminary agreement that does not bind the parties to their ultimate contractual objective, but which does contain a binding agreement to negotiate open terms in good faith." Brief at 3. For the proposition that they may enforce against Kopperl a binding agreement to negotiate in good faith, the Bain Defendants cite and quote *Vacold*

*LLC v. Cerami, 545 F.3d 114, 124 (2d Cir. 2008)*, which applied New York law.

*Vacold* is the most recent in a string of Second Circuit cases which divide binding preliminary agreements into two categories, Type I and Type II, with Type II binding the parties "to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework." *Id.* The earlier cases include *Network Enterprises, Inc. v. APBA Offshore Productions, Inc., 264 Fed. Appx. 36 (2d Cir. 2008)*; [*14] *Brown v. Cara, 420 F.3d 148 (2d Cir. 2005)*; *Adjustrite Systems, Inc. v. GAB Business Services, Inc., 145 F.3d 543 (2d Cir. 1998)*, and *Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69 (2d Cir. 1989)*. These cases adopt and follow the seminal opinion of District Judge Pierre Leval (as he then was) in *Teachers Insurance & Annuity Association of America v. Tribune Co., 670 F.Supp. 491 (S.D.N.Y. 1987)*, which first articulated the Type I/Type II analysis of binding preliminary agreements.

In the case at bar, the Bain Defendants contend that they have adequately pleaded a Type II binding preliminary agreement to negotiate in good faith the terms of the final agreement. "The considerations relevant to whether a binding Type II agreement exists are: (1) whether the intent to be bound is revealed by the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) whether there was partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Network Enterprises, 264 Fed.Appx. at 37* (citing *Brown v. Cara*).

However, the question of whether the Bain Defendants have adequately [*15] pleaded an enforceable Type II agreement does not arise unless Connecticut law provides for such a cause of action. Judge Leval's decision in *Tribune* and the cited Second Circuit cases adopting it, including *Vacold*, all construed New York law. The Second Circuit made a particular point of that in *Brown*, noting that in *Tribune*, Judge Leval described the two types of binding preliminary agreements after "collecting the relevant New York law," *420 F.3d at 153*, and adding in a footnote: "Defendants express some doubts as to whether Type II agreements exist in New York law, or are merely a creature of the federal courts. However, New York courts have cited with approval *Tribune* and *Adjustrite*, and appear to recognize the possibility of 'Type II' preliminary agreements." *Id. at 153 n.1* (citing New York cases).

I read *Brown* as an implicit but clear holding by the Second Circuit that in a diversity case, a federal court cannot enforce a Type II preliminary agreement unless the law of the state where it sits recognizes the concept. This is a logical requirement in diversity cases, since

some states explicitly reject the concept. See, *e.g.*, *Cinelli v. Ward*, 997 S.W.2d 474, 478 (S.Ct. Ky. 1999):

> Simply   [*16] stated, we view the Agreement as lacking the necessary definiteness of an enforceable contract requiring consummation of the proposed transaction and as lacking the requisite intent of the parties to be bound to same. We construe it as merely an attempt to bind the parties to good faith negotiations. We note that *some jurisdictions recognize such agreements to negotiate in good faith* and have imposed a measure of damages for a party's failure to so negotiate. (citing *Tribune*). *We seem to take the "all or nothing" approach*: Either the agreement is enforceable as a binding contract to consummate the transaction or it is unenforceable as something less.

(citing Kentucky cases) (footnote omitted) (emphases added).

Moreover, the most recent New York cases relax their adherence to Type I/Type II preliminary agreement analysis. In *IDT Corp. v. Tyco Group, S.A.R.L.*, 13 N.Y.3d 209, 215 n.2, 918 N.E.2d 913, 890 N.Y.S.2d 401 (2009), affirming the dismissal of a complaint, the New York Court of Appeals said:

> The parties debate whether the settlement is a Type I or Type II preliminary agreement as used in federal lines of cases (citing *Brown* and *Tribune*). While we do not disagree with the reasoning in federal cases, we do not find   [*17] the rigid classifications into "Types" useful. . . . [W]e find that it is enough to ask in this case whether the agreement contemplated the negotiation of later agreements and if the consummation of those agreements was a precondition to a party's performance. In the instant matter, it clearly was.

In *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 70 A.D.3d 423, 427, 894 N.Y.S.2d 47 (1st Dept. 2010), the Appellate Division declined to follow *Tribune* because "our Court of Appeals recently rejected the Federal Type I/Type II classifications as too rigid" (citing *IDT Corp.*). These cases would undermine the Bain Defendants' reliance upon Second Circuit cases

construing New York law, even if New York law governed this case, which it does not.

In the case at bar, the relevant question is whether, under Connecticut law, a preliminary agreement may bind a party to negotiate in good faith with respect to the open issues and terms in the final contemplated agreement, so that a failure or refusal to negotiate those terms constitutes an actionable breach of contract. The few Connecticut cases cited in the parties' briefs do not directly address that question. In his Main Brief at 4, Plaintiff relies   [*18] on *Dacourt Group, Inc. v. Babcock Industries, Inc.*, 747 F.Supp. 157, 160 (D.Conn. 1990), a diversity case which cited only *Tribune* and another case that applied New York law, *Reprosystem B.V. v. SCM Corp.*, 727 F.2d 257, 264 (2d. Cir. 1984). Appearing to accept the regimen set forth in those New York cases without any discussion of whether it was applicable under Connecticut law, Judge Eginton rejected the plaintiff's claim on the facts: "Based on the evidence presented, the Court does not find that . . . a *binding* preliminary agreement sufficient to support an implied duty of good faith existed." *Dacourt*, 747 F. Supp. at 160 (emphasis in original). In light of the fact that *Dacourt* did not discuss whether the duty to negotiate in good faith applies in Connecticut or cite any Connecticut cases recognizing such a duty, this Court does not consider it persuasive authority that a cause of action for breach of duty to negotiate in good faith exists under Connecticut law.

In a diversity case, a federal court's proper function is to apply the law of the state in which it sits, not create that law. Therefore, in the absence of a showing that this counterclaim is viable under Connecticut law,   [*19] it will be dismissed under *Rule 12(b)(6)* for failure to state a claim upon which relief can be granted, without leave to replead.

### 4. *Count Three: Fraudulent Misrepresentation*

The gravamen of this counterclaim is that Kopperl fraudulently misrepresented "that he intended to negotiate and finalize the terms of a Definitive Agreement and that he had the financial wherewithal to complete the transaction." Bain Defendants' Brief at 5.

Plaintiff contends that this claim cannot be legally viable because there is no enforceable contractual obligation under Connecticut law to negotiate in good faith in the circumstances of the case, "and thus no claim can be asserted for a misrepresentation regarding a non-existent duty." Plaintiff's Reply Brief at 3. But the second proposition does not necessarily follow from the first. The elements of a cause of action for fraudulent misrepresentation are "(1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was

made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment." *Billington v. Billington, 220 Conn. 212, 217, 595 A.2d 1377 (1991).* [*20] A false representation by Kopperl that he intended to negotiate in good faith is a statement of fact that satisfies the first element, whether or not he had a legal duty to do so. The February 27, 2006 Letter of Intent and Agreement in Principle, signed by both Kopperl and Bain, establishes the timing, content and form of Kopperl's statements the Bain Defendants say were false. At least for the purpose of pleading a plausible claim, fraudulent intent may be inferred from Kopperl's alleged stonewalling of Bain's repeated efforts to get him to discuss the final contract terms.

Where the fraudulent misrepresentation counterclaim fails to pass *Twombly-Iqbal* muster is in the fourth element, which requires factual allegations sufficient to show that the Bain Defendants relied on Kopperl's false statements of intent "to [their] detriment," that is to say, Kopperl's conduct caused the Bain Defendants damages which must be adequately pled. Fraud is not actionable unless it causes damage. The deficiency of this counterclaim in that regard was discussed *supra*. This counterclaim will be dismissed, with leave to replead on the element of damages.

### 5. *Count Four: Negligent Misrepresentation*

I reach [*21] the same conclusion with respect to the Bain Defendants' counterclaim for negligent misrepresentation. The elements for this cause of action are that "(1) defendant had a duty to use reasonable care in giving information, (2) defendant supplied false information, (3) upon which the plaintiff relied, to its damages." *Winn v. Ameriquest Mortgage Co., No. CV-05-40150021S, 2006 Conn. Super. LEXIS 1129, 2006 WL 122975 (Sup.Ct. Hartford Apr, 12, 2006).* This claim arises out of the same nexus of facts pleaded in support of the counterclaim for fraudulent misrepresentation. Kopperl's argument that "Defendants make no claim that Plaintiff owed any *duty* to enter into an agreement with them," Main Brief at 8, misses the mark: the duty alleged on the part of Kopperl is to use reasonable care in giving information about his intentions and capacity during the course of serious and important discussions about a commercial relationship. This counterclaim is adequately pled, except for the element of damages, discussed *supra*. This counterclaim will be dismissed, with leave to replead on the element of damages.

### 6. *Counts Five and Six: Breach of Fiduciary Duty and Breach of Duty of Loyalty*

The Amended Counterclaim alleges in prefatory [*22] ¶ 15 that, "[p]resuming that Bain and Kopperl would reach a definitive agreement, Bain hired Kopperl

as a director of ARI and VRS, with his title to be determined by the definitive agreement."

Kopperl does not dispute on this motion that he was a director of the corporate defendants at times pertinent to the case. He does not deny that a company director owes a fiduciary duty and a duty of loyalty to the company. Notwithstanding Kopperl's contrary assertions, the counterclaims adequately allege acts that, if proven, would constitute breaches by Kopperl of those duties, principally the diversion to himself of company funds generated by transactions involving vehicles.

Kopperl's Reply Brief at 6 says that such allegations pertain to "his performance *as an employee* of ARI and VRS" and "are irrelevant to Mr. Kopperl's performance *as a director* of ARI and VRS, and thus irrelevant to a breach of fiduciary duty claim." No authority is cited for the doubtful proposition that a company director may wrongfully divert company funds and escape a charge of breach of fiduciary duty because he was also an employee at the time. Most corporate employees are not directors, but this one was. Nor is there [*23] substance to Kopperl's contention that these counterclaims' "failure to allege that any of these transactions was either concealed from the Defendants, or unauthorized by them" render them insufficient under *Iqbal*. The descriptions of the transactions are introduced by the allegation in prefatory ¶ 26 that "Kopperl was also improperly and fraudulently booking sales of automobiles."

However, these counterclaims trail off into inadequate pleading. Count Five alleges that "Kopperl violated his fiduciary duties to ARI, VRS and Bain in various ways as aforedescribed," and "[a]s a result of the foregoing, ARI, VRS, and Bain have suffered damages." ¶¶ 43, 44. Count Six recites the same formula for the breach of the duty of loyalty. The Defendants and the Court are left to select from the 40 prefatory paragraphs the particular conduct that constitutes a particular breach. These counterclaims also fail to allege damages sufficiently, for the reasons previously stated. Counts Five and Six will be dismissed, with leave to replead, specifying which alleged acts of the Plaintiff constitute a breach of the duties involved, and stating a claim for damages in a manner consistent with this Ruling, or [*24] if so advised, asserting a claim for nominal damages. See *News American Marketing In-Store, Inc. v. Marquis, 86 Conn. App. 527, 535, 862 A.2d 837 (2004).*

### 7. *Counts Seven and Eight: Civil Theft and Conversion*

These counterclaims sufficiently allege actionable diversions by Kopperl of property belonging to the Bain Defendants. However, the allegations of damages are deficient. These counterclaims will be dismissed, with

leave to replead a claim for damages in a manner consistent with this Ruling.

### 8. *Count Nine: Computer Crime - Violation of Conn. Gen. Stat. § 53a-251*

*Conn. Gen. Stat. § 53a-251* contains the state's computer-crime statute. *Conn. Gen. Stat. § 52-570b* provides that "any person who suffers any injury to person, business or property may bring an action for damages against a person who is alleged to have violated any provision of *section 53a-251*." The Bain Defendants rely on that provision in asserting this counterclaim against Plaintiff.

Count Nine does not assert a plausible claim under the statute. All the prefatory paragraphs allege on this subject is that after his termination, "Kopperl breached the privacy and security of the electronic data used at ARI and VRS" and "surreptitiously and  [*25] unlawfully accessed company email through the accounts and passwords of two other active employees" in conjunction with "several unsuccessful attempts by Kopperl to access the computer system under his own, then-deactivated, account." ¶¶ 37, 39. While the Bain Defendants allege that Kopperl accessed the companies' computer systems without authorization, there is no allegation that Kopperl used the accessed information in any way that caused damage to the Defendants. Accordingly, the Defendants do not state a viable statutory claim. In *News American, 86 Conn.App. at 547-48*, a case where unauthorized computer access undoubtedly occurred, the Connecticut Appellate Court held that "[i]n order to state a valid claim under *§ 52-570b*, however, the plaintiff needed to show that it suffered injury," and the claim was properly rejected where the trial court "found that the record contained no evidence of injury, actual damages, unjust enrichment, actual loss or pecuniary loss suffered by the plaintiff." In the case at bar, there is no allegation of that necessary element.

While the Bain Defendants seek to distinguish *News American* on the ground that the defendant in that case was still in plaintiff's  [*26] employ when he accessed the company's computers without authorization, whereas Kopperl's employment had been terminated, this is a

distinction without a difference; injury is a necessary element in either event.

The Defendants also assert in their Brief at 11 that "[t]he legislation, however, does not require proof - or allegations - of pecuniary loss to satisfy the element of harm." For that proposition they cite and quote *§ 52-570b* as follows: "Proof of pecuniary loss is not required to establish actual damages . . . " This is in fact a partial quotation of *§ 52-570b(d)*, which reads in its entirety (with the words Defendants omitted in italics): "Proof of pecuniary loss is not required to establish actual damages *in connection with an alleged violation of subsection (e) of section 53a-251 arising from misuse of private personal data*." The statute defines "private personal data" as "data concerning a natural person which a reasonable person would want to keep private and which is protectable under law." *Conn. Gen. Stat. § 53a-250(10)*. The Defendants' counterclaim fails to allege that Kopperl accessed any private personal data, or that he misused any accessed data and caused injury [*27] thereby.

Count Nine will be dismissed without leave to replead.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's motion to dismiss Counts One and Nine of the Bain Defendants' Amended Counterclaim is GRANTED, without leave to replead.

Plaintiff's motion to dismiss Counts Three, Four, Five, Six, Seven and Eight of the Bain Defendants' Amended Counterclaim is GRANTED, with leave to replead. Any repleaded counterclaims must be filed and served not later than **September 22, 2010**.

It is SO ORDERED.

Dated: New Haven, Connecticut

August 30, 2010

*/s/ Charles S. Haight, Jr.*

CHARLES S. HAIGHT, JR.

SENIOR UNITED STATES DISTRICT JUDGE



ADVANCED ARM DYNAMICS OF NEW ENGLAND LLC v. COMPREHENSIVE
PROSTHETIC SERVICES LLC AND JOHN ZENIE

DOCKET NO. CV 06-5004605S

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF NEW HA-
VEN AT NEW HAVEN

*2011 Conn. Super. LEXIS 182*

February 23, 2011, Decided

NOTICE:        THIS DECISION IS UNREPORTED
AND MAY BE SUBJECT TO FURTHER APPELLATE
REVIEW. COUNSEL IS CAUTIONED TO MAKE AN
INDEPENDENT DETERMINATION OF THE STA-
TUS OF THIS CASE.

JUDGES:   [*1] Corradino, Judge Trial Referee.

OPINION BY: Corradino

OPINION

**CORRECTED - MEMORANDUM OF DECISION
(Correction to Memorandum of Decision dated
10/7/10, filed on 10/8/10 Correction made was re: typo
in plaintiff's name in the heading)**

**1.**

The Court will first make general references to the
facts of the case before discussing the general legal prin-
ciples it will rely on. More detailed reference to the facts
will be made when it tries to apply those legal principles
to the issues before it.

Several counts have been brought by the plaintiff
against Mr. Zenie. The first count lies in breach of fidu-
ciary duty, the second count and third count assert a
breach of the employment and operating agreements.
The plaintiff also advances a violation of CUTPA against
Zenie and the company he set up in 2005, CPS. In the
tenth count the plaintiff alleges Zenie and CPS violated *§
53a-251* of the general statutes which makes it a crime to
steal or engage in the unauthorized use of information
stored on a computer system.

Regarding the breach of fiduciary duty claim the
court will rely heavily on a decision it wrote in
2000, *Custard Insurance Adjusters v Nardi* 2000 CT Sup
5085 and a more recent opinion, *CTRE LLC v Thora
Colburn* 2008 CT Sup 10477  [*2] which concerned
breach of that duty in the employment context.

The alleged violation of fiduciary duty is central to
all the counts against the defendant and in many respects
underlies and supports the allegations and legal theories
of these counts. Or to put it another way the factual alle-
gations on which the breach of fiduciary duty claim lie,
form the factual basis for the various legal theories ad-
vanced by the plaintiff in the various counts.

**2.**

The basic facts of the case do not appear to be in
dispute. John Migueles and John Zenie are prosthetists
who met each other in college. Mr. Migueles founded
AAD New England in 1998. On November 25, 2002
AAD New England he entered into an "operating agree-
ment" with Mr. Zenie, they described themselves as
founding members of a new entity to be called Advanced
Arm Dynamics of New England LLC which was formed
under our Limited Liability Company Act, Connection
Limited Liability Company Act, *§ 34-100 et seq.* In the
introductory section in paragraph A it states "AAD has
developed specialized knowledge and methodologies for
business development, marketing and providing high
quality services to patients who need consultation and
patient care services   [*3] on upper extremity prosthetics
(that is, artificial limbs for the shoulder, arm and hand
area. . ." Mr. Zenie is described as "operator" and para-
graph B states that he "provides patient care services in
upper add lower extremity prosthetics (that is, artificial

limbs for the arm and leg area) and has expertise to manage and market such services. Paragraph C states AAD and operator (Zenie) "desire to establish the company to operate a business which provides consulting and advanced patient care services in upper extremity prosthetics." It then says "Accordingly, the parties agree to form, own, manage and operate the company on the following terms: (the provisions of the agreement follow)

Section 1 contains "organization provisions" In section 1.2 it says "Purpose: The company has been organized to attract new patients and requests for service by informing prospective patients and referral sources about available services for the provision of upper extremity artificial limbs (the 'Business') and for all other purposes for which a limited liability company may be formed under the act."

Section 6 of the Agreement will be quoted by the Court in relevant part:

"**6. Confidential Information**.

**6.1** [*4] **Trade Secrets of the Company**. Operator will help the Company develop and will have access to and become acquainted with various trade secrets, all of which shall be owned by the Company, used in the operation of the Company's Business, and maintained as confidential by Operator and the Company. Unless and until they become public information or of general knowledge, Operator shall not disclose any such trade secrets, directly or indirectly, or use them in any way other than for the Company's benefit or for any purpose other than performing services for and on behalf of the Company.

**6.2 Property Ownership**. Patient information, files contracts, manuals, reports, letters, notes, notebooks, lists, records, patient lists, vendor lists, purchase information, designs, computer programs and similar items and information, relating to the Business, coming into the Company's possession in connection with the Business, shall be the Company's property. . . .

**6.3 Confidential Data**. Operator, in the course of Operator's duties, will have access to and become acquainted with patient information, financial, accounting, statistical and personal data of the Company. Except for such information which is [*5] otherwise available through public means or general trade knowledge, all such data is confidential and shall not be disclosed, directly or indirectly, or used by Operator in any way, other than providing services to patients for and on behalf of Operator and the Company.

**6.4 Protection of Confidential Information and Other Property**. . . . Operator acknowledges that the Company cannot protect its trade secrets and other confidential information against unauthorized use or disclosure and cannot readily assure compliance with Sections 6.1 through 6.3 above if Operator holds interests in competitive businesses or engages in or assists competitive activities by others. . . ."

**6.5 Further Protection**. Operator agrees that for a period of two (2) years following any purchase of Operator's Member Interest by the Company or another Member, as provided in this Agreement, unless Employment is terminated "without cause' under the Employment Agreement, Operator shall not directly or indirectly render upper extremity prosthetics services of a business, professional or commercial nature, whether alone, as shareholder, partner, or as a director, officer, manager employee, consultant, or holder of more [*6] than 5% of the capital stock of any other corporation or other entity, to or for any person or firm, whether for compensation or otherwise, that is competitive with the Company. Without restricting the scope of activity that may be competitive with the Company, any business engaged in any service related to upper extremity prosthetics hall be deemed automatically to be competitive with the company.

**6.6 Exceptions**. Section 6.5 shall not prohibit Operator from purchasing, for investment purposes, up to 5% of the outstanding stock of a publicly-held corporation listed on the New York Stock Exchange, provided that the investment does not require Operator to participate in the operation of the company in which Operator invests.

**6.7 Experience; Absence of Hardship**. Operator acknowledges and represents that Operator has sufficient experi-

ence and expertise, particularly in lower extremity prosthetics and orthotics, to engage in noncompetitive activities after the expiration or termination of this Agreement (but while the provisions in Section 6.5 continue in effect), and that Sections 6.1 through this Section 6.7 will not impose any form of undue hardship on Operator."

In section 9 at 9.7 it [*7] states "9.7 Indemnification, except for a breach of fiduciary duty which a manager owes to a company and to its members, as provided by the act, the company agrees to indemnify the manager and the members against any and all judgments. . ." As noted Mr. Zenie is defined as the "Operator in the opening paragraph of the agreement and section 1.3 states there shall be one manager and that "The first manager shall be the Operator," i.e. Zenie.

The first paragraph identifies AAD and John Zenie as the "founding members" of the new LLC.

Paragraph 1.5 of section 1 states "the company shall employ Operator pursuant to the Employment Agreement attached here to as Exhibit A ('Employment Agreement')"

The Employment agreement is between the new LLC, Advanced Arm Dynamics of New England LLC and "John R. Zenie an individual ('employee'). Paragraph 7 entitled "Disclosure of Information" which contains a long list of "proprietary information" it goes on to say that "in light of the highly competitive nature of the industry in which the company conducts its business" the employee agrees such information presently existing or obtained in the future "shall be considered confidential." The term of employment [*8] was to be for four years and the employee agrees that during the term and for two years thereafter he will not disclose any such information with out the company's consent or make use of it for his own benefit or that of any other entity.

In paragraph A of section 3 of the agreement it states the ". . . employee shall serve as manager of the company and faithfully and to the best of his ability perform the duties that customarily pertain to such office. . ."

These agreements were signed and became effective in November 2002. Employees were hired to assist Mr. Zenie in the operation of the business and by 2004 there were four, Holly Hollo the administrative manager, Roy Ferneini the business development manager, and two technicians Joe Peloquin and Joe Gaetani. The various claims in this matter arise out of the fact that through his attorney Mr. Zenie terminated the operating and em-

ployment agreement on May 18, 2005 and formed another business Comprehensive Prosthetics Services (CPS). Soon joining him in his new venture were employees of AAD New England.

3

(a)

The first count sets forth a claim of violation of fiduciary duties by Mr. Zenie. To Advance such a claim the plaintiff has the burden [*9] of establishing the existence of a fiduciary relationship. The court will first discuss whether such a relationship existed here and in the following subsections the duties such a relationship imposes.

In *Hi-Ho Tower Inc. v Com-Tronics Inc.* 255 Conn 20, 38, 761 A.2d 1268 (2000) the court said that: "In the similar cases in which this court has recognized the existence of a fiduciary relationship, the fiduciary was in a dominant position, thereby creating a relationship of dependency, or was under a specific duty to act for the benefit of another.

By the very act of signing the document setting up the new company in the "operating agreement Mr. Zenie established a fiduciary relationship with ADD New England as a founding member and manager and also assumed such a relationship to the company through entering into the Employment Agreement. Both agreements imposed specific duties on Mr. Zenie to act in the best interest of the newly formed company. Mr. Zenie signed both agreements and is presumed to know their contents and the duties the agreements imposed on him. The general law is that: "One who accepts a written contract is conclusively presumed to know its contents and to assent to them. A party signing [*10] a written contract has a duty to inform him or herself of its contents before executing it", "Contracts" 17 Am Jur 2d, § 201, page 214; Calamari & Perillo On Contracts, 5th ed, § 9.41, Page 392, cf *Friezo v Friezo* 281 Conn. 166, 199, 914 A.2d 533 (2007).

Apart from the specific obligations and status conferred by these two agreements *section 34-141(a)* of the Limited Liability Company Act states "(a) A member or manager shall discharge his duties under section 31-140 and the operating agreement in good faith, with the care an ordinary prudent person in a like position would exercise under similar circumstances and in the manner he reasonably believes to be in the best interests of the limited liability company . . .". *Section 34-140* states members shall manage such an entity subject to its articles of organization which may set forth "provisions for regulation and management of its affairs."

Under the Employment Agreement Zenie is an agent of ADD New England and agency is a fiduciary relationship, *Restatement (3d) Agency, § 1.01*; *comment c* thereof states that elements of common law agency are present in the relationship between employer and employee."

Before examining the general law on specific alleged [*11] violations of the fiduciary relationship alleged here, reference should be made to procedural issues which arise when a principle sues an agent for such violations. Several of the cases about to be discussed involve situations where an agent in a fiduciary relationship had direct dealings with the party to which a fiduciary duty was owed. But the general principals set forth would seem to apply to all breaches of fiduciary obligation where the breach is claimed to have harmed the party to whom the fiduciary duty is owed to the agent's benefit. In *Murphy v Wakelee* 247 Conn. 396, 400, 721 A.2d 1181 (1998) the court said:

"Our law on the obligations of a fiduciary is well settled. [A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other . . . . The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him . . . .(1994). Once a [fiduciary] relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary . . . . Furthermore, [*12] the standard of proof for establishing fair dealing is not the ordinary standard of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence . . . . Proof of a fiduciary relationship, therefore, generally imposes a two fold burden on the fiduciary. First, the burden of proof shifts to the fiduciary and second, the standard of proof is clear and convincing evidence."

See also *Heaven v Timber Hill LLC* 96 Conn. App. 294, 302-303, 900 A.2d 560 (2006). There is indication in the cases, however, that this burden shifting exercise comes into play when a fiduciary or confidential relationship exists and this is "shown together with suspicious circumstances". In the *Heaven* case at 96 Conn.

