## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **EAST POINT SYSTEMS, INC., et al.** | ) | **CIVIL CASE NO. #3:13-cv-00215-VAB** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **STEVEN MAXIM, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | **FEBRUARY 3, 2016** |

## MAXIM DEFENDANTS' POST-TRIAL BRIEF

**TABLE OF CONTENTS**

Table of Authorities…………………………………………………………………iii

I. Introduction……………………………………………………………………..1

II. Summary of Trial Evidence………………………………………………………3

    A. MEI enters the digital age………………………………………………..3

    B. Maxim offers suggestions to Margarido………………………………………3

    C. Margarido receives funding from S2K……………………………………..4

    D. Maxim struggles with Field-Comm.net……………………………………..4

    E. EPS permits Maxim to develop Task Tracker………………………………...5

    F. Pajemola surprises Maxim with a web-based communication system………………..7

    G. Use of the name Field Navigator may have caused confusion at trial………………...8

    H. No source code was copied; only some database nomenclature……………………..10

    I. Pajemola begins to market his software to others and is hired by MFSS……………15

    J. MEI instructs its subcontractors and encounters industrial spies……………………16

    K. EPS throws Maxim out without inquiry and Pajemola severs ties…………………..18

    L. Maxim Defendants acted in accordance with their contracts and duties to EPS…….19

    M. Plaintiffs offered no evidence that Maxim Defendants caused them damage……… 20

        Money paid to Pajemola……………………………………………………… 20

        Fees EPS supposedly would have received……………………………………… 20

        Vague claims about business loss………………………………………………… 23

    N. Plaintiffs' trial testimony lacks credibility…………………………………...24

i

III.    Legal Argument…………………………………………………………………27

    A.  Counts I, II, II, IV, V, VI and IX – Plaintiffs failed to prove breach of contract…… 27

    B.  Counts VII and VIII – Plaintiffs failed to prove breach of fiduciary duties…………31

    C.  Count X – Plaintiffs failed to prove tortious interference with business
        expectancy………………………………………………………………………...32

    D.  Count XI – Plaintiffs failed to prove a violation of the Connecticut Uniform
        Trade Secrets Act……………………………………………………………………33

    E.  Count XII – Plaintiffs failed to demonstrate a computer-related offense……………34

    F.  Count XIII – Plaintiffs failed to prove a violation of the Connecticut Unfair
        Trade Practices Act…………………………………………………………………34

    G.  Count XIV – Plaintiffs failed to prove an infringement of copyright………………35

    H.  Count XV – Plaintiffs failed to establish a right to a constructive trust……………38

    I.   Default judgment against Pajemola and CFS…………………………………...39

IV.    Conclusion……………………………………………………………………… 40

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases:</u>

A.H. Harris & Sons, Inc. v. Naso, 94 F. Supp. 3d 280 (D. Conn. 2015)…………………………...28

Baker v. Selden, 101 U.S. 99 (1879)…………………………………………………………….36

CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc., 44 F.3d 61 (2d Cir.1994)……….37

Cohen v. Cohen, 182 Conn. 193 (1980)………………………………………………………….39

Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693 (2d Cir.1992)…………………………36

Daley v. Aetna Life & Cas. Co., 249 Conn. 766 (1999)…………………………………………32

Dreamcatcher Software Dev., LLC v. Pop Warner Little Scholars, Inc., 298 F. Supp. 2d 276
      (D. Conn. 2004)……………………………………………………………………………… 32

Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340 (1991)……………………………35-36

Foley v. Huntington Co., 42 Conn. App. 712 (1996)…………………………………………… 29

Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823 (10th Cir. 1993)……………….37, 38

Kite v. Pascale, No. 3:07-CV-0513 AWT, 2015 WL 1485022
      (D. Conn. Mar. 31, 2015)…………………………………………………………………..31

Langan v. Johnson & Johnson Consumer Companies, Inc., 95 F. Supp. 3d 284
      (D. Conn. 2015)……………………………………………………………………………… 35

Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 522 (6th Cir. 2004)………….37

Mazer v. Stein, 347 U.S. 201 (1954)……………………………………………………………..36

New Haven Tobacco Co., Inc. v. Perrelli, 18 Conn. App. 531 (1989)…………………………..29

Ostrowski v. Avery, 243 Conn. 355 (1997)…………………………………………………… 31-32

Providence Elec. Co. v. Sutton Place, Inc., 161 Conn. 242 (1971)………………………………39

Scott v. Gen. Iron and Welding Co., Inc., 171 Conn. 132 (1976)………………………………..29

TIE Commc'ns, Inc. v. Kopp, 218 Conn. 281 (1991)…………………………………………….28

United Rentals, Inc. v. Price, 473 F. Supp. 2d 342, 346 (D. Conn. 2007)………………………… 27

**Court Rules:**

Fed. R. Civ. P. 26(a)(3)……………………………………………………………………......20

**Statutes:**

General Statutes § 35-51(a)……………………………………………………………………33

General Statutes § 35-51(b)……………………………………………………………………33

General Statutes § 35-51(d)(1)………………………………………………………………...33

General Statutes § 42-110b(a)…………………………………………………………………35

General Statutes § 42-110g(a)………………………………………………………………... 35

17 U.S.C. § 102(b)……………………………………………………………………………36

Defendants Steven Maxim ("Maxim"), S2K, Inc. ("S2K"), Maxim Enterprises, Inc. ("MEI"), and Maxim Field Service Supply, Inc. ("MFSS") (collectively, "Maxim Defendants") hereby submit their post-trial brief in the above-captioned action, explaining why Maxim Defendants' conduct was beyond reproach and why Plaintiffs' action should fail.

## I.       Introduction

Maxim is a creative businessman who believes in analyzing the data his businesses generate, to promote efficiency and productivity. One of those businesses, MEI, once used software developed by Plaintiff East Point Systems, Inc. ("EPS"). In his role as customer (through MEI) and later EPS board member, Maxim frequently recommended enhancements to EPS's product, some of which would have helped MEI and its subcontractors to analyze their operations. EPS repeatedly rejected Maxim's recommendations, so MEI eventually had to develop its own set of analytical software tools, known as Task Tracker. MEI did so with the full knowledge and even the cooperation of EPS, and MEI then offered Task Tracker to EPS. EPS declined. Task Tracker was designed to work with commercial information that MEI had provided to EPS over the years in the conduct of MEI's business. EPS made MEI's information available to MEI for this exact purpose, providing access to database tables in which MEI's information was stored. Maxim Defendants accessed and used certain aspects of the database tables, as permitted, but never accessed or used <u>any</u> source code of EPS. What Maxim Defendants did do was in absolute compliance with the parties' contractual obligations, and in conformance with Maxim's duties as an EPS board member.

Maxim also repeatedly urged EPS to develop a web-based version of its software – another recommendation that EPS rejected. Following this rejection, co-defendant Edwin Pajemola ("Pajemola"), the software developer who had worked on Task Tracker, developed his

own web-based program to serve MEI's business needs. Pajemola married his original, web-based program to Maxim's analytical tool set to give Maxim the complete package that EPS had refused to provide. Because Pajemola's system worked better than the EPS system, MEI began to use it. As a board member of EPS, Maxim was not obligated to have MEI use an inferior EPS product, especially after EPS declined to make the very improvements that Maxim was seeking and ultimately got through Pajemola.

Maxim's relationship with Pajemola eventually ended. <u>After that</u>, Pajemola appears to have licensed two software programs he developed to two EPS customers – A&M Recovery and Berghorst Enterprises. Plaintiffs did not produce <u>any</u> technical evidence about the nature of the software programs that Pajemola licensed to these two entities. There is no reason to believe that any portion of the EPS software appears in these later-developed programs. But Plaintiffs might ask the Court to guess that Pajemola used EPS database tables, and that the Maxim Defendants are liable for this thing that might – or might not – have happened.

The above conduct by Maxim Defendants and Pajemola was badly misapprehended by Plaintiffs, who lashed out with this litigation rather than ask Maxim for an explanation. Now, Plaintiffs claim damages in three basic categories: (1) fees that A&M Recovery and Berghorst Enterprises allegedly paid to Pajemola; (2) (in an act of double counting) an approximation of the fees Plaintiffs claim EPS would have received from A&M Recovery and Berghorst Enterprises, if not for Pajemola's asserted interference; and (3) business expenses that allegedly arose from Plaintiffs' misunderstanding of, and over-reaction to, a software demonstration witnessed by Plaintiffs' industrial spies. Maxim Defendants are not liable for any of that. Rather, Maxim Defendants should prevail, at which point they will move for payment of their attorneys' fees pursuant to contract for having had to defend this unfortunate and unnecessary action.

2

II.     **Summary of Trial Evidence**

  A.     **MEI enters the digital age**

The business of MEI was to coordinate the work of subcontractors maintaining homes

that were subject to foreclosed mortgages, known as the property preservation industry. (792:4-

8.[1]) Some of MEI's subcontractors were field workers – lawn mowers, locksmiths and the like –

while others filled an intermediary role, connecting their own field workers to MEI. (792:9-18;

213:25-214:4 (Thomas Margarido ("Margarido")[2] conceding that "some of [MEI's]

subcontractors were, in fact, regional companies that had their own subcontractors").) In the

early days, the coordination of field workers was handled by paper documents, faxed from a

bank or national property preservation company, which MEI would manually distribute to

subcontractors. (793:18-23; 68:25-69:4.) Once the job was complete, the subcontractor would

notify MEI by returning a form along with photographs. (793:24-794:7; 69:6-13.)

