IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EAST POINT SYSTEMS, INC., | ) | |
| THOMAS MARGARIDO, JASON | ) | |
| MARGARIDO, AND PAUL TAFF | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | CIVIL ACTION NO. 3:13-cv-215 |
| | ) | |
| | ) | |
| STEVEN MAXIM, S2K, INC., MAXIM | ) | |
| ENTERPRISES, INC., MAXIM FIELD | ) | |
| SERVICE SUPPLY, INC., EDWIN | ) | |
| PAJEMOLA, AND CLEVELAND FIELD | ) | |
| SYSTEMS, LLC | ) | FEBRUARY 3, 2016 |
| Defendants. | ) | |

**PLAINTIFFS' POST TRIAL BRIEF**

Maxim, Maxim Enterprises and S2K ("Maxim Defendants") are the poster child for the various common law prohibitions against unfair and deceptive practices. As a member of the board of directors for East Point Systems ("EPS), Steven Maxim, on behalf of S2K made promises and signed agreements that he would not compete with the plaintiffs and that he would keep all of their confidences. It was only after Maxim had gained a position of trust and access to the plaintiffs' most sensitive confidential information, that he used that against them and cannibalized their business. His actions on behalf of himself as well as S2K and Maxim Enterprises epitomized the concerns cognized by almost every facet of the law concerning business relationships. Maxim and his associated business violated the fundamental public policy underlying these laws, and he and his affiliates, must be held to account.

## I.     The Defendants Wrongfully Copied and Used Plaintiff's Computer Code to Unfairly Compete.

Under the plaintiffs' verified complaint, the issue of whether the defendants copied significant portions of the plaintiffs' database source code is directly relevant to multiple bases for liability. However, by the very nature of the allegations, direct evidence of such copying is inherently difficult to prove via direct evidence. It is certainly rare, that an individual engaging in clandestine copying of others' property would announce to another individual, let alone the world, that they were engaging in such an activity. Consequently, the law recognizes that "it is generally not possible to establish copying as a factual matter by direct evidence, as it is rare that the plaintiff has available a witness to the physical act of copying…Therefore, copying is ordinarily established indirectly by the plaintiff's proof of access and substantial similarity." *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 115 (2d Cir. 1998); *See also Boisson v. Banjan*, *Ltd.*, 273 F.3d 262, 267-68 (2d Cir. 2001).

Although such an acknowledgement comes directly from the world of copyright law, applicable to count 14 of the plaintiffs' verified complaint, it is equally applicable to the other causes of action based on the same or substantially similar factual allegations. At trial, the plaintiffs adduced substantial evidence establishing both that the defendants had access to the plaintiffs' database source code and that the defendantssubsequently produced software, field navigator, and was substantially similar to that of the plaintiffs' fieldcomm.net.

At trial, it was undisputed that the defendants – Edwin Pajemola, Steven Maxim, Maxim Enterprises, and S2K – had access to the source code for the database, associated with Fieldcomm.net.  According to testimony of Thomas Margarido, both Edwin Pajemola and Maxim Enterprises were granted access to both the FieldComm.net database source code and the database itself through executed agreements. (Tr. Dec. 7, 2015, at 127:16-129:13). Both agreements, executed with Maxim Enterprises and Edwin Pajemola, provided that "[East Point Systems] agrees to provide [Edwin Pajemola], access to the Source Code copy for the sole purpose of permitting [Maxim Enterprises] to support its own licensed copies of the computer programs and databases by making modifications to the current software and databases required to meet [Maxim Enterprise's] unique needs and objectives." (Exhibit 5, at §2.0; Exhibit 6, at §2.0).

In addition to the agreements, granting Edwin Pajemola and Maxim Enterprises, access to the database source code, plaintiffs also submitted evidence that Edwin Pajemola, working on behalf of Maxim, and Maxim himself did in fact access the source code for the database associated with FieldComm and FieldComm.net. At trial, the plaintiffs presented the testimony of their former software manager Fred Johannes III. After confirming that Steven Maxim had been provided with access to the database source code, he further testified that he knew that Maxim Enterprises had actually accessed said source code because he had "helped Edwin [Pajemola] on several occasions with reporting queries against the database." (Tr. Dec. 9, 2015, at 416:24-417:7). This reporting had taken place at a time when Pajemola was working for Maxim Enterprises. (Tr. Dec. 9, 2015, at 417:11-13).

3

Not only did the representatives for the plaintiffs and their former employees state that the defendants had access to the database source code, but Steven Maxim acknowledged as much. During his testimony, he confirmed that he had charged Pajemola to "write whatever code was necessary to take data from East Point's program and put it into Field Navigator." (Tr. Dec. 10, 2015, at 732:10-14).

Given the overwhelming evidence that the defendants had access to the East Point database source code and that they did in fact access it, the plaintiffs need only prove that the code, developed by the defendants' Field Navigator was substantially similar to that created by the plaintiffs. At trial, there was little question as to whether the code that was produced by the defendants incorporated portions of code that had been copied directly from the plaintiffs.

At question at trial, was the portion of the code associated with the database portion of both the plaintiffs' FieldComm and FieldComm.net and the defendants' Field Navigator. As explained by plaintiffs' expert John Morgan, in comparing the databases of the Maxim system and the East Point Systems system, the analysis consisted of comparing a series of tables used to order data as well as the columns contained within those tables. (Tr. Dec. 8, 2015, at 279:4-13).  It is these tables that give structure to the data contained within a database and allow for easy tracking of the data contained therein. (Tr. Dec. 8, 2015, at 279:18-25).

To compare the database created by East Point Systems and Maxim, Morgan started by comparing all of the tables that were defined in both databases. (Tr. Dec. 8, 2015, at 282:2-9).  Through his review of both databases, Morgan concluded that out of

4

the 137 tables that comprised the East Point Systems database, 102 of them also appeared in the Maxim database "in substantially similar form." (Tr. Dec. 8, 2015, at 292:9-13).  Aside from the obvious, this is remarkable because there exist no standard naming conventions within the programming industry." (Tr. Dec. 8, 2015, at 287:10-288:10). In other words, the only thing dictating a code's naming convention is the preference of the programmer or programmers responsible for creating it.  Ultimately, an organization will have a set of standards for naming that will result in a pattern in the ways that names are assigned. (Tr. 288:3-289:18).

Morgan further noted that a specific table from the Maxim database was essentially identical to that of a corresponding table from the East Point Systems database. (Tr. Dec. 8, 2015, at 293:11-294:5)[1]. He found that the odds of even a single table having such similarity would be virtually non-existent in the absence of copying. (Tr. Dec. 8, 2015, at 4-5). His conclusion that copying had occurred was bolstered by the fact that it was not just one table that had been substantially reproduced, but instead 102 out of 137 of the tables that made up the East Point Systems database. (Tr. Dec. 8, 2015, at 294:1-5).  As a result, Morgan concluded that the Maxim database contained substantial portions that had been directly copied from the East Point Systems database.

Moreover, the defendants did not rebut the copying of the East Point Systems database, and in fact presented an expert, who essentially confirmed with the findings of John Morgan.  Defendant's witness Gregory Kelley testified that he agreed that he

---

[1] Morgan noted that the tables in question both had the same name of "audit" and contained 15 identical columns in terms of names, types, sizes etc.

found a 74% copy rate in the tables of the Maxim database from the East Point Systems Database. (Tr. Dec. 8, 2015, at 330:20; 331:3). His ultimate conclusion was that the Maxim database had been substantially copied from the East Point Systems database. (Tr. Dec. 8, 2015, at 346:7-12).

Ultimately, the defendants took the core of the FieldComm technology to create their product. (Tr. Dec. 8, 2015, at 309:6-21). Essentially, all that the defendants did to the plaintiffs' technology was to make it web-based and changed the graphical user interface, or the way that it looked. They took everything else, including the database source code, access to customer data, goodwill and insider information. The end result was Field Navigator, which took all functionality from the plaintiffs' technology while adding a couple of features. (Tr. Dec. 7, 2015, at 160:10-21). By creating and marketing it, the defendants violated myriad duties both in statute and in common law that they had to the plaintiffs.

## II.   LIABILITY FOR ACTIONS OF EDWIN PAJEMOLA

"In order to hold an employer liable for the intentional torts of his employee, the employee must be acting within the scope of his employment and in furtherance of the employer's business." *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 500-501, 656 A.2d 1009 (Conn. 1995)(quoting *Cardona v. Valentin*, 160 Conn. 18, 22, 273 A.2d 697 (1970); *Pelletier v. Bilbiles*, 154 Conn. 544, 547, 227 A.2d 251 (1967); *Antinozzi v. A. Vincent Pepe Co.*, 117 Conn. 11, 13, 166 A. 392 (1933); *Son v. Hartford Ice Cream Co.*, 102 Conn. 696, 699, 129 A. 778 (1925). But it must be the affairs of the principal, and not solely the affairs of the agent, which are being furthered in order for the doctrine

to apply. Larsen, at 501 (*citing* Mitchell v. Resto, 157 Conn. 258, 262, 253 A.2d 25 (1968); A-G Foods, Inc.  v. Pepperidge Farm, Inc., 216 Conn. 200, 208, 579 A.2d 69 (1990)).

From the record, it is apparent, that all of the actions taken by Edwin Pajemola, in copying the plaintiffs' source code and promoting a competing product were undertaken within the scope of his employment with Maxim. According to Steven Maxim, he had employed Pajemola in 2009 to develop Field Navigator. (Tr. Dec. 9, 2015, at 605:6-18). More specifically, Maxim admitted that as part of his employment, Pajemola was instructed to write whatever code was necessary for Field Navigator to extract information from the East Point database.  (Tr. Dec. 10, 2015, at 738:20-739:5). Further, Pajemola testified during his deposition that Maxim had originally requested that Task Tracker, an element of Field Navigator be able to work with East Point's tables and databases. (Pajemola Depo. Tr. Jan. 6, 2014, at 152:8-14). Since Pajemola was operating at the direct request of Maxim, it is clear that such activity was in the scope of his employment.

Beyond the involvement in creating Field Navigator, Pajemola's further efforts to promote said product were also within the scope of his employment. At the time that Pajemola was working to promote Field Navigator to potential subcontractors, such as the Mullers he was working as an employee of Maxim. As the Mullers testified, when they called for Edwin Pajemola and Cleveland Field Services, they ended up speaking with representatives of Maxim Enterprises, including Steven Maxim. (Tr. Dec. 9, 2015, at 437:439:10, 460:9-20). At that time Pajemola and Maxim were attempting to sign up subcontractors in exchange for 1% of their revenues. (Tr. Dec. 9, 2015, at 697:20-25)

7

Ultimately, Pajemola was able to successfully license the product under just that pricing scheme to both Berghorst and A&M Recovery. (Pajemola Depo. Tr. Jan. 6, 2014, at 98:9-22). The fact that Pajemola was marketing the software together with Maxim in the same demonstration,in the manner prescribed by Maxim, indicates that he was acting within the scope of his employment.   Therefore, all of the actions taken by Pajemola in copying the plaintiffs' source code and then marketing it should be directly attributable to all of the Maxim Defendants.

## III.     BREACH OF FIDUCIARY DUTY

As a member  of the board of directors of East Point Systems, Steven Maxim and had fiduciary duties to the plaintiffs to act in good faith, with ordinarily prudent care, in a manner believed to be in the best interest of the plaintiffs. In creating and suborning the creation of a derivative software of East Point's FieldComm software, Steven Maxim breached his fiduciary duties under Connecticut common law and Connecticut General Statutes §33-756. These were duties that he took on through the execution of the East Point Systems, Inc. Shareholder Agreement. (Exhibit 13).

"'An officer and director occupies a fiduciary relationship to the corporation and its stockholders.' *Katz Corp. v. T.H. Canty & Co., Inc.*, 168 Conn. 201, 207, 362 A.2d 975 (1975). 'He occupies a position of the highest trust and therefore he is bound to use the utmost good faith and fair dealing in all his relationships with the corporation.' Id." *Pacelli Bros. Transportation, Inc. v. Pacelli*, 189 Conn. 401, 407, 456 A.2d 325 (1983). "[A] director [must] act in good faith. See General Statutes §33-756." *Thames Recycling, Inc. v. Gallo*, 50 Conn .App. 767, 781-82, 720 A.2d 242 (1998) (action

against director and shareholder of closely held corporation on behalf of corporation and also other stockholders of the corporation).

Under the common law and Connecticut General Statutes §33-756, a director is liable for breach of fiduciary duty if he or she fails to act "(1) in good faith; (2) with the care of an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) in a manner he reasonably believes to be in the best interests of the corporation." *Sterner v. Saugatuck Harbor Yacht Club, Inc.*, 188 Conn. 531 (1982) (C.G.S. §33-459 (predecessor to §33-756) "adopts common law standards of fair play"). "[A] fiduciary duty is breached when the fiduciary engages in self-dealing by using the fiduciary relationship to benefit [his] personal interest." *Mangiante v. Niemiec*, 82 Conn. App. 277, 284 843, A.2d 656 (2004) (citing *Spector v. Konover,* 57 Conn. App. 121, *128,* 747 A.2d 39 (2000). Further, "[o]nce a fiduciary relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. . . . Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of proof of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence." *Spector v. Konover*, 57 Conn. App. 121, 747 A.2d 39 (Conn. App. Ct. 2000)(quoting *Konover Development Corp. v. Zeller*, 228 Conn. 206, 229-30, 635 A.2d 798 (1994)(internal quotations omitted).

In the present case, it is uncontroverted that Steven Maxim had a fiduciary duty to East Point Systems and its board members and owners. On July 26, 2004, Steven Maxim entered into an agreement with the plaintiffs, whereby S2K would take an ownership interest in East Point Systems of 600 out of 10,000 total shares in the

company for a cost of $250,000. (Exhibit 13, at §3(a)).  As part of this agreement, it was established that Steven Maxim would serve on the board of directors. (Exhibit 13, at 5(b)). As such, both Steven Maxim, as a board member, and S2K as a shareholder in the business, represented by Steven Maxim as its agent, owed a fiduciary duty to the plaintiffs. Such fiduciary relationship having been established, the defendants bear the burden of showing, by clear and convincing evidence that S2K and Steven Maxim engaged in fair dealing in association with the conduct at issue at trial. This is a burden that the defendants did not carry, nor could they, Steven Maxim engaged in flagrant self-dealing, enriching himself at the expense of the plaintiffs, to whom he owed the utmost duty of fair dealing.

In the present case, it is apparent that Steven Maxim gained financial advantage and benefit at the expense of the plaintiffs when he developed or suborned the development of the derivative product, Field Navigator, and then engaged in competition with the plaintiffs with said product. At trial, it was undisputed that Steven Maxim and S2K were given access to the source code to the plaintiffs' database. (see e.g. Dec. 7, 2015, at 132:5-23)

Although Steven Maxim testified that he never derived any revenue from his relationship with A&M Recovery, he still derived a benefit from it. (*See* Tr. Dec. 9, 2015, at 660:2-4). Maxim had used Field Navigator, which contained the plaintiffs' code as consideration to move forward a possible purchase of A&M Recovery. (Tr. Dec. 9, 2015, at 660:5-13). Even though Maxim was not able to derive revenue from his arrangement with A&M or other contractors, as he claimed, his intention had been to charge 1% of revenues from subcontractors for use of his product." (Tr. Dec. 9, 2015, at 667:17-20).

And despite his protestations that such a fee would only be to recoup the costs of managing Field Navigator, the profits developed by Edwin Pajemola indicate that such a scheme would have been very profitable for Maxim.  (Pajemola Depo. Tr. Jan. 6, 2014, at 97:6-17).

Further, Steven Maxim admitted that in deploying Field Navigator in the field services industry, he had never considered whether doing so would injure East Point Systems and breach his duties as a member of the board of directors. (Tr. Dec. 9, 2015, at 627:6-628:1).

## IV.    Defendants Breached All Contracts Allowing Them Access to the Plaintiffs' Source Code

Through their dealings with the plaintiffs, the defendants; The Maxim Defendants all executed confidentiality and non-competition agreements with East Point Systems. By copying East Point Systems' database source code for commercial gain, these defendants committed breach of contract, that caused the plaintiffs' damages. At trial, the plaintiffs adduced sufficient evidence to prove by a preponderance of the evidence that the Maxim Defendants breached the agreements by establishing "the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Keller v. Beckenstein*, 117 Conn. App. 550, 558 (2009), cert. denied, 294 Conn. 913 (2009).

Through agreements, executed on July 26, 2004 and in December, 2008, the Maxim Defendants entered into agreements entitling them and their agent's access to the East Point Systems source code on the condition that the Maxim Defendants

maintain confidentiality and not use said information to compete with East Point Systems. (Exhibits 2, 3, and 14). The plaintiffs further executed a software source code and indemnity agreement with both Pajemola and Maxim, which imposed similar duties. (Exhibit 5, 6) The original agreements, executed on July 26, 2004, secured a promise from S2K and Maxim not to disclose confidential information or compete with East Point Systems, in connection with a transfer of "knowledge of certain confidential, proprietary, technical or financial information, products and/or materials concerning [East Point Systems]. (Exhibit 2, at p. 1; Exhibit 3, at p. 1). Maxim and Maxim Enterprises subsequently executed agreements with the same promises to East Point Systems, in exchange for East Point Systems "permit[ting] access by Maxim and Maxim's  Agent to the source code and related proprietary information of certain software produced by [East Point Systems] for the purpose of permitted [sic] Maxim to modify  the software."[2] (Exhibit 14, at p. 1). Similarly, the software source code agreements executed with Maxim and Pajemola required that neither would:

> …divulge, disclose, or otherwise make the Source Code available to any parties other than Licensee's Agent. The Licensee shall not use, rent, lease, sell, or otherwise dispose of the Source Code, related documentation, or any other item made available to them [as per the contract] except as may be provided in this agreement…[and that]…Licensee…will not misuse the Source Code which misuse would include any disclosure of the Source Code to anyone other than Licensee's Agent, any unauthorized use of the Source Code, or any sale, lease, exposure or transfer of the Source Code to a third party.

(Exhibit 5, at §3.0; Exhibit 6, at §3.0).

---

[2] The term agent was further restricted in the agreement by the provision requiring that "[Maxim and Maxim Enterprises] shall be permitted in accordance with the terms and conditions hereof, to release certain Confidential Information only to Maxim's Agent, namely Edwin Pajemola." Exhibit 14, at §2C.

As far as the requirements imposed on them, the plaintiffs fulfilled their obligations under these agreements. Pursuant to the aforementioned agreements, the plaintiffs made the software for FieldComm available to Maxim and Pajemola and gave them access to the database and provided insights into how it worked. (Tr. Dec. 7, 2015, at 132:10-16). At trial, former software manager for East Point Systems testified that while he was working for East Point Systems, that Steven Maxim had been provided with access to the source code for the East Point Systems database, and that Edwin Pajemola had actually accessed the database source code on several occasions. (Tr. Dec. 9, 2015, at 415:24-416:7). Moreover, Maxim was provided with a branched copy, separate from the one maintained by East Point Systems, specifically for Maxim to develop features customized to his business that were not ready for release to the general public. (Tr. Dec. 9, 2015, at 415:9-415:23).

Although the plaintiffs had fulfilled their obligation of providing confidential information to the Maxim Defendants under the agreements, the same could not be said for the Maxim Defendants. After copying the East Point Systems source code, as discussed previously, the Maxim Defendants wrongfully engaged in competition with the plaintiffs in direct violation of the various agreements promising confidentiality and non-competition.

Although the defendants denied at trial that they were engaged in selling and licensing the Field Navigator product, which was a derivative of East Point's FieldComm products, their actions nonetheless constituted competition, in violation of their agreements. The best defense that Maxim could put forward at trial was that the companies using Field Navigator were not customers, but were subcontractors.

However, they were still paying a subsidiary of Maxim Enterprises a fee in exchange for using his software..

At the time that the confidentiality and non-compete agreements were in effect, the plaintiffs were engaged in a business of providing software that allowed contractors, responsible for maintaining foreclosed properties for banks, to coordinate their services and track work orders. (Tr. Dec. 7, 2015, at 68:1-16). East Point initially offered FieldComm for a flat fee of $1500 and then eventually moved over to a monthly leasing fee. (Tr. Dec. 7, 2015, at 71:14-72:3). These pricing structures for the software were the primary ways that East Point made money off of doing business in the Field Services Industry. At the time that the Maxim Defendants created Field Navigator, the plaintiffs' customers included regional service providers, such as A&M Recovery, which would accept orders from national service companies or banks and perform the direct services of maintaining foreclosed properties. (Tr. Dec. 7, 2015, at 74:7-75:12).

At trial, it was revealed that while Steven Maxim, sat on the plaintiffs' board of directors, the Maxim Defendants provided Field Navigator - a derivative of the plaintiffs' FieldComm software – to plaintiff's client, A&M Recovery. (Tr. Dec. 9, 2015, at 624:9-23). It was also shown that after this occurred A&M Recovery switched from using the FieldComm.net product offered by the plaintiff to Field Navigator, offered by the defendants. (Tr. Dec. 9, 2015, at 625:5-19; Tr. Dec. 7, 2015, at 166:16-167:3). During this transition period, the plaintiffs lost the revenue from all of the subcontractors, used by A&M Recovery. (Tr. Dec. 7, 2015, at 166:16-167:3). By taking the revenues, associated with doing business with A&M, the defendants directly competed with the plaintiffs for revenues developed from subcontractors associated with A&M.

In his testimony, Steven Maxim implied that he was not competing with the plaintiffs because he was not directly selling a version of Field Navigator to customers for independent use.   Instead, he testified that in order to use Field Navigator, an individual or company had to become a subcontractor of Maxim Enterprises. (Tr. Dec. 9, 2015, at 646:15-18). However, this naming distinction from that of "customer," did not mean that Maxim was taking business from East Point Systems in order to boost his own business. Although he considered them to be contractors, Maxim testified that in order to be a subcontractor of Maxim Enterprises, an entity had to use Field Navigator, the software that was developed by a subsidiary, Maxim Field Services. (Tr. Dec. 9, 2015, at 645:1-8). For use of this software, subcontractors of Maxim Enterprises were to be obligated to pay 1 percent of their revenues, generated through using the system. (Tr. Dec. 9, 2015, at 644:1-9). Ultimately, the important consideration is not the labels that are used in this situation, but rather the substantive reality. By offering a field services software management program in Field Navigator, the Maxim defendants were able to engage regional companies and subcontractors that would have continued to use the plaintiffs' software. Depriving the plaintiffs of business, even if using a different business model, is still competition strictly forbidden by the agreements that the Maxim Defendants entered into with the plaintiffs. This conduct caused damages to the plaintiffs' business, which should be compensated in full.

### a. Defendants' Further Failed to "Safeguard" Plaintiffs' Intellectual Property from the Actions of Edwin Pajemola

In addition to their active competition with the plaintiffs, the defendants also violated their contractual obligations by allowing Edwin Pajemola to compete with their

protected intellectual property.   As part of the agreements, the defendants had an obligation to "safeguard" the plaintiffs' intellectual property. (Exhibit 5, at §2.0; Exhibit 6, at §2.0; *see also* Exhibit 2, §1; Exhibit  2, §1).  This duty to maintain and safeguard the plaintiffs' source code was not limited to prohibiting the abuse misuse? of it, but to ensure that no other so abused misused?  it.  This is a duty that the defendants failed.

