# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| EAST POINT SYSTEMS, INC., | : | |
| THOMAS MARGARIDO, JASON | : | |
| MARGARIDO, AND PAUL TAFF, | : | |
|  | : | |
|    Plaintiffs, | : | CIVIL ACTION NO.: |
|  | : | 3:13-cv-00215 (VAB) |
| v. | : | |
|  | : | |
| STEVEN MAXIM, S2K, INC., MAXIM | : | |
| ENTERPRISES, INC., MAXIM FIELD | : | |
| SERVICE SUPPLY, INC., EDWIN | : | |
| PAJEMOLA, AND CLEVELAND FIELD | : | MARCH 22, 2016 |
| SYSTEMS, LLC, | : | |
|  | : | |
|    Defendants. | : | |

## MEMORANDUM AND ORDER

Plaintiffs, East Point Systems, Inc., Thomas Margarido, Jason Margarido and Paul Taff, brought this action against Defendants, Steven Maxim, S2K, Inc., Maxim Enterprises, Inc., Maxim Field Service Supply, Inc. (collectively, the "Maxim Defendants"), Edwin Pajemola, and Cleveland Field Systems, LLC (collectively, the "Pajemola Defendants").  The Court held a four-day bench trial, and now sets forth its findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(1).

As explained below, the Court finds for the Maxim Defendants on Counts One through Eight, and Ten through Fourteen.  The Court finds for Plaintiffs on Count Nine and orders S2K, Inc. to sell its shares of East Point Systems, Inc. for $57,000.  The Court also finds for Plaintiffs on Count Fifteen and establishes a constructive trust over any Field Navigator software in the Maxim Defendants' possession containing Field-Comm.net database tables.

The Court finds for Plaintiffs on Counts Eleven through Thirteen against the Pajemola Defendants and awards $750,000 in damages and an additional $100,000 in punitive damages, as

1

well as reasonable costs and attorney's fees.  The Court also finds for Plaintiffs on Count Fifteen and imposes a constructive trust on any Field Navigator software in the Pajemola Defendants' possession containing Field-Comm.net database tables.  Finally, the Court permanently enjoins the Pajemola Defendants from using or otherwise disposing of such software.

This memorandum addresses motions pending against the Pajemola Defendants for contempt, default judgment, and dismissal of counterclaims.  For the reasons explained below, Plaintiffs' Motion for Contempt (ECF No. 149) is GRANTED IN PART AND DENIED IN PART.  Plaintiffs' Motion to Dismiss Counterclaims for Failure to Prosecute (ECF No. 150) is GRANTED.  Plaintiffs' Motion for Default Judgment (ECF No. 152) is GRANTED IN PART AND DENIED IN PART.  Maxim Defendants' Motion for Default Judgment (ECF No. 151) is FOUND AS MOOT.

## I.       FINDINGS OF FACT

The parties to this action operate in the mortgage field service industry, which provides preservation services for mortgaged properties in default or foreclosure.  Lenders and national mortgage servicing companies typically engage regional service companies, which, in turn, typically engage subcontractors to perform preservation services on properties in default or foreclosure, such as drive-by inspections, mowing lawns, changing locks, and winterizing.

In 1996, Thomas Margarido and Paul Taff began doing business together to develop software for the mortgage field service industry.  They formed East Point Systems, LLC for that purpose.  Thomas Margarido's son, Jason, helped developed the software and eventually became an owner of East Point Systems, LLC.  The initial version of the software was called Field-Comm, and was developed using a tool called FileMaker Pro.  It took several years to develop, test, and market.

Field-Comm facilitated the processing of work orders for mortgage field services.  Users could upload work orders to Field-Comm, and Field-Comm could automatically assign work orders to contractors based on certain data (*e.g.*, the service requested or the location of the property), track the status of work orders, allow field workers to upload photographs of completed work, track the history of services performed on properties, automatically create invoices, process payments, and generate reports.

Initially, East Point Systems, LLC licensed Field-Comm to customers for a $1,500 fee.  Customers received compact discs containing the software, and installed the software on their computers.  Later, instead of the $1,500 fee, East Point Systems, LLC charged its customers a monthly fee, and charged "per click" fees for particular transactions conducted within Field-Comm.  Regional service companies would pay "per click" fees for particular transactions that they conducted, and subcontractors of the regional service companies would also pay "per click" fees for particular transactions that they conducted.  Field-Comm was not web-based.  Only computers on which Field-Comm had been installed could access and use Field-Comm.

East Point Systems, LLC licensed Field-Comm to Steven Maxim's father for use in his business, Maxim Enterprises, Inc. ("MEI").  When Steven Maxim took over MEI, he discovered Field-Comm and contacted Thomas Margarido.  Thomas Margarido trained Steven Maxim on Field-Comm in or about 1999.  MEI then used Field-Comm in its business.

MEI was a regional service company.  It coordinated subcontractors to perform mortgage field services in some northern states.  MEI received work orders from lenders and national servicing companies, distributed those work orders to subcontractors, and reported back to the lenders and national servicing companies when the work was done.  Some of MEI's subcontractors actually performed the work, while others were contractors who, in turn, engaged

subcontractors to perform the work.  To make money, MEI retained 15 to 20 percent of the money that lenders and national servicing companies paid to have work done.

In or about 2004, Thomas Margarido told Steven Maxim that East Point Systems, LLC might go out of business without a cash infusion, and that, if it went out of business, it would not be able to support Field-Comm any longer.  Steven Maxim inquired about investing in East Point Systems, LLC.  Following negotiations, East Point Systems, LLC was reorganized into East Point Systems, Inc. ("East Point").  S2K, Inc. ("S2K"), a hardware retail company owned by Steven Maxim, purchased shares of East Point for $250,000, and Steven Maxim took a position on the board of directors of East Point (the "Board").

Several agreements were entered into at this time.  First, Paul Taff, Thomas Margarido, Jason Margarido, and S2K entered into a Shareholder Agreement.  Second, Paul Taff, Thomas Margarido, Jason Margarido, and S2K entered into a Cross Purchase Agreement.  Third, East Point and S2K entered into a Confidentiality and Non-Competition Agreement.  Fourth, East Point and Steven Maxim entered into a Confidentiality and Non-Competition Agreement.

While on the Board, Steven Maxim participated in meetings regarding the general direction of East Point, large expenditures, and principal compensation.  He periodically engaged a financial professional to review East Point's books and records.  He also proposed numerous enhancements to Field-Comm.  For example, he proposed that Field-Comm have a reverse payment feature, so that if a lender or servicing company underpaid for a service, Field-Comm could reverse any payment already made to a subcontractor for that service.  East Point did not implement this feature immediately, however.  Steven Maxim came up with many ideas for improving Field-Comm, but East Point was unable to implement enhancements as quickly as Steven Maxim wanted them for use in his business, MEI.

In 2004, Steven Maxim proposed transitioning Field-Comm to a web-based format. The other principals of East Point rejected this proposal. They believed that transitioning to a web-based format was too risky because, at that time, the tools for web-based software development either did not exist or were unreliable. East Point instead developed the next version of its software using Microsoft's .NET framework. The principals of East Point believed that the .NET framework was more stable, well-developed, and posed less risk than the then-existing tools for web-based software development. East Point called the next version of its software Field-Comm.net, and began offering it to customers in 2005. East Point registered a copyright for Field-Comm.net. The effective date of that copyright registration was November 20, 2012. Pls.' Ex. 7.

Field-Comm.net was an improvement over Field-Comm. East Point could send downloadable software updates to customers, which was not possible with Field-Comm. Also, users could access Field-Comm.net through web browsers, whereas Field-Comm could be accessed only from computers on which it was installed.

Despite its improvements, however, Steven Maxim encountered problems with Field-Comm.net. He found it cumbersome – it sometimes timed out – and payment processing errors resulted in MEI overpaying contractors approximately $100,000 during one period. Also, Steven Maxim wanted the ability to perform advanced data analytics. He wanted to track and measure how much time, money, and staff was spent on various jobs so that MEI could identify and remedy inefficiencies. Field-Comm.net could not perform data analytics to Steven Maxim's satisfaction.

Steven Maxim told the principals of East Point that he was experiencing issues with Field-Comm.net, and that he wanted to improve the software's data analytics capabilities. East

Point agreed to "branch" the code.  That is, East Point created a copy of Field-Comm.net's code to which MEI could make modifications to meet its business objectives.  MEI's branch was isolated from the code driving the software that East Point's other customers used.  As a result, modifications that MEI made to its branch did not affect any other customer's software.

Around the same time, East Point referred a business analyst to Steven Maxim to help address his issues with Field-Comm.net.  That business analyst referred Steven Maxim to a software developer named Edwin Pajemola.  MEI engaged Edwin Pajemola to develop modifications to its branch.

To facilitate the modification of MEI's branch, East Point agreed to give MEI and Edwin Pajemola access to Field-Comm.net's source code and database.  In December 2008, two agreements were entered into by the various parties.

First, East Point, MEI, and Edwin Pajemola entered into a Software Source Code Access and Indemnity Agreement.[1]  Under this agreement, East Point gave MEI and Edwin Pajemola access to Field-Comm.net's source code and database for the purpose of enabling MEI to modify its copy of Field-Comm.net.

Second, East Point and Steven Maxim, both individually and as a duly authorized official of MEI, entered into a Confidentiality and Non-Competition Agreement.  This agreement acknowledged the Software Source Code Access and Indemnity Agreement, and set forth restrictions on the use of certain information disclosed under that agreement.

Field-Comm.net had two main components: (1) a database and (2) an application that allowed users to add data to and retrieve data from the database.

---

[1] Two copies of the Software Source Code Access and Indemnity Agreement were admitted at trial.  One is signed only by Steven Maxim as president of MEI.  The other is signed only by Edwin Pajemola as MEI's agent.  Neither is executed by East Point.  The two copies differ slightly in format, but appear to be identical in substance.  *See* Pls.' Exs. 5, 6.

The database was comprised of various tables, each of which contained columns and rows. Each table had a name, and each column had a name. Table and column names generally followed the same nomenclature: lower case words separated by underscores. For example, one table was named "grass_cut_schedule" and another was named "invoice_payment." Names generally indicated the type of data contained within the table or column. The database also contained views, which display and restrict access to data, as well as stored procedures and functions, which manipulate data to generate reports (*e.g.*, a summary of amounts invoiced to a particular client during a particular period).

The database was critical to the functionality of Field-Comm.net. Field-Comm.net's ability to generate prices and invoices for services automatically, as well as automatically assign work orders to contractors, was driven by the structure and content of the database tables.

The application drove the graphical user interface, with which users interacted when adding data to (*e.g.*, uploading photographs of completed work), and retrieving data from (*e.g.*, accessing work orders), the database. The application contained query language that drove the interactions between the user interface and the database.

Following the execution of the Software Source Code Access and Indemnity Agreement and the Confidentiality and Non-Competition Agreement in December 2008, Steven Maxim directed Edwin Pajemola to retrieve MEI's data from the Field-Comm.net database. Edwin Pajemola accessed the database, but never accessed the application code. Steven Maxim, who is not a programmer, never personally accessed either.

One of the first improvements that Steven Maxim, MEI, and Edwin Pajemola developed was Task Tracker, a stand-alone application that was not integrated with Field-Comm.net. Task Tracker was a timekeeping tool that tracked the amount of time and money spent on jobs. It also

contained the reverse payment feature that Steven Maxim had proposed as a member of the Board, a "scorecard" feature that allowed MEI to give performance evaluations to subcontractors, a late job tracker, a write-off tracker, and several other tracking features.  Task Tracker provided MEI with metrics that it could use to improve efficiency.