App. at 303-304, *Murphy* at 247 Conn. at page 405 the courts characterize prior cases by saying "In such cases, if the superior party obtains a possible benefit, equity raises a presumption against the validity of the transaction or contract," also see *Cadle Co. v D'Addario* 268 Conn. 441, 456, 844 A.2d 836 (2004).

Zenie, because of his management position and direct contact with and control over employees and confidential information [*13] and assets of the L.L.C. and the geographical location of Mr. Miguelas, could be said to be the "dominant" member of the company and is in a "superior" position to Miguelas as regards the company management and assets. This is somewhat analogous to burden shifting rules when one party has access to and control over facts and circumstances necessary to the establishment of a particular aspect of litigation -- here with the added ingredient of a fiduciary relationship thrown into the mix.

(b)

Given the existence of a fiduciary relationship, the question becomes what is the nature and ambit of the fiduciary obligation owed by someone in Mr. Zenie's position a fiduciary relationship having been established. This question is best discussed in terms of agency law. Mr. Zenie is obviously the agent of the LLC through the employment agreement.

Also agency is defined as a fiduciary relationship in *§ 1.01 of the Restatement (3d) Agency* and as noted in *comment (c)*: "Agency encompasses a wide and diverse range of relationships and circumstances. The elements of common law agency are present in the relationships between employer and employee, corporation and officer, client and lawyer, and partnership [*14] and general partner." For example, Connecticut has applied this principle to so-called joint ventures. In *Electronic Associates v Auto Equipment Development Corp*. 185 Conn 31, 35, 440 A.2d 249 (1981) the court said: "As a matter of law parties to joint ventures undertake fiduciary duties to each other concerning matters within the scope of the joint venture." Zenie as a member and "operator" (read "manager") of this LLC, under the Limited Liability Company Act had an agency relationship with it which carried along with it concomitant fiduciary obligations. *Section 34-130* states in *subsection (a)* that except as provided in *subsection (b)* "every member is an agent of the limited liability company for the purpose of its business or affairs . . . *subsection (b)* states that merely being a member does not mean such person is an agent but "(2) even manager is an agent for the purpose of its business or affairs." The agreement defines Mr. Zenie as the "operator" by which clearly qualified him as a "manager" given the broad range of his duties under the founding agreement. Section *§ 34-140 (a)* just makes clear that the

fiduciary duties imposed on members or managers runs back to the LLC and is not a statutory  [*15] invention to protect entities dealing with LLC in that the latter's agents can bind the LLC or expose it to liability.

The broad principles on which a claim of violation of a fiduciary relationship are based is found in agency law where it has been said that . . . "an agent or principle is bound to the exercise of the utmost good faith, loyalty and honesty towards his (her) principal or employer;" 3 Am. Jur. 2d, "Agency", § 210. Encompassed within this fiduciary principle is the duty of loyalty. *Restatement (3d) Agency in § 8.01* defines the following "general fiduciary principle": "An agent has a fiduciary duty to act loyally for the principle's benefit in all matters connected with the agency relationship." Our case law subscribes to this broad principal, *Town & Country House & Home Service v Evans* 150 Conn. 314, 317, 189 A.2d 390 (1963) of *News America v Marquis* 86 Conn. App. 527, 533, 862 A.2d 837 et seg. (2004). A count alleging a violation of the duty of loyalty by someone in a fiduciary relationship "is a common law cause of action independent of any statute", *id at 86 Conn. App. Page 534*, if *Sperry Rand Corp v Rothlein* 241 F. Supp. 549, 559 (D. Conn, 1964) (Applying Connecticut Law)

Moving from the general  [*16] to the specific the court will now try to discuss those various requirements and aspects of the duty of loyalty that form the basis of the allegations here. The court has relied heavily on the restatements of Agency, 2d and 3d. Connecticut Appellate courts have done so extensively, see *Holiday Inc v Munroe* 37 Conn. Sup 546, 426 A.2d 814 (1981) (Restatement 2d) and especially recently *Middlesex Mutual Ins Co v Komondy* 120 Conn. App. 117, 991 A.2d 587 (2010) (Restatement 2d); *Yale University v Out of the Box LLC* 118 Conn. App. 800, 985 A.2d 1080 (2010) (Restatement 3d); *Byars v Berg* 116 Conn. App. 843, 977 A.2d 734 (2009) (Restatement 2d); *Leblanc v New England Raceway LLC* 116 Conn. App. 267, 976 A.2d 750 (2009) (Restatement 3d) *Hollister v Thomas* 110 Conn. App. 692, 955 A.2d 1212 (2008) (Restatement 2d) *National Publishing Co v Hartford Fire Ins Co* 287 Conn. 664, 949 A.2d 1203 (2008) (Restatement 2d) *Ravetto v Triton Thalassic Technologies Inc* 285 Conn. 716, 941 A.2d 309 (2008) (Restatement 2d); *Mystic Color Lab Inc v Auctions Worldwide* 284 Conn. 408, 934 A.2d 227 (2007) (Restatement 2d) *Bella Vista Condominium Assoc. v Byars* 102 Conn. App. 245, 925 A.2d 365 (2007) (Restatement 2d).

After setting forth these general principles the court will discuss the facts of this case to determine whether the particular claims of violation  [*17] of the duty of loyalty have been met.

**4.**

**(a)**

The plaintiff claims various specific violations of the duty of loyalty by Mr. Zenie. The court will first discuss the alleged solicitation by Mr. Zenie of employees of the plaintiff in his new business prior to his departure from the plaintiff LLC.

The cases are not uniform in their treatment of pre-departure solicitation of employees by defendant planning on leaving the company to work for a competitor or set up his or her own competing business. The majority view and this court believes better view bars such activity. This issue is dealt with in *§ 8.04* competition of Restatement 3d. That section says such an individual may prepare to compete after the agency relationship terminates as long as the action taken is "not otherwise wrongful."

It violates the duty of loyalty to encourage or arrange for fellow employees to work for a competitor or rival business one intends to establish while still working for a company that will be subjected to the competition, *BBF Inc. v Geramium Power Devices Corp.* 13 Mass. App. Ct. 166, 430 NE 2d 1221, 1225 (Mass, 1992); *Sperry Rand Corp. v Rothlein* 241 F. Supp. 549, 563 (D Conn., 1964); *Electronic Assoc. v Automatic Equipment* 185 Conn 31, 36, 440 A.2d 249 (1981); [*18] also see *Nichols-Morris Corp. v Morris* 174 F. Supp. 691, 698 (S.D NY, 1959); *Chusid & Co. v Leeman & Co.* 326 F Supp 1043, 1060 (SD NY, 1971); *Bancroft-Whitney Co. v Glen* 64 Cal. 2d 327, 49 Cal. Rptr. 825, 411 P2d 921, 935 (Cal, 1966); *Dames & Moore v Baxter & Woodman Inc.* 21 F. Supp. 2d 817, 822 (ND, Ill, 1998), also see comment e of § 393 of Restatement 2d and discussion in document *(c) to § 8.04 of Restatement 3d* which cites *Ridal v 520 S. Michigan Ave Assoc.* 78 F Supp 2d 748, 763 (ND, Ill, 1999). See also numerous cases cited in 19 COA 745 "Cause of action by employer against party inducing employee to leave employment," at § 5, page 763.

Several cases hold that it is improper to solicitate fellow employees particularly in two situations (1) where the person so soliciting is an officer of the business that will be subjected to the competition (2) where the solicitation is aimed at key employees. It should also be noted that comment (e) to the Restatement (2d) Agency says it is permissible for an employee to make arrangements to compete before he or she leaves an employment "however, a court may find that it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously  [*19] and without giving the employer an opportunity to hire and train replacements." A fortiori it would be improper for

one employee who is an officer to orchestrate such a departure under such circumstances.

Thus the cases attach some importance to the fact that solicitation of employees by an officer or manager has occurred. See *Chelsea Industries Inc v Gaffney 389 Mass. 1, 449 NE2d 320, 362 (Mass, 1983)*; *Electronic Associates Inc v Automatic Equipment Development Corp. 185 Conn 31, 33, 440 A.2d 249 (1981)*; *National Rejectors Inc. v Trieman et al 409 S.W.2d 1, 37 (MO, 1966)*, of more recent case of *Security Title Agency Inc. v Pope 219 Ariz. 480, 200 P3d 977, 991 (Auz Ct App., 2008)*

See also reference to more recent cases in *comment (e) to section 8.04 of the Restatement of Agency*, *GAB Business Services Inc. v Lindsey & Newsom 83 Cal. App. 4th 409, 424, 99 Cal. Rptr. 2d 665 (2000)*. There the court noted that one of the defendant former officers of the plaintiff "used his insider's knowledge of employee skills and salaries to recruit valued employees away from the corporation he owed a fiduciary duty to, and into jobs with the corporation's competitor", id, ef *Reading Radio Inc v Fink 2003 PA Super 353, 833 A2d 199, 211 (8a super, 2003, appeal denied 577 Pa. 723, 847 A.2d 1287 (Pa 2004)*.

Comment [*20] (c) also notes that: "Some of the cases discuss a 'higher duty' applicable to corporate officers and directors but in the context in which the position held has enabled the defendant to inflict substantial competitive disadvantage "citing *Veco Corp. v Babcock 243 Ill. App. 3d 153, 611 N.E.2d 1054, 1059, 183 Ill. Dec. 406 (see App 1993)* where the court said:

"In general, employees may plan, form, and outfit a competing corporation while still working for the employer, but may not commence competition . . . corporate officers, however, stand on a different footing; they owe a fiduciary duty of loyalty to their corporate employer not to (1) actively exploit their positions within the corporation for their own personal benefit, or (2) hinder the ability of a corporation to continue the business for which it was developed."

In *Veco* the defendant officers solicited for a competing business venture all the employees involved with the present employer's ability to service a major client.

The defense to such a claim is often factual in nature. It could be argued, for example, that the solicited employees "were in the process of being eliminated or leaving on their own" *GAB Business Services v Lindsey*

*& Newcomb 83 Cal App 4th at p425* or [*21] that any solicitation did not occur until after the termination of the fiduciary obligation because a defendant had resigned his position. *Republic Systems & Programming Inc. v Computer Assistance Inc. 322 F. Supp. 619, 626 (D Conn. 1970)* (applying Connecticut law); *Electronic Assoc Inc. v Automatic Equipment Development Inc. 185 Conn. 31, 36, 440 A.2d 249 (1981)*.

The court will discuss the defenses when it conducts its factual analysis.

**(b)**

There are other aspects of Mr. Zenie's conduct which the plaintiff claims violated his fiduciary duties. This conduct is alleged to have occurred while Mr. Zenie was still employed by AAD-New England or had its inception while he was still working at that company and evidenced in conduct after he left. The court will try to set forth its understanding of the law as to these claims. Both of the matters are discussed in *Section 8.05 of Restatement 3d* which states:

"§ 8.05 Use of Principal Property: Use of confidential Information

An agent has a duty (1) not to use property of the principal for the agent's own purposes or those of third party (2) not to use or communicate confidential information of the principle for the agents own purposes or those of a third party.

The [*22] commentary to *§ 8.05 at section b* has two observations regarding the ambit of this section. It says at pp314-315; "An agent is subject to this duty whether or not the agent uses the property of the principal to compete with the principal or causes harm to the principal through the use. At page 315 it says; "Termination of an agency relationship does not end an agent's duties regarding property of the principal. A former agent who continues to possess property of a principle has a duty to return it . . ."

Retention and use of customer lists by an agent or one otherwise owing a fiduciary duty who leaves the company and sets up a competing company or works for such company has been often litigated.

Restatement 3d regards customer lists as a type of "confidential information" under certain circumstances. In *comment (c) to § 8.05* the law is summarized:

> "An agent's duties concerning confidential information do not end when the agency relationship terminates. An agent is not free to use or disclose a principal's trade secrets or other confidential information whether the agent retains a physical record or them or retains them in the agent's memory.
>
> See Illustrations 6 and 7.
>
> "6. P, who owns a   [*23] commercial cleaning service, maintains a list of customers and prospective customers, noting particulars about each. P's list would be of competitive use to others. P maintains the list on a computer in P's office and restricts access to high-level employees within P's organization. A, P's general manager, who wishes to establish a competing cleaning service, retains a hard copy of the list that P gave to A to use in A's work. A resigns, taking the list and planning to use it to solicit business for A's new competing firm. A has breached A's duty to P.
>
> 7. Same facts as Illustration 6, except that A commits the list to memory, memorizing a portion each day and then trying that portion into A's home computer each evening. Same result.

Speaking very broadly the law is that while one is employed by one company it is not permissible under a duty of loyalty test to solicit that company's customers for a rival business already existing and a fortiori for a rival business one plans to form, see *Duane Jones Co. Inc. v Burke* 306 NY 172, 188, 117 N.E.2d 237 (NY, 1954) and *Ellis & Marshall Assocs. Inc. v Marshall* 16 Ill. App. 3d 398, 403-404, 306 N.E.2d 712 (1973) commenting on *Duane Jones*. Our state adopts this rule, see *Town & Country House and Home Service Inc. v Evans* 150 Conn 314, 317, 189 A.2d 390 (1963); [*24] *Holiday Food Co. v Munroe* 37 Conn. Sup. 546, 549, 426 A.2d 814 (App. Div of Sup. Ct, 1981) *Chelsea Industries Inc. v Gaffney* 389 Mass. 1, 449 N.E.2d 320,

326 (Mass 1983); *SHV v Coal Inc. et al v Wingrove* 376 Pa. Super. 241, 545 A.2d 917, 920 (Pa 1988).

The general rule, however, must be further explained. *Holiday Inn v Monroe supra* involved a claim for damages and injunctive relief where the former employee acquired customers of the principal for his competing business. The court cited *Town & Country House & Home Services* for the proposition that a claim could be made for "business done with customers solicited before the end of the employment" but held it was not the case that "any customer with whom the defendant had contact could never become a customer of the business formed by the defendant when he left the plaintiff's employ." But the court did say the rule and this fiduciary mandate "would apply only to customers solicited by the defendant for the enhancement of his business before his employment with the plaintiff had terminated," *id* 37 Conn. Sup. Pp 549, 550.

*Ellis & Marshall Associates Inc. v Marshall supra* is interesting in this regard and suggests the fine lines that must be drawn. It held that *Duane Jones Inc.* was different  [*25] from the case before it because in *Marshall* the facts "although similar in some respects lack the proof that the defendant did more than inform certain clients of his intention to leave the plaintiff's employ. The defendant here did not ask the plaintiff's clients to approve his plan or even attempt at that time to persuade them to employ him in his new capacity. The defendant's conduct prior to his resignation falls short of that which the *Jones* court found to be violative of and employee's fiduciary duty to his employer, "*16 Ill. App. 3d at p 404*.

Another aspect of the issues presented by cases of this type is illustrated by the case of *Western Medical Consultants v Johnson* 835 F.Supp 554, 558 (D Ore., 1993). There the court recognized the rule that "the agent cannot utilize confidential information of the principal in her subsequent competition with that principal, nor may the agent solicit customers before the termination of her agency." In *Johnson* the court found no evidence of "customer contacts". The evidence demonstrated to the court that the defendant did not violate any fiduciary duty because she found potential customers through two sources (1) the yellow pages and (2) a listing   [*26] form a government agency, *id, page 559*.

(c)

Leaving aside the solicitation of customers similar issues concerning the violation of fiduciary duties are raised when it is claimed the former employee now in competition with the company he or she worked for, used information contained in documents or other resources developed by the former employer. The court

will repeat a *section 8.05 of Restatement 3d* reads as follows:

> § 8.05 Use of Principal's Property; Use of Confidential Information
>
> An agent has a duty (1) not to use property of the principal for the agent's own purposes or those of a third party; and (2) not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party.

The comments to this section indicate that "The rule is a corollary of a principal's right as an owner of property, to exclude usage by others." It applies if the agent uses the property to compete with the principal (*comment b*) and "termination of an agency relationship does not end an agent's duties regarding property of the principal" (id). *Comment (c)* defines "confidential information" very broadly; "Many employees and other agents are given access by the principal  [*27] to information that the principal would not wish to be revealed or used except as the principle directs. Such information may pertain to the principal's business plans, personnel, financial results and operational practices among a range of possibilities." In fact the same comment goes on to say that the agent is not free to use such confidential information "whether the agent retains a physical record of them or retains them in the agent's memory."

The rule stated is a counter part of Section 395 and 396 of Restatement 2d Agency. It can cover a whole range of activity such as use of actual machinery developed by an employer use of documents setting forth manufacturing techniques and, as noted customer lists with a concomitant solicitation of the customers of the former employer. See *David Welch Co. v Erskine & Tulley 203 Cal. App. 3d 884, 250 Cal. Rptr. 339, 341-343* (fee schedules, methods of operation, and other information). Compare also *News America v Marquis 86 Conn. App. 527, 862 A.2d 837 (2004)*, where the former employer provided in store advertising to retail chain stores. The former employee being sued for breach of the duty of loyalty took business related material, customer lists, customized presentations, e-mails  [*28] he sent and received and copies of store list material. The court struggled with the plaintiff's ability to prove a damage amount but had no problem in finding that the removal of documents from the employer's business" on the eve of resignation, on a Sunday, and trying to induce a fellow employee to leave the principal to become employed by a competitor are of course breaches of the duty of loyalty", *id at page 538*.

The reasoning behind the rule is straight forward and set forth in comment (a) to § 395 of Restatement 2d: "The relation of principle and agent permits and requires great freedom of communication between the principal and the agent because of this the agent is often placed in a position to obtain information of great use in competing with the principal. To permit an agent to use for his own benefit or for the benefit of others in competition with the principal information confidentially given or acquired by him in the performance of or because of his duties as agent would tend to destroy the freedom of communication which should exist between the principal and the agent." The rule is fairly easy to apply -- it applies "to information which the agent should know his principal  [*29] would not care to have revealed to others or used in competition with him (sic)".

A Second Circuit case sets forth the guideline with its caveat analogous to the one for customer lists and solicitation of customers. The court said: "The rule applicable to the present inquiry is that an agent has a duty not to use confidential knowledge acquired in his employment in competition with his principal. . . . This duty exists as well after the employment is terminated as during it's continuance" . . . . On the other hand, use of information based on general business knowledge or gleaned from general business experience is not covered by the rule, and the former agent is permitted to compete with his former principal in reliance on such general publically available information," *Abro Music Inc. v Harrisongs Music Ltd 722 F2d 988, 994 (CA 2d, 1983)*.

**(d)**

Despite these general principles, a final observation should be made. The duty of loyalty and the law of fiduciary obligations does not prevent a former employee from competing with his principal. Referring to comment (e) of restatement (2) the court in *Town & Country House & Homes Service v Evans supra* said that absent a restrictive agreement:  [*30] "the agent can properly compete with his principal in matters for which he had been employed. Thus before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete", *150 Conn. at page 317*. It would seem to follow that before he or she leaves the employment the employee can take steps to set up a business which will compete with the employer or entity to which a duty of loyalty was owed. It has been so held in cases cited in the Reporters' Notes; see *Mercer Management Consulting Inc. Wilde 920 F Supp. 219, 234* where the defendants took several actions to set up a competing business while still employed by the former employer -- they incorporated the planned competing business, made arrangements for office space, inquired about benefit packages, investigated computer

systems, and met with an accountant. Also see *Instrument Repair Service Inc. v Gumby* 238 Ga. App. 138, 518 S.E.2d 161, 164 (Ga App. 1999). But see *Kentucky case of Steelvest Inc. v Scansteel Serv Ctr* 807 S.W.2d 476, 483 (KY, 1991) which says directors and officers may not set up a business intended to be competitive while still serving as officers -- they should terminate their  [*31] position before making such arrangements.

The notes indicate even if the setting up of the competitive business is done in "stealth" this does not constitute a breach of fiduciary duty, see *Mercer Management* case supra. It is said an agent has no duty to disclose "his competitive intentions" except where silence on the part of the agent places principal at a disadvantage in its dealings with its own agent", quoting from *CTC Communications Inc. v Bell Atl corp* 14 F. Supp. 2d 133, 143 (D. Me, 1998).

An older Illinois case is also instructive. The court in *James C. Wilborn & Sons Inc. v Heniff* 95 Ill. App. 2d 155, 237 N.E.2d 781 (1968) said:

"A review of the evidence indicates that the defendants merely exercised their right to leave one employment and form or join a rival business. Thus, this case is distinguishable from those cited by the plaintiff. The latter involved either the appropriation of a bona fide trade secret (e.g., *Schulenburg v Signatrol, Inc.,* supra) or a proven plot to destroy another's business. . . . The defendant, herself, did not violate his duty of loyalty to Wilborn by forming Brandex and purchasing machinery for it while working for Wilborn. It is not necessarily a breach of duty  [*32] for an agent to form a rival concern and purchase machinery for it while working for his principal. . . . though it would be for an agent to continue to work for his principal after a rival corporation which he also served as agent begins business." 95 Ill. App. 2d at 163.

Also see *Radiar Abrasives v Diamond Technology* 177 Ill App. 3d 628, 637, 532 N.E.2d 428, 126 Ill. Dec. 743 (1988).

**5.**

**Violation of Duty of Loyalty**

The court will now attempt to apply the foregoing case law and principles to the claims made in this case.

**(a)**

The court will first discuss whether solicitation of the plaintiff's employees occurred here so as to allow the court to conclude Mr. Zenie violated this aspect of the duty of loyalty. The operating agreement setting up the LLC and the employment agreement for Mr. Zenie were

effective in November 2002. By 2004 there were four employees in the office, Ms. Holly Hollo who was the administrative manager and patient coordinator, Roy Ferneini the business development manager, and two technicians, Joe Peloquin and Joe Gaetani.

Mr. Zenie, through counsel, sent a letter to the plaintiff's lawyer on May 18, 2005 terminating his employment with and membership in the plaintiff LLC as of July 1, 2005. He worked at AAD  [*33] New England until June 30 and started operating his new company CPS, in July 2005. Holly Lanouette (the marriage name of Holly Hollo) sent in a letter of resignation to Mr. Migueles dated June 17, 2005. The effective date of her resignation was July 1, 2005. On the same date Joseph Peloquin also sent a resignation letter to Mr. Migueles, effective July 1, 2005.

Ms. Hollo started working for CPS and Mr. Zenie on July 11, 2005. She left in 2006 to be a stay at home mom. Mr. Peloquin began working for CPS in July 2005. Mr. Ferneini testified he sent in a letter of resignation to AAD New England and began working for CPS July 18, 2005.

Ms. Hollo testified and Mr. Zenie agreed that, while still working for the plaintiff, he negotiated the terms of her employment with his new company, CPS, in May or June of 2005. Over several pages of testimony Ms. Hollo repeatedly said Mr. Zenie offered her a job with the new company he was forming, all of this taking place before June 30, 2005 while Zenie was still employed by the plaintiff and a member of the LLC. She also testified Mr. Zenie told her he had offered jobs to Peloquin and Ferneini. She said that after Zenie left she herself thought AAD New  [*34] England would have difficulty carrying on since the patients were so loyal to Mr. Zenie. Zenie did nothing to dispel this; Hollo also testified Zenie said he did not think the company could continue without him.

More to the point Ms. Hollo signed an employment agreement between her and CPS on June 16, 2005 which Mr. Zenie also signed while he was still an employee of the plaintiff and a member of the LLC. He also gave her a raise of several thousand dollars over the salary from her AAD New England position. This agreement (Ex 26) even said Hollo would be offered "comparable health insurance to that provided by AAD"; it included a deferred compensation plan and educational expense reimbursement. She did not have the latter at AAD New England. Paragraph 6 said "additional benefits and terms of employment (e.g. vacation sick days, etc.) shall be equal or greater than that provided by AAD." (emphasis by this court). As noted the next day, June 17th, she quit working for the plaintiff.

As to Mr. Peloquin he had known Mr. Zenie prior to coming to work at the plaintiff's company. In June 2005 he overheard a conversation between Zenie and someone else at the office in which Zenie said he was [*35] leaving AAD, New England; Zeinie also told him he was leaving. At one point in his testimony he said he approached Mr. Zenie about going into his new company -- he wanted to follow Zenie, Zenie had trained him as a prosthetist. He later said that in June 2005 he negotiated with Zenie the terms of his employment agreement at CPS which included a raise. He sent in his letter of resignation to the plaintiff on June 17, 2005. As of that date he had accepted Zenie's offer of employment at CPS.

Mr. Ferreini also testified at the time of trial he had known Mr. Zenie for nineteen years. He met him because he needed a brace and said of Zenie: "John was able to make me work." Ferneini's brother is a doctor and over the course of the years referred patients to Zenie.

Mr. Ferrreini testified that in May or June 2005 Zenie told him he was leaving AAD New England. He stated he did not ask Mr. Zenie for a job prior to Zenie's departure on June 30, 2005 and Zenie did not offer him a job during that time frame. He was "happy" where he was and sent Mr Migueles an e-mail saying he was staying with AAD New England but knowing Zenie leaving "we won't have any revenue" he asked for a retention bonus and a [*36] raise. Not hearing anything he resigned a week later. He resigned on July 11th and started working at CPS on July 18, 2005.

Mr. Ferneini's story is somewhat contradicted by other witnesses. Hollo testified that Zenie told her that he offered Ferneini a job at CPS. At trial Mr. Zenie was asked whether he offered a job to Ferneini in late May 2005. He said "A. Again I affirmatively responded to his request for employment in late May or early June." In response to a further question about whether he offered Ferneini a job in late may or early June Zenie said: "A. Yes.".

As to all of these people Mr. Zenie said it was "absolutely" his testimony that they came to him independently and said I would like to work for CPS as opposed to him asking them if they would like to work for him in his new company.

He also made an offer of a job to Mr. Gaetani and as to all these four people Zenie offered a raise which to him "certainly constituted a better pay grade." Gaetani also testified Zenie offered him a job before Zenie left AAD New England at CPS. Gaetani said he wanted Zenie to put the offer in writing but Zenie "said no, he wouldn't put it in writing." Gaetani never left AAD New England to work [*37] for CPS.