To assist in this process, Maxim reached out to Margarido in about 1999 or 2000 to learn

about software developed by EPS. (795:8-797:2; 99:18-21.) At first, this software functioned as

an electronic filing system, but it evolved so that forms and photographs could be transmitted

electronically between MEI and subcontractors. (795:25-796:23.) The electronic forms contained

essentially the same substance as the paper forms that were used previously. (798:24-797:2.)

  B.     **Maxim offers suggestions to Margarido**

In this early iteration of the software, MEI had to load it onto a particular computer that

would then be capable of communicating with other computers, but only those that had this

software. (798:16-20.) Maxim made many recommendations to Margarido about possible

---

[1] Transcript citations without prefixes refer to the Trial Transcript of December 7-10,
2015.

[2] Hereinafter, Plaintiff Thomas Margarido will be referred to by his last name only, while
his son, Plaintiff Jason Margarido, will be referred to by his full name to avoid confusion.

improvements to the software, offering his knowledge about the needs of MEI as an actual user

of the program. (798:21-799:10.) For example, MEI was the first to transfer information between

the office and the field using tablets, to help Margarido develop this capability. (799:11-21.)

### C.    Margarido receives funding from S2K

In about 2002 or 2003, Margarido asked Maxim if he would like to become an investor,

noting that if the company responsible for maintaining his software went down for lack of funds,

Maxim would not be able to find another company to fill the void. (202:13-22; 801:4-11; 202:13-

22 (Margarido conceding that Maxim was concerned about MEI's vulnerability if EPS failed).)

Thus pressured, in 2004, S2K – a corporation partially owned by Maxim – invested $250,000 in

a newly-formed company, plaintiff EPS. (801:12-20; Ex. 13, at 1.) At the time of its formation,

EPS was also owned by Margarido, along with plaintiffs Jason Margarido and Paul Taff

("Taff"). (Ex. 13, at 1.) When S2K became a shareholder of EPS, Maxim was given a seat on the

board of EPS. (802:5-15.)

### D.    Maxim struggles with Field-Comm.net

The investment made by S2K led to the development of new software by EPS, known as

Field-Comm.net. (802:16-21.) Maxim assisted EPS in developing Field-Comm.net, by offering

recommendations regarding features that it should have. (802:22-803:3.) Maxim also

recommended that the EPS product be web-based, but that advice went unheeded. (803:4-14;

203:14-17 (Margarido conceding that Maxim had been "pushing for a web-based software

program for as long as he served on the board").) Once MEI began using Field-Comm.net, MEI

found it cumbersome. (803:19-804:5.) MEI struggled to conduct business while EPS

occasionally took down the system so that code could be fixed. (804:7-19.) Even worse, Field-

Comm.net created double payments to contractors, resulting in a loss of approximately $100,000

in just one payroll period. (804:20-805:5.) Maxim pressed for a feature that would allow EPS's

software to reverse payments to contractors if necessary, and although EPS eventually added

such a feature, Margarido conceded that it came too late for Maxim's use. (206:14-207:10.)

Maxim did help EPS resolve many of the system's deficiencies. (805:6-11.)

     **E.**     **EPS permits Maxim to develop Task Tracker**

     As time went on, Maxim wished to analyze the MEI data contained in the Field-

Comm.net program. (806:13-17.) Maxim hoped the data might allow MEI to assess the

productivity of office staff, the efficiency of particular subcontractors, and the like. (807:18-

808:11.) Maxim suggested to EPS that it should add features to the Field-Comm.net software

that would allow for these analytics. (806:18-807:1.) EPS refused to do so, but eventually agreed

to branch its Field-Comm.net code as a way to allow MEI to make those modifications to the

software itself. (807:2-10.) EPS had no problems with Maxim building these ancillary features

for use at MEI. (216:21-24 (testimony of Margarido).) MEI, through Pajemola, developed a

program called Task Tracker that could measure MEI capacity and efficiency. (807:12-808:11.)

Maxim showed a rudimentary version of Task Tracker to Margarido during a meeting in Ohio, in

hopes that EPS would be willing to incorporate it into Field-Comm.net. (808:15-18; 810:4-7.)

     In connection with the development of Task Tracker, Maxim wanted Pajemola to extract

the MEI data from the EPS system. (809:6-10.) The MEI data included the general information

that MEI's clients would send to MEI – property addresses, loan numbers, due dates, work order

instructions, and the like. (809:11-17.) So that Pajemola could access the MEI data, in or about

December 2008, MEI and Pajemola entered into Software Source Code Access and Indemnity

Agreements with EPS. (810:8-811:9; Ex. 5 & Ex. 6.) While Maxim is aware that Pajemola did

extract the MEI data from Field-Comm.net, he does not know mechanically how it was done.

(812:16-21.) Maxim was not interested in understanding the workings of Field-Comm.net, but simply wished to retrieve MEI's information. (710:21-24 ("I wanted just to pull my information out of East Point, out of the database table, so that I could view it in an easy format.").)

Now in possession of the MEI data, Pajemola was able to further develop Task Tracker to measure the productivity of the MEI subcontractors as well as the office staff. (813:25-814:7.) With Task Tracker in this more robust state, Maxim and Pajemola travelled to Connecticut to demonstrate the improved program. (814:19-23; Ex. 26 ("Paj. Dep.") 157:19-22 ("The trip there was to show what this new product does and to have [EPS] accept it or incorporate it into their product.").) Maxim had hoped EPS would want to provide Task Tracker as an add-on to Field-Comm.net, to generate additional revenue.[3] (815:8-17.) Instead, the reaction of the people at EPS seemed to be shock that MEI had developed a product so quickly. (815:2-7.) But neither Margarido, nor the other EPS personnel watching the Task Tracker demonstration, objected to the development of Task Tracker, or to the extraction of data from Field-Comm.net. (817:6-13.)

Pajemola continued to develop the Task Tracker capabilities. (817:14-20.) The chargeback tracker allowed MEI and its subcontractors to track chargebacks from banks that adjusted payments where work might not have been properly performed. (818:6-17.) The write-off tracker made transparent, to MEI and its subcontractors, when a balance on an invoice had

---

[3] Maxim also suggested to Margarido that he would like a share of this revenue stream. (711:17-19.) Plaintiffs were apparently offended by this suggestion, as their counsel emphasized that neither of the Margaridos nor Taff ever requested payment for their ideas. (703:20-705:2.) This comparison is flawed. Not only has Maxim never requested compensation for the countless ideas he has provided to EPS, but Maxim also provided those ideas without receiving a paycheck, unlike the Margaridos and Taff, who were on the payroll during Maxim's time on the EPS board. (816:9-25.) But Task Tracker was a product developed by MEI at great expense, in order to give MEI a competitive advantage over other EPS customers. There is no legal or commercial basis for Plaintiffs' apparent position that MEI should have donated the Task Tracker development expense to EPS, or lost its competitive advantage, without gaining something in return.

been written off. (821:1-8.) The capacity tracker helped MEI determine the level of staff it

needed for particular amounts of work. (821:19-822:7.) Maxim and Pajemola developed other

analytical tools too – a scorecard, a late job tracker, a client lead tracker, a work-in-progress

indicator, an invoice finance tracker, an aging summary, a subcontractor potential profit tracker,

and others, which Maxim explained during a video demonstration secretly witnessed by

Margarido.[4] (817:24-824:25.) Maxim had suggested all of these analytical tools to EPS, but EPS

declined to incorporate them into Field-Comm.net. (825:1-6; see also 160:25-161:9 (Margarido

conceding that the features he observed at the demonstration were "substantially the same" as

those recommended to him by Maxim).)

### F.     Pajemola surprises Maxim with a web-based communication system

In about March 2010, Pajemola revealed to Maxim that in addition to improving Task

Tracker, he had also independently created source code for a web-based system that would allow

MEI to communicate with its subcontractors. (830:15-831:3, 831:9-10.) Maxim had not

instructed Pajemola to do this work. (831:4-8.) Once Maxim confirmed with Pajemola that no

EPS source code had been used in Pajemola's development of the web-based order transferring

system, MEI began using the new system internally with its subcontractors. (834:13-835:6; Paj.

Dep. 141:8-11 (noting that the new system "started from scratch" and that "there was no other

source code that I was looking at").) Combining Task Tracker with the new order-transferring

system allowed MEI to use the web to convey orders to its subcontractors and it allowed MEI's

subcontractors to convey progress reports and photographs back to MEI, just as MEI and its

subcontractors did in the old fax-and-print days. (833:21-834:6.) Pajemola was familiar with the

---

[4] The demonstration was to Jennifer and John Muller (misrepresenting themselves as
Valerie and John Lyman), and is captured in Defendants' Exhibit 502 and Plaintiffs' Exhibit 9.

concept of conveying information and photographs regarding foreclosed properties <u>not</u> from EPS, but from his experience as a programmer at Safeguard. (Paj. Dep. 184:22-185:5.)