Maxim took  absolutely no precautions in safeguarding the plaintiffs' intellectual property. While developing and marketing Field Navigator, Maxim did not take any steps to investigate whether his code, which he knew mined the plaintiffs' database, contained any of the plaintiffs' source code. (Tr. Dec. 9, 2015, at 701:5-10). Further, Maxim admitted that he undertook no effort to determine whether Pajemola was staying within the terms of the authorized use of the plaintiffs' source code. (Tr. Dec. 10, 2015, at 734:6-11). As a result of Maxim's failure to adequately safeguard the plaintiffs' intellectual property, the plaintiffs suffered damages.

## V.    TORTIOUS INTERFERENCE

By developing a competing product to that of the plaintiffs, the Maxim Defendants tortiously interfered with various business expectancies that the plaintiffs had. In order to prevail on a claim of tortious interference, a plaintiff must establish that "(1) a business relationship existed between the [plaintiff] and [a third party]; (2) the defendant intentionally interfered with that business relationship while knowing of its existence; and (3) the [plaintiff] suffered an actual loss as a result of that interference. *Collins v. Anthem Health Plans, Inc.*, 275 Conn. 309, 880 A.2d 106 (Conn. 2005)(*citing Solomon v. Aberman*, 196 Conn. 359, 364, 493 A.2d 193 (1985).

As adduced at trial, before the introduction of Field Navigator to the field services industry, the plaintiffs had business relationships with a wide ranging number of regional providers and subcontractors. In fact, before the advent of Field Navigator, the plaintiffs had maintained a corner on the market with their FieldComm software. (Tr. Dec. 7, 2015, at 83:5-10). More specifically, at trial it was established that the plaintiffs maintained ongoing business relationships with A&M Recovery Services and Berghorst Enterprises for the provision of their field services software, FieldComm and subsequently, FieldComm.net. (Tr. Dec. 7, 2015, at 73:13-23).

These relationships were ultimately disrupted and interfered with by the defendants' introduction of the Field Navigator software. As described previously, the defendants wrongfully derived Field Navigator from the plaintiffs' software. They then, not only offered Field Navigator to their subcontractors, but required that they use that product in order to continue doing business. This was software that provided substantially the same service as the plaintiffs' software, with perhaps more features and more functionality. (Tr. Dec. 9, 2015, at 622:13-19; Tr. Dec. 7, 2015, at 160:10-161:9) By unfairly using their insider knowledge of the plaintiffs' business and product, the defendants interfered with the plaintiffs' business relationships and damaged them irreparably.

Moreover, at the time that Berghorst and A&M were taken away from the plaintiffs' system, both Pajemola and Maxim were aware of their business relationship with the plaintiffs.  At the time that Steven Maxim was on the board of directors, he switched his subcontractors over to Field Navigator and away from East Point. (Tr. Dec. 9, 2015, 669:5-21). Further, while on the board of directors, Steven Maxim had full

access to all of the plaintiffs' records, including "the company's books...revenues, [and] sales." (Tr. Dec. 10, 2015, at 727:3-23) Examination of this information would have made it clear to Maxim that both A&M Recovery and Berghorst Enterprises were clients of the plaintiffs. Not only did Maxim have access to the records of the business, but he in fact, had actual knowledge of the plaintiffs' clients while he served on the board of directors.   During his testimony, Maxim admitted that at the time that he proposed providing Field Navigator to A&M Recovery and Berghorst Enterprises, that he was aware that both were clients of the plaintiffs. (See Tr. Dec. 9, 2015, at 626:21-24; Tr. Dec. 10, 2015, at 751:1-8).

As a result of the provision of Field Navigator to subcontractors of East Point Systems, including Berghorst and A&M Recovery, the plaintiffs suffered actual damage. As was developed at trial, both Berghorst and A&M Recovery and their subcontractors switched to Field Navigator, decimating the plaintiffs' revenues. (See e.g. Berghorst Depo. Tr. Feb. 5, 2015, at 48:13-22; Strickland Depo. Tr. Feb. 2, 2015, at 14:12-25,17:1-7). The precise amount of damages suffered because of that loss will be discussed more fully herein.

## VI.    ACTION FOR COMPUTER-RELATED OFFENSE

Connecticut Law provides a private cause of action for computer-related offenses. Conn. Gen. Stat. §52-570b.   Specifically, this statute provides for a civil remedy for violation of the criminal statute contained in Connecticut General Statutes §53a-251. Among other acts, the two statutes acting in conjunction impose liability on an individual if "[a]s a result of his accessing or causing to be accessed a computer

system, [the individual] intentionally makes or causes to be made an unauthorized display [or] disclosure…in any form, of data residing in, communicated by or produced by a computer system

## VII.    Defendants Are Liable Under the Connecticut Unfair Trade Practices Act for Unfairly Copying the Plaintiffs' Software and Using It to Compete

In copying the plaintiffs' source code, without permission, and using it to compete with the plaintiffs in the field services industry, the Maxim Defendants committed an Unfair Trade Practice, actionable under the Connecticut Unfair Trade Practices Act ("CUTPA").   The act provides that, "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Conn. Gen. Stat. §42-110b(a). It is well settled that in determining whether a practice violates CUTPA [the Connecticut Supreme Court has] adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]." *Ulbrich v. Groth*, 310 Conn. 375, 409, 78 A.3d 76 (2013).

"A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA

may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . Furthermore, a party need not prove an intent to deceive to prevail under CUTPA. . . . *Thames River Recycling v. Gallo*, 50 Conn. App. 767, 786, 720 A.2d 242 (1998)(quoting Cheshire Mortgage Service, Inc. v. Montes, 223 Conn. 80, 105-106, 612 A.2d 1130 (1992)." (Citations omitted; internal quotation marks omitted.); Gebbie v. Cadle Co., 49 Conn. App. 265, 278-79, 714 A.2d 678 (1998).

More specifically, "Although purely intracorporate conflicts do not constitute CUTPA violations, actions…designed 'to usurp business and clientele of one corporation in favor of another . . . fit squarely within the provenance of CUTPA.' " *Ostrowski v. Avery*, 243 Conn. 355, 379, 703 A.2d 117 (1997)(*quoting Fink v. Golenbock*, 238 Conn. 183, 212, 680 A.2d 1243 (1996). Connecticut courts have repeatedly invoked CUTPA as applying to claims involving board members where said members' actions go "beyond governance of the corporation," and place them "in direct competition with the interests of the corporation." *Fink*, 238 Conn. at 212.

As previously discussed, with relation to the plaintiffs' claims for breach of contract, the defendants' development and marketing of Field Navigator placed Maxim squarely in competition with the plaintiffs. While the nature of the defendants' actions of unfair copying and unscrupulous competition with the plaintiffs' has been set forth in detail in preceding sections, the manner in which the defendants carried out these deeds further implicates how the defendants' actions were immoral, unethical, oppressive, and unscrupulous.  Everything about the way that the defendants carried out the development and deployment of Field Navigator was clandestine and indicative

20

of an improper purpose. First, from the record it is apparent that Maxim was aware of the fact that his Field Navigator program might infringe on the intellectual property rights of the plaintiffs. At trial, Maxim admitted to seeking a legal opinion from an attorney about whether he and his employees had copied enough elements of East Point's code to by liable for copyright infringement. (Tr. Dec. 9, 2015, at 592:5-9).

In addition to his knowledge that there was concern that the Field Navigator code infringed on the plaintiffs' intellectual property, Maxim also kept the development and deployment of Field Navigator a secret from the plaintiffs. Further, Maxim never disclosed to the plaintiffs that he planned to give access to Field Navigator as part of a plan to work with and possibly purchase A&M Recovery, a company that Maxim knew to be a client of the plaintiffs. (Tr. Dec. 9, 2015, at 659:20-660:21). Had Maxim's actions been legitimate, there would have been no need to keep them a secret.

## VIII.   Defendants are liable for infringement of plaintiff's copyrighted software

It was established at trial that plaintiff EPS was the owner and copyright holder of the FieldCom database software. See certified registration certificate copyright trial Exhibit, 7; testimony of Thomas Margarido (Tr. Dec. 7, 2015, at 179:8-180:8) The evidence at trial was undisputed that EPS developed, marked and sold the FieldComm product at great expense following years' of time and effort.  EPS was successful in selling its FieldComm software in the marketplace to a number of customers including Maxim Enterprises, A&M Recovery and Berghorst Industries. (Tr. Dec. 7, 2015, at 73:13-23; Berghorst Depo. Tr. Feb. 5, 2015, at 30:11-18; Strickland Depo. Tr. Feb. 2, 2015, at 24:6-24).

The evidence was also undisputed at trial that Maxim and Pajemola were given access to the, data base, computer source code, file names, data tables, as well as features under development. (Tr. Dec. 7, 2015, at 127:16-129:13; Tr. Dec. 9, 2015, at 416:24-417:7) By contract, the defendants were granted a limited license by EPS to use the software only in Maxim's operation.   Sale to competitors was expressly prohibited and EPS was to own any derivative works. (Confidentiality Agreements, Exhibits 2, 3).

The evidence in the record clearly established that substantial portions of EPS computer code, database tables, file names, were copied by defendants to enable the competing product Field Navigator to work. In fact defendants' own computer expert, Gregory Kelley conceded that substantial portions of Field Navigator were copied exactly from the EPS software. (Exhibit 22; Tr. Dec. 8, 2015, at 330:16-332:8). Further, Maxim formed his own "software company" Maxim Field Services after directing Pajemola to copy EPS code so that data could easily be moved from EPS' product to Field Navigator. (Tr. Dec. 10, 2015, at 739:1-21).

Plaintiff's computer expert, John Morgan conducted a forensic examination of the Field Navigator product source code and confirmed that it was substantially similar to FieldComm and included many sections that were copied exactly. (Exhibit 22; Tr. Dec. 10, 2015, at 292:6-296:22). Further, the plaintiffs' expert Morgan confirmed after examining both products, that defendants copied the heart of the EPS program, its unique table structures and file naming protocols all of which embodied the essence of FieldComm. (Exhibit 22; Tr. Dec. 10, 2015, at 286:8-296:22, 312:19-313:20) It bears emphasis that both experts agreed that the source code for Field Navigator's the graphic user interface or "GUI" was different from FieldComm.  This is due the fact that

Field Navigator displays its search results over an internet based platform. This fact does not diminish or affect EPS's copyright claims.

It is well established that both computer programs and database compilations are copyrightable. *Computer Associates International, Inc. v. Altai, Inc., 982 F.2d 693, 706 (*2d Cir. 1992*).  Key Publications, Inc. v. Chinatown Today Publishing Enterprises Inc.*, 945 F.2d 509 (2d Cir. 1991); With respect to computer programs, in the Second Circuit, the court uses the three-part abstraction-filtration-comparison analysis developed in *Altai, Inc., 982 F.2d at 706 (*2d Cir. 1992*)*. That complex analysis was later summarized in *Softel, Inc. v. Dragon Med. & Sci. Communs.*, 118 F.3d 955, 963 (2d Cir. 1997)(internal citations omitted):

We have prescribed an "abstraction-filtration-comparison" method of analysis for determining whether a program has been infringed. Under this analysis, the allegedly infringed program is first broken down and examined at varying levels of abstraction. Second, the allegedly infringed program is "filtered" at each level of abstraction through various copyright doctrines that deny protection to certain types of materials.  For example, the *scene a faire* doctrine denies protection to program elements that are dictated by external factors such as "the mechanical specifications of the computer on which a particular program is intended to run" or "widely accepted programming practices within the computer industry." Third, the resulting protectable expression is compared with the allegedly infringing program. … "An allegation of infringement based on similarities in architecture cannot be ignored merely because many or all of the design elements that make up that architecture are not protectable when considered at a lower level of abstraction." Id.

Thus, in the present case, the fact that both experts confirmed copying of uniquely named files as well as organizational structure and architecture of data tables together with substantial similarity in the data model all suffice to establish the requisite evidence of copyright infringement. Moreover, plaintiffs have established intentional and willful violation of the copyright act such that multiple damages and attorneys' fees should be awarded.

**IX.   CONNECTICUT UNIFORM TRADE SECRETS ACT**

A plaintiff may "recover damages for actual loss caused by misappropriation…[or]…for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss." Conn. Gen. Stat. §35-53(a). Under the Connecticut Uniform Trade Secrets Act, "Misappropriation" is defined as, the "disclosure or use of a trade secret of another without express or implied consent by a person who…at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was…acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Conn. Gen. Stat. § 35-51(b).  A Trade Secrets, protected by the Act is "information, including a formula, pattern, compilation, ***program***, device, method, technique, process, drawing, cost data or ***customer list*** that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts

that are reasonable under the circumstances to maintain its secrecy." Conn. Gen. Stat. §35-51b.

The database source code, associated with the plaintiffs' FieldComm products is protected under this Act.  The source code, contained within the plaintiffs' database included the type of "program" and "customer lists" specifically protected under the act. Further, it is clear both that the plaintiffs' derived economic value from keeping it secret and that others gaining access to it would gain economic value. As was shown at trial, the plaintiffs originally cornered the market in their sector of the field services industry, through the use of their FieldComm software. (Tr. Dec. 7, 2015, at 79:9-11.  Plaintiffs' expert further testified that the database source code was the most important component of the software. (Tr. Dec. 8, 2015, at 309:12-21)  Once the database source code was no longer secret and used in a competing product, the plaintiffs suffered significant financial losses. Furthermore, it was clearly shown that Edwin Pajemola did in fact derive financial gain from eventually developing and marketing the derivative Field Navigator software. (Pajemola Depo. Tr. Jan. 6, 2014, at 118:4-16)

In addition to the value of the source code's secrecy, the plaintiffs took reasonable precautions to maintaining its secrecy. Although they disclosed the database source code to both Maxim and Pajemola, the plaintiffs did execute associated agreements limiting further disclosure and improper use. (Exhibits 2, 3, 5, and 6).

Because it was a trade secret, Maxim's use of the plaintiffs' code violated the Act. Prior to using the plaintiffs' source code to compete with them, the Maxim

Defendants had executed agreements whereby they acknowledged that the information that they were given was to be kept secret, and not to be used in competition with the plaintiffs. (Exhibit 2, at §1-2; Exhibit 3, at §1-2; Exhibit 5, at §3.0). Further, the defendants were not only bound to keep the source code secret by these agreements, but they were also, never given permission to use said code to compete with the plaintiffs by offering it to subcontractors at the rate of 1% of all revenues. By doing so, the defendants violated the Connecticut Uniform Trade Secrets Act and are liable to the plaintiffs for damages.

## X.    DAMAGES

Proof of damages "should be established with reasonable certainty and not speculatively and problematically." *Leisure Resort Tech., Inc. v. Trading Cove Assocs*., 277 Conn. 21, 35 889 A.2d 785 (2006) (quoting Johnson v. Flammia, 169 Conn. 491, 500, 363 A.2d 1048 (1975)). Damages for lost profits are recoverable to "the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty. *Beverly Hills Concepts v. Schatz & Schatz*, 247 Conn. 48, 69, 717 A.2d 724 (1998). "The law does not require that lost profits be proven with absolute certainty but only with such reasonable certainty that damages are not based wholly upon speculation and conjecture." *Benvenuti Oil Co. v. Foss Consultants, Inc.*, CV01-0485270-S, 2006 Conn. Super. LEXIS 238, at *41 (Conn. Super. Ct. Jan. 25, 2006); *S. New Eng. Tel. Co. v. Jeffrey Coho*, 2006 Conn. Super. LEXIS 2881, at *29 (Conn. Super. Ct. Sept. 27, 2006)(both quoting 22 Am.Jur.2d Damages, §444 (2004).

At trial, these damages were established primarily by part-owner of East Point Systems, Paul Taff, who testified that as a direct result of A&M Recovery and Berghorst Enterprises changing to Field Navigator, East Point Systems lost $59,688.17 and $152,040.95 from them, respectively. (Tr. Dec. 9, 2015, at 492:4, 501:18-21). As an owner, Taff was qualified to testify to those amounts. See *Securitron Magnalock v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995). Despite some uncertainty as to methods, Taff was reasonably certain of the amount of damages, and as such makes it more probable than not that they are correct. Because absolute certainty is not required, Taff's opinion is sufficient to establish compensatory damages. Additionally, Taff's summary of damages was reasonable in light of the testimony of Pajemola, that from usurping those opportunities, he was able to make approximately $300,000 from the A&M Recovery during a similar period. (Pajemola Depo. Tr. Jan. 6, 2014, at 97:6-97:17).

The plaintiffs in this case, are also entitled to recover for consequential damages pursuant to the breaches of contract contained within the first six counts of the plaintiff's verified complaint. Traditionally, consequential damages include "any loss that 'may fairly and reasonably be considered [as] arising naturally, i.e., according to the usual course of things, from such breach of contract itself.'" *Ambrogio v. Beaver Rd. Assocs.*, 267 Conn. 148, 155, 836 A.2d 1183, (Conn. 2003)(*quoting West Haven Sound Development Corp. v. West Haven*, 201 Conn. 305, 319, 514 A.2d 734 (1986)(internal quotations omitted).

In the present case, the plaintiffs are entitled, at common law, to recover their costs of litigation of this matter, less taxable costs, as punitive damages against the

defendants. The plaintiffs are so entitled because the defendants are liable under the aforementioned causes of action and such violations were caused by the reckless indifference to the rights of others or an intentional wanton violation of those rights. *Label Systems Corp v. Aghamohammadi*, 270 Conn. 291, 335, 852 A.2d 703 (2004). The common law also provides a basis for punitive damages in a situation such as this. Under Connecticut Law, a plaintiff entitled to punitive damages is entitled to the total cost of the plaintiff's litigation expenses less taxable costs. *See R.I. Pools, Inc. v. Paramount Concrete, Inc.*, 149 Conn. App. 839, 875-76, 89 A.3d 993 (2014); *Anastasia v. General Casualty Co. of Wisconsin*, 307 Conn. 706, 709 n.2, 59 A.3d 207 (2013).

In addition to remedies available at common law for punitive damages, the plaintiffs are also entitled to punitive damages under CUTPA. "[T]he plaintiff who establishes CUTPA liability has access to a remedy far more comprehensive than the simple damages recoverable under common law." *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 656 A.2d 1009 (Conn. 1995). Punitive damages under CUTPA are not "limited to providing redress only for [plaintiffs] who can put a precise dollars and cents figure on their loss." Hinchliffe v. American Motors Corp., 184 Conn. 607, 617, 440 A.2d 810 (Conn. 1981). Much like under common law, punitive damages may be awarded under CUTPA if the evidence "reveal[s] a reckless indifference to the rights of others or an intentional and wanton violation of those rights. *Fairchild Heights Residents Ass'n v. Fairchild Heights, Inc.*, 310 Conn. 797, 825 82 A.3d 602 (2014). In determining punitive damages under CUTPA, a court should also consider the degree of relative blameworthiness, whether the defendant's action was taken to maximize profit, whether the wrongdoing was difficult to detect, the extent of the plaintiff's injuries, the amount of

compensatory damages awarded, and whether the punitive damages award would deter the defendant and others from similar conduct, without financially destroying the defendant. *Id* (*citing Ulbrich v. Groth*, 310 Conn. 375, 454, 78 A.3d 76 (2013).

### a.  Damages as to Edwin Pajemola

The plaintiffs submit that they are entitled to damages against Edwin Pajemola, who as previously been defaulted for the causes of action against him. The plaintiffs seek that he be held joint and severally liable for the damages caused to the plaintiffs for his actions in concert with the Maxim Defendants and otherwise. The evidence adduced at trial showed that Pajemola is liable for punitive damages on the counts for which he was defaulted. The evidence clearly showed the type of willful and wanton actions on Pajemola's part that justify such a reward. This was exemplified by Pajemola's belief that he owned the source code to Field Navigator. (Pajemola Depo. Tr. Jan. 6, 2014, at 72:16-25). The malicious nature of Pajemola's conduct is further belied by  his ultimate betrayal of his accomplice, Steven Maxim. Once he saw fit, Pajemola locked Maxim out from access to the Field Navigator source code and began selling the product on his own. (Tr. Dec. 9, 2015, at 691:24-692:9). Based on the previous factual recitations and these indications of Pajemola's intent, the plaintiffs respectfully request that the court exercise its discretion in awarding punitive damages.


WHEREFORE Plaintiffs respectfully request this Honorable Court grant relief on all counts of the plaintiffs' verified complaint, and award compensatory, consequential, and punitive damages in addition to attorney's fees and costs.

Date:  February 3, 2015                    By: /s/ Bruce H. Raymond
                                           Bruce H. Raymond ct04981
                                           Raymond Law Group LLC
                                           90 National Drive, Suite 3
                                           Glastonbury, CT 06033
                                           P: 860-633-0580
                                           F: 860-633-0438
                                           raymond@raymondlawgroup.com
                                           Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date a copy of foregoing pleading was filed electronically

and served by mail on anyone unable to accept electronic filing. Notice of this filing will

be sent by e-mail to all parties by operation of the court's electronic filing system or by

mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic

Filing. Parties may access this filing through the court's CM/ECF System.

And by MAIL TO

Edwin Pajemola
4223 Morely Drive
Reminderville, OH 44202

Cleveland Field Systems, LLC
4223 Morely Drive
Reminderville, OH 44202

_____/s/_____

Bruce H. Raymond

A  Neutral
As of: February 3, 2016 9:11 PM EST

# S. New Eng. Tel. Co. v. Jeffrey Coho dba Kamco Florists

Superior Court of Connecticut, Judicial District of New Haven, at New Haven

September 27, 2006, Decided ; September 27, 2006, Filed

CV030476159S

### Reporter

2006 Conn. Super. LEXIS 2881

Southern New England Telephone Company v. Jeffrey Coho dba Kamco Florists et al.

**Notice: [*1]** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**Prior History:** *Southern New Eng. Tel. Co. v. Coho, 2005 Conn. Super. LEXIS 2884 (Conn. Super. Ct., Oct. 28, 2005)*

## Core Terms

advertising, heading, damages, lost profits, directories, casket, Funeral, funeral directors, florist, yellow pages, Contracts, modification, appears, Plans, Prearranged, expenses, listing, parties, says, funeral home, profits, calculated, brush, Supplies, licensed, services, box, sales representative, claim for damages, no evidence

## Case Summary

### Procedural Posture

Plaintiff telephone company brought suit against defendant advertiser to collect money owed for advertising placed in telephone books. The advertiser filed a counterclaim for breach of contract.