In 2009, Steven Maxim and Edwin Pajemola demonstrated Task Tracker to the other principals of East Point, and proposed adding it to Field-Comm.net.  East Point declined, and did not add it to Field-Comm.net.  MEI continued to use Task Tracker in its business, and the East Point principals did not object.

In or about March 2010, at an annual meeting with MEI's subcontractors, Edwin Pajemola presented a web-based field services software he had developed.  Steven Maxim was surprised because he had not instructed Edwin Pajemola to develop a web-based software.  Edwin Pajemola called the new software Field Navigator, and MEI began using it in its business.

Field Navigator had many of the same core features as Field-Comm.net (*e.g.*, distributing work orders, generating invoices and reports, processing payments, uploading photographs of completed work), but also integrated Task Tracker and the metric-generating features that Steven Maxim and Edwin Pajemola had developed.  Steven Maxim thought that Field Navigator gave MEI a competitive advantage because MEI no longer had to work with two systems (Field-Comm.net and Task Tracker), it could be updated easily, and its web-based format allowed users to view content simultaneously.  Steven Maxim and Edwin Pajemola did not tell East Point about Field Navigator.

In March 2010, Edwin Pajemola pursued a copyright titled, "Software application that provides a tool for streamlined work order processing, including communications with contractors and clients for property preservation companies."  Pls.' Ex. 20.

Later in 2010, Steven Maxim formed Maxim Field Service Supply, Inc. ("MFSS"), a company intended to handle the development of Field Navigator.  In August 2010, MFSS and Edwin Pajemola entered into an Employment Agreement, which provided that Edwin Pajemola was responsible for designing, programming, and maintaining Field Navigator.

MEI required its subcontractors to use Field Navigator.  Accordingly, when MEI sought to engage a subcontractor, it required the subcontractor to execute two agreements: (1) an agreement to create the contractor-subcontractor relationship, and (2) a software license agreement under which MFSS licensed Field Navigator to the subcontractor.

To recoup its costs in developing Field Navigator, MFSS planned to charge MEI's subcontractors one percent of their annual revenues for their use of Field Navigator.  MFSS ultimately never charged MEI's subcontractors for their use of Field Navigator, however, because the mortgage field service industry declined with the improvement of the housing market, and Steven Maxim believed it would be an unfair tax on subcontractors, who were not using Field Navigator as much because of the decline in business.  No Maxim Defendant ever received any money from any entity for use or license of Field Navigator.

In early 2011, East Point engaged a firm called Marketing On Demand to research competitors.  Marketing On Demand is owned and operated by Jennifer Muller and her husband, John Muller.  As part of their competitive research, the Mullers engage in "secret shopping," which involves posing as potential customers to gather information on competitors' products, marketing, and pricing.

The Mullers discovered a web site for Cleveland Field Systems, LLC ("CFS"), an Ohio company that Edwin Pajemola formed apparently for the purpose of developing and licensing software.  The Mullers informed the East Point principals, who authorized the Mullers to

investigate.  The Mullers called CFS and reached Edwin Pajemola.  The Mullers disguised their

true identities and requested a demonstration of the software from Edwin Pajemola.  The Mullers

later spoke with Kelly Bernstein, an MEI employee, who set up a videoconference for the

demonstration.  The demonstration occurred on April 1, 2011.  The Mullers recorded the

demonstration, and Thomas Margarido secretly observed.  Kelly Bernstein and Edwin Pajemola

demonstrated Field Navigator, and Steven Maxim later joined the call.

After the demonstration, Kelly Bernstein, an MEI employee, sent the Mullers a

Subcontractor Software License Agreement, under which MFSS would license Field Navigator

to the Mullers.   It is unclear whether Kelly Bernstein also sent the Mullers a subcontractor

agreement to create a contractor-subcontractor relationship.

After the demonstration, Thomas Margarido called Steven Maxim and complained that

Edwin Pajemola was marketing software through CFS.  Steven Maxim directed Edwin Pajemola

to take down the CFS web site.  Steven Maxim then severed his relationship with Edwin

Pajemola, and Edwin Pajemola stopped returning Steven Maxim's phone calls and e-mails.

Soon afterward, East Point removed Steven Maxim from the Board.  East Point offered to

purchase S2K's shares, and retained an appraiser who valued the shares at $33,000.  S2K hired

its own appraiser, who valued the shares at $57,700.  East Point offered to purchase the shares

for $57,700, but S2K declined.  S2K remains a shareholder.

In 2011, Steven Maxim explored the possibility of a merger between MEI and A&M

Recovery Services, Inc. ("A&M"), a regional service company that organized subcontractors to

perform property preservation services in some southeastern states.  A&M used Field-Comm.net

for those purposes, and was one of East Point's largest accounts.  Steven Maxim knew that A&M

was a customer of East Point's.

10

As part of its due diligence, MEI installed Field Navigator at A&M's offices.  Steven Maxim thought that, if A&M and MEI both used Field Navigator, he could determine whether synergies existed between the two businesses such that, if merged, they could service efficiently a large territory across northern and southern states.  Neither MEI nor MFSS charged A&M for the use of Field Navigator.

In late 2011, CFS licensed software called Field Navigator to A&M.  In November 2011, CFS licensed software called Field Navigator to Berghorst Enterprises, L.L.C. ("Berghorst"), another regional service company that was a customer of East Point's.  Steven Maxim was not aware of either transaction.  No Maxim Defendant received any money from either transaction.  In 2012, MFSS sued Edwin Pajemola and CFS in Ohio state court alleging, *inter alia*, that Edwin Pajemola breached a non-competition provision in his employment agreement with MFSS.

Sometime in 2011, East Point started to lose revenue from its A&M account.  A&M continued to pay East Point its monthly licensing fee, but "per click" revenue from A&M and its subcontractors declined.  East Point's revenue from Berghorst also started to decline sometime in 2011.  East Point lost "per click" revenue from Berghorst and its subcontractors.

The mortgage field service industry continued to decline into 2014 as the housing market improved.  MEI, MFSS, and A&M have closed their doors.  East Point went from thirty-six employees at its peak, to fourteen employees in 2014.

The parties engaged two computer science experts to compare Field-Comm.net and Field Navigator.  The experts agreed that a significant number of table and column names from Field-Comm.net's database had been copied into Field Navigator's database.  Approximately 102 of the 137 tables making up Field-Comm.net's database appeared in Field Navigator's database with the same names.  Those 102 copied tables constituted approximately 42% of the

243 total tables in Field Navigator's database.  The other tables in Field Navigator's database generally followed a different naming convention.

As to columns, approximately 475 of the approximately 887 columns in Field-Comm.net's database appeared in Field Navigator's database with the same name, and substantially the same data types and data sizes.  Thus, approximately 54% of the columns in Field-Comm.net appeared largely unaltered in the Field Navigator database.  Of the 102 copied tables, only 19 had changes to the names, data types, sizes or ordering of their columns.  Thus, approximately 81% of the 102 tables copied from Field-Comm.net's database appeared unaltered in Field Navigator's database.

The experts also compared the two databases' views, stored procedures, and functions.  The experts agreed that, of the approximately 1,200 views, stored procedures, and functions in Field Navigator's database, none were copied exactly from Field-Comm.net's database, and no significant number were substantially similar.  The Plaintiffs' expert discovered, however, that four functions appearing only in Field Navigator's database contained "fieldcom" in their names.

The defense expert compared the two systems' application code and user interfaces.  The Plaintiffs' expert did not.  The defense expert found no significant evidence of copying in Field Navigator's application code.  He found that Field Navigator's user interface was largely tabular, while Field-Comm.net's user interface displayed tabs only in its "Orders" section.  Some tab names were common between the two.  He also found that Field Navigator's search function used terminology that Field-Comm.net used to indicate order status.  He found no other significant similarities between the two systems' user interfaces.

## II.     CONCLUSIONS OF LAW

### A.     Count One: Breach of Shareholder Agreement by Steven Maxim and S2K

In Count One, Plaintiffs claim that, "[b]y copying [East Point]'s Field-Comm.net architecture and design for commercial gain, [Steven] Maxim [and] S2K violated the Shareholder Agreement."  Verified Compl. ¶ 122.

First, Steven Maxim was not a party to the Shareholder Agreement, *see* Pl.'s Ex. 13, and therefore, is not liable for its breach.  *FCM Grp., Inc. v. Miller*, 300 Conn. 774, 797 (2011) ("[O]nly parties to contracts are liable for their breach.").  Second, the only evidence regarding S2K was that it sold hardware and held East Point shares.  There was no evidence of any conduct by S2K that would amount to a breach of the Shareholder Agreement.

Plaintiffs argue, without citation to authority, that "[Steven] Maxim, as an agent of S2K was able to bind it in contract, and should be liable for all of his actions in effectuating such contracts.  Conversely, [Steven] Maxim should not be able to have another corporate entity perform actions which he himself is barred from doing via contract.  Therefore, he is personally liable for his actions."  Pls.' Reply at 2-3.

As best as the Court can tell, the first sentence suggests that, because Steven Maxim could bind S2K, he is personally liable for breach of a contract to which S2K is party.  The Court disagrees.  Steven Maxim is not a party to the Shareholder Agreement, and Plaintiffs did not pierce the corporate veil.  The second and third sentences seem to suggest that, if another entity owned by Steven Maxim and not party to the Shareholder Agreement engaged in conduct that would amount to a breach of the Shareholder Agreement, Steven Maxim and/or that entity is somehow liable for a breach of the Shareholder Agreement.  Again, persons not party to the

agreement are not liable for its breach, and Plaintiffs did not pierce the corporate veil.  Count One fails.

### B.      Count Two: Breach of Confidentiality and Non-Competition Agreement by Steven Maxim

In Count Two, Plaintiffs claim that Steven Maxim breached a Confidentiality and Non-Competition Agreement dated July 26, 2004 "[b]y copying [East Point]'s Field-Comm.net architecture and design for commercial gain[.]"  Verified Compl. ¶ 126-27.  Count Two fails because Plaintiffs did not prove[2] that any such breach caused their damages, and did not prove damages with reasonable certainty.

The elements of a breach of contract claim are (1) formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages. *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014). Furthermore, Plaintiffs must establish that the breach caused their damages.  *Collins v. Anthem Health Plans, Inc.*, 275 Conn. 309, 333 (2005) (a plaintiff must prove that its damages "were caused by the breach and were not the product of some other source") (citing *W. Haven Sound Dev. Corp. v. W. Haven*, 201 Conn. 305, 316 (1986)); *see also Lipshie v. George M. Taylor & Son, Inc.*, 265 Conn. 173, 182 (2003) (noting that determining causation in connection with a breach of contract claim is a question of fact, and concluding that evidence was insufficient to find causation).

Plaintiffs' theory is that East Point lost revenue as a result of Steven Maxim's alleged breach of the agreement.  *See* Verified Compl. ¶ 127-28.  Even assuming that Steven Maxim breached, Plaintiffs did not show that the breach, if any, caused East Point's loss of revenue.

---

[2] Unless otherwise stated, the terms "prove," "show," and "establish" mean prove by a preponderance of the evidence.