It is evident to the court at least whether the burden is on the plaintiff to prove violation of a fiduciary duty or on the defendant to dispel it by clear and convincing evidence that, from the foregoing recitation of the facts found by the court, Zenie violated his duty of loyalty by soliciting employees of the plaintiff to work for CPS. The court attaches no significance, in this regard, to whether these employees first approached him about employment with his new company. The point is that he supervised these people, while still an officer of the plaintiff he hired them to work for the new company he was setting up, CPS. The fact that each one of them approached Zenie for prospective employment is not what caused harm to AAD New England; as rational actors it must be assumed that each of them would not have agreed to jump ship unless they received an offer from Zenie to the effect that they were hired. A word used in some of the case law cited by the court states in lieu of solicitation language, that an employee planning on setting up or joining a competing firm may not "entice" a fellow employee to leave. If these people would have gone to work for CPS in any event leaving [*38] their at-will positions with AAD New England why was it found necessary to give each one of them "a better pay grade", to use Mr. Zenie's own words. The agreement signed by Hollo and Zenie underlined the specific monetary advantages offered to her by CPS employment as opposed to her then current AAD New England employment. These added benefits to these employees simply were an encouragement to leave employment with the plaintiff by an officer thereof. It dispels any notion that at the point they approached him, they were already in the process of leaving on their own.

Zenie's status as an officer was something he could not trade upon in offering jobs to these people. He hired them and generally supervised their work. His experience with them in these regards would have given him an insight into their skills. He must have thought highly of them since he eventually offered all of them employment in his new company.

If in fact Zenie was approached by these people, the answer to that supposition is a respectful, so what? He should have told them in light of his fiduciary obligations and duty of loyalty that he could not, at the present time, discuss employment with them while he was still [*39] an officer of AAD New England. To say that that was not his fiduciary obligation would be tantamount to saying AAD New England had no justifiable interest in ensuring its company was not denuded of its employees almost all at once. If such an interest existed, which surely must be the case, Zenie as an officer had a duty not to do anything to bring about that eventuality.

The court will also conclude this section by referring to two matters that were raised as something relevant to

all the claims of fiduciary obligation and any violation thereof. It is said that CPS was really not a competitor of AAD New England. It was suggested that CPS did not, and was not envisaged by Zenie as a company that would compete with AAD New England. The court has difficulty with the premises of this position. Subsection C of the "Operating Agreement" states that "AAD and Operator (Zenie) desire to establish the company to operate a business which provides consulting and advanced patient care services in upper extremity prosthetics." Subsection A does note AAD's extensive knowledge and methodologies with regard to the delivery of upper extremity services. But subsection B say that Mr. Zenie "provides patient [*40] care services in upper and lower extremity prosthetics (that is, artificial limbs for the arm and leg area), and has the expertise to manage and market such services" (emphasis by court.) In fact the way the business operated is that AAD New England did accept and treat lower extremity patients and Mr. Zenie stated at CPS he treated at least some upper extremity patients.

Also leaving the competition factor aside, if a company officer owing a duty of loyalty, while working for that company, makes job offers to employees who leave as a group even if not to work for a competitor but, for example, an entity in a related business why would not that be a violation of fiduciary obligations? Furthermore the court does not accept the notion they, the three employees who left, were not key employees. Separately considered, perhaps, but their leaving as a group in effect eviscerated the AAD New England office. Zenie had a right to resign but he resigned in the context of taking with him the business development manager for AAD New England, its managing secretary, and a technician. They were certainly valuable enough for a business of this type for Zenie to make job offers to all four of the employees [*41] and offer them raises suggesting there is not a fungible market for such employees. Once he decided to leave employees at all Mr. Zenie made no discernible effort to solicit skilled employees elsewhere.

Also once these employees left in masse it certainly would seem to have had an effect on AAD New England ability to compete with CPS as to upper extremity business. But such an observation really is involved with the issue of damages not with the predicate to such a discussion - has a breach of fiduciary duty been established?

Finally the court will specifically address something that it did not in its general discussion of the duty of loyalty and solicitation of fellow employees. The court in *Nardi* did not intend to suggest by citing *Electronics Associates, Inc. v. Automatic Equipment Develop. Corp.*, 185 Conn. 31, 440 A.2d 249 (1981) that a company officer otherwise owing a duty of loyalty cannot violate that duty if he solicits a fellow employee who does not have an employment contract but is employed at will to

work for a competing company or a competing company he plans to establish. In fact *Electronic Associates* stands for the opposite proposition. See *page 36* where the court noted the solicitation [*42] occurred of the at-will employees after Merritt left the plaintiff's employment and once he so left "no fiduciary duties restrained him from using ordinary methods to encourage his former coworkers or subordinates to follow him to its competitor." Or to put it in a less long winded way the solicited at-will employees certainly have a right to leave the present employer but this has nothing to do whether a company officer owing a duty of loyalty can effectuate that result by making such employees job offers for a competing company he or she plans to establish.

The court concludes that in regards to the solicitation of AAD New England employees, it is clear that Mr. Zenie violated the duty of loyalty owed to the plaintiff.

**(b)**

The court's previous discussion of case law seems to underline the position that there is nothing improper for a person with a fiduciary obligation to simply inform patients of an intention to leave the employment of an entity to whom the duty is owed nor is it true that someone setting up a new business cannot have as a patient or customer anyone who was the customer of the former employer. This would have too stifling an effect on the right to compete and the creation [*43] of healthy competitive markets.

What cannot be done is to engage in actual solicitation of customers, here patients, while still employed by a company with which one intends to compete. The reasons for this seem obvious. If one engages in this type of activity, the customer or patient is really being encouraged to put off or delay using the services of the employer to whom the employee and future defendant owes a fiduciary duty, all for the financial benefit of the latter. Also this employee is provided a convenient platform from which he can pursue his or her solicitations.

Ms. Hollo testified that Mr. Zenie had instructed her to maintain patient lists and keep them current when she first started working for AAD New England. They were obviously important especially in this type of medical business where people would often have to revisit a treatment facility for adjustment to their prosthetic devices. That appears to be a large portion of the business of places like AAD and CPS. Renewed visits and follow up visits are an important part of the revenue base of this type of company.

Hollo testified that after Mr. Zenie formally resigned, as to patients who had known and treated with Zenie [*44] over the years, "we" would say Zenie is not going to be here but a practitioner would be at AAD New

2011 Conn. Super. LEXIS 182, *

England to take care of their needs. She would then say, upon patient inquiry, -- but that is not clear -- that Zenie would be opening an office in Branford. AAD New England was located in Guilford, the neighboring town to Branford -- the message being, hold off you can just go see Zenie in Branford. Ms. Hollo testified she also heard Zenie give this information to AAD New England patients. From May 18 to June 30, 2005 Hollo and Zenie knew the address in Branford since he had signed a lease for CPS so patients were also given the exact address.

Several patients were also given Mr. Zenie's cell phone number, she heard Zenie give this information to customers. In fact some of them called Zenie at CPS, once he opened there, on his cell phone according to Hollo. Hollo remembered five to ten calls of this type "mostly from people he knew" which implies less than all. But Hollo testified that from, May 18, 2005 to June 30, 2005, "all of the active patients of AAD New England" were given this information and Zenie instructed her to give the information to the patients.

Hollo also testified that [*45] she took patient lists from AAD New England saying "we wanted to get business from them. "She said she took the patient list from that company to CPS and used it to create a Christmas Card List; this list was merged with a doctor's list also taken from AAD New England. Hollo testified as to the doctors she just got information relating to them from the phone book. Zenie sent out these cards to solicite business.

An interesting side note to all this is that when the Christmas cards were sent out at AAD New England and CPS they were sent to both upper and lower extremity patients which has a bearing on the lack of competition position of the defendant -- why the cards to upper extremity patients?

Mr. Zenie denied Hollo's testimony. He said he never gave his cell phone number to patients or contacted them in any way. He was not aware that the patient list from AAD New England was taken by Hollo for use at CPS and that it provided the list of people to whom Ms. Hollo was instructed to send Christmas cards.

But on the other hand he testified that patient lists were important for business purposes other than just mailing season's greetings. It was important to know whether a patient had an upper [*46] or lower extremity device, the demographics of the business, and one would imagine patient addresses which might not be as easily procurable as a referral doctor's address which can be found without fail in a phone book.

The court accepts the testimony of Hollo. It is difficult to believe these patients just happened to locate Mr. Zenie in Branford without resort to cell phone access.

Suit against Hollow by AAD New England was dropped so she had a possible motive to give the testimony she did, but so did Mr. Zenie.

Basically the court finds it difficult to believe a person of Mr. Zenie's intelligence and business and organizational skills, as attested to by Mr. Migueles, who hired AAD New England's employees, and was their supervisors at that location somehow would have no knowledge of and participate in or direct the giving of his cell phone number and new business address and remain oblivious to Hollo's taking of a patient list from his former employer. Why would he not have explicitly instructed Hollo not to do these things just as he said he had patient's acknowledged they had not been solicited by CPS, what ever they might take that word to mean or from another perspective was Hollo [*47] during all this to carry favor with her new boss -- but how could that be, if she did not tell Zenie she was doing it? If one were to accept the posture he adopted at trial, he would have been highly offended at such a communications and would have ordered it to stop immediately.

In any event the court concludes the defendant violated the duty of loyalty as regards soliciting patients of AAD New England. What Hollo testified to goes beyond just giving people notice that you are leaving your current employment. Patients in effect were directed to where they could contact him at his new and competing business. In effect he gave himself a jump start after July 1, 2005 to set his business up and going before AAD New England could effectively respond, in part because of its loss of employees. There was in the court's opinion, a violation of the duty of loyalty.

**(c)**

Besides patient lists used to compete with an entity to which a fiduciary obligation was owed by going after its customer base there are other items of confidential information which were taken from AAD New England that the latter claims were used to its detriment in violation of Mr. Zenie's duty of loyalty. A so-called memory stick [*48] was used to take various items from AAD New England computers; so encoded they could be and in fact were used to aid CPS's operations.

For a violation of the duty of loyalty as to the various forms taken, as the earlier discussion indicated, the materials or information must be used in the context of a case such as this, to compete with the former principal or entity to which the fiduciary obligation is owed. The rule is not difficult to comprehend - it applies, according to the Restatement, "to information which the agent should know his principal would not care to have revealed to others or used in competition with him(sic)".

Some of the items taken were a list of suppliers who served AAD New England and provided prosthetic devices. Correct phone and contact information was important so that CPS technicians like their predecessors at AAD New England could contact the suppliers.

Also maintained in the AAD New England office and copied on to memory sticks were authorization forms for assessing what insurance companies would pay for prosthetic devices and the associated treatment of patients when such devices were installed and had to be repaired or adjusted after installation. The forms [*49] contained so-called L codes which Mr. Zenie would check off to ascertain insurance coverage. The L codes were taken from notebooks maintained in the AAD New England office. The forms copied included physician lists; medical providers were a source of referrals.

There is an "Initial Patient Assessment Form "of some five pages and a document entitled "Surgical Considerations for Optimal Prosthetic Rehabilitation." Also copied are what appear to be pricing lists.

Ms. Hollo also testified as to patient lists that were copied to the memory stick and which included contact information.

Mr. Migueles testified that he developed the patient assessment form which he described as an evolving document. The document was used to guide practitioners as to how the patients were to be serviced and to develop justifications and authorization documents to secure insurance coverage.

Another form copied was titled "Surgical Considerations for Optimal Prosthetic Rehabilitation". This form served as a guide to surgeons working with prosthetic providers to know what kind of prosthetic options were available and what would provide optimal prosthetic function.

Exhibits 6 listed various devices and codes for types [*50] of prosthetic devices made by various manufactures, the device to be ordered depending on the patient's needs. Mr. Migueles testified the manufactures have "huge catalogues". This whittles the process of ordering devices down and saves time in procuring the right device.

The posture taken by Mr. Zenie was that he did not instruct Ms. Hollo to copy these forms on to the memory stick. It did not appear to be a defense based for example on some notion that the forms and the information contained therein, especially as to the patient assessment form and the surgical considerations form, were something one who prepared these devices for patients would have in his or her knowledge by practicing in this field. Migueles stated these forms were in a format that was unique to AAD New England.

The court accepts Ms. Hollo's testimony which contradicts that of Zenie.

Ms. Hollo testified that between May 15, 2005 and June 30, 2005 when her resignation and that of Mr. Zenie were effective she made copies of electronic documents from AAD New England's computer system. She said that she was instructed to do this by Zenie. At one point he had given her a so-called memory stick which is attached to the [*51] computer to enable one to copy its contents. Many documents can be copied to this device. She copied all the forms used in the business, patient and Christmas card lists, supplier lists, insurance files. The forms included patient information. Secretarial forms were copied which Hollo did on her own volition, because she did not want to have to type the information again when she started working at CPS.

Unless instructed to do so by Mr. Zenie what possible reason would Hollo have to take forms that were not just secretarial forms but clinical in nature, such as the initial Patient Assessment Form and the Surgical Considerations Form? True, she had settled the suit brought against her by AAD New England but she did not give the impression that she was testifying so as to curry favor with anyone. She was selective in that sense; she testified Zenie did not instruct her to copy the secretarial forms, she did it for her own benefit. She also testified that fairly soon after CPS started up they did not rely on AAD New England forms because a Futura system was utilized that had its own forms.

Turning to the Futura forms relied upon by CPS they were not offered into evidence so that the court [*52] could compare them especially to the clinical forms just mentioned. And at least to the court some of Hollo's testimony was confusing. She said there was no need to use AAD New England forms because a Futura system was installed by CPS which had prepared forms. But it is unclear whether the information on the AAD New England forms was still utilized, was it added to the appropriate places in the Futura forms for example, it is also to be noted that the memory stick was taped to the wall of the CPS office, Zenie knew where it was according to Hollo, and it was used about twice a month. Why and for what purpose are not clear. The plaintiff's expert testified the memory stick was in fact used hundreds of times. If Zenie knew of the downloading process, and he had a fiduciary obligation, the burden should have been on him to dispel the notion that anything downloaded from the memory stick was not used in violation of the fiduciary obligation. Even leaving that aside, all the information and materials downloaded from the memory stick constitute information known only to Zenie and CPS. Once a prima facie case of the occurrence of downloading against the background of a fiduciary obligation [*53] is established, the burden of explanation as to how the

downloaded material was used should shift to the defendants since they have exclusive knowledge about this subject. In this context the burden of proof that any downloaded materials were not used in violation of a fiduciary obligation would be shifted to the defendants in this case, see 29 Am. Jur. 2d "Evidence", § 175, see _Aydin v. First State Ins. Co., 18 Cal. 4th 1183, 77 Cal. Rptr. 2d 537, 959 P.2d 1213, 1218 (Cal, 1998)._

If in fact Mr. Zenie instructed Ms. Hollo to transfer the forms to the memory stick what possible motive would he have, absent a defense based on their uselessness in a competitive setting or based on his own pre-existing knowledge of the profession and how his job should be done. The motive for such an instruction must be that he believed it would provide CPS with a competitive advantage. Or to put it another way violation of fiduciary duty by use of confidential material does not merely envisage securing advantage in an ongoing competitive struggle with a former employer or principal. It also could result in the inability of that employer or principal to operate at all. Here employees were solicited to work for CPS, physician lists and patient  [*54] lists were taken - physicians referred patients and once patients started with one of these centers a lucrative long term relationship could develop.

The court counted 64 doctors on the physicians list, 23 companies were listed on the "Suppliers List", and 102 patients were listed on Exhibit 24. Physicians are actively approached for referrals in this business where even patients treated in the past can be a lucrative source of income because of repairs and adjustments that might be needed. The patient list was compiled May 5, 2005. The documents discussed were transferred to the memory stick when the decision to start CPS had already been decided upon and the request to transfer and the mechanics of carrying it out were done by people who at the time were still employees of AAD New England. All this information including the intake forms enabled CPS to operate at optimum levels the moment it opened its doors. It had patient "intake forms" and the surgical considerations forms for immediate use to service patients.

Mr. Zenie was apparently not willing to rely on patients following him and finding out where CPS was located, he or his secretary could not be expected to remember the names  [*55] and contact information on 102 patients, 64 doctors and 23 suppliers. If the contrary was true why did he tell Hollo to transfer these items to the memory stick and why did Ms. Hollow do so?

An answer to all this is to says AAD New England was really not competitive with CPS so per the Restatement test for confidential documents why would Mr. Zenie have reason to believe his former employer would care about having CPS use this material? AAD New

England treated upper and lower extremity patients despite its declared raison d'etre [1] but and Zenie treated some upper extremity patients at CPS - this itself is a lucrative aspect of the prosthetic business, testimony indicated upper extremity devices cost in the range of $50,000 to $100,000. Also when the patient list was compiled on May 5, 2005 there is no indication that upper extremity patients were excluded thus precluding their receipt of cell phone numbers, office location and Christmas cards. Do the suppliers listed or physicians listed deal exclusively with lower extremity patients, both, or upper extremity patients?

> 1   This is an aspect of the case not explicitly developed by the plaintiff and the court does not rely on it as the predicate  [*56] to any of its conclusions.

**(d)**

The plaintiff also argues that other conduct engaged in by Zenie between May 18 and July 1, 2005 "facilitated his breach of (the) duty of loyalty" - his preparations to compete. The conduct alleged under this heading referred to in plaintiff's brief include (1) forming and registering CPS with the Connecticut Secretary of State (2) Directing his attorney to obtain a business license for CPS; (3) setting out in the first half of June 2005 to locate CPS office space (4) directing Ms. Hollo to transfer AAD New England's Connecticut Medical Reimbursement Program provider number to CPS and (5) ordering equipment needed to manufacture prosthetic devices.

The courts concludes all these proposed findings have been established but leaving aside category four has difficulty in concluding they would lead to a finding of a violation of fiduciary duty.

The court would refer to the line of cases discussed in its general discussion of the law which generally hold that an employee can take steps to set up a business which will compete with the employer to which the duty of loyalty was owed. As the cases cited indicate this could include arranging to purchase machinery locating [*57] office space, inquiring about benefit packages for prospective employees, meeting with an accountant or investigating computer systems. A Connecticut case, referred to by the court, held an agent can compete with his principle after terminating employment and can purchase a rival business and upon termination of employment immediately compete with the principle, _Town & Country House & Home Service v Evans, Supra 150 Conn at page 317._

This is a difficult area. The commentary to § 8.04 of restatement 3d is instructive citing cases on both sides of the issue but does not suggest a departure from the gen-

eral rule set form in comment (e) to section 393 of the Restatement 2d where it is said under the heading "Preparation for competition after termination of agency": "after the termination of his agency in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which the has been employed. . . Even before the termination of the agency he is entitled to make arrangements to compete except that he cannot properly use confidential information peculiar to his employer's business and acquired therein."

Given the high value our society places on [*58] competitive models reflected in our law, it would unnecessarily diminish the possibility of effective competition if the employee had to wait until termination of employment to take steps to set up his competitive company. A new enterprise could take weeks or months to be set up, giving the former employer a chance to nip the project in the bud (to coin a phrase) through price and advertising and customer incentives.

What is not permissible in preparing for competition is to purloin confidential information or solicit fellow employees and customers or otherwise take steps while still employed as an agent to unfairly cripple the former employer's right to effectively carry on business and/or compete. This would also destroy the disderatum of effective competition upon termination of the employment. Mere preparations, such as those referred to here only prepare for the competition and/or do not in themselves threaten the existence of the former employer's business prior to the termination of employment. To hold otherwise would put too heavy a price on the right to compete absent any indication the preparations involved do not violate duties as to confidentiality, for example.

Neither is [*59] there any evidence here that the preparations we are discussing in this section required Mr. Zenie to devote less time to his AAD New England work than he otherwise would have -- he is not said to have gone out during the middle of a work day to locate rental space for CPS or talk to lawyers or suppliers. The only testimony indicates that he continued to perform his work responsibilities for AAD New England until he left. Perhaps from an odd perspective it was in his interest to treat patients to the best of his ability -- he hoped to draw them to his new business when he left AAD New England.

However, Ms. Hollo did testify that after May 18, 2005, but before July 1, 2005 Mr. Zenie told her to switch the Medicaid Reimbursement number form AAD New England to John Zenie. It was transferred to CPS because by that time "we knew the name of the new company. Hollo testified Zenie and she were under the impression that the number attached to him was a provider -- he was the prosthetist treating the patients. Zenie

told her the number "belonged to him". This Medicad number was necessary for AAD New England to get reimbursed through that program.

Zenie denied telling Hollo to do this but why would [*60] she do it on her own. It is not clear to the court that in fact the Medicaid number was switched over to CPS. The internal memo of AAd New England notes Ms. Hollo "had requested to change ownership "of the number and it said AAD New England would" need a letter to stop this action". In any event Zenie did not get a medicaid number for CPS until October 2005.

The court can find no violation of the duty of loyalty by the listed preparations to compete noted in the plaintiff's brief.

....

But in several of the foregoing ways the court concludes that while working for AAD New England and before leaving that work Mr. Zenie violated his fiduciary obligations.

**6.**

## Breach of Operating Agreement and Employment Agreement

**(a)**

The court will first discuss the employment agreement and whether its terms have been violated by some of the same conduct which the court has found to be a violation of Zenie's fiduciary obligations.

The two provisions of that agreement at issue are section 3(b) and 7(a). Section 3(b) basically says the employee "Shall devote his full business time, energy and skill to the performance of his duties hereunder and shall not, without prior written approval of the company, become employed [*61] by or engaged in any business activity other then that of the company. . ."

There is no indication that Mr. Zenie's pre-departure preparations to form and prepare to operate CPS interfered with his employment obligations at AAD New England. The court has already discussed the generally liberal view the case law takes of so-called predeparture preparations to compete. However, there is nothing to prevent parties by way of contract from limiting or even barring post departure competition by way of non-compete agreements. See for example *Scott v General Iron & Welding Co. 171 Conn. 132, 368 A.2d 111 (1976); Torrington Creamery v Danbury 126 Conn 515, 12 A.2d 780 (1940); Hart Nimmger & Campbell Associates v Rogers 16 Conn. App. 619, 548 A.2d 758 (1988); Robert Weiss & Associates v Wiederlight 208 Conn. 525, 546 A.2d 216 (1988);* see also recent case

2011 Conn. Super. LEXIS 182, *

reviewing law in this area. _Deming v Nationwide Mutual Ins. Co. 279 Conn. 745, 761, 905 A.2d 623 (2006)_; 54A Am.Jur. 2d. "Monopolies& Restraints of Trade §§ 880 et. Seg., Dobbs Law of Remedies 2d ed, § 12.22 (2) at p449 of Vol. 3.

If this is true, it is difficult to see why parties cannot agree to limit pre-departure preparations to compete more strictly than would be required under the law of fiduciary obligations.   [*62] The employer may have an interest in trying to ensure the employee concentrate on using his or her mental energies to foster and develop only the employer's business. This would have a very limited effect on discouraging competition which is a key objective in setting guidelines in this area of the law, but recognizes a valid employer interest especially in highly competitive markets or where the business sought to be protected is a new venture in an otherwise untested or undeveloped market.

The court concludes a violation of § 3(b) of the employment agreement has been established by the pre-departure preparations to compete by Mr. Zenie -- getting CPS legally established, finding rental space, ordering machinery etc. This is certainly "business activity" having nothing to do with AAD New England's business; solicitation of employees and customers would also fall under this heading.

**(b)**

The violation of § 7(a) which defines what the plaintiff considered to be confidential is quite clear. The language is broad an inclusive as to all proprietary information computer programs, materials, pricing techniques, also see § 7(b). The court refer to its discussion concerning the so-called memory   [*63] stick and copies made of notebook material, use of these resources by CPS and direction by Zenie, which the court has found to secure this proprietary AAD New England information.

**(c)**

As to the Operating Agreement Violations of Sections 6.2, 6.3 and 6.4 have also been established for the immediately foregoing recisons and as a result of the court's findings of breach of Mr. Zenie's duty of loyalty. These sections involve confidential information of AAD New England and property ownership by the company of patient information, files, manuals, notebooks, patient lists, vendor lists, purchase information

**7.**

**Connecticut Unfair Trade Practices Act Against Zenie and C.P.S**.

A claim under the act, § 42-110b has also been made against Mr. Zenie. The court relies on its discussion in _Custard Insurance Adjusters v Nardi_ 2000 CT Sup. 5085. The court has not found that there has been a significant change in the law.

_Section 42-110b(a)_ states "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." _Subsection (4) of § 42-110a_ defines trade and commerce "(to mean) the advertising, the sale or rent or lease, the offering   [*64] for sale or rent or lease or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state".

In deciding whether CUTPA should apply in a particular case the U.S. Supreme Court in _FTC Sperry & Hutchinson_ 405 U.S. 233, 92 S. Ct. 898, 31 L. Ed. 2d 170 formulated the "cigarette rule" which our court has followed many times, see for example _Ivey, Barnum, O'Mara v Indian Harbor_ 190 Conn. 528, 539, fn. 13, 461 A.2d 1369 (1983). _Associated Investment Co. LTD Partnership v Williams Assn. IV_ 230 Conn. 148, 155, 645 A.2d 505, Fn 11 (1994).

The "cigarette rule" uses the following criteria to determine whether a practice is unfair:

> "(1) whether the practice, without having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, otherwise -- whether, in other words, it is within at least the penumbra of some common -- law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to customers."

Furthermore, as noted in The Connecticut Unfair Trade Practices Act, Langer, Morgan & Belt, Vol. 1, § 2.2 at   [*65] page 13.

> "the 'cigarette rule' standard has been extended under CUTPA to apply not only to customer relations but to other commercial relations such as competitor relations. This is consistent with the United States Supreme Court's parenthetical inclusion of competitors or other businessmen(sic) along with customers

when it quoted the Cigarette Rule language in (FTC v Sperry & Hutchinson) Supra." (The law has not changed see Vol. 12 conn. practice series, § 2.2, page 19, of *Sportsmen's Boating Corp. v Hensley* 192 Conn. 747, 474 A.2d 780 (1984))

As a predicate to applying CUTPA the actions complained of must fall within the "trade and commerce" definition of *§ 42-110a (4)*. *Quimby v Kimberly Clark Corp.* 28 Conn. App. 660, 613 A.2d 838 (1992) held that CUTPA was not applicable to employer -- employee relationships, of *Manning v Zuckerman* 388 Mass 8, 12, 444 NE 2d 1262 (1983).