The new system allowed MEI to better coordinate the work of its subcontractors. (831:11-20.) In addition to bringing all of MEI's needs into one web-based system, the new system also had the capability of updating without being taken down, which allowed MEI to run its business continuously. (831:21-832:7.) Maxim also valued the transparency of the new system – MEI contractors were able to see the same information as the MEI central office, alleviating confusion over the status of work orders and payments. (832:8-13.) All of these features were ones that Maxim had urged EPS to adopt, but that EPS had rejected. (833:4-8; 160:23-161:9 (Margarido conceding the same).)

> **G.      Use of the name Field Navigator may have caused confusion at trial**

MEI's new system became known as Field Navigator. (833:10-12.) At trial some confusion may have arisen with regard to how this name was later used to refer to other programs. Independently of Maxim, Pajemola developed software for Andrew Strickland ("Strickland") and Heather Berghorst ("Berghorst"). The Field Navigator software used by MEI is not the same software as the Field Navigator software used by Strickland or by Berghorst. (Paj. Dep. 181:9-13 ("[T]here's a whole set of different tables. . . . It was a clean start.").) Therefore, when speaking here of the software at issue, the Maxim Defendants will use the terminology MEI Field Navigator, Strickland Field Navigator and Berghorst Field Navigator.

To clarify further, Maxim allowed Strickland to use MEI Field Navigator during a due diligence period when Maxim and Strickland were considering merging their companies. (849:13-21.) None of the Maxim Defendants charged any fee to Strickland for his use of the software, nor was there ever any intention to do so. (850:8-13.)

What Strickland later used to operate his own business, after he and Maxim decided against merging, was software that Pajemola created specifically for Strickland and his company, A&M Recovery. (Paj. Dep. 137:9-11 ("Andrew was telling me his company needs. So that's how – that's how I developed Navigator."); Paj. Dep.154:21-23 ("Field Navigator started from scratch. A lot of it, almost 95 percent of it, the requirements came from A&M Recovery."); Paj. Dep. 181:15-19 ("[Strickland] wanted something that runs his business a little bit better . . . and it got started because [EPS was] not providing these functionalities that A&M was asking for."))

At Pajemola's deposition, Plaintiffs' counsel inquired as to whether Strickland Field Navigator was similar to the software used by MEI, to which Pajemola responded: "I would say there's some similarities, however the starting points were different. By starting points, I mean the – the requirements were all new because the requirements were coming from a different – you know, from a particular client, which was A&M Recovery." (Paj. Dep. 22:9-25 (emphasis added).) Strickland Field Navigator has not been evaluated by any computer experts and no technical evidence is before the Court regarding its computer structure, or whether it has any similarities to Field-Comm.net.

Similarly, Berghorst Field Navigator also has not been evaluated by any computer experts and no technical evidence is before the Court regarding its computer structure, or whether it has any similarities to Field-Comm.net. As with Strickland Field Navigator, Pajemola developed Berghorst Field Navigator specifically for Berghorst. (Paj. Dep. 128:4-7 ("It was more of a customized type of solution, and so the solution would be different for A&M as opposed to Berghorst, just because they operated differently.").)

**H.      No source code was copied; only some database nomenclature**

The evidence is that <u>no</u> EPS source code was copied to create either Task Tracker or the larger package known as MEI Field Navigator, a significant point explained in greater detailer below. Pajemola did use the nomenclature of a portion of the EPS database tables. But he did so with authorization, and this nomenclature was only a small part of Field-Comm.net.

As noted above, MEI Field Navigator consisted of Task Tracker, which was developed with the assistance and permission of EPS, and a separate web-based order transferring system later developed from scratch by Pajemola. (833:13-18.) Maxim's testimony is consistent with the findings of the two software experts in this case, who found that MEI Field Navigator contained a portion of the tables and columns found in the Field-Comm.net database structure, but that the two software applications were otherwise distinct from one another.

The database tables constituted a small fraction of the overall EPS product and, even then, only a modest percentage of the EPS database tables appeared in MEI Field Navigator (after having been copied with permission of EPS, as described above). Plaintiffs' expert, John Morgan ("Morgan"), found that MEI Field Navigator contained 243 tables, of which only 102 were in "substantially similar form" as in Field-Comm.net (meaning that they had the same names and contained most of the same columns). (292:9-294:5; Ex. 22, at 7.) In other words, the 102 substantially similar tables were just 42 percent of the total number of tables in that database. (332:3-9; Ex. 22, at 7.) With regard to column names, Field-Comm.net contained 887 total columns and only 456 of those column names could be found in the MEI Field Navigator database. (Ex. 503, at 6; Ex. 22, at 11.) In other words, Morgan found that MEI Field Navigator used 51 percent of the Field-Comm.net column names. (331:21-332:2.) None of this is

surprising. EPS made the nomenclature of the database tables available to MEI so that MEI could use that same nomenclature in order to better analyze the MEI data, as described above.

Aside from this limited portion of the table and column names, there are <u>no</u> other significant similarities between Field-Comm.net and MEI Field Navigator. (332:16-333:3; 334:21-337:4; Ex. 503, at 11.) Even the appearances of the two programs (known as the "user interfaces") differ, and not simply because MEI Field Navigator was web-based. (334:21-337:4.) All of this is consistent with the testimony provided by Maxim and Pajemola that MEI Field Navigator was not a secretive attempt to copy Field-Comm.net, but rather evolved from Task Tracker, a program permitted and encouraged by EPS that made use of some of the Field-Comm.net column and table names in order to extract MEI data for analysis.

The Field-Comm.net table and column names utilized in MEI Field Navigator were not creative, nor were the naming conventions unique to EPS. The names were generic, such as: invoices, grass cut and vendor orders. (329:16-21.) Defendants' expert, Gregory Kelley ("Kelley"), explained that programmers typically use generic names when designing a database: "One would typically try to name the tables in accordance with the data that's in there. You would not want to name a table Bob and have it talk about orders, it absolutely makes no sense." (330:10-13.) With regard to the Field-Comm.net naming conventions, which Morgan describes in some detail in his report (Ex. 22, at 12-14), EPS can lay no claim to them; those naming conventions were borrowed from an insurance company. Jason Margarido, once a software engineer at Travelers Insurance Company, developed Field-Comm.net. (257:11-16; 259:3-12.) Regarding that development, Jason admitted that "the naming convention that we used for the tables [and] the column names within those tables came from my experience when I worked for [T]ravelers. It was kind of a standard that they had used for naming things there . . . ." (386:15-

11

19.) In other words, EPS here claims offense at the authorized copying of EPS naming conventions that EPS itself copied from another company.

Plaintiffs did not present any evidence that Maxim Defendants copied any EPS source code. But the Court might be on the lookout for any attempt by Plaintiffs' counsel to use misleading terminology to suggest that source code was copied, which he might do to make the Software Source Code Access and Indemnity Agreement applicable. At trial, Plaintiffs' counsel insisted on repeatedly referring to the nomenclature of the database tables and columns as "the source code for the database." (See, e.g., 346:13-14; 416:3-4; 418:9; 419:6; 617:6; 650:6.) He likely did this because the Software Source Code Access and Indemnity Agreement (Ex. 5) specifically forbids the misuse of the source code of the computer programs and databases listed in Exhibit A to that agreement. The term "source code" is not defined in the Software Source Code Access and Indemnity Agreements and, therefore, at trial Plaintiffs' counsel attempted to impose his own definition, which would label the nomenclature as source code. Neither expert endorsed this definition.

This is one illustration of such an attempt, with Plaintiffs' counsel examining Kelley:

Q. All right. So source code is a term that applies both to the database portion and the application that runs the database. Is that fair?

A. I would say it applies to – in my opinion the source code would apply to your functions, your stored procedures and your views as they exist in the database, not necessarily the tables themselves. But the interactions with those tables, yes.

Q. All right. And the database portion of the source code was copied from the East Point system to the Maxim system; is that correct? Or substantially copied.

A. You are talking about the tables and the column names? Yes.

Q. I'm talking about the source code for the database.

A. The tables and the column names were copied between the two. My opinion is the tables and column names were copied between the two.

(345:24-346:17.) Despite the best efforts of Plaintiffs' counsel, Kelley would not be pressed into using improper terminology. Kelley insisted on using the terminology accepted by his industry and explained to the Court that the source code is what creates the user interface and connects the database to that user interface. (344:25-345:2.) As Kelly noted above, the source code is <u>not</u> the database tables themselves. Tellingly, Plaintiffs' counsel never tried to get Plaintiffs' expert, Morgan, to adopt this misleading terminology. In fact, after Morgan testified that many of the database tables were copied, he concluded: "I did not note any copying of source code . . . ." (308:22-23.) No evidence supports Plaintiffs' counsel's suggestions that the nomenclature used in the database tables should be considered source code.

Earlier, Kelley explained that he examined three distinct elements of MEI Field Navigator and Field-Comm.net: "I examined the database provided by East Point and as well as by Maxim. I also examined the source code from both applications. And, finally, I examined the user interface for both applications." (326:4-7.) Kelley also defined each element, to avoid confusion. First, he noted: "The role of the database structure in a software application is for the storing and housing of data. It allows a user input to be stored in some format and then allowed to be retrieved at some later date and time for purposes of reporting or feedback to the user." (326:19-24.) Second: "The user interface basically allows the user to input data, may allow the user to recall information from the databases. It's basically look and feel." (334:7-10.) Finally, Kelley explained the term source code: "It drives the user's experience. It creates the actual user interface that they see. It allows them to enter data. It will check that data. It will store the data in the database and then retrieve the data from the database." (337:13-18.) Despite this clear and precise road map, Plaintiffs' counsel insisted on using his own fuzzy terminology when examining Kelley.