### Overview

The advertiser, a florist, also sold caskets. The court stated that based on the evidence before it, it could not find that the advertiser had assented to the headings under which certain ads were placed. Therefore, there had been partial performance by the telephone company, which was entitled to recover the value of the benefit incurred. Next, in his counterclaim, the advertiser argued that the telephone company had breached the contract by listing his business under "Funeral Directors Equipment and Supplies" instead of "Funeral Plans Prearranged." The court stated that as the advertiser was not a licensed funeral director, permitting him to advertise under the latter heading would violate public policy as embodied in *Conn. Gen. Stat. § 42-201*. Moreover, the ad itself had been approved by the advertiser and was more prominent than the heading, and it reached the public the advertiser sought to reach; thus, any award of damages would be entirely speculative. Even if the lost profit claim was squarely before the court, the advertiser had not proven it. There was no successful history of prior sales, and no expert testimony on market conditions and prospects had been offered.

### Outcome

The court awarded the telephone company $7,439.90 on its claim. The court denied recovery on the counterclaim.

## LexisNexis® Headnotes

Contracts Law > Contract Modifications > General Overview

*HN1* The parties may validly agree to substitute or materially change a contract, but as required in originally making it, mutual assent to its meaning and conditions is necessary. They must assent to the same thing in the same sense if they are to vary the contract in any way after it has been executed; a written contract can be modified by a subsequent parol agreement if that is the intention of the parties because the parties to a written contract retain the power to alter or vary or discharge any of its provisions by a subsequent agreement. For modifications of a contract to be enforceable there must be new consideration. Mutual promises qualify as sufficient consideration for a binding contract; however,

for a valid modification, there must be mutual assent to the meaning and conditions of the modification.

Contracts Law > Contract Modifications > General Overview

*HN2* A modification under a contract not fully performed on either side is binding if the modification is fair and equitable in view of circumstances not anticipated by the parties when the contract was made. This does not seem to require consideration for "fair and equitable" modifications for the evident reason that such modification would often occur at or near the time of contract formation when there are ongoing transactions between the parties.

Contracts Law > Standards of Performance > Partial Performance > General Overview

*HN3* Connecticut appears to follow the general rule that although there are exceptions, partial performance of an entire and indivisible contract by one of the parties does not entitle that party to performance of the contract by the other party or to recovery on the contract. However, there is considerable authority supporting a recovery of the value of the benefit occurred even though a party who has only partially performed cannot prevail in an action on the price.

Healthcare Law > Medical Treatment > Human Remains > Duties of Funeral Providers

*HN4* See *Conn. Gen. Stat. § 42-200*.

Healthcare Law > Medical Treatment > Human Remains > Duties of Funeral Providers

*HN5* See *Conn. Gen. Stat. § 42-201*.

Healthcare Law > Medical Treatment > Human Remains > Duties of Funeral Providers

*HN6* *Conn. Gen. Stat. § 42-200* makes no distinction between oral and written contracts. In other words, the statutes seem to say that if you have a situation where the final disposition of a body presents itself as a "funeral service contract" involves the furnishing of funeral type merchandise where the merchandise is not required immediately, that is the type of preplanning that is not permissible without a license. To blanketly permit an unlicensed person as defined in *Conn. Gen. Stat. § 42-201* to engage in such transactions and to enable such trade by advertising of course violates the statute.

Healthcare Law > Medical Treatment > Human Remains > Duties of Funeral Providers

*HN7* The state has an important interest in regulating the funeral industry; it is a time where consumers in the market place are peculiarly vulnerable.

Civil Procedure > Remedies > Damages > Compensatory Damages

*HN8* Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty. A court must have evidence by which it can calculate the damages which is not merely subjective or speculative but which allows for some objective ascertainment of the amount.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

*HN9* A lost profit claim falls within the definition of "contract damages."

Contracts Law > ... > Types of Damages > Compensatory Damages > General Overview

*HN10* Contract damages are ordinarily based on the injured party's expectation interest and are intended to give it the benefit of its bargain, by awarding the injured party a sum of money, that will, to the extent possible, put it in as good a position as it would have been had the contract been performed.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

*HN11* It has been said specifically with regards to lost profit claims that such claims are permitted only if the profits were reasonably within the contemplation of the defaulting party at the time the contract was made. On the other hand, nearly all commercial contracts are entered into in contemplation of future profits. Thus, if profit is an inducement to making a contract, a loss of profits as a result of the breach of that contract is generally considered to be within the contemplation of the parties and recovery of lost profits will be allowed as damages if causation is proved with reasonable certainty.

Civil Procedure > Remedies > Damages > Compensatory Damages

*HN12* Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.

2006 Conn. Super. LEXIS 2881, *1

Contracts Law > ... > Types of Damages > Compensatory Damages > General Overview

*HN13* In calculating damages, doubts are generally resolved against the party in breach. A party who has by its breach forced the third party to seek compensation in damages should not be allowed to profit from its breach where it is established that a significant loss has occurred. A court may take into account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty giving greater discretion to the trier of fact. Damages need not be calculable with mathematical accuracy and are often at best approximate.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

*HN14* If the wrongful act of the defendant prevents determination of the exact amount of damages, the defendant is not allowed to insist on absolute certainty but only that the evidence show the lost profits by reasonable inference.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

*HN15* Lost profits need not be established with certainty, but evidence of lost profits must be based upon objective data from which the loss can be determined with a reasonable degree of exactness.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

*HN16* In order to recover lost profits, a plaintiff must present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty. The law does not require that lost profits be proven with absolute certainty but only with such reasonable certainty that damages are not based wholly upon speculation and conjecture.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

*HN17* When the courts speak of lost profit calculations, they of course talk in terms of net profits.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

*HN18* To establish lost profits, a claimant must show business revenue as well as expenses.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

*HN19* "Profits" have been defined as the net pecuniary gain from a transaction, the gross pecuniary gains diminished by the cost of obtaining them. Simply put, net profits are what remains after a business deducts expenses.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

*HN20* In trying to calculate lost profits, the Supreme Court of Connecticut has permitted lost profits to be calculated by extrapolating from past profits. One would imagine that the corollary of this is also true--failure to show profit must have some bearing on the ability to earn future profits. A plaintiff must demonstrate those lost net profits by offering proof of the income and expenses of the business for a reasonable time anterior to its interruption with a consequent establishing of the net profits during the previous period. Put simply, to show that it lost profits, the plaintiff must first show that it was previously earning profits.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Avoidable Consequences

*HN21* In a contract action a party claiming breach has a duty to mitigate damages and must make reasonable efforts to do so; also, the party who has breached bears the burden of proving that the other party has failed to mitigate damages. If a court determines no such reasonable efforts were made the damage award will be reduced by the amount that could have been avoided.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > General Overview

*HN22* Conn. Gen. Prac. Book, R. Super. Ct. § 10-3(a) requires a defendant to plead a statute that he is relying on in a special defense.

Contracts Law > Defenses > Affirmative Defenses > Statute of Limitations

*HN23* *Conn. Gen. Stat. § 52-576* provides for a six-year statute of limitations.

Contracts Law > Defenses > Affirmative Defenses > Statute of Limitations

Contracts Law > Types of Contracts > Executory Contracts

2006 Conn. Super. LEXIS 2881, *1

*HN24* *Conn. Gen. Stat. § 52-581* provides for a three-year statute of limitations for actions based on an oral contract. *Conn. Gen. Stat. § 52-576* says that no action for an account, or on any simple or implied contract, or on any contract in writing shall be brought but within six years after the right of action accrues. It has been held that the predecessor statute to *Conn. Gen. Stat. § 52-581* applied to executory contracts, which have been defined as a contract to be performed, each party having bound himself to do or not to do a particular thing.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > General Overview

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Strike > General Overview

*HN25* A special defense cannot be used in lieu of a motion to strike to challenge the complaint's sufficiency.

Civil Procedure > Pleading & Practice > General Overview

Civil Procedure > Remedies > General Overview

Evidence > Burdens of Proof > General Overview

*HN26* The burden is on the party claiming setoff to prove it. Any setoff is a debt independent of the action sued upon.

**Judges:** Thomas J. Corradino, Judge.

**Opinion by:** Thomas J. Corradino

# Opinion

*MEMORANDUM OF DECISION*

(A.)

This case involves a claim by the Southern New England Telephone Company (SNETCO) for unpaid advertising placed in the company's phone books. The defendant Jeffrey Coho denies this claim by arguing that SNETCO breached the contract it had with him for the advertising as to certain yellow page directories. He also maintains that at trial SNETCO never established the amount it claims he owed for the advertising it placed in its yellow pages.

Mr. Coho also brings a counterclaim against SNETCO. He argues that by breaching the contract for advertising

on 1999-2000 books he lost business which he would have garnered if the correct advertising was put in the phone books. As will be discussed much of the dispute centers on the wording in the original contract document signed by Coho for the heading to his business and the heading actually put in the phone books. Mr. Coho also argues that the advertising put into the 1999-2000 phone book **[*2]** misstated the actual nature of his business.

Mr. Coho at first ran a florist business out of his home; he then decided to sell caskets. He claims he competed directly with funeral directors and wished to sell directly to the public and could offer caskets at a price much lower than funeral homes could. He ran this casket aspect of his business out of a furnished basement room. He also offered for sale crosses, urns, cards, and rosary beads.

SNETCO makes a claim for advertising for Mr. Coho's florist business in the years 1997-1998, and in the 1998-1999 Manchester book. In November 1998 a SNETCO agent and Mr. Coho signed a contract for florist and casket advertising in several 1999-20000 yellow page directories. The court will describe the casket showroom advertising which actually ran in the 1999-2000 SNET yellow pages for the Hartford, Glastonbury, and Manchester/Rockville phone books. From the towns listed on these books which were introduced as exhibits it can be seen that they were distributed over a fairly wide area of north central Connecticut. Mr. Coho ran his business as Kamco Florists and Kamco Caskets Showroom. Mr. Coho had advertising for his florist business in the 1997-1998, 1998-1999, and **[*3]** 1999-2000 SNET Manchester and South Windsor-East Hartford yellow pages and the 1999-2000 Manchester white pages directory. There appears to be no dispute as to the contents or placement of the florist advertisement yellow page advertisements.

As noted the litigated dispute centers on the heading and ad placed in the 1999-2000 books for his casket business. The court will try to describe these advertisements.

All three books have a square box in which is written "Funeral Directors Equipment and Supplies." Beneath this small box it has only one listing which is for Kamco and each one says:

Kamco Casket & Showroom 1670 Ellington Rd, South Windsor (with the phone number on the same line as the address).

2006 Conn. Super. LEXIS 2881, *3

Beneath this information it says (SEE ADVERTISEMENT THIS PAGE) in caps. Two of the books have the foregoing information in bright red print.

The actual picture advertisement is the same for each three books and they all appear prominently on the top of their respective pages. One of the advertisements is in black and white, two have coloring - Manchester/Rockville and Hartford.

All three on the top line in large type say "Kamco Caskets Showroom." Immediately below that are **[*4]** what might be described as two separated four-line statements. The one on the left which is in color in Manchester/Rockville and Hartford say in the following format with the same large type size:

> Funeral Directors
>
> Welcome to Inquire
>
> About All
>
> Wholesale Products

To the right and to the opposite of this in block print in all three books appears the following:

> TO THE GENERAL PUBLIC
>
> At 1/2 of what the Funeral Homes charge
>
> with no sacrifice of quality or dignity
>
> Mahogany Finished Casket $ 1600

The first line is in large type, slightly larger than the just discussed language aimed at funeral directors.

Below these two statements in large black lettering with each word preceded by a black square in three lines are the words Caskets, Crosses, Urns, Cards, Rosary Beads. At the bottom left of each ad appears Kamco's phone number in large, prominent type with the street address underneath the number.

As a background to all three advertisements over which some of the print is overlaid there appears an open, empty casket which appears to be of wood, the Manchester/Rockville Book is the only one that presents the casket in full color.

It should also **[*5]** be noted that in the Glastonbury book directly beneath the box saying "Funeral Directors Equipment and Supplies" below which Kamco's address and phone number is given is another box in which the words "Funeral Plans-Pre-arranged" appears with one listing underneath for a funeral home. There is no other advertising for this funeral home on this page or any other.

The Manchester/Rockville book also has a box directly beneath the Kamco listing which says "Funeral Plans-Prearranged" with one listing for a funeral home which has no other advertisement on this page or any other.

The Hartford book, directly below the Kamco listing has a box for "Funeral Motor Cars" which says "See also Limousine Service" directly beneath the box with two listings, one in bold red letters but with no other advertising in the book. Directly below this listing is a box with the words "Funeral Plans-Prearranged." There are two listings, both funeral homes neither of which have any other advertising in the yellow pages.

*(B.)*

*SNETCO Claim*

There are two aspects to the plaintiff's claim. One claim appears to be in implied contract for the florist advertising appearing in the two 1997-1998 directories, **[*6]** and the florist advertisement in the 1998-1999 Manchester directory. Mr. Coho does not complain about the nature of the advertisement or deny that he did not have the advertising placed in these directories.

The second aspect of the claim arises out of a November 1998 agreement signed by Mr. Coho and a SNETCO sales representative for advertising in several 1999-2000 yellow page directories. The advertising contemplated was for the florist business and Mr. Coho's desire to sell caskets and funeral merchandise.

First it is necessary to examine the November 12, 1998 agreement between the parties. A sales representative of the plaintiff, Mr. Crouse, came to Mr. Coho's home and place of business to sell advertising space in the company's directories for Coho's florist and casket business. Mr. Crouse was subpoenaed to court to testify; he does not work for the plaintiff any longer, seemed like a candid witness and had no ascertainable reason to engage in falsehoods about the case.

Mr. Crouse could not fully recall the conversation with Coho several years after the fact but he believed Coho wanted to advertise under the title "Funeral homes and

directors" heading. There seems no dispute **[*7]** that Coho was not a licensed funeral director as required by state law so any contract for advertising on that basis would violate public policy, see generally Calamari *On Contracts* "Illegal Bargains," § 22.3 p. 851-53 discussing effect of licensing statutes, 17A Am.Jur.2d "Contracts," §§ 237 et seq., Restatement 2d Contracts, Vol. II, *§ 178, 12 Havemeyer Place Co., LLC v. Gordon, 76 Conn.App. 377, 389, 820 A.2d 299 (2003)*.

Mr. Coho testified that Mr. Crouse suggested the heading "Funeral plans pre-arranged." This would seem to be likely since some of the books introduced into evidence have this every heading for funeral homes and it is not the type of term that one would think the ordinary consumer of advertising services such as Mr. Coho would have on the tip of his tongue. An advertising sales representative would be expected to be aware of the use of such headings in its company's directories.

Interestingly despite Coho's claim that the November 12, 1998 agreement was an integrated contract no objection was made under the parol evidence rule to Crouse's testimony that he or the sales representative he was with, to be more **[*8]** exact, told Mr. Coho that he could not guarantee the heading "funeral plans prearranged" would be placed in the directories. However, this version of events is supported by the very nature of the regular way SNETCO processed these orders. A sales representative like Crouse would not have the authority to finally approve an ad; another SNETCO employee, here Mr. Sanscomb who testified, would have to review the advertising language agreed to in the contracts created by the sales representatives. This makes business sense since there would be a need to insure uniform practice, as to advertisers, compliance with state law and an intelligle format in the advertising process. Mr. Sanscomb who no longer worked for SNETCO at the time of the trial was the Manager of Process and Standards. Another important part of his job was preventing what he called "billboarding." Advertisers must be prevented from publishing under a particular heading where the advertiser does not really provide the product or service represented by that heading. Such a control person as Sanscomb is necessary if advertisers are not given unfair competitive advantage. Mr. Coho never directly contradicted Crouse's statement **[*9]** that during the November 12, 1998 discussions with him Crouse told him the "Funeral plans prearranged" could not be guaranteed.

In any event Mr. Crouse had a so-called "bubble jet printer" with him at the time of the November 12th

meeting and printed out the claimed contract document on the date of the meeting. The document was signed by both Crouse and Coho. It provided for florist advertising in several directories and then had the language "Funeral Plans Prearranged" for several directories. This was the proposed heading under which Mr. Coho's business would be listed. The document is entitled "Advertising Contract" and it also lists the costs of the proposed advertising in some detail. At the end of the document it states: "I the undersigned, hereby represent that I am duly authorized to enter into this contract on behalf of the Advertiser and do approve the above advertising or other agreed services, which I have reviewed in detail via computer display. I agree to pay the amounts shown above. I verify, that I have reviewed, understand, and agree to be bound by the Terms and Conditions as attached to this Advertising Contract." Then there appears the following: "I verify that **[*10]** I have reviewed, understand and agree to be bound by the Terms and Conditions as attached to this Advertising Contract. This contract shall continue until withdrawn or rejected as provided in said Terms and Conditions." The referenced "Terms and Conditions" were not produced by either side so the court cannot weigh the possible bearing of this language on any issue before the court.

Mr. Coho argues he is not obligated to pay for the advertising actually placed in the directories regarding his casket business because it did not comport with the terms of the November 12th contract which was meant to appeal to the general public. The advertising actually published listed his business under the heading "Funeral Directors and Supplies." A clear distinction in the court's mind must be made between three aspects of the advertising placed in the 1999-2000 directories. First there was the florist advertising, then there was the advertising for the casket business (1) the *heading* under which Kamco was listed and (2) the *advertisement* that appeared near the top of the page in each of the 1999-2000 directories.

(1)

The plaintiff of course cannot deny that the advertising regarding the **[*11]** heading under which Kamco Caskets appeared in its directories was not the heading explicitly set forth in the November 12th agreement. It argues, however, that after November 12th and prior to the placement of the ads the parties modified the language as to the heading that was to appear in the directories, that is "Funeral Directors Equipment and Supplies."

2006 Conn. Super. LEXIS 2881, *11

In *Hess v. Dumouchel Paper Co., 154 Conn. 343, 347, 225 A.2d 797 (1966)* the court said **HN1** "The parties may validly agree to substitute or materially change a contract, but as required in originally making it, mutual assent to its meaning and conditions is necessary . . . They must assent to the same thing in the same sense . . . if they are to vary the contract in any way after it has been executed; in *New England Petroleum Corporation v. Groppo, 214 Conn. 444, 572 A.2d 970 (1990)* the court said, quoting from an earlier case: "A written contract can be modified by a subsequent parol agreement if that is the intention of the parties . . . because the parties to a written contract retain the power to alter or vary or discharge any of its provisions by a subsequent agreement." In *Coniglio v. White, 72 Conn.App. 236, 804 A.2d 990 (2002)* **[*12]** at footnote 5 the court said . . ."for modifications of a contract to be enforceable there must be new consideration . . . Mutual promises qualify as sufficient consideration for a binding contract; however, for a valid modification, there must be mutual assent to the meaning and conditions of the modification," see also *Harris Calorific Sales Co. v. Manifold Systems, Inc., 18 Conn.App. 559, 563, 559 A.2d 241 (1989)*. The *Restatement (2d) Contracts, § 89* takes a more liberal view. Saying that **HN2** a modification "under a contract not fully performed on either side is binding (a) if the modification is fair and equitable in view of circumstances not anticipated by the parties when the contract was made"; comment (a) does not seem to require consideration for "fair and equitable" modifications for the evident reason that such modification would often occur at or near the time of contract formation when there are ongoing transactions between the parties, cf. 17A Am.Jur.2d "Contracts," § 511, p. 483-85. Neither side specifically addressed the consideration issue as a prerequisite for modification.

In **[*13]** any event the court will try to discuss the facts on which a modification claim can be based. Mr. Crouse testified that after November 12th discussions were had at SNETCO about the heading. Mr. Sanscomb testified that he decided Mr. Coho could not advertise his business under the heading "Funeral Plans Prearranged." Mr. Crouse told Mr. Coho of the decision; Coho was quite upset apparently and said that he would sue because he had a contract, signed on November 12th, which provided for the heading "Funeral Plans Prearranged."

As to the advertisement at the top of each page the facts become quite convoluted. Mr. Crouse had memory problems as to the conversations with Mr. Coho but his

testimony was that Mr. Coho agreed to the proposed ads after meeting with Coho and discussing their contents. The copy sheet (Ex. 12) sets forth, according to Crouse the result of their conversation but it was not signed by Mr. Coho. Mr. Coho testified that he adamantly opposed the heading of "Funeral Directors Supplies and Equipment" but interestingly at a deposition said that as to the ads he would just wait and see what they looked like before taking a position which can certainly be considered a party **[*14]** admission. *O'Brien v. John Hancock Mutual Life Ins. Co., 143 Conn. 25, 29-30, 119 A.2d 329 (1955)*, Evidence Code *§ 8-3(1)(A)*. In fact there is every reason for the court to conclude that the ads were in fact approved by Coho. They are located in a prime position near the top of the page. In the upper right hand corner in bold letters there is a sales pitch "To the General Public." Their very content indicates Mr. Coho gave input on the nature of the ads. Where would a SNET sales representatives have garnered the information that he sold caskets at half the price of funeral homes or that, as the ad says, a member of the public could get a mahogany casket for $ 1600. The details that Kamco offered in addition to caskets "crosses, wins, cards, and rosary beads" could hardly have been expected to come from information supplied at the November 12th Crouse-Coho encounter which seemed to have dealt with the heading to be used. In fact the placement on the left of the ad directed to funeral directors "about all wholesale products" can hardly be said to have diluted the sales pitch to the public despite the fact that Mr. Coho testified and the **[*15]** court agrees that he was in competition with funeral directors and did not engage generally in the business of selling to funeral directors. In fact because he advertised selling to funeral directors at wholesale this would impress the public by convincing them they must be getting a good deal if they bought from Kamco.

Perhaps oddly, the parties did not directly address separately the fact that the services to be provided Kamco were, as noted, # 1 the heading and # 2 the display ad and nor did they discuss what legal effect this might have on the modification of contract argument and SNETCO's damage claim.

(2)

The November 12, 1998 document talking about "Funeral Plans Prearranged" appears to have encompassed the heading *and* the ad which is referred to as "display ad" in that document. The language in the document for "Funeral Plans Prearranged" is "DBL

Quarter Column + 1 Color Display." On the basis of this record the court finds it difficult to conclude Mr. Coho assented to the heading "Funeral Directors Supplies and Equipment" and that there was mutual assent as to the oral modification of the contract as to the heading; see cases cited on prerequisites of oral modification.

[*16]   The fact that the copy ad which the court concludes he did agree to have run contains in a small box at the top of the first page "Heading Funeral Directors Equipment Supplies" in Crouse's handwriting when the document was not signed by Coho does not convince the court Coho had a change of heart in this regard when he approved the ad and agreed to this heading.

The court concludes that there was partial performance by SNETCO. In this case, *HN3* Connecticut appears to follow the general rule that although there are exceptions "partial performance of an entire and indivisible contract by one of the parties does not entitle that party to performance of the contract by the other party or to recovery on the contract . . . However, there is considerable authority supporting a recovery of the value of the benefit occurred even though a party who has only partially performed cannot prevail in an action on the price." "Contracts" 17 Am.Jur.2d § 621 p. 579-80; *Weinstein v. Mutual Trust Life Ins. Co., 119 Conn. 654, 166 A. 63 (1933)*; *Vines v. Orchard Hills, Inc., 181 Conn. 501, 505, 435 A.2d 1022 (1980)*.