"[U]nder Connecticut law, the causation standard applicable to breach of contract actions asks not whether a defendant's conduct was a proximate cause of the plaintiff's injuries, but rather whether those injuries were foreseeable to the defendant and naturally and directly resulted from the defendant's conduct." *Meadowbrook Ctr., Inc. v. Buchman*, 149 Conn. App. 177, 188-89 (2014). "[U]nless they are too speculative and remote, prospective profits are allowable as an element of damage whenever their loss arises directly from and as a natural consequence of the breach." *Id.* (quoting *Kay Petroleum Corp. v. Piergrossi*, 137 Conn. 620, 624 (1951)). The plaintiff must provide "*sufficient* evidence to prove such damages . . . with reasonable certainty and not speculatively and problematically." *Id.* (emphasis in original) (quoting *Sullivan v. Thorndike*, 104 Conn. App. 297, 304 (2007) and *Leisure Resort Tech., Inc. v. Trading Cove Assocs.*, 277 Conn. 21, 35 (2006)).

At the outset, Plaintiffs' causation showing is weakened by the delay between MEI's use of Field Navigator and East Point's loss of revenue. Edwin Pajemola presented Field Navigator to Steven Maxim on or about March 2010, and MEI began using Field Navigator in its business sometime in 2010. Tr. 830-31, 835. Paul Taff testified that he observed declining revenue from A&M and Berghorst beginning sometime in 2011. *Id.* at 512. Thus, MEI began using Field Navigator sometime in 2010, possibly as early as spring 2010, but East Point did not start to lose revenue until sometime the following year.

Plaintiffs' causation showing is weakened further because Plaintiffs proved only that East Point started to lose revenue from A&M and Berghorst "sometime" in 2011. Tr. at 512. But CFS licensed software called Field Navigator to A&M and Berghorst in late 2011, and, as discussed *infra*, no Maxim Defendant is responsible for those transactions. As a result, the Court does not find that the revenue decline beginning sometime in 2011 was caused by a Maxim

Defendant's breach rather than "some other source," *Collins*, 275 Conn. at 333, namely, CFS's licensing transactions with A&M and Berghorst in late 2011.

First, CFS licensed software called Field Navigator to Berghorst in November 2011, *see* Pls.' Ex. 15, and licensed software called Field Navigator to A&M in late 2011, *see* Pls.' Ex. 18 (A&M record showing check written out to Edwin Pajemola in July 2011, and bills received from, and payments made to, CFS beginning January 4, 2012); Pls.' Ex. 26, Pajemola Dep. at 1:32:50 (Edwin Pajemola testifying that he received revenue from Field Navigator in late 2011). Plaintiffs urge the Court to hold Maxim Defendants responsible for those transactions.

"[I]t is a general rule of agency law that the principal in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the agent's employment." *Ackerman v. Sobol Family P'ship, LLP*, 298 Conn. 495, 508 (2010) (quoting *Maharishi Sch. Vedic Scis., Inc. v. Conn. Constitution Assocs. Ltd. P'ship*, 260 Conn. 598, 606 (2002)). Neither CFS nor Edwin Pajemola acted as agents of any Maxim Defendant when CFS licensed software to A&M and Berghorst. Prior to CFS's licensing activities, Steven Maxim instructed Edwin Pajemola to shut down the CFS website, he and Edwin Pajemola severed ties, and Edwin Pajemola stopped returning Steven Maxim's phone calls and e-mails. *See* Tr. at 240-41, 845-46. Plaintiffs did not prove that any Maxim Defendant was aware of, much less authorized, CFS's licensing transactions with A&M and Berghorst, and the evidence showed that no Maxim Defendant received any money from those transactions. Because neither Edwin Pajemola nor CFS was acting pursuant to authority, actual or apparent, from any Maxim Defendant when CFS entered into licensing transactions with A&M and Berghorst, the Court does not hold any Maxim Defendant responsible for those transactions.

Plaintiffs argue that the demonstration given to the Mullers provides a basis for holding Maxim Defendants responsible for CFS's licensing transactions with A&M and Berghorst.  It is true that the Mullers set up the demonstration by contacting Edwin Pajemola through the CFS website, Edwin Pajemola participated in the demonstration, and the demonstration evidenced that MEI was going to license Field Navigator to the Mullers for a fee.  But the Court finds that Steven Maxim and Edwin Pajemola severed their relationship after that demonstration, and that no Maxim Defendant participated in CFS's licensing transactions, and Plaintiffs did not prove that Edwin Pajemola or CFS acted pursuant to authority from any Maxim Defendant in connection with those transactions.

Plaintiffs also argue that MFSS's Ohio state court lawsuit against CFS and Edwin Pajemola provides a basis for holding Maxim Defendants responsible for CFS's licensing activities.  The Court disagrees.  The existence of a lawsuit in which MFSS alleges that it has some ownership in Field Navigator, and that CFS and/or Edwin Pajemola breached an employment agreement by licensing software to A&M and Berghorst, does not establish an agency relationship between any Maxim Defendant and CFS in connection with CFS's licensing transactions with A&M and Berghorst.  Nor is there anything in the record in this case which would permit this Court to draw such an inference from the Ohio lawsuit.

Second, Mr. Taff testified that he did not know when in 2011 the A&M revenue started to decline, Tr. 507, 512, and he did not know when in 2011 the Berghorst revenue started to decline, *id.* at 571.[3]  Given that Mr. Taff testified only that the A&M and Berghorst revenue

---

[3] Before trial, Plaintiffs disclosed a certified public accountant (the "CPA") as an expert to testify as to Plaintiffs' economic damages.  However, Plaintiffs did not provide Defendants with an expert report as required by Fed. R. Civ. P. 26(a)(2)(B), or a summary of facts and opinions as required by Fed. R. Civ. P. 26(a)(2)(C).  Accordingly, the Court precluded the CPA from testifying as an expert.  Order at 5, ECF No. 185.  Plaintiffs contended that, although they had initially disclosed him as an expert, the CPA actually would testify as a fact witness.  The Court "allow[ed] Plaintiffs an opportunity to lay a foundation for [the CPA's] personal knowledge" to testify as a fact witness as to their damages, *id.*, but Plaintiffs did not call the CPA to testify at trial.

started to decline "sometime" in 2011, *id.* at 512, Plaintiffs did not prove that their loss of

customer revenue was caused by Steven Maxim's breach and not "some other source," *Collins*,

275 Conn. at 333, namely, CFS's licensing transactions with A&M and Berghorst in late 2011.

In other words, Plaintiffs failed to show that the time in 2011 when their revenue from A&M and

Berghorst started to decline was not the same time in 2011 when CFS licensed software to A&M

and Berghorst.  Significantly, Mr. Taff testified that "the bulk" of A&M mobile users "start[ed]

to turn off" in April 2012, Tr. at 570:8-11, which was several months after CFS licensed

software to A&M, and approximately two years after Edwin Pajemola presented Field Navigator

to Steven Maxim.  Because no Maxim Defendant is responsible for CFS's licensing transactions

with A&M and Berghorst, Plaintiffs failed to show that Steven Maxim's breach, if any, caused

their damages.

      Finally, Plaintiffs failed to prove damages with reasonable certainty.  "When damages are

claimed they are an essential element of the plaintiff's proof and must be proved with reasonable

certainty."  *Lawson v. Whitey's Frame Shop*, 241 Conn. 678, 689 (1997).

      Plaintiffs claim lost revenue.  In a breach of contract action, the award of damages is

---

Instead, Plaintiffs called Mr. Taff to testify about damages.  While Mr. Taff was on the stand, he relied on a summary spreadsheet purportedly containing figures representing licensing and "per click" revenue that East Point received, as well as projections of lost revenue.  Mr. Taff also had with him "month-to-month records for each individual account, which would include these individual contractors for when they started, how much they paid each month, when they terminated, and, if available, the reasons for their termination."  Tr. 573:14-19.  The Court did not allow these documents into evidence as exhibits because Plaintiffs had not timely provided them to Defendants under Fed. R. Civ. P. 26(a)(3).  *Id.* at 584-85.  But the Court nevertheless allowed Plaintiffs' counsel to continue questioning Mr. Taff as to when in 2011 the A&M and Berghorst revenue started to decline.  Tr. 579-80 ("[W]hy don't you finish up with his testimony on this.  I'm going to keep this under advisement . . . .").  Plaintiffs' counsel then asked Mr. Taff, "From looking at those documents, are you able to – do these documents contain the start and end dates for the revenue losses that you referred to on the direct testimony?"  *Id.* at 580:19-22.  Defendants reiterated their objection, the Court acknowledged that objection, and then told Plaintiffs' counsel, "Go ahead.  I said I'm going to let you inquire.  I want this to move on."  *Id.* at 581:4-5.  Plaintiffs' counsel did not repeat the question, or continue to inquire as to when in 2011 the A&M and Berghorst revenue started to decline, but instead changed topic and asked Mr. Taff why contractors "left."  *Id.* at 580-81.  Despite the Court permitting Plaintiffs' counsel to continue to inquire as to when in 2011 the A&M and Berghorst revenue started to decline, the examination never returned to this point.  *See id.* at 580-86.

designed to place the injured party in the position it would have been in had the contract been performed. *Flater v. Grace*, 291 Conn. 410, 426 n.11 (2009). Lost profits may be awarded for this purpose. *See Ambrogio v. Beaver Rd. Assocs.*, 267 Conn. 148, 155 (2003) ("[O]ur case law unequivocally supports awarding lost profits as an element of compensatory damages for general breach of contract claims."). "With respect to the calculation of lost profits, '"net profit" is the gross amount that would have been received, less the cost of running the business. . . .'" *Gianetti v. Norwalk Hosp.*, 304 Conn. 754, 806 (2012) (quoting 22 Am. Jur. 2d 409 § 458).

Plaintiffs offered only revenue figures at trial. They offered no evidence as to what expenses, if any, they would have incurred in generating that revenue in order for the Court to arrive at a reasonably certain calculation of lost profits. *Cf. Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 69 (1998) ("[W]e have permitted lost *profits* to be calculated by extrapolating from past *profits*.") (emphasis added); *see also Englewood Terrace Ltd. P'ship v. United States*, 479 F. App'x 969, 973 (Fed. Cir. 2012) (award of gross revenue is not appropriate for breach of contract claim); *Richard Parks Corrosion Tech., Inc. v. Plas-Pak Indus., Inc.*, No. 3:10-cv-00437 (WWE), 2012 WL 4471258, at *5 (D. Conn. Sept. 27, 2012) (granting summary judgment as to breach of contract claim where claimant offered no evidence of expenses incurred to generate revenue). Awarding Plaintiffs gross revenue would place them in a better position than they would have been absent a breach.

In any event, Plaintiffs' lost revenue projections were discredited. Mr. Taff based his testimony regarding East Point's lost revenue on a summary spreadsheet, purportedly containing figures representing licensing and "per click" revenue that East Point received and projections of lost revenue. He testified that the projections were calculated by averaging prior years' revenue figures. *See* Tr. at 520-22. But those projections "collapsed under gentle prodding." Defs.' Br.

at 21.  On cross-examination, the Maxim Defendants showed that the projections were not accurate averages of prior years' revenue figures, and were sometimes higher than the true averages of prior years' revenue figures.  Mr. Taff offered no explanation as to why the figures were wrong, nor did he offer an alternative explanation as to how they were reached.  *See* Tr. at 529-32, 569.[4]

Plaintiffs argue that, "[d]espite some uncertainty as to methods, Taff was reasonably certain of the amount of damages, and as such makes it more probable than not that they are correct."  Pls.' Br. at 27.  The law provides otherwise.  "Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount with *reasonable certainty*. . . . In order to recover lost profits, therefore, the plaintiff must present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty."  *Beverly Hills Concepts, Inc.*, 247 Conn. at 69-70 (emphasis in original).  Plaintiffs offered only revenue figures, those figures were discredited, and Plaintiffs did not otherwise "present sufficiently accurate and complete evidence" from which the Court could calculate damages with reasonable certainty.  *See id.* at 70.