Mr. Zenie was an employee of AAD New England when the breaches of the duty of loyalty occurred and uncertain respects the unacceptable behavior postdated his termination of employment with AAD New England.

*Larsen Chelsey Realty Co. v Larsen* 232 Conn. 480, 656 A.2d 1009 (1995) significantly limited the reach of *Quimby*. In *Larsen* the defendant was found to have [*66] taken actions violative of CUTPA when he had been hired by a competitor while he still was employed by the plaintiff. In effect the Larsen court held the defendant violated the duty of loyalty and though employed by the plaintiff company was acting "outside the scope of his employment relationship with the plaintiff," id pp493-494. Thus the *Quimby* limitations on what is after all an ameliorative act did not apply.

The case of *Fink v Golenbock* 238 Conn 183, 680 A.2d 1243 (1996) is also instructive. There the defendant was an employee and fifty percent shareholder in a company. (an interesting analogy to this case). The other 50 percent shareholder sued him relying on CUTPA. He alleged the defendant converted corporate assets, tortuously interfered with the company's reasonable business expectations, was unjustly enriched, and breached his fiduciary obligations. In Langer, Belt, and Morgan the court notes at § 3.3, pp 70-71 that Fink "rejected the argument that the dispute was one over governance of a corporation and observed *Glenbock's* conduct 'placed him indirect competition with the interests of the corporation' (*238 Conn at p. 214*).

Here CPS was organized before Zenie left his employment with AAD [*67] New England, he solicited employees and patients of that company: the employer was left with no prosthetist and one technician -- a situation which by any observation would have taken time by AAD New England to correct. Ms. Hollo at Zenie's direction copied from notebooks and from a computer forms and documents used in some degree by the new company.

Was all of this done in a competitive context? AAD New England primarily sought to develop an upper extremity prosthetic business but it had at the same time many lower extremity patients. The entire patient or customer list was taken from that company which included upper and lower extremity patients. It is certainly logical for a company trying to develop a practice in one specific area of medical treatment to at the same time carry on business in another treatment area - that was the whole point, one would imagine, why Migules thought Zenie was a good pick. Mr. Zenie is skilled in lower and upper extremity prosthetics and concentrated in lower extremity. He pursued this concentration he pursued at CPS, although he did have some upper extremity patients and there is no indication he turned them away. On the contrary while still at AAD. [*68] New England his cell phone number and new location was given indiscriminately to the plaintiff's patients and the patient lists that were taken included both upper and lower extremity patients.

In a way all of this is related to the "ascertainable loss" requirement. As a result of Zenie's action several employees, three of a total of four where removed from AAD New England and joined CPS upon its opening. The solicitation of patients as discussed by the court, facilitated the hit the ground running start up of CPS -- patients AAD New England would only have the opportunity to struggle to get back.

The act does not require the amount of any ascertainable loss to be proven. In cases like this such a requirement would place an often insurmountable barrier to the operation of an act intended to be ameliorative at least in a case where injunctive relief is being sought -- if that is true then here can an exact amount requirement be imposed in an ordinary damage claim. Given the facts of a case like this some loss can be assumed and nothing prevents a CUTPA claim from being made.

Commenting of the ascertainable loss requirement at § 6.4 of Vol. 12 of the Connecticut Practice Series, Langer, Morgan, [*69] and Belt note that *Hinchliffe v AMC* 184 Conn 607, 440 A.2d 810 (1984) held that "ascertainable meant 'capable of being discovered, observed or established.' Thus, in order to satisfy the 'ascertainable loss' requirement, the loss has to be measurable, but it is not necessary to allege or prove the amount of the ascertainable loss. The court in *Hinchliffe* determined that use of the term 'loss' rather than 'damage' indicated that CUTPA plaintiffs 'are not required to prove actual damages of a specific dollar amount' and that 'loss' necessarily encompasses a broader meaning than the term 'damage.' Determining that 'loss' is 'synonymous with deprivation, detriment and injury,' the court concluded that '[w]henever a consumer has received something oth-

er than what he bargained for, he has suffered a loss of money or property."

_Hinchliffe_ was an action brought by a consumer under CUTPA. It is difficult to see why its reasoning should not apply to an action brought by a competitor especially in a market situation where the evidence seems to indicate a lack of, numerous competitors -- a lack of which, under present economic theory, does not benefit consumer.

As to CPS, that company directly benefited from Zenie's [*70] wrongful actions. He created the company and in effect acted as its agent.

**8**.

**Violation of § 53a-251 Against Zenie and CPS**

_Section 53a-251_ deals with computer crimes. The activity claimed to be in violation of the statute is set forth in _subsection (e), subparagraphs 1 through 4_. Those sections are fairly summarized by the plaintiff as being applicable to this case and make it unlawful (1) intentionally to make or cause to be made an unauthorized use, disclosure or copy of computer data or information by accessing or causing to be accessed a computer system (2) intentionally and without authorization to take data from a computer system (3) knowingly to receive or retain computer data obtained through an unauthorized access, use, copy or disclosure; or (4) to use or disclose any computer data known or believed to have been obtained unlawfully.

The plaintiff is also correct in saying that the "plain language" allows for liability simply for copying information or data without authorization regardless of whether the information is used.

_Section 52-570b_ allows a person aggrieved because of a violation of a violation of _§ 53a-251_ to bring a civil action.

The foregoing, at least for the court  [*71] represents the easy part of the analysis. _Subsection (a) of § 52-570b_ states any person aggrieved by a violation of § 53a-251 may bring an action in Superior Court "for (1) an order temporarily or permanently restraining and enjoining the commencement or continuance of such act or acts (violative of § 53a-251) (2) an order directing the appointment of a receiver." Here no injunctive relief is being sought, there is no request that a receiver be appointed. It also does not seem the liability claim has been pursued in terms of a claim for restitution. It has been said that: "a claimant who has established an entitlement to restitution by providing the unjust enrichment of the defendant at the claimant's expense is ordinarily entitled to a personal money judgment against the defendant for

the amount of the enrichment in money", Restatement (Third) Restitution and Unjust Enrichment, Ch7, introductory note p. 117 (Tentative Draft N05, March 12, 2007).

No independent valuation was placed upon or claimed for these documents.

_Subsection (c) of § 52-570b_ appears to be more relevant to the present discussion of the claim being made. That section states "(c) Independent of or in conjunction with  [*72] an action under subsection (a) of this section, any person who suffers any injury to person, business or property may bring an action for damages against a person who is alleged to have violated any provisions of section 53a-251." The aggrieved person in such an action can recover damages, unjust enrichment and treble damages if there is a showing of "willful and malicious conduct." The claim here, in the court's opinion should be considered as "independent" of any action authorized by _subsection (a)_ but still relying on a violation of _§ 53a-251_.

The court has found that Ms. Hollo at Mr. Zenie's direction did in fact take numerous materials from the AAD New England computer system which material was used for the benefit of CPS, Zenie being a course the founder and agent of CPS. In that context Zenie and CPS thus knowingly received the material for use in the CPS business.

Even given that the court has some difficulty in ascribing any specific damage amount to the specific violations of _§ 53a-251_, which the court will further discuss in the next portion of this opinion dealing with damages.

**9**.

**Damages**

The court will make some general comments on causation and damages in light of its findings  [*73] as to various theories of liability. A predicate to awarding any damages is of course the requirement that the damages claimed were proximately caused by the defendant's wrongful conduct. In _Abrahams v Young & Rublcain Inc._ _240 Conn. 300, 692 A.2d 709 (1997)_ the court said that "it is axiomatic that proximate cause is 'an actual cause that is a substantial factor in the resulting harm", _id page 306_. A case cited by the plaintiff is instructive _Birnie v Electric Boat Co. 288 Conn. 392, 953 A.2d 28 (2008)_. That court noted "this court expanded the scope of the requisite proximate cause analysis by determining, that the 'substantial factor' causation standard "applies for example in tort law . . . id p. 411_. The test has been applied in claims under CUTPA, see _Abrahams v Young Rublcain supra_ and Workers compensation law, _Birnie v Electric Boat Co_. Supra. _Birnie_ quoted from an article in

2011 Conn. Super. LEXIS 182, *

The Harvard Law Review "describing 'a substantial factor (in a causation analysis) as not the sole factor, nor the predominant factor . . . it is enough if it is a substantial part of the causative antecedents. If it is one of several substantial factors." The court noted our state "has never adopted any major contributing factor    [*74]    theory. Instead we have relied on the substantial factor basis of proximate causation", *id p 412*. The court did go on to note that in the claim under the workers compensation claim before it "the substantial factor causation standard simply requires that the employment, or the risks incidental there to, contribute to the development of the injury in more than a de minimus way", (emphasis by the court), *id pp 412-413*.

The general question remains as to what requirements as to the exact amount of any damages must be met. It has been said that "a damage theory may be based on assumptions so long as the assumptions are reasonable in light of the record evidence . . . . The reasonableness of the assumptions underlying the plaintiff's damage theory is determined by the trier of fact . . . Federal appellate courts have refused to find damage evidence insufficient unless there was no basis for critical assumptions made by the trier of fact" *Cheryl Terry Enterprises v Hartford 270 Conn. 619, 640, 854 A.2d 1066 (2004)* (emphasis by Supreme Court) which quoted from *Westport Taxi Services, Inc v Westport 235 Conn 1, 28, 664 A.2d 719 (1995)*. Quoting from earlier cases the court in *Leggett Street Limited Parts v Beacon Industries 239 Conn. 284, 309, 685 A.2d 305 (1996)* [*75] said "'although damages often are not susceptible of exact pecuniary compensation and must be left largely to the sound judgment of the trier . . .; this situation does not invalidate a damage award as long as the evidence afforded a basis for a reasonable estimate by the (trier) of that amount' . . . . Mathematical exactitude in the proof of damages is often impossible, but the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate". See also on the latter point *Falco v James Peter Associates Inc. 165 Conn 442, 445, 335 A.2d 301 (1973)*. Also see *Willow Springs Condo Assn. Inc v 7th BRT Dev. Corp. 245 Conn 1, 65, 717 A.2d 77 (1998)*.

Connecticut law, then follows the law in all jurisdictions in these general observations, see, for example, section 703 of the article on damages in 22 Am. Jur. 2d at pages 605-606 which cites several Connecticut cases. There it says:

"The law of evidence regulates questions relating to the burden of proof in actions for damages. Generally, the burden of proof is upon the plaintiff, or on the party making a claim for damages, to show the fact and extent of an injury and to show the amount and value of his or her damages, whether   [*76] the action is for a breach of contract or for tort. Damages must be proved with reasonable certainty or by a preponderance of the evidence, but damages need not be proven with absolute, mathematical certainty, and it is sufficient if a litigant provides a reasonably accurate and fair basis for the computation of alleged damages, or if the evidence enables the factfinder to make a fair and reasonable approximation of damages"

In *Blanche Road Corp. v Bensalem Tp, 57 F3d 253, 265 (CA3, 1995)* the court referring to Pennsylvania law made observation which flow from the foregoing statements in our law and in Am Jur. There the court said: "Under Pennsylvania law speculative damages may not be awarded. Damages are considered speculative if 'the uncertainty concerns the fact of damages not the amount' . . . Consequently, damages are not considered speculative merely because they are not capable of exact calculation, "also see *Health Call v Atrium Home & Health Care 268 Mich. App. 83, 706 NW 2d 843, 852 (Mich. App. 2005)*. The *Health Call* case involved a suit by a home health care provider against a competitor and three independent contractor nurses who terminated their contracts with the plaintiff corporation and   [*77] went to work for the competitor. The court also said that "when the nature of a case permits only an estimation of damages with certainty it is proper to place before the jury all the facts and circumstances which have a tendency to show their probable amount . . . Furthermore the certainty requirement is relaxed where damages have been established but the amount of damages is an open question," *id page 852*.

The Am. Jur. Article cites a Second Circuit case which embellishes the just mentioned observation. In *Raisheurch v Foster 247 F3d 337 (CA 2, 2001)* the court said that although a damage award cannot be based on speculation: "If the plaintiffs inability to prove an exact amount of damages arises from the actions of the defendant a fact finder 'has some latitude to make a just and reasonable estimate of damages based on relevant data." The court in footnote two said it was relying on the so-called "Bigelow Principle" set forth in *Bigelow v RKO Radio Pictures 327 U.S. 251, 66 S. Ct. 574, 90 L. Ed. 652 (1946)* where the Supreme Court is said to have established that in cases where a defendant's wrong doing has prevented the plaintiff from demonstrating the exact measure of damages suffered the fact finder may

make [*78] a just and reasonable estimate of damages, *id page 264*. The same footnote referred to another U.S. Supreme Court case which said: "it does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted", *J. Truett Payne Co. v Chrysler Motors Corp. 451 U.S. 557, 566-567, 101 S. Ct. 1923, 68 L. Ed. 2d 442 (1981)*. The Am. Jur. Section refers to these principles as general law in an "observation" comment at § 703, page 608. Our appellate courts have not adopted the "Bigelow Principle" by direct reference thereto but there is the interesting case of *Hunting v Chambers 99 Conn. App. 664, 671-672, 916 A.2d 56 (2007)*. In that case the plaintiff landlord sought to recover damages for breach of a lease agreement and conversion of certain items of the plaintiff's property. One of the items taken was a grandfather clock. The court placed a value of $10,000 on the clock based on the owner's opinion as to value. The court noted: "Unfortunately, due to the defendant's disposing of the clock it was no longer available for inspection or appraisal at the time of trial. Quoting from an earlier case the court said: "when faced with the constraints of incomplete information, a court [*79] cannot be faulted for fashioning an award as equitably as possible under the circumstances", *id page 672*.

In *Crowell v Palmer 134 Conn. 502, 510-511, 58 A.2d 729 (1948)* the court cited a U.S. Supreme Court case predating Bigelow for the proposition that "where a defendant has by his wrongful conduct made the calculation of damages difficult, he will not be heard to urge such difficulty as a reason for not assessing by approximation." Also see *Holmes v Freeman 23 Conn. Sup. 504, 509, 1 Conn. Cir. Ct. 336, 185 A.2d 88 (App. Divi. Cir. Ct, 1962)*.

*Granato v. Benettiere 5 Conn. Cir. Ct. 150, 246 A.2d 901 (1967)* is interesting in this regard. There the trial court had to assess damages or more exactly prospective profits. The court noted that such a determination is "one of the most of the most difficult subjects with which courts have to deal," *id page 156*. Quoting from a treatise the court said: . . . "a wrongdoer should not be allowed to insist upon an ideal and impractical standard of proving what would have been the results of an enterprise which his wrong has frustrated. All that he can insist upon and all that the law requires, is that it be proved, with such certainty as men will act upon in their daily affairs, that a loss has occurred and that [*80] in measuring the loss the court or jury should not resort to a mere guess, but should be guided by some rational standard," *id page 157* or to put it more succinctly and quoting from Yale Law Journal comment the court said: "it should not be forgotten that any uncertainty resulted from the defendant's breach; it would be unfair to permit

defendant to profit from that uncertainty in the litigation", *id pp 155-156*.

(b)

The court will try to apply these general principles to each of the claims where the court has found the theory of liability has been proven. First the court will discuss the breach of fiduciary duty damage claim, more specifically a subset thereof -- breach of the duty of loyalty. Such a claim is a tort claim, *Gardner Heights Health Care v Korolyshun, 117 Conn. App. 745, 747, 982 A.2d 186 (2009)*; *Ahern v Kappalumakkel 97 Conn. App 189, 192, 903 A.2d 266 (fn3) (2006)*. Also see *§ 874 of Restatement (2d) Torts comment (b)* to the same effect. The comment goes on to say that the beneficiary of the duty is entitled to tort damages for harm that is caused by the breach of duty, cf. *comment (d) to § 8.01 of Restatement (3d) Agency*. Section 401 of Restatement (2d) Agency at comment (a) says that . . . "if a paid [*81] agent does something wrongful, either knowing it to be wrong, or acting negligently, the principal may have an action of tort or an action of contract."

Under the broad principles laid down in *sections 901 to 917 of the Second Restatement of Torts* and *sections 119 et. seq.* in the article on damages in 22 Am. Jur. 2d, a party guilty of tortious conduct can certainly be held responsible to compensate the plaintiff for the destruction in value of a business. As § 401 of Restatement (2d) Agency says: "An agent is subject to liability for loss caused to the principle by any breach of duty" and as *§874 of Restatement (2d) Torts* states: "One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation. It follows therefore, that if the loss claimed is that of a business venture and the breach of duty caused that loss, the party who had been owed that duty can recover for the value of the loss.

The Plaintiff presented testimony of John Kramer, a CPA who is a partner at Blum Shapiro; there he heads the "business valuation section of the litigation consulting group. Mr. Krimer has impressive credentials and [*82] much experience. He has been a CPA for thirty five years. He did an extensive evaluation of AAD New England and on the assumption that Mr. Zenie's conduct destroyed the value of the business testified that the value of AAD New England just prior to Mr. Zenie's conduct was $1,570,000. As an alternative theory of loss Mr. Kramer testified that the company's revenues terminated at the end of June 2005 and AAD New England incurred $502,352.43 in expenses to keep the business operating until it closed in May 2007. The plaintiff claims Zenie and CPS "are responsible for such expenses because CPS was wrongly in competition with AAD New England" in a variety of ways which are then listed and basically en-

2011 Conn. Super. LEXIS 182, *

compasses the various breaches of the duty of loyalty found by the court.

**(1)**

The most difficult problem presented to the court by this case has been the damage claim as it relates to whether there should be a recovery for the value of the business just prior to Mr. Zenie's departure on the theory that his actions, in effect, destroyed the business of AAD New England.

The court found the case of *Vigoro Industries Inc. v Crisp 82 F. 3d 785 (CA 8, 1996)* instructive. In that case *Vigoro Industries* [*83] commenced an unfair competition action against former employees and the competitor that hired them away. The trial court found that one of these employees, Kenneth Crisp breached his duty of loyalty and the Court of Appeals concluded his violation, by soliciting co-workers and customers, breached his duty of loyalty -- these conclusions "were well supported in the record", *id page 789*. The appeals court noted that one of *Vigoro's* damage claims was for over two million dollars and upheld the trial court's rejection of this and other claims. *Vigoro* claimed lost going concern value, lost profits, and an unjust enrichment claim. *At page 789* the Eighth Circuit said:

"The district court rejected *Vigoro's* damage theories as without factual support. The court found that the other Marvell employees were loyal to Crisp and would have left *Vigoro* to join him at Cleveland Chemical if Crisp had waited until after he resigned before soliciting them. After carefully surveying competitive conditions in the Marvell local market, the court further found that most of *Vigoro's* customers would have chosen to do business with Crisp at Cleveland Chemical if he had not solicited them before leaving *Vigoro*.    [*84] Thus, the court found that *Vigoro's* damages should be limited to the harm caused immediately after Crisp's departure by his pre-resignation soliciting. The court estimated this damage at $75,000. See *866 F. Supp. At 1172*.

"In a bench trial, ascertaining the plaintiff's damages is a form of factfinding that can be set aside only if clearly erroneous." *Hall v. Gus Constr. Co., 842 F. 2d 1010, 1017 (8th Cir. 1988)*. Here, the district court was clearly correct in rejecting *Vigoro's* extravagant lost profit theories, which irrationally attributed all of *Vigoro's* extravagant competitive losses to the fact that Crisp had jumped the gun by three weeks in soliciting *Vigoro's* employees and customers. That left the district court with the difficult task of estimating what damage in fact flowed from Crisp's limited breach of duty. While we might have been inclined to assign more financial significance to the fact that Crisp took all of *Vigoro's* work force, with advance notice to customers but inadequate warning to *Vigoro*, the question for an appellate court "is not whether it would have made the findings the trial court did, but conviction that a mistake has been committed." *Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969)* [*85] (quotation omitted). Applying this standard, we conclude that the breach-of-duty damages found by the district court are not clearly erroneous."

In several respects the circumstances here are similar to those in *Vigoro Industries*. The Employment Agreement provided for a term of four years but allowed the employee, Zenie, the right to terminate his employment upon thirty days notice. Much of the activity upon which the court based its finding of a breach of the duty of loyalty occurred within a matter of weeks before Mr. Zenie left the plaintiff's employ. He "jumped the gun" as *Vigoro* puts it by a few weeks. That being the case, it is difficult to see how these acts alone caused the destruction of the plaintiff's business or better put can be considered as the cause of that destruction. In other words, if Mr. Zenie had simply resigned according to the agreement and not violated his fiduciary duties, the plaintiff company would have found itself in the same position by Zenie's simple act of leaving. Peloquin, a technician at AAD New England, had been trained by Zenie and had known him for a period of time. Mr. Fernieni, the business manager met Zenie in 1990 because he needed a brace.    [*86] In all likelihood these two individuals would have followed Zenie to CPS after it opened in July 2005 without improper solicitation by Zenie.

Ms. Hollo would have done the same. She testified that patients who came to Zenie at AAD New England were happy with his work. She knew they would follow him to CPS and was surprised when Mr. Migueles said AAD New England would continue in operation. Patients followed Zenie to AAD New England and she assumed they'd follow him to CPS.

From Hollo's comments and the fact that many patients of the plaintiff did follow Zenie to CPS the court concludes many of them would have found Zenie's new location and become patients of CPS in any event. Zenie testified patients could have found him by asking their doctors, friends, from contacts with amputee support groups, and by simply looking him up in the phone book. The court would add that amputee patients are not one office visit patients but come in for adjustments, replacements and follow up care so that eventually loyal patients would have been able to contact Zenie once a phone was placed in the CPS office.

Or to look at the problem from another perspective what was the business, AAD New England, which [*87] was about to be destroyed? As to its operating history in 2004-2005 a substantial part of its income was based on revenues derived form treatment of lower extremity patients. AAD New England in its Operating Agreement emphasized the focus of the company would be to develop prosthetic services for upper extremity amputees. But Zenie was the practitioner hired and even the operating agreement noted he was skilled in upper and lower extremity care. Pricing lists for materials used for such patients were prepared and used. Under the AAD New England logo a patient initial assessment form was developed by Zenie and used at AAD New England. Patient lists and Christmas mailing lists included upper and lower extremity patients.

The model envisaged after Zenie departed however, seemed to want to concentrate on upper extremity patients exclusively; Mr. Conyer's deposition testimony explicitly indicated that. That appeared to be the point of floating a contract relationship with Zenie after the latter indicated he was resigning from AAD New England. Mr. Migueles after Zenie's intentions were made clear only sought out upper extremity practitioners to replace Zenie who brought the unique advantage [*88] of being skilled in upper and lower extremity practice. The theme of the plaintiff's case was not that by Zenie's breaches of agreements or duties of loyalty that AAD New England could not continue to care for lower extremity amputees to carry the business along while it developed an upper extremity clientele. In any event that argument was never pursued. That being the case the court cannot award damages, in its opinion, based on the foregoing for destruction of the business. The court, however, would explicitly note that it is not reaching this conclusion based on a determination that Mr. Kramer's valuation of the business as of July 1, 2005 was flawed.

But that does not end the discussion of damages. In Vigoro Industries the trial court did award $75,000 in damages to the plaintiff for other harm caused to Vigoro Industries by the defendant Crisp who breach his duty of loyalty in that he "took all of Vigoro's workforce with advance notice to customers but inadequate warning to Vigoro", *82 F3d at page 789*. What was really the basis of the court's award of damages in that case? The court will try to discuss that question.

(2)

As noted, perhaps too many times, the breach of loyalty claim [*89] lies in tort. Broadly speaking the following represents basic tort law, Restatement (2d) Torts:

"*§ 919*. Harm Suffered and Expenditures Made in Efforts to Avert Harm

(1) One whose legally protected interests have been endangered by the tortuous conduct of another is entitled to recover for expenditures reasonably made or harm suffered in a reasonable effort to avert the harm threatened.
(2) One who has already suffered injury by the tort of another is entitled to recover for expenditures reasonably made or harm suffered in a reasonable effort to avert further harm."

*Section 874* states that "one standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation", also see *comment d (1) to § 8.01 of Restatement (3d) Agency* and § 401 of Restatement (2d) Agency; generally see § 417 of 22 Am. Jur. 2d "Damages".

Mr. Zenie gave no notice with his resignation that he would be opening a business in the next town over form AAD New England almost immediately upon leaving his employment there. He took one of two technicians with him, an experienced and knowledgeable secretary, and was soon joined by a business manager all [*90] of whom the court has found he had solicited in violation of his duty of loyalty to AAD New England.

2011 Conn. Super. LEXIS 182, *

The secretary took forms and material from the plaintiff that were confidential in nature. The forms and material copied or transferred to the so-called memory stick involved some that were germane to upper and lower extremity patient services, the Christmas list contained upper and lower extremity patients, CPS did service upper extremity patients after its formation -- only two or three but fees involving them could be fairly substantial.

AAD New England had a perfect right to try to minimize its losses as a business by at least for a time keeping in operation while it made efforts to hire a practitioner to replace Zenie. But the evidence from Migueles, Conyers and Zenie made clear that this is a difficult thing to accomplish given the limited number of skilled people available. It is also difficult to secure skilled technicians. After Zenie left the office was run by a fill-in, out of state administrative assistant and Mr. Conyers, also out of state covering patients every two weeks or so.

The court concludes that because of the lack of advanced warning, some level of competition for [*91] upper extremity patients secured in part by relying on patient solicitation and lists, leaving the AAD New England office largely stripped -- not attractive for prospective prosthetic practitioner sought to be hired, entitles the plaintiff to reimbursement for some of the expenses it made to keep the office running. A fair time period would run from July 2005 through January 2006, approximately a month after the Christmas lists were mailed. That amounts to $220,000 ($189,239.50 for legal expenses in December 2005 not included).

**(d)**

The court makes the same award on the breach of contract claim with the award not being duplicative. The usual rubric is that in breach of contract cases is that "as a general rule, contract damages are awarded to place the injured party in the same position as he(sic) have been had the contract been fully performed *Bachman v Fortuna 145 Conn 191, 194, 141 A.2d 477 (1958)*; *Fuessenich v DiNardo 195 Conn. 144, 153, 487 A.2d 514 (1985)*; *Argentinis v Gould 219 Conn. 151, 157, 592 A.2d 378 (1991)*. That type of calculation cannot be made here but the measure of damages in contract cases in flexible. Thus *Section 347 of the Restatement (2d) Contracts* states the injured party "has a right to damages based on [*92] his expectation interest as measured by . . . (b) any other loss (referring to expectation interest), including incidental or consequential loss, caused by the breach . . ." *Comment (c)* defines other loss to mean that "the injured party is entitled to recover for all loss actually suffered. Items of loss other than loss in value of the other party's performance are often characterized as in-

cidental or consequential. Incidental losses include cost incurred in a reasonable effort, whether successful or not, to avoid loss. . .", see discussion in previous section.