The database structure <u>is</u> more than just tables and columns. It also contains views, stored procedures and functions. (327:7-8.) As Kelley noted above, those three objects could be considered a form of source code, although that is not what the phrase source code tends to reference. But whether or not views, stored procedures and functions should be termed source code is irrelevant to this case; while MEI Field Navigator contained approximately 1,200 of those objects, <u>none</u> of them was found to be significantly similar to the views, stored procedures and functions in Field-Comm.net. (332:16-333:3.) Plaintiffs' counsel should not succeed in hoodwinking the Court into thinking that source code of <u>any</u> kind was copied. Both expert witnesses agreed that Field-Comm.net source code does not appear in MEI Field Navigator. (308:22-23; 318:7-18; Ex. 503, at 7.)[5] Margarido agreed that "the source code that drives the computer system was never accessed and never provided, only the database tables." (214:16-20.) Jason Margarido said the same. (397:7-10 (agreeing that "East Point did not provide Mr. Maxim or Mr. Pajemola with a copy of the source code").)

Plaintiffs' counsel might also misuse the technical term "function" in his brief, as he did at trial. As noted above, a "function" is an object contained in a database. Kelley explained that a function is a software element that "allows for manipulation, calculation, extrapolation of information." (327:19-328:1.) Despite this, in cross-examining Kelley, Plaintiffs' counsel insisted – despite objection – on using the term "functions" to refer to the software features, i.e.,

---

[5] Information regarding the source code did not appear in Morgan's report. When he was questioned regarding this omission at trial, he admitted that he chose to not include any of his findings regarding the source code in his report, stating: "there was no substantial similarity between the application code, so that did not warrant discussion." (318:7-18.) Morgan was asked to search for similarities in the two computer products and, finding no duplication of the application code, he simply left that out of his report (Ex. 22), apparently so as to make the copying of the relatively prosaic database tables appear more dramatic.

what a lay person might notice that the software can do. (352:6-353:6.) Kelley later explained the

confusion that can result from this improper usage:

> Q. First, just to clarify, Mr. Kelley, I noticed that Attorney Raymond repeatedly asked you questions with the phrase functions and features, and you answered each time just with features. Would you like to explain why you did that? Because clearly there is a distinction in your mind between the two.
>
> A. Well, when I was talking about functions – when I hear the word "functions," as I mentioned before, I kind of look at two different functions of the application. There is the user functionality, which is kind of the user interface and how one interacts with the program, and then there is the functionality under the hood, so to speak, how the data is queried from the database, how the database is manipulated and how information is entered into it and extracted from it. So I see those as two different things. And so in light of the questions that I was receiving when I was asked about functions, I interpreted that as being the user functions, which would be basically the features of the applications, what the user sees.

(362:23-363:20.) Plaintiffs' counsel did not do this without a purpose – the term "functionality"

also appears in the Software Source Code Access and Indemnity Agreement. (Ex. 5.) Plaintiffs

wish to broaden the definition of functionality as much as possible, in hopes that the Court will

find Maxim Defendants liable if any feature of MEI Field Navigator serves a similar purpose as a

feature of Field-Comm.net – e.g., if both programs can transmit photographs or work orders.

This is not the technical definition of computer functionality. Furthermore, software features are

not protected by copyright law, so this misuse of the term "functionality" could also be an

attempt to shoehorn the non-protectable underline(features) of Field-Comm.net into the technical category

of underline(functions), a category that might be protected in some circumstances. These attempts to

mislead should not succeed.

**I.      Pajemola begins to market his software to others and is hired by MFSS**

In mid-2010, Margarido notified Maxim that Pajemola appeared to be trying to sell

software to the property preservation industry and requested that Maxim do something about it.

(835:11-836:3.) In response, Maxim asked Pajemola to take down a website, which was related

to Pajemola's new company (defendant Cleveland Field Systems, LLC ("CFS")), and MFSS entered into an employment agreement with Pajemola. (836:5-16.)

MFSS had been formed by Maxim to manage Pajemola's software development for MEI. (826:12-19.) Maxim's intention was to charge his subcontractors one percent of the revenue they were obtaining through MEI to offset the cost of developing MEI Field Navigator. (827:1-6.) Maxim could instead have simply increased the percentage of the bank payment that MEI retained when paying its subcontractors, which was in the neighborhood of 15 percent. (827:7-13.) But Maxim is a devout believer in the importance of analytics, and he was curious about whether there would be a proven return on his investment. (827:7-22.) So a separate software company was established to allow for measurement of the costs and benefits of the computer efforts. (Id.) As it turned out, MFSS never charged MEI's subcontractors any software fee because work became scarce and Maxim did not want to place an additional burden on them. (839:13-16; 840:24-841:11.) Therefore, MFSS received no income from MEI Field Navigator, even from MEI subcontractors, nor did any of the other Maxim Defendants.

**J.      MEI instructs its subcontractors and encounters industrial spies**

After Maxim spoke with Pajemola, MEI continued to use MEI Field Navigator without complaint from Margarido. (836:18-24.) During this time, MEI instructed its subcontractors on the logistics and benefits of using MEI Field Navigator, in addition to fielding daily calls from persons wishing to become new subcontractors. (836:25-837:22.) MEI never fielded any calls from competing property preservation companies looking to purchase MEI Field Navigator for use independently of MEI. (837:23-838:4.)

Maxim likely would not have reacted well if he had received such a call, as he considered the software to be a valuable strength of MEI that his competitors did not possess: "[B]y us

having these metrics that we were able to measure, we would have a competitive advantage over any other contractors in the industry, that I felt. So by us developing [MEI Field Navigator], I didn't want to license that out to just anybody, only to our internal subcontractors that were using it then." (838:11-24.) Maxim never intended to license MEI Field Navigator to MEI's competitors. (838:25-839:5.)

On a regular basis, EPS hired Jennifer and John Muller to misrepresent their identities and induce EPS's competitors to reveal proprietary information. (146:25-147:6.) While doing this, the Mullers noticed that Pajemola had reactivated the CFS website and, posing as Valerie and John Lyman, they contacted Pajemola to request a software demonstration. (147:7-13.) According to Jennifer/Valerie, EPS had hired them in the past to use false pretenses to determine the features included in the software created by EPS's competitors, their pricing, and similar information. (451:1-16.) She explained that EPS's motive in hiring spies was, in part, to find out what features their competitors were offering so that EPS could copy those features. (452:20-25.)

In response to an inquiry from Jennifer/Valerie, Pajemola apparently agreed to set up a demonstration of MEI Field Navigator through an MEI employee with access to the website. (Ex. 9; Ex. 502.) EPS secretly recorded this demonstration. (Id.) Maxim was involved with just the final third of the demonstration, having stumbled by without knowing in advance that it was taking place. (Id.; 841:18-22.) Despite Plaintiffs' claims to the contrary, Maxim never compared MEI Field Navigator to Field-Comm.net, nor did he say anything disparaging about EPS during this presentation. (843:22-844:6; see also Section I.N, below, regarding Plaintiffs' lack of credibility.)

Maxim believed the Mullers/Lymans to be potential subcontractors looking to perform some of the property preservation work flowing through MEI, and that, as part of that inquiry,

they wanted to know how MEI interacted with its subcontractors. (841:23-842:4.) Central to this interaction was MEI's use of MEI Field Navigator. (841:23-842:4.) Such a belief by Maxim was reasonable. Jennifer/Valerie specifically asked Maxim "can you help us get business" – a logical question to come from a subcontractor hoping MEI would send work, but not a logical question from a competitor – and, as noted above, MEI received calls from prospective subcontractors daily. (Ex. 502, 119:4; 837:14-22.) If Maxim had thought the Mullers/Lymans were potential competitors of MEI, he would never have explained MEI Field Navigator. (842:5-13.)

Following the call, MEI sent the Mullers/Lymans an agreement prominently labeled "SUBCONTRACTOR SOFTWARE LICENSE AGREEMENT." (844:7-10; Ex. 501.) MEI might have also sent the Mullers/Lymans a second subcontractor agreement with specifics regarding working for MEI. (844:11-25.) Jennifer/Valerie recalls alerting MEI to the fact that she was not interested in a subcontractor agreement, but does not recall receiving any non-subcontractor agreement from MEI in response. (468:8-24.) Margarido said he and the Mullers/Lymans were "surprised" to receive a subcontractor agreement but, curiously, he does not recall asking them to try to get any different contract from MEI. (194:24-195:3; 196:24-197:10.)

### K.    EPS throws Maxim out without inquiry and Pajemola severs ties

After the call with the Mullers/Lymans, Maxim received a notification of a special EPS board meeting. (845:1-8.) At that meeting, Maxim was removed from the board. (Id.) Margarido never asked Maxim about the call, nor did he inquire about the evolution of MEI Field Navigator. (845:9-22; 199:16-23 (Margarido conceding that he did not call Maxim to inquire).)