The court will now discuss the damage claim of SNETCO [*17]  for the 1997-1998 florist advertising in the South Windsor--East Hartford books and the 1998-1999 florist advertising in the Manchester directory. Apart from a statute of limitations defense Mr. Coho does not directly dispute these bills for the content, quality or location of the advertising. On this aspect of the SNETCO claim the court concludes Mr. Coho owes the plaintiff $ 3,509.90. As to the 1999-2000 directories Mr. Coho should pay SNETCO for the bold listing in the Manchester white pages and the 1999-2000 florist ad in the South Windsor directory. These two matters come to a total of $ 666.

As to the casket advertising in the 1999-2000 Glastonbury, Hartford and Manchester yellow pages the court, as noted, has concluded that it cannot find Mr. Coho assented to the "Funeral Directors Equipment and Supplies" heading. Therefore it concludes Mr. Coho should have to pay only 1/2 of the charge for the 1999-2000 ads in the Glastonbury and Hartford yellow pages or $ 2,034 since the court assumes he was charged for the heading which appears on the same page as the display advertisement. The court has decided the display advertisement does contain language aimed at funeral directors but [*18]  this does not dilute the prominent position of the ad as it is directed to the general public and for the reasons stated may enhance its appeal.

As to the 1999-2000 charge for the Manchester directory the court concludes Mr. Coho should pay for the florist advertising and the display advertisement but not the heading which appears on the same page as the advertisement and concludes that portion of the debt is $ 1330. [1]

[*19]   The court awards $ 7,439.90 on the SNETCO claim.

(C.)

The court will now discuss Mr. Coho's claim against SNETCO regarding the 1999-2000 directory. The court has difficulties with the defendant's claim against SNETCO on both on the basis of liability and the request for damages.

Mr. Coho relies on his claim that SNETCO breached his November 12, 1998 agreement by failing to present his business as one of "Funeral Plans Prearranged." Both sides spent much time and energy over the nuances of whether in fact Mr. Coho's activities violated state regulations. Defense counsel at trial and in his brief argued that nothing in state or federal law prohibited Mr. Coho from conducting his business the way he had been and under the foregoing heading. The Federal Trade Commission per a consumer guide introduced

---

1   The defendant introduced into evidence a letter from a SNETCO collection manager which indicated in 1999 or 2000 the yellow page account balance had been carried in the telephone account but had recently been moved to a "Yellow Page Bill." That letter makes clear what the changes were for unpaid Yellow Page Advertising which does not differ substantially from Mr. Dauria's trial testimony as to the amount Mr. Coho currently owes. Mr. Dauria is a service specialist for credit and collections. The defendant's brief also states Dauria could not ascertain "what portions of payments made by Mr. Coho were directed to yellow pages versus telephone charges." But no evidence was introduced by Mr. Coho of what if any payments were made by him and when and the foregoing statement cannot be used to indicated Coho was being sued in this case for telephone bill charges.

2006 Conn. Super. LEXIS 2881, *19

into evidence encourages people and families to engage in "funeral planning" under a section identified as "Pre Need." But the booklet notes that the states have licensing boards regulating the funeral industry. At another point the booklet acknowledges that "Laws of individual states govern the prepayment of funeral goods and services."

We have two statutes, *§ 42-200* and *§ 42-201* which **[*20]** stated as follows at the time of contract formation:

*Section 42-200*

> **HN4** For the purposes of this section and sections 42-201 to 42-206c, inclusive, "*funeral service contract"* means a contract which requires the payment of money or the delivery of securities in exchange for the final disposition of a dead human body, including funeral, burial or other services, *or the furnishing of personal property or funeral merchandise in connection with any such disposition, wherein the use or delivery of such services, property or merchandise is not required immediately."* (Emphasis added.)

*Section 42-201*

> **HN5** No person, firm or corporation shall enter into a funeral service contract to provide such services, property or merchandise unless such person, firm or corporation is licensed in accordance with the provisions of chapter 385. No person may arrange, promote or sell any funeral service contract on behalf of a funeral service establishment unless such person is an embalmer or funeral director licensed in accordance with the provisions of chapter 385. Any person who violates the provisions of this section shall be guilty of a class A misdemeanor.

The court would refer **[*21]** to the explicit underlined language of *§ 42-200*. **HN6** The statue makes no distinction between oral and written contracts. In other words, the statutes seem to say that if you have a situation where the final disposition of a body presents itself a "funeral service contract" involves the furnishing of funeral type merchandise where the merchandise is not required immediately that is the type of preplanning that it is not permissible without a license which Mr. Coho did not have. To blanketly permit an unlicensed person as defined in *§ 42-201* to engage in such transactions and to enable such trade by advertising of course violates the statute. But in fact Mr. Coho did in

his business and whether he violated *§ 42-201* because he had no license, which he does not, misses the point. The point is to permit anyone without a license to make such a blanket advertisement would violate the statute and to enforce a breach of contract claim against SNET, even if such a contract claim could be made would violate public policy. A cursory examination of *§ 178 of the Restatement (2d) Contracts section (3)* indicates such a contract would be unenforceable on grounds **[*22]** of public policy. **HN7** The state has an important interest in regulating the funeral industry; it is a time where consumers in the market place are peculiarly vulnerable, refusal to enforce the stated policy would encourage a complete disregard of the law if advertisers were thereby permitted to publish such information to the general public. The very publishing of such an ad by unlicensed actors is the misconduct which would be at issue.

Interestingly in the phone books presented to the court there was a heading for "Funeral Plans Prearranged." But all of the listings under this heading were for funeral homes which presumably had licensed funeral directors operating them.

It is also true that even if SNETCO can be said to have breached its agreement as to the heading and that heading is not unenforceable on the just stated public policy grounds the court has concluded the ad was approved by Mr. Coho and of course it was published. The court described the ad, its contents and location previously. It substantially touted the very business Mr. Coho wanted to engage in and was directed at the very audience he wanted to reach. The fact that the ad was directed and even baselessly directed **[*23]** at funeral directors does not distract from its appeal to the public Coho was interested in reaching. How on earth can the court separately determine the damages that resulted from the failure to place the desired heading in the directories apart from the ad and conclude that certain damages suffered by Mr. Coho were suffered because of the wrong heading which could not be said to have been cancelled or reduced by the ad. The ad was quite effective, certainly more prominent than the heading itself so that any award of damages would be entirely speculative. As said in *Restatement (2a) Contracts, § 352* **HN8** "Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." A "court must have evidence by which it can calculate the damages which is not merely subjective or speculative, but which allows for some objective ascertainment of the amount." *Bronson*

2006 Conn. Super. LEXIS 2881, *23

*& Townsend v. Battistoni, 167 Conn. 321, 326-27, 355 A.2d 299 (1974)*.

But even if the court's position on the two last discussed areas is incorrect and the lost profit claim is squarely before it the court does not believe that such a claim has been proven. First **[*24]** the court will make general remarks in that manner on another case involving a lost profits claim. **HN9** A lost profit claim falls within the definition of "contract damages." In *comment a to § 347 of the Restatement (2d) Contracts* it says that:

> **HN10** Contract damages are ordinarily based on the injured party's expectation interest and are intended to give (it) the benefit of (its) bargain, by awarding (the injured party) a sum of money, that will, to the extent possible, put (it) in as good a position as (it) would have been had the contract been performed.

**HN11** It has been said specifically with regards to lost profit claims that such claims are permitted "only if the profits were reasonably within the contemplation of the defaulting party at the time the contract was made," 22 Am.Jur.2d "Damages," § 448, page 400; *Schonfeld v. Hilliard, 218 F.3d 164, 175 (CA 2, 2000)*. On the other hand "nearly all commercial contracts are entered into in contemplation of future profits," *Krikorian v. Dailey, 171 Va. 16, 197 S.E. 442, 448 (Va. 1938)*. In the above section of Am.Jur. just referred **[*25]** to it says:

> Thus, if profit is an inducement to making a contract, a loss of profits as a result of the breach of that contract is generally considered to be within the contemplation of the parties and recovery of lost profits will be allowed as damages if causation is proved with reasonable certainty.

See *Camino Real Mob. Home Park Partnership v. Wolfe, 119 N.M. 436, 891 P.2d 1190, 1200 (N.M. 1995)* for excellent discussion.

In this case it is clear that profit was an inducement to making the advertising contract.

It is the measuring of lost profits that presents the real difficulty. There are first of all various categories of lost profit situations. One type of claim involves lost profits for a new business, *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin, 247 Conn. 48, 63, 717 A.2d 724 (1998)*, long standing businesses can also make a lost profit claim, *Granato v. Benettiere, 5*

*Conn. Cir. Ct. 150, 154, 246 A.2d 901 (1968)*, *Cheryl Terry Enterprises Ltd. v. City of Hartford, 270 Conn. 619, 641, 854 A.2d 1066 (2004)*.

All authorities and cases seem to agree that "measuring unrealized profits entails extensive **[*26]** problems of proof," *Granato at 5 Conn. Cir. Ct. p. 154,* and is "one of the most difficult subjects with which courts have to deal," *id., p. 156*. The governing principle is set forth in *Restatement (2d) Contacts where at § 352* it says:

*§ 352*. Uncertainty as a Limitation on Damages

> **HN12** Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.

The ensuing commentary at page 145 of volume 1 of the Restatement says: "The main impact of the requirement of certainty comes in connection with recovery for lost profits." But then the commentary goes on to add that **HN13** in calculating damages.

Doubts are generally resolved against the party in breach. A party who has by (its) breach, forced the third party to seek compensation in damages should not be allowed to profit from (its) breach where it is established that a *significant* loss has occurred. A court may take into account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty giving greater discretion to the trier of fact. Damages need not be calculable with mathematical **[*27]** accuracy and are often at best approximate.

The problem with the foregoing is that it is premised on the predicate establishment of a "significant loss." How does one decide that? And certainly the broad discretion given to the trial court would not sanction guessing. But it is true that broad statements are made in the commentaries and case law. At § 457, 22 Am.Jur.2d "Damages" says at page 408.

> **HN14** if the wrongful act of the defendant prevents determination of the exact amount of damages, the defendant is not allowed to insist on absolute certainty but only that the evidence show the lost profits by reasonable inference.

*Message Center Management v. Shell Oil Products, 85 Conn.App. 401, 421, 857 A.2d 936 (2004)* cf. *Gilmore v. Cohen, 95 Ariz. 34, 386 P.2d 81, 82 (Ariz. 1963)*,

2006 Conn. Super. LEXIS 2881, *27

*Contemporary Mission, Inc. v. Famous Music Corp.,* 557, F.2d 918, 926 (CA 2, 1977).

But there are qualifications on this just quoted broad language. The *Granoto* case said that in these lost profit cases absolute certainty cannot be required nor could it be obtained but the court went on to say a court cannot resort to a mere guess but (quoting from a commentator), **[*28]** "should be guided by some rational standard"; if the litigant furnishes the best available proof of the amount of loss--the most satisfactory date the situation allows--this would suffice, *5 Conn.Cir. at p. 156-57*; also see *Gilmore v. Cohen, 386 P.2d at page 82*. Where the contract said: "In other words the plaintiff in every case should apply some reasonable basis for computing the amount of damage and must do so with such precision as, from the nature of his (her) claim and the available evidence, is possible." *Gilmore* is a case where the court said doubts as to the extent of injury should be resolved in favor of the innocent party and against the wrong doer. But using the just mentioned reasoning upheld the trial court's denial of a lost profit claim for failure to meet the reasonable certainty test. Thus **HN15** lost profits need not be established with certainty but . . . "evidence of lost profits must be based upon objective data from which the loss can be determined with a reasonable degree of exactness." *Maxvill-Glasco v. Royal Oil, 800 S.W.2d 384, 386 (Tex-.App. 1990)*, *Southwest Battery v. Owen, 131 Tex. 423, 115 S.W.2d 1097, 1099 (Tex. 1938).* **[*29]**

Although *Beverly Hill Concepts, supra,* involved a new business scenario and a tort claim was made the court did say that: **HN16** "In order to recover lost profits, therefore, the plaintiff must present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty," *247 Conn. at page 70* cf. *W.W. Gay Mechanical Contractor v. Wharfside Two Ltd., 545 So. 2d 1348, 1351 (Fla. 1989)*; cf. 22 Am.Jur.2d "Damages," § 444: "The law does not require that lost profits be proven with absolute certainty but only with such reasonable certainty that damages are not based wholly upon speculation and conjecture." P. 395.

The court will conclude this preliminary discussion of the standards it will apply to the facts of this case by mentioning two other observations made in these lost profit cases.

**HN17** When the courts speak of lost profit calculations they of course talk in terms of net profits, *Cheryl Terry*

*Enterprises Ltd. v. City of Hartford, supra*, *Ellwest Stereo Theatres, Inc. v. Davilla, 436 So. 2d 1285, 1288 (La. 1983)* (cited in **[*30]** *Beverly Hill Concepts); Lindevig v. Dairy Equipment Co., 150 Wis. 2d 731, 442 N.W.2d 504 (Wis.Ct.App. 1989)*; *The Drews Co. v. Ledwith-Wolfe Assoc., 296 S.C. 207, 371 S.E.2d 532 (S.C., 1988)*; *Maxvill-Glasco v. Royal Oil, 800 S.W.2d 384, 386-87 (Tex.App. 1990).*

In *Cheryl Terry Enterprises Ltd.* the court upheld the lost profit claim after noting the meticulous way in which the plaintiff calculated her costs in the busing contracts she had previously bid on in the past. The jury could rely on this testimony to determine future costs which could then be subtracted from the contract price to determine net profits. In *Ellwest,* the plaintiff was deprived of the opportunity to run a retail store, an accountant calculated net profit figures from other stores run by the plaintiff after taking out all operating expenses, bonuses and other compensation to officers. In *Lindevig* the court stated that **HN18** to establish lost profits a claimant must show business revenue as well as expenses. The court held that "because the plaintiffs produced no evidence of expenses, the evidence showing gross profits had no evidentiary value." *id.,* **[*31]** page 508. In *Drews Co.* the court quoted from *Rest of Contracts § 331, comment b* (1932) **HN19** "Profits" have been defined as "the net pecuniary gain from a transaction, the gross pecuniary gains diminished by the cost of obtaining them." Simply put "net profits are what remains after a business deducts expenses," *Maxvill-Glasco v. Royal Oil, 800 S.W.2d at page 386*.

Another observation that should be made is that **HN20** in trying to calculate lost profits our court has "permitted lost profits to be calculated by extrapolating from past profits see e.g., *Westport Taxi Service, Inc. v. Westport Transport District, supra, 235 Conn. 32-33*; *Humphrys v. Beach, (149 Conn. 14, 21, 175 A.2d 363)* ("in the absence of evidence to the contrary, the court was entitled to draw the inference that the plaintiff's business would continue to be as profitable as it had been in the year and a half before the trial"), quote from *Beverly Hill Concepts, Ltd., 247 Conn. at p. 69-70*. One would imagine that the corollary of this is also true--failure to show profit must have some bearing on the ability to earn future profits. In *Metropolitan Express Services, Inc. v. City of Kansas, 71 F.3d 273, 275* **[*32]** (CA 8, 1995)* the court noted that the plaintiff "must demonstrate those lost net profits by offering 'proof of the income and expenses of the business for a reasonable time anterior to its interruption with a

consequent establishing of the net profits during the previous period . . . Put simply, "to show that it lost profits (the plaintiff) must first show that it was previously earning profits." Interestingly perhaps for this case the court noted that although the plaintiff "argue(d) that the loss figures (for previous two years) are deceptive because they represent the company's overall loss for tax purposes and ignore individual gains within segments of the company, (the plaintiff) offered no documentary evidence to explain the contradiction." (*Id.*)

Moving from the general to the particular the defendant Mr. Coho advances two variations of a lost profit claim. He has introduced the census records of the towns which were serviced by the subject directories and maintains that what he bargained for was that his business would be advertised to each household in the areas covered by the directories. Therefore, his damages, and the only way to make him whole would be to award him **[*33]** damages for the cost of mailing to each of the households in the defined area. An award based on such a theory would mean that he would be entitled to damages in the amount of $ 326,192 for the year 1999 and the same amount for the year 2000 resulting in a damage claim of over $ 750,000.

He relies on the case of *Lexington Products Ltd v. BD Communications, 677 F.2d 251 (CA 2, 1982)*. In that case the Second Circuit held that the trial court erred in awarding only nominal damages. Lexington, a foreign corporation, wished to market a polishing brush and liquid in this country. The defendant entered into an exclusive marketing agreement with Lexington, it agreed to buy 200,000 brushes a year at cost for the life of the contract, to pay Lexington royalties for each brush sold, and to spend $ 500,000 in television advertising and promotion each year of the contract. The trial court found that Lexington had successfully marketed the product in Britain but it also found in 1977 only 60843 brushes were sold in America and that the defendant spent well below the sum supposed to be allocated for advertising; "with BD's steady decline in advertising there was a corresponding **[*34]** decline in (the product's) sales," *id., p. 252*. Lexington suggested two bases for recovery (1) the court should decide the money actually spent on advertising by the number of brushes sold to reach a ratio for each brush of almost 60 cents per brush. Using this ratio it was argued that if the defendant had spent the agreed amount on advertising over half a million brushes would have been sold and the defendant would owe Lexington almost a quarter of

a million dollars minus royalties already paid. (2) The second theory argued that at least Lexington would have been expected to sell 200,000 brushes each year for the life of the contract so damages could have been easily calculated based on markup minus royalties.

*Lexington* offers no basis for the defendant's lost profit claim. In *Lexington* there was a successful history of prior sales of the product and a basis in that sales record and the parties' very agreement to calculate damages. Here the testimony was clear that Mr. Coho did not have a successful business, for several years of its operation he apparently did not earn the minimum $ 6,000 necessary to mandate the filing of federal income tax returns and **[*35]** even if his profits in those years were somewhat larger than some of his testimony indicated they would not have supported the enormous damage claim made here. *Lexington* in fact referred to *Freund, Washington Square Press, 34 N.Y.2d 379, 314 N.E.2d 419, 357 N.Y.S.2d 857* (1974, Ct.App.) which the *Lexington* court said was a case where the New York court correctly held only nominal damages were appropriate. In *Fruend* the court of Appeals, as *Lexington*, noted based its decision of the fact that the author who sued the defendant publishing company did not prove "any public acceptance of his unpublished work," *id., p. 253*. In *Lexington* the court said contrary to Mr. Fruend "Lexington had shown a track record of (brush) sales before (the defendant's) breach where Mr. Fruend's drama book had no prior sales history," *id., p. 254*. Neither does Mr. Coho's sales history justify the huge damage figure requested here. The *Lexington* court made a point of saying the damages awarded in the case before it was based on competent evidence because it was based on "the record of sales and advertising," *id.* Query would even the *Lexington* court award the mailing cost **[*36]** to all the households in U.S. reached by its media coverage?

Also no expert testimony was offered relative to market conditions and prospects for Coho's casket business. The possibility for such an analysis was presented by the fact that there were operating businesses listed in the directories under "Funeral Plans/Prearranged." No evidence was offered as to the demographics of the households in the census tracts, i.e., the age of various inhabitants related to mortality productions, how many of the households might be inhabitated by out-of-state residents who in all likelihood would not be buried in state or have a need for Mr. Coho's products.

On a more practical level, if phone companies were exposed to damage claims such as the one made here

2006 Conn. Super. LEXIS 2881, *36

their businesses would not be viable given the possibilities of human error and failure of communication from customer to sales representative to content control officer to printer. This aspect of the damage claim is not accepted by the court.

Another damage claim made by Mr. Coho is based on his advertising in the so called "Reminder" book which has no relation to SNET and advertises to the public. The argument runs as follows. The "Reminder" [*37] reaches 67,321 households, the SNET contract reached 299,259. The first figure is divided into the last figure and the figure of 4:445 is arrived at. The brief says Coho testified he had $ 21,000 net profits from casket sales during the period covered by the 1999-2000 yellow page publication. That figure could be multiplied by 4.445 for a lost profit claim of $ 93,335. But if one examines the Reminder ads submitted into evidence none of them refer to the logo "Funeral Plans Prearranged." In fact exhibit G on the page before the Kamco Casket Showroom ad has a listing for "Funerals-Prearranged" under which funeral homes appear and not Kamco. Kamco is listed under "Funeral Products."

In any event the premise of this argument is the $ 21,000 profit figure. But Mr. Coho kept no record of expenses associated with his casket business and even seemed to imply the casket portion of his business had no expenses although be it had advertising expenses, auto expenses for transportation, rental and mortgage expenses on the property from which he ran his business and several other ordinary office expenses, some shipping costs and taxes. But Mr. Coho kept no ledger book or any records of expenses. [*38] Mr. Coho did not even have definite notion as to how many

contacted him as a result of the Reminder ads in the towns in question. As noted on neither of the lost profit theories was any expert testimony presented on a demographics, estimates of lost profits because of failure to get the advertising Mr. Coho wanted coupled for example of what comparative prices funeral directors or other funeral merchandise suppliers were selling in the area which is the subject of this claim.

Finally the court will discuss the mitigation of damages issue. *HN21* In a contract action a party claiming breach has a duty to mitigate damages and must make reasonable efforts to do so; also the party who has breached bears the burden of proving someone in Mr. Coho's position has failed to mitigate damages. *Ann Howard's Apricots Restaurant, Inc. v. CHRO, 237 Conn. 209, 229, 676 A.2d 844 (1996)*, see also *Restatement (2d) Contracts § 353*. If a court determines no such reasonable efforts were made the damage award "will be reduced by the amount that could have been avoided," 22 Am.Jur.2d § 353, page 323. It is true that there is no reasonable substitute for [*39] the yellow pages but query whether radio or television advertising or newspaper advertising could have been resorted to by Mr. Coho. The court will not factor in this element into its analyses, however, because the record is too nebulous for the court to arrive at any conclusions on mitigation especially in light of the fact that the SNETCO has the burden of proof on mitigation.

In any event the court concludes that the defendant has not established his claim against the plaintiff and in any event has not proven damages beyond a nominal amount. The court therefore denies recovery in the counterclaim. [2]

[*40]  Corradino, Judge

---

[2]   The defendant has raised several special defenses which the court concludes have not been established.

(1) Statute of Limitations. *HN22* The Practice Book, § 10-3(a) requires a defendant to plead a statue that he is relying on in a special defense. The defendant did not plead the particular limitations statute he is relying on and even his post-trial brief does not do so.

However, the relevant statutes seem to be § 52-576 and § 52-581. *HN23* Section 52-576 provides for a six-year statute of limitations. The plaintiff relies on a theory of modification of a written contract as to the 1999-2000 advertising; interestingly the defendant relies on the same "written contract" in his counter claim and the damage claim he makes thereunder. It would seem to the court that therefore § 52-576 with its six-year limitation applies to the 1999-2000 advertising period so the suit was commenced within the statutory period.