In sum, Plaintiffs did not prove that their lost revenue was caused by a breach by Steven

---

[4] Maxim Defendants move to strike Mr. Taff's testimony appearing in the trial transcript at pages 491:24 through 532:20, and 567:21 through 586:11.  Defs.' Br. at 20.  They argue that the Court should strike this testimony under the best evidence rule, the rule against hearsay, and Fed. R. Evid. 403, because Mr. Taff simply recited revenue figures and projections from a financial record that was not timely produced and not admitted into evidence.  Defs.' Br. at 20-21.  The Court will not strike all of the testimony that Maxim Defendants identify, because it includes Mr. Taff's testimony regarding the makeup of East Point's accounting department, what East Point does when a contractor's account becomes inactive, how East Point charges contractors, when East Point's revenue from A&M and Berghorst started to decline, and other matters.  *See United States v. Sliker*, 751 F.2d 477, 483 (2d Cir. 1984) (oral testimony about an insurance policy was properly admitted to prove the existence of insurance, in contrast to proving the terms of the policy).  The Court will, however, strike under Fed. R. Evid. 1002 those portions of Mr. Taff's testimony where he offered revenue figures and projections from the spreadsheet (*e.g.*, Tr. at 493:14-17 ("Now that you have the summary in front of you, is there a more precise number you could advise the Court of? A. $152,040.95.").  *See* Fed. R. Evid. 1002 (original writing is required to prove its content).  Mr. Taff did not have a present recollection, *see, e.g.*, Tr. at 512 ("Q. So other than what's in the summary sheets, you don't know?  A. That is correct."); *id.* at 531 ("And you can't tell from this document alone, you have to look at the documents that are on the bench in the courtroom? A. I would have to review all of them."), and by referring to the spreadsheet and reciting the figures, he was reading into evidence the contents of an excluded document.

Maxim, and did not prove damages with reasonable certainty.  Count Two fails.

C.    **Count Three: Breach of Confidentiality and Non-Competition Agreement by S2K**

In Count Three, Plaintiffs claim that, "[b]y copying [East Point]'s Field Comm.net architecture and design for commercial gain, S2K violated" a Confidentiality and Non-Competition Agreement dated July 26, 2004.  Verified Compl. ¶ 131-32.

As noted *supra* at Part II.A, the only evidence regarding S2K was that it sold hardware and held East Point shares.  There was no evidence of any conduct by S2K that would amount to a breach of the agreement.  Count Three fails.

D.    **Count Four: Breach of Confidentiality and Non-Competition Agreement by Steven Maxim and MEI**

In Count Four, Plaintiffs claim that, "[b]y copying [East Point]'s Field Comm.net architecture and design for commercial gain, [Steven] Maxim and MEI violated" a Confidentiality and Non-Competition Agreement dated December 2008, and that East Point lost customer revenue as a result.  *Id.* ¶¶ 136-39.

Count Four fails for the reasons discussed *supra* at Part II.B.  Even if Steven Maxim and MEI breached the agreement, Plaintiffs did not prove that the breach caused their damages, and did not prove damages with reasonable certainty.

E.    **Count Five: Breach of Source Code Access and Indemnity Agreement by Edwin Pajemola and MEI**

In Count Five, Plaintiffs claim that, Edwin Pajemola and MEI violated the Software Source Code Access and Indemnity Agreement," and that Plaintiffs lost customer revenue as a result.  *Id.* ¶¶ 140-46.

1.    **MEI**

Count Five fails against MEI for the reasons discussed *supra* at Part II.B.  Even if MEI

breached the agreement, Plaintiffs did not prove that the breach caused their damages, and did not prove damages with reasonable certainty.[5]

### 2.    Edwin Pajemola

The Pajemola Defendants were defaulted under Rule 55(a).  ECF No. 146.  Before the bench trial, Plaintiffs moved for default judgment against them.  ECF No. 152.  The Court combined a Rule 55(b)(2) default judgment hearing with the bench trial.  ECF No. 176.

In light of the Pajemola Defendants' defaults, the Court must "accept[] as true all of the factual allegations of the complaint, except those relating to damages[,]" *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981), and draw all reasonable inferences in Plaintiffs' favor, *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).  Where damages are uncertain, they may be proved at a post-default hearing.  *Norcia v. Dieber's Castle Tavern, Ltd.*, 980 F. Supp. 2d 492, 500 (S.D.N.Y. 2013).  As noted above, the Court combined a post-default Rule 55(b)(2) hearing with the bench trial.  ECF No. 176.  One of the purposes of a Rule 55(b)(2) hearing is to "determine the amount of damages[.]"  Fed. R. Civ. P. 55(b)(2)(C).  The burden is on the plaintiff seeking default judgment to establish damages with reasonable certainty.  *Norcia*, 980 F. Supp. 2d at 500.

Count Five fails against Edwin Pajemola because Plaintiffs failed to prove damages with reasonable certainty.  Plaintiffs' claimed damages with respect to Count Five are lost revenues.  Verified Compl. ¶¶ 145-46.  Plaintiffs argue that they are entitled to revenue that CFS received when it licensed software to A&M and Berghorst.  Mem. Supp. Mot. Def. Judg. at 6, ECF No. 152-1.  Edwin Pajemola testified that CFS received approximately $100,000 in revenue from

---

[5] Plaintiffs also argue that MEI failed to "safeguard" their code in violation of paragraph 2.0 of the Software Source Code Access and Indemnity Agreement.  *See* Pls.' Br. at 15-16.  But Plaintiffs did not prove that such a breach, if any, caused their damages.  As discussed *infra* at Part II.L.1, Plaintiffs did not prove, as to the Maxim Defendants, that the software that CFS licensed to A&M and Berghorst contained any Field-Comm.net elements.

Berghorst, Pls.' Ex. 26 at 1:19:57, and approximately $300,000 in revenue from A&M, *id.* at

1:16:09.  But Plaintiffs offered no evidence of the expenses, if any, they would have incurred in

generating that revenue.  *See, e.g.*, *Englewood Terrace Ltd. P'ship*, 479 F. App'x at 973 (award

of gross revenue is not appropriate for breach of contract claim); *Plas-Pak Indus., Inc.*, 2012 WL

4471258, at *5 (granting summary judgment as to breach of contract claim where claimant

offered no evidence of expenses incurred to generate revenue).

Edwin Pajemola offered a "guesstimate," not based upon any review of financial

records,[6] that his profit from that revenue was $250,000.  *See* Pls.' Ex. 26 at 1:36:53.  Plaintiffs

offered no evidence as to whether their expenses in generating that revenue, if any, would have

been comparable to Edwin Pajemola's, or the nature of those expenses, and the Court will not

speculate.  *See Adler v. Rosenthal*, 163 Conn. App. 663 (2016) ("[T]he court must have evidence

by which it can calculate the damages, which is not merely subjective or speculative . . . but

which allows for some objective ascertainment of the amount . . . .") (quoting *Am. Diamond*

*Exch., Inc. v. Alpert*, 302 Conn. 494, 510-11 (2011)).  The Court finds that Plaintiffs did not

"present sufficiently accurate and complete evidence," *Beverly Hills Concepts, Inc.*, 247 Conn. at

70, from which the Court could calculate with reasonable certainty Plaintiffs' damages.

Plaintiffs also claim that they are entitled to attorneys' fees and costs from Edwin

Pajemola under paragraph 4.0 of the Software Source Code Access and Indemnity Agreement.

Mem. Supp. Mot. Def. Judg. at 6, ECF No. 152-1.  The Court disagrees.  Paragraph 4.0 imposes

indemnification obligations only on MEI, not on Edwin Pajemola.  *See* Pls.' Ex. 6 ¶ 4.0.

---

[6] Edwin Pajemola testified that he would need to review financial records stored on his computer to arrive at a more accurate figure.  Pls.' Ex. 26 at 1:37:30.  Edwin Pajemola failed to produce that computer in discovery despite a Court order to do so.  But "[e]ven where the defendant by his own wrong has prevented a more precise computation, the [factfinder] may not render a verdict based on speculation or guesswork."  *Meadowbrook Ctr., Inc.*, 149 Conn. App. at 189 (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946)).  While records on Edwin Pajemola's computer may have helped to calculate his profit with reasonable certainty, the question is what Plaintiffs' profit would have been – information in Plaintiffs' possession – and Plaintiffs failed to provide a sufficient evidentiary basis upon which the Court could make that determination with reasonable certainty.

Moreover, the Verified Complaint does not assert an indemnification claim under paragraph 4.0 against any Defendant, and a party may not amend its complaint through arguments in briefs. *E.g.*, *Ribis v. Mike Barnard Chevrolet-Cadillac, Inc.*, 468 F. Supp. 2d 489, 495 (W.D.N.Y. 2007) ("[A] plaintiff may not use a memorandum of law or similar paper to assert a claim that is not contained in the complaint."); *Johnson v. Levy*, No. 10-CV-3217 (ADS) (ETB), 2012 WL 3580236, at *6 (E.D.N.Y. Aug. 17, 2012) ("It is well-settled that the Plaintiffs cannot amend their complaint through arguments in a brief . . . .").

### F.  Count Six: Breach of Source Code Access and Indemnity Agreement by Steven Maxim and MEI

In Count Six, Plaintiffs claim that Steven Maxim and MEI violated the Software Source Code Access and Indemnity Agreement, and that Plaintiffs lost customer revenue as a result. Verified Compl. ¶¶ 149, 152-53.

Steven Maxim is not a party to the Source Code Access and Indemnity Agreement in his individual capacity.  *See* Pls.' Ex. 5, 6.  Even if he were, and he and/or MEI breached the agreement, Plaintiffs did not prove that the breach caused their damages, and did not prove damages with reasonable certainty.  Count Six fails.

### G.  Count Seven: Breach of Statutory Fiduciary Duty by Steven Maxim and S2K

In Count Seven, Plaintiffs claim that, "[b]y creating or suborning the creation of a derivative version of [East Point]'s software," and "[b]y marketing a competing software package to third parties," Steven Maxim and S2K breached statutory fiduciary duties under Conn. Gen. Stat. § 33-756.  Verified Compl. ¶¶ 156-58.

Plaintiffs' claimed damages are unclear.  Their Verified Complaint alleges that they suffered "monetary damage and loss[.]"  *Id.* ¶ 159.  Their brief notes that Maxim Defendants derived no profit from Field Navigator, but "would have" if they charged a fee. Pls.' Br. at 10-

11.  Plaintiffs have sought lost revenue.  As discussed *supra* at Part II.B and Part II.E.2, Plaintiffs failed to prove their damages with reasonable certainty.  Count Seven fails.

### H.      Count Eight: Breach of Common Law Fiduciary Duty by Steven Maxim and S2K

In Count Eight, Plaintiffs claim that, "[b]y creating or suborning the creation of a derivative version of [East Point]'s software," and "[b]y marketing a competing software package to third parties," Steven Maxim and S2K breached their common law fiduciary duties. *Id.* ¶¶ 161-65.  Count Eight fails for the reasons discussed *supra* at Part II.G.