Furthermore, Section 16 of the Employment Agreement provides for attorneys' fees which the court will grant.

**(e)**

The court will now discuss damages under CUTPA. *Section 42-110g(a) of the General Statutes* provides that any person suffering an ascertainable loss as the result of a practice prohibited by *§ 42-110b* can bring an action "to recover actual damages. The section also provides that: "The court may, in its discretion, award punitive damages. . ."

Actual damages under CUTPA have been defined to include loss and expenses incurred by the CUTPA plaintiff as a result of a violation of the act, *Prish Walko v Bob Thomas Ford Inc. 33 Conn App. 575, 587, 636 A.2d 1383 (1994)*, [*93] see *Grand Light & Supply Co. Inc. v Honeywell Inc. 771 F2d 672 (CA2, 1985)* where in *footnote 3 at page 681* the court said: "Damages under CUTPA are to be measured according to a restitution formula rather than according to contract principles. *Bailey Employment System v Hahn*. The district court's task was to attempt to return to plaintiff what it lost as a result defendants' actions." Here the plaintiff lost the influx of money spent to avoid as much loss as possible as a result of the defendants' actions. The award for damages as to actual damages is the same as that entered in the previously discussed damage awards.

Punitive damages under the act are discussed in section 6.11 of volume 12 of the Connecticut Practice Series, "Connecticut Unfair Trade Practices", Langer, Morgan, Belt. In *Gargano v. Heyman 203 Conn. 616, 623, 525 A.2d 1343 (1987)* the court applied the common law test for the propriety of punitive damages to CUTPA. Earlier cases were quoted to the effect that "In order to award punitive or exemplary damages evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights."

There are no guidelines provided in the statute and because [*94] of the varied fact patterns our court provides no guidelines as to whether such damages should be awarded and how much a punitive damage award should be. The problem can be approached from another perspective. In *BMW of North America v Gore 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)* the court said states can impose punitive damages to further legitimate interests which would include prevention of deceptive trade practices, *id page 568*. In applying the constitutional test of whether any such award violated due process the court in *Fabri v United Technologies*

*Interm, Inc.* 387 F3d 109, 125 (2004) noted this but then applied the so-called *Gore* test to determine whether the due process requirement of fair notice has been met in awarding punitive damages under CUTPA. That test includes the degree of reprehensibility of the conduct in question, the disparity between the harm caused the plaintiff and the punitive damage award and the difference between the punitive damage remedy and the civil penalties authorized or imposed in comparable cases. The considerations of whether a punitive damage award is within constitutional limits can provide some guidance as to the factors that should be considered in making such   [*95] an award in the first place.

The court believes that Zenie acted recklessly with respect to the rights of the plaintiff company. He is a highly intelligent person as well as a skilled and even prominent prosthetist who knows the requirements of running a successful practice in this field. Taking active steps which led to the stripping of the AAD New England staff while he owed a duty of loyalty to that company cannot be ignored. He certainly had no right to instruct Hollo to take the materials she did and encode many of them on the memory stick.

On the other hand some of the same troubles the court had in awarding the value of the business pursuant to Mr. Kramer's calculations persist here. He knew or must have known many patients and much of the staff would follow him to CPS in any event. Much of the material taken or copied by Hollo were of use in lower extremity cases which Conyers made clear in the June 2005 meeting was not an area in which AAD New England was interested -- a thought expressed by Conyers before he knew or had reason to know of the employee solicitation going on and the materials being taken. That is, the AAD New England decision not to do lower extremity work was   [*96] arrived at independently of any calculations by that company that Zenie's wrongful actions made that an impossible option in any event.

The court also believes that a punitive damage award that is too excessive might interfere with the ability of Zenie to carry on his profession. The court has awarded $220,000 in damages and attorneys' fees which it concludes are appropriate under *§ 42-110g (d)* of CUTPA and which will be substantial. As a deterrent, however, some punitive damages are in order. The court awards $20,000 in punitive damages.

**(f)**

The court has difficulty awarding any damages under *§ 52-570b* which is the private cause of action for violation of the criminal statute, *§ 53a-251*. The court cannot calculate the specific damages or competitive loss suffered by AAD New England by taking and copying the forms and other documents from that company. They represented only a part of the actions which constituted violation of the duty of loyalty and which caused damage. Under *subsection (d) of § 52-570b* pecuniary loss need not proven but this makes sense only in light of the fact that to establish "actual damages" referred to in *subsection (a)* injunctive relief may be sought under this [*97] statute as well as the appointment of a receiver. As noted *subsection (c)* authorized a civil action where a person who suffers injury to business or property where a claim for "actual damages" may be made. Such damages need not be "pecuniary loss" but they do not suggest nominal damages either. Yet *subsection (e)* provides on a *subsection (c)* suit. But to "prevail" one must establish "actual damages". The court cannot calculate any such amount that can be ascribed to violation of the statute on the evidence presented. The court makes no damage award under *§ 52-570b*.

The court awards $220,000 in damages, punitive damages in the amount of $20,000, and attorneys' fees.

Corradino, J.T.R.



**MILSO INDUSTRIES CORPORATION, Plaintiff, v. EDWARD C. NAZZARO,
LIBERTY CASKET COMPANY, EDWARD LARKIN and KIRK A. BOGGIA,
Defendants.**

**Civ. No. 3:08CV1026(AWT)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*2012 U.S. Dist. LEXIS 123999*

**August 30, 2012, Decided
August 30, 2012, Filed**

**COUNSEL:** [*1] For Milso Industries Corp., Plaintiff: David T. Martin, John W. Cannavino, LEAD ATTORNEYS, Cummings & Lockwood - Stmfd, Stamford, CT; John H. Doyle, III, Steven I. Cooper, Wallace B. Neel, LEAD ATTORNEYS, PRO HAC VICE, Reed Smith, LLP - NY, New York, NY; Lawrence J. Reina, LEAD ATTORNEY, Reed Smith LLP - NY, New York, NY.

For Edward C Nazzaro, Liberty Casket Co, Edward C Larkin, Kirk A Boggia, Defendants: Ben M. Krowicki, LEAD ATTORNEY, Bingham McCutchen, Hartford, CT; Jeffrey T. Karp, LEAD ATTORNEY, PRO HAC VICE, Newman & Newman, Boston, MA; Sara R. Simeonidis, LEAD ATTORNEY, Bingham McCutchen-State St Htfd, Hartford, CT.

For Edward C Nazzaro, Liberty Casket Co, Edward C Larkin, Kirk A Boggia, Counter Claimants: Ben M. Krowicki, LEAD ATTORNEY, Bingham McCutchen, Hartford, CT; Sara R. Simeonidis, LEAD ATTORNEY, Bingham McCutchen-State St Htfd, Hartford, CT.

For Milso Industries Corp., Counter Defendant: David T. Martin, John W. Cannavino, LEAD ATTORNEYS, Cummings & Lockwood - Stmfd, Stamford, CT; Lawrence J. Reina, LEAD ATTORNEY, Reed Smith LLP - NY, New York, NY; Steven I. Cooper, Wallace B. Neel, LEAD ATTORNEY, Reed Smith, LLP - NY, New York, NY.

For Edward C Nazzaro, Liberty Casket [*2] Co, Counter Claimants: Sara R. Simeonidis, LEAD ATTORNEY, Bingham McCutchen-State St Htfd, Hartford, CT.

For Milso Industries Corp., Counter Defendant: David T. Martin, John W. Cannavino, LEAD ATTORNEYS, Cummings & Lockwood - Stmfd, Stamford, CT; John H. Doyle, III, Lawrence J. Reina, Steven I. Cooper, Wallace B. Neel, LEAD ATTORNEYS, Reed Smith, LLP - NY, New York, NY.

**JUDGES:** Alvin W. Thompson, United States District Judge.

**OPINION BY:** Alvin W. Thompson

**OPINION**

**RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

The plaintiff, Milso Industries Corporation ("Milso"), brings this action against the defendants, Edward C. Nazzaro ("Nazzaro"), Liberty Casket Company ("Liberty"), Edward Larkin ("Larkin") and Kirk A. Boggia ("Boggia"), setting forth a claim in the First Cause of Action for breach of contract against Nazzaro and Larkin; a claim in the Second Cause of Action for misappropriation of trade secrets under the Connecticut Uniform Trade Secrets Act ("CUTSA"), *Conn. Gen. Stat. § 35-50 et seq.*, against all the defendants; a claim in the Third Cause of Action for breach of fiduciary duties, including the duty of loyalty, against Nazzaro and Larkin; a claim in the Fourth Cause of Action for aiding and abetting breach of [*3] fiduciary duty against Liberty and Boggia; a claim in the Fifth Cause of Action for unjust enrichment against all the defendants; a claim in the Sixth Cause of Action for tortious interference with contractual relations against Nazzaro, Liberty and Boggia; a

Case 3:13-cv-00215-VAB   Document 83-1   Filed 07/25/14   Page 152 of 176

Page 2
2012 U.S. Dist. LEXIS 123999, *

claim in the Seventh Cause of Action for interference with business expectancies against all the defendants; a claim in the Eighth Cause of Action for unfair competition under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110 et seq., against all the defendants; a claim in the Ninth Cause of Action for conversion against all the defendants; a claim in the Tenth Count for civil conspiracy against all the defendants; a claim in the Eleventh Cause of Action for false designation of origin in violation of *§ 43(a)* of the Lanham Act, *15 U.S.C. § 1125(a)*, against Liberty; and a claim in the Twelfth Cause of Action for false advertising in violation of *§ 43(a)* of the Lanham Act, *15 U.S.C. § 1125(a)*, against Liberty. (See Second Am. & Supplemental Compl. (Doc. No. 85).) Nazzaro and Liberty set forth two counterclaims, in the First Counterclaim a request for a declaratory judgment, and in the Second Counterclaim [*4] an unfair trade practices claim under CUTPA, alleging "sham" litigation. (See Answer & Affirmative Defenses to Am. Compl. (Doc. No. 53).) The plaintiff and the defendants have each moved for summary judgment on all the plaintiff's causes of action and both of the defendants' counterclaims, except that the plaintiff has not moved for summary judgment on the Third and Fourth Causes of Action as to claims involving conduct of Larkin. For the reasons set forth below, both motions for summary judgment are being granted in part and denied in part.

## I. FACTUAL BACKGROUND

In 2005, The York Group, Inc. ("York"), a subsidiary of Matthews International Corporation ("Matthews"), acquired Milso Industries, Inc. ("Old Milso"). Old Milso was a Brooklyn-based, family-owned company that for decades had been in the business of manufacturing, marketing, selling and delivering caskets and other funeral-related items to funeral homes. Old Milso had a well-established marketing, sales and distribution network and an experienced sales team. Old Milso was owned and operated by several members of the Pontone family, including Scott Pontone, Vice President of Operations ("Pontone"). Nazzaro and Larkin served as [*5] sales representatives of Old Milso (and its predecessors-in-interest), operating in Connecticut and in New England generally.

York and Midnight Acquisition Corporation acquired the assets of Old Milso and certain related entities, pursuant to an Asset Purchase Agreement dated May 28, 2005 (the "APA"), for $110 million. In connection with the acquisition, Midnight Acquisition Corporation changed its name to "Milso Industries Corporation." Section 2.12 of the APA provided that the purchased assets included certain "Assumed Contracts." The "Assumed Contracts" in Schedule 2.1.2A to the APA in-

cluded thirty-three employment agreements with Old Milso's employees, each of which contained confidentiality, non-solicitation and non-compete provisions enforceable for 18 months after termination of employment.

Old Milso had entered into these employment agreements in or around March 2003. Nazzaro and Larkin entered into their employment agreements with Old Milso (the "Employment Agreements") on March 11, 2003. Pontone signed the Agreements on behalf of Old Milso. The Employment Agreements provide that they are to be construed under New York law, contain merger clauses, and are silent as to assignability. [*6] The parties dispute the intent of Old Milso, Nazzaro, and Larkin as to assignability at the time they entered into the Employment Agreements.

On June 29, 2005, York sent a letter to Old Milso's employees (the "June 29th Letter") informing them of the imminent acquisition, advising them that their employment would be terminated upon the closing, and offering to re-hire them as employees of the new company, Milso. The letter read as follows:

> As you know, we expect to complete a combination of the Milso and York businesses shortly. We are excited about the combination, which we believe will create benefits and opportunities for Milso's customers and employees.
>
> We would like you to continue to work in the enlarged business. Because of the way the transaction has been structured, we intend to accomplish this by having your existing employment terminate at the closing of the Milso and York transaction and then arrange for you to be re-hired by the corporation that is acquiring the Milso business and assets. That corporation's name (presently "Midnight Acquisition Corporation") will be Milso Industries Corporation.
>
> This letter is our formal offer to re-hire you in the way described above. If [*7] you accept our offer, your cash compensation will be no less than your current cash compensation. In addition, the other terms of employment we are offering are substantially similar in the aggregate to the terms of your current employment.
>
> To accept this offer, please sign and return this letter in the space provided below and return it to us in the self-addressed stamped envelope. By

signing this letter and accepting our offer of employment on the terms described above, you agree to remain subject to the terms and conditions set forth in the At-Will Employment, Non-Disclosure and Non-Competition Agreement, a copy of which is attached hereto, and that we shall be the "Company" under the Agreement.

We look forward to your ongoing contributions to the success of the combined Milso and York businesses.

Aff. Sara R. Simeonidis Supp. Defs.' Mot. Summ. J. (Doc. No. 124) ("Simeonidis Aff."), Ex. 4.)

Neither Nazzaro nor Larkin signed the June 29th Letter. However, after the closing pursuant to the APA, both worked for Milso for substantially the same wages and benefits until 2008.

Milso contends that during this time it maintained the confidentiality of the following customer and financial information: [*8] customer lists, customer contact information, customer preferences with respect to sales and marketing contracts, discounts offered to customers, distribution of casket sales and price points and cost structures concerning Milso's products. To protect this "confidential" information, Milso entered into confidentiality agreements with business parties, acquisition targets, other companies and employees. Milso also contends, and the defendants dispute, that funeral home customers expressly agreed that Milso's costs and terms (including discounts) are confidential. The defendants contend that much of this "confidential" information is publicly available and can be determined by reference to the yellow pages, trade publications or Milso's price list or by asking Milso's customers.

In February 2008, Nazzaro and his close friend Boggia conceived an idea for a new casket business. At that time, Boggia's only experience in the death care industry was working for his father, a casket salesmen, in the 1970s and early 1980s, when Boggia was a young man and had not yet graduated from college. Immediately prior to February 2008, Boggia was a construction consultant. Nazzaro assisted Boggia in drafting [*9] a business plan, which would be used in order to secure financing. The business plan for the new business--the Liberty Casket Company--was finalized on March 14, 2008. The business plan represented that Nazzaro was the "Director of Sales and Business Development" of Liberty, which would "use the market changing experience of Edward Nazzaro." On March 17, 2008, Boggia

filed the papers to form Liberty as a Connecticut corporation.

For a period of time, Liberty imported metal caskets from China for sale to its customers. These imported models were indicated with a "C" on the Liberty price list. It is undisputed that Milso also sells foreign-manufactured metal caskets, which in Milso's case are made in Mexico. Milso offers a study by Hal Poret in which he concludes that casket consumers' purchasing decisions vary depending on whether the words "Made in China" are on the catalog pages they review.

Milso contends that in March, April and early May 2008, Nazzaro communicated and e-mailed about the new business, and used his paid vacation time from Milso to visit suppliers to negotiate agreements and place orders for caskets on behalf of Liberty. It contends that in May 2008, Nazzaro ordered a [*10] customized delivery truck, negotiated warehouse space, ordered dollies, arranged for invoicing software, and developed and priced the Liberty logo. Liberty's logo is the Statue of Liberty wrapped in the American flag, and both Liberty's logo and its promotional materials are red, white and blue. The defendants contend that Nazzaro provided only minimal assistance and did so during his own time.

Nazzaro resigned from Milso on May 19, 2008 and became a Liberty employee and salesperson. Liberty announced its formation on June 8, 2008 and sold its first caskets in the summer of 2008. Nazzaro sold caskets on behalf of Liberty to many of his customers from his time at Milso. Nazzaro also created a price comparison sheet that directly compared Milso products and Liberty products, with prices and percent comparisons.

In July 2008, Milso filed this action against Nazzaro and Liberty. Sometime thereafter, Boggia contacted Larkin to offer him employment at Liberty. Larkin resigned from Milso on October 7, 2008 and accepted employment with Liberty one week later. Larkin then sold caskets on behalf of Liberty to many of his customers from his time at Milso. Milso amended the complaint and added Boggia [*11] and Larkin as defendants.

## II. LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *Fed. R. Civ. P. 56(c)*. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994)*. When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. See, e.g., *Anderson v. Liberty Lobby, Inc., 477 U.S.*

Case 3:13-cv-00215-VAB   Document 83-1   Filed 07/25/14   Page 154 of 176

Page 4
2012 U.S. Dist. LEXIS 123999, *

*242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987)*. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." *Gallo, 22 F.3d at 1224*.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not [*12] defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248* (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson, 477 U.S. at 248*. Only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. See *Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990)*.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)* (quoting *Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)*). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trs. of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997)* [*13] (quoting *W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)*). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson, 477 U.S. at 252*.

## III. DISCUSSION

### A. Breach of Contract (First Cause of Action)

Milso claims in the First Cause of Action that Nazzaro and Larkin breached the restrictive covenants in their Employment Agreements with Old Milso--Nazzaro by helping to establish a rival casket company, and both by soliciting Milso's clients. The defendants contend that Milso cannot enforce the Employment Agreements because (i) the employment of Nazzaro and Larkin was terminated by the June 29th Letter, and they were re-hired by Milso as at-will employees and the Employ-

ment Agreements have expired and are unenforceable; and (ii) the restrictive covenants in the Employment Agreements are in any event unreasonable and thus unenforceable. The plaintiff contends that the Employment Agreements are enforceable, the restrictive covenants are reasonable and that Nazzaro and Larkin breached the Employment Agreements, causing [*14] Milso to suffer damages.

The parties agree that the choice of law provision in the Employment Agreements governs. The Employment Agreements provide that New York law will control any disputes arising out of the contract.

### 1. The June 29th Letter Did Not Render the Employment Agreements Unenforceable

The defendants contend that because the June 29th Letter terminated the employment of Nazzaro and Larkin and they never counter-signed their letters, the Employment Agreements expired and when they worked for Milso it was as at-will employees. Thus, they argue, the restrictive covenants expired 18 months after June 29, 2005. In support of this argument, the defendants rely on *SIFCO Indus., Inc. v. Advanced Plating Techs., Inc., 867 F. Supp. 155, 158-59 (S.D.N.Y. 1994)*. In SIFCO, the plaintiff corporation had recently acquired the assets of another corporation. It brought suit against terminated employees of the acquired business for breaching the covenants not to compete in their employment agreements with the acquired business. As in this case, the employment agreements were expressly assigned to the plaintiff upon its purchase of the other corporation's assets. Nevertheless, the court held [*15] that SIFCO could not enforce the non-compete provisions.

The defendants cite SIFCO for the proposition that an acquiring company cannot enforce covenants not to compete in the employment agreements the acquired business had with its employees if their employment was terminated. However, *SIFCO* is distinguishable. In SIFCO the employees were terminated by a letter from the business being acquired, not a letter from the acquiring corporation, i.e. SIFCO, and SIFCO offered the defendants consulting positions that expressly avoided creating an employment relationship, but also conditioned the consulting arrangements on modification of the terms of the confidentiality agreements that had been in place between the defendants and the acquired business. The court held that the agreements were not enforceable because the plaintiff made no showing that "it made a firm offer to each defendant of continued employment in a position comparable in salary, benefits, responsibility, and location to the employee's previous position." *Id. at 158*. Rather, the defendants "were involuntarily terminated . . . and none of the actions taken by SIFCO sub-

Case 3:13-cv-00215-VAB   Document 83-1   Filed 07/25/14   Page 155 of 176

Page 5
2012 U.S. Dist. LEXIS 123999, *

sequent to that date altered the fact of that termination." [*16] *Id. at 159.*

Here, the June 29th Letter simultaneously terminated Nazzaro and Larkin's employment with Old Milso as of the date of the closing and also offered each of Nazzaro and Larkin a position with Milso with essentially the same salary and benefits. The letter stated that those who accepted the offer to be re-hired would receive terms of employment that "are substantially similar in aggregate to the terms of [their] current employment," including "cash compensation . . . no less than . . . current cash compensation." (Simeonidis Aff., Ex. 4.) These terms constitute the "firm offer" of "continued employment in a position comparable . . to the employee's previous position" that was absent in SIFCO. See *SIFCO, 867 F. Supp. at 158.*

The court in SIFCO echoed a concern voiced in *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 48 N.Y.2d 84, 397 N.E.2d 358, 421 N.Y.S.2d 847 (N.Y. 1979),* where the court held that an employer could not enforce a restraint on an employee's mobility after terminating his employment. The court in Post reasoned that "[a]n employer should not be permitted to use offensively an anticompetition clause . . . to economically cripple a former employee and simultaneously deny other potential [*17] employers his services." *Id. at 361.*

Thus, under New York law, a non-competition provision in an employment agreement can be enforced after the employment agreement is assigned, despite the termination of employment, if the employee is given an offer of comparable continuous employment. See *Post, 397 N.E.2d at 360-61* ("An essential aspect [of enforceable restraints on employee mobility] is the employer's continued willingness to employ the party covenanting not to compete.").

**2. The Assignability of the Employment Agreements Depends on the Intent of the Parties to the Employment Agreements**

The parties disagree as to whether the Employment Agreements were assignable from Old Milso to Milso despite the absence of an express assignability clause.

In general, employment agreements containing non-competition provisions, as opposed to personal services contracts, are assignable under New York law. See *Eisner Computer Solutions, LLC v. Gluckstern, 293 A.D.2d 289, 741 N.Y.S.2d 511, 511 (1st Dept. 2002).* In addition, under New York law, "an express assignment to a subsequent purchaser of the covenant not to compete is unnecessary. A subsequent sale of the business will pass the covenant as an incident of the goodwill [*18] of the business even though it is not expressly assigned." *Aquavella v. Viola, 13 Misc. 3d 1234[A], 831 N.Y.S.2d 353, 2006 NY Slip Op 52111[U], 2006 WL 3232167, *1 (N.Y. Sup. 2006)* (citing 6A N.Y. Jur. 2d Assignments § 14 (March 2006 Update)).

If there is no express assignment, however, the assignability of such an employment agreement depends on the intent of the parties to that agreement. See *Archer Worldwide, Inc. v. Mansbach, 289 A.D.2d 349, 734 N.Y.S.2d 869, 869 (2d Dept. 2001)* (affirming the trial court's determination that an employment agreement was unenforceable on the ground that "there was no evidence the parties intended the agreement to be assignable when it was originally executed."); *Abalene Pest Control Serv., Inc. v. Powell, 8 A.D.2d 734, 187 N.Y.S.2d 381, 383 (2d Dept. 1959)* ("Whether or not the covenants by appellant not to compete with respondent's assignor after the termination of his employment, were assignable, without his consent, depends on the intention of the parties in entering into the agreement."); *ENV Servs., Inc. v. Alesia, 10 Misc. 3d 1054[A], 809 N.Y.S.2d 481, 2005 NY Slip Op 51947[U], 2005 WL 3240478, at *6 (N.Y. Sup. 2005)* (granting summary judgment to defendants because, inter alia, "[t]here is no evidence that the parties intended the employment agreements [*19] to be assignable when they were originally executed.").

In this case, there is no assignability clause, so the assignability of the Employment Agreements between Old Milso and each of Nazzaro and Larkin depends on the intent of the parties. [1] The parties dispute whether Larkin and Nazzaro negotiated that the Employment Agreements would not be assignable, and each side has provided evidence in support of its position. Thus, there are genuine issues of material fact as to the parties' intent with respect to assignability and Milso can not show that it is entitled to summary judgment on the breach of contract claim.

> 1   Milso contends that extrinsic evidence of intent is barred by New York's parol evidence rule because (a) the Employment Agreements contain merger clauses providing that the Employment Agreement supersedes "all prior employment agreements addressing the terms, conditions, and issues contained herein" (Simeonidis Aff., Ex. 1 - At-Will Employment Nondisclosure and Non-Competition Agreement, ¶ 18), (b) there are no references in the Employment Agreements to a bar of assignability, and (c) the contracts themselves are unambiguous and that prevents the defendants from inserting a [*20] provision that would bar the assignment of the Employment Agreements. Milso properly cites *Wallace Steel, Inc. v. Ingersoll-Rand Co., 739 F.2d 112, 115 (2d Cir. 1984)* for the proposition that "[t]he parol evidence rule provides in substance that, where

the parties have reduced their agreement to writing, evidence of prior or contemporaneous agreement may not be offered to contradict, vary, or subtract from the terms of the writing." However, here the terms of the writing do not address the question of assignability so evidence of intent as to assignability does not contradict, vary, or subtract from the terms in the writing. Therefore, in light of *Archer*, *Abalene*, and *ENV Servs.*, the court finds Milso's argument unpersuasive. In addition, Milso relies on language from *Special Prods. Mfg., Inc. v. Douglass, 159 A.D.2d 847, 553 N.Y.S.2d 506, 509 (3d Dept. 1990)* (stating that "[b]ecause executory contracts, which do not involve exceptional personal skills on the part of the assignor and which the assignee can perform without adversely affecting the rights and interests of the adverse party, are freely assignable absent a contractual, statutory or public policy prohibition . . . . , a clear and unambiguous [*21] prohibition is essential to effectively prevent assignment." (citations omitted)). However, in Douglass, the court also stated that "[w]hen the original parties to an agreement so intend, a covenant not to compete is freely assignable." Id. (citing Abalene).