Within a month of the call with the Mullers/Lymans, Pajemola stopped returning calls and emails from Maxim, thus severing their relationship. (845:23-846:13.)

**L.      Maxim Defendants acted in accordance with their contracts and duties to EPS**

Margarido indicated that Plaintiffs would have had no complaint with the Maxim

Defendants using MEI Field Navigator within MEI's own office. (231:11-15.) Plaintiffs,

however, do have a complaint with the Maxim Defendants, meaning Plaintiffs must mistakenly

believe Maxim Defendants were in some way involved with Pajemola's software sales to

Andrew Strickland and Heather Berghorst. They were not.

Not only was there no evidence presented at trial that Strickland Field Navigator and

Berghorst Field Navigator were in any way related to Field-Comm.net, but Strickland and

Berghorst have each testified that Maxim was not involved with their acquisition of these

programs. (Ex. 504 ("Strick. Dep."), 24:25-25:2 ("Q. When you did the transition to Field

Navigator, did Maxim or any of his entities play a role? A. No sir."); Ex. 505 ("Berg. Dep."),

50:6-8 ("Q. Prior to switching over the Field Navigator, did you have any conversations with

Maxim about Field Navigator? A. No.").)

Strickland's accounting data reveals that all of his payments went either to Pajemola or to

CFS. (Ex. 18.) Berghorst produced an agreement with CFS. (Ex. 15.) And all of this occurred

after Pajemola stopped returning Maxim's calls in or about April 2011. Specifically, Strickland

paid Pajemola and/or CFS for the first time on July 22, 2011 (Ex. 18), and Berghorst entered into

her agreement with CFS on November 14, 2011 (Ex. 15). These two exhibits, offered by

Plaintiffs, support Maxim's testimony that: (1) none of the Maxim Defendants received any part

of whatever money Pajemola may have received from Strickland or Berghorst, and (2) Maxim

has no knowledge of the software used by Strickland or Berghorst, including the nature of any

database tables. (852:15-855:15.) Even Margarido conceded that he did not know whether

Maxim or his affiliated companies had "anything to do with" the licensing of software by

Pajemola to A&M or Berghorst Enterprises, or payments by those entities to Pajemola. (223:17-224:8; 224:19-225:15.)

> **M.      Plaintiffs offered no evidence that Maxim Defendants caused them damage**

Plaintiffs have offered three theories of damages in this case.

**Money paid to Pajemola.** First, Plaintiffs point to Pajemola's deposition testimony where he recalled receiving approximately $300,000 from Strickland and $100,000 from Berghorst. As noted above, Strickland Field Navigator and Berghorst Field Navigator have not been evaluated by any computer experts and no facts are before this Court regarding those two programs, or whether they have any technical similarities to Field-Comm.net. Furthermore, Pajemola's actions occurred at a time when Pajemola was no longer employed by MFSS and, therefore, any money paid went directly to Pajemola or to Cleveland Field Systems, not to Maxim or to any business entities affiliated with Maxim. (Ex. 15; Ex. 18; 852:15-855:15.)

**Fees EPS supposedly would have received.** Second, Plaintiffs offered an estimate of the fees Plaintiffs claim EPS <u>would</u> have received from A&M Recovery and Berghorst Enterprises, if not for Pajemola's asserted interference. This offer was made through Taff. Taff relied on several charts, which were not allowed into evidence because Plaintiffs produced years-old documents for the first time in the courtroom, instead of disclosing them thirty days in advance of trial as required by the Federal Rules. <u>See</u> Fed. R. Civ. P. 26(a)(3). (585:1-4.) After the Court excluded the late-disclosed financial charts, Maxim Defendants moved to strike all testimony arising from those documents. (585:10-12.) The Court took that motion under advisement. (585:24-25.) Maxim Defendants now renew that motion to strike, which would cover the testimony from 491:24 through 532:20 and from 567:21 through 586:11. The testimony should be stricken based on the best evidence rule. Plaintiffs' witness should not be permitted to discuss

20

– from faulty memory – numbers that are listed with precision in company financial documents that are not in evidence. Furthermore, Taff admitted that he did not understand the numbers (calculated by non-witness Doriann Plant); therefore, his testimony is also impermissible as hearsay and fails the Rule 403 balancing test. The probative value of Taff's testimony – a failed attempt to recite numbers he did not understand – is far outweighed by the prejudice.

During direct examination, when Taff was claiming to understand the charts, Taff testified about numbers that supposedly showed estimated revenue that could have been realized from A&M Recovery and Berghorst Enterprises. But Taff was unable to deliver those sums from memory and had to essentially read them from the charts. (See, e.g., 491:24-492:17 (counsel helping Taff get one number correct by showing him the document that was later excluded from evidence).) Originally, Taff asserted that the estimates in the charts were averages: "At the month that an individual company stopped paying us, from that month going forward we use the average of [2010 and 2011] as an average amount that we were losing, and we kept that up for each individual on this list until the main office shut down." (521:5-10.) That explanation collapsed under gentle prodding.

Maxim Defendants' counsel went through some of the entries contained in the charts to test the calculations, such as this exchange exploring how EPS averaged 12 and 0 and somehow came up with 62:

> Q. And I take it that A&M Recovery was a client of East Point for the entire year of 2010?
> A. That is correct.
> Q. And in 2010, A&M Recovery paid $0.12 for messages in 2010?
> A. That's what the records show.
> Q. Right. And then in 2011, A&M Recovery paid zero for messages, correct?
> A. That is correct.

> Q. So when you calculated your average in 2012, the average loss there was $0.62, correct?
>
> A. Correct.
>
> Q. And that's substantially more than Mr. Strickland paid you even in 2010, correct?
>
> A. Correct.

(569:1-15.) After an earlier inquiry about other numbers for which the averaging described by Taff could not result in the totals expressed in the charts, Taff admitted that he had no understanding of how the estimates were created:

> A. It's Doriann's formula. I don't know how she came up with that number.
>
> Q. We could go down the whole chart, but I assume your answer would be the same, you don't actually know how the calculations were made.
>
> A. That is correct.

(532:15-20.) This testimony was inexplicably at odds with Taff's earlier assertion, on direct examination, that he was "[v]ery familiar" with "the method that was used by the company to come up with the number[s]" in the document and spoke from "personal knowledge" about them. (494:21-495:3.)

Even if these estimated damages were calculated as first explained by Taff – which they were not – EPS still would not have proved any profit that would have been realized but for Pajemola's actions. Both Strickland and Berghorst were unhappy with Field-Comm.net and looking to make a change regardless of Pajemola. (Strick. Dep., 24:21-24 ("if I ha[d] been so satisfied and the changes had been made and being made to East Point, I would never have went and looked for another software solution"); Berg. Dep., 54:18-24 ("Q. Okay. In November/December 2011, if you did not learn about Field Navigator, would you have continued your use of field-comm.net? A. No. Not at that time. Q. So you were, at that time, in the market for a different software altogether? A. Yes.").) Margarido even admitted such

22

dissatisfaction. (225:20-25 (conceding that Heather Berghorst did not like some features of the EPS software).)

Furthermore, EPS hopes to blame Maxim Defendants for lost revenue caused by a decline in the entire industry. Maxim testified that business for MEI began to taper off 2010, as the housing market started to recover. (840:9-841:1.) Even Taff conceded that business fell off as the economy improved. (518:3-24.) MEI is no longer operating because of the lack of work. (861:14-25.) Neither is A&M Recovery, according to Margarido. (204:25-205:3.)

Finally, as noted above, Maxim Defendants are not liable for the conduct of Pajemola after they severed ties in April 2011 (which is not to concede liability for Pajemola's conduct before that date).

For all of the above reasons, Plaintiffs' second theory of damages should be rejected.

**Vague claims about business loss.** Third, Margarido vaguely claimed that senior management had to take time off from work to deal with throwing Maxim off the EPS board. (161:24-162:2.) He did not quantify how much time was spent by these individuals, but noted that Jason Margarido and Paul Taff were involved, along with stockholders, the corporate lawyer and the software engineers. (162:15-21.) With regard to Margarido's implication that Maxim's forced departure from EPS in some way distracted from EPS's software development, in fact the lead developer of Field-Comm.net later explained that the only thing he ever did concerning Maxim was develop software features for him. (428:17-24.) Margarido also claimed that EPS's choice to pursue litigation against Maxim Defendants (instead of simply communicating with Maxim) resulted in a loss of money, which led to a lack of product development, which led to a greater loss of money. (166:1-7.) The Court has already rejected this line of testimony as speculative. (174:3-15; 177:17-19.)

For all of these reasons, Plaintiff's business-loss theory lacks support and the damages sought should also be denied.

**N.      Plaintiffs' trial testimony lacks credibility**

The hostility that Margarido expresses toward Maxim is not warranted by the facts, but appears to derive from a misunderstanding by Plaintiffs about – or a refusal to acknowledge – what actually happened as Maxim tried to cope with EPS's failure to give him the computer product he kept requesting. This dynamic is perhaps most apparent in the inability of Margarido and Jennifer/Valerie to accurately describe the telephone conference in which MEI Field Navigator was demonstrated. In particular, Margarido's false accounts of that demonstration call into question his ability to render any accurate testimony.