That leaves for discussion the charge for florist advertising in the two 1997-1998 directories. *HN24* Section 52-581 provides for a three-year statute of limitations for actions based on an "oral contract." Section 52-576 says that "no action for an account, or on any simple or implied contract, or on any contract in writing shall be brought but within six years after the right of action accrues . . ." The case of *Hitchcock v. Union New Haven Trust Co., 134 Conn. 246, 258-59, 56 A.2d 655 (1947)* explains the differences between these two statutes. *Hitchcock* held that the predecessor statute to § 52-581(6010) applied to executory

2006 Conn. Super. LEXIS 2881, *40

contracts Ballentine Law Dictionary defines such contracts as "A contract to be performed, each party having bound himself to do or not to do a particular thing." The advertising claim for the 1996-1997 directories is not based on executory contract theory but is an action on account based on an implied contact theory. So it would appear that § 52-576 applies.

(2) The defendant claims that the plaintiff failed to state a claim upon which relief may be granted. **HN25** A special defense can not be used in lieu of a motion to strike to challenge the complaint's sufficiency. In any event the court's opinion, if correct, disposes of this claim.

(3) The set off claim is rejected. **HN26** The burden is on the defendant to prove it. Any set off is a debt independent of the action sued upon. The defendant offered no evidence that SNET owed any debt to Mr. Coho. This set off claim is no more than a denial that SNET proved its monetary claim.

(4) The defendant offered absolutely no evidence of payments made on the claim by SNET. Thus Mr. Coho cannot claim the SNET claim is barred in whole or in part because SNET received payment.

(5) The statute of frauds defense (§ 52-550). The court accepts the plaintiff's well reasoned comments on pages 12 through 15. The court has concluded that SNET can bring its claim or the basis of written contract that was orally modified only in certain respects. In any event no evidence was presented to indicate the agreement was not capable of being performed within one year, *CR Klewin v. Flagship Properties*, 220 Conn. 569, 580, 600 A.2d 772 (1991).

(6) Estoppel will not lie since no evidence was presented that the plaintiff was grossly negligent or intentionally deceived the defendant the court's discussion makes clear that this is the conclusion it arrived at. In fact the court reduced the SNET claim insofar as it sought to charge him for a heading it could not find that he assented to.

(7) See (6); SNET's full claim is not obviated by this special defense.

(8) No evidence of waiver presented.

(9) There was consideration here. SNET published advertisements in its directories, Mr. Coho agreed to pay. Insofar as Coho did not agree to certain portions of what was published, the court did not order payment.

(10) The special defense of negligence has no real applicability to this case.

Interestingly although he did not specifically abandon any of his special defenses. Mr. Coho's post-trial memorandum only briefed the statute of limitations, set off and unclean hands special defense.

◆ Positive

As of: February 3, 2016 9:08 PM EST

# *Benvenuti Oil Co. v. Foss Consultants, Inc.*

Superior Court of Connecticut, Judicial District of New London, at New London

January 25, 2006, Decided ; January 25, 2006, Filed

CV010485270S

**Reporter**

2006 Conn. Super. LEXIS 238; 2006 WL 328678

Benvenuti Oil Company v. Foss Consultants Inc. et al.

**Notice:** **[*1]** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**Subsequent History:** Costs and fees proceeding at *Benvenuti Oil Co. v. Foss Consultants, 2006 Conn. Super. LEXIS 3004 (Conn. Super. Ct., Oct. 3, 2006)*

**Prior History:** *Benvenuti Oil Co. v. Foss Consultants, Inc., 2003 Conn. Super. LEXIS 2177 (Conn. Super. Ct., Aug. 1, 2003)*

## Core Terms

customers, lost profits, damages, forgery, costs, marginal, oil, new trial, calculated, trial court, radius, estimate, residential, projection, new customer, invoice, profits, circumstances, expenses, courts, unfair, sales, fixed cost, telemarketing, breach of contract claim, companies, deceptive, oil company, Contracts, practices

## Case Summary

### Procedural Posture

Plaintiff oil company, in a second suit based on a contract it alleged defendants, a programmer company and its principals, breached, the company brought counts alleging: (1) fraud; (2) forgery; (3) breach of contract; and (4) an alleged violation of Connecticut's Unfair Trade Practices Act (CUTPA).

### Overview

The company brought a first action alleging the programmer breached the parties' contract by selling a program that was supposed to be exclusive to the company within a 25-mile radius. In a second suit, the company alleged the first action was decided on summary judgment after the programmer submitted a forged contract without the 25-mile radius clause. After concluding the company's forgery/fraud claim was justified, the court tried the remaining breach and CUTPA claims. It rejected the programmer's claims that a new trial was not warranted absent a motion by the company, and it held that the programmer breached the parties' contract with regard to the 25-mile radius. However, the forgery transgression was a fraud on the court and had nothing to do with trade or commerce, as meant by *Conn. Gen. Stat. § 42-110a(4)*, so the CUTPA claim was dismissed. The company simply failed to present a reasonable methodology to calculate lost profit damages and no other evidence on damages was presented. Therefore, only nominal damages on the fraud and breach claims were warranted. However, punitive damages in the form of attorney fees were available since a nominal damage award was made.

### Outcome

The court dismissed the CUTPA count. The court found for the company on the forgery, fraud, and breach claims, but awarded only nominal damages. The court did award punitive damages in the form of attorney fees.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

*HN1* When a judgment is opened pursuant to *Conn. Gen. Prac. Book, R. Super. Ct. § 17-4*, causes of action precluded by the judgment can go forward to trial. Such motions are filed as part of and within the original litigation. Petitions for new trial under *Conn. Gen. Stat. §§ 52-570*, -882, are separate actions ancillary to the

original suit whose judgment the petitioner seeks to avoid so that a new trial can go forward.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

**HN2** The statutory remedy for fraud on the court is that the court may grant a new trial for reasonable cause under *Conn. Gen. Stat. § 52-270(a)*, which includes every cause for which a court of equity could grant a new trial, such as, for example, fraud, accident and mistake.

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Jurisdiction

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

**HN3** The general rule is that trial courts by virtue of their inherent powers may set aside a verdict and grant a new trial on its own motion, but, while Connecticut does not say that trial courts have no subject matter jurisdiction over this matter, Connecticut holds that a petition for new trial must be filed in accordance with statutory procedure or the court has no authority to act.

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Jurisdiction

Civil Procedure > Judgments > Relief From Judgments > General Overview

Civil Procedure > ... > Relief From Judgments > Excusable Mistakes & Neglect > Mistake

**HN4** A trial court has inherent power to open a judgment mistakenly entered as a result of clerical error. But, a court otherwise does not have authority to open and vacate a judgment in the absence of a motion to open filed by a party. The power to grant one is not dependent on statute but is an incidental power of common-law courts. Basically courts have inherent powers to open judgments, but statutes can regulate the exercise of that power.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

**HN5** A petition for a new trial is properly instituted by a writ and complaint served on the adverse party; although it is collateral to the action in which the new trial is sought, it is by its nature a distinct and separate proceeding.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

Evidence > Burdens of Proof > Allocation

**HN6** The burden is on the petitioner to prove facts entitling it to a new trial. There must be strong reason to grant the petition and it will not be granted unless injustice was, or might have been done, at the earlier trial.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

**HN7** A petition for new trial is to be decided on the issues it raises without regard to any issues raised on appeal, but the procedure is not meant to reach errors that the petitioner should have been aware of at the time of appeal.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

**HN8** Due diligence is a requirement for granting a petition for new trial and, if the basis for the request is a claim of newly discovered evidence, such evidence must be of such a nature that it could not have been discovered earlier.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

**HN9** In deciding a petition for new trial the court must keep in mind that there has to be an end to litigation.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

**HN10** A petition for new trial should not be granted unless the court can conclude that the result, on the ascertainable facts including any newly discovered evidence, would lead to a different result.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

**HN11** If fraud has prevented a party from pursuing a right it has by way appeal, a new trial may be granted.

Contracts Law > Contract Interpretation > General Overview

**HN12** The contract must be viewed in its entirety, with each provision read in light of the other provision and every provision must be given effect if it is possible to do

so. In addition, when there are multiple writings regarding the same transaction, the writings should be considered together.

Torts > Business Torts > Fraud & Misrepresentation > General Overview

*HN13* All four requirements for establishing common-law fraud must be found to exist. The fourth element requires that a plaintiff prove that it acted on a false representation to its injury, which requires that a party claiming to be injured was injured because it relied on a misrepresentation.

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

*HN14* The Connecticut Unfair Trade Practices Act, *Conn. Gen. Stat. § 42-110b(a)*, says that no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

Governments > Courts > Judicial Precedent

Governments > Legislation > Interpretation

*HN15* *Conn. Gen. Stat. § 42-110b(b)* directs Connecticut courts to be guided by the interpretation given the Federal Trade Commission Act, *15 U.S.C.S. § 45*, by the Federal Trade Commission (FTC) and the federal courts. The FTC has adopted the so-called "cigarette rule" to define unfair practices, which means the act is immoral, unethical, unscrupulous and oppressive, and it has caused substantial injury and offers no countervailing benefits to society.

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

*HN16* "Deceptive" under the Connecticut Unfair Trade Practices Act means: (1) there must be a representation likely to mislead consumers; (2) the consumer must interpret the representation reasonably under the circumstances; (3) the misleading misrepresentation must be material.

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

*HN17* A cigarette rule analysis is not required when a deceptive act is established. All deceptive acts and

practices are unfair, but not all unfair acts and practices are deceptive. A special subclass deception has more particularized elements that are easier to apply than the unfairness criteria. Put another way, unfair practices are not always deceptive but deceptive practices are always unfair.

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

*HN18* *Conn. Gen. Stat. § 42-110a(4)* defines "trade or commerce" to mean the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or other thing of value in this state.

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

Governments > Courts > Judicial Precedent

Governments > Legislation > Interpretation

*HN19* Because the governing statutes in Massachusetts are virtually identical to Connecticut's, Connecticut courts repeatedly look to the reasoning and decisions of the Supreme Judicial Court of Massachusetts with regard to the scope of the Connecticut Unfair Trade Practices Act.

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

Governments > Legislation > Interpretation

*HN20* When the legislature employs the terms "persons engaged in the conduct of any trade or commerce" it intends to refer specifically to individuals acting in a business context. That determination must turn on the circumstances of each case, with emphasis on the following factors: (1) the nature of the transaction, (2) the character of the parties involved; (3) the activities engaged in by the parties; (4) whether similar transactions have been undertaken in the past, (5) whether the transaction is motivated by business or personal reasons; and (6) whether the participant played an active part in the transaction.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

*HN21* Contract damages are ordinarily based on the injured party's expectation interest and are intended to give it the benefit of its bargain, by awarding the injured

party a sum of money, that will, to the extent possible, put it in as good a position as it would have been had the contract been performed. With regards to lost profit claims, such claims are permitted only if the profits were reasonably within the contemplation of the defaulting party at the time the contract was made. On the other hand nearly all commercial contracts are entered into in contemplation of future profits.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

**HN22** If profit is an inducement to making a contract, a loss of profits as a result of the breach of that contract is generally considered to be within the contemplation of the parties and recovery of lost profits will be allowed as damages if causation is proved with reasonable certainty.

Contracts Law > Remedies > General Overview

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

**HN23** Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

**HN24** The main impact of the requirement of certainty comes in connection with recovery for lost profits. But, in calculating damages, doubts are generally resolved against the party in breach. A party who has by its breach, forced the in third party to seek compensation in damages should not be allowed to profit from its breach where it is established that a significant loss has occurred. A court may take into account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty giving greater discretion to the trier of fact. Damages need not be calculable with mathematical accuracy and are often at best approximate.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

**HN25** If the wrongful act of the defendant prevents determination of the exact amount of damages, the defendant is not allowed to insist on absolute certainty but only that the evidence show the lost profits by reasonable inference. But, in such cases, the damages may be estimated according to facts that give the trier of

fact a reasonable basis for determination of probable lost profits.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

**HN26** The requirement of "reasonable certainty" in establishing the amount of damages applies with added force where a loss of future profits is alleged. This is so because such loss is capable of proof more closely approximating mathematical precision. In other words the plaintiff in every case should apply some reasonable basis for computing the amount of damage and must do so with such precision as, from the nature of the claim and the available evidence, is possible. Doubts as to the extent of injury should be resolved in favor of the innocent party and against the wrong doer. Lost profits need not be established with certainty but evidence of lost profits must be based upon objective data from which the loss can be determined with a reasonable degree of exactness.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

**HN27** In order to recover lost profits, the plaintiff must present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty. The law does not require that lost profits be proven with absolute certainty but only with such reasonable certainty that damages are not based wholly upon speculation and conjecture.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

**HN28** When the courts speak of lost profit calculations they of course talk in terms of net profits.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

**HN29** To establish lost profits, a claimant must show business revenue as well as expenses. Where the plaintiffs produce no evidence of expenses, the evidence showing gross profits has no evidentiary value. "Profits" are the net pecuniary gain from a transaction, the gross pecuniary gains diminished by the cost of obtaining them. Simply put, net profits are what remains after a business deducts expenses.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

Case 3:13-cv-00215-VAB   Document 205   Filed 02/03/16   Page 50 of 69

Page 5 of 24
2006 Conn. Super. LEXIS 238, *1

*HN30* In trying to calculate lost profits it is permitted for lost profits to be calculated by extrapolating from past profits. The corollary is also true. Failure to show profit must have some bearing on the ability to earn future profits. The plaintiff must demonstrate those lost net profits by offering proof of the income and expenses of the business for a reasonable time anterior to its interruption with a consequent establishing of the net profits during the previous period. Put simply, to show that it lost profits, the plaintiff must first show that it was previously earning profits.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

*HN31* Lost profits only requires reasonable certainty, doubts are generally resolved against the party in breach of contract, and absolute certainty in these situations is not required. Mere guessing is not permissible, there must be a rational standard on which to base a damage award, a reasonable basis must be provided for the court to reach an estimate of damages, and the estimates have to be based on objective data and complete evidence.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

*HN32* Past costs and expenses are all well and good but are only useful in a lost profit calculation for future lost profits if they are used as a basis to estimate future cost projections that can then be deducted from projected revenue.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Lost Profits

*HN33* It is true that a claim for the value of lost customers which must assume a market willing to purchase them is not exactly analogous to a claim for loss in value of a business due to breach. But, in the latter circumstances, it is recognized these two types of recovery will be allowed in the same case but not for the same time period. For double recovery in such a situation such a loss must exist independently of lost profits.

Contracts Law > ... > Damages > Measurement of Damages > Actual & Nominal Damages

Contracts Law > ... > Damages > Types of Damages > Punitive Damages

*HN34* Although punitive damages are recoverable at common law, they ordinarily may be awarded only if the complainant pleads and proves a right to recover compensatory or nominal damages.

Civil Procedure > Remedies > Damages > Punitive Damages

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > Avoidable Consequences

*HN35* A party cannot recover damages flowing from a consequence that the party could reasonably have avoided. Damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation. Similar principles apply in tort actions.

**Judges:** Thomas J. Corradino, J.

**Opinion by:** Thomas J. Corradino

# Opinion

*MEMORANDUM OF DECISION*

This case has been tried in two phases. The court heard numerous witnesses lay and expert over the course of many trial days. The court will repeat the factual background to the case given in its first decision which has the same heading and is designated as 2003 Ct.Sup. 9100. The court will elaborate more on the following facts as it becomes necessary in this decision.

The plaintiff Benvenuti Oil Company sells oil to customers in an area of Eastern Connecticut. Its customers lie in a radius of approximately thirty miles. Mr. Mazzella who runs the company had a real interest in expanding the operations of his company. He had to repay a loan to his relative from whom the business was purchased and family members worked in the business who had to be supported by its operations. One option was to buy another similar company which would have cost three or four hundred thousand dollars in the 1995 time frame involved in this case. **[*2]** At the end of 1995, another option presented itself. Mr. Mazzella was contacted by Marc Trichon, a sales representative of Foss Consultants, Inc. run by John Spinogatti. Leonard Levenberg worked in the Foss office and did various clerical jobs. That company had developed a successful marketing scheme geared to helping oil companies attract new customers. It was Mr. Mazzella's understanding of what was represented to him that if he paid the program fee of $ 25,500, his company would be

guaranteed 250 new customers and he would be given a 25-mile exclusive radius, that is, Foss would not sell the program to other companies in that radius. There was an option to renew the program after the first year. With a down payment, Mr. Mazzella received an invoice which used the term "25 mile exclusive radius." Dates for training were set up for January 12 and 13, 1996. Felicia Spinogatti did the training in the Foss program. The parties dispute when the training actually occurred, Benvenuti claims it occurred January 26 and 27, 1996. At the conclusion of the training, a payment of $ 6,500 had to be made to Foss. A check to Foss for $ 6,500 plus Felicia Spinogatti's expenses dated January 27 was [*3] offered into evidence. It should also be noted that after the initial contact with the sales representative, Marc Trichon, Mr. Mazzella indicated to Trichon that he wanted a more formal agreement than the invoice. This request was allegedly made soon after the initial contact with the sales representative.

In any event, it came to pass that in the fall of 1996, Mr. Mazzella learned that the Deep River Oil Company was using the Foss program and it was located within the 25-mile radius of Benvenuti. Mr. Mazzella felt this violated his agreement and he contacted Foss to complain speaking to Leonard Levenberg who worked for Foss. Mazzella did not speak to John Spinogatti himself until January 1997. Attempts to work out the dispute were unsuccessful and eventually Benvenuti Oil Company filed suit against Foss. In September 1996, Mr. Spinogatti faxed to his lawyer what purported to be a signed copy of an agreement between Foss and Benvenuti which made no reference to the 25-mile exclusive radius. The faxed copy was dated January 13, 1996 and that date appeared under the signatures of Felicia Spinogatti and Charles Mazzella. The plaintiff claims, and it does not appear to be disputed, that [*4] based on this faxed agreement, a trial court granted summary judgment in favor of Foss. The Appellate Court sustained the action of the trial court. While the matter was before the trial court, Levenberg, who had been sued and allegedly threatened by John Spinogatti, told Charles Mazzella that the purported agreement was a forgery. He alleged Jon Spinogatti, the son of John Spinogatti, forged Charles Mazzella's signature and Felicia Spinogatti signed the document when it was otherwise blank, that is, not containing Mazzella's signature.

None of this information was brought to the trial or Appellate Court by the plaintiff. In any event this suit was filed August 22, 2001, fifteen days after the

Appellate Court upheld the trial court's granting of the defendant's motion for summary judgment in the first suit.

An expert could not determine if Mazzella's signature was forged from the fax copy of the agreement Spinogatti gave to his lawyer. But in the fall of 2002, the alleged original suddenly appeared and was delivered to Mazzella by Levenberg. Levenberg claims that he had gotten this document from discarded files of Foss, sent it to Trichon who had also been sued by Spinogatti for [*5] illegally using the Foss program and was reminded by Trichon of the document before he called Mazzella. An expert testified at trial that the signature of Mazzella was a trace forgery--someone traced his signature from a document apparently superimposed on the forged document. Levenberg, as noted, testified that he was present when John Spinogatti concocted a scheme to forge this document. Before receiving the forged document back, Spinogatti allegedly bet Trichon lunch that Mazzella would sign the agreement. Trichon could not understand why he would do so but later Spinogatti told Trichon that he owed him lunch.

This court tried the suit on the second complaint of August 2001 and that trial was bifurcated. The complaint in this second suit contains several counts (1) fraud (2) forgery (3) breach of contract and (4) an alleged violation of Connecticut's Unfair Trade Practices Act, CUTPA.

In its earlier decision the court concluded that the matters which the court and parties agreed should be tried in the first phase of this litigation were the forgery and fraud counts only. If liability were to be found on these issues the issue of damages was to be tried at a later hearing. At that [*6] hearing the court was also to hear the breach of contract and CUTPA claims.

For the reasons set forth in the earlier opinion the court concluded that the January 13, 1996 document was forged. The trial court rested its decision dismissing the case on the assumed validity of that document as did the Appellate Court in *64 Conn.App. 723, 781 A.2d 435 (2001)*. This court concluded further that John Spinogatti was responsible for the forgery but the plaintiffs had not proven its case against Jon and Felicia Spinogatti.

In this opinion the court will first discuss the viability of the breach of contract claim and the CUTPA claim as set forth in the August 2001 Benvenuti complaint and then will further comment on the forgery/fraud count.

Then the court will discuss the claim for damages.

2006 Conn. Super. LEXIS 238, *6

*BREACH OF CONTRACT*

In the first suit brought by Bevenuti in June 1997 one of the counts was for breach of contract. The plaintiff claimed Foss breached its agreement to give it a 25-mile exclusive radius meaning that Foss would not sell its marketing program to any other company within 25 miles of Benvenuti's Waterford office. In that litigation the trial court granted a motion for summary judgment [*7] on the breach of contract count and the Appellate Court upheld this action at *64 Conn.App. 723, 781 A.2d 435 (2001)*. That court said that "the parties agree that they generated three documents relating to the contract. Those documents are (1) a December 8, 1995 invoice provided by the defendant (2) a December 9, 1995 letter of confirmation signed by the defendant's president John Spinogatti . . . and (3) a January 13, 1996 document drafted by the defendant and titled 'Agreement between Foss Consultants, Inc. (and) Benvenuti Oil Company . . .' "

The Appellate Court rendered its decision on August 7, 2001. Both the trial court and the Appellate Court based their decision dismissing the breach of contract count on their view that the January 13, 1996 agreement was a complete integration of the agreement between the parties. These courts relied on the fourth paragraph which was defined as a "merger clause" thus making it an integrated written document barring the use of parol evidence to vary its terms. That paragraph read "This agreement contains a complete and final understanding between buyer and seller. All promises made by Foss Consultants Inc. the seller, are in the agreement: [*8] there are no others." The agreement only contained a guarantee by Foss that new customers "will be within a 25 mile radius of Benvenuti Oil Company." (See *Tallmadge Bros. Inc. v. Iroquois Gas Transmission, 252 Conn. 479, 495, 504, 746 A.2d 1277* et seq. for our rule on merger clauses).

The January document allegedly signed by the presidents of both companies contained no reference to Benvenuti's exclusive radius claim and the merger clause in that document dictated the result arrived at by the trial court and the Appellate Court in dismissing the breach of contract claim.

In its first decision this court found the January 1996 document containing what purported to be Mazella's signature to be a forgery. Two issues, at least, are now presented: (1) the ruling of the Appellate Court (*64 Conn. App. 723, 781 A.2d 435 (2001)*) has never been

reopened--nothing in this regard was filed in the trial court or the Appellate Court. The question becomes can this trial court in effect reopen the final judgment of the Appellate Court by entertaining a breach of contract claim which is factually the same as the claim in the first litigation? There too the plaintiff claimed Foss violated [*9] its agreement to grant Benvenuti a 25-mile exclusive radius; (2) the second question is, even if this court had the power to entertain the breach of contract claim, can it conclude Benvenuti should prevail on that claim absent consideration of the January 13th document?

(a)

It would seem to be self-evident that litigation of a particular cause of action cannot go forward in one suit if the same cause of action was previously litigated in an earlier suit and was dismissed by the former trial judge whose dismissal was upheld on appeal.