### I.      Count Nine: Breach of Cross Purchase Agreement by S2K

In Count Nine, Plaintiffs claim that S2K breached the Cross Purchase Agreement by not selling its shares of East Point when East Point offered to purchase them.  Plaintiffs seek specific performance.  *Id.* ¶¶ 167-74.[7]

The paragraph of the Cross Purchase Agreement upon which Plaintiffs rely provides that "[i]f one or more Connecticut Shareholders shall at any time notify S2K in writing that they desire to purchase the shares of the corporation owned by S2K, then S2K . . . shall offer to sell all of its shares to such Connecticut Shareholders . . . ."  Pls.' Ex. 4 ¶ 4.B.(i).

The elements of a breach of contract claim are (1) formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages. *Meyers*, 311 Conn. at 291.  The parties entered into the Cross Purchase Agreement, Plaintiffs substantially performed,[8] S2K breached by not selling its shares when Plaintiffs offered to

---

[7] Plaintiffs also claim that S2K's conduct was "in bad faith and has led to costly litigation" and "[a]s a result, the defendants should be liable for all of the plaintiffs' costs associated with litigation."  Pls.' Br. at 10.  They cite no authority for this proposition, and the Cross Purchase Agreement, which contains an arbitration clause, provides that "each party shall bear the cost of their own attorney's fees."  Pls.' Ex. 4 at 059.

[8] Plaintiffs did not prove that they notified S2K "in writing[,]" Pls.' Ex. 4 ¶ 4.B.(i), but S2K did not raise this issue, and the Court found that Plaintiffs did notify S2K, in some way, that they desired to purchase its shares, and thereby substantially performed.  *See Pack 2000, Inc. v. Cushman*, 311 Conn. 662, 700 (2014) (doctrine of substantial

purchase them at the valuation that S2K's own appraiser provided, and Plaintiffs suffered

damages as a result (*i.e.*, they were deprived of the shares and their value).

"Specific performance is a form of equitable relief which rests in the sound discretion of

the court." *Nann v. Pignatelli*, 3 Conn. App. 74, 79 (1984). "Generally contracts for the transfer

of stock are not specifically enforceable because damages will suffice. When the stock,

however, is that of a closely held corporation, which is difficult to value in money, specific

performance may be the only just remedy." *Eyges v. Herrmann*, No. CV010810973, 2001 WL

1617937, at *3 (Conn. Super. Ct. Nov. 28, 2001).

Here, the stock is that of a closely held corporation, and the Court concludes that specific

performance is appropriate under the circumstances. In its brief, S2K offered to sell its shares

for $57,700, Defs.' Br. at 30, which appears to be the appropriate price under Schedule B-1 of

the Cross Purchase Agreement. Schedule B-1 provides that if S2K objects to Plaintiffs'

appraisal, which happened here, then S2K must get its own appraisal, which happened here.

Pls.' Ex. 4 at 058. Plaintiffs agreed to purchase the shares at S2K's appraised value, but S2K

refused. Thus, it appears that the parties reached agreement as to value, but did not consummate

the sale. Plaintiffs' briefing does not engage with Schedule B-1, or explain why another price

should apply. The Court orders S2K to sell its shares for $57,700.

**J.     Count Ten: Tortious Interference with Business Expectancy by Defendants**

In Count Ten, Plaintiffs claim that Defendants tortiously interfered with their business

relationships with Berghorst and A&M. Verified Compl. ¶¶ 176-84. Again, Plaintiffs' claimed

damages are lost revenues. *Id.* ¶ 183. Lost profits would have been an appropriate measure of

damages for tortious interference, but lost profits must be proved with reasonable certainty. *Am.*

performance protects "those who have performed in all material and substantive particulars, so that their right to
[performance] may not be forfeited by reason of mere technical, inadvertent, or unimportant omissions or defects.")
(quoting *In re Centennial Park, LLC*, 461 B. R. 853, 863 (Bankr. D. Kan. 2011)).

*Diamond Exch., Inc. v. Alpert*, 302 Conn. 494, 510-11 (2011).  Count Ten fails for the reasons discussed *supra* at Part II.B and Part II.E.2.

**K.     Count Eleven: Violation of Connecticut Uniform Trade Secrets Act ("CUTSA") by Defendants**

In Count Eleven, Plaintiffs claim that Field-Comm.net's code was a trade secret, and that Defendants misappropriated it in violation of CUTSA.  Verified Compl. ¶¶ 185-98; Pls.' Br. at 24-26.

**1.     Maxim Defendants**

Count Eleven fails for the reasons discussed *infra* at Part II.L.1.  Plaintiffs must establish that a Maxim Defendant's violation of CUTSA proximately caused their damages.  *See Solomon v. Aberman*, 196 Conn. 359, 385 (1985) ("It is axiomatic that damages recoverable in tort must be proximately caused by a defendant's tortious conduct."); *Edible Arrangement Int'l, Inc. v. Incredible Franchise Corp.*, No. 3:07-cv-01788 (WWE), 2010 WL 2232488, at *2 (D. Conn. May 25, 2010) (as to CUTSA claim, jury found that defendant's conduct did not proximately cause plaintiff's injury).  Assuming *arguendo* that a Maxim Defendant violated CUTSA by misappropriating elements of Field-Comm.net's code, Plaintiffs did not prove that the violation, if any, proximately caused their damages.  *See infra* at Part II.L.1.

**2.     Pajemola Defendants**

The Court will enter default judgment against the Pajemola Defendants on Count Eleven. Accepting as true all of Plaintiffs' allegations against the Pajemola Defendants, except those relating to damages, and drawing all reasonable inferences in Plaintiffs' favor, the Court finds, with respect to Pajemola Defendants only, that (a) Field-Comm.net's database was a trade secret under Conn. Gen. Stat. § 35-51(d) which derived economic value from not generally being known to others and which Plaintiffs made reasonable efforts to keep secret, *e.g.* Pls.' Exs. 5, 6;

(b) Edwin Pajemola used the trade secret (*i.e.*, copied Field-Comm.net database tables) in developing, without Plaintiffs' consent, the Field Navigator software that CFS licensed to A&M and Berghorst; and (c) the misappropriation proximately caused Plaintiffs to lose revenue from A&M and Berghorst.[9]

Plaintiffs failed to prove their actual damages with reasonable certainty, as discussed *supra* at Part II.E.2.  However, CUTSA authorizes a prevailing plaintiff to recover for unjust enrichment caused by the misappropriation.  Conn. Gen. Stat. § 35-53(a).

"Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy.  Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment."  *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 283 (1994).  "[T]he measure of damages in an unjust enrichment case ordinarily is not the loss to the plaintiff but the benefit to the defendant."  *Id.* at 285.

As noted *supra* at Part II.E.2, Edwin Pajemola offered a "guesstimate" that he made a $250,000 profit from the $400,000 in revenue that CFS received from its licensing transactions with A&M and Berghorst.  While this evidence is not sufficient to prove Plaintiffs' lost profits with reasonable certainty, the Court finds that, given the Pajemola Defendants' defaults and their failure to produce a computer containing more fulsome financial records, *see* Fed. R. Civ. P. 37(b)(2)(A), it is sufficient to prove the benefit to the Pajemola Defendants for unjust enrichment

---

[9] As a result of the Pajemola Defendants' defaults and failures to obey this Court's discovery orders, *see* Fed. R. Civ. P. 37(b)(2)(A), and the Court's obligation to deem Plaintiffs' allegations admitted and draw all reasonable inferences in Plaintiffs' favor, *e.g.*, Verified Compl. ¶ 193 ("Defendants used Plaintiffs' confidential and proprietary trade secrets to compete with [East Point], including usurping opportunities and soliciting clients and prospects of [East Point]"), the Court deems established the fact that Field-Comm.net database tables were copied into the software that CFS licensed to A&M and Berghorst.  As discussed *infra* at Part II.L.1, however, this fact was not established by a preponderance of the evidence against the Maxim Defendants.

purposes.  Accordingly, the Court will award Plaintiffs unjust enrichment damages of $250,000.

The Court will also award $100,000 in punitive damages, as well as reasonable attorney's fees.  Under CUTSA, "if the court finds wilful and malicious misappropriation, the court may award punitive damages" in an amount not exceeding twice the award of actual and unjust enrichment damages, and may award reasonable attorney's fees.  Conn. Gen. Stat. § 33-53(b).

In *Elm City Cheese Co., Inc. v. Federico*, 251 Conn. 59, 90-93 (1999), the Connecticut Supreme Court held that a trial court properly awarded punitive damages and attorney's fees under CUTSA where the defendant, who misappropriated a business's trade secrets, was "on a course for [the business]'s demise rather than to enter into fair competition" and was "choking off . . . [[the business]'s life lines by getting the three major customers of [the business]'s product."  Here, shortly after severing ties with Maxim Defendants, Edwin Pajemola targeted two of East Point's "lifeline" accounts – A&M and Berghorst.  The Court finds that the Pajemola Defendants' conduct under these circumstances was wilful and malicious, and demonstrated reckless indifference to East Point's rights under the Software Source Code Access and Indemnity Agreement.

### L.      Count Twelve: Computer-Related Offense by Defendants

In Count Twelve, Plaintiffs claim that Defendants, "through [Steven] Maxim's and [Edwin] Pajemola's access to [East Point]'s computer system," committed a computer-related offense in violation of Conn. Gen. Stat. § 53a-251.  *See* Verified Compl. ¶¶ 207-09.

That statute provides, in relevant part, that a person "is guilty of the computer crime of misuse of computer system information" when:

> (1) As a result of his accessing or causing to be accessed a computer system, he intentionally makes or causes to be made an unauthorized display, use, disclosure or copy, in any form, of data residing in, communicated by or produced by a computer system;

> or (2) he intentionally or recklessly and without authorization (A)
> alters, deletes, tampers with, damages, destroys or takes data
> intended for use by a computer system, whether residing within or
> external to a computer system, or (B) intercepts or adds data to
> data residing within a computer system; or (3) he knowingly
> receives or retains data obtained in violation of subdivision (1) or
> (2) of this subsection; or (4) he uses or discloses any data he knows
> or believes was obtained in violation of subdivision (1) or (2) of
> this subsection.

Conn. Gen. Stat. § 53a-251(e).

There is a private right of action: "[A]ny person who suffers any injury to person,

business or property may bring an action for damages against a person who is alleged to have

violated any provision of section 53a–251. The aggrieved person shall recover actual damages

and damages for unjust enrichment not taken into account in computing damages for actual loss,

and treble damages where there has been a showing of wilful and malicious conduct." Conn.

Gen. Stat. § 52-570b(c).

### 1.    Maxim Defendants

Count Twelve fails against the Maxim Defendants because, although it appears that MEI

may have violated Conn. Gen. Stat. § 53a-251(e)(1), Plaintiffs did not prove that such violation,

if any, proximately caused their harm.

A person violates Conn. Gen. Stat. § 53a-251(e)(1) when, "[a]s a result of his accessing

or causing to be accessed a computer system, he intentionally makes or causes to be made an

unauthorized display, use, disclosure or copy, in any form, of data residing in, communicated by

or produced by a computer system[.]"

MEI was party to the Software Source Code Access and Indemnity Agreement. That

agreement authorized MEI to access "the Source Code copy for the *sole purpose* of permitting

[MEI] to support its own licensed copies of the computer programs and databases by making

modifications to the current software and databases required to meet [MEI]'s unique needs and

objectives." Pls.' Ex. 5 ¶ 2.0 (emphasis added). It prohibited MEI from using "any other item made available . . . hereunder except as may be provided in this Agreement." *Id.* ¶ 3.0. Thus, any use not provided for under the agreement of any item that Plaintiffs made available under the agreement was an unauthorized use.