### 3. Reasonableness of the Restrictive Covenants

"Restrictive covenants are judged by the standard of reasonableness as demonstrated in a three-prong test[,] to wit: if the covenant (1) is no greater than is required for the protection of the legitimate interest of the employer; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public. *BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 388-89, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (1999)." ENV Servs., 809 N.Y.S.2d 481, 2005 WL 3240478, at *4*. "The cognizable employer interests under the first prong is limited to misappropriation of the employer's trade secrets or confidential client lists, or protection from competition by a former employee whose services are unique or extraordinary." Id. (citations omitted).

The defendants contend that Milso cannot enforce the covenants in the Employment Agreements because it has no legitimate protectable interest in that it has no protectable trade [*22] secrets and its customer and pricing information is not confidential. The plaintiff disputes this contention. Each side has produced evidence in support of its position so there are genuine issues of material fact as to whether Milso has a legitimate protectable interest and the restrictive covenants are reasonable. Therefore, the defendants cannot show that they are entitled to summary judgment on the breach of contract

claim. Therefore, both motions for summary judgment on the claim for breach of contract are being denied.

### B. Misappropriation of Trade Secrets under CUTSA (Second Cause of Action)

Milso claims in its Second Cause of Action that all the defendants misappropriated its trade secrets in violation of CUTSA. "In the absence of clear consent or waiver by the principal, an agent, during the term of the agency, is subject to a duty not to compete with the principal concerning the subject matter of the agency. 3 C.J.S., Agency, § 143; Restatement (Second), 2 Agency § 393." *Town & Country House & Homes Serv, Inc. v. Evans, 150 Conn. 314, 317, 189 A.2d 390 (1963)*. "Upon termination of the agency, however, and in the absence of a restrictive agreement, the agent can properly compete with his principal [*23] in matters for which he had been employed." Id. Even after the employment has ceased however, "the employee remains subject to a duty not to use trade secrets, or other confidential information which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer." *Allen Mfg. Co. v. Loika, 145 Conn. 509, 514, 144 A.2d 306 (1958)*.

The plaintiff argues that its customer lists and "business plan" [2] are trade secrets and that Nazzaro and Larkin misappropriated its trade secrets and damaged it. The defendants argue that Milso's customer and pricing information are not trade secrets, there is no proof that Nazzaro and Larkin ever had access to Milso's "business plan," and that Milso never protected its business information as confidential, and that in any event there was no misappropriation by them of Milso's information. [3]

> 2   The plaintiff asserts that "Nazzaro and Larkin, because they had worked for Milso for many years, were intimately aware of additional Milso trade secrets that constituted Milso's confidential 'business plan': the nature of its business, information about its distribution network, discounts and pricing given to customers,   [*24] price points and margins on Milso's products, inventory buying patterns, and confidential information concerning Milso's suppliers." (Mem. Law Supp. Pl. Milso Indus. Corp.'s Mot. Summ. J. (Doc. No. 129-1) ("Pl.'s Br."), 33-34.)

> 3   The court notes that one point not raised by the parties, and therefore not addressed by the court, is the fact that CUTSA "supersede[s] any conflicting tort, restitutionary, or other law of this state pertaining to civil liability for misappropriation of a trade secret." *Conn. Gen. Stat. § 35-57(a)*; see also *Nora Beverages, Inc. v. Perrier Grp. Of Am., Inc., 164 F.3d 736 (2d Cir. 1998)*

("The district court correctly found that CUTSA preempts any tort remedy for misuse of trade secrets.").

A plaintiff must establish the existence of a trade secret before it can seek protection under CUTSA. The statute defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value [*25] from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Conn. Gen. Stat. § 35-51(d)*. "The three part statutory test for the definition of a trade secret therefore requires that the information: (1) be of the kind included in the nonexhaustive list contained in the statute; (2) be 'of independent economic value'; and (3) 'was the subject of reasonable efforts to maintain its secrecy.'" *Dreamcatcher Software Dev., LLC v. Pop Warner Little Scholars, Inc., 298 F. Supp. 2d 276, 282 (D. Conn. 2004)* (quoting *Elm City Cheese Co. v. Federico, 251 Conn. 59, 78, 752 A.2d 1037 (1999))*. The question of whether information sought to be protected rises to level of a trade secret under CUTSA is a question of fact. See *id. at 282*; *Elm City Cheese, 251 Conn. at 68*; *Allen, 145 Conn. at 516*.

With respect to the first prong, there is no genuine issue as to whether Milso's customer lists and "business plan" are information of the kind included in the nonexhaustive list in *§ 35-51(d)*. Although customer lists are on the "periphery of the law of trade secrets," *Air Support, Inc. v. Acuna, No. CV 950148386S, 1996 Conn. Super. LEXIS 1378, 1996 WL 362097, at *3 (Conn. Super. May 29, 1996)*, [*26] courts have frequently held that customer lists and pricing information are deserving of trade secret protection. See, e.g., *Town & Country House & Home Serv., 150 Conn. at 319* ("A list of customers, if their trade and patronage have been secured by years of business effort and advertising and the expenditure of time and money, constitutes an important part of a business and is in the nature of a trade secret."); *Triangle Sheet Metal Works, Inc. v. Silver, 154 Conn. 116, 126, 222 A.2d 220 (1966)* ("[F]inancial details of [plaintiff's] costs, pricing, and bidding . . . fully meet the definition of trade secrets . . . ."). Therefore, Milso's customer lists and "business plan" satisfy the first prong of the statutory test for a trade secret.

With respect to the second prong, there are genuine issues of material fact as to whether Milso's customer lists and "business plan" are of independent economic value. The plaintiff has provided evidence that its customer lists were carefully vetted and maintained lists of private contact information, cell phone numbers and e-mails that would not be retrievable by public means, or would require significant resources to duplicate, and evidence as to the economic value [*27] of its "business plan." On the other hand, the defendants have provided evidence that Milso's customer lists and "business plan" are comprised of information that is publicly available or readily ascertainable, inter alia, because listings of area funeral homes are publicly available; the funeral home directors on Milso's customer lists were long-time personal friends of Nazzaro and Larkin, whose relationships with these individuals predate their employment by Old Milso; and Milso's customers are free to share Milso's price list, the volume and types of caskets purchased, and discounts received from Milso. Compare *Holiday Food Co., Inc. v. Munroe, 37 Conn. Supp. 546, 553, 426 A.2d 814 (1981)* (customer list not a trade secret where the customers "were [former employee's] friends as well as potential clients"), with *Dreamcatcher Software Dev., 298 F. Supp. 2d at 282* ("An alleged secret is not deprived of trade secrets simply because it is comprised of materials that are "common [and] commercially available.") (quoting *Elm City Cheese Co., 251 Conn. at 74*).

With regard to the third prong, there are also genuine issues of material fact as to whether Milso made reasonable efforts to maintain the secrecy [*28] of its customer lists and pricing information. "The question of whether . . . a party has made reasonable efforts to maintain the secrecy of a purported trade secret is by nature a highly fact-specific inquiry." *Elm City Cheese, 251 Conn. at 80*. Reasonable efforts to maintain secrecy include "requiring employees to sign confidentiality agreements or otherwise advising them of the confidential nature of the process; posting of warning or cautionary signs, or placing legends on documents; taking precautions regarding visitors, by requiring them to sign confidentiality agreements, having them sign in, and shielding the process from their view; segregating information, so that no one person or written source discloses the entire manufacturing process; and using unnamed or coded ingredients." 1 R. *Milgrim, Trade Secrets (1999) § 1.04, 1-178 through 1-189*.

The plaintiff has provided evidence as to the employment agreements it entered into with employees other than Larkin and Nazzaro, as well as confidentiality agreements it entered into with business parties and prospective business partners. On the other hand, each of Nazzaro and Larkin avers that, in his experience, Milso's customers are [*29] under no obligation to protect information relating to pricing, discounts or payment terms and that customers often share this information to obtain a better deal from competing casket companies, and Pontone testified that he never had any trouble obtaining information from a customer about the discount he or she

Case 3:13-cv-00215-VAB   Document 83-1   Filed 07/25/14   Page 158 of 176

Page 8
2012 U.S. Dist. LEXIS 123999, *

was paying. (Simeonidis Aff., Ex. 12 - Dep. of Scott Pontone, 117.)

In addition, genuine issues of material fact exist as to whether there was a misappropriation of any of Milso's information that constitutes trade secrets under CUTSA. Therefore, both motions for summary judgment on the CUTSA claim are being denied.

## C. Breach of Fiduciary Duties (Third Cause of Action)

Milso claims in the Third Cause of Action that Larkin and Nazzaro breached their fiduciary duties to Milso, including the duty of loyalty. Milso has moved for summary judgment on this claim as to Nazzaro, and Larkin and Nazzaro have also moved for summary judgment on this claim.

"The essential elements to pleading a cause of action for breach of fiduciary duty under Connecticut law are: (1) That a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, [*30] (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in any matter relating to the plaintiff; (2) That the defendant advanced his or her own interests to the detriment of the plaintiff; (3) That the plaintiff has sustained damages; and (4) That the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty." T. Merritt, 16 Connecticut Practice Series: Elements of an Action § 8.1 (2010-2011 Ed.).

### 1. Larkin

With respect to Larkin, Milso fails to identify in its opposition any conduct by him that would amount to a breach of fiduciary duty. It is undisputed that Larkin was not involved in Liberty's formation, that he never solicited any customer for Liberty or informed any customer of his plans to work for Liberty prior to resigning from Milso, and that he resigned from Milso on October 7, 2008, accepted Liberty's offer of employment three days later, and did not solicit customers for Liberty until November 2008. Therefore, the defendants' motion for summary judgment as to the claim of breach of fiduciary duties with respect to Larkin is being granted.

### 2. Nazzaro

With [*31] respect to Nazzaro, the plaintiff contends that Nazzaro breached his fiduciary duties to Milso both while he was employed by Milso and after his resignation. "In the absence of clear consent or waiver by the principal, an agent, during the term of the agency, is subject to a duty not to compete with the principal concerning the subject matter of the agency. 3 C.J.S., Agen-

cy, § 143; Restatement (Second), 2 Agency § 393." *Town & Country House & Homes Serv., 150 Conn. at 317.*

Before the end of his employment, an employee "can properly purchase a rival business and upon termination of employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment . . . in direct competition with the employer's business." Id. (quoting Restatement (Second) of Agency § 393 cmt. e); see also *Mec-Gar, S.R.L. v. Hard, No. CV020077396S, 2002 Conn. Super. LEXIS 3314, 2002 WL 31440778 (Conn. Super. Oct. 2, 2002)* (finding that defendant breached his fiduciary duty where defendant solicited plaintiff's customer while still employed by plaintiff). In addition, "[k]nowledge acquired by an employee during his employment cannot be used for his own advantage to the injury of [*32] the employer during employment." *Town & Country House & Home Serv., 150 Conn. at 317* (citations omitted).

"The limits of proper conduct with reference to securing the services of fellow employees are not well marked." *Custard Ins. Adjusters, Inc. v. Nardi, No. CV980061967S, 2000 Conn. Super. LEXIS 1003, 2000 WL 562318, at *22 (Conn. Super. Apr. 20, 2000).* However, in *Elec. Assocs., Inc. v. Automatic Equip. Dev. Corp., 185 Conn. 31, 36, 440 A.2d 249 (1981),* the court concluded that "[o]nce Merritt left the plaintiff's employment, no fiduciary duty restrained him from using ordinary methods to encourage his former coworkers or subordinates to follow him to its competitor."

Finally, "after the employment has ceased the employee remains subject to a duty not to use trade secrets, or other confidential information which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer." *Allen, 145 Conn. at 514.*

Here, genuine issues of material fact exist as to whether Nazzaro breached his fiduciary duty of loyalty while he was employed by Milso by, inter alia, soliciting customers for Liberty or otherwise competing with Milso before the end of his employment by Milso, [*33] and using knowledge acquired by him during his employment by Milso to his own advantage to the injury of Milso, and also as to whether Nazzaro breached the duty of loyalty after his resignation by, inter alia, employing methods other than ordinary methods to encourage Larkin to resign and go to work for Liberty, and using confidential information he acquired in the course of his employment by Milso for his own benefit or the benefit of Liberty, to the detriment of Milso.

Therefore, both motions for summary judgment on the claim for breach of fiduciary duties with respect to Nazzaro are being denied.

### D. Aiding and Abetting Breach of Fiduciary Duty (Fourth Cause of Action)

Milso claims in the Fourth Cause of Action that Boggia and Liberty aided and abetted alleged breaches of fiduciary duties by Nazzaro and Larkin. Milso has moved for summary judgment with respect to the part of the claim that relates to aiding and abetting Nazzaro, and the defendants have moved for summary judgment as to the entire claim.

To prevail on a claim for aiding and abetting a breach of fiduciary duty under Connecticut law, a plaintiff must show "(1) a wrong by the primary violator or principal; (2) knowledge of [*34] that wrong by the alleged aider and abettor; and (3) substantial assistance to the principal by the aider and abettor in achievement of the primary violation." *Harris v. Wells, Civ. Nos. B-89-391 (WWE), B-89-482 (WWE), 1991 U.S. Dist. LEXIS 1994, 1991 WL 23535, at *2 (D. Conn. Feb. 6, 1991).*

To satisfy the first requirement, Milso must prove an underlying tort. See *Master-Halco, Inc. v. Scillia Dowling & Natarelli, 739 F. Supp. 2d 109, 121 (D. Conn. 2010)* ("[I]t goes without saying that individuals cannot aid and abet themselves."). As to Larkin, summary judgment has been granted in his favor as to the underlying tort, so Milso can not establish that Boggia and/or Liberty aided and abetted Larkin. As to Nazzaro, the defendants argue that the aiding and abetting claim fails because the breach of fiduciary duties claim fails. However, genuine issues of material fact exist as to whether Nazzaro breached his fiduciary duties to Milso.

Therefore, the defendants' motion for summary judgment as to the aiding and abetting breach of fiduciary duties claim against Boggia and Liberty is being granted insofar as it relates to aiding and abetting Larkin and denied insofar as it relates to Nazzaro, and the plaintiff's motion [*35] for summary judgment on the aiding and abetting of fiduciary claim is being denied.

### E. Unjust Enrichment (Fifth Cause of Action)

Milso claims in the Fifth Cause of Action that all the defendants received benefits for which they unjustly did not pay by improperly soliciting Milso's clients, customers, employees, and other business relations, and by utilizing Milso's confidential and proprietary information and trade secrets. To prevail on a claim of unjust enrichment, a plaintiff must prove: "(1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Jo-Ann Stores, Inc. v. Prop. Operating Co., 91 Conn. App. 179, 194, 880 A.2d 945 (2005)* ("[R]ight of recovery under the

doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another."). "Unjust enrichment is a very broad and flexible equitable doctrine that has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain [*36] a benefit that has come to him at the expense of the plaintiff." *Gagne v. Vaccaro, 255 Conn. 390, 409, 766 A.2d 416 (2001).*

The defendants argue that they are entitled to summary judgment as to this claim because it is entirely predicated on the plaintiff's trade secrets claim, which they contend fails. However, the unjust enrichment claim is not entirely predicated on any trade secrets claim, and in any event the plaintiff's CUTSA claim survives summary judgment. In addition, genuine issues of material fact exist, inter alia as to whether the defendants unjustly did not pay the plaintiff for benefits. Therefore, both motions for summary judgment on the claim for unjust enrichment are being denied.

### F. Tortious Interference with Contractual Relations (Sixth Cause of Action)

Milso claims in the Sixth Cause of Action that Liberty and Boggia tortiously interfered with the contractual relationship that existed between Nazzaro and Milso in the form of Nazzaro's Employment Agreement, and that Nazzaro, Liberty and Boggia tortiously interfered with the contractual relationship that existed between Larkin and Milso in the form of Larkin's Employment Agreement.

In Robert S. Weiss & Assoc., Inc. v. Wiederlight, [*37] the court observed:

> "This court has long recognized a cause of action for tortious interference with contract rights or other business relations. (Citations omitted.) *Blake v. Levy, 191 Conn. 257, 260, 464 A.2d 52 (1983).*'" *Solomon v. Aberman, 196 Conn. 359, 364, 493 A.2d 193 (1985).* Nevertheless, "not every act that disturbs a contract or business expectancy is actionable. *Jones v. O'Connell, [189 Conn. 648, 660-61, 458 A.2d 355 (1983).].*" *Blake v. Levy, supra, 191 Conn. at 260-61, 464 A.2d 52.*

*208 Conn. 525, 535-36, 546 A.2d 216 (1988).*

In order to prove a claim for tortious interference with contractual relations, a plaintiff must establish "(1) the existence of a contractual or beneficial relationship,

(2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct." *Appleton v. Bd. of Educ. of Town of Stonington, 254 Conn. 205, 212-13, 757 A.2d 1059 (2000)* (citations omitted).

In Wiederlight, the court stated with respect to the fourth element:

> "'[F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's [*38] conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously.'. . . "[A]n action for intentional interference with business relations . . . requires the plaintiff to plead and prove at least some improper motive or improper means. . . . '[A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself.'"

*Wiederlight, 208 Conn. at 536* (internal citations omitted).

Wiederlight also involved a claim of interference with a restrictive covenant:

> The third count of the plaintiff's amended complaint alleged that IAC "knew or in the exercise of reasonable care should have known" of the restrictive covenant in the Wiederlight-Weiss agreement and that, "[d]espite this knowledge either actual or constructive," IAC encouraged Wiederlight to sell insurance in violation of the agreement to IAC's financial benefit. The third count concluded that IAC's activities "constituted an interference with a contractual relationship."

*Id. at 535.* The court concluded that "[t]he assertion that [*39] IAC 'encouraged' Wiederlight to sell commercial insurance in the restricted area when it knew or should have known of the covenant's term does not fairly imply that IAC acted with 'fraud, misrepresentation, intimida-

tion or molestation' or that it acted with malice." *Id. at 536* (quoting *Blake v. Levy, 191 Conn. at 261*).

Here, in response to the defendants' argument that the plaintiff has not produced evidence that interference with the Employment Agreements was tortious, the plaintiff argues that the defendants' conduct was tortious "as they knew that the competing employment would immediately injure Milso by diverting existing accounts serviced by Nazzaro and Larkin from Milso to Liberty." (Pl.'s Br. 43.) However such knowledge shows only that the defendants knew that they would be taking business away from Milso, which would be in the normal course because they were competing with Milso; such knowledge does not fairly imply that the defendants acted with fraud, misrepresentation, intimidation or molestation or that they acted with malice.

Therefore, the defendants' motion for summary judgment on the claim for interference with contractual relations is being granted, and the plaintiff's [*40] motion is being denied.

## G. Interference with Business Expectancies (Seventh Cause of Action)

Milso claims in the Seventh Cause of Action that all the defendants tortiously interfered with its business expectancies, i.e., its relationships with customers. In order to maintain a claim for interference with business expectancies, Milso must establish "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 27, 761 A.2d 1268 (2000)*. In Biro v. Hirsch, the court explained:

> The plaintiff need not prove that the defendant caused the breach of an actual contract; proof of interference with even an unenforceable promise is enough. . . . A cause of action for tortious interference with a business expectancy requires proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . . The plaintiff is required to plead and prove at least some improper motive or improper means.

*62 Conn. App. 11, 21, 771 A.2d 129 (2001)* (citations and quotation [*41] marks omitted). "[T]o substantiate a claim of tortious interference with a business expectancy, there must be evidence that the interference resulted from the defendant's commission of a tort." *Id. at 22* (ci-

tations and quotation marks omitted). Here the defendants contend that the plaintiff has not produced evidence that the interference resulted from the commission of a tort by one or more of the defendants. However, the plaintiff has produced evidence that creates genuine issues of material fact, inter alia, as to whether the defendants used improper means by misappropriating the plaintiff's trade secrets to solicit customers for Liberty.

Therefore, both motions for summary judgment on the claim for tortious interference with business expectancies are being denied.

## H. CUTPA (Eighth Cause of Action)

Milso claims in the Eighth Cause of Action that all the defendants' conduct constitutes unfair competition in violation of CUTPA. The court notes that CUTSA and CUTPA claims may both be pursued in the same action. See, e.g., *Gerner v. Applied Indus. Materials Corp., No. X08CV020192069S, 2005 Conn. Super. LEXIS 1693, 2005 WL 1805670 (Conn. Super. June 30, 2005); Matrix Inv. Corp. v. Ward, No. 567613, 2004 Conn. Super. LEXIS 2629, 2004 WL 2284195 (Conn. Super. Sept. 16, 2004).*

CUTPA [*42] provides, in relevant part, that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Conn. Gen. Stat. § 42-110b(a).* Connecticut courts have adopted the following factors, known as the "cigarette rule," to determine whether a trade practice is unfair or deceptive: "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it was immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers (or competitors or other business men)." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433-34, 849 A.2d 382 (2004).* "Whether a practice is unfair and thus violates CUTPA is an issue of fact." *Id. at 434* (quoting *Ancona v. Manafort Bros., Inc., 56 Conn. App. 701, 714-15, 746 A.2d 184, cert. denied, 252 Conn. 953, 749 A.2d 1202 (2000)).*

There are two parts of Milso's CUPTA claim: (a) the claim that the defendants used Milso's [*43] confidential information for the startup of Liberty and then to help Liberty compete with Milso, targeting Milso's Connecticut customer base, and (b) a claim that Liberty deceived its customer base into buying caskets from Liberty instead of Milso, by undercutting Milso's price for its American-made caskets and delivering inferior Chinese-manufactured products, despite Liberty's patriotic logo and marketing materials. Genuine issues of material fact exist, inter alia, as to whether Milso's customer list and "business plan" are comprised of information that is publicly available or readily ascertainable, and as to whether Liberty sold Chinese-made caskets in a manner that constituted unfair competition. Therefore, both motions for summary judgment on the CUTPA claim are being denied.

## I. Conversion (Ninth Cause of Action)

Milso claims in the Ninth Cause of Action that all the defendants unlawfully misappropriated and converted confidential and proprietary information for their own personal advantage, including "Milso's customer contacts, purchase histories and discount information, and information concerning Milso's overall business plan and operation." (Pl's Br. 40.) "The tort of '[c]onversion [*44] occurs when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights.'" *Hi-Ho Tower, 255 Conn. at 43-44* (citing *Wellington Sys., Inc. v. Redding Grp., Inc., 49 Conn. App. 152, 169, 714 A.2d 21 (1998))* (emphasis omitted). "In Connecticut, intangible property interests have not traditionally been subject to the tort of conversion, except for those intangible property rights evidenced in a document." *Id. at 45.* See also *Froom Dev. Corp. v. Developers Realty, Inc., No. X05CV054004243S, 2007 Conn. Super. LEXIS 1116, 2007 WL 1470533, at *3 (Conn. Super. Apr. 24, 2007)* ("In general, conversion applies to tangible personal property, however, an exception is made where 'intangible property rights are evidenced by a document.'") (quoting *Hi-Ho Tower, 255 Conn. at 44*).

In support of their motion for summary judgment, the defendants argue that the plaintiff has failed to identify anything that was actually converted by the defendants. In response the plaintiff maintains only that Nazzaro converted Milso's property when he retained information on his Treo handheld device. Assuming arguendo that the exception made where intangible property rights are evidenced by [*45] a document is properly extended to information on a handheld device, the plaintiff nonetheless has failed to produce evidence as to an essential element of a conversion claim, i.e. that the defendant assumed and exercised ownership over property belonging to another, to the exclusion of the owner's rights. Milso has produced evidence that could show that Nazzaro retained information to the plaintiff's harm, but Milso has not produced evidence that could show that Nazzaro deprived Milso of its property permanently or for a period of time, or acted in a way that was inconsistent with Milso's right of dominion. See *Deming v. Nationwide Mut. Ins. Co., 279 Conn. 745, 770, 905 A.2d*

2012 U.S. Dist. LEXIS 123999, *

*623 (2006)* ("Thus, '[c]onversion is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm. The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm.") (quoting *Label Sys. Corp. v. Aghamohammadi, 270 Conn. 291, 329, 852 A.2d 703 (2004)*). While Nazzaro exercised dominion over the Treo device, it is [*46] undisputed that the device was his property.

Therefore, the defendants' motion for summary judgment on the conversion claim is being granted, and the plaintiff's motion for summary judgment is being denied.

**J. Civil Conspiracy (Tenth Cause of Action)**

Milso claims in the Tenth Cause of Action that all the defendants conspired "to unfairly compete with Milso by misappropriating and using Milso's confidential information about its customers, products, pricing and discounts." (Mem. Law Opp'n Defs.' Mot. Summ. J. (Doc. No. 145) ("Pl.'s Opp."), 29.) To prevail on a cause of action for conspiracy to commit a tort, or "civil conspiracy," the plaintiff must prove "(1) [a] combination between two or more persons; (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means; (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object; (4) which act results in damage to the plaintiff." *Williams v. Maislen, 116 Conn. 433, 437, 165 A. 455 (1933).*

To prove a claim for civil conspiracy, a plaintiff must establish that the underlying acts are wrongful. See *Weinberg v. Isom, No. CV 0140152, 1995 Conn. Super. LEXIS 3587, 1995 WL 785051, at *6 (Conn. Super. Dec. 26, 1995)* ("To [*47] be legally sufficient the plaintiff must allege that the underlying acts are wrongful."). Where the party asserting a claim for conspiracy to commit a tort is unable to establish the underlying cause of action, the cause of action for conspiracy also fails. See *Litchfield Asset Mgmt. Corp. v. Howell, 70 Conn. App. 133, 140, 799 A.2d 298 (2002)*, cert. denied, *261 Conn. 911, 806 A.2d 49 (2002)* (For a plaintiff to recover on a conspiracy claim, the court must find the facts necessary to satisfy the elements of an independent underlying cause of action. More specifically, where the plaintiff is unable to establish the underlying cause of action for fraud, the cause of action for conspiracy to defraud must also fail.) (citations and quotations omitted).

Under the "intracorporate conspiracy" doctrine, "[e]mployees of a corporation acting in the scope of their employment cannot conspire with one another or with

the corporation that employs them; each acts for the corporation and the corporation cannot conspire with itself." *Harp v. King, 266 Conn. 747, 781, 835 A.2d 953 (2003)* (quoting *Day v. Gen. Elec. Credit Corp., 15 Conn. App. 677, 684, 546 A.2d 315 (1988)*); see also *Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008)* ("[U]nder the intracorporate [*48] conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together.") (quotation omitted); *Herrmann v. Moore, 576 F.2d 453, 459 (2d Cir. 1978)* ("[T]here is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment."); *Cole v. Univ. of Hartford, 391 F. Supp. 888, 893 (D. Conn. 1975)* ("Simply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation."). Thus, Liberty cannot form a conspiracy with its own officers, directors and employees.