- Margarido testified that Maxim "said the Field-Comm system just didn't work for them," or at least that Maxim said "something about Field-Comm." (188:13-19.) In fact, after reviewing the entire transcript of the call, Margarido conceded that Maxim never said so. (234:17-235:17.) Margarido further conceded that he had testified inaccurately at his deposition when he said: "Steve Maxim went on to extol the greatness of this new program that they had created and mentioned that the Field-Comm system just didn't work for them in several ways and they decided to develop their own." (236:5-14; 236:16:23.)

- Margarido testified that he "believed" that Maxim compared his product to the EPS software. (191:16-19.) In fact, although Jennifer/Valerie "tried to get Mr. Maxim to compare his product with East Point," Margarido conceded that Maxim "never mentioned" Field-Comm.net in responding to her question. (191:16-19; 192:6-8.)

- Margarido testified that "Mr. Maxim referred to a customer down in Florida, which was obviously A&M." (156:3-6.) In fact, a review of the transcript of the demonstration shows that Maxim actually referred to "a contractor down in Florida." (Ex. 502, 121:10-11; see also id.,124:8-9 (referring to the "gentleman down in Florida").) Maxim never said he had a "customer" in Florida; he was exploring a merger with A&M.

- Margarido suggested that the Mullers/Lymans had made clear that they tried to purchase software from Maxim to use independently of Maxim's companies. Margarido testified that "the Mullers said they were starting a new office and they were looking for software to run the office." (193:4-7.) In fact, although Jennifer/Valerie said (falsely) that they were buying a "preservation company" and were "functioning with [the prior owner's] own homegrown software" (Ex. 502, 118:6-20), she did not say she wanted to purchase software to operate independently of MEI. Even Margarido conceded that some "subcontractors" of MEI "were, in fact, regional companies that had their own subcontractors." (213:25-241:4.) Thus, Maxim would have thought nothing amiss about a regional company inquiring about serving as a subcontractor of MEI and using the computer tools of the trade.

- Margarido, speaking about the demonstration, said the "screen actually looked eerily familiar," as if to suggest that MEI Field Navigator looked like Field-Comm.net. (151:21-22.) In fact, Kelley presented an unbiased and different view: the Field-Comm.net was "laid out almost in a star shape," while MEI Field Navigator "was more of a tabular format," with "tabs across the top." (335:3-336:2.)

Jennifer/Valerie's credibility problems are arguably even worse than Margarido's. Jennifer/Valerie falsely testified by affidavit that at the end of the call Maxim "explained how to

sign up for the product," but she conceded at trial that he had not done so, but merely said he would send a contract (465:3-18), after which she received the subcontractor contract. Jennifer/Valerie swore in her affidavit that Pajemola and Kelly Bernstein said the tabs in Field Navigator "were the same as East Point's." (471:21-25.) A search of the transcript of the demonstration reveals that the words "East Point" were never used, nor is there any comparison of "tabs" in the two programs. She testified that at the beginning of the demonstration, she identified herself "as a potential purchaser of software," and she made the same assertion in an affidavit. (454:17-19; 457:19-25.) But she was unable to identify any such statement in the transcript of the demonstration. (455:1-457:5.)[6]  Jennifer/Valerie appears to make a living by saying things that are false. (447:6-472:12.) Sometimes, she says false things under oath. She is unworthy of credence here.

The unwarranted hostility of Plaintiffs is encapsulated in an assertion in the opening remarks of their counsel: "During the April Fools Day demonstration, Mr. Maxim bragged that he had already stolen one of East Point's customers ," and Maxim engaged in "a direct offer to sell the new software . . . ." (27:15-16; 28:4-9.) Nothing like that happened. Plaintiffs' entire trial presentation should be viewed in light of their anger over things that did not happen, and their inability to understand and accurately describe what did happen.

---

[6] On re-direct, Plaintiffs' counsel had Jennifer/Valerie say she disclosed that she was a "potential purchaser of the software" during some preliminary call with unidentified participants. (472:15-23.) In other words, her supposed disclosure was not made at the recorded demonstration – as she falsely asserted under oath – but was made in some conveniently-not-recorded prior conversation. Given Jennifer/Valerie's lack of credibility, the fact that the supposed statement was not recorded, and the importance of the actual words she might have used if she made such a statement, the referenced testimony is not entitled to any weight.

III.    **Legal Argument**

Plaintiffs failed to prove the elements of the various causes of action they have alleged. Maxim met his fiduciary duty to EPS. Not only did Maxim offer all of his ideas for software improvements to EPS for development, but he only engaged in his own development as permitted by EPS. Maxim Defendants abided by the terms of the parties' contracts, including the authorized copying of part of the database tables. Maxim had no interest in EPS's software and this is why no EPS source code (not even the source code contained in the database tables) appears in MEI Field Navigator. Plaintiffs other claims are similarly flawed, as discussed below.

A.    **Counts I, II, III, IV, V, VI and IX – Plaintiffs failed to prove breach of contract**

To prove a breach of contract, a plaintiff must show the formation of an agreement, performance by one party, breach of the agreement by the other party and damages. United Rentals, Inc. v. Price, 473 F. Supp. 2d 342, 346 (D. Conn. 2007). With regard to the breaches of contract alleged, Plaintiffs failed to prove damages, as explained above in Section I.M.

Plaintiffs failed to show that the Shareholder Agreement (Ex. 13) was an agreement between Plaintiffs and Maxim. Therefore, Count I must fail as to Maxim. Plaintiffs failed to show that S2K breached the Shareholder Agreement, as S2K sells hardware; it does not produce or modify computer software. (791:13-25.) Therefore, Count I must fail as to S2K.

Plaintiffs failed to show that Maxim breached the 2004 Confidentiality and Non-Competition Agreement (Ex. 3), as he released no EPS information, confidential or otherwise, and he did no software design independent of EPS until EPS gave him permission to do so.[7]

---

[7] Plaintiffs elicited vague testimony that a person who worked with Pajemola might have been able to get access to the MEI database tables, because Maxim did not cause this person to sign a confidentiality agreement. (729:4-730:22.) Plaintiffs presented no evidence about what computer information this person actually saw, and no evidence about any damages arising from the involvement of this person. This testimony cannot sustain a claim of breach of contract.

Maxim worked for years to improve Field-Comm.net and only began to develop new software when EPS refused to incorporate certain reporting features or consider marketing a web-based product. EPS instead encouraged Maxim to design whatever it was that MEI required. Therefore, Count II must fail. Plaintiffs also failed to show that S2K breached the 2004 Confidentiality and Non-Competition Agreement (Ex. 2), as S2K sells hardware; it does not produce or modify computer software. (791:13-25.) Therefore, Count III must fail.

Plaintiffs failed to show that Maxim and MEI breached the 2008 Confidentiality and Non-Competition Agreement (Ex. 14). Again, Maxim and MEI only began to develop new software when EPS refused to incorporate certain reporting features or consider marketing a web-based product and instead encouraged Maxim to design whatever it was that MEI required. That software was used internally by MEI and its subcontractors – not sold in competition with EPS. Nor did Maxim and MEI release any confidential information without the consent of EPS. Therefore, Count IV must fail.

Furthermore, both the 2004 Confidentiality and Non-Competition Agreement and the 2008 Confidentiality and Non-Competition Agreement are unreasonable and overly restrictive and, therefore, unenforceable.[8] When evaluating the reasonableness of covenants not to compete, Connecticut courts look to five factors: (1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the beneficiary; (4) the extent of the restraint on the restrained party's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests. A.H. Harris & Sons, Inc. v. Naso, 94 F. Supp.

---

[8] Plaintiffs may point to Paragraph 3.C of the various Confidentiality and Non-Competition Agreements as evidence that the geographical restriction is reasonable and does not impose undue hardship. But the Court is not obligated to believe these inaccurate recitals. "A recital of fact in an integrated agreement may be shown to be untrue." TIE Commc'ns, Inc. v. Kopp, 218 Conn. 281, 291 (1991) (quoting Restatement (Second) of Contracts § 218(1)).

3d 280, 293 (D. Conn. 2015). In this case, not only is the length of time excessive (four years in one of the agreements), but the language of the restrictive covenant is so broad and wide-ranging that it could be interpreted to prevent Maxim from achieving success in Ohio so long as Plaintiffs have a <u>single</u> client within the United States. A restrictive covenant that protects the beneficiary in areas in which he does not do business or is unlikely to do business is unreasonable. <u>Scott v. Gen. Iron and Welding Co., Inc.</u>, 171 Conn. 132, 138 (1976). The two agreements are also contrary to the public interest as they could unreasonably deprive the public of a superior software product that would benefit them. <u>See</u> <u>New Haven Tobacco Co., Inc. v. Perrelli</u>, 18 Conn. App. 531, 536 (1989). Counts II, III and IV must fail for these reasons as well.