There are two statutory mechanisms to allow the cause of action to be re-litigated--*§ 52-212a* of the general statutes (*P.B. § 17-4*) and *§ 52-270*. *P.B. § 17-4* is entitled "Setting Aside or Opening Judgments and is filed in the action where the judgment has been entered. *Section 52-270* appears to be implemented by *§ 52-582* which is a "Petition for a New Trial." *HN1* When a judgment is opened pursuant to *P.B. § 17-4* causes of action precluded by the judgment can go forward to trial. Such motions are filed as part of and within the original litigation. Petitions for new trial under *§§ 52-570*, *52-582* are separate actions ancillary [*10] to the original suit whose judgment the petitioner seeks to avoid so that a new trial can go forward. The court could only find one appellate case in which the statutes, *§ 52-212a* and *§ 52-270*, are discussed together, *Breen v. Breen, 18 Conn.App. 166, 172-73, 557 A.2d 140 (1989)*, but not analytically distinguished except perhaps in a temporal sense--a petition for new trial for newly discovered evidence, for example, talks in terms of whether such evidence could have been discovered and produced at the "former trial." *Suffield Development Associates Ltd. Partnership v. National Loan Investors L.P. 260 Conn. 766, 779, 802 A.2d 44 (2002)* says that *HN2* the "statutory remedy for fraud on the court is that the Superior Court may grant a new trial for 'reasonable cause;' *General Statutes § 52-270(a)*; which includes 'every' cause for which a court of equity could grant a new trial, such as, for example, 'fraud, accident and mistake' . . ."

*HN3* The general rule is that trial courts by virtue of their inherent powers may "set aside a verdict and grant a

new trial on its own motion," 58 Am.Jur.2d "New Trial" §§ 23 [*11] -26, pp. 101-03. Our state does not appear to say trial courts have no subject matter jurisdiction over this matter but rather holds a petition for new trial must be filed in accordance with statutory procedure or the court has "no authority to act," cf. *State v. Rogelstad, 73 Conn.App. 17, 33, 806 A.2d 1089* et seq. (2002), *In re Clifton B., 15 Conn.App. 367, 369-70, 544 A.2d 666 (1988)*. [1]

 [*12] It would seem then that a petition for a new trial on the breach of contract claim should have been filed in this case. The question becomes then is the failure to file such a petition fatal to the assertion of such a claim in this suit, filed shortly after the Appellate Court upheld the original trial court's dismissal of that claim.

It is necessary to briefly review the characteristics of a *§ 52-270* procedure and the predicates for granting such a petition

(1) *HN5* "A petition for a new trial is properly instituted by a writ and complaint served on the adverse party; although it is collateral to the action in which the trial is sought, it is by its nature a distinct and separate proceeding." *In re Clifton B., 15 Conn.App. 367, 370, 544 A.2d 666 (1988)*, see *State v. Asherman, 180 Conn. 141, 144, 429 A.2d 810 (1980)*.

(2) *HN6* The burden is on the petitioner to prove facts entitling it to a new trial. *Fitzpatrick v. Hall-Brooke Foundation, 72 Conn.App. 692, 807 A.2d 480 (2002)*; there must be strong reason to grant the petition *City of Meriden v. Rogers, 111 Conn. 115, 149 A. 406 (1930)* and it will not be granted  [*13] unless injustice was, or might have been done, at the earlier trial; *Brown v. Keach, 24 Conn. 73 (1855)*.

(3) *HN7* The petition is to be decided on the issues it raises without regard to any issues raised on appeal, *Terracino v. Fairway Asset Management,*

*75 Conn.App. 63, 815 A.2d 157 (2003)*. But the procedure is not meant to reach errors that the petitioner should have been aware at the time of appeal, *LaBow v. LaBow, 69 Conn.App. 760, 796 A.2d 592 (2002)*.

(4) *HN8* Due diligence thus is a requirement for granting such a petition and if the basis for the request is a claim of newly discovered evidence such evidence must be of such a nature that it could not have been discovered earlier; *Crook v. Clarke, 124 Conn. 317, 199 A. 428 (1938)*; *Daniels v. State, 88 Conn.App. 572, 870 A.2d 1109 (2005)*.

(5) *HN9* In deciding such a petition the court must keep in mind that there has to be an end to litigation. *Fitzpatrick v. Hall-Brooke Foundation, Inc., supra.*

(6) *HN10* Such a petition should not be granted unless the court can conclude that the result, on the ascertainable facts including any newly discovered  [*14] evidence, would lead to a different result, *Gilbert v. Walker, 64 Conn. 390, 30 A. 132 (1894)*; *Williams v. Commissioner, 41 Conn.App. 515, 677 A.2d 1 (1996)*.

(7) *HN11* If fraud has prevented a party from pursuing a right it has by way appeal, a new trial may be granted. *Murphy v. Zoning Bd. of Appeals, 86 Conn.App. 147, 860 A.2d 764 (2004)*.

As noted no petition for a new trial has been filed in this case but a trial was held on liability and damages over numerous days. The court refers to its earlier opinion at 2003 Ct.Sup. 9100. It would appear that every one of the foregoing criteria has been met. The action the court has been hearing on the suit filed soon after the Appellate Court result adverse to the plaintiff is collateral to the earlier action but it is certainly a distinct and separate proceeding.

The plaintiff had a heavy burden to convince this court that a purported contract document dated January 13,

---

[1]   Interestingly Horton & Knox in their commentary to P.B. § 17-4 observe that *HN4* "a trial court has inherent power to open a judgment mistakenly entered as a result of clerical error." *Cusano v. Burgundy Chevrolet, 55 Conn.App. 655, 740 A.2d 447 (1999)* cert. denied . . . (but) "a court otherwise does not have authority to open and vacate a judgment in the absence of a motion to open filed by a party, *East Haven Building Supply v. Fanton, 80 Conn.App. 734, 837 A.2d 866 (2004)* . . ."

The law is somewhat confusing in this area; in an older case speaking of the right to a new trial the court said the power to grant one is not dependent on statute but is an incidental power of common-law courts, *Zaleski v. Clark, 45 Conn. 397 (1877)*. Basically while the courts seem to be saying is that they have inherent powers in this area but it is accepted that statutes can regulate the exercise of that power.

1996 was a forgery attributable to Mr. Spinogatti. Both the first trial court and the Appellate Court which upheld that court's dismissal of the breach of contract claim explicitly and exclusively relied on **[*15]** that document to reach their decision. An obvious injustice was committed and any action this court might be persuaded to take due to the forgery have nothing to do with the reasoning or result of the first trial judge or the Appellate Court.

As discussed in its earlier opinion the plaintiffs cannot be faulted for lack of due diligence or failure to procure viable evidence of forgery during the prior litigation. Whether as part of a plan or not Spinogatti submitted a faxed copy of the January 1996 agreement to the trial court which could not be studied by the plaintiff's expert to determine if a forgery of Mazzella's signature had been committed. The original was only delivered to the plaintiffs months after the decision by the Appellate Court.

In effect this court held in its earlier decision and by this decision, based on actual facts and evidence produced before it, that forgery which is a subcategory of fraud, prevented the plaintiffs from pursuing their right to litigate their position on the breach of contract claim in the trial court and at the appellate level.

The remaining issue under at least the criteria for determining whether a petition for a new trial should be granted **[*16]** is whether, given the finding of forgery and fraud, would the result be different on the question of whether Foss breached its contract with Benvenuti as both the earlier suit and this action claim.

If the January 1996 document is excluded from consideration, as it must be in this court's view, the contract documents remaining are the 12/8/95 invoice given to Mazzella by Trichon and "Accepted by Mazzella" who so signs the invoice and a letter written by Spinogatti to Mazzella and dated 12/9/95 which contains only Spinogatti's signature.

In the first decision this court decided that the term "exclusive radius" used in the invoice means what Benvenuti Oil Company claims it does--it had exclusive right under the agreement with Foss to use the Foss program within a 25-mile radius. The court refers to its previously stated reasons for reaching this conclusion. And it particularly notes the written language on the bottom left of the invoice wherein "Foss guarantees 250 new customers" but then says "option to extend exclusive radius at $ 300 per month after 1st year." As to the option there is no reference to 250 new customers; unless "exclusive radius" is totally meaningless--not to be **[*17]** recommended under traditional rules of contract interpretation, cf. *§ 203. Restatement (2d) Contracts*--the phrase has to be given the interpretation advanced by the plaintiff.

The December 9th letter contains no mention of an "exclusive radius" and far from using the exclusivity language of a "merger clause" is introduced by the following: "As per our recent meeting with you the following will confirm and summarize our agreement." But any confirmation must have reference to promises made in the invoice unless the court is to condone a bait and switch operation as noted in its first decision.

A problem with the defendant's position, at least to the court, is its inability to give a satisfactory explanation of "exclusive radius"--if Spinogatti's explanation that it merely meant 250 customers within 30 miles of the Benvenuti office the work exclusive is superfluous. If the parties had Spinogatti's understanding of their agreement as to exclusivity and whether the agreement contemplated it as opposed to Benvenuti's why did Spinogatti feel compelled to create a forged January 1996 document with a bona fide "merger clause"? And why would Spinogatti tell Mazzella when the latter complained **[*18]** about what he felt was a violation of the agreement with regards to selling the Foss program to Deep River that Deep River was just seeking to expand its service contract base rather than its home oil delivery as brought out in the first phase of this litigation?

Spinogatti certainly knew how to create the language of a valid merger clause; the court concludes he did not put such language in the December 9th letter for fear of losing the deal Trichon had worked out as reflected in the invoice as regards an exclusive radius and which Trichon said he often put in the mix to "clinch a deal." The defendant makes much of the fact that Trichon and Levenberg had a falling out with him and this explains away much of their negative testimony. But at the time of the Benvenuti deal and the creation of the invoice all of them were on apparently good terms, anxious to make money--Trichon and Levenberg on their commissions and Foss on its $ 25,500 contract price. It strains credulity to say that Spinogatti under these circumstances would not have been informed of the terms of the invoice before he wrote the December 9th letter, leaving aside the purely innocuous meaning he gives to "exclusive radius" **[*19]** in any event. Also it is

argued why would Foss be foolish enough to lock itself out of selling its program to others indefinitely for a mere $ 300 per month which is the price for extending exclusivity set forth in the invoice. The point is that this invoice language is at worst a gimmick to induce a sale or simply reflects a part of the agreement everyone thought they had. Under these circumstances the court cannot accept the defendant's invitation to regard to the December 9th letter, unsigned by Mazzella as the sole "contract" document thereby per the parol evidence rule excluding consideration of the invoice which was in fact signed by him and prepared by Foss's agent. The court regards both these documents as contract documents and also relies on the circumstances surrounding contract formation mentioned here and in its earlier decision. If the invoice and the December 9th letter are in fact accepted as contract documents, under rules of ordinary contract interpretation *HN12* "The contract must be viewed in its entirety, with each provision read in light of the other provision . . . and every provision must be given effect if it is possible to do so . . . In addition, 'when there are **[*20]** multiple writings regarding the same transaction, the writings should be considered together.' " *United Illuminating Co. v. Wisvest-Conn. LLC, 259 Conn. 665, 671, 791 A.2d 546 (2002)*; *Restatement 2d Contracts, § 202(2)*; 17A Am.Jur.2d "Contracts," § 379, pp. 367-68. Also "all of the writing that form a part of the same transaction should be interpreted together, and, if possible, harmonized," *Contracts* Calamari & Perillo, 5th ed. § 3.13, page 159, *Wonderland Shopping Center v. CDC Mortgage, 274 F.3d 1085, 1092 (CA6, 2001)*; *Century Financial Services v. Bates, 934 S.W.2d 619, 621 (MO.App., (1996)*; cf. *Sidney v. DeVries, 215 Conn. 350, 353, 575 A.2d 228 (1990)*.

The December 9th letter does not contain the language associated with merger clauses--there is no explicit statement that the letter "is a final, complete, and exclusive statement of all the terms agreed upon," *Calamari & Perillo* at § 3.6, page 142. Thus inclusion of the invoice exclusive radius language as part of the agreement does not contradict anything in the Spinogatti **[*21]** letter which was prepared only a day after the December 8th invoice containing the language. From the foregoing and for reasons set forth in its first decision the court concludes that if the January 1996 agreement is found to be a forgery, which this court had concluded it was, the result on the breach of contract claim would have been different.

The court then believes that all of the criteria for the granting of a petition for a new trial have been met but

through the mechanism of a full trial on the breach of contract claim in this post-appeal independent law suit. The court does not believe the plaintiff should have been barred from litigating this matter or perhaps more exactly that this court should be barred from considering the claim because a petition for a new trial as such was not filed. In effect the petition and hearing on the merits through trial were litigated all together. The defendant can hardly claim prejudice by being barred from presenting evidence or argument which would have precluded the granting a new trial or in litigating whether or not a breach of contract should be found once that hurdle was passed. There must have been at least twenty days of trial testimony **[*22]** with all told over 2000 pages of transcript testimony. The court has in fact concluded that civil forgery and fraud have been proven by clear and convincing evidence (see first decision). This is a higher standard than would perhaps be required to sustain the burden of establishing the separate right to a new trial.

In any event the court concludes that it would exalt form over substance and completely ignore the equitable role of the court in acting on these matters where new trial issues and allegations of fraud are involved to preclude the plaintiff from litigating its breach of contract action in this present suit under the unusual circumstances presented.

*FORGERY/FRAUD*

One of the allegations in the August 2001 complaint is for common-law fraud and there is also an allegation of forgery. There is much to be said for the position that the forgery and fraud claims are duplications, forgery being a subcategory of the types of fraud that can be perpetrated, cf. *Cook v. Bieluch, 32 Conn.App. 537, 549, 629 A.2d 1175 (1993)*, cf. *Maturo v. Gerard, 196 Conn. 584, 587, 494 A.2d 1199 (1985)*, 37 Am.Jur.2d "Fraud & Deceit," § 1 **[*23]** , pp. 30-33.

The case of *Harold Cohn & Co. v. Harco International, 72 Conn.App. 43, 51, 804 A.2d 218 (2003)* sets forth *HN13* the four requirements for establishing common-law fraud. All of the elements must be found to exist. In its prior opinion the court found that the first three elements had been established by "clear and satisfactory evidence." The court in its first opinion quoted the fourth element in *Cohn* which requires that a plaintiff prove that it acted on a false representation (here forgery) to its injury--the court characterized this element as setting forth a requirement that a party

claiming to be injured was injured because it relied on a misrepresentation.

In *Suffield Development Association v. National Loan Investors, 260 Conn. 766, 802 A.2d 44 (2002)* the reliance factor could not be found because the false representation in that case was made to the court and it was the court that relied on the misrepresentation to the plaintiff's harm. The court in *Suffield Development* was not prepared to recognize a new tort for "fraud on the court" under these circumstances; an action in damages would not lie, the remedy was a statutory one **[*24]** for a new trial, *id. page 779*.

In its prior opinion this court discussed the reliance factor and despite expressed reservations concluded it was established.

In *Suffield Development* the court explicitly said that the defendant "made a fraudulent misrepresentation not to the plaintiff but to the trial court, which induced the trial court to act to the plaintiff's detriment," *id. page 780*. Here the misrepresentation was made to both the plaintiff in legal proceedings and to the trial and Appellate Courts. As a result the claims originally made in the first litigation could not be advanced. The court has previously discussed and will rely on its conclusion that under the circumstances of this case a petition for a new trial was not necessary to advance the breach of contract claim. In any event if *Suffield Development* is strictly read all the elements of a common-law fraud/forgery action appear to have been met. The elements for this claim meet the first three *Cohn* requirements and the reliance factor appears to have been satisfied in light of the fact, for example, as previously discussed in the breach of contract claim, the **[*25]** court has concluded the result in the first litigation dismissal of that suit and affirmance on appeal--would have been different if the January 13, 1996 had been shown to be a forgery. In this situation why should this litigation be voided because a new trial petition was not filed per statute when as previously discussed all the same issues can be addressed in this litigation without duplicative effort. This result necessarily follows from the court's conclusion that the elements of common-law fraud have been met here.

The plaintiff cannot be accused of laches or unnecessary in advancing the claim of fraud. As discussed in its first decision in the earlier litigation a faxed copy of the January 1996 "agreement" was submitted to the trial court. The plaintiff retained an expert but he could not determine if a forgery had been perpetrated from a fax. An original was not obtained until November 2, 2002, over one year after this suit was filed. Under these circumstances it is difficult to see how a motion or petition for a new trial could have been filed, cf. *Varley v. Varley, 180 Conn. 1, 428 A.2d 317 (1980)* (family case), criteria for reopening a new trial therein **[*26]** apply to civil cases, see *Beacon Falls v. Posick, 17 Conn. App. 17, 549 A.2d 656 (1988)*--the third requirement--"clear proof of the perjury or fraud" could not have been established. Although the foregoing is somewhat repetitive of the discussion in the breach of contract section, it would seem to be an odd result to say this second suit is invalidated. In other words by filing this suit in August 2001 the defendant had months of forewarning and access to discovery mechanisms which would not have been available if a petition for a new trial had been filed in November 2001 when the original was produced for the plaintiff's inspection and examination.

*CUTPA*

A claim under the Connecticut Unfair Trade Practices Act, *§ 42-110(a) et seq.* (CUTPA) has been made against John Spinogatti and Foss Consultants, Inc. During the first part of this trial the court decided it would only permit a CUTPA claim under paragraphs 41(c) and (d) of the complaint. In that paragraph the plaintiff alleges "the defendant's conduct" violated the act "in the conduct of a trade or business."

> (c) by forging the signature of Charles Mazzella in violation of *General Statutes § 52-565*. **[*27]**

> (d) by perpetrating a fraud upon the plaintiff and the trial court by presenting the forged document described in this document as genuine.

***HN14*** CUTPA says that ( *§ 42-110b(a)*)

> No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

The plaintiff argues that the acts of fraud and/or forgery are unfair acts or practices under CUTPA. ***HN15*** *Subsection (b) of § 42-110b* directs our courts to be guided by the interpretation given the Federal Trade Commission Act (*§ 15 U.S.C. 45*) by the FTC and the federal courts. The FTC has adopted the so-called "cigarette rule" to define "unfair practices" and it is set

2006 Conn. Super. LEXIS 238, *27

forth in *Hartford Electric Supply Co. v. Allen-Bradley Co., 250 Conn. 334, 367-68, 736 A.2d 824 (1999)*. It is argued forgery is a class D felony, it is immoral, unethical, unscrupulous and oppressive, it has caused substantial injury and offers no countervailing benefits to society--all of which satisfy the cigarette rule criteria and paraphrase it.

The plaintiff also argues that the forgery here was *HN16* "deceptive" under CUTPA citing the test set forth in [*28] *Caldor, Inc. v. Heslin, 215 Conn. 590, 597, 577 A.2d 1009 (1990)* (1) there must be a representation likely to mislead consumers (2) the consumer must interpret the representation reasonably under the circumstances (3) the misleading misrepresentation must be material--the plaintiff argues that all of this is true of the forgery in this case. [2]

 [*29]  The difficulty with finding a CUTPA violation here, however, lies not in trying to ascertain whether forgery or fraud, all other things being equal, can constitute a deceptive and therefore unfair practice under the statute--of course they can. But a predicate to any analysis of whether acts or practices are unfair and/or deceptive is the requirement of *subsection (a) of § 42-110b* that such acts occur "in the conduct of any trade or commerce." [3]

It is true that our cases have referred to the broad reach of CUTPA and its remedial purpose. As noted in *McLaughlin Ford Inc. v. Ford Motor Company, 192 Conn. 558, 566, 567, 473 A.2d 1185 (1994)* it is also true that CUTPA is not limited [*30] (for example) to conduct involving consumer injury "and that" a competitor or other business person can maintain a CUTPA cause of action without showing consumer injury.

*Associated Investment Co. Ltd. Partnership v. Williams Associates IV, 230 Conn. 148, 159, 645 A.2d 505 (1994)* talks of "the unique breadth and flexibility of the cause of action created by CUTPA." But "because CUTPA applies only to acts in the conduct of any trade or commerce, there is a significant limitation on the reach of the act," Languer, Morgan, Belt at § 3.1, page 57. The Federal Trade Commission Act contains no definition of "trade or commerce" but arguably it is more far reaching than our act (perhaps because of interstate application). The federal statute applies not only, like our statute, to proscribed acts "in the conduct of trade or commerce" but to "unfair or deceptive acts or practices in *or affecting* commerce" (emphasis by this court,) see *15 U.S.C. § 45(a)*.

In any event the forgery and resulting fraud in this case took place years after the plaintiff was induced to enter into a business relationship with Foss Consultants. The forged document was concocted [*31] to entice the plaintiff corporation into establishing a business relationship; it was an attempt to lead a trial court to accept the defendant's characterization of a business relationship that had already been entered into and was in fact terminated. Thus the courts and the plaintiff were misled in *court proceedings* not by an act involving the initiation or carrying on of an ongoing business relationship and directly involved with such matters.

Massachusetts has a consumer protection act with wording similar to out own (Mass. Consumer Protection Act, *M.G.L. C93A, § 1 et seq.*) and our court has said that . . .*HN19* "because 'the governing statutes in Massachusetts are virtually identical to our own' . . . we have, therefore, repeatedly looked to the reasoning and decisions of the Supreme Judicial Court of Massachusetts with regard to the scope of CUTPA, *Normand Josef Enterprises Inc. v. Conn. National Bank, 230 Conn. 486, 521, 646 A.2d 1289 (1994)*.

The case of *Begelfer v. Najarian, 381 Mass. 177, 409 N.E.2d 167 (Mass. 1984)* dealt with a claim made under that state's consumer protection act. The issue before the court was whether "the defendants are [*32] persons engaged in trade or commerce," *id.* p. 175. Referring to an earlier case, *Lantner v. Carson, 374 Mass. 606, 373 N.E.2d 973 (1978)*, the court said that there "we

---

[2]  *HN17* A cigarette rule analysis is apparently not required when a deceptive act is established. As noted in Vol. 12 of the Connecticut Practice series Lanquer, Morgan, and Belt in their excellent commentary on CUTPA say "All deceptive acts and practices are unfair, but not all unfair acts and practices are deceptive. As a special subclass deception has more particularized elements that are easier to apply than the unfairness criteria," § 2.3, page 25. FTC blessing for this observation is underlined by their quotation from *Figgie Int'l. Inc., 107 FTC 313, 373 n.5 (1980)* "Put another way, unfair practices are not always deceptive but deceptive practices are always unfair" ( § 2.1, fn. page 14).

[3]  *HN18* Section 42-110a(4) defines trade or commerce to mean "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or other thing of value in this state."

concluded that **HN20** when 'the Legislature employed the terms' persons engaged in the conduct of any trade or commerce 'it intended to refer specifically to individuals acting in a business context,' " *id.* p. 176. "That determination, it was held, must turn on the circumstances of each case, with emphasis on the following factors: 'the nature of the transaction, the character of the parties involved . . . the activities engaged in by the parties . . . whether similar transactions have been undertaken in the past, whether the transaction is motivated by business or personal reasons (as in the sale of a home) and whether the participant played an active part in the transaction,' " *Lynn v. Nashawaty, 12 Mass. App. Ct. 310, 423 N.E.2d 1052, 1054 (1981)*, cf. *Rex Lumber Co. v. Acton Block Co. Inc., 29 Mass. App. Ct. 510, 562 N.E.2d 845, 850 (1990)*.