MEI caused its agent, Edwin Pajemola, to access Field-Comm.net, which is a "computer system" under the statute because "'[c]omputer system' means a computer, [and] its software[.]" Conn. Gen. Stat. § 53a-250(7). Edwin Pajemola accessed that software, because "'[a]ccess' means to instruct, communicate with, store data in or retrieve data from a computer, computer system or computer network." *Id.* § 53a-250(1). Edwin Pajemola communicated with, and retrieved data from, Field-Comm.net. The database tables that Edwin Pajemola copied from Field-Comm.net are "data" under the statute because "data" is defined broadly to include "information of any kind in any form, including computer software." *Id.* § 53a-250(8).

As a result of that access, Edwin Pajemola developed the Field Navigator software that MEI used, which contained a significant number of database tables identical to Field-Comm.net's. Field Navigator was not a modification to Field-Comm.net. It was a different, web-based software. Because the Software Source Code Access and Indemnity Agreement was entered into for the "sole purpose" of allowing MEI modify its copy of Field-Comm.net, Pls.' Ex. 5 ¶ 2.0, and the agreement prohibited MEI from using "any other item made available . . . hereunder except as may be provided in this Agreement[,]" *id.* ¶ 3.0, the use of Field-Comm.net database tables to develop Field Navigator was not authorized under the Source Code Access and Indemnity Agreement.

MEI intentionally used Field Navigator in its business beginning sometime in 2010. Steven Maxim, MEI's president, knew that Field Navigator was a different, web-based system,

and not merely a modification to MEI's copy of Field-Comm.net.

In sum, it appears that MEI may have violated the statute because, "[a]s a result of [MEI's] accessing or causing to be accessed [Field-Comm.net], [MEI] intentionally ma[de] or cause[d] to be made an unauthorized display, use, disclosure or copy, in any form, of [database tables] residing in, communicated by or produced by [Field-Comm.net.]"  *See* Conn. Gen. Stat. § 53a-251(e)(1).

However, Plaintiffs did not prove that MEI's violation, if any, proximately caused their harm.  "It is axiomatic that damages recoverable in tort must be proximately caused by a defendant's tortious conduct."  *Solomon*, 196 Conn. at 385.  "The requirement of proximate cause is a less severe limitation of liability than the requirement of anticipation or foreseeability in breach of contract cases.  A proximate cause is '[a]n actual cause that is a substantial factor in the resulting harm . . . .'"  *Meadowbrook Ctr., Inc.*, 149 Conn. App. at 188 (quoting *Mattegat v. Klopfenstein*, 50 Conn. App. 97, 105 (1998)); *accord Elliott v. City of Waterbury*, 245 Conn. 385, 402 (1998) ("[P]roximate cause [exists when] the defendant's negligence was a substantial factor in causing the plaintiff's injuries and . . . the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence.") (quoting *Fleming v. Garnett*, 231 Conn. 77, 86 (1994)).

Plaintiffs failed to prove that MEI's violation, if any, was a substantial factor in producing their injury because (a) as discussed *supra* at Part II.B, there was a delay between MEI's use of Field Navigator and Plaintiffs' loss of customer revenue, and Plaintiffs did not prove that their loss of revenue beginning "sometime" in 2011 was caused by MEI's use of Field Navigator rather than CFS's licensing activities with A&M and Berghorst in late 2011; and (b) Plaintiffs did not establish that the software that CFS licensed to A&M and Berghorst contained

any Field-Comm.net elements.[10]

The experts only compared Field-Comm.net to the Field Navigator software that MEI used.  Plaintiffs presented no technical evidence regarding the software that CFS licensed to Berghorst and A&M.  As a result, the Court does not find that that software contained any Field-Comm.net elements.[11]  Thus, Plaintiffs did not prove that a Maxim Defendant's computer-related offense, if any, was a substantial factor in any injury caused by CFS's licensing software to Berghorst and A&M.

### 2.    Pajemola Defendants

Accepting as true the allegations in the Verified Complaint, except allegations pertaining to damages, and drawing all reasonable inferences in Plaintiffs' favor, the Court will, for the reasons discussed *supra* at Part II.L.1, enter default judgment against the Pajemola Defendants on Count Twelve.  Again, because of the Pajemola Defendants' defaults and discovery failures, the Court found, as to the Pajemola Defendants only, that the software that CFS licensed to Berghorst and A&M contained Field-Comm.net database tables.

The statute authorizes recovery of "actual damages."  *Id.*  "[A]ctual damages are synonymous with compensatory damages and with general damages."  *DiNapoli v. Cooke*, 43 Conn. App. 419, 427 (1996).  They must be proved with reasonable certainty.  *See, e.g.*, *Beverly Hills Concepts, Inc.*, 247 Conn. at 69; *Lawson*, 241 Conn. at 689.  As discussed *supra* at Part II.B

---

[10] For the reasons discussed *supra* at Part II.B, the Court also finds that Edwin Pajemola and CFS were not acting within the scope of any employment relationship with any Maxim Defendant when CFS licensed software to Berghorst and A&M.  *Cf. Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 500 (1995) ("Under the doctrine of respondeat superior, a master is liable for the wilful torts of his servant committed within the scope of the servant's employment and in furtherance of his master's business.").

[11] In addition to the absence of evidence regarding the technical makeup of the software that CFS licensed to Berghorst and A&M, Edwin Pajemola testified that A&M commissioned him to develop customized software for A&M, and that the software he developed had "some similarities" to the software that MEI was using, but the "starting points" were different because A&M's requirements were different, Pls.' Ex. 26 at 18:41, *et seq.*, and testified that he built the software that CFS licensed to A&M "from scratch" based on A&M's requirements, *id.* at 1:18:40.

and Part II.E, Plaintiffs failed to prove actual damages with reasonable certainty.

The statute also authorizes recovery of damages for unjust enrichment.  Conn. Gen. Stat. § 52-570b(c).  As discussed *supra*, Plaintiffs established $250,000 in unjust enrichment damages against Pajemola Defendants.  But the Court already awarded Plaintiffs those damages under CUTSA, and double recovery is prohibited.  *See Chapman Lumber, Inc. v. Tager*, 288 Conn. 69, 111 (2008).  However, the statute authorizes "treble damages when there has been a showing of wilful and malicious conduct."  *Id.*  As discussed *supra* at Part II.K.2, the Court found that Pajemola Defendants engaged in wilful and malicious conduct, and therefore will treble the unjust enrichment damages under Conn. Gen. Stat. § 52-570b(c), resulting in an additional award of $500,000.

Finally, the statute provides that "the court shall award to any aggrieved person who prevails, reasonable costs and reasonable attorney's fees.  *Id.* § 52-570b(e).  The Court already awarded Plaintiffs reasonable attorney's fees under CUTSA, but will award reasonable costs under Conn. Gen. Stat. § 52-570b(e).

The Court imposes joint and several liability on Edwin Pajemola and CFS for all relief awarded hereunder.  "Where two or more persons unite in an act which constitutes a wrong to another, intending at the time to commit it, or in doing it under circumstances which fairly charge them with intending the consequences which follow, they incur a joint and several liability for the acts of each and all of the joint participants."  *Biro v. Hill*, 214 Conn. 1, 6 (1990).  The Court finds that Edwin Pajemola and CFS acted in concert to copy Field-Comm.net database tables and license competing software containing those tables to A&M and Berghorst.  *Hart, Nininger & Campbell Assocs., Inc. v. Rogers*, 16 Conn. App. 619, 630 (1988) (trial court properly imposed joint and several liability on defendants who acted in concert to solicit and

induce plaintiffs' clients in violation of noncompetitive covenants).

### M. Count Thirteen: Violation of Connecticut Unfair Trade Practices Act ("CUTPA") by Defendants

In Count Thirteen, Plaintiffs claim that Defendants violated CUTPA by competing with East Point.  *See* Verified Compl. ¶¶ 216-34.

#### 1. Maxim Defendants

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42–110b(a).  It further provides that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action to recover actual damages."  *Id.* § 42-110g(a).  "The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper."  *Id.*

CUTPA applies to a "broad spectrum of commercial activity."  *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 492 (1995).  "[I]t is construed liberally in an effort to effectuate its public policy goals."  *Landmark Inv. Grp., LLC v. CALCO Const. & Dev. Co.*, 318 Conn. 847, 881 (2015) (quoting *Sportsmen's Boating Corp. v. Hensley*, 192 Conn. 747, 756 (1984)).  In determining whether a practice violates CUTPA, courts consider "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)."  *Gaynor v. Hi-Tech Homes*, 149 Conn. App. 267, 275 (2014).  The plaintiff must prove that the unfair or

deceptive trade practice proximately caused the ascertainable loss. *Abrahams v. Young & Rubicam, Inc.*, 240 Conn. 300, 306 (1997).

The analysis of the CUTPA claim is somewhat different from the analysis of Plaintiffs' CUTSA, computer-related offense, and copyright infringement claims. Those claims concern misappropriation of Field-Comm.net elements, while the CUTPA claim potentially covers a broader range of activity, including Maxim Defendants' competitive activity, without regard to whether Field-Comm.net code was copied or used in that competitive activity. *See Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 492 (1995) ("CUTPA, by its own terms, applies to a broad spectrum of commercial activity."). However, although it appears that Steven Maxim, MEI, and MFSS may have engaged in an unfair trade practice, the Court does not find that their conduct proximately caused Plaintiffs' ascertainable loss.

First, Plaintiffs proved that they suffered an ascertainable loss. The Supreme Court of Connecticut has held that "the words 'any ascertainable loss' as used in [CUTPA] do not require a plaintiff to prove a specific amount of actual damages . . . ." *Hinchliffe v. Am. Motors Corp.*, 184 Conn. 607, 612-13 (1981). Therefore, Plaintiffs' failure to prove their damages with reasonable certainty is not fatal to their CUTPA claim. *Beverly Hills Concepts, Inc.*, 247 Conn. at 79 (plaintiff's failure to prove damages with reasonable certainty "d[id] not dispose of the CUTPA claim" because "[u]nder CUTPA, there is no need to allege or prove the amount of the ascertainable loss.") (quoting *Hinchliffe*, 184 Conn. at 614). Plaintiffs proved that they lost customer revenue beginning sometime in 2011, which satisfies the requirement to show ascertainable loss. *See Hinchliffe*, 184 Conn. at 613 ("loss" is synonymous with "deprivation, detriment and injury[,]" and a "loss is ascertainable if it is measurable even though the precise amount of the loss is not known").

36

Second, Steven Maxim, MEI, and MFSS may have engaged in an unfair trade practice by using Field Navigator.  When Steven Maxim grew dissatisfied with Field-Comm.net, Plaintiffs authorized MEI to modify its copy of Field-Comm.net to meet its business needs and wants. Steven Maxim and Edwin Pajemola then developed Task Tracker, and presented it to Plaintiffs. Plaintiffs did object to MEI's use of Task Tracker, and MEI continued to use Field-Comm.net and Task Tracker in its business.

When MEI started using Field Navigator in 2010, Steven Maxim knew that Field Navigator was not a modification to Field-Comm.net, but rather a new, web-based software that did what Field-Comm.net did – facilitate the processing of work orders for property preservation services.  This time, Defendants did not inform Plaintiffs about Field Navigator.