Both sides have moved for summary judgment on this claim. In support of its motion, Milso simply makes a conclusory assertion that the defendants acted in concert to commit all the business torts alleged by Milso, but it provides no explanation why there are no genuine issues of material fact as to its contention. Thus, Milso fails to meet its initial burden with respect to summary judgment.

In response to the defendants' argument, [*49] in support of their motion for summary judgment, that the civil conspiracy claim fails because of the intracorporate conspiracy doctrine, Milso narrows its claim to the period prior to May 18, 2008, i.e. the date Nazzaro resigned from Milso. An argument based on the intracorporate conspiracy doctrine and an argument that the civil conspiracy claim fails because the plaintiff cannot establish the underlying torts are the only arguments the defendants make. However, as discussed above, genuine issues of material fact exist as to certain of the underlying torts.

Therefore, the plaintiff's motion for summary judgment on the claim for civil conspiracy is being denied, and the defendants' motion for summary judgment is being granted as to the period beginning May 18, 2008 and otherwise denied.

**K. False Designation of Origin and False Advertising under the Lanham Act (Eleventh and Twelfth Causes of Action)**

Milso claims that Liberty violated § 43(a) of the Lanham Act: (a) in the Eleventh Cause of Action, because of false designation of origin, and (b) in the Twelfth Cause of Action, because of false advertising.

The Lanham Act's purpose is to "make 'actionable the deceptive and misleading use [*50] of marks,' and 'to protect persons engaged in ... commerce against unfair competition.'" *Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28, 123 S. Ct. 2041, 156 L. Ed. 2d 18 (2003)* (quoting *15 U.S.C. § 1127*). The Lanham Act was intended "to promote fair business dealing" and "not to provide a windfall to an overly eager competitor." *Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641, 649 (3d Cir. 1958)*.

*Section 43(a)* of the Lanham Act, *15 U.S.C. § 1125(a)(1)*, provides in pertinent part:

> Any person who, on or in connection with any goods ... uses in commerce ... any false designation of origin ... which-(A) is likely to cause confusion ... as to the origin ... of his or her goods, or (B) in commercial advertising or promotion, misrepresents the ... geographic origin of his or her or another person's goods ... shall be liable in a civil action to any person who believes that he or she is likely to be damaged by such act.

*Subsection (a)(1)(A)* creates, inter alia, a "false designation of origin" cause of action, while *subsection (a)(1)(B)* creates a "false advertising" cause of action. See *Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc., 926 F.2d 134, 139 (2d Cir. 1991)*. "Falsity may [*51] be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse consumers." *NBA v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997)* (citation omitted).

Milso contends that the manner in which the defendants sell in the United States imported Chinese-made caskets constitutes both false geographic "designation of origin" and, taken with Liberty's iconography, "false advertising" in violation of the Lanham Act.

## 1. Standing

As a threshold issue, the defendants argue that Milso does not have standing to bring its Lanham Act claims. To establish standing under *Section 43(a)* of the Lanham Act, Milso must "demonstrate a 'reasonable interest to be protected' against the advertiser's false or misleading claims, and a 'reasonable basis' for believing that this interest is likely to be damaged by the false or misleading advertising. The 'reasonable basis' prong embodies a requirement that the plaintiff show both likely injury and a causal nexus to the false advertising." *Havana Club Holding, S.A. v. Galleon S.A., 203 F.3d 116, 130 (2d Cir.*

*2000)* (citations omitted). "[T]he likelihood [*52] of injury and causation will not be presumed, but must be demonstrated." *Johnson & Johnson v. Carter-Wallace, Inc., 631 F.2d 186, 190 (2d Cir. 1980)*.

Relying on *New Colt Holding Corp. v. RJG Holdings of Florida, Inc., 312 F. Supp. 2d 195, 234-35 (D. Conn. 2004)*, the defendants argue that a competitor who sells foreign-made goods lacks "likely injury," and therefore standing, when asserting a false advertising claim based on designation of origin. Thus, they contend, because Milso sells Mexican-made caskets, it lacks standing.

In New Colt, the defendants asserted false designation of origin and false advertising counterclaims. The defendants argued that the plaintiffs' designation of their revolver as "Made in the USA" was false, and they conducted a consumer survey the results of which suggested that whether a revolver is of domestic origin is an important consideration to many firearms purchasers. The court held that the defendants failed to demonstrate injury and therefore lacked standing. The court reasoned that even if consumers knew that the plaintiffs' revolvers were of foreign origin, there was no evidence suggesting that they would necessarily choose to instead purchase defendants' [*53] revolvers, which were also foreign-made. The court observed that "Plaintiffs may reap some undue benefit, but at best this injures other manufacturers whose products are manufactured in the U.S. and not Defendants." *Id. at 234*.

As in New Colt, in this case the party bringing Lanham Act claims has produced a survey suggesting that consumers prefer products of domestic origin. And, as in New Colt, the party bringing Lanham Act claims also sells products that are foreign-made; Milso does not dispute that it sells caskets made in Mexico. However, whereas in New Colt it appeared that all of the complaining party's revolvers were foreign-made ("it is undisputed that Defendants' revolvers are of foreign origin. . . . It is therefore unclear how Defendants are damaged.", *id. at 234*), here it is undisputed that Milso sells both American-made and Mexican-made caskets. The plaintiff argues that "to the extent Milso manufactures American made caskets, then Liberty's false advertising unfairly elevates its less desirable foreign-made product to compete on the same ground." (Pl.'s Opp. 31.) The court agrees that Milso has standing because it manufactures American-made caskets.

## 2. Per se violation based [*54] on the Tariff Act

The plaintiff argues, relying on *Alto Prods. Corp. v. Ratek Indus. Ltd., No. 95 Civ. 3314 (LMM), 1996 U.S. Dist. LEXIS 12812, 1996 WL 497027 (S.D.N.Y. Sept. 3, 1996)*, that the defendant failed to mark its caskets as

Case 3:13-cv-00215-VAB   Document 83-1   Filed 07/25/14   Page 164 of 176

Page 14
2012 U.S. Dist. LEXIS 123999, *

"Made in China" in accordance with the Tariff Act, *19 U.S.C. § 1304*, and such failure constitutes a per se violation of the Lanham Act. [4]

    4    The Tariff Act provides, in relevant part, that:

> [E]very article of foreign origin . . . imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article.

    *19 U.S.C. § 1304(a).*

In Alto Prods., the court placed weight on the "rationale underlying the marking requirements of the Tariff Act," *1996 U.S. Dist. LEXIS 12812, [WL] at 5*, and the logic supporting the holding in *Bohsei Enter. Co., U.S.A. v. Porteous Fastener Co., 441 F. Supp. 162 (1977)*. See *Bohsei, 441 F. Supp. at 164* ("To hold that omission of such a material fact [as country of origin] is not such a false representation as to affect the competition of the sale to the detriment of a seller who [*55] complies with the mandate of *19 U.S.C. § 1304* requires an utterly naive view of the realities of the market place."). In Alto Prods., the court reasoned:

> [T]he court now holds that failure to designate country of origin in violation of the Tariff Act violates *§ 43(a)* of the Lanham Act as a matter of law. Logic dictates that in light of these considerations, a consumer encountering goods with no marking as to country of origin will assume that they are American-made, thus creating a likelihood of confusion with goods which are, in fact, American-made.

*1996 U.S. Dist. LEXIS 12812, 1996 WL 497027 at *5.*

However, such a per se rule would be in conflict with the fact that "[t]he [Lanham] Act imposes no affirmative duty of disclosure . . . and a claim cannot be based on the failure to disclose a fact." *Clark Consulting, Inc. v. Fin. Solutions Partners, LLC, No. 05 Civ. 06296(SAS), 2005 U.S. Dist. LEXIS 28642, 2005 WL 3097892, at *3 n.38 (S.D.N.Y. Nov. 17, 2005)* (citing

*Agency Dev., Inc. v. Med Am. Ins. Co., 310 F. Supp. 2d 538, 547 (W.D.N.Y. 2004)* ("Plaintiff's proposed claim must fail because it cannot base a Lanham Act claim on the defendants' failure to disclose a fact.")); *Avon Prods., Inc. v. S.C. Johnson & Son, Inc., 984 F. Supp. 768, 798 (S.D.N.Y. 1997)* [*56] ("[T]he Lanham Act 'impos[es] no affirmative duty of disclosure.'") (quoting *Int'l Paint Co. v. Grow Grp., Inc., 648 F. Supp. 729, 730 (S.D.N.Y. 1986)); Int'l Paint Co., 648 F. Supp. at 730* ("[T]his court has construed the reach of *§ 43(a)* of the Lanham Act proscription against the false representations as imposing no affirmative duty of disclosure."); *McNeilab, Inc. v. Am. Home Prods. Corp., 501 F. Supp. 517, 532 (S.D.N.Y. 1980)* ("[A] failure to inform consumers of something, even something that they should know, is not per se a misrepresentation actionable under *section 43(a)* of the Lanham Act.")).

In analyzing whether a claim can be based on a failure to disclose, the court in Universal City Studios, Inc. v. Sony Corp. of America reasoned:

> Rather than looking to case law, therefore, it is necessary to look to the statute. It is hard to see how a simple failure to disclose can be brought within its terms. No reference to omissions of material fact or obligation to disclose such as is found in other federal statutes (e.g. *15 U.S.C. § 77l*) appears. The key language seems to be "false description," false "representation," and false "designation of origin." The absence of any statement [*57] is neither "false" nor a "representation." And it is difficult to see where such a disclosure requirement, if implied, would end, for no limits on the extent and nature of that disclosure can be readily deduced.

*429 F. Supp. 407, 410 (C.D. Cal. 1977).*

In addition, in the absence of language in the statute such a per se rule would inappropriately restrict the ability of the finder of fact to evaluate the particular circumstances of each case. Cf. *York Grp., Inc. v. York S., Inc., Civil Action No. H-06-0262, 2006 U.S. Dist. LEXIS 78052, 2006 WL 3057782, at *7 (S. D. Texas Oct. 26, 2006)* (rejecting the argument that an alleged Tariff Act violation is a per se violation of the Lanham Act because, inter alia, the Fifth Circuit has "expressed its refusal to interfere with or predict factual determinations by administrative agencies . . . ."). Any number of factual scenarios will be present in cases where a claim is brought pursuant to *§ 43(a)* of the Lanham Act. While it is likely that in a number of those cases the factual representa-

tions made will be false or misleading in the absence of a designation of origin in accordance with the Tariff Act, it is also likely that in at least some instances the factual representations [*58] will not be false or misleading in the absence of a designation in accordance with the Tariff Act.

### 3. False Designation of Origin; Literally False Advertising

To the extent the plaintiff is advancing a claim for false designation of origin that does not rely on its argument that a violation of the Tariff Act constitutes a per se violation of the Lanham Act, that claim for false designation of origin rests on the same argument and evidence as the plaintiff's Lanham Act claim for literally false advertising. Although the plaintiff argues that Liberty's Chinese-made caskets are either never marked as "Made in China" or are marked with such a flimsy sticker that it is removed or falls off, the plaintiff has produced no evidence in support of these assertions. The plaintiff has, however, created a genuine issue as to whether the stickers designating caskets as having been manufactured in China are inadequate to inform consumers that those caskets are made in China. Relying on this evidence, Milso contends that Liberty's extensive use of American iconography, including the name of the company and its logo containing the Statue of Liberty wrapped in an American flag, constitute a false designation [*59] of origin and literally false advertising in view of the fact that the stickers designating caskets as having been manufactured in China are inadequate under the circumstances to inform consumers that the caskets are made in China.

Although the company name, "Liberty Casket," and the iconography of the Statue of Liberty and the American flag evoke clear associations with the United States of America, these words and symbols are too general to evoke any specific geographical associations or to support an inference that there is an implied claim of domestic manufacture. See *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 256, 36 S. Ct. 269, 60 L. Ed. 629, 1916 Dec. Comm'r Pat. 281 (1916) ("We do not regard the words 'The American Girl,' . . . [used] in connection with shoes . . . as being a geographical or descriptive term. It does not signify that the shoes are manufactured in America, or intended to be sold or used in America, nor does it indicate the quality or characteristics of the shoes."); *Forschner Grp., Inc. v. Arrow Trading Co.*, 30 F.3d 348, 355 (2d Cir. 1994) ("The phrase Swiss Army knife cannot fairly be read to say 'made in Switzerland' so as to be geographically descriptive. Therefore, the use of the phrase by the distributor [*60] of a knife made in China does not constitute false advertising.").

Therefore, the defendants' motion for summary judgment on the plaintiff's claims for false designation of origin and for literally false advertising in violation of the § 43(a) of the Lanham Act is being granted, and the plaintiff's motion is being denied.

### 4. Claim for Impliedly False Advertising

"'[P]laintiffs alleging an implied falsehood are claiming that a statement, whatever its literal truth, has left an impression on the listener [or viewer] that conflicts with reality' - a claim that 'invites a comparison of the impression, rather than the statement with the truth.' . . . Therefore, whereas 'plaintiffs seeking to establish a literal falsehood must generally show the substance of what is conveyed, . . . a district court must rely on extrinsic evidence [of consumer deception or confusion] to support a finding of an implicitly false message.'" *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007) (quoting *Schering Corp. v. Pfizer, Inc.*, 189 F. 3d 218, 229 (2d Cir. 1999)).

"[T]he success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey." *Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beechman Corp.*, 960 F.2d 294, 298 (2d Cir. 1992).* [*61] "[W]here the plaintiff cannot demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement, the plaintiff cannot establish that it suffered any injury as a result of the advertisement's message." Id.

The plaintiff contends that "[t]he [Poret] Report conclusively demonstrates that omission of the words 'Made in China' from Liberty's lithographs is materially misleading to consumers with a deception rate significantly higher than 20%." (Pl.'s Br. 55.) However, the record supports the defendant's contention that "the Poret study provides no evidence that 'a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement.'" (Mem. Law Supp. Defs.' Mot. Summ. J. (Doc. No. 132) 40 (citing *Johnson & Johnson*, 960 F.2d at 298).)

The Poret Report explains how the study was designed:

> STUDY DESIGN    400 qualified respondents participated in this study, which was conducted in 9 locations in Connecticut and Massachusetts.
>
> The objectives of the study [*62] were to determine: (a) whether or not the information that a Liberty casket is made

in China would be material to a potential casket purchaser; and (b) whether the failure to properly disclose such information is misleading to consumers. Accordingly, a standard market research experiment was designed to test whether the presence or absence of such information would potentially impact a consumer's decision about which casket to purchase.

The experiment was composed of two Cells.

200 respondents were assigned at random to Cell 1 and 200 to Cell 2.

Overview of Design

Respondents in Cell 1 were shown a booklet containing three lithographs of Liberty caskets and a booklet containing three lithographs of Matthews caskets. The Liberty lithographs did not designate the caskets as being made in China. Respondents were then asked which casket (out of the six shown to them) would be their first, second, and third choices to buy (if they had a preference or preferences at all).

Respondents in Cell 2 were also shown a booklet containing three lithographs of Liberty caskets and a booklet containing three lithographs of Matthews caskets. The Matthews booklet was identical to the booklet shown to Cell [*63] 1. The Liberty booklet was the same as the one shown to Cell 1 except that the lithographs were changed to indicate that the Liberty caskets are "Made in China." Respondents were then asked the identical question as in Cell 1 - which casket (out of the six shown to them) would be their first, second, and third choices to buy (if they had a preference or preferences at all).

(Decl. Hal Poret (Doc. No. 129-6), Ex. A - Expert Report of Hal Poret, 6.) The "Summary of Key Findings and Opinions" includes five findings and opinions. The final finding and opinion is: "5) Based on the survey results, it is my opinion to a high degree of professional certainty that the information that a Liberty casket is made in China is material to consumers and that the omission of such information is misleading to consumers." (Id. at 18.)

Although Poret's survey would support a conclusion that information that a casket is made in China is material to consumers, it does not support a conclusion that the omission of such information from Liberty's advertising and promotional materials renders them impliedly false. No part of Poret's survey focused on Liberty's advertising and promotional materials and whether [*64] they suggest that Liberty's caskets are manufactured domestically. Nor for that matter did any part of the study focus on advertising and promotional materials in general to determine what characteristics of such materials, if any, would suggest to consumers that a product is manufactured domestically. Rather, the Poret Report draws an inference that because information that a casket is made in China is material to consumers, the omission of such information is misleading to consumers, which is a conclusion that would apply to the promotional materials of any company in the industry. However, Milso's claim here is not that omission from a casket manufacturer's advertising and promotional materials of the fact that a casket is made in China renders them impliedly false, and for that reason Liberty's advertising and promotional materials violate the Lanham Act, but rather that Liberty's pervasive use of American iconography, including the name of the company and its logo, requires disclosure of the fact that its caskets are manufactured in China in order for Liberty's advertising and promotional materials not to be implicitly false.

In addition, the mere fact that information that was [*65] material to consumers was omitted in advertising and promotional materials is not enough to support a claim under the Lanham Act in light of the fact that "the Lanham Act 'impos[es] no affirmative duty of disclosure.'" *Avon Prods., 984 F. Supp. 768 at 798* (quoting *Int'l Paint Co., 648 F. Supp. 729*).

Therefore, the defendants' motion for summary judgment on the plaintiff's claim for impliedly false advertising in violation of the Lanham Act is being granted, and the plaintiff's motion is being denied.

**L. Declaratory Judgment (Count One of Counterclaim)**

In the First Counterclaim, the defendants seek a declaratory judgment that the Employment Agreements are unenforceable. For the reasons set forth above in the discussion of the plaintiff's First Cause of Action, there are genuine issues of material fact as to whether the Employment Agreements are enforceable. Therefore, both motions for summary judgment as to the First Counterclaim are being denied.

**M. "Sham" Litigation in Violation of CUTPA (Count Two of Counterclaim)**

2012 U.S. Dist. LEXIS 123999, *

The defendant's Second Counterclaim is that Milso violated CUTPA by filing "sham" litigation. The Second Circuit has held that "the filing of a single non-sham lawsuit-cannot   [*66]   form the basis for a CUTPA claim." *Suburban Restoration Co., Inc. v. ACMAT Corp., 700 F.2d 98, 102 (2d Cir. 1983)*. "Sham" litigation in the CUTPA context consists of "actions rife with abusive intent and absent any indicia of success," and "[f]actors present in sham litigation include, but are not limited to the presence of repetitive litigation . . . deliberate fraud, supplying false information, and whether lower courts have stated or implied that the action is frivolous or objectively baseless and whether they have dismissed it out of hand." *Zeller v. Consolini, 59 Conn. App. 545, 555, 758 A.2d 376 (2000)*.

Milso's action is not a "sham" lawsuit. First, the lawsuit is not "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 50, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993)* (defining "sham" litigation). There is no evidence that could support a finding of fraudulent intent, repetitiveness, or frivolity on Milso's part, particularly in view of the fact a number of Milso's claims have survived summary judgment. Therefore, the plaintiff's motion for summary judgment on the Second Counterclaim is   [*67]   being granted, and the defendants' motion is being denied.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment (Doc. No. 129) is hereby GRANTED in part and DENIED in part, and Defendants' Motion for Summary Judgment (Doc. No. 122) is hereby GRANTED in part and DENIED in part.

Judgment shall enter in favor of the plaintiff with respect to the defendants' Second Counterclaim. Judgment shall enter in favor of the defendants with respect to the plaintiff's Third Cause of Action as to Larkin only (Breach of Fiduciary Duties), Fourth Cause of Action only as to Boggia and Liberty insofar as relates to aiding and abetting Larkin (Aiding and Abetting Breach of Fiduciary Duties), Sixth Cause of Action (Tortious Interference with Contractual Relations), Ninth Cause of Action (Conversion), Tenth Cause of Action only as to the period beginning May 18, 2008 (Civil Conspiracy), Eleventh Cause of Action (Lanham Act claim for false designation of origin), and Twelfth Cause of Action (Lanham Act claim for false advertising).

It is so ordered.

Dated this 30th day of August 2012, at Hartford, Connecticut.

/s/ Alvin W. Thompson

United States District Judge



**Katherine Lodovico v. Richard Mihalcik et al.**

**CV075013091S**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF HART-FORD AT HARTFORD**

*2010 Conn. Super. LEXIS 2150*

**August 17, 2010, Decided**
**August 17, 2010, Filed**

**NOTICE:**     THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**JUDGES:**   [*1] Richard M. Rittenband, Judge Trial Referee.

**OPINION BY:** Richard M. Rittenband

**OPINION**

*MEMORANDUM OF DECISION*

*FACTS AND PROCEDURE:*

This is a somewhat unusual case in which the defendants chose not to be present throughout the trial, and presented no witnesses. Defendants' attorney was limited, therefore, to cross examination of the plaintiff. The plaintiff was the only person to testify, and the Court found her honest and credible.

The plaintiff, Katherine Lodovico, met the defendant, Richard Mihalcik a/k/a (hereinafter also "Mihalcik") when both of them were employed by the Beazley Company Real Estate Agency in 2005 as real estate agents. There, they formed a personal, romantic relationship, and in 2006 the plaintiff and defendant Mihalcik left Beazley to go into business in their own real estate agency. In April 2006, they formed Valley Premier Properties, LLC (hereinafter also "Valley Premier") a Connecticut limited liability company which was to offer brokerage services relating to the sale of residential and commercial real estate in the state of Connecticut with emphasis on the Naugatuck Valley. Mihalcik had a real estate license. There was another original partner who subsequently sold his  [*2] interest to the plaintiff and Mihalcik. Mihalcik became the owner of fifty one percent (51%) interest in Valley Premier, and the plaintiff held forty nine percent (49%) ownership of Valley Premier. The business began in June 2006. The plaintiff did the bookkeeping, administrative functions and both she and Mihalcik devoted time to the sale of residential and commercial properties. In March 2007 the personal relationship was ended by the plaintiff, but they agreed to continue as business partners in Valley Premier. By June 2007 Mihalcik's emotions were stimulated when he learned that the plaintiff was dating someone else. Mihalcik become hostile toward the plaintiff, harassed her and threatened her. He also stalked her. The threats were numerous but it is unnecessary to repeat them in detail here. See plaintiff's Exhibit 13, and email in which he made threats and was obviously very angry with the plaintiff. This hostile environment promoted by Mihalcik culminated in August 2007 when Mihalcik terminated the plaintiff's status with Re/Max New England, Inc., the overall brokerage firm of which Valley Premier was a franchisee. It was Mihalcik who terminated her employment and activities.  [*3] [1] Mihalcik was the broker and owner of record of Valley Premier and had contacted Re/Max New England, Inc., to place the plaintiff on "inactive" status. Mihalcik not only did not give plaintiff notice that he was terminating her as an agent, but did not even once communicate to her that he was taking that action. It was clear, according to the plaintiff who was the only witness to testify, in this trial, that the actions of Mihalcik resulted from his anger and resentment toward the termination of their personal romantic relationship. It

had nothing to do with her performance because in the June 2007 monthly report to Re/Max New England, Inc., the plaintiff earned commissions in that month of $ 16,175 resulting in her being the second highest producing agent for Valley Premier. Mihalcik earned commissions of only $ 11,758. See plaintiff's Exhibit 18.

    1   This is in sharp contrast to defense counsel's disingenuous claim in his brief that the plaintiff left voluntarily.

Not only could the plaintiff no longer conduct herself as an agent of Valley Premier, but she had made a series of loans to Valley Premier in purchasing furniture and equipment, executing the real estate and equipment leases [*4] and made contributions for working capital as well as other loans to Valley Premier. She was unable to recoup the money she had loaned to Valley Premier and commissions and other funds due to her. She also testified without contradiction that on August 21, 2007 Mihalcik took the funds in the Valley Premier checking account at Thomaston Savings Bank of $ 722.46 and deposited that money in another account at Thomaston Savings Bank under CT Premier Properties, LLC (hereinafter also "CT Premier"). When Mihalcik transferred the money by first closing the Valley Premier accounts, plaintiff was still a member of Valley Premier holding a 49% interest. The plaintiff claims that the transfer was made to deprive the plaintiff of access to those funds. Mihalcik never notified the plaintiff of these actions and never moved to dissolve Valley Premier or to have plaintiff removed as a member of Valley Premier. Plaintiff's Exhibit six. CT Premier was formed by Mihalcik on August 31, 2007 with the same business address at 100 Bank Street, Seymour, Connecticut. See plaintiff's Exhibit 15. Also, plaintiff testified that Mihalcik had not only made the transfer of monies but removed all the books and records [*5] of Valley Premier and transferred all of the remaining business assets of Valley Premier consisting of commission income, furniture and equipment to CT Premier. The testimony regarding the removal of funds and closing of the accounts was not contested at trial and was admitted by the defendants in their respective answers including an admission that Mihalcik had formed CT Premier for the purpose of brokering and selling residential real estate.

Plaintiff also testified that Mihalcik on August 24, 2007 made a written complaint against the plaintiff with the Seymour Connecticut Police Department (plaintiff's Exhibit 12). The plaintiff claims that the allegations were false and baseless and known by Mihalcik to be false and they are the subject of a count for defamation which will be explained hereafter.

Mihalcik did not show up or be present at trial. His attorney was there and stated that Mihalcik "chose not to

be here." There was no indication that he was unavailable. In addition, during the pretrial process Mihalcik did not comply with court orders for production and was fined $ 250 and later $ 750 for failure to comply by Elgo, J. This deprived the plaintiff of some of the documents [*6] she felt she could use in pursuing her claims.

The parties agreed to file briefs on July 14, 2010 with the reply briefs due a week later on July 21, 2010. The briefs were filed.

*STANDARD OF REVIEW:*

"The plaintiff in a civil case sustains his burden of proof as to any essential element in his cause of action if the evidence, considered fairly and impartially, induces in the mind of the trier, a reasonable belief that it is more probable than otherwise that the facts involved in that element are true." *Busker v. United Illuminating Co., 156 Conn. 456, 458, 242 A.2d 708 (1968).* This is also known as proof by a preponderance of the evidence.