Plaintiffs failed to show that MEI breached the Source Code Access and Indemnity Agreement (Ex. 5), which prohibits the misuse of the Field-Comm.net source code. MEI did not access or use any EPS source code. As noted above, the structure of the database tables is not source code; not even Plaintiffs' expert said that. (<u>See</u> p. 12-14, above.) Source code is not defined in the Source Code Access and Indemnity Agreement – the agreement simply states that source code is written in a human readable computer language, which distinguishes it from the object code that is written in a machine readable form. (Ex. 5, at 1.) The agreement suggests that only a portion of "the computer programs and databases" are source code, but does not indicate which portions those are. (<u>Id.</u>) Therefore, we must turn to the evidence presented at trial. <u>See, e.g.</u>, <u>Foley v. Huntington Co.</u>, 42 Conn. App. 712, 734 (1996) ("The evidence admitted in the present case was not used to vary the terms of the contract, but to ascertain the meaning of the terms.").

The only trial evidence regarding the definition of source code is the testimony Plaintiffs elicited from Kelley that "the source code would apply to your functions, your stored procedures

and your views as they exist in the database, not necessarily the tables themselves." (346:3-5.) As noted above, only a portion of the tables were copied, and even Plaintiffs' own expert was unable to find that any source code was copied. (308:22-23.)

Additionally, MEI did not exceed the authorization granted to it by EPS, which was to use the database structure to design a program that could extract MEI's information from the Field-Comm.net database in the form of various reports. The Source Code Access and Indemnity Agreement permitted MEI to use EPS source code to meet MEI's "unique needs and objectives." (Ex. 5 ¶ 2.0.) Plaintiffs well knew that the business of MEI was to coordinate the work of its subcontractors, and that it used the computer program to accomplish this need and objective. Plaintiffs cry foul because MEI paired Task Tracker with the independent program that Pajemola developed from scratch, but nothing about the Source Code Access Agreement barred MEI from using software developed by others, or required MEI to continue to use EPS's inferior product. For all of these reasons, Counts V and VI must fail as to MEI.

Plaintiffs also failed to show that the Source Code Access and Indemnity Agreement was an agreement between Plaintiffs and Maxim, who did not sign it individually. (Ex. 5.) Therefore, Count VI must fail as to Maxim.

With regard to the breach alleged in Count IX, S2K is willing to tender its shares for the total share value of $57,700, as determined by Maxim Defendants' analyst (see Ex. 11, at iv & 54).[9] Even that would be an injustice to S2K, which invested $250,000 in EPS only to promptly lose almost all of it. But S2K is resigned to the terms of the Cross Purchase Agreement as written (Ex. 4 & Ex. 4.a), and is willing to accept the relatively modest payment of $57,700.

---

[9] Maxim Defendants' expert added EPS's $350,000 in excess cash to its $821,759 in invested capital (EPS did not have any debt outstanding as of the valuation date). (Ex. 11, at 54.) The expert then assumed an ownership percentage of 5.8 percent for S2K (resulting in $67,840) and applied a 15 percent discount (for lack of marketability) to reach this figure. (Id.)

**B.      Counts VII and VIII – Plaintiffs failed to prove breach of fiduciary duties**

General Statutes § 33-756 provides general standards for directors. A director must act: (a) in good faith; (b) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (c) in a manner he reasonably believes to be in the best interests of the corporation. Here, prudently and in good faith, Maxim repeatedly offered his software innovations to EPS, but was rebuffed because of the company's frequently asserted lack of interest in developing a web-based system. EPS had so little interest in Maxim's ideas regarding efficiency tracking and accounting that it agreed to allow Maxim to pursue them individually, drawing MEI's data from the Field-Comm.net database system in order to do so. EPS cannot properly assert that Maxim acted against EPS's interests when EPS consistently refused to take Maxim's advice and develop the software that Maxim needed to run a successful business. Therefore, Count VII – alleging a breach of General Statutes § 33-756 – fails as to Maxim.

To prove a breach of common law fiduciary duties, Plaintiffs must show that: (a) a fiduciary relationship existed; (2) that the defendant advanced his or her own interests to the detriment of the plaintiff; (3) that the plaintiff sustained damages; and (4) that those damages were proximately caused by the fiduciary's breach of his or her fiduciary duty. Kite v. Pascale, No. 3:07-CV-0513 AWT, 2015 WL 1485022, at *7 (D. Conn. Mar. 31, 2015).

As noted above, Maxim only "advanced his own interests" after EPS rebuffed his recommendations and gave him leave to pursue his ideas individually. Even then, Maxim hoped to persuade EPS to market his software once it was developed. The "adequate disclosure of a corporate opportunity is an absolute defense to fiduciary liability for alleged usurpation of such a corporate opportunity. A corporate fiduciary who avails himself or herself of such a safe harbor should not be held accountable subsequently for opportunities embraced or forgone." Ostrowski

31

v. Avery, 243 Conn. 355, 376-77 (1997). Finally, when Pajemola presented MEI with a web-based system created independently from EPS – which EPS had refused to develop – MEI had no obligation to forgo this improvement and continue to use EPS's inferior product. Maxim was free to pursue his ideas after EPS rejected them. Therefore, Count VIII fails as to Maxim.

      S2K was not a director of EPS. Therefore, Counts VII and VIII also fail as to S2K, which did not have a fiduciary duty. Furthermore, as noted above, S2K has no involvement with software, so even if a duty did exist, these Counts would still fail as to S2K.

### C.    Count X – Plaintiffs failed to prove tortious interference with business expectancy

      To prove tortious interference with business expectancy, Plaintiffs must show that EPS had a business relationship with another party; the Maxim Defendants intentionally interfered with the business relationship while knowing of the relationship; and, as a result of Maxim Defendants' interference, EPS suffered actual loss. Dreamcatcher Software Dev., LLC v. Pop Warner Little Scholars, Inc., 298 F. Supp. 2d 276, 286–87 (D. Conn. 2004). Furthermore, Plaintiffs cannot prevail on a claim of tortious interference unless they prove the acts alleged were tortious, by demonstrating "at least some improper motive or improper means." See Daley v. Aetna Life & Cas. Co., 249 Conn. 766, 806 (1999). "The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification." Id. (quotation marks omitted).

      First, Plaintiffs were unable to establish any actual loss, as explained in Section I.M. Second, the only business relationships noted by Plaintiffs at trial were those between EPS and Strickland and EPS and Berghorst. Maxim Defendants did not intentionally interfere with those relationships. As noted above, Pajemola took Strickland and Berghorst on as customers of CFS after Pajemola and Maxim had broken ties, and licensed them software that Pajemola developed

32

specifically for them. Furthermore, EPS not would have continued to profit from Strickland and Berghorst but for Pajemola's actions, as Strickland and Berghorst were both unhappy with the performance of Field-Comm.net. (Strick. Dep., 24:21-24; Berg. Dep., 54:18-24.) Plaintiffs cannot sustain a claim of tortious inference on the fact that Maxim and Strickland explored a merger and, therefore, both used MEI Field Navigator for a brief time to measure their joint operations and their ability to work together. (See 849:13-850:3.) MEI was free to explore such business developments and doing so was not tortious. For all these reasons, Count X must fail.

### D.     Count XI – Plaintiffs failed to prove a violation of the Connecticut Uniform Trade Secrets Act

To prove a violation of the Connecticut Uniform Trade Secrets Act (General Statutes § 35-50 et seq.), Plaintiffs must show that Maxim Defendants misappropriated a trade secret belonging to EPS. Plaintiffs were unable to prove that the Field-Comm.net database structure is a trade secret; specifically, Plaintiffs did not establish that the database structure derives "independent economic value, actual or potential, from not being generally known." See General Statutes § 35-51(d)(1). Furthermore, even assuming the database structure could be considered a trade secret, it was not misappropriated by Maxim Defendants. See General Statutes § 35-51(b) (defining "misappropriation" as "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"). The database structure was provided to Maxim Defendants by EPS, subject to the Source Code Access and Indemnity Agreement; therefore, Maxim Defendants did not acquire it by improper means. See General Statutes § 35-51(a) (defining "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage"). MEI's authorized use of the Field-Comm.net database structure was not a misappropriation of a trade secret, and that is true for both Task Tracker standing alone and in conjunction with the

33

additional software that Pajemola developed from scratch. For all of these reasons, Count XI must fail.

**E.      Count XII – Plaintiffs failed to demonstrate a computer-related offense**

To succeed in an action for a computer-related offense under General Statutes § 52-570b, Plaintiffs must prove that Maxim Defendants violated § 53a-251. Plaintiffs claim that Maxim Defendants violated General Statutes § 53a-251(e)(1), (3) and (4). Those subsections all relate to the unauthorized use of a computer system with a resulting impact on the data contained therein – for example, disclosing proprietary financial data stored on a company's computer. Maxim Defendants did not do anything like that. As noted above, Maxim Defendants' use of the Field-Comm.net databases was authorized under the Source Code Access and Indemnity Agreement. The entire purpose of that agreement was to allow MEI to access its data for reporting purposes. Furthermore, the Field-Comm.net database tables themselves are not "data residing in, communicated by or produced by a computer system." The database tables are part of the computer system itself. The information that MEI input into the database tables was the data residing in the system. Plaintiffs did not show any impact on EPS's data.

Finally, as Plaintiffs will not be able to prove the occurrence of any injury to person, business or property – malicious or otherwise – Plaintiffs will not be able to collect actual damages, damages for unjust enrichment or treble damages pursuant to General Statutes § 52-570b(c). For all of these reasons, Count XII must fail.