Clearly this isolated act of forgery did not take place in a "business context" but in a "litigation context" arising out of **[*33]** a dispute between two businesses that was brought to court. The warring parties were businesses and business people but the character they adopted when the forgery occurred was in their capacity as litigants. It is certainly true that Mr. Spinogatti took an active part in creating the forged document but the "transaction," i.e., the creation of that document was not motivated by "business reasons" but solely to enhance the chances of prevailing in litigation arising out of a business dispute but carrying the risk of depleting the personal assets of the responsible party and his apparently closely held corporation.

If a case such as this, where the gravamen of the CUTPA complaint is the filing of a forged document during and to influence pending litigation between two businesses, what will be the limits on CUTPA litigation? Will every business dispute in the courts involving contract claims generate CUTPA litigation by way of amendment to pending litigation where there is some allegation, for example, that discovery requests were not fully or promptly complied with?

Commenting on the Federal Trade Commission Act and CUTPA the District Court in *Bailey Employment System v. Hahn, 545 F. Supp. 62, 72 (D.Conn. 1982)* **[*34]** said that "the Connecticut statute, like the federal act, was enacted in an attempt to foster honesty and full disclosure in the conduct of business." The transgression here, forgery, had nothing to do with the conduct of business at the time and under the circumstances in which it occurred. Therefore it did not

take place in a "business context" and could not be said to be an act done in trade or commerce.

The CUTPA count is therefore dismissed.

DAMAGES

(1)

LOST PROFIT CLAIM

The court has concluded the plaintiff may advance a breach of contract and a forgery/fraud claim and the central damage claim in this case is one for lost profits. As a result of the defendant's breach of the agreement to give Benvenuti Oil Company a 25-mile exclusive radius, Benvenuti claims it lost profits for several years. The court will have to discuss the facts in more detail but basically the allegation is that when Benvenuti learned Deep River was using the Foss program within what was thought to be its exclusive radius, Benvenuti made a business decision not to market its product in the so called "western towns." Using projections arrived at from other areas where Benvenuti used the program and applying **[*35]** them to these western towns, Benvenuti made an estimate of how many customers it lost, and relied on two experts to establish the monetary value of the loss which was projected out for several years.

First the court will make some general comments about the nature of this type of lost profit claim and how the courts treat such a claim.

(a)

As noted the plaintiff's primary damage claim--apart from issues of punitive damages, double damages, attorneys fees, etc.--is one for lost profits. The court's analysis of the substantive claims earlier in this opinion define the damage claim as one for contract damages. In this case the lost profit claim falls within the definition of "contract damages." In *comment a to § 347 of the Restatement (2d) Contracts* it says that

> **HN21** Contract damages are ordinarily based on the injured party's expectation interest and are intended to give (it) the benefit of (its) bargain, by awarding (the injured party) a sum of money, that will, to the extent possible, put (it) in as good a position as (it) would have been had the contract been performed.

2006 Conn. Super. LEXIS 238, *35

It has been said specifically with regards to lost profit claims **[*36]** that such claims are permitted "only if the profits were reasonably within the contemplation of the defaulting party at the time the contract was made," 22 Am.Jur.2d "Damages," § 448, page 400; *Schonfeld v. Hilliard, 218 F.3d 164, 175 (CA2, 2000)*. On the other hand "nearly all commercial contracts are entered into in contemplation of future profits," *Krikorian v. Dailey, 171 Va. 16, 197 S.E. 442, 448 (Va. 1938)*. In the above section of Am. Jur. just referred to it says

> Thus, **HN22** if profit is an inducement to making a contract, a loss of profits as a result of the breach of that contract is generally considered to be within the contemplation of the parties and recovery of lost profits will be allowed as damages if causation is proved with reasonable certainty.

See *Camino Real Mob. Home Park Partnership v. Wolfe, 119 N.M. 436, 891 P.2d 1190, 1200 (N.M. 1995)* for excellent discussion).

In this case it is clear that profit was an inducement to making the contract. The whole point of the excellent Foss program was to increase profits, that was the inducement offered to companies for entering **[*37]** into a contract for the program which would cost them $25,500 plus expenses. Not a small sum for relatively small companies. Foss even guaranteed 250 new customers if the program was purchased. The plaintiff then has a right to make a claim for lost profits.

It is the measuring of lost profits that presents the real difficulty. There are first of all various categories of lost profit situations. One type of claim involves lost profits for a new business, *Beverly Hills Concepts Inc. v. Schatz & Schatz, Ribicoff & Kotkin, 247 Conn. 48, 63, 717 A.2d 724 (1998)*, long standing businesses can also make a lost profit claim, *Granato v. Benettiere, 5 Conn. Cir. 150, 154, 246 A.2d 901 (1968)*, *Cheryl Terry Enterprises Ltd. v. Hartford, 270 Conn. 619, 641, 854 A.2d 1066 (2004)*.

All authorities and cases seem to agree that "measuring unrealized profits entails extensive problems of proof," *Granato at 5 Conn.Cir. p. 154*, and is "one of the most difficult subject with which courts have to deal," *id. p. 156*. The governing principle is set forth in Restatement (2d) Contracts where at *§ 352* it says

*§ 352*. Uncertainty as **[*38]** a Limitation on Damages

**HN23** Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.

The ensuing commentary at page 145 of volume 1 of the Restatement says: **HN24** "The main impact of the requirement of certainty comes in connection with recovery for lost profits." But then the commentary goes on to add that in calculating damages.

> Doubts are generally resolved against the party in breach. A party who has by (its) breach, forced the in third party to seek compensation in damages should not be allowed to profit from (its) breach where it is established that a significant loss has occurred. A court may take into account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty giving greater discretion to the trier of fact. Damages need not be calculable with mathematical accuracy and are often at best approximate.

The problem with the foregoing is that it is premised on the predicate establishment of a "significant loss." How does one decide that? And certainly the broad discretion given to the trial court would not sanction guessing. But generally **[*39]** similarly broad statements are made in the commentaries and case law. At § 457 22 Am.Jur.2d "Damages" says at page 408.

> **HN25** if the wrongful act of the defendant prevents determination of the exact amount of damages, the defendant is not allowed to insist on absolute certainty but only that the evidence show the lost profits by reasonable inference.

*Message Center Management v. Shell Oil Products, 85 Conn. App. 401, 421, 857 A.2d 936 (2004)* cf. *Gilmore v. Cohen, 95 Ariz. 34, 386 P.2d 81, 82 (Ariz. 1963)*, *Contemporary Mission Inc. v. Famous Music Corp., 557 F.2d 918, 926 (CA 2, 1977)*.

*But* interestingly the section goes on to say: "In such cases, the damages may be estimated according to facts that give the trier of fact a reasonable basis for determination of probable lost profits."

Indeed there are qualifications on this just quoted broad language. The *Granoto* case said that in these lost profit cases absolute certainty cannot be required nor could it be obtained but the court went on to say a court cannot resort to a mere guess but (quoting from a

commentator), "should be guided by some rational standard"; if the litigant [*40] furnishes the best available proof of the amount of loss--the most satisfactory date the situation allows--this would suffice, *5 Conn.Cir. at pp. 156-57*; also see *Gilmore & Cohen, 386 P.2d at page 82*. *HN26* "The requirement of 'reasonable certainty' in establishing the amount of damages applies with added force where a loss of future profits is alleged . . . This is so because such loss is capable of proof more closely approximating 'mathematical precision.' In other words the plaintiff in every case should apply some reasonable basis for computing the amount of damage and must do so with such precision as, from the nature of his (her) claim and the available evidence, is possible." *Gilmore* is a case where the court said doubts as to the extent of injury should be resolved in favor of the innocent party and against the wrong doer. But using the just mentioned reasoning upheld the trial court's denial of a lost profit claim for failure to meet the reasonable certainty test. Thus lost profits need not be established with certainty but . . ."evidence of lost profits must be based upon objective data from which the loss can be determined with a reasonable degree [*41] of exactness" *Maxvill-Glasco v. Royal Oil, 800 S.W.2d 384, 386 (Tex.App. 1990)*, *Southwest Battery v. Owen, 131 Tex. 423, 115 S.W.2d 1097, 1099 (Tex. 1938)*.

Although *Beverly Hills Concepts, supra*, involved a new business scenario and a tort claim was made the court did say that: *HN27* "In order to recover lost profits, therefore, the plaintiff must present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty," *247 Conn. at page 70* cf. *W.W. Gay Mechanical Contractor v. Wharfside Two Ltd., 545 So. 2d 1348, 1351 (Fla, 1989)*; cf. 22 Am.Jur.2d "Damages," § 444: "The law does not require that lost profits be proven with absolute certainty but only with such reasonable certainty that damages are not based wholly upon speculation and conjecture." P. 395.

The court will conclude this preliminary discussion of the standards it will apply to the facts of this case by mentioning two other observations made in these lost profit cases.

*HN28* When the courts speak of lost profit calculations they of course talk in terms [*42] of net profits, *Cheryl Terry Enterprises Ltd. v. Hartford, supra*, *Ellwest Stereo Theatres Inc. v. Davilla, 436 So. 2d 1285, 1288 (La. 1983)* (cited in Beverly Hill Concepts); *Lindevig v. Dairy Equipment Co., 150 Wis. 2d 731, 442 N.W.2d 504*

*(Wis.Ct.App. 1989)*; *The Drews Co. v. Ledwith-Wolfe Assoc., 296 S.C. 207, 371 S.E.2d 532 (S.C. 1988)*; *Maxvill-Glasco v. Royal Oil, 800 S.W.2d 384, 386-87 (Tex.App. 1990)*.

In *Cheryl Terry Enterprises Ltd.* the court upheld the lost profit claim after noting the meticulous way in which the plaintiff calculated her costs in the busing contracts she had previously bid on in the past. The jury could rely on this testimony to determine future costs which could then be subtracted from the contract price to determine net profits. In *Ellwest* the plaintiff was deprived of the opportunity to run a retail store, an accountant calculated net profit figures from other stores run by the plaintiff after taking out all operating expenses, bonuses and other compensation to officers. In *Lindevig* the court stated that *HN29* to establish lost profits a claimant must show business [*43] revenue as well as expenses. The court held that "because the plaintiffs produced no evidence of expenses, the evidence showing gross profits had no evidentiary value" *id. page 508*. In *Drews Co.* the court quoted from Rest of Contracts *§ 331, comment B* (1932) "Profits" have been defined as "the net pecuniary gain from a transaction, the gross pecuniary gains diminished by the cost of obtaining them." Simply put "net profits are what remains after a business deducts expenses," *Maxvill-Glasco v. Royal Oil, 800 S.W.2d at page 386*.

Another observation that should be made is that *HN30* in trying to calculate lost profits our court has "permitted lost profits to be calculated by extrapolating from past profits see e.g., *Westport Taxi Service Inc. v. Westport Transport District, supra, 235 Conn. 1, 32-33, 664 A.2d 719*; *Humphrys v. Beach, (149 Conn. 14, 21, 175 A.2d 363*) ("in the absence of evidence to the contrary, the court was entitled to draw the inference that the plaintiff's business would continue to be as profitable as it had been in the year and a half before the fire"), quote from *Beverly Hill Concepts Ltd., 247 Conn. at pp. 69-70*. [*44] One would imagine that the corollary of this is also true--failure to show profit must have some bearing on the ability to earn future profits. In *Metropolitan Express Services Inc. v. City of Kansas, 71 F.3d 273, 275 (CA 8, 1995)* the court noted that the plaintiff "must demonstrate those lost net profits by offering 'proof of the income and expenses of the business for a reasonable time anterior to its interruption with a consequent establishing of the net profits during the previous period . . . Put simply, "to show that it lost profits (the plaintiff) must first show that it was previously earning profits." Interestingly perhaps for this case the

court noted that although the plaintiff "argue(d) that the loss figures (for previous two years) are deceptive because they represent the company's overall loss for tax purposes and ignore individual gains within segments of the company, (the plaintiff) offered no documentary evidence to explain the contradiction" (*id.*)

(1)

The court will now try to apply these general observations to the facts of this case. The court has been frustrated by this case. It is convinced that a forgery was perpetrated here which was designed [*45] to and in fact mislead the plaintiff in the first litigation and the trial court which dismissed the plaintiff's case based on that forged document. The Appellate Court upheld the trial court resting its analysis on the very same document.

The court is also of the opinion that the plaintiff may very well have suffered a loss, even a loss of profit due to the breach of the agreement the defendant Foss had with the plaintiff oil company. Clearly a lost profit claim would be viable if it could be adequately proven; garnering a profit was the essence of the Foss program, see 22 Am.Jur.2d "Damages," § 448; *Schonfeld v. Hilliard, supra, Krikorian v. Dailey, supra; Camino Real Mobile Home Park Partnership v. Wolfe, supra*.

As just discussed the Restatement (2d) Contracts makes clear that proof of**HN31** lost profits only requires "reasonable certainty" and "doubts are generally resolved against the party in breach (of contract)," *§ 352*, cf. also *Message Center Management v. Shell Oil Products, supra* and "absolute certainty" in these situations is not required, § 457 of previously mentioned Am. Jur. article. [*46]

But having said all that mere guessing is not permissible, there must be a rational standard on which to base a damage award, a "reasonable basis" must be provided for the court to reach an estimate of damages, these estimates have to be based on "objective data" and "complete evidence," *Granato v. Benettiere, supra, Gilmore v. Cohen, supra; Maxvill-Glasco v. Royal Oil, supra, Beverly Hills Concepts Inc. v. Schatz, Schatz Ribicoff & Kotkin, supra*.

The court has read and reread the testimony of the various experts presented by both sides and believes it can fairly come to certain basic conclusions.

Simply put the profit that would have been derived from a sale is determined by first estimating the gross profit

that would be expected from the sale and then deducting the expenses that would be expected to be incurred to achieve the sale. An estimate of net profits is then arrived at which if loss of profit from the sale is the recognized claim, translates into the award for lost profits.

If the basis of the lost profit claim is loss of customers or sales, fixed costs cannot be deducted from the gross profit figure. [*47] That requires a definition of fixed costs in this context. In other words if we posit a point in time in the instant before the sale, fixed costs would be those costs that have already been incurred to operate the business and which would not be increased or affected by the fact that a sale is about to occur and has in fact taken place.

Examined from this perspective lost profits for a seller of goods or services should not be that difficult. Benvenuti Oil sells oil to residential customers. Its business decision to not market the so-called western towns when it learned another company was using the Foss program resulted in a loss of sales. The defendant's breach here is similar then to a breach by a buyer of a contract to purchase--in such circumstances as the Restatement notes, *§ 352*, comment b "proof of lost profit will not be difficult."

But the just mentioned Restatement comment represents only the beginning of the problems that this court, at least, has with the lost profit analysis presented by the plaintiff's accountant. Here we are not dealing, for example, with a single new car sale with the car on the dealer's lot shipped and prepared for sale besides being completely fungible [*48] in the sense that if it is not sold to customer A, customer B will certainly come along to buy it.

In this case the decision not to continue with the Foss program in the western towns meant Benvenuti could not telemarket over 19,000 residences in those towns. Mr. Levy, the plaintiff's other expert, testified the demographics and fuel usage of those towns was similar to that of the central and eastern towns where Benvenuti successfully used the Foss program. Using the percentage rate of success in the central and eastern towns as about 1 percent and applying it to the western towns Benvenuti came up with a figure of 199 lost customers and assumes and projects that loss for a five-year period for a total of almost 1000 lost customers. Even if we accept Levy's 842 gallons per residential customer figure which translates to 1084 customers in

2006 Conn. Super. LEXIS 238, *48

1996 (arrived at by dividing 842 into 913,000, representing gallons of residential oil) this would translate into a doubling of the customer base.

The direct and cross examination of all the experts in the case and common sense would seem to indicate that an increase of that order and even the substantial increase that would result if the 1 percent **[\*49]** ratio for new customers was not used but the more accurate lesser percentage of .58 percent leading to over several hundred new customers over 5 years would have to result in increased fuel costs, maintenance and repair on trucks, possible replacement and acquisition of new trucks, and more office staff. Even before the Foss program was purchased the business had to make these calculations in order to ensure it adequately served its customer base. There is nothing in the record to indicate that these same costs could not have been estimated for the prospective addition of Foss customers from the western towns. Would it have been an exact projection of costs associated with having added these customers?--of course not. But exactness cannot be required by a wrongdoer when there is an attempt to calculate lost profits. However, such a cost projection could have been based on an actual historic record of costs incurred in servicing past customers projected on to costs of servicing new customers.

But oddly the plaintiff's accountant, who struck the court as a very candid witness, in response to a question from the court agreed that under his method of determining lost profits the actual **[\*50]** costs for new customers was not important. His analysis was dependent on a comparison of sales increases which were up 40 percent for the five-year perird in which there is a claim for loss profits compared to only a 10 percent increase in the marginal costs (as calculated by him) for volume increase. For the five-year period from 1996 to 2001 there was an approximate ratio in which sales increased at a rate of about 25 percent more than marginal costs. From that point determination of lost profits for each year from 1996 to 2001 was quite simple for Filingeri. The .2549 percent percentage was applied to the marginal cost figure. For 1996 this turned out to be $ 39,025. This sum was subtracted from the gross profit figure of $ 313,863 which resulted in a marginal income figure of $ 274,838. In 1996 according to one Exhibit (8) 913,000 gallons of residential oil were sold. If we divide

this figure into the marginal income figure, Benvenuti made .301 cents per gallon. If that number is multiplied by the 842 gallons each customer used then we have a profit of $ 253.46 on each customer. That would be multiplied by the 199 customers lost and we have a loss of $ 50,439.46. Projected over **[\*51]** five years there is a loss of $ 252,197.32. Mazella's experience and Levy who had long experience in the oil industry estimated this was a conservative period for which a customer would stay with an oil company once the customer was acquired. The court accepts this estimate. In any event the same equation calculations were used for the ensuing four years resulting in a very substantial lost profit claim. [4]

In effect the plaintiff's accountant said he was trying to come up with an *equation* that would signify lost profit based on a potential client that had not been obtained. He verified his analysis by determining that the ratio of increased sales to marginal costs was fairly **[\*52]** constant for five years. And in fairness to his position it should be noted that *if* the accountant's marginal cost estimation is accepted this ratio remained constant during a time period when new customers were being added. But how can the ratio be assumed to be a correct projection if 1000 or even several hundred new customers are added without an examination of the actual historic costs of servicing customers given their location, the numbers involved, staff needed to service a particular number of customers, delivery costs, average service life of trucks with attendant repair costs?

The problem with the equation and method used by the plaintiff's accountant is that the first projected lost sale for cost estimate purposes is treated the same as the 50th, 70th and, if otherwise established, the 199th lost customer if the 1 percent ratio is used. This cannot be right and in the last analysis the court agrees with the defendant's expert that the equation and method used by the plaintiff's expert makes no practical sense.

*HN32* Past costs and expenses are all well and good but are only useful in a lost profit calculation for future lost profits if they are used as a basis to estimate **[\*53]** future cost projections that can then be deducted from projected revenue. In this regard the case of *Rivenbark v. Finis P. Ernest Inc., 37 Ill. App. 3d 536, 346 N.E.2d 494 (Ill.App.3d 1976)* is perhaps of some interest. There,

---

[4]   In Exhibit 10 the same equation analysis was used but there was an adjustment for 1996, a slight recalculation of oil actually sold, a deduction of $ 50 per customer which represented the sales commission for signing up a customer under the Foss program. This slightly increased the lost profit claim in 1996 and in the ensuing years.

the plaintiff, a dry wall contractor, agreed to furnish labor and materials for the construction of certain buildings in a housing project. The plaintiff claimed that the defendant wrongfully refused to permit him to complete the contract. The plaintiff's wife made the lost profit calculation and the court said:

> To determine lost net profits, (the plaintiff's wife calculated the percentage of profit on the work completed ($ 48,330.09 + $ 144,461.37 x 100 = 33 + %) and projected that plaintiff's profit on the uncompleted portion of tie contract would have been of an identical percentage if the work had been completed. Taking 33 + percent of the difference between the total contract price ($ 218,632.29) and the contract price of the work completed ($ 144,461.37), which equals $ 74,170.92, plaintiff's wife thus arrived at the figure of $ 22,385.17 for lost profits.

> 4 We find this figure erroneous because plaintiff's witness employed [*54] an incorrect method of calculation of lost profits. Plaintiff presented no evidence of the projected cost of completion of the work. There was no testimony regarding anticipated direct costs (labor and material), indirect costs (overhead and other expenses) or how long it would have taken to complete the contract. Without such testimony the proper amount of lost net profit cannot be ascertained. It may be that plaintiff's cost of completion would have been greater than the contract price for the work remaining. In this instance, plaintiff would not be entitled to any lost profits. On the other hand, plaintiff's estimate may well approximate a fair amount of anticipated profits lost as a result of defendant's breach. Under these circumstances we conclude that the court erred in awarding lost profits in the manner calculated. *id.*

Interestingly at several points during his testimony the plaintiff's accountant, Mr. Filingeri, sought to justify his method and the equation he used by saying he was trying to project into the future the financial effect on Benvenuti of losing a customer and apparently that was why he did not do an actual cost analysis. But as noted the actual cost [*55] analysis could have been used to predict future costs of adding customers and in fact his method freezes costs in the year it is applied to the hypothetical lost customer number and then projects the lost profits for five years. The court therefore, cannot award lost profits on the basis of Filingeri's analysis and it does not have enough information available to it to

project future costs as noted employees would have to be interviewed concerning the office staff needed to service certain amounts of customers, truck repair and maintenance records would have to be reviewed to determine added costs that would be incurred in this area to service hundreds of new customers, the need for added trucks and labor to make deliveries would have to be explored, the need for new building space and facilities would at least have to be explored based on current utilized space given the existing customer base.

There is another consideration which does not necessarily, standing alone, invalidate Mr. Filingeri's analysis but which raises questions about it that have never really been answered in the record by him or anyone else. During the five-year period in which the lost profit analysis was made, [*56] 1996-2001, despite the fact that Benvenuti drew back from marketing the western towns, there was a fairly steady increase in the number of new customers. Yet the profit picture for the plaintiff company was decidedly mixed with losses in some years and the ordinary income figures did not even match the hoped for profit from the lost western town customers. As Mr. Koliani, the defendant's expert said, how can one observe such a profit picture (based on real customers) and say, well if we add 199, 100, 75, etc., new customers to those years there would have been a profit? See previous general discussion concerning relevance of profit history and case of *Metropolitan Express Services Inc. v. City of Kansas, 71 F.3d 273, 275 (CA 8, 1995)*.