As a result of his position on the Board, and his Confidentiality and Non-Competition Agreement, Steven Maxim owed a duty not to compete with East Point.  *See* Pls.' Exs. 3, 14; *see, e.g.*, *Katz Corp. v. T. H. Canty & Co.*, 168 Conn. 201, 207 (1975) (director occupies fiduciary position of the highest trust and is bound to use utmost good faith and fair dealing with corporation).  MEI also owed a duty not to compete with East Point as a result of its Confidentiality and Non-Competition Agreement.  Pls.' Ex. 14.  The agreements included broad prohibitions on competition:

> . . . MAXIM shall not directly or indirectly (whether as shareholder, partner, joint venturer, principal, agent, officer, director, employee, contractor, consultant or otherwise, alone or in association with any other person or entity) carry on, share in the profits of or be engaged or take part in any business which is engaged, wholly or partially, in the production, development, marketing or sales of computer software to the mortgage servicing industry and its independent field contractors and/or any business closely related to the business of EPS . . . ."

Pls.' Ex. 3 ¶ 3.A; Pls.' Ex. 14 ¶ 3.A.

By developing Field Navigator, Steven Maxim, MEI, and MFSS likely "engaged, wholly

or partially, in the production . . . [or] development . . . of computer software to the mortgage servicing industry and its independent field contractors . . . ."  *Id.*

In light of Steven Maxim's position on the Board, and his and MEI's non-competition obligations, Steven Maxim, MEI, and MFSS may have engaged in an unscrupulous trade practice that offended public policy when they developed and used a software that performed the same essential functions as Field-Comm.net but did not make money for East Point, and did not inform East Point about this software.  *Cf. Ostrowski v. Avery*, 243 Conn. 355, 379 (1997) ("actions outside the scope of the employment relationship designed 'to usurp the business and clientele of one corporation in favor of another . . . fit squarely within the provenance of CUTPA.'") (quoting *Fink v. Golenbock*, 238 Conn. 183, 212 (1996)).

However, the Court does not find that this conduct proximately caused Plaintiffs' ascertainable loss.  As noted *supra*, "[a] proximate cause is '[a]n actual cause that is a substantial factor in the resulting harm . . . .'"  *Meadowbrook Ctr., Inc.*, 149 Conn. App. at 188 (quoting *Mattegat*, 50 Conn. App. at 105).

The Court recognizes that two forces may combine to cause a plaintiff's injury, and that if a defendant's conduct was a substantial factor in producing that injury, the defendant would not be relieved from liability even though another force contributed to producing the injury.  *Wagner v. Clark Equip. Co.*, 243 Conn. 168, 179-80 (1997).  But the Court does not find or infer that any Maxim Defendant's use of Field Navigator was a substantial factor in Plaintiffs' loss of customers or revenue.  *Cf. Serv. Rd. Corp. v. Quinn*, 241 Conn. 630, 639-40 (trial court could have inferred that defendants' conduct caused loss of customers).  In light of the delay between MEI's use of Field Navigator and Plaintiffs' loss of customer revenue, Plaintiffs' failure to show that their customer revenue declined in 2011 as a result of MEI's use of Field Navigator as

opposed to CFS's licensing activities in late 2011, and their failure to show that the software that CFS licensed to A&M and Berghorst contained Field-Comm.net elements, the Court concludes that Plaintiffs did not establish the requisite causal relationship between any Maxim Defendant's use or development of Field Navigator and their ascertainable loss.  *See, e.g.*, *Nationwide Mut. Ins. Co. v. Mortensen*, 606 F.3d 22, 31 (2d Cir. 2010) (affirming district court's dismissal of CUTPA claim where plaintiff insurance company did not show that defendant insurance agents' competitive conduct caused plaintiff to lose customers) (citing *Quinn*, 241 Conn. at 642-44 and *Hinchliffe*, 184 Conn. at 613-15).

### 2.    Pajemola Defendants

For the reasons discussed *supra* at Part II.M.1, and in light of Pajemola Defendants' defaults and discovery failures, the Court finds that Pajemola Defendants engaged in an unfair trade practice by developing Field Navigator software that contained elements of Field-Comm.net, which was an unauthorized use under the Software Source Code Access and Indemnity Agreement to which Edwin Pajemola was party, and licensing that software to A&M and Berghorst, two of East Point's "lifeline" accounts, which caused Plaintiffs to lose revenue from A&M and Berghorst.

CUTPA authorizes recovery of actual damages, punitive damages, equitable relief, costs, and reasonable attorney's fees.  Conn. Gen. Stat. §§ 42-110g(a), (d).  Plaintiffs did not prove actual damages with reasonable certainty, the Court will not award punitive damages under CUTPA, in addition to the punitive damages already awarded under CUTSA, and the Court already awarded reasonable costs and attorney's fees.  The Court addresses *infra* Plaintiffs' request for injunctive relief under CUTPA against the Pajemola Defendants.

### N.        Count Fourteen: Copyright Infringement

In Count Fourteen, Plaintiffs claim that Defendants infringed their copyright in Field-Comm.net and that Plaintiffs suffered damages as a result.  Verified Compl. ¶¶ 235-48.

### 1.        Maxim Defendants

A party who prevails on a copyright infringement claim under the Copyright Act of 1976 may recover either (a) actual damages plus any additional profits of the infringer not taken into account in computing actual damages, or (b) statutory damages.  17 U.S.C. §§ 504(a)-(b).  The plaintiff may elect, at any time before final judgment is entered, to recover statutory damages instead of actual damages and profits.  *Id.* § 504(c)(1).

It appears that Plaintiffs did not elect to pursue statutory damages.  Even if they had, that claim would fail because a plaintiff is not entitled to statutory damages or attorney's fees if the infringement commenced before the effective date of the copyright registration, or if the infringement commenced after first publication of the work and before the effective date of the copyright registration unless the registration was made within three months after first publication.  *See* 17 U.S.C. § 412; *Ez-Tixz, Inc. v. Hit-Tix, Inc.*, 919 F. Supp. 728, 735 (S.D.N.Y. 1996) (citing *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1012 (2d Cir. 1995)).  The effective date of Plaintiffs' copyright registration was November 20, 2012.  Pls.' Ex. 7.  The infringement, if any, commenced before that date.  Registration was not made within three months after first publication on June 30, 2009.  *Id.*

Turning to actual damages, the Court finds that Plaintiffs did not prove that any infringement by any Maxim Defendant caused their actual damages.  The statute provides that a "copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are

not taken into account in computing the actual damages." 17 U.S.C. § 504(b).

Assuming *arguendo* that the Field Navigator software that Maxim Defendants used infringed Plaintiffs' copyright, Plaintiffs did not prove that their claimed actual damages occurred as a result of the infringement. As discussed *supra*, Plaintiffs did not show that their revenue declined as a result of MEI's use of Field Navigator as opposed to CFS's licensing activities. Moreover, as to the Maxim Defendants, Plaintiffs did not prove that any Field-Comm.net elements were present in the software that CFS licensed to A&M and Berghorst. Finally, Plaintiffs failed to prove adequately their actual damages, *see Abeshouse v. Ultragraphics, Inc.*, 754 F.2d 467, 470 (2d Cir. 1985) (award under § 504(b) may not be based upon undue speculation), and while the statute allows a copyright owner to "present proof only of the infringer's gross revenue" in establishing the infringer's additional profits not taken into account in computing actual damages, 17 U.S.C. §§ 504(a)(1), (b), Plaintiffs did not prove that any Maxim Defendant received revenue from Field Navigator. Count Fourteen fails against the Maxim Defendants.

## 2. **Pajemola Defendants**

Count Fourteen also fails against the Pajemola Defendants. As discussed *supra*, Plaintiffs cannot recover statutory damages or attorney's fees because the infringement, if any, commenced before the effective date of their copyright registration. Moreover, Plaintiffs failed to prove adequately their actual damages. *See Abeshouse*, 754 F.2d at 470 (award under § 504(b) may not be based upon undue speculation).

The statute allows a prevailing plaintiff to recover additional profits of the infringer not taken into account in computing actual damages, and provides that a plaintiff may prove those additional profits by showing the infringer's gross revenue, which shifts the burden to the

infringer to prove deductible expenses.  17 U.S.C. § 504(b).

Section 504(b) "was intended to permit a recovery of actual damages *plus* the infringer's profits.  The latter measure, however, is recoverable only if and to the extent that such profits have not already been taken into account in computing the actual damages.  This part of the statute is designed to prevent a cumulative recovery of plaintiff's damages and defendant's profits where defendant's profits constitute nothing more than a measure of the damages suffered by the [plaintiff]."  *Pret-A-Printee, Ltd. v. Allton Knitting Mills, Inc.*, No. 81 Civ. 3770 (WCC), 1982 WL 1788, at *7 (S.D.N.Y. Sept. 16, 1982) (emphasis in original; internal quotation marks and citation omitted).  Thus, while it would be proper to award additional profits "where the copyright owner has suffered damages not reflected in the infringer's profits," *Abeshouse*, 754 F.2d at 470 (quoting H.R. Rep. No. 1476, 94th Cong., 2d Sess. 161), Plaintiffs relied solely on Pajemola Defendants' profits as the measure of their actual damages, *see* Pls.' Mem. Supp. Mot. Def. Judg. at 18, ECF No. 152-1, and did not show that they suffered damages not reflected in those profits.

### O.   Count Fifteen: Constructive Trust

In Count Fifteen, Plaintiffs seek to establish a constructive trust over "property, revenue, and proceeds" held by Defendants and derived from unauthorized use of Plaintiffs' software. *See* Verified Compl. ¶¶ 250-56.

### 1.   Maxim Defendants

Plaintiffs did not address their fifteenth claim in their post-trial briefs or closing argument despite Maxim Defendants' addressing it in their post-trial brief.  Defs.' Br. at 38-39.  As a result, it may be abandoned as to Maxim Defendants.  *E.g.*, *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 828 F. Supp. 1114, 1129 (S.D.N.Y. 1993) (plaintiff may have abandoned claim that it did

not address in its post-bench-trial briefs after defendant had addressed it in its brief), *aff'd*, 32

F.3d 690 (2d Cir. 1994).  Nonetheless, in an abundance of caution, the Court will address it.

"[A] constructive trust arises where a person who holds title to property is subject to an

equitable duty to convey it to another on the ground that he would be unjustly enriched if he

were permitted to retain it."  *Cohen v. Cohen*, 182 Conn. 193, 203 (1980).  "The issue raised by a

claim for a constructive trust is, in essence, whether a party has committed actual or constructive

fraud or whether he or she has been unjustly enriched."  *Cadle Co. v. Gabel*, 69 Conn. App. 279,

295 (2002); *see also United Coastal Indus., Inc. v. Clearheart Const. Co.*, 71 Conn. App. 506,

511 (2002) (equitable claims such as unjust enrichment "are meant to provide an alternative basis

for recovery in the event of a failure to prove . . . breach of contract . . . .").

As discussed *supra*, the Software Source Code Access and Indemnity Agreement

provided "access to the Source Code copy for the sole purpose of permitting [MEI] to support its

own licensed copies of the computer programs and databases by making modifications to the

current software and databases required to meet [MEI]'s unique needs and objectives."  Pls.' Ex.

5 ¶ 2.0.  It prohibited the use of "any other item made available . . . hereunder except as may be

provided in this Agreement."  *Id.* ¶ 3.0.  The Field Navigator software that MEI used was not a

modification to Field-Comm.net.  It was a different, web-based software.  Given the similarity

between the databases of Field Navigator and Field-Comm.net, the Court finds that Maxim

Defendants used an item made available under the Software Source Code Access and Indemnity

Agreement, specifically, Field-Comm.net database tables, for a purpose other than the "sole

purpose" permitted under that agreement.  To allow the Maxim Defendants to retain software

developed in part through an unauthorized use of Field-Comm.net database tables would result in

unjust enrichment.  Under its equitable powers, therefore, the Court will impose a constructive

trust over any Field Navigator software in Maxim Defendants' possession containing Field-Comm.net database tables.