In addition, this Court evaluates the credibility of the witnesses based upon their appearance and demeanor on the witness stand, the consistency or inconsistency of their testimony, their memory or lack thereof of certain events, whether they were candid and forthright or evasive and incomplete, their manner in responding to questions and their interest or lack of interest in the case.

Also, the Court evaluates general credibility on the basis of other testimony in this case as well as documents in evidence as to their consistency or inconsistency with other evidence.

The [*7] burden is on the plaintiff to prove his allegations by a preponderance of the evidence, and the defendants have the burden of proving their allegations in their special defenses by a preponderance of the evidence.

*CREDIBILITY:*

The Court finds that the plaintiff was credible, honest and candid with a good memory for details in her testimony and finds her to have been a credible witness who was and is believable.

In sharp contrast is the defendant Mihalcik who did not show up for trial. In *Sturgeon v. Sturgeon, 114 Conn.App. 682, 690-91, 971 A.2d 691 (2009)* "a party is entitled to comment on weakness of opposing party's case by bringing to jury's attention the failure to call witnesses to support its own factual theories with witnesses." Further, in *Rabeck v. Danbury Orthopedic Associates, P.C., 72 Conn.App. 359, 369-70, 805 A.2d 130 (2002)* it appears that it is necessary to establish that a witness who does not show up at trial is available to testify in accordance with *C.G.S. § 52-216c.* As stated, it's a

clear inference that Mihalcik was available to testify but "chose not to attend" as stated by his attorney. The Court, therefore, based upon the failure of Mihalcik to come to court to defend the claims of the plaintiff, [*8] draws an adverse inference as to his potential testimony. The adverse inference is that any such testimony if given by Mihalcik either under direct or cross examination would have been harmful or detrimental to his interest in the case. Additionally, the Court finds a pattern of failure to comply with court orders as to discovery is contrary to Mihalcik's credibility; and finally, Attorney Lee, in his cross examination of the plaintiff, did not in any way diminish her credibility as a witness. [2], [3]

> 2   Attorney Timothy Lee representing the defendants did a credible job, but the plaintiff was a very good witness.
>
> 3   *Sturgeon v. Sturgeon supra* and *C.G.S. § 52-216c* permit comments on failure to call a witness in closing argument in a jury case. Certainly if attorneys in a jury case can make this argument, in a court case, the trial judge certainly has a right to make this inference and consider this failure on the part of the defendants.

*ISSUES AND FINDING:*

The court will make findings based upon the specific counts of the amended complaint of May 2, 2008 which brought in CT Premier as an additional defendant.

*(1) First Count: Breach of Fiduciary Relationship.*

It is well settled that "a fiduciary [*9] or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interest of the other." *High-Ho Tower, Inc., v. Com-Tronics, Inc., 255 Conn. 20, 38, 761 A.2d 1268 (2000).* ". . . In the seminal cases in which this Court has recognized the existence of a fiduciary relationship, the fiduciary was either in a dominant position, thereby creating a relationship of dependency, or was under a specific duty to act for the benefit of another." *Id. 38.*

Also, in *High-Ho Tower, Inc., supra at page 41* the Court found that "The law will imply [fiduciary responsibilities] only where one party to a relationship is unable to fully protect its interest [or where one party has a high degree of control over the property or subject matter of another] and the unprotected party has placed its trust and confidence in the other."

Here there is no question that Mihalcik owed a fiduciary duty to the plaintiff. He was in a dominant position holding 51% of Valley Premier and the plaintiff holding a minority interest of 49%. Further, Mihalcik was the broker, and the plaintiff was an agent. He [*10] was, therefore, superior to the plaintiff and was under a specific duty to act for the benefit of the plaintiff in protecting her 49% interest. As the broker and the one who held the franchise from Re/Max New England, Inc., Mihalcik controlled Valley Premier, had a high degree of control over Valley Premier since he was the only signatory to the franchise and, therefore, the plaintiff was the unprotected party who had to place her trust and confidence in Mihalcik.

It is clear to this Court that the plaintiff has put forth sufficient credible evidence that Mihalcik was a fiduciary and owed a duty to the plaintiff.

"Proof of a fiduciary relationship imposes a twofold burden on the fiduciary. Once a fiduciary relationship is found to exist, *the burden of proving fair dealing shifts to the fiduciary*. Furthermore, the standard of proof for establishing fair dealing is not the ordinary fair preponderance of the evidence standard. *The fiduciary is required to prove fair dealing by clear and convincing evidence.*" *Oakhill Associates v. D'Amato, Sr. et al., 228 Conn. 723, 638 A.2d 31 (1994), Gorelick v. Montanaro, 119 Conn.App. 785, 990 A.2d 371 (2010)* (Emphasis added.)

Certainly in cross examination, the defendants did [*11] not prove fair dealing on the part of Mihalcik, and offering no evidence Mihalcik could not and did not prove fair dealing by clear and convincing evidence. By Mihalcik's stalking of the plaintiff, making threats to her, unlawfully terminating her position with Valley Premier as aforesaid, putting her on inactive status whereas no other agents were put on inactive status, failure to give her notice of her termination, refusing or neglecting to pay back the loans the plaintiff had given to Valley Premier as aforesaid, Mihalcik's removal of $ 722.46 from the Valley Premier checking account and depositing that money in the new company he had formed, CT Premier, and thereby taking unlawfully her 49% interest in Valley Premier thereby depriving the plaintiff of access to those funds, Mihalcik's removal of the books and records of Valley Premier so that the plaintiff would not have access to same, fraudulently transferring all of the business assets of Valley Premier consisting of commission income and furniture and equipment to CT Premier and making a false complaint against the plaintiff with the Seymour, Connecticut Police Department, it is clear that Mihalcik several times breached his [*12] fiduciary duties towards the plaintiff. The Court, therefore finds, based upon all of the evidence that Mihalcik breached his fiduciary duties towards the plaintiff, and she suffered damages as a result.

*(2) Second Count: Withdrawn by the Plaintiff.*

*(3) Third Count: Withdrawn by the Plaintiff.*

*(4) Fourth Count: Breach of Contract.*

The Court finds that Mihalcik breached the terms of the operating agreement (plaintiff's Exhibit six) in which they agreed to set up and operate a real estate brokerage company known as Valley Premier Properties, LLC, with Mihalcik owning 51% thereof and the plaintiff owning 49% thereof. Further, there were oral agreements between the plaintiff and Mihalcik that plaintiff would be reimbursed for monies she loaned to Valley Premier. Plaintiff testified, and the Court believes her, that the purchases included the acquisition of furniture and equipment for the business, supplies and other pertinent items, that she had become obligated for the commercial lease of the premises and the telephone system and photocopier. Plaintiff became a guarantor to Wells Fargo Financial Leasing for the telephone system and photocopier. Mihalcik refused to lend his personal name as [*13] guarantor on these leases. She also guaranteed as co-owner of the business a credit card under the name of Valley Premier, but Mihalcik refused to sign any personal guarantee as was required of her.

By placing her on inactive status and terminating her position at Valley Premier, and, in effect, taking away her 49% of the business, continuing to owe her money that she had expended or guaranteed, closing the Valley Premier accounts and taking with him all monies of Valley Premier and commissions and fraudulently turning these assets including furniture and equipment over to a new company which he organized known as CT Premier were all elements of his breach of contract both written and oral. Accordingly, the Court finds that the plaintiff has sustained her burden of proof for breach of contract in the fourth count by a preponderance of the evidence.

*(5) Fifth Count: Breach of the Covenant of Good Faith and Fair Dealing.*

"Every contract carries an implied Covenant of Good Faith and Fair Dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Warner v. Konover, 210 Conn. 150, 154-56, 553 A.2d 1138 (1989)* and *Habetz v. Condon, 224 Conn. 231, 238, 618 A.2d 501 (1992).* [*14] "The law does not permit the exercise of a right to repudiate a contract when the exercise of such a right and bad faith would work an injustice." *Habetz v. Condon, supra, Id. 238.*

For all of the reasons stated in regard to Count Four, the actions by Mihalcik in breaching the contract between the parties were of a deliberate nature and done in bad faith; namely, putting the plaintiff on inactive status, in effect terminating her from the partnership of which she owned 49% refusing and/or neglecting to repay the monies that she loaned to the company they set up, namely Valley Premier, the taking of the money from

Valley Premier and transferring it to CT Premier as stated in Count four and for all the reasons stated therein Mihalcik's actions or inactions when action was required were done in bad faith and clearly amounted to a breach of the covenant of good faith and fair dealings which the plaintiff had a right to believe that the covenant would not be broken. The Court finds Mihalcik liable under Count Five.

*(6) Sixth Count: Tortious Interference with Business Relationships and Expectancies.*

Plaintiff has sustained her burden of proving that she had business expectancies. First, she [*15] expected to continue working as a 49% owner of Valley Premier and obtain commissions as a result of sales that she made of real estate. Secondly, she expected that the money she had loaned to Valley Premier for equipment, furniture, becoming liable on the real estate lease and other loans based upon Mihalcik's promise that she would be repaid were also expectancies that she expected to make in reimbursement from Valley Premier.

It is obvious that Mihalcik knew of the business expectancy. They went into this venture with the expectation that both of them would be making money from the sale of real estate and since Mihalcik promised the plaintiff that she would be reimbursed for her expenditures, he obviously knew she expected that. As for the third element it is clear that defendant Mihalcik tortiously interfered with her business expectancies. First and foremost is that the deliberate action taken by Mihalcik to have the plaintiff terminated as an agent of Valley Premier by placing her on inactive status as an agent of Re/Max New England, Inc., thereby depriving her of any future earnings by commission or otherwise. Secondly, Mihalcik removed all remaining funds of Valley Premier, closed [*16] the accounts and transferred same to CT Premier and thereby opening up a new real estate known as CT Premier Property's LLC and transferring all remaining furniture and equipment of Valley Premier to CT Premier. In effect he not only interfered with her business expectancy of receiving commissions and profits from her 49% ownership of Valley Premier but by refusing/neglecting to repay her the monies she had loaned to Valley Premier he interfered with that business expectancy and in effect closed her out of the real estate agent business. Finally, the plaintiff has sustained her burden of proving an actual loss as a result of Mihalcik's tortious interference. She obviously lost any future commissions. She lost the money that was loaned to Valley Premier and not repaid and she lost her 49% of the business, the assets of which were transferred to another company controlled and owned by Mihalcik. The Court concludes that Mihalcik is liable for tortious interference of a business relationship and the damages the plaintiff suffered will be set out hereafter in more detail.

2010 Conn. Super. LEXIS 2150, *

*(7) Seventh Count: Defamation.*

On August 24, 2007 Mihalcik went to the Seymour, Connecticut Police Department and filed [*17] a complaint, plaintiff's Exhibit 12. He made a written statement in which he claimed among other things, that in April 2006 he opened a real estate company of which he is the sole owner. In September 2006 he opened a second company with a partner, Katherine Lodovico. Mihalcik states that he is a 51% owner of the second company and Lodovico is 49% owner. In the police report it is clear that Mihalcik stated that Lodovico has no legal authority to open an account under Re/Max, that she legally has no part of that company, and that further she has no right to use Valley Premier money to pay for a cell phone that her daughter uses. These statements made to the Seymour police were false and were known by Mihalcik to be false when he made them. During the trial it became clear from the plaintiff's testimony that Mihalcik knew in May 2006 that the plaintiff was ordering a cell phone under the Valley Premier name for Mihalcik and the plaintiff. Plaintiff testified that she had a preexisting Cingular cell phone account that included a phone for herself and her daughter which she then transferred over to the Valley Premier account and that Mihalcik was fully aware that her daughter was also [*18] on the account. Further, Mihalcik told the Seymour police that the plaintiff had no right to open a credit card account with Citibank and had no right to use his personal information all of which was false and known by Mihalcik to be false when he made those statements to the police.

In the case of *Cweklinsky v. Mobil Chemical Co., 267 Conn. 210, 217, 837 A.2d 759 (2004)* the Court set forth the following criteria to establish a case of defamation: "(1) The defendant published a defamatory statement." This Court finds that the statements made to the Seymour police were false and Mihalcik knew them to be false. "(2) The defamatory statement identifies the plaintiff to a third party." The statement clearly identified the plaintiff in this case to the Seymour police officers: "The defamatory statement was published to a third person." The statement was published to Seymour police officers and "(4) The plaintiff's reputation suffered injury as a result of the statement." All of these elements have been proven by a preponderance of the evidence by the plaintiff. "Libel per se is a defamatory statement in writing the meaning of which is apparent per se which is apparent on the face of the statement and [*19] it is actionable without proof of actual damages . . . when the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation . . . The individual plaintiff is entitled to recover, as general damages, for the injury to his or her reputation and for the humiliation and mental suffering which the libel caused him or her." *Lega Siciliana Social*

*Club, Inc. v. St. Germaine, 77 Conn. App. 846, 851-52, 825 A.2d 827 (2003).* Also in *St. Germaine, supra at 853* the Court held that "two of general cases of libel which are generally recognized, are actionable per se are (1) libel charged in crimes and (2) libel which injure a man or a woman in his/her profession and calling . . . to fall within the category of libels that are actionable per se because they charge crime, the libel must be one which charges a crime which involves moral turpitude or to which an infamous penalty is attached."

In the case at bar Mihalcik filed two reports falsely accusing the plaintiff of theft and fraud. These are crimes of moral turpitude and the reports are defamation per se.

*(8) Eighth Count: Connecticut Unfair Trade Practices Act (also known as "CUTPA").*

In the leading case [*20] of *Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 591, 592, 657 A.2d 212 (April 1995)*, the Court set forth the elements for a violation of CUTPA.

> *Section 42-110b(a)* provides: 'No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.' In determining whether certain acts constitute a violation of this act, 'we have adopted the criteria set out in the cigarette rule by the federal trade commission . . . (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]. *Conaway v. Prestia, [191 Conn. 484, 492-93, 464 A.2d 847 (1983)]*, quoting *FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 244-45 n.5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 567-68, 473 A.2d 1185 (1984);* [*21] see Statement of Basis and Purpose of Trade Regulation Rule 408, *Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8355 (1964). Atlantic Richfield Co. v. Canaan Oil Co., 202 Conn. 234, 239, 520 A.2d 1008*

*(1987)*; *Daddona v. Liberty Mobile Home Sales, Inc.*, 209 Conn. 243, 254, 550 A.2d 1061 (1988).

It is well settled law that it is only necessary to prove one of the three elements of the cigarette rule in order to prove a violation of CUTPA.

1. Under CUTPA there must be participation in the conduct of trade or commerce before relief can be sought under CUTPA. The conduct in which the defendant would have to be involved includes the advertising, or the offering of sale, rent or lease or the distribution of any service and any property, tangible or intangible, real, personal or mixed and any other article, commodity or thing of value in Connecticut. The Court finds that the conduct of a real estate brokerage firm or company is clearly in the conduct of trade or commerce.

2. This Court finds that the plaintiff has sustained her burden of proving a violation of CUTPA by clear and convincing evidence in that the defendants [*22] violated CUTPA by Breach of Fiduciary Duty as set forth in Count One, Breach of the Covenant of Good Faith and Fair Dealing found in Count Five, Tortious Interference with a Business Relationship or Expectancy as found in Count Six and Defamation as found in Count Seven. It meets the following criteria of the cigarette rule:

(a) ". . . it is within at least the penumbra of some common law, statutory, or other established concept of unfairness. (Emphasis added.) It was certainly unfair of the defendants to act as they did as specified above, in particular the defendant Mihalcik."

(b) By the violations of Counts One, Five, Six and Seven, the Court finds that the actions or inactions of the defendants, in particular Mihalcik, were immoral, unethical, oppressive and unscrupulous.

(c) ". . . whether it causes substantial injury to consumers [competitors or other businessmen]." [*23] These actions and inactions as described of the defendants certainly hurt the reputation of the plaintiff and she suffered substantial financial injury by not having the loans she made to the business repaid, by not having all of her commissions paid to her and the other financial damages set forth herein and hereafter."

These injuries are substantial, they are not clearly outweighed by any counter-veiling benefits to consumers or competition that the practice produces and it is not an injury the plaintiff could reasonably have avoided.

The Court, therefore, finds that the defendants violated CUTPA for the reasons stated above and have suffered ascertainable loss which will be set forth hereafter.

The plaintiff is entitled to attorneys fees and punitive damages under CUTPA.

*9. Ninth Count: Fraudulent Transfer.*

As for fraudulent conveyance, the Court finds by clear and convincing evidence as follows:

1. Mihalcik had control of Valley Premier and its assets being a 51% stockholder and the agent of record with Re/Max New England, Inc. He exercised complete control of Valley Premier.

2. With that complete control he set up another LLC known as CT Premier at the same address as Valley Premier [*24] and transferred without consideration from CT Premier all the assets, including cash, equipment, liabilities, etc.; to CT Premier of which he was the sole owner. This was clearly done for the purpose of removing the assets of Valley Premier from the claims of the plaintiff by, in effect, terminating the LLC in which the plaintiff had a 49% interest and transferring it away from her 49% interest and any other assets of which she had a part by her 49% interest and transferring it to CT Premier which effectively extinguished her 49% interest in Valley Premier. The transfer was done by Mihalcik from a company of which he had control and majority ownership to another company of which he had control and majority ownership and all of this was done without consideration (at least no consideration was brought forth as evidence by the defendants in the trial).

Accordingly, this Court finds that the transfer of the assets of Valley Premier to CT Premier was a fraudulent conveyance committed by the defendant Mihalcik, Valley Premier and CT Premier.

The fraudulent conveyance proximately caused the unjust loss or injury complained of by the plaintiff in that she no longer was able to access or obtain [*25] the assets of Valley Premier of which she was a 49% owner and could not obtain reimbursement of the loans she made to Valley Premier.

Valley Premier is liable to the plaintiff under this fraudulent conveyance and the assets transferred are hereby revoked from CT Premier which is equally liable to the plaintiff under the fraudulent conveyance, and the plaintiff is entitled to seek damages against CT Premier.

*10. Tenth Count: Successor Liability of CT Premier.*

The evidence that has been found that proved there was a fraudulent transfer of all the assets, money, commissions, equipment etc. from Valley Premier to CT Premier, is sufficient to prove by clear and convincing evidence that CT Premier is the successor to Valley Premier. Nothing had really changed with either LLC other than that all the income, profits and assets were moved to CT Premier. The assets of Valley Premier were

2010 Conn. Super. LEXIS 2150, *

intentionally placed beyond the reach of the plaintiff including her 49% interest in Valley Premier. This was the continuation of the enterprise of Valley Premier to CT Premier, the latter conducting the same business with essentially the same employees doing the same jobs and producing the same products.

Further,  [*26] CT Premier has succeeded to the liability of defendant Valley Premier because it is a continuation of the selling LLC, Valley Premier. The plaintiff has demonstrated what is in effect a single LLC after the transfer of assets. The Court finds that CT Premier is burdened with successor liability for the debts of Valley Premier because of the transfer of all of the latter's assets. CT Premier is equally liable to the plaintiff as Valley Premier.

As part of this count and the Fraudulence Conveyance count, this Court finds that Mihalcik is personally liable for 49% of the assets of both Valley Premier and CT Premier because Mihalcik was the alter ego of both LLCs, and the Court by clear, precise and convincing evidence finds that the LLC veil of both LLCs is hereby pierced because Mihalcik was and is the alter ego of both LLCs. He controlled and does control both LLCs to the extent that the LLCs take no action or inaction under their own authority but do so only under the complete authority of Mihalcik. The LLCs have not a mind of their own, therefore, he is liable under the Fraudulent Transfer Count and the Successor Liability Count as well as the LLCs. [4]

4  In *United Electrical Contractors, Inc. v. Progress Builders, Inc., 26 Conn.App. 749, 755, 756, 603 A.2d 1190 (1992),*  [*27] the Court stated that "the corporate veil will be pierced when the 'the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor.' " The Court stated that the corporate veil may be pierced under the "instrumentality rule" upon proof of three elements:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attack so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own;

(2) That such control must have been used by the defendants to commit fraud or wrong, to perpetrate the violation of a statutory

or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights:

(3) That the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of. (Citations omitted.)

The Court finds that based upon the totality of the evidence all three elements have been proven by clear, precise, convincing and unequivocal evidence. This piercing of the veil applies to an LLC as well as a corporation. In this [*28] particular case, therefore, the individual defendant, Mihalcik, was the alter ego and the veil has been pierced, and he is, therefore, liable on all of the counts of the complaint.

*DEFENDANTS' CLAIMS:*

Defendants cite in their brief that the plaintiff is not entitled to a return of her capital contribution of $ 250 because of the clause or phrase that says "No Recourse Against Member" and the brief goes on to say "It specifically states that 'the member shall look solely to the assets of the company for the return of their investment . . . they shall have no recourse against any other member.' " However, as this decision has shown the defendant Mihalcik took all the assets of Valley Premier and transferred it to his new company. Since there were no assets of the company for the return of the investment except what was taken from Valley Premier and transferred to CT Premier the plaintiff still has the right to recover that amount from Mihalcik who fraudulently conveyed the assets of Valley Premier to the new company.

Defendants also criticized the plaintiff's contention that she should be paid back the loans that she made which were not a capital contribution to Valley Premier but loans.  [*29] Defendants claim that the plaintiff has a claim against Valley Premier but not Mihalcik. However, the defendants' brief overlooks the fact that it was the defendant Mihalcik who in effect fired the plaintiff, took all the assets and transferred them to another company of which he was the principal, and Mihalcik is personally liable on all counts for the additional reason that this Court, in this memorandum has found that he was the alter ego of both of the LLCs, and this Court has pierced the LLC veil on both LLCs making him personally liable.

The defendants in questioning whether there was a breach of fiduciary duty state that the courts have stated that "a fiduciary or confidential relationship is character-

ized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interest of the other . . . The Supreme Court has traditionally confined the traditional principles of fiduciary duty to cases involving 'fraud, self dealing or conflict of interest.' " *Murphy v. Wakelee, 247 Conn. 396, 400, 721 A.2d 1181 (1998).* This Court finds that Mihalcik did commit fraud, self dealing and had a conflict of interest [*30] based upon all the factors contained in this memorandum.

*DAMAGES:*

Based upon the totality of the evidence, and, at trial, defendants' counsel was not able to attack successfully the damages set forth and introduced by plaintiff as Exhibit 52 to which reference is hereby made. The plaintiff testified credibly before this Court to all of these damages at trial. They consist of the following:

*Summary of Losses*

   *Katherine Lodovico*

|  |  | Plaintiff's |
|---|---|---|
| Personal Loans from Kathy Lodovico Made to Valley Premier Properties | $ 16,300.00 | (Ex. 24) |
| Payments made by Kathy Lodovico to Wells Fargo Financial Leasing | $ 10,276.22 | (Ex. 33) |
| Payments made by Kathy Lodovico to Citibank For Valley Premier Properties Credit Card | $ 3,606.40 | (Ex. 36) |
| Furniture and Supplies Paid by Kathy Lodovico (Personal Credit Card) | $ 14,578.33 | (Ex. 39) |
| Computers Paid by Personal Account of Kathy Lodovico | $ 2,437.97 | (Ex. 41) |
| Miscellaneous Business Expenses Paid by Kathy Lodovico | $ 375.00 | (Ex. 43) |
| Payments made by Kathy Lodovico to Trust Realty Corporation for Property at 100 Bank Street, Seymour, CT | $ 11,910.91 | (Ex. 46) |
| Commission Income Due to Kathy Lodovico | $ 4,600.00 | (Ex. 48) |
| Total Losses | $ 64,084.83 [5] | |

   5   This figure does *not* include postjudgment interest, nor attorneys [*31] fees and costs of collection.

   Accordingly, the Court enters compensatory judgment damages for the plaintiff in the amount of $ 64,084.83 against all defendants.

   In addition, plaintiff seeks damages of $ 32,042.41 for defamation per se under the Seventh Count which

sum represents one-half of her actual damages, and the Court so orders judgment in that amount as well against Mihalcik only.

   The Court finds that under *C.G.S. § 37-3a* the monies due the plaintiff were wrongfully withheld by the defendants. The Court awards statutory interest of 10% under said statute on the $ 64,084.83 commencing on August 21, 2007 which was the date the assets, bank accounts of Valley Premier were closed down and transferred to CT Premier to August 21, 2010 which is three

years which totals prejudgment interest of $ 19,225.45. Unless the defendants pay this amount immediately, which is doubtful, the prejudgment interest and postjudgment interest which is the same 10% will certainly go to at least August 21, 2010.

The Court will award $ 50,000 in punitive damages under the CUTPA Count. The plaintiff seeks $ 128,169.66 in punitive damages, but in view of all the circumstances, the Court feels that a proper amount [*32] would be $ 50,000.

The Court also awards attorneys fees under the CUTPA count as well as attorneys fees under Breach of Fiduciary Duty and the Intentional Tort of Failure to

Deal in Good Faith, Defamation against Mihalcik only and Tortious Interference with a contract, business expectancies, business relationship and fraudulent conveyance, all of which are intentional, in the total amount as requested of $ 33,262.50.

Costs in the amount of $ 1,433.36 are also awarded to plaintiff against all defendants.

*CONCLUSION:*

The following damages sustained by the plaintiff are awarded against the defendant Mihalcik in the following amounts:

| | |
|---|---|
| 1. Loans | $ 64,084.83 |
| 2. Defamation | $ 32,042.41 |
| 3. Prejudgment Interest | $ 19,225.45 |
| 4. Punitive Damages | $ 50,000.00 |
| 5. Attorneys Fees | $ 33,262.50 |
| 6. Costs | $ 1,433.36 |
| Total | $ 200,048.55 |

From the totality of the evidence, the Court enters judgment against the defendant Mihalcik for $ 200,048.55. The same amounts are awarded against both Valley Premier, LLC and CT Premier, LLC, the latter being liable as the successor LLC for these damages with the exception of the damages for defamation resulting in

an award against both Valley Premier, LLC and CT Premier, LLC of a $ 168,006.14.

If [*33] either side wishes to have a hearing on the amount of punitive damages and attorneys fees, please contact caseflow for a hearing to be held under the provisions of the Connecticut Practice Book.

Rittenband, Judge Trial Referee