**F.      Count XIII – Plaintiffs failed to prove a violation of the Connecticut Unfair Trade Practices Act**

To prove a violation of the Connecticut Unfair Trade Practices Act (General Statutes § 42-110a et seq.), Plaintiffs must show that Maxim Defendants engaged in unfair methods of competition, or unfair or deceptive acts or practices in the conduct of any trade or commerce. See

General Statutes § 42-110b(a). "Trade or commerce" is defined to mean "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services . . . in this state." General Statutes § 420-110a(4). Connecticut courts look to three factors when determining whether an act or practice is unfair:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].

Langan v. Johnson & Johnson Consumer Cos., Inc., 95 F. Supp. 3d 284, 288 (D. Conn. 2015) (quotation marks omitted). An act or practice is deceptive, when there is: "(1) a representation, omission, or other practice likely to mislead consumers; (2) the consumer interpret[s] the message reasonably under the circumstances; and (3) the misleading representation, omission, or practice [is] material – that is, likely to affect consumer decisions or conduct." Id. As Maxim Defendants acted only pursuant to the authorization granted to them by EPS, their actions cannot be considered unfair or deceptive. Maxim Defendants did nothing immoral, unethical, oppressive, or unscrupulous; have caused no substantial injury to anyone; and have not engaged in any practices likely to mislead consumers.  Furthermore, to prevail on an action for damages, Plaintiffs must show that they suffered an "ascertainable loss of money or property," which Plaintiffs failed to do, as noted in Section I.M. See General Statutes § 42-110g(a). Despite the remark of Plaintiffs' counsel, Maxim is far from being "a poster child" for CUTPA. (21:21.) For all of these reasons, Count XIII must fail.

### G.    Count XIV – Plaintiffs failed to prove an infringement of copyright

To establish copyright infringement, Plaintiffs must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist

Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). Plaintiffs claim a copyright in the database structure of Field-Comm.net, but that structure – a collection of columns designed to contain the basic facts related to the mortgage field service industry – does not possess "the minimal degree of creativity" required for originality. Id. at 345. Plaintiffs might have spent some days of work to put the tables together, but "copyright rewards originality, not effort." Id. at 364. Jason Margarido even admitted that the naming conventions were not original to EPS, but borrowed from Travelers. (386:15-19.)

Furthermore, even if a work is in some sense "original" under § 102(a), it still may not be copyrightable because § 102(b) provides that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of [its] form." 17 U.S.C. § 102(b). "[P]rotection is given only to the expression of the idea – not the idea itself." Mazer v. Stein, 347 U.S. 201, 217 (1954); see also Baker v. Selden, 101 U.S. 99, 101-02 (1879) (explaining that while a book describing a bookkeeping system is worthy of copyright protection, the underlying method described is not); Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 703 (2d Cir.1992) ("It is a fundamental principle of copyright law that a copyright does not protect an idea, but only the expression of the idea.").

"[C]ompared to aesthetic works, computer programs hover even more closely to the elusive boundary line described in § 102(b)." Altai, 982 F.2d at 704. Plaintiffs present MEI Field Navigator as an equivalent to Field-Comm.net, simply because the two programs can be used to fulfill some of the same goals, but this is a misguided attempt to protect the idea of enabling businesses in the property preservation industry to communicate using computers. Plaintiffs cannot rely on copyright law to provide them with a monopoly on this idea.

"Where the 'expression is essential to the statement of the idea,' <u>CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.</u>, 44 F.3d 61, 68 (2d Cir.1994), or where there is only one way or very few ways of expressing the idea, the idea and expression are said to have 'merged.' In these instances, copyright protection does not exist because granting protection to the expressive component of the work necessarily would extend protection to the work's uncopyrightable ideas as well." <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 387 F.3d 522, 535 (6th Cir. 2004) (citations omitted). In other words, Plaintiffs cannot claim a copyright in their table nomenclature (like "grass_cut"), if there are only a few ways in which to express that idea.

Like the doctrine of merger, the doctrine of "scenes a faire" also precludes copyright protection in this case. "In the computer-software context, the doctrine [of scenes a faire] means that the elements of a program dictated by practical realities – <u>e.g.</u>, by hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, <u>target industry practices</u>, and standard computer programming practices – may not obtain protection." <u>Gates Rubber Co. v. Bando Chem. Indus., Ltd.</u>, 9 F.3d 823, 838 (10th Cir. 1993) (emphasis added). As Kelley explained, both Field-Comm.net and MEI Field Navigator stored and manipulated information related to "orders received from banks, jobs given to contractors, whether the jobs were complete, invoicing on those jobs." (350:18-23.) The software features of both programs were dictated by the practice of the property preservation industry and therefore similar. The environment being modelled by both programs involved "banks holding properties requesting jobs to be performed on those properties, and then you had the contractors performing the work and . . . invoicing." (330:1-7.)

In order to successfully model this environment, a programmer would need to write code that would allow banks to send orders to regional coordinators, those coordinators to assign jobs

to contractors, and those contractors to report on their progress – and EPS cannot prevent future programmers from expressing this idea under the guise of copyright enforcement. "Granting copyright protection to the necessary incidents of an idea would effectively afford a monopoly to the first programmer to express those ideas." Gates Rubber Co., 9 F.3d at 838.

As noted above, to the extent that MEI copied the nomenclature of some of EPS's database tables and columns, MEI did so with the express permission of EPS. EPS did not present any evidence of subsequent use beyond the scope of EPS's authorization. Therefore, because the Field-Comm.net database lacks originality, and under the doctrines of merger and scenes a faire, and because Maxim Defendants acted within the authorization of EPS, Count XIV must fail.

In Count XIV, Plaintiffs claim statutory damages under 17 U.S.C. § 504. (Complaint ¶ 246.) Even if MEI Field Navigator had infringed Plaintiffs' rights in Field-Comm.net, statutory damages would not be available to Plaintiffs. EPS published Field-Comm.net on June 30, 2009 and received a copyright registration for it on November 20, 2012. (Ex. 7.) Pursuant to 17 U.S.C. § 412, "no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for . . . any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." Plaintiffs allege that Maxim Defendants infringed EPS's copyright prior to its registration. Therefore, even if Plaintiffs were to prevail on Count XIV, Plaintiffs are not entitled to statutory damages.

### H.    Count XV – Plaintiffs failed to establish a right to a constructive trust

To attain the imposition of a constructive trust, Plaintiffs must prove that Maxim Defendants would be unjustly enriched if permitted to retain the "property, revenue, and

proceeds" they allegedly derived from their access to Field-Comm.net. See Cohen v. Cohen, 182 Conn. 193, 203 (1980). To demonstrate unjust enrichment, Plaintiffs must prove "that [Maxim Defendants were] benefited; that is, [they have] received something of value [; and] that the benefit was unjust; that it was not paid for by [Maxim Defendants], to the detriment of [Plaintiffs]." See Providence Elec. Co. v. Sutton Place, Inc., 161 Conn. 242, 246 (1971). Maxim Defendants did not gain any unjust benefit from their access to Field-Comm.net. They gained access to MEI's data held by EPS, so that MEI could create the analytical tools that made MEI's business more efficient and competitive. To the extent this was an "enrichment," it was with the permission of EPS and was not "unjust."  And any such "enrichment" was governed by the Source Code Access and Indemnity Agreement that must dictate the nature of the parties' interaction. EPS cannot now ignore the contract, which permitted MEI's actions, and instead seek a quasi-contractual recovery. As noted above, MEI never sold computer software in competition with EPS, so MEI did not realize a "benefit" of a more conventional form.

## I.      Default judgment against Pajemola and CFS

Pajemola and CFS ("Pajemola Defendants") have been defaulted in this case. (Dkt. No. 144.) Due to Maxim Defendants' understanding of Pajemola Defendants' financial situation and the current pursuits of Maxim's businesses, Maxim Defendants no longer wish to pursue their claims against Pajemola Defendants. Based on the default, Maxim Defendants request that the Court enter judgment for Maxim Defendants on Pajemola Defendants' claim against them. (Dkt. No. 32.)

**IV.      Conclusion**

For the reasons given above, Maxim Defendants have acted properly in their interactions with Plaintiffs, even taking all appropriate steps to try to help EPS with its business. Maxim Defendants acted in conformance with all requirements imposed by statute, common law and the parties' contracts. Judgment should enter in favor of Maxim Defendants on all counts.

<div style="margin-left:40%">

**Defendants Steven Maxim,
S2k, Inc., Maxim Enterprises, Inc., and
Maxim Field Service Supply, Inc.**

</div>

By:    /s/ Mary Mintel Miller
Brian O'Donnell
Federal Bar No. ct16041
Mary Mintel Miller
Federal Bar No. ct28994
Reid and Riege, P.C.
One Financial Plaza
Hartford, CT  06103
P: 860-278-1150
F: 860-240-1002
bodonnell@rrlawpc.com
mmiller@rrlawpc.com

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that the foregoing Motion was filed electronically on this 3rd day of February, 2016.  Notice of filing was sent by electronic service to those parties receiving notices through the Court's CM/ECF system.  The undersigned further certifies the Motion was sent by regular U.S. mail, postage prepaid, to:

Mr. Edwin Pajemola and Cleveland Field Systems, LLC
4223 Morely Drive
Reminderville, OH  44202

/s/ Mary Mintel Miller
Mary Mintel Miller