It is true that for some of the years officer's salaries increased-maybe the profits went there--but then questions arise as to why such costs were fixed costs not marginal costs such a transfer to marginal costs would skewer the whole application of the Filingeri formula in determining marginal income and marginal income per gallon.

(b)

But assuming the court is incorrect in rejecting the Filingeri analysis and his use of an equation [*57] and average profit and cost increases, the court would still have difficulty in arriving at a lost profit figure based on any such analysis in *this* case. To arrive at a gross profit figure, in determining "marginal expenses" and thus marginal income, marginal income per gallon and yearly lost profit from the putative lost customers brought about by the breach, even to determine the number of

lost customers, incorrect and unexplained assumptions were made.

For one thing the lost profit projection after 1996 assumed that if Benvenuti continued to telemarket the so-called western towns it would continue to garner 199 customers per year. The Foss program itself only guaranteed 250 new customers for the first year of the program and that was for the whole area within a 25-mile radius from Benvenuti's Waterford office and thus would cover the western, central, and eastern towns. Mr. Levy, the plaintiff's oil industry expert with many years in the industry and experience with telemarketing explicitly said he was rendering no opinion as to whether Benvenuti was entitled to lost customer damages beyond the first 1996 ten-month customer calling cycle. The court could not ascertain where **[*58]** in the record a basis for the continued garnering of 199 customers, or even two thirds, half, or a quarter of that number could be found. Benvenuti did apparently continue to use the Foss program in the central and eastern towns and gained new customers, one could *speculate*, from the use of that program; but a post-1996 percentage signup rate per total population as a result of this telemarketing was not presented which in turn could be applied to the western towns. People with experience in telemarketing testified and there was no testimony presented that the percentage of signups for a particular area would stay the same in cycles subsequent to the ten-month calling cycle under the Foss program. Does the size of a town's customer base make a difference? the length of the cycle? the extent of competition even by companies not using the Foss program? The court cannot just pick a number of putative lost customers in years subsequent to 1996 even if it were to reject the 1 percent central and eastern town 1996 signup rate which was applied to the western towns to arrive at the 199 lost customer estimate for the latter. For post-1996 years the court can find no basis for even applying **[*59]** the lesser percentage figure even relied on by Levy to determine lost customers in 1996. The rubric repeated in the cases about not requiring mathematical precision in these lost profit cases and not permitting the wrongdoer to take advantage of the fact that exact estimates cannot be provided does not at least to this court involve guessing and speculation which would allow substituting one number for lost customers over another and could lead to massive windfalls based on some whim of a trial court. This is especially true where evidence would have been available to give more exact estimates but was not presented to the court.

Furthermore if we just concentrate on the lost profit projection for 1996 or if we look to the lost profit projections for the subsequent years there seems to be a continuing flaw in the Filingeri analysis which skewers his ultimate conclusions as to marginal income per gallon and thus lost profit for customer in several respects. For example in 1996 the entire sales of the company, $ 1,188,992, not just sales of oil to residential customers, was used as what the court will call a base figure for the Filingeri analysis. Various costs of goods sold were subtracted **[*60]** from that figure to arrive at the gross profit. For example in 1996 the gross profit figure was $ 313,863. The increase in marginal expenses for that year was calculated at .2549 which was multiplied against those marginal expenses to produce a figure of $ 39,025. This was deducted from gross profits and represented marginal income. Marginal income per gallon was determined by dividing residential oil sold into marginal income which in 1996 was $ 274,838 in Exhibit 8 which produce a figure that was then used as a multiplier times the number of gallons purportedly used by each residential customer--842 gallons. This is how the lost income per customer was determined which then had to be multiplied by the number of lost customers and projected out over five years for 1996.

The base number represents company's sales. Insofar as that number includes sales not only of residential oil--the only thing the Foss program was concerned with--but of commercial oil sales or other company business, use of that base number skewers the formula and equation used to determine marginal income which is key to in turn determining marginal income per residential oil gallon. At one point the company president **[*61]** said he sold very little commercial oil in 1996 but in that year he sold diesel, hot water heaters, and home humidifiers. In fact a person working for the company had a plumber's license. Benvenuti started installing air conditioners in fact in 1999. The company also converted propane and natural gas heating systems to home heating oil. A profit was made on the furnace installations--Mazzella said he "could" add 10 to 15 percent to the price of the furnace or boiler. At another point Mr. Mazzella testified "My mix is primarily residential accounts. My commercial account business is probably maybe one percent, two, you know." This will not do for a lost profit analysis. No exact figures are given for residential and commercial--what does 1 percent or 2 percent mean? Percentage of customers, percentage of oil sold? and what of the other aspects of the Benvenuti business briefly referred to above. All of

this information is crucial if the court is to test the validity of the Filingeri conclusions as to marginal income for gallon of residential oil that is sold. In 1996 a reduction of indeterminate thousands of dollars could be involved which only is magnified if the projection is thrown **[*62]** out for five years and this is true for every year.

Also labor costs were an item directly deducted from the gross sales figure on the way to determining gross profit in 1996 of $ 313,863. Mr. Filingeri having arrived at this figure then turned to those costs which he determined would be sensitive to volume increases in sales of apparently residential oil. But by deducting labor costs from gross sales he in effect is spreading labor costs that might be otherwise associated with new Foss customers over the whole customer base.

For some reason repair and maintenance were listed not as a "marginal cost" but as a "fixed cost" not responsive to increased sales volume. Certainly it would seem that increased volume would mean increased delivery time and mileage.

For the court at least there are other difficulties with the fixed cost--marginal cost designations used in the Filingeri formula which directly offers his lost profit calculations.

And what is the category of "Depreciation" listed in 1996 as a fixed cost and the other years--why is it a fixed cost? Is it concerned with equipment or truck replacement?

Also although there is a category of "office salary" listed as a marginal cost **[*63]** group insurance of over $ 29,000 in 1996 is listed as a fixed cost yet this sum represents 15 percent of all fixed costs and would have added 20 percent to marginal cost if transferred to that column. It is understandable why "office salary" would be a marginal cost since increased volume fostered by the Foss program would have effect on staffing decisions--yet how then is group insurance placed in the fixed cost column.

In the 1996 financial report, Exhibit 10, "group insurance" is listed as a fixed cost, thus not subject to

changes in sale volume but one would think this cost would depend on staffing levels which can certainly relate to business activity. If added to marginal cost it would represent almost 20 percent of the figure Filingeri relied upon but what portion of it ought to be placed in that column--does it apply to officers?

Interestingly although "office salary" was listed as a marginal cost "officers salary" was said to be a fixed cost for 1996 and ensuing years, although Charles Mazzella is a hardworking hands on manager who apparently worked in several aspects of this business--not unusual for a small family run business.

The point of all this is that the more costs **[*64]** put in "fixed cost" rather than "marginal cost" the higher the percentage of marginal increase for new sales. This would substantially affect the lost profit calculations.

The net result of the foregoing is that the court on its own cannot parse out various matters critical to a national estimate for lost profits in 1996 or any subsequent years--what portion of gross sales were in fact attributable to residential oil sales, what portion of labor should be attributed to the Foss program, should all of it be listed as a marginal cost--doesn't it have to be but then we are back to the problem of spreading out Foss program costs over the entire customer base.

Last but not least of the court's concerns is the issue of what profit could be *in fact* expected by Benvenuti from having missed the opportunity to telemarket the western towns. The signup sheets in Exhibit 4 for the program indicate that in many cases extra services and price discounts were offered, contrary to that program's policy--such matters would affect expected profits from the new customers and also costs which somehow would have to be added to the "marginal cost" column affecting marginal income per gallon calculations. **[*65]** The sheets indicate several were so called "will call" customers not "automatic delivery customers" and several people cancelled after being signed up. Many sheets were lost. [5]

In any event for all of the foregoing reasons the court does not accept the Filingeri analysis and cannot **[*66]**

---

[5]   Another observation that can be made about the application of the Filingeri formula is Levy's estimate that the average customer used 842 gallons per year. Mr. Levy is certainly a very qualified expert and the manual he used is accepted in the industry but the court can make the observation that this figure is a statewide calculation. The temperature in the northern sector of our state fluctuates greatly from that along the cost where a great part of Benvenuti's customers are located. Interestingly in another phase of this litigation Benvenuti calculated its residential customers used 717 gallons per year. Again there is no apparent explanation why these calculations could not have been redone or the reason for the discrepancy.

use it to make an estimate of lost profits. Neither can it otherwise arrive at a fair estimate of lost profit that is based on speculation or surmise. The defendant is a wrongdoer who perpetrated a fraud and he cannot demand mathematical precision in the determination of lost profits. But he is not devoid of rights and this court cannot be asked to impose damages not based on what it considers a reasonable basis.

(c)

The plaintiff makes another claim for damages which it entitles "Sale of Accounts Damages."

This claim may be designated the value of lost customers. The basis of the claim is an assumption that Benvenuti lost customers in the western towns. Given that assumption the question was posed to the expert Levy in his May 3, 2004 testimony--assume Mr. Mazzella wanted "to sell those customers"--"Is there a way to determine the value of those customers?" In one and a half pages of its brief the plaintiff summarizes what it takes to be Levy's position and claims the value of what it characterizes as the loss of the opportunity to sell those lost customers accounts is $ 374,682.00 using a 6-year cycle of lost customers. Only eight transcript pages dealt with this concept and in **[*67]** the defendant's opposition brief this claim was not explicitly addressed. The interplay between a claim such as this and a lost profit claim was not discussed by the plaintiff. It would seem at least to the court that a lost profit claim and value of account claim cannot be advanced together since any damage award would then be duplicative.

*HN33* True, a claim for the value of lost customers which must assume a market willing to purchase them is not exactly analogous to a claim for loss in value of a business due to breach. But in the latter circumstances it has been recognized these two types of recovery will be allowed in the same case but not for the same time period *N.E. Telephone Co. v. Am. Tel. & Tel. Co., 651 F.2d 76, 90* (fn. 30), cited in *Westport Taxi v. Westport Transit District, 1991 Conn. Super. LEXIS 1498 (Katz, J.)*, *Protectors Ins. Service v. USF&G, 132 F.3d 612, 616 (CA 10, 1998)*. It has been held that for double recovery in such a situation "such a loss must exist independently of lost profits," 22 Am.Jur.2d "Damages," § 456, page 407, cf. *Protectors Ins. Services v. USF&G, supra,* **[*68]** *Albrecht v. The Herald Co., 452 F.2d 124, 131 (CA 8, 1971)*. Here Mr. Levy clearly relied on operating profit margins to determine customer value. (5/3/04 A.M. transcript pp. 89-90.) It seems to the court

that if it had been inclined to award lost profit damages an award for what the lost sale value of customers would have been duplicative.

But the court has rejected the plaintiff's lost profit claim and the question then becomes whether a separate lost value of customer claim can be advanced. Assuming that this is at least a theoretical possibility the court has several difficulties with it in this case. There is no indication that Mr. Mazzella would have entertained the notion of ever selling the customers he would have acquired in the western towns. Mr. Levy simply said at page 97 of the May 3d, A.M. transcript.

> Q. Okay. And in the field of residential oil sales the value per customer is a valid concept.
>
> A. (Levy) Yes it is.
>
> Q. And people do sell customers.
>
> A. Yes.

But real world claims for loss have to be made in real world markets. Mr. Levy's extensive oil industry background lies in Long Island; more than one witness testified that **[*69]** that is a residential oil market of hundreds of thousands of customers with many companies competing for business in any one area. No market analysis was done by Levy as to the market for such customers from this discreet area of Connecticut--the so-called western towns. Deep River was closest to this pool of customers but the owner was not asked for example of that company's ability and willingness to have offered the price per customer Mr. Levy suggested.

A more basic problem the court has with this claim is the purported explanation of it by the expert Levy. At least to this court to refer to some generic industry formula without any explanation as to how it really operates or why it makes sense in relation to a particular case will not do. The court will quote from Levy's testimony to indicate why to it at least this claim was inexplicable.

> Q. Is there a way to determine the value of those customers?
>
> A. Yes. What you do is you take the margin, again, the selling price less the purchase price. Normally the way you start is you multiply that times one and a half for a full-service company that has service, and automatic deliveries, and budget plans, and everything he **[*70]** has and come up with a number.

If I'm working on 40 cents, then that business is worth 60 cents a gallon. If I'm working on a dollar, that margin is worth a dollar and a half a gallon.

Q. Were you able to determine a margin from Benvenuti Oil from the financial statements?

A. We took the reported margin and took the financial statement for 2002, took his purchases, subtracted his gross profit and we added back the labor costs and the subcontract costs and came up with a number that was higher than he reported.

Q. I want you to explain to His Honor how you go about determining the value of a customer. In other words--and I assume the value--if someone were to sell that customer--

A. Correct.

Q.--he would have a certain value on that customer.

A. What we do is we take--it was an individual customer. We would take the margin on that account. Again, the selling price less the purchase price, multiply it times the number of gallons they use in a 12-month period and multiply that times one and a half times the margin. So if I've got a customer who burns--again, let's use easy math. If you have a thousand gallons a year and you have a 50-cent margin, that customer **[*71]** would be worth $ 750, one and a half times the margin.

THE COURT: Why do you divide it into half, because they are providing service?

THE WITNESS: No. The industry average right now, most companies are looking for somewhere between five, four and a half to six, in that range payback. So if I can add incremental gallons without adding a whole bunch of overhead, the number becomes the earning before interest times the fact of 45 But when I have an individual customer to sell, that value is actually higher, because I've got none of the overhead coming in.

Later on at page 92 the following occurs where, speaking of 1996, Attorney Bartinik asks the following:

Q. I want you to determine--from those numbers you determine the number of lost customers, lost opportunities. I just want to have you make a determination as to value of those lost customers.

A. If we used 79 accounts times 842 gallons times 90 cents is $ 59,866.20. Ninety-four accounts. Again

it would be 94 times 842 times 90 cents. The number would be $ 71,233.20.

Where does the 90 cents come from? For reasons previously discussed the 842 gallon per customer figure is not even supportable. Also in **[*72]** his damage claim set forth in the brief the plaintiff applies Levy's calculations to a multiple year cycle of repeated lost customers. As noted previously Levy himself said he was not asked to and could offer no opinion as to any lost customer projections after the year 1996 and as indicated the court itself has similar doubts about such projections.

Perhaps even more fundamentally Levy's abstract accepted in the industry formula or method of loss evaluation does not take account of the actual facts of this case. The customer signup sheets in Exhibit 4 indicated there were many will call customers not the automatic delivery customers the Foss program understandably demanded. Discounts were given, services offered at the salesperson's discretion which involved extra costs. Given Benvenuti's track record can we postulate the lost customers in the western towns would be pure Foss program "lost opportunities" or less profitable possibilities for a company considering a purchase of such accounts? This of course would have an effect on customer value.

Finally to return to a factor briefly alluded to previously--Mr. Levy appears to have developed his experience in a highly competitive New **[*73]** York market. Felicia Spinogatti testified to this intense competition in the Long Island residential oil market for example. How can an abstract industry formula be used to evaluate sale value of lost customers without some kind of real world market analysis of possible competitive bidders for any such customers? The location of companies willing to purchase such customers would directly affect labor and other delivery costs which would also necessarily affect the value of any prospective customer accounts to such companies.

Mr. Mazzella himself said at one point the desirability of marketing in certain towns in part depended on his access to Route 9 and I-95. An evaluation of the available market for purchase of such accounts has to be made. Again this is not Long Island with numerous competing residential oil companies all presumably relatively equidistant to customers. At the very least this should have been explored before a court had been asked to award hundreds of thousands of dollars in damages.

2006 Conn. Super. LEXIS 238, *73

The court does not award damages on this aspect of the damage claim.

*DAMAGE AWARD*

In light of the foregoing the court will award duly nominal damages of $ 1 each for the Breach **[*74]** of Contract claim and the Forgery/Fraud claim. In light of the court's finding of fraud the court will award punitive damages. *Markey v. Santangelo, 195 Conn. 76, 77, 485 A.2d 1305 (1985)*, *Plikus v. Plikus, 26 Conn.App. 174, 180, 599 A.2d 392 (1991)* in the form of attorneys fees, compare *Triangle Sheet Metal Works Inc. v. Silver, 154 Conn. 116, 127, 222 A.2d 220* et seq. (1966) because of the "malicious or wanton misconduct" involved in the forgery. In its brief the plaintiff submits a claim for attorneys fees of $ 145,514.05 for post-August 2, 2001 litigation (i.e., prosecuting this second suit). Further fees are claimed from April 29, 2004 to the present date. It will be necessary to have a post-trial hearing on this issue. The court will order a prejudgment remedy of $ 200,000 on the attorney fee claims subject to plaintiff's further evidence and challenge by the defendant who really did not address specific claimed amounts but only generally opposed attorneys fees on the grounds that the requisite causes of action had not been established and the proper remedy for the plaintiff was to bring an action for a new trial rather than **[*75]** a second suit alleging breach of contract, CUTPA violations and fraud.

The issue of whether punitive damages can be awarded when only nominal damages have been awarded is not entirely clear. In 22 Am.Jur.2d, § 554, pages 495-97 the following is said:

> Under the view of some courts, a plaintiff is generally entitled to recover punitive damages by showing that he or she suffered at least or at a minimum, nominal damages. Other courts state similarly that nominal damages may support a punitive award, observing that the foundational requirement for punitive damages is merely that some legally protected interest be invaded.

> Some courts follow the view that punitive damages may not be recovered if only nominal damages are found or awarded. The rationale for this rule is that if an individual cannot show actual harm, he or she has but nominal interest, and society has little interest in having unlawful, but otherwise harmless, conduct deterred.

Even in jurisdictions taking the view that nominal damages will not support an award for punitive damages

on the basis that "society has little interest in having unlawful but otherwise harmless conduct deterred," the facts of this **[*76]** case would seem to call for allowance of such damages. Fraud was committed on a trial court and an Appellate Court and the plaintiff was left with the difficult task of proving future loss profits.

In *Farrar v. Hobby, 503 U. S. 103, 114-15, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992)* the court held the prevailing party in a *42 U.S.C. § 1983* action who recovers only nominal damages and thus is a "prevailing party" can recover punitive damages when the lawsuit serves a significant public purpose. Cf. *McGrath v. Toys R Us, 3 N.Y.3d 421, 821 N.E.2d 519, 788 N.Y.S.2d 281* (NY Ct. of App., 2004). Here the plaintiff could be said to have a right to recover punitive damages even if the state's taking a more restrictive view.

Our state seems to accept the more liberal position. In a CUTPA case *Associated Investment Co. Ltd. Partnership v. Williams Associates, 230 Conn. 148, 645 A.2d 505 (1994)* the court at page 161 fn.16 said:

> **HN34** Although punitive damages are recoverable at common law, they ordinarily may be awarded only if the complainant, unlike the defendants here, pleads and proves a right to recover compensatory *or nominal damages* (emphasis by this court).

**[*77]**

The court cited among other authority 4 *Restatement (2d) Torts § 908*, p. 465 (1979). Also see *Lyons v. Nichols, 63 Conn.App. 761, 768, 778 A.2d 246 (2001)* (defamation case, nominal and punitive damages awarded where Appellate Court noted the court "refrained from awarding compensatory damages because the plaintiff could not provide the court with a reasonable means of calculating the extent of the harm his reputation had suffered from the libelous statement," *id.* page 76); also see *DiNapoli v. Cooke, 43 Conn.App. 419, 682 A.2d 603 (1996)*.

Finally in light of the court's decision the court has no occasion to rule on the request for prejudgment interest and a double damage claim for forgery. *Section 52-565* provides for double damages for a person injured by the forgery. The injury caused by the forgery here would be the expenses associated perhaps with the first litigation. It would be an odd stretch of words to say that this would translate into doubling of attorneys fees.

Also in light of the court's present order as to the prejudgment remedy the defendant should disclose

assets to that amount. Further orders **[*78]** will await postjudgment hearings.

Corradino, J.

ENDNOTE

1. The court should also mention that the defendant raised several issues that are somewhat interrelated but in light of the court's decision on damages need not have been directly dealt with. Under the doctrine of Mitigation of Damages or Avoidance of Consequences it has been said in 22 Am.Jur.2d, "Damages" that under the doctrine of avoidable consequences **HN35** "a party cannot recover damages flowing from a consequence that the party could reasonably have avoided," *§ 340*. In *§ 341* it is stated that this is an extension of the principle of proximate cause. The *Restatement (2d) Contracts at § 350* says "damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation," also see 22 Am.Jur.2d "Damages," sections 351 et seq. Similar principles apply in tort actions, see *Restatement (2d) Torts, Section 918*. Our state follows this law, *Eastern Sportswear Co. v. S. Augstein & Co., 141 Conn. 420, 106 A.2d 476 (1954)*; *Richard v. A. Waldman & Sons Inc., 155 Conn. 343, 232 A.2d 307 (1967)*; **[*79]** *Eaton Factors Co. v. Bartlett, 1 Conn. Cir. Ct. 376, 24 Conn.Sup. 40, 186 A.2d 166 (1962)*; *Preston v. Keith, 217 Conn. 12, 584 A.2d 439 (1991)*; *Lange v. Hoyt, 114 Conn. 590, 159 A. 575 (1932)*.

The court accepts Mr. Mazzella's testimony that he did not market the western towns based on a rational business decision after he learned Deep River was using the Foss program in his exclusive area. The defendant's testimony from Felicia Spinogatti, for example, that in the case of competition her company would continue to do the Foss program in the Long Island market. That market has thousands upon thousands of prospective residential oil customers not the roughly 19,000 in the western towns. It certainly seems to have been a rational decision to abandon telemarketing there and concentrate on areas closer to

Benvenuti's home base in Waterford where the costs would be lower--not an idle consideration since this small company had spent over $ 25,000 buying into a program that did not deliver, in terms of exclusive radius, what was promised. The defendant also made much of the fact that Benvenuti's business was concentrated in areas where telemarketers **[*80]** would not incur toll charges whereas the western towns would have involved toll calls--not an unimportant consideration when telemarketing is the method to procure customers. So the suggestion would seem to be that Mazzella would have decided not to market the western towns in any event. But Mazzella said he planned to increase his telemarketers and only decided not to when he learned he did not have an exclusive radius to the west--if he did there is nothing to indicate the monetary advantage of marketing the west would not have outweighed telephone cost considerations.

It was also suggested that two of the western towns were successfully telemarketed by Benvenuti--so why not market the rest of the western towns? But Mr. Mazzella offered an explanation for this; his salesperson lived in those towns and he had contacts there. In his otherwise thorough presentation the defendant did not attempt to refute this.

Finally there was some suggestion that having withdrawn from the west Mazzella could have his telemarketers concentrate on the eastern towns so what business was actually lost. Not only was this claim not factually established but it ignores the previously mentioned fact that **[*81]** Mr. Mazzella had planned to increase the number of telemarketers so he could use the Foss program in the west and east to the extent it was productive. The court accepts Mr. Mazzella's representations and the Foss program is a very successful one in this industry.

Suffice to say that if the plaintiff had been able to prove his damage claims beyond a nominal amount, the court would not have reduced that claim for any of the foregoing reasons advanced by the defendant.