Plaintiffs did not prove that any Maxim Defendant received revenue or proceeds from Field Navigator. Therefore, the Court will not establish a constructive trust on any revenue or proceeds in the Maxim Defendants' possession.

### 2.    Pajemola Defendants

Because Edwin Pajemola was party to the Software Source Code Access and Indemnity Agreement, and for the reasons discussed *supra* at Part II.O.1, the Court will impose a constructive trust against the Pajemola Defendants.

As noted *supra*, a constructive trust may be appropriate in the case of unjust enrichment. "Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Hartford Whalers Hockey Club*, 231 Conn. at 283.

Accepting as true Plaintiffs' allegations against the Pajemola Defendants, except allegations pertaining to damages, and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that Edwin Pajemola accessed Field-Comm.net's database under the Software Source Code Access and Indemnity Agreement, created derivative software in violation of his obligations under that agreement, and CFS received revenue from licensing the derivative software. *See* Verified Compl. ¶¶ 75, 80-81, 85-86, 108-11, 145.

"[T]he measure of damages in an unjust enrichment case ordinarily is not the loss to the plaintiff but the benefit to the defendant." *Hartford Whalers Hockey Club*, 231 Conn. at 285. As

44

noted *supra* at Part II.E, Edwin Pajemola offered a "guesstimate" that he made a $250,000 profit from the $400,000 in revenue that CFS received from its licensing transactions with A&M and Berghorst.  While this evidence was not sufficient to prove Plaintiffs' lost profits with reasonable certainty, the Court finds that, given the Pajemola Defendants' defaults and their failure, despite Court order, to produce a computer containing underlying financial records, it is sufficient to prove the benefit to the defendant for unjust enrichment purposes.  *See* Fed. R. Civ. P. 37(b)(2)(A).  However, since the Court already has awarded damages for this same amount, it would result in a double recovery to impose a constructive trust on the same funds.  Accordingly, the Court does not do so.  The Court will, however, impose a constructive trust on any Field Navigator software in the Pajemola Defendants' possession containing Field-Comm.net database tables.

### P.    Permanent Injunction

Plaintiffs seek, under various statutes, to enjoin permanently Defendants from using or otherwise disposing of software derivative of Field-Comm.net.  Plaintiffs did not address this "drastic remedy[,]" *Gilliam v. Am. Broad. Cos., Inc.*, 538 F.2d 14, 27 (2d Cir. 1976), in their post-trial briefs or closing argument.  As a result, these claims may be abandoned as to Maxim Defendants.  *See Ortho Pharm. Corp.*, 828 F. Supp. at 1129.  Nonetheless, in an abundance of caution, the Court will address them.

The standard for a permanent injunction is essentially the same as the standard for a preliminary injunction, except that the moving party, instead of showing a likelihood of success on the merits, must show actual success on the merits.  *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987).  To obtain a preliminary injunction, a party must demonstrate that it is "likely to suffer irreparable injury if relief is denied but also that there is either (1) a

likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the plaintiff's favor." *Procter & Gamble Co. v. Chesebrough-Pond's Inc.*, 747 F.2d 114, 118 (2d Cir. 1984). The irreparable harm must be imminent, not remote or speculative. *Marriott v. Cty. of Montgomery*, 426 F. Supp. 2d 1, 11 (N.D.N.Y. 2006). However, the "imminent" aspect is not crucial to granting a permanent injunction. *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999). The party seeking a permanent injunction must show the absence of an adequate remedy at law. *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011).

### 1.    Maxim Defendants

While the imminence aspect is not crucial, Plaintiffs still must show that they are likely to suffer irreparable harm.[12] As noted *supra*, Plaintiffs did not brief this issue with respect to Maxim Defendants. The Court will not enter permanent injunctions against the Maxim Defendants because (a) the evidence showed that Steven Maxim, MEI, and MFSS are no longer operating in the property preservation industry, and (b) the Court has imposed a constructive trust in Plaintiffs' favor over any Field Navigator software in Defendants' possession containing Field-Comm.net database tables. *See S.E.C. v. Dibella*, No. 3:04-cv-01342 (EBB), 2008 WL 6965807, at *12 (D. Conn. Mar. 13, 2008) (for permanent injunction, there must be "'some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.'") (quoting *S.E.C. v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992)), *aff'd*, 587 F.3d 553 (2d Cir. 2009)).

---

[12] A plaintiff need not show irreparable harm to obtain injunctive relief under CUTPA. *Fairchild Heights Residents Ass'n, Inc. v. Fairchild Heights, Inc.*, 310 Conn. 797, 805 n.6 (2014). But Plaintiffs did not establish that a Maxim Defendant's unfair trade practice caused their ascertainable loss. *See Quinn*, 241 Conn. at 644 (fact that plaintiff fails to prove particular loss or extent of loss does not foreclose injunctive relief under CUTPA if reasonable inference can be drawn that unfair trade practice caused loss).

2.      **Pajemola Defendants**

Plaintiffs prevailed on their CUTPA claim against Pajemola Defendants, and CUTPA does not require Plaintiffs to demonstrate irreparable harm to obtain injunctive relief, *Fairchild Heights, Inc.*, 310 Conn. at 805 n.6.  *Bristol Tech., Inc. v. Microsoft Corp.*, 114 F. Supp. 2d 59, 95-96, 99 (D. Conn. 2000) (noting that state substantive law applies to request for permanent injunction, and that plaintiff who prevails on CUTPA claim may seek injunctive relief without establishing irreparable harm), *vacated on other grounds*, 250 F.3d 152 (2d Cir. 2001). Accordingly, the Court will enjoin permanently the Pajemola Defendants from using or otherwise disposing of software containing Field-Comm.net database tables.

Although Edwin Pajemola testified that CFS had no customers and was not doing any business, Pls.' Ex. 26 at 02:30, the ordinary requirement to show imminent irreparable harm does not apply, and the Court deems it "necessary and proper" under Conn. Gen. Stat. § 42-110g(a) to enjoin the Pajemola Defendants from potentially reactivating CFS's business and licensing competing software containing Field-Comm.net database tables to the dwindled population of mortgage field services contractors that makes up East Point's potential customer base.  The Court concludes that East Point does not have an adequate remedy at law because, as evidenced by their defaults in this matter, the Pajemola Defendants have been out of communication, and doubt exists as to whether Pajemola Defendants are able to pay the judgment in this case.  *See* Defs.' Br. at 39; *e.g.*, *Painewebber Inc. v. Nwogugu*, No. 98 Civ. 2441 (DLC), 1998 WL 545327, at *2 (S.D.N.Y. Aug. 26, 1998) (no adequate remedy at law where it was unlikely that defendant would be able to pay the judgment); *Transamerica Rental Fin. Corp. v. Rental Experts*, 790 F. Supp. 378, 382 (D. Conn. 1992) (no adequate remedy at law where defendant's ability to pay judgment was in doubt).

### III.   MOTIONS

#### A.   Motion for Contempt and Motion to Dismiss Counterclaims for Failure to Prosecute (ECF No. 149 and ECF No. 150)

The Pajemola Defendants were represented by counsel for nearly a year at the beginning of this case.  When their counsel withdrew in March 2014, the Court notified them that "if an appearance is not entered in their behalf[,] they will not receive notice of court proceedings and judgment against them on plaintiff's claims may enter and their counterclaim(s) dismissed without further notice."  Order, ECF No. 71.  The Pajemola Defendants did not appear, engage successor counsel, or prosecute their claims and defenses any further.

On April 30, 2015, the Court granted in part and denied in part Plaintiffs' motion to compel the Pajemola Defendants to respond to certain discovery requests.  Ruling on Pls.' Mot. Compel at 1, ECF No. 141.  The Court declined to hold the Pajemola Defendants in contempt at that time, but allowed Plaintiffs to renew their motion to hold them in contempt if they failed to comply with the Court's order.  *Id.* at 5.  The Pajemola Defendants failed to comply with the order, and Plaintiffs renewed their motion.  Plaintiffs ask the Court to impose a fine and dismiss the Pajemola Defendants' counterclaims.  ECF Nos. 149.  Plaintiffs also move under Rule 41(b) to dismiss the Pajemola Defendants' counterclaims for failure to prosecute.  ECF No. 150.

If a party fails to obey a subpoena or an order to provide discovery, the Court may hold that party in contempt.  Fed. R. Civ. P. 37(b)(2)(A)(vii), 45(g).  This Court has discretion in imposing sanctions for discovery failures, but should consider "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of . . . noncompliance."  *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012) (quoting *Agiwal v. Mid Island Mortg.*

*Corp.*, 555 F.3d 298, 302 (2d Cir. 2009)).

The Court finds the Pajemola Defendants in contempt under Federal Rules of Civil Procedure 37 and 45 for failing to comply with the Court's order compelling them to respond to Plaintiffs' and the Maxim Defendants' discovery requests, and, under Rule 37(b)(2)(A) and Rule 41(b), will dismiss all of their claims against Plaintiffs and the Maxim Defendants.

Dismissal of the Pajemola Defendants' claims is an appropriate sanction because their failures to appear, respond to discovery requests, and prosecute their claims were willful. At the beginning of this case, they engaged counsel in apparent recognition of their responsibility to participate in this action. But since their counsel withdrew, they have been willfully non-compliant with this Court's orders for years, despite the Court's warning of the consequences of non-compliance. *See, e.g.*, *Trans World Airlines, Inc. v. Hughes*, 332 F.2d 602, 614 (2d Cir. 1964) (district court did not err in dismissing counterclaims of party who willfully failed to appear for deposition with knowledge of consequential sanctions). Dismissal of the Pajemola Defendants' counterclaims also is appropriate under Federal Rule of Civil Procedure 41(b) for failure to prosecute. *E.g.*, *Livecchi v. U.S. Dep't of Hous. & Urban Dev.*, 153 F. App'x 16, 17 (2d Cir. 2005) (district court did not err in dismissing claim of *pro se* party who did not pursue his claim for over one year, and court warned that failure to prosecute could result in dismissal).

### B.       Maxim Defendants' Motion for Default Judgment

The Maxim Defendants moved for default judgment against the Pajemola Defendants. ECF No. 151. They later informed the Court that, due in part to their understanding of the Pajemola Defendants' financial situation, they no longer wish to pursue their claims against the Pajemola Defendants, but do seek default judgment in their favor with respect to the Pajemola Defendants' claims against them. Defs.' Br. at 39. Because the Court already dismissed the

Pajemola Defendants' claims against the Maxim Defendants, the Court finds as moot the Maxim Defendants' motion for default judgment.

IV.     **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Contempt (ECF No. 149) is GRANTED IN PART AND DENIED IN PART.  Plaintiffs' Motion to Dismiss Counterclaims for Failure to Prosecute (ECF No. 150) is GRANTED.  Plaintiffs' Motion for Default Judgment (ECF No. 152) is GRANTED IN PART AND DENIED IN PART.  Maxim Defendants' Motion for Default Judgment (ECF No. 151) is FOUND AS MOOT.  The Clerk shall enter judgment consistent with this memorandum and close this case.


SO ORDERED at Bridgeport, Connecticut this twenty-second day of March, 2016.


  /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE