IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EAST POINT SYSTEMS, INC., | ) | |
| THOMAS MARGARIDO, JASON | ) | |
| MARGARIDO, AND PAUL TAFF | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | CIVIL ACTION NO. 3:13-cv-215 |
| | ) | |
| | ) | |
| STEVEN MAXIM, S2K, INC., MAXIM | ) | |
| ENTERPRISES, INC., MAXIM FIELD | ) | |
| SERVICE SUPPLY, INC., EDWIN | ) | |
| PAJEMOLA, AND CLEVELAND FIELD | ) | |
| SYSTEMS, LLC | ) | April 27, 2016 |
| Defendants. | ) | |

**PLAINTIFFS' MOTION FOR AMENDED FINDINGS PURSUANT TO
FRCP 52(b) AND TO ALTER OR AMEND JUDGMENT PURSUANT TO
FRCP 59(e)**

Pursuant to Federal Rules of Civil Procedure 52(b) and 59(e), the plaintiffs respectfully

request that this Honorable Court reconsider and amend various findings of fact from its

decision, dated March 22, 2016 and as a consequence, amend the judgment that was entered in

this case on March 30, 2016. The specific amendments that are sought are set forth more fully in

the accompanying memorandum of law in support of this motion.

Date:  April 27, 2016

By: /s/ Bruce H. Raymond
Bruce H. Raymond ct04981
Evan K. Buchberger ct29973
Raymond Law Group LLC
90 National Drive, Suite 3
Glastonbury, CT 06033
P: 860-633-0580
F: 860-633-0438
raymond@raymondlawgroup.com
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EAST POINT SYSTEMS, INC., | ) | |
| THOMAS MARGARIDO, JASON | ) | |
| MARGARIDO, AND PAUL TAFF | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | CIVIL ACTION NO. 3:13-cv-215 |
| | ) | |
| | ) | |
| STEVEN MAXIM, S2K, INC., MAXIM | ) | |
| ENTERPRISES, INC., MAXIM FIELD | ) | |
| SERVICE SUPPLY, INC., EDWIN | ) | |
| PAJEMOLA, AND CLEVELAND FIELD | ) | |
| SYSTEMS, LLC | ) | April 27, 2016 |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR AMENDED FINDINGS PURSUANT TO FRCP 52(b) AND TO
ALTER OR AMEND JUDGMENT PURSUANT TO FRCP 59(e)**

Although the standard for granting a motion to amend or correct judgment pursuant to

Rule 52(b) and 59(e) "is strict, and reconsideration will generally be denied unless the moving

party can point to controlling decisions or data that the court overlooked-matters, in other words,

that might reasonably be expected to alter the conclusion reached by the court," courts have

recognize the importance of accuracy and "the need to correct a clear error or prevent manifest

injustice." *Virgin Alt. Airways v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir. 1992); *St.

Laurie Ltd. V. Yves St. Laurent Am., Inc.*, 13-CV-6857, 2015 U.S. Dist. LEXIS 42621, at *39

(S.D.N.Y. Mar. 25, 2015)(quoting *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995);

*Range Road Music Inc. v. Music Sales Corp.,* 90 F.Supp.2d 390, 392 (S.D.N.Y. 2000).

## I.   Plaintiffs respectfully request that this Court amend its finding as to the admissibility of testimony from the plaintiffs' fact-witness, Kevin Flaherty

The plaintiffs hereby respectfully request that the Court reverse its prior ruling, excluding the testimony of the plaintiffs' certified public accountant, Kevin Flaherty from testifying as a fact witness. In the alternative, the plaintiffs respectfully request that the Court rescind its finding from its written opinion, dated March 30, 2016, deeming the plaintiffs to have waived any claim relating to the presentation of Mr. Flaherty's testimony. Through their argument and offer of proof, the plaintiffs provided sufficient foundation for Mr. Flaherty's testimony. Moreover, the plaintiffs had previously disclosed Flaherty as an expert, out of an abundance of caution, more than a year before the trial began. Therefore, for the following reasons, the plaintiffs respectfully request that the Court order further presentation of evidence in this case, to allow for the presentation of Mr. Flaherty.

Courts in this circuit have repeatedly recognized that "preclusion of evidence is a harsh remedy [and] should be imposed only in rare situations." *Izzo v.ING Life Ins. & Annuity Co.*, 235 F.R.D. 177, 186 (E.D.N.Y. 2005)(Quoting *Update Art, Inc. v. Modiin Publishing Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988). Because Kevin Flaherty would have testified at trial as a fact witness, and the Plaintiffs have properly disclosed him as such, an extreme action such as preclusion should not have been taken. Because of Flaherty's exclusion from trial, the plaintiffs were deprived of the opportunity to present the evidence from their chosen witness, who would have been able to coherently and methodically respond to questions of counsel and the court as to summaries of the plaintiffs' damages. As the Court observed during trial, plaintiffs' witness Paul Taff, on whom the plaintiffs' were forced to rely at trial, was ill to the point of not being able to testify competently.

Though Mr. Flaherty does possess the skills and unique knowledge of a certified public accountant, such knowledge was not to be employed in any opinion rendered by him.  In fact, Mr. Flaherty's testimony would not have been offered as an opinion, and would have been strictly constrained to a summary of the facts of damages in the case.  In determining whether a witness's testimony constitutes expert opinion "[o]ften, the determination is based on the specific facts of the case and the content of the proffered testimony itself." *Boles v. Merck & Co.*, 647 F.Supp.2d 265, 280 (N.Y.S.D. 2009); *Guarnieri v. Pa. Fed'n. Bhd. of Maint. of Way Emples.*, 153 F. Supp. 2d 736, 745 (E.D. Pa. 2001).  Courts have held that even witnesses who were not properly disclosed as expert witnesses should still be allowed to testify to factual matters, "as only expert testimony, not fact testimony, should be excluded if deemed to be in the form of an opinion." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 00 Civ. 8720 (NRB), 2004 U.S. Dist. LEXIS 18599 (S.D.N.Y. Sept. 13, 2004)(*reversed on unrelated grounds* 424 F.3d 195 (2d Cir. 2005)); *Wechsler v. Hunt Health Sys. Ltd.*, 198 F.Supp.2d 508, 529 (S.D.N.Y. 2002).  Ultimately, the rationale is that "factual testimony does not constitute "an opinion" under Federal Rule of Evidence 702, even if given by a person with [expert qualifications]." *Id* (*citing Gomez v. Rivera Rodriguez, 344 F.3d 103, 111-114 (1st Cir. 2003).* Moreover, the typical concerns of possibly misleading a jury with expert testimony, cloaked with the authority of expertise, is minimized when tried to a court, sophisticated in its command of the law.

In the present case, the testimony of Kevin Flaherty was offered as a strict summary of the losses suffered by the Plaintiffs.  This constitutes a straightforward recitation of facts, set forth in exhibits submitted by the plaintiffs and other documents properly relied on, and requires no synthesis of any data or any opinion about said facts that would require the use of the witness's expertise. As such, even though Flaherty did not produce a report, pursuant to Federal

Rule of Civil Procedure 26, he still should have been allowed to testify as to his factual findings. Therefore, the plaintiffs respectfully request that this Court enter an order granting additional testimony from Kevin Flaherty as to factual matters in this case.

Alternatively, should this Court decline to order rehearing with the addition of the testimony of Kevin Flaherty, the plaintiffs respectfully request that the Court alter its finding, contained on page 17, footnote 3 of its decision, indicating that the plaintiffs may have waived any claim as to the exclusion of Flaherty's testimony. Given the Court's previous ruling and the plaintiffs' offer of proof, the plaintiffs sufficiently preserved this claim, despite not presenting the testimony of Mr. Flaherty. The previous ruling made clear that any presentation of Mr. Flaherty would be futile as to meet the court's requirements for qualifying as a "fact witness."

In order to preserve a claim of error, a party must make an offer of proof as to the content of the excluded evidence where "the significance of the excluded evidence is not obvious" or "it is not clear what the testimony of the witness would have been." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 151-52 (2d Cir. 2010) (quoting *Fortunato v. Ford Motor Co.*, 464 F.2d 962, 967 (2d Cir. 1972)); see also Fed. R. Evid. 103(a)(2). For excluded evidence, an offer of proof is sufficient if, at the very least, "a party informs the court of its substance." Fed. R. Evid. 103(a)(2); *Robinson v. Suffolk County Police Dep't,* 544 Fed. Appx. 29 (2d Cir. N.Y. 2013).

This court's ruling demonstrated that the plaintiffs would not be able to lay a foundation so as to meet the Court's standard. In its ruling, this Court found that Kevin Flaherty could not testify as a fact witness because it appeared that "he was not employed by the Plaintiffs and was not personally involved with the compilation or maintenance of the plaintiffs' financial records during the relevant time periods." ECF No. 185. In fact, the plaintiffs' contention was that such a certified public accountant, who merely examined the books and financial records of a company

could testify as a fact witness without having been employed or personally involved with their creation. Therefore, the court was fully informed as to the substance of his offered testimony. The only contention was as to the legal standard by which the witness would be judged. As such, at the time of trial, it would have been futile for the plaintiffs to present the testimony of Mr. Flaherty, as the court had already ruled that his lack of contemporaneous retention precluded him from being a fact witness.

As relief, the plaintiffs respectfully request that the Court enter an order granting additional testimony from the plaintiffs' accountant, Kevin Flaherty, pursuant to Federal Rule of Civil Procedure 59(a)(2). In the alternative, should such testimony not be granted, the plaintiffs respectfully request that the Court amend its judgment to reflect that the plaintiffs have not waived a claim that Flaherty was improperly excluded from testifying.

## II.   The Court Should Reconsider Its Ruling, Precluding the Admission of Plaintiffs' Exhibit 23 for Identification

The plaintiffs respectfully request that this Court revisit its decision to exclude plaintiff's exhibit 23 pursuant to Federal Rule of Civil Procedure 26. Ultimately, the plaintiffs did not expect to need to present exhibit into evidence as proof of damages and therefore, precluding the evidence in question should be reconsidered as the Rule contemplates disclosure of evidence that is expected to produced or may be produced.

Under the Federal Rules of Civil Procedure, "If a party fails to provide information…as required by Rule 26(a) or (e), the party is not allowed to use that information…to supply evidence…at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). A party is subject to such sanctions if it fails to provide "an identification of each document or other exhibit, including summaries of other evidence—separately identifying those

items the party expects to offer and those it may offer if the need arises." Fed. R. Civ. P. 26(a)(3)(A)(iii).

"Despite this apparently self-executing penal language…[t]he imposition of sanctions under Rule 37(c) for failure to comply with disclosure obligations is discretionary, and preclusion will be ordered only in rare cases." *Hamilton v. City of Peekskill Police Dep't,* No. 13-cv-8138 (NSR), 2015 U.S. Dist. LEXIS 101903 (S.D.N.Y. Aug. 3, 2015); *Church Ins. Co. v. Trippe Mfg. Co*., No. 04-cv-6111, 2005 U.S. Dist. LEXIS 33363, at *21 (S.D.N.Y. Dec. 19, 2005) (internal quotation marks omitted); see also Fed. R. Civ. P. 37(c)(1) ("In addition to or instead of this [preclusion] sanction, the court . . . may impose other appropriate sanctions."). In determining whether to exclude evidence which was not disclosed pursuant to Rule 26(a)(3)(A)(iii) a court must consider "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the precluded [evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Matheson v. Kitchen*, 515 Fed. Appx. 21, 23(2d Cir. N.Y. 2013)(quoting *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006).

The first factor of this inquiry should not weigh in favor of precluding the plaintiffs' proffered evidence. Based on representations by counsel, and corroborated by the circumstances attendant to the proffer, the plaintiffs' reason for not disclosing plaintiffs' exhibit 23 was due to the fact that the plaintiffs did not expect that they would offer it as an exhibit or that it might even be a possibility. Tr. At 577-578. The plaintiffs' initial strategy regarding this information was to offer the testimony of their disclosed certified public accountant, Kevin Flaherty. Flaherty's testimony would have been sufficient to establish the plaintiffs' damages and would

not have required the admission of exhibit 23. He was not sick and would not have struggled to respond to factual questions about the claimed financial losses.

After the preclusion of this witness, the plaintiffs sought to prove damages through Paul Taff, who was aided in his testimony by exhibit 23. Ultimately, the document did not allow Taff to testify as to the plaintiffs' damages from personal knowledge. As such, the plaintiffs were forced to seek to admit evidence of damages through a tertiary source – exhibit 23 itself. The fact that the plaintiffs had gone through their two anticipated means of offering evidence of damages and had to find yet another avenue lends credence to the claim that failure to disclose was caused by the fact that the plaintiffs did not foresee offering the exhibit at all. Certainly, it does not indicate the type of malicious conduct that would warrant the sanction of preclusion. This is especially the case here, where the law of evidence allows opinion testimony of a business owner to the value of his property. *See e.g. Securitron Magnalock v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995); *Aunt Sally's Praline Shop, Inc. v. United Fire & Casualty Co*., 418 Fed. Appx. 327 (5th Cir. 2011); *Lighting Lube, Inc. v. Witco Corp.*, *4 F.3d 1153* (3rd Cir. 1993).

The second factor further weighs against the preclusion of exhibit 23. Given the failure of the plaintiffs' first two methods of proving damages, the plaintiffs' only other option to prove damages was to introduce exhibit 23. Without such proof, myriad counts of the plaintiffs' complaint failed despite extensive showing of the Maxim defendants' wrongful conduct. Although the exhibit did not refresh his recollection as to its contents, Taff had sufficient recollection as to production of the document to allow it to be admitted into evidence.

In order for a business record to be authenticated by a custodian, that custodian "need not have personal knowledge of the actual creation of the document…[n]or is there any requirement

under Rule 803(6) that the records be prepared by the party who has custody of the documents and seeks to introduce them into evidence." *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995).  "Rather, all that is required is proof that "it was the business entity's regular practice to get information" from the person who created the document... *Id*. In his testimony, Mr. Taff provided sufficient information for the admission of the exhibit into evidence. As Mr. Taff testified, the exhibit in question was "a printout of Doriann's record of her invoicing, what was paid and what was not. The money ends up in my accounting for the...company." Tr. 571:23-572:4. This testimony indicates the type of contemporaneous and ongoing reporting, as part of the ordinary course of business at East Point Systems, that would allow Mr. Taff to testify as to the document's authenticity. As such, had exhibit 23 not been excluded under Rule 26 of the Federal Rules of Civil Procedure, it would have come into evidence as proof of the plaintiffs damages in this case. In light of this Court's ruling, denying the plaintiffs relief on various counts of their complaint for failure to specify the quantum of their damages, the proffered evidence is undoubtedly critical. From the contents of the document, the plaintiffs would have been able to prove their damages, thereby altering the outcome of the proceeding. Therefore, this factor weighs strongly against the sanction of exclusion.

The third factor is the prejudice suffered by the defendants in admitting undisclosed evidence. Courts in this circuit have routinely acknowledged that a defendant's negligence in conducting discovery weighs against a finding of prejudice from a failure to disclose under Rule 26. *See e.g. Hamilton v. Peekskill Police Department*, No. 13-cv-8138(NSR), 2015 U.S. Dist. LEXIS 101903 (N.Y.S.D. Aug. 3, 2015)(holding that a defendant's failure to seek to depose or submit formal written discovery weighed against finding of prejudice, ultimately precluding the sanction of exclusion)(*Mattheson v. Kitchen*, 515 Fed. App'x. 21, 23 (2d Cir. 2013)(holding it to

be an abuse of discretion to preclude eyewitness testimony where nonmoving party was on notice about an eyewitness's existence but "made no effort to locate or contact" him).

Similarly, the fact that the plaintiffs disclosed the subject-matter contained within exhibit 23, on May 16, 2014, approximately, a year and one-half before trial. On that date, the plaintiffs provided to the defendants, a notice of expert witnesses, that included Kevin Flaherty. *See Attached* Exhibit A. As was indicated previously, the defendants made no written discovery requests with relation to Mr. Flaherty or any of the evidence underlying his conclusions. Here, the information contained within exhibit 23, underlay the conclusions of Mr. Flaherty, and essentially conveyed substantially the same information. As such, the defendants were on notice of this information for over a year and one-half, and therefore, the possibility of a continuance to address such information should not be implicated in the analysis of the propriety of sanctions under Rule 37. *See e.g. United States v. District Council*, 90 Civ. 5722 (CSH), 1993 U.S. Dist. LEXIS 12597 (S.D.N.Y. Sept. 8, 1993).

Ultimately, none of the factors weigh in favor of precluding plaintiffs' exhibit 23. As such, plaintiffs' exhibit 23 should be entered into evidence as a full exhibit and weighed accordingly to find that the plaintiffs have suffered real articulable damages and this Court should award relief accordingly. Therefore, the plaintiffs' respectfully request that this court accept exhibit 23 into evidence through additional testimony and weigh said evidence accordingly as to damages.

### III.   Maxim is liable for his acts in his personal and representative capacity

In the present case, the Court should hold that the defendant, Maxim is liable for the breach of contracts, entered into by S2K. The facts presented at trial proved that for the purposes

of S2K's dealings with the plaintiffs, Maxim was S2K and S2K was Maxim. There were no other managers or substantial shareholders of S2K and there were no agents beside Maxim to act on its behalf.   Because S2K was Maxim's alter-ego, he should not be able to escape liability by implying some difference between S2K and him where none exists.

In Connecticut, "courts will . . . disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor." *Angelo Tomasso, Inc. v. Armor Construction and Paving, Inc*., 187 Conn. 544, 552, 447 A.2d 406 (1982).  Courts in Connecticut have repeatedly "affirmed judgments disregarding the corporate entity and imposing individual stockholder liability when a corporation is a mere instrumentality or agent of another corporation or individual owning all or most of its stock. *Id* at 553; *Zaist v. Olson*, 154 Conn. 563, 573, 227 A.2d 552 (1967).

Where a party satisfies either the "instrumentality rule" or the "identity rule," courts regularly disregard corporate structure. *Saphir v. Neustadt*, 177 Conn. 191, 209-10, 413 A.2d 843 (1979). "The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.   *Tomasso*, 187 Conn. At 553-554

(quoting *Lowendahl v. Baltimore & O.R. Co.*, 247 App. Div. 144, 157 (1936); *Fisser v. International Bank*, 282 F.2d 231, 238 (2d Cir.1960).

Based on the evidence adduced at trial, Maxim dominated the operations of S2K in a way that would warrant disregarding the corporate formalities that he erected. According to Maxim himself, he owned approximately 92 percent of the shares of S2K.[1] Tr. 635:25-636:21. This type of supermajority gave Maxim the type of control over the operation of S2K whereby he could not be meaningfully challenged by any other individual. Specifically, as to S2K's dealings with the plaintiffs, it is apparent that Maxim acted unilaterally in entering into contracts on behalf of S2K. All of the contracts between S2K and the plaintiffs were executed only by Maxim. Exhibits 2, 3, 4, and 5. Furthermore, Maxim testified that the investment by S2K in East Point, which led to the shareholder agreement and his place on the board of directors, came about because of discussions that only he, Maxim, had with Thomas Margarido of East Point. Tr. 801:9-18. On the contrary, there was no testimony that there were any other actors on behalf of S2K other than Maxim.

This domination by maximum was ultimately used to perpetrate a fraud against the plaintiffs. As this Court acknowledged,  "it appears that MEI may have violated Conn. Gen. Stat. §53a-251(e)(1)." Dec. at 30.[2] The plaintiffs request that the Court strengthen this finding, based

---

[1] At trial Maxim testified that only he and his mother were shareholders of S2K and that she held only approximately 8 percent of the shares.

[2] Holding that "it appears that MEI may have violated the statute because, "[a]s a result of [MEI's] accessing or causing to be accessed [Field-Comm.net], [MEI] intentionally ma[de] or cause[d] to be made an unauthorized display, use, disclosure or copy, in any form, of [database tables] residing in, communicated by or produced by [Field-Comm.net.]" *See* Conn. Gen. Stat. § 53a-251(e)(1)." This Court further held that the Maxim defendants had violated the Connecticut Unfair Trade Practices Act In light of Steven Maxim's position on the Board, and his and MEI's non-competition obligations, Steven Maxim, MEI, and MFSS may have engaged in an

on the facts before it, to affirmatively find that the Maxim defendants did indeed violate the Connecticut Unfair Trade Practices Act and commit a computer crime in violation of Conn. Gen. Stat. §53a-251. Regardless of whether this amendment is made, the plaintiffs rely on the Court's findings in this regard as well as on arguments set forth in the plaintiff's post-trial brief, and reply brief that the Maxim defendants' used S2K for fraudulent acts with regards to the plaintiffs.

Further, as will be further discussed in the following section, this fraud proximately caused the plaintiffs' injuries. As such, the corporate structure of S2K should be disregarded and Maxim should be held personally liable for the breaches of contract that he perpetrated on contracts executed in S2K's favor. Ultimately, Maxim should not be allowed to commit acts which he is prohibited to do under the guise of S2K's authority. Justice requires that he be held liable for the breaches that he committed irrespective of the name that he used at the time of the breach. Accordingly, the plaintiffs respectfully request that this Court amend its finding that the plaintiffs failed to pierce the corporate veil in regards to Sections II.A, II.C, II.F to allow for such veil piercing so as to hold Maxim responsible for his actions.

## IV.   The Bad Acts, Proven in Various Counts of the Plaintiffs' Complaint Proximately Caused the Plaintiffs' Injuries

In denying the plaintiffs relief in various sections of its decision[3], the Court found that the plaintiffs had not proved that the bad acts of the Maxim defendants proximately caused their damages. The plaintiffs respectfully submit to this court, that there was sufficient evidence to prove that the Maxim defendants proximately caused the plaintiffs' injuries.

---

unscrupulous trade practice that offended public policy when they developed and used a software that performed the same essential functions as Field-Comm.net but did not make money for East Point, and did not inform East Point about this software." Dec. at 38.

[3] Including sections II.B, II.D, II.E.1, II.F, II.L.1, II.M.1, II.N.1

As with all elements of a cause of action, proximate cause of injuries must be proven by a preponderance of the evidence. *See e.g. Duncan v. Mill Mgmt. Co. of Greenwich, Inc.*, 308 Conn. 1, 25 n.17, 60 A.3d 222 (2013). By a preponderance, a plaintiff need only prove that the that the "fact is more likely true than not." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997). In the present case, the plaintiffs presented evidence that proved, by a preponderance of the evidence that their injuries were proximately caused by the Maxim defendants' actions. The plaintiffs submitted evidence that elements from their Fieldcomm.net software was present in the Field Navigator product that Pajemola marketed to A&M and Berghorst, and that such activity was attributable to Maxim through their agency relationship. This along with other evidence was not undermined by a delay in the losses suffered by the plaintiffs, as such a delay would be expected.

First, the plaintiffs request that the Court revise its finding that there was no evidence that code from the plaintiffs' fieldcomm.net was incorporated into the Field Navigator products that were employed with Berghorst and A&M.  As the experts at trial agreed, the naming conventions and other similarities between the Fieldcomm.net software and the Field Navigator product that were analyzed for trial, made it an inescapable conclusion that the Field Navigator software that was analyzed had substantially been created by copying the database aspects from Fieldcomm.net. See Tr. Dec. 8, 2015, at 293:11-294:5[4]; 330:20-346:12.[5]  Therefore, it was proven at trial, that aspects of the plaintiffs' database had been copied into the Maxim defendants' Field Navigator software.

Consequently, in relation to the claim of damages caused by the defection of Berghorst and A&M, the question became whether there was sufficient proof, by a preponderance of the

---

[4] Testimony of plaintiffs' expert, John Morgan.
[5] Testimony of defendants' expert, Gregory Kelley.

evidence, that the code that Pajemola used to transfer data, in fact, contained elements from the plaintiffs' database. Although there was no analysis of Pajemola's Field Navigator, presented to Berghorst and A&M, for the presence of East Point's code, it should be noted at the outset, that the reason that this was impossible was because of Pajemola's non-compliance with discovery orders, which ultimately led this court to find him in contempt. Moreover, there was more than sufficient evidence to demonstrate that it more likely than not, that the plaintiffs' code was contained within the Field Navigator product that was marketed and used by Berghorst and A&M.

The most compelling evidence proving that Berghorst and A&M used Field Navigator that contained Fieldcomm.net elements was the testimony from Maxim himself.  At trial, Maxim testified that he knew that the Field Navigator program that had been given to A&M contained a component that would allow data to be taken from East Point's system and be directly input into Field Navigator. Tr. 739:1-21[6]. He was not just aware of this, but had directed Pajemola to do so. Id. The available circumstantial evidence corroborated this as well.  The relative ease with which Berghorst and A&M switched over to Field Navigator indicates that the Field Navigator product

---

[6] Q. …You assigned Mr. Pajemola to write whatever code was necessary to get the information from an East Point database so that it could then work in Field Navigator, right?
A. Yes, that's correct.
Q. All right. And you knew that that was part of Field Navigator, correct? It had a component which would allow it to take data from East Point Systems and make Field Navigator work. That part was necessary, correct?
A. Yes, that's correct.
Q. All right. And when you gave Field Navigator to A&M, you knew that with it came the opportunity to take the data from East Point's database and make Field Navigator work with that same data, correct?
A. That's correct.
Q. And you were the one that implemented that or assisted with that at -- working with Mr. Strickland, correct?
A. That's correct.

that they used contained code derived from Fieldcomm.net.   As John Morgan testified, uncontradicted, without the copied code, the process of transferring data over to a competitor's software takes "substantial effort." Tr. 298:22-299:13[7]. However, Heather Berhorst of Berghorst Enterprises testified that the data from Fieldcomm.net had been electronically transferred over to Field Navigator as opposed to having been entered manually. Berghorst Depo. at 45:1-10. Additionally, Heather Berghorst testified that she did not believe that she had experienced any data loss during the transfer. Berghorst Depo. at 45:20-24. Similarly, Ira Strickland of A&M testified that when A&M had switched from Fieldcomm.net to Field Navigator, the business's data had been transferred over to Field Navigator electronically and had not required any manual input. Strickland Depo. at 15:10-20. As such, the plaintiffs submit that this Court should reverse its ruling that there was no evidence that elements of the plaintiffs' software were contained within Pajemola's Field Navigator.

In further finding that the plaintiffs failed to establish proximate cause against the Maxim defendants, this Court held that the Maxim defendants could not be held liable for the profits made by Pajemola. Dec. at pp. 15-17. However, the agency relationship that was established at trial was sufficient to hold against the Maxim defendants, and as such, the plaintiffs respectfully request that this Court reconsider and hold those actions against the Maxim defendants.

---

[7]Morgan testified more fully that, "When you have a client who has been using your software for a long time, they may very well have a large amount of data stored in the database that's defined according to your data model. So if they want to switch to a competitor's product, there is often quite a substantial effort involved in figuring out how to export the data out of your product and convert it into the format used by a competing product, and not only does that take work to develop the mapping between the two and do the actual conversion, but also there is a degree of risk involved, if you don't convert it right you could end up with corrupted data. So if a competitor's product were to have a very similar or perhaps copied data model, it's much easier to transition data from one system to the other. So that barrier is much lower."

Typically, an employer may be held liable for the intentional acts of an employee if the employee was acting within the scope of his employment and the conduct in question was in furtherance of the employer's business. *See, A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 208, 579 A.2d 69 (1990). However, under the aided-in-agency theory, an employer may be held liable for the intentional acts of an employee, even if that employee is acting outside the scope of his or her employment or not in furtherance of the employer's business, if the employee "was aided in accomplishing the tort by the existence of the agency relation." *Doe v. Hartford Roman Catholic Diocesan Corp.*, UWY-CV10-5015963, 2014 Conn. Super. LEXIS 1123 (Conn. Super. Ct. May 9, 2014)(quoting Restatement (Second) of Agency §219(2)(d)(1958); *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998); *Motzer v. Global Associates,* 2001 Conn. Super. LEXIS 1691 (Conn.Super. June 19, 2001).

Although courts in Connecticut have been resistant to applying this standard outside of the employment context of harassment, the instant case is the quintessential example of an agent acting outside the scope of his employment, but only being successful in his wrongful conduct because of the existence of the agency relationship. *See e.g. Doe v. St. Francis Hospital*, Dkt. No. X02 UWY CV 085008551, 2011 Conn. Super. LEXIS 3355, (June 2, 2011, Shaban, J.); *Jean-Charles v. Perlitz*, 937 F.Sup.2d 276, 287 n.9 (D.Conn. 2013); *Lara v. Legionaries of Christ*, Dkt. No. X03 CV 106016974, 2011 Conn. Super. LEXIS 2166 (August 30, 2011, Miller, J.). See also, *Doe v. Hartford Roman Catholic Diocesan Corp.*, 2014 Conn. Super. LEXIS 1137, judicial district of Hartford, Dkt. No. CV 115035749, (January 7, 2014, Peck, J.). Many other jurisdictions have held that the acts of an agent, aided by the existence of the agency relationship can give rise to liability of the principal outside the context of employment harassment. *See e.g. Doe v. Forrest*, 176 Vt. 476, 853 A.2d 48 (2004) (applying aided-in-agency to claim of sex abuse

by police officer); *Costos v. Coconut Island Corp.*, 137 F.3d 46 (1st Cir. 1998) (applying aided-in-agency where hotel employee sexually assaulted guest); *Ayuluk v. Red Oaks Assisted Living, Inc.*, 201 P.3d 1183 (Ak. 2009).

In the instant case, it is apparent that Pajemola's agency relationship with Maxim aided Pajemola in harming the plaintiffs and causing their injuries. Pajemola was Maxim's employee. *See* Tr. 661:18-20. Even assuming, as this Court held, that Pajemola's agency relationship terminated before Pajemola began marketing Field Navigator to customers such as Berghorst and A&M, Pajemola was still aided in committing these acts by the agency relationship while it existed. As a result of that employment relationship and agency, Pajemola was given access to all aspects of the plaintiffs' Fieldcomm.net software, including the database, which as previously mentioned, and acknowledged by this court, was substantially copied. *See* Exhibit A at p. 6. Without access to Eastpoint's database, Pajemola never would have been able to develop the Field Navigator software that incorporated database aspects from Fieldcomm.net. Consequently, his access to the Field Navigator software developed for Maxim, ultimately allowed him to market his product to consumers like Berghorst and A&M.

Aside from his access to the Fieldcomm.net database and the resulting product, Pajemola also benefitted from being able to represent to potential customers that he was working with Maxim. According to the evidence in the record, Pajemola was initially introduced to clients, such as Berghorst and A&M, along with the Field Navigator software by Maxim. Ira Strickland testified that just prior to A&M switching from Fieldcomm.net, he flew four or five of his employees out to Maxim's office, where they met with Maxim and Pajemola about switching to Field Navigator. Strickland Depo. at 12:7-13:7. Even once Pajemola's malfeasance came to light,

Pajemola was able to continue to profit from his misdeeds by relying on his prior relationship with Maxim. Once Berghorst became concerned over possible legal repercussions from Pajemola's acts, Pajemola produced the Software Access and Indemnity Agreement to assure Berghorst that he was acting pursuant to legitimate authority. *See* Exhibit 6; Berghorst Depo. at 59:17-61:16.

Further, this Court held that the delay in revenue losses by the plaintiffs cut against a claim that Maxim's activities had proximately caused the plaintiffs damages. *See* Dec. p. 32. However, given the testimony and evidence adduced at trial, such a delayed and tapered drop off in revenues would be expected and, in fact, would be completely consistent with the damages having been caused by Maxim. As Strickland testified, his company, A&M, had continued to subscribe to Fieldcomm.net up until 2014. Strickland Depo. at 14:22-25. Similarly, Tom Margarido testified that while A&M had always maintained their subscription, there was a steady drop off in the revenue that East Point received from A&M's subcontractors. Tr. 166:15-167:1. This was corroborated by Paul Taff's testimony that the total revenues received by East Point through Fieldcomm.net was from A&M and all of their subcontractors, individually. Tr. 498:21-499-10. Therefore, a substantial amount of the plaintiffs' losses were sustained because of the steady exodus of A&M's subcontractors to Field Navigator. With so many individual subcontractors switching over the Field Navigator, it is to be expected that the fall off in revenue would occur over an extended period of time and not all at once, at the time that Maxim switched over to Field Navigator.

Ultimately, the plaintiffs presented sufficient evidence to prove, by a preponderance of the evidence that the acts of Maxim proximately caused their losses. As discussed herein, Maxim

should be held responsible for the actions of Pajemola, because it was only possible for Pajemola to market a rival product because of his role as agent for Maxim. He never would have been able to develop the competing product or market it to buyers. Moreover, there was sufficient evidence to show that elements of Fieldcomm.net were present in Pajemola's Field Navigator program, which he marketed to A&M and Berghorst. The plaintiffs presented both direct testimonial evidence that this was the case along with compelling circumstantial evidence indicating that the ease with which A&M and Berghorst moved over to Pajemola's version of Field Navigator was only possible if there had been substantial copying. Therefore, the plaintiffs' respectfully request that this Honorable Court, revise its findings, contained within Sections II.B, II.D, II.E.1, II.F, II.L.1, II.M.1, II.N.1, that the plaintiffs' failed to establish that their injuries were proximately caused by the actions of the Maxim defendants.

## V.   Plaintiffs request that the court amend its finding that the appropriate price for the specific performance of S2K's sale of East Point should be $57,000

In its decision, the Court found that the plaintiffs and S2K had come to an agreement as to the value of the stocks that S2K held of East Point. Dec. at p. 26. However, as this Court's own ruling acknowledges, S2K refused to accept that deal, and refused to do so wrongfully. S2K should not be awarded with the higher value of the two valuations after it wrongfully withheld its consent, while the value of said stock continued to decline. The plaintiffs' request that this court reconsider, and consider both valuations that were submitted to the Court as exhibits 10 and 11. The plaintiffs, through their proffered evidence and argument, did not offer the $57,700 figure as a the proper valuation, but merely as evidence of S2K's bad faith refusal to sell the shares when the plaintiffs had submitted to not one, but two evaluations. As such, the plaintiffs respectfully request that the Court weigh the evidence that was properly before it as to the valuation of S2K's

shares in East Point, as presented in exhibits 10 and 11. The plaintiffs submit that the accurate valuation was $33,000 set forth in exhibit 10.

**CONCLUSION**

For the reasons set forth herein, the plaintiffs respectfully request that this Court amend such findings of fact and conclusions of law as are necessary to avoid injustice and order additional evidence be taken where appropriate.


Date:  April 27, 2016                              By: /s/ Bruce H. Raymond
                                                   Bruce H. Raymond ct04981
                                                   Evan K. Buchberger ct29973
                                                   Raymond Law Group LLC
                                                   90 National Drive, Suite 3
                                                   Glastonbury, CT 06033
                                                   P: 860-633-0580
                                                   F: 860-633-0438
                                                   raymond@raymondlawgroup.com
                                                   Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date a copy of foregoing pleading was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

And by MAIL TO

Edwin Pajemola
4223 Morely Drive
Reminderville, OH 44202

Cleveland Field Systems, LLC
4223 Morely Drive
Reminderville, OH 44202

Ⓐ Neutral

As of: April 27, 2016 11:43 AM EDT

## *St. Laurie Ltd. v. Yves St. Laurent Am., Inc.*

United States District Court for the Southern District of New York

March 25, 2015, Decided; March 26, 2015, Filed

13-CV-6857 (DAB)

**Reporter**

2015 U.S. Dist. LEXIS 42621

SAINT LAURIE LTD., Plaintiff, v. YVES SAINT LAURENT AMERICA, INC. et al., Defendants.

**Prior History:** *St. Laurie, Ltd. v. Yves St. Laurent Am., Inc., 2014 U.S. Dist. LEXIS 143441 (S.D.N.Y., Sept. 30, 2014)*

## Core Terms

trademark, motion to dismiss, preliminary injunction, clothing, specific performance, irreparable harm, men's clothing, Defendants', Amend, obligations, parties, alleges, Companies, trade name, trademark infringement, Predecessor, Gauche, cases, Rive, advertising, unfair competition, website, set forth, dilution, provides, register, services, reasonable inference, registration, injunction

**Counsel:** [*1] For Saint Laurie Ltd., Plaintiff: Steven Brent Pokotilow, LEAD ATTORNEY, Madelon Lys Witte, Stroock & Stroock & Lavan LLP, New York, NY.

For Yves Saint Laurent America, Inc., Yves Saint Laurent S.A.S., Defendants: Jonathan Henry Sherman, LEAD ATTORNEY, Boies, Schiller & Flexner LLP (D.C.), Washington, DC; Amos Emory Friedland, Boies, Schiller & Flexner LLP(Westchester), Armonk, NY; Edward John Normand, Boies, Schiller & Flexner, LLP, Armonk, NY; Elimelech Rosenbluh, Boies, Schiller & Flexner LLP(Westchester), Armonk, NY.

For Kering S.A., Luxary Goods International (L.G.I.) S.A., Defendants: Jonathan Henry Sherman, LEAD ATTORNEY, Boies, Schiller & Flexner LLP (D.C.), Washington, DC; Amos Emory Friedland, Boies, Schiller & Flexner LLP(Westchester), Armonk, NY; Edward John Normand, Boies, Schiller & Flexner, LLP, Armonk, NY;

Elimelech Rosenbluh, Boies, Schiller & Flexner LLP(Westchester), Armonk, NY.

**Judges:** Deborah A. Batts, United States District Judge.

**Opinion by:** Deborah A. Batts

## Opinion

MEMORANDUM AND ORDER

DEBORAH A. BATTS, United States District Judge.

On September 26, 2013, Plaintiff Saint Laurie Ltd. ("Plaintiff" or "Saint Laurie") filed the present action. Plaintiff filed an Amended Complaint on December 23, 2013, [*2] against Defendants Yves Saint Laurent America, Inc., Yves Saint Laurent S.A.S. (collectively, "Defendants YSL"), Kering S.A. ("Kering"), Kering Americas, Inc. ("KAI"), and Luxury Goods International S .A. ("LGI") (collectively, "Defendants"). Saint Laurie asserted eight Claims against Defendants: (1) breach of contract; (2) trademark infringement, pursuant to *15 U.S.C. § 1125*; (3) false designation of origin, pursuant to *15 U.S.C. § 1125(a)*; (4) trademark dilution, pursuant to *15 U.S.C. § 1125(c)*; (5) trademark infringement under New York common law; (6) trademark dilution, pursuant to *New York General Business Law § 360-l*; (7) unfair competition under New York common law; and (8) unlawful deceptive acts and practices, pursuant to *New York General Business Law § 349*.

Now before the Court are four Motions to Dismiss filed by Defendants. Defendants YSL and LGI move to dismiss Claim One of the Amended Complaint. Defendants Kering and KAI filed a Motion to Dismiss the entire Amended Complaint. Also before the Court is Plaintiff's Motion to Amend/Correct Order on Motion for Preliminary Injunction.[1]

---

[1]   Unless otherwise noted, the Court shall refer to the four Motions to Dismiss collectively as the "Motions to Dismiss." The Court shall refer to the Motion to Amend/Correct Order on Motion for Preliminary Injunction as [*3] "Motion to Amend."

2015 U.S. Dist. LEXIS 42621, *2

For the reasons stated below, Defendants YSL and LGI's Motions to Dismiss Count One are DENIED. Defendant Kering's Motion to Dismiss is DENIED as to Count One but GRANTED without prejudice as to Counts Two through Eight. Defendant KAI's Motion to Dismiss all claims is GRANTED without prejudice. Plaintiff's Motion to Amend is DENIED as to the decision on the Preliminary Injunction but the Order is amended to clarify certain findings of the Court, as set forth below.

I. FACTUAL BACKGROUND

A. Events Giving Rise to the Instant Suit

The following facts are assumed true for purposes of the instant Motions.

Plaintiff is a manufacturer of men and women's clothing. (Am. Compl. ¶ 23.) Since 1956, it has used the trademark, "Saint Laurie," which is registered with the United States Patent and Trademark Office ("USPTO") as the following trademarks: International Class 25 for men and women's clothing, including suits, sport coats, and ties; International Class 35 for clothing for theatrical and motion picture productions; and International Class 40 for tailoring services and bespoke clothing for men and women.[2] (Id. ¶¶ 7, 23 & Ex. 5.)

Beginning in the 1950s, clothing designer Yves Saint Laurent began marketing men and women's ready-to-wear clothing and fashion accessories under the marks "Yves Saint Laurent" and "YSL."[3] (Id. ¶¶ 27-28.) In the 1970s, YSL launched a men's clothing line in the United States. (Id. ¶ 30.) Plaintiff subsequently filed a trademark infringement action in 1974 against the then-existing YSL companies—Yves Saint Laurent Men's Clothing, Inc. and Yves Saint Laurent, Inc.—and their parent company, Lanvin-Charles of the Ritz, Inc.[4] (Id. ¶ 30. ) In 1975, the parties resolved the suit via a settlement agreement. (Id. Ex. A (the "1975 Agreement").)

The 1975 Agreement provided that a YSL store in New York, New York would have its sign altered to "Saint Laurent Rive Gauche" and that "Saint Laurent Rive

Gauche" labeled men's clothing only could be sold [*5] in Saint Laurent Rive Gauche stores. (1975 Agreement ¶ 3, Ex. 2.) The parties also agreed that YSL's advertisements and labeling pertaining to men's clothing sold under the Yves Saint Laurent or Saint Laurent Rive Gauche trademarks would state "Yves Saint Laurent" or "Saint Laurent Rive Gauche," respectively. (Id. ¶ 5.) The 1974 Defendants were prohibited from selling or advertising "men's clothing under the trade name 'Saint Laurent' alone." (Id. ¶ 35.) In return, Plaintiff agreed that "advertising and/or labelling by [Saint Laurie] in connection with French styled or modeled clothing [would] be accompanied by a prominent display of the name 'Saint Laurie Ltd.'" (Id. ¶ 9.) The 1975 Agreement was to remain in effect as long as Plaintiff sold men's clothing under the Saint Laurie trade name. (Id. ¶ 10.) Finally, the 1975 Agreement provided that "[a] party aggrieved by a breach of this agreement shall be entitled to specific performance as a remedy." (Id. ¶ 13.)

In the early 1980s, YSL launched a women's clothing line in the United States using the name "Saint Laurent." (Am. Compl. ¶ 32.) Plaintiff filed a trademark infringement suit in 1981 against Yves Saint Laurent, Inc. and Charles [*6] of the Ritz Group Ltd. (Id. ¶ 32.) The parties again settled through a 1982 Stipulation of Settlement and Discontinuance. (Id. Ex. B. (the "1982 Agreement").) The 1981 Defendants agreed not to use "Saint Laurent" as the trade name "in connection with men's clothing to the extent restricted by the [1975 Agreement] or on or in connection with women's suits, sport coats, overcoats, raincoats, or vests." (1982 Agreement ¶ 2.) The 1981 Defendants were permitted to use and register for the trademark "Saint Laurent" in all goods and services not otherwise restricted by the 1975 Settlement or 1982 Agreement. (Id. ¶ 3.) The 1981 Defendants agreed to notify Plaintiff of any application to register the trademark "Saint Laurent" with the USPTO or New York State Trademark Office. (Id. ¶ 15.) In return, Plaintiff "agree[d] not to assert any claim or commence any action . . . based on the use of 'SAINT LAURENT' as permitted above, nor oppose or petition to cancel the registration of 'SAINT LAURENT' based on the use of 'SAINT LAURENT' as permitted above." (Id. ¶ 3.) Plaintiff also would not use the "Saint Laurie"

---

[2]   Bespoke clothing, also known as made-to-measure, [*4] is clothing that is custom tailored for an individual.

[3]   For clarity, "YSL" refers to the clothing brand. Defendants Yves Saint Laurent America, Inc. and Yves Saint Laurent S.A.S. are referred to collectively as "Defendants YSL."

[4]   The defendants in the 1974 and 1981 suits are not parties to the instant action, the reason for which shall be explained below. See infra at 6-7.

2015 U.S. Dist. LEXIS 42621, *6

name "in connection with perfumery or cosmetics." (Id. ¶ 2.) The 1982 Agreement disclaimed liability [*7] of YSL to Saint Laurie for use of "Saint Laurent" by a third party. (Id. ¶ 6.) Finally, it provided, "[a]ny party aggrieved by a breach of this stipulation shall be entitled to specific performance as a remedy." (Id. ¶ 11.)

In 1999, Plaintiff alleges the PPR Group purchased the then-existing YSL companies and the YSL brand; the PPR Group has since been renamed as Kering S.A., a Defendant in the instant suit. (Am. Compl. ¶ 29.) Through that 1999 transaction or transactions, Plaintiff alleges, " [u]pon information and belief, Kering . . . acquired the entirety of the assets, liabilities and obligations of the predecessor YSL Companies . . . including the contractual obligations set forth in the 1975 Agreement and 1982 Stipulated Order." (Id. ¶ 14.)

Defendant Kering is the parent corporation of Defendants YSL, LGI, and KAI. (Id. ¶¶ 13-14.) Defendant LGI distributes goods using the YSL trademarks and allegedly is the successor in interest to the YSL trademarks, the 1975 Agreement, and the 1982 Agreement (collectively, the "Agreements"). (Id. ¶¶ 10-11.) Defendant KAI is a subsidiary of Defendant Kering. (Id. ¶ 15.) Defendant Yves Saint Laurent S.A.S. is an affiliate of Defendant Yves Saint Laurent America,  [*8]  Inc. (Id. ¶¶ 8-9.)

Plaintiff alleges that YSL has began a rebranding campaign: it now promotes itself as "Saint Laurent," with "Paris" appearing below. (Id. ¶ 36, Exs. C-D.) Plaintiff alleges that Defendants advertise and sell men and women's clothing using the new trade name "Saint Laurent Paris." (Id. ¶ 16.)

On December 10, 2012, Defendant LGI filed an application with the USPTO to register "Saint Laurent" for International Class 9, 14, 18, and 25 goods. (Id. ¶ 12; U.S. Trademark Application Serial No. 85,799,140 (filed Dec. 10, 2012).) The application was published for opposition on January 21, 2014, and Plaintiff filed an opposition on March 20, 2014. (See U.S. Trademark Application Serial No. 85,799,140 (filed Dec. 10, 2012); see also ECF No. 50, Kozinn Decl. Ex. E.)[5]

On December 13, 2012, Defendant LGI applied to register "Saint Laurent Paris" with the USPTO for International Class [*9] 9, 14, 18, and 25 goods. (U.S. Trademark Application Serial No. 85,799,160 (filed Dec. 13, 2012).) The application was published for opposition on November 26, 2013; Plaintiff filed an opposition on December 19, 2013. (Id.) Plaintiff opposed all International Class 25 goods being granted registration.[6] (See Notice of Opp'n to U.S. Trademark Application Serial No. 85,799,160 (filed Dec. 19, 2013).) When opposing both "Saint Laurent" and "Saint Laurent Paris" being granted registration, Plaintiff asserted that the applications violated both the 1975 Agreement and the 1982 Agreement and that the trademarks would result in a likelihood of confusion and trademark dilution.

B. Procedural History

Plaintiff filed this action on September 26, 2013 against Defendants YSL, Yves Saint Laurent America Holding, Inc., and Saint Laurent. Parties filed a Stipulation dismissing the latter two entities and giving Plaintiff leave to file an Amended Complaint, which this Court endorsed on December 18, 2013. (ECF No. 8.) Plaintiff filed an Amended Complaint on December 23, 2013, which added Defendants Kering, KAI, and LGI as parties.

After filing the Amended Complaint, Plaintiff filed a Motion for a Preliminary Injunction on January 13, 2013,

---

[5]   Plaintiff opposed the following International Class 25 goods being granted a trademark: "Men's, women's clothing, namely, suits, coats, jackets, pants, shirts, raincoats, tuxedos, blazers, and three- quarter coats." (Notice of Opp'n to U.S. Trademark Application Serial No. 85,799,140 (filed Mar. 20, 2014).)

[6]   Specifically, Plaintiff opposed,

All goods and services in the class [25] . . . namely: Men's, women's and children's clothing, namely, suits, coats, jackets, pants, shirts, raincoats, sweatsuits, underwear, pullovers, knit shirts, and under garments; evening wear, namely, evening dresses, evening gowns, evening wraps, tuxedos, blazers, and three-quarter coats; hosiery, namely, socks and stockings; knitwear clothing, namely, sweaters, knitted underwear, and knit caps; sportswear, namely, sports shirts, sport jerseys, sport [*10] pants; clothing accessories, namely, suspenders, ties, bow ties, and scarves; belts for clothing; gloves; footwear and headwear.

(See Notice of Qpp'n to U.S. Trademark Application Serial No. 85,799,160 (filed Dec. 19, 2013).)

which was fully submitted on May 7, 2014. Defendants YSL filed a Motion to Dismiss on January 30, 2014, which was fully submitted on March 10, 2014. Defendant KAI filed a Motion to Dismiss on March 13, 2014, which was fully submitted on April 8, 2014. Defendant Kering filed a Motion to Dismiss on April 18, 2014, which was fully submitted on May 12, 2014. And, Defendant LGI filed a Motion to Dismiss on May 6, 2014, **[\*11]** which was fully submitted on May 27, 2014. Although Defendants Kering and KAI moved to dismiss all Claims of the Amended Complaint, Defendants YSL and LGI moved to dismiss only Claim One. Both trademark opposition proceedings were suspended in April 2014 in light of the instant suit.

The Court denied the Motion for Preliminary Injunction on September 30, 2014. On October 20, 2014, Plaintiff filed its Motion to Amend/Correct Order on Preliminary Injunction, which was fully submitted on November 17, 2014.

II. Motions to Dismiss

A. Legal Standard for a Rule 12(b) (6) Motion to Dismiss

For a complaint to survive dismissal under *Rule 12(b) (6)*, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. "A claim has facial plausibility," the Supreme Court explained,

> [W]hen the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "'merely' consistent with" a defendant's liability, it "stops short of the line **[\*12]** between possibility and plausibility of 'entitlement to relief.'"

*Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Twombly, 550 U.S. at 556-57*). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly, 550 U.S. at 555* (internal quotations omitted). "[I]n keeping with these principles,' the Supreme Court stated,

> A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they

are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal, 556 U.S. at 678*.

In considering a motion under *Rule 12(b)(6)*, the Court must accept as true all factual allegations set forth in the Complaint and draw all reasonable inferences in favor of the Plaintiff. See *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.l, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*; *Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004)*. However, this principle is "inapplicable to legal conclusions," *Iqbal; 556 U.S. at 678*, which, like the Complaint's "labels and conclusions," *Twombly, 550 U.S. at 555*, are disregarded. Nor should a court "accept [as] true a **[\*13]** legal conclusion couched as a factual allegation." *Id. at 555*.

"In considering a motion to dismiss for failure to state a claim pursuant to *Rule 12(b)(6)*, a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint" or "document[s] 'integral' to the complaint." *DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010)* (citation omitted). A court may also consider facts "drawn from matters of which we may take judicial notice." *Mary Jo C. v. N.Y. State & Local Ret. Sys., 707 F.3d 144, 149 (2d Cir. 2013)*. However, though such evidence may be considered, the Court's function is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Holloway v. King, 161 F. App'x 122, 124 (2d Cir. 2005)* (citation omitted).

B. Motions to Dismiss Breach of Contract Claim (Count One)

Defendants argue that Plaintiff's breach of contract claim and request for specific performance pursuant to the Agreements fail because: (1) Defendants, other

2015 U.S. Dist. LEXIS 42621, *13

than LGI, are not bound by the Agreements;[7] (2) Plaintiff has breached the Agreements, (3) Defendants' use does not violate the Agreements; and (4) Plaintiff's filing of the Complaint was unduly delayed and specific performance is not warranted.

Under New York law,[8] a breach of contract claim is alleged properly where the plaintiff pleads " (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)*; *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC., 861 F. Supp. 2d 344, 355 (S.D.N.Y. 2012)*.

In certain circumstances., "[s]pecific performance is an appropriate remedy in a breach of contract claim." *Schanfield v. Sojitz Corp. of Am., 663 F. Supp. 2d 305, 348 (S.D.N.Y. 2009)*; see *Sokoloff v. Harriman Estates Dev. Corp., 96 N.Y.2d 409, 415, 754 N.E.2d 184, 729 N.Y.S.2d 425 (2001)*. Under New York law, "a party can be compelled to perform its contractual obligations if (1) there is a valid contract; (2) plaintiff has substantially performed under the contract and is willing and able to perform its remaining [*15] obligations; (3) defendant is able to perform its obligations; and (4) plaintiff has no adequate remedy at law." *U.S. Bank Nat'l Ass'n v. Dexia Real Estate Capital Mkts., No. 12 Civ. 9412, 2014 U.S. Dist. LEXIS 93543, 2014 WL 3368670, at *9 (S.D.N.Y. July 9, 2014)*. Assuming a breach is proven, "[w]hen specific performance is contemplated by the contract, courts tend to find that irreparable harm would be suffered unless specific performance is granted." *Wells Fargo Bank v. Bank of Am., No. 11 Civ. 4062, 2013 U.S. Dist. LEXIS 13522, 2013 WL 372149, at *8 (S.D.N.Y. Jan. 31, 2013)*(citing *Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 2009))*. However, if a party "materially breached the contract . . . , he may not be awarded specific performance." *Grace v. Nappa, 46 N.Y.2d 560, 567, 389 N.E.2d 107, 415 N.Y.S.2d 793 (1979)* ; *Net2Globe Int'l Inc. v. Time Warner Telecomm. of N.Y., 273 F. Supp. 2d 436, 457 (S.D.N.Y. 2003)*.

1. Which Defendants are Bound by the Agreements

Defendants YSL, KAI, and Kering argue that the 1975 Agreement and 1982 Agreement do not bind them. Defendant LGI does not move to dismiss on this ground.[9]

"It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." *Crabtree v. Tristar Auto. Group, Inc., 776 F. Supp. 155, 166 (S.D.N.Y. 1991)*; *MBIA Ins. Corp. v. Royal Bank of Canada, 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009)* ("[A] a party who is not a signatory to a contract cannot be held liable for breaches of that contract."); *Black Car & Livery Ins., Inc. v. H & W Brokerage, Inc., 28 A.D.3d 595, 813 N.Y.S.2d 751, 752 (N.Y. App. Div. 2006)*.

In general, under New York law, "a parent corporation and its subsidiary are regarded as legally distinct entities and a contract under the corporate name of one is not treated as that of both." *Analect LLC v. Fifth Third Bancorp, 380 F. App'x 54, 56 (2d Cir. 2010)* (quoting *Carte Blanche (Sing.) Pte., Ltd. v. Diners Club Int'l, Inc., 2 F.3d 24, 26 (2d Cir. 1993))*; see also *United States v. Bestfoods, 524 U.S. 51, 61, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998)*; *Yankee Gas Servs. Co. v. UGI Utils., Inc., 428 Fed. Appx. 18, 20 (2d Cir. 2011)* ("[i]t is a general principle of corporate [*16] law . . . that a parent corporation . . . is not liable for the acts of its subsidiaries.") A parent corporation is liable for the acts of its subsidiary upon a "showing of fraud or complete control" of the subsidiary. *Analect LLC, 380 F. App'x at 57* (citation and internal ellipses omitted). A parent corporation may also be liable under an agency theory. See *Pullman v. Alpha Media Pub., No. 12-CV-1924, 2013 U.S. Dist. LEXIS 50697, 2013 WL 1290409, at *20 (S.D.N.Y. Jan. 11, 2013)* ("To hold a principal liable for the acts of its subsidiaries under agency law, total domination does not need to be proven. But there must be 'a relationship between the corporation and the cause of action. Not only must an arrangement exist between the two corporations so that one acts on behalf of the other and within the usual agency principles, but

---

[7]   Plaintiff's Amended Complaint alleges that LGI is the [*14] "successor of all interest and goodwill in the YSL trademarks as well as the contractual obligations set forth in the 1975 Agreement and 1982 Stipulated Order held by the predecessor YSL companies." (Am. Compl. ¶ 11.) Defendant LGI admits that it "owns the intellectual rights to the YSL trademarks" and does not move to dismiss on the ground that it is not bound by the Agreements (LGI Ans. to Am. Compl. ¶ 10; LGI Mot. to Dismiss.)

[8]   Parties' briefs assume New York law controls in this diversity action, and this "implied consent is sufficient to establish choice of law." *Motorola Credit Corp. v. Uzan, 388 F.3d 39, 61 (2d Cir. 2004)*(citation and internal ellipses omitted).

[9]   *See supra* note 7.

Case 3:13-cv-00215-VAB   Document 218   Filed 04/27/16   Page 28 of 98

Page 6 of 15
2015 U.S. Dist. LEXIS 42621, *16

the arrangement must be relevant to the plaintiff's claim of wrongdoing.'") (citations omitted).

Additionally, "Under New York law . . . , a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities." *New York v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 205, 209 (2d Cir. 2006)*. However, there are certain exceptions:

> [A] buyer of a corporation's assets will be liable as its successor if: (1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the [*17] purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations.

*Id.* (citation omitted).

The 1975 Agreement involved Yves Saint Laurent, Inc., Yves Saint Laurent Men's Clothing, Inc., and Lanvin-Charles of the Ritz, Inc. The 1982 Agreement involved Yves Saint Laurent, Inc. and Charles of the Ritz Group Ltd.[10] Because Defendants were not party to the Agreements, Plaintiff must plead privity of contract between Plaintiff and Defendants.

a. Defendant Kering S.A.

Defendant Kering argues that it is not bound by the Agreements because, as a parent corporation for Defendants YSL, LGI, and KAI, it is not liable for the acts of its subsidiaries. The Court agrees that Defendant Kering cannot be held liable solely on the basis of its parent corporation relationship with the other Defendants. Nor has Plaintiff alleged facts to support liability based on an agency theory. Plaintiff would need to plead one of the exceptions; fraud or domination, to state a claim against Kering.

Plaintiff argues that Defendant [*18] Kering is bound by the Agreements because it was a purchaser of the Predecessor YSL Companies and assumed its liabilities. Specifically, Plaintiff alleges, upon information and belief, that the PPR Group, recently renamed Kering S.A., purchased the Predecessor YSL Companies in or around 1999, and in doing so, "acquired the entirety of the assets, liabilities and obligations of the predecessor YSL Companies through one or more corporate transactions . . . and as such has assumed all rights and obligations of said YSL Companies," including the two Agreements. (Am. Compl. ¶¶ 14, 29.) Although such legal conclusions are generally insufficient under the Iqbal and Twombly pleading standards, the Second Circuit has held that a plaintiff may survive a motion to dismiss by "pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant." *Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010)* (internal quotation marks omitted); see also *Cain v. Simon & Schuster, Inc., No. 11 Civ. 4460, 2012 U.S. Dist. LEXIS 92434, 2012 WL 2574747, at *2 (S.D.N.Y. July 3, 2012)*. The Court's records indicate that the parties came to some agreement about the appropriate corporate entities to be sued (ECF No. 8), which resulted in the dismissal and addition of named defendants in the Amended Complaint. However, it appears [*19] that the Parties' subsequent efforts to agree upon the nature of the corporate relationships were less successful.[11] Here, Plaintiff argues that the Complaint alleges all publicly available facts and that any additional facts regarding assumption of liabilities are "by their very nature uniquely and exclusively in the possession and control of" the Defendants. (Plf. Opp. to YSL Mot. to Dismiss 13-14.) Thus, taking as true all factual allegations set forth in the Amended Complaint and drawing reasonable inferences in favor of Plaintiff, PPR's assumption of those liabilities would suffice to bind Kering. Plaintiff has plead sufficient facts to support Kering's privity of contract to survive dismissal at this stage.

b. Kering Americas, Inc.

Plaintiff claims that because Defendant KAI is a subsidiary of Defendant Kering, "it is highly likely that . . . [KAI] also assumed the rights and obligations relating to the [Agreements]." (Pl.'s Opp'n to Def.'s KAI Mot. Dismiss 12.) Besides the legal conclusion that, "each

---

[10]   The Court will refer to the original signatories to the two Agreements as the "Predecessor YSL Companies."

[11]   (See Order on Mot. for Prelim. Injunc. 7-8.) The Court declines to conduct an extensive analysis of the scope and substance of the communications between the Parties, both before and after the filing of the Amended Complaint, related to the corporate structure, particularly in light of the fact that there was a substitution of defense counsel during that period. (Plf. Opp. to YSL Mot. to Dismiss, Lane Decl., Ex. A; see also Plf. Opp. to KAI Mot. to Dismiss 2; Plf. Reply in Supp. [*20] of Mot. for Prelim. Injunc. 11.)

Defendant has acquired . . [the] obligations set forth in the [Agreements]," (Am. Compl. ¶ 18), Plaintiff does not allege that Defendant KAI has any relationship to the Predecessor YSL Companies, the current YSL Defendants, or LGI. Plaintiff's speculative allegation that KAI is bound through its relationship with Kering cannot withstand Iqbal's pleading requirements.

Because Plaintiff failed to allege sufficient facts that Defendant KAI is bound by the Agreements, Defendant KAI's Motion to Dismiss Claim One is GRANTED without prejudice.

c. Defendants Yves Saint Laurent S.A.S. Defendant Yves Saint Laurent America, Inc.

As to Defendants YSL, again, the main allegation specific to the issue of privity of contract is that "each Defendant has acquired, by operation of law and/or as a matter of equity, the rights and obligations set forth in the 1975 Agreement and **[*21]** 1982 Stipulated Order." (Tim. Compl. ¶ 18.) However, Plaintiff also alleges, and Defendants YSL admit, that Defendants YSL "promote and/or sell men's and women's clothing and related goods and accessories that are the subject of this action." (Am. Compl. ¶ 19; YSL Ans. to Am. Compl. ¶ 19.) Taking Plaintiff's facts as true and making reasonable inferences in Plaintiff's favor, it is plausible that Defendants YSL's business is a continuation of the Predecessor YSL Companies', which would bind them to the Agreements. Again, because information about the exact nature of the corporate transactions and relationships is in the hands of Defendants, Plaintiff has plead sufficient facts to support the YSL Defendants' privity of contract at this stage.[12]

2. Plaintiff's Purported Breaches of the Agreements

Defendants contend that Saint Laurie's claims for breach of contract and specific performance must be dismissed because Plaintiff has breached the 1975 Agreement and 1982 Agreement. Specifically, Defendants assert that Plaintiff's website violates the 1975 Agreement because Plaintiff advertises itself as "Saint Laurie" and "Saint Laurie-Merchant Tailors" without a prominent display of "Ltd."[13] In the 1975 Agreement, Saint Laurie agreed,

> [A]dvertising and/or labelling by SL in connection with French styled or modelled clothing will be accompanied by a prominent display of the name 'Saint Laurie Ltd.' and will be done in such a manner so as not to be misleading as to the origin of the goods and not to be confusingly similar to Yves Saint Laurent and/or Saint Laurent Rive Gauche.
>
>   **[*23]**

(1975 Agreement ¶ 9.) Defendants do not contend that Plaintiff's website uses "Saint Laurie" in connection with French styled or modelled clothing. Rather, Defendants assert that the mere use of "Saint Laurie" constitutes a breach of the 1975 Agreement.

Under New York law, "words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005)* (citations and quotations omitted). Therefore,

an interpretation of a contract that has the effect of rendering at least one clause superfluous **[*24]** or

---

[12]   The Court will not consider Defendants YSL's frivolous and glib arguments that "there is no 'case or controversy' . . . on the contract claim," so Plaintiff "lacks standing to pursue it and the Court lacks subject matter jurisdiction" under **Rule 12(b)(1)**. (Defs. YSL's Mot. to Dismiss 20.) In making this argument, Defendants YSL cite to one Northern District of Texas case that is contrary to well-established Second Circuit law. Compare Natural Res. Def. Council v. Johnson, 461 F.3d 164, 171 (2d Cir. 2006) (explaining when resolving **[*22]** a Rule 12(b)(1) motion "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff" (citation omitted)) with Defs. YSL's Reply 7 ("[T]he plaintiff is not entitled to inferences drawn in its favor."). This Court admonishes Defendants YSL, reminding counsel only to advance arguments that have a reasonable basis in applicable law or fact.

[13]   The Court takes judicial notice of Saint Laurie's website. See Magnoni v. Smith & Laquercia, LLP, 701 F. Supp. 2d 497, 501 (S.D.N.Y. 2010); see also Patsy's Italian Rest., Inc. v. Banas, 575 F. Supp. 2d 427, 443 n. 18 (E.D.N.Y. 2008) ("It is generally proper to take judicial notice of articles and Web sites published on the Internet."), aff'd, 658 F.3d 254 (2d Cir. 2011); ECF No. 23, Normand Decl. Exs. 27-28. In addition, the authenticity of the website and its printouts have not been challenged. The Court, however, will not take judicial notice of Andrew Kozzin's Declaration, (ECF No. 36, Rozzin Decl. ¶¶ 10-18), which attempts to explain the meaning of "French styled or modeled clothing." Novie v. Vill. of Montebello, No. 10 Civ. 9436, 2012 U.S. Dist. LEXIS 115948, 2012 WL 3542222, at *9 (S.D.N.Y. Aug. 16, 2012) (collecting cases finding that "it is improper for a court to consider declarations and affidavits on a motion to dismiss").

meaningless . . . is not preferred and will be avoided if possible. Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.

*Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992)* (citations and quotations omitted); *LaSalle, 424 F.3d at 206.*

Defendants' interpretation would render meaningless the limiting language of Paragraph 9 of the 1975 Agreement, "in connection with French styled or modelled clothing." Defendants' reading would also render Paragraph 4 of the 1982 Agreement meaningless as those parties "consent[ed] to the use . . . of 'SAINT LAURIE' as a trademark or trade name on or in connection with any and all goods or services and advertising therefore, except perfumery and cosmetics." (1982 Agreement ¶ 4.) Finally, Defendants' interpretation, in seeking to ignore the limiting language and prevent Plaintiff from ever using "Saint Laurie" without "Ltd." cannot be made in good faith without calling into question Defendants' use of "Saint Laurent" with other words or alone in circumstances similarly provided for in the Agreements. Accordingly, Defendants have not demonstrated that Plaintiff's website constitutes a breach of the 1975 Agreement. **[*25]**

Additionally, Defendant LGI asserts that Plaintiff breached the 1982 Agreement when it filed an overly broad opposition to the USPTO regarding the registration application of "Saint Laurent" for International Class 9, 14, 18, and 25 goods.[14] In the 1982 Agreement, Plaintiff agreed to not "oppose or petition to cancel the registration of 'SAINT LAURENT' based on the use of 'SAINT LAURENT' as permitted" in the Agreement. (1982 Agreement ¶ 3.) YSL could use the trade name "Saint Laurent" except "in connection with men's clothing to the extent restricted by the [1975 Agreement] or on or in connection with women's suits, sport coats, overcoats, raincoats, or vests." (1982 Agreement ¶ 2.)

When Plaintiff learned of the application for "Saint Laurent," it filed an opposition to <u>only</u> International Class 25 goods being **[*26]** granted registration. Plaintiff did not oppose the registration of International Class 9,

14, and 18 goods. Nonetheless, Defendant LGI contends this opposition breached the 1982 Agreement because it was overly broad. In addition to opposing men and women's clothing, Plaintiff opposed the registration of, <u>inter alia</u>, children's clothing, hosiery, evening gowns, pullovers, sweaters, knit caps, belts, and footwear. Defendants' moving papers, however, are devoid of any analogous case law supporting their claim that Plaintiff's actions would preclude Plaintiff's breach of contract claim. Accordingly, this argument is not grounds for granting a motion to dismiss.

3. Defendants' Use of "Saint Laurent Paris" and "Saint Laurent" Alone

Defendants assert that the use of "Saint Laurent Paris" is not, as a matter of law, a breach of the Agreements. As noted above, Paragraph 5 of the 1975 Agreement provides:

> [I]n advertisements and/or labelling . . pertaining to men's clothing sold under the trademarks Yves Saint Laurent or Saint Laurent Rive Gauche . . . , the words "Saint Laurent" will either be preceded by the word "Yves" (YSLMC) in equivalent size or followed by the words "rive gauche" (YSLXNC) either **[*27]** directly after or immediately below. . . . Neither YSLMC nor YSLXNC shall sell or advertise men's clothing under the trade name "Saint Laurent" alone.

(1975 Agreement ¶ 5.) Pursuant to the 1982 Agreement, the Predecessor YSL Companies further agreed:

> not to use, or license the use of "Saint Laurent" as a trademark or trade name on or in connection with men's clothing to the extent restricted by the [1975 Agreement] or on or in connection with women's suits, sport coats, overcoats, raincoats, and vests.

(1982 Agreement ¶ 3.) Additionally, Saint Laurie "consent[ed] to the use by [Predecessor YSL Companies] . . . of 'Saint Laurent' as a trademark or trade name on or in connection with any and all goods and services and advertising thereof, except for men's clothing to the extent restricted by the [1975 Agreement] and except women's suits, sport coats, overcoats,

---

[14]   Defendant LGI does not assert that Plaintiff's opposition to the "Saint Laurent Paris" application breached the 1982 Agreement. It bears noting that, although Defendant LGI was obligated to notify Plaintiff of any application to register "Saint Laurent" with the USPTO, Plaintiff avers that Defendant LGI did not do so regarding the "Saint Laurent" and "Saint Laurent Paris" applications.

2015 U.S. Dist. LEXIS 42621, *27

raincoats, and vests." (Id. ¶ 3.)

Defendants assert that Paragraph 5 of the 1975 Agreement does not prohibit YSL from selling men's clothing bearing trade names other than "Yves Saint Laurent" or "Saint Laurent Rive Gauche." Defendants claim that prohibiting YSL from using any trademarks other than "Yves Saint Laurent" or "Saint Laurent Rive **[*28]**   Gauche" would render the second sentence meaningless. They also claim such a reading would be an unreasonable reading because it would "[freeze] YSL in time, preventing it from updating its image and style in the fast-changing world of fashion." (Def. YSL Mot. to Dismiss 22.) The Court agrees that Defendants are not limited to using "Yves" or "Rive Gauche" with "Saint Laurent" for all men's clothing for all time. Instead, the Court reads this provision to mean that Defendants must use Yves preceding or Rive Gauche following "Saint Laurent" for men's clothing sold under those two trademarks, but are permitted to sell men's clothing under other trademarks, so long as such other trademarks do not use "Saint Laurent" alone.

The 1982 Agreement provides support for this reading, and clarifies the requirements as they pertain both to men's clothing already covered by the 1975 Agreement and to certain additional types of women's clothing. The 1982 Agreement contains no similar language requiring that YSL use particular words in conjunction with "Saint Laurent."[15] The court infers that the Parties intended not to include such limiting words. See *Quadrant Structured Prods. Co. v. Vertin, 23 N.Y.3d 549, 560, 992 N.Y.S.2d 687, 16 N.E.3d 1165 (2014)* ("[W]here there is ambiguity, if parties to a contract **[*29]**   omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission. The maxim expressio unius est exclusio alterius, as used in the interpretation of contracts, supports precisely this conclusion.") Instead, the 1982 Agreement prohibits the use of "Saint Laurent" as a trademark for certain items, and includes a provision not found in the earlier 1975 Agreement in which Saint Laurie explicitly consents to the use of "Saint Laurent" alone for all other goods and services not specified in the two Agreements. Thus, the Court reads the 1982 Agreement to prevent Defendants from registering or using the trademark or trade name "Saint Laurent" alone for men's clothing and for the specified types of women's clothing but not requiring that YSL use any particular words in connection with other potential trademarks.

Plaintiff alleges that Defendants have attempted to register the trademark "Saint Laurent" alone for categories covering the restricted clothing items, and have used and directed others to use "Saint Laurent" alone. Taking Plaintiff's allegations as true and making reasonable inferences in favor of Plaintiff, Plaintiff has stated a claim for breach of the Agreements and thus dismissal on this basis is not warranted.

4. Plaintiff's Purported Delay in Bringing **[*31]**   the Suit

Defendants next argue that, because Plaintiff delayed in bringing the instant suit, it cannot seek specific performance under the Agreements.[16] In denying the Motion for Preliminary Injunction, this Court found that Plaintiff was not unduly delayed in filing its Motion for

---

15   In the briefing on the Motions to Dismiss, Motion for Preliminary Injunction, and Motion to Amend, Plaintiff claims, with varying levels of equivocation, that YSL was required to use "Yves" with the specified women's clothing. (Compare Plf. Opp. to Mot. to Dismiss 15 (highlighting the "clear restriction **[*30]**   in the Agreements against usage of 'Saint Laurent' unless preceded by the word "Yves" for advertising of men's and women's clothing products") and Plf. Mot. for Prelim. Injunc. 12-13 (same) with Plf. Mot. to Amend 19 ("The 1982 Agreement does not specify . . . that the prohibited use of 'Saint Laurent' is limited to its use "alone" on specified items of women's clothing. It also does not specify whether or not the use of 'Saint Laurent' in combination with other words following it was prohibited. However, the 1982 Agreement incorporated the terms of the prior 1975 Agreement . . . [and] it is therefore reasonable to infer that [the 'Yves'] limitation was also applicable to going forward uses for the items of women's clothing specified.")).

16   Defendants also contend that the claim for specific performance should be dismissed because Plaintiff fails to allege that it performed its obligations under the contract and is ready and willing to perform its obligations under the contract. (See YSL Mot. to Dismiss 13, 17; LGI Mot. to Dismiss 2.) They cite to no analogous case law supporting dismissal on those bases, instead citing to one case that was dismissed because the plaintiff failed "to allege the existence of a specific contract." Petitt v. Celebrity Cruises, Inc., 153 F. Supp. 2d 240, 263 n.27 (S.D.N.Y. 2001). The remaining cited cases were dismissed either after trial or at summary judgment and shall not be considered. At this stage, where Plaintiff has pleaded "enough facts to state a claim to relief that is plausible on its face," Twombly, 550 U.S. at 570, and Defendants' assertions are devoid of analogous case law, the Court will not consider Defendants' argument.

2015 U.S. Dist. LEXIS 42621, *31

Preliminary Injunction. (See Order on Mot. for Prelim. Injunc., ECF No. 80 at 12.) Although unreasonable delay may preclude specific performance, all of the cases to which Defendants cite in their Motions to Dismiss discuss delay in the context of deciding preliminary injunction or summary judgment motions. The Court notes that the analyses on a motion to dismiss and a motion for a preliminary injunction are not necessarily the same. See *Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985)* ("Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction."); *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J., No. 08-CV-7069, 2009 U.S. Dist. LEXIS 39931, 2009 WL 1154094, at *11 (S.D.N.Y. Mar. 19, 2009)* ("To succeed on the equitable defense of laches, a defendant must establish both plaintiff's unreasonable lack of diligence under the circumstances ... as well as prejudice from such a delay. In determining whether such delay is fatal in a suit for **[*32]** specific performance regard must always be had to the peculiar circumstances of each case." (citations and internal quotation marks omitted)).

However, there is no reason for the Court to depart from its finding on the Motion for Preliminary Injunction that the delay was not unreasonable. Defendants' cited cases, with the exception of *Citibank, 756 F.2d at 277* (finding a preliminary injunction **[*33]** was improper due to the plaintiff's delay), involved delays far greater than the purported delay here—even if the Court credited Defendants' sequence of events.[17] The delay is not a grounds for dismissing Plaintiff's claim for specific performance on a motion to dismiss.

C. Defendants Kering and KAI's Motion to Dismiss Trademark and Unfair Competition Claims (Counts Two Through Eight)

Defendants Kering and KAI move to dismiss Counts Two through Eight of the Amended Complaint; Defendants LGI and YSL do not. Plaintiff alleges trademark infringement and unfair competition under

state and federal law. Defendants Kering and KAI argue that Plaintiff does not state a claim because Plaintiff failed to plead facts regarding the corporate structure sufficient to hold them **[*34]** liable for their affiliates' actions. Defendants Kering and KAI also argue that Plaintiff has not alleged any specific facts regarding those Defendants' actions that support liability for the infringement and unfair competition under any other theory of liability.

1. Legal Standards for Trademark and Unfair Competition Claims

Plaintiff alleges violations of the Lanham Act for trademark infringement, false designation of origin, and trademark dilution. The Lanham Act provides a cause of action against:

> [a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

*15 U.S.C. § 1125(a) (1)*. The Lanham Act also provides a cause of action and injunctive relief, as a remedy for violation, where "use of a mark or trade name . . . is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, **[*35]** regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." *15 U.S.C. § 1125(c)*. Although actual confusion is not required to succeed, Plaintiff must show a likelihood of confusion.[18]

Plaintiff also alleges violations of New York State law for trademark infringement, unfair competition, trademark dilution, and unlawful deceptive acts and practices. As with Plaintiff's federal law claims, to make out a common law claim for trademark infringement or unfair

---

[17]   One of Defendants' cited cases involved a two-year delay but with a "period attributable to unexplained inaction" of eight or nine months. *EMF Gen. Contr. Corp. v. Bisbee, 6 A.D.3d 45, 53, 774 N.Y.S.2d 39 (N.Y. App. Div. 2004)*. In Bisbee, the Appellate Division reversed the lower court's dismissal after trial of plaintiff's specific performance claim, holding that the delay could be explained by normal business practices and "was neither so long nor so 'unconscionable'" so as to deny access to specific performance. *Id. at 53, 56*.

[18]   In analyzing likelihood of confusion, a court may consider a variety of factors, including the eight set forth in *Polaroid Corp v. Polarad Elecs. Corp., 287 F.2d 492 (2d. Cir. 1961)*:

competition under New York law, Plaintiff must allege that Defendants' use of its trademark is likely to lead to confusion, mistake, or deception of customers. *Allied Maint. Corp. v. Allied Mech. Trades, Inc., 42 N.Y.2d 538, 543, 369 N.E.2d 1162, 399 N.Y.S.2d 628 (1977)*. New York's common law unfair competition **[*36]** encompasses the "principle that one may not misappropriate the results of the skill, expenditures and labors" of another, even if the two parties are not in direct competition with each other. *ITC Ltd. v. Punchgini, Inc., 9 N. Y. 3d 467, 477, 880 N.E.2d 852, 850 N.Y.S.2d 366 (2007)*. Misappropriation theory includes protection of "commercial advantage" or "goodwill," where "consumers of the good or service provided under a certain mark by a [defendant] . . . primarily associate the mark with the plaintiff." *Id. at 479*.[19]

Plaintiff also alleges violations of *New York General Business Law §§ 360-l* and *349*. *Section 360* provides injunctive relief for trademark dilution, defined as "injury to business reputation or of dilution of the distinctive quality of a mark or trade name." *Section 349* provides **[*37]** a cause of action for unlawful and deceptive acts and practices, and allows for up to treble damages for willful or knowing violations. Id.

2. Application to Defendants Kering and KAI

As with Count One, Defendants Kering and KAI argue that Plaintiff did not plead sufficiently their corporate relationships to form the basis of liability for Counts Two through Eight. As to Defendant Kering, the corporate structure was plead sufficiently to overcome this argument; as to KAI, it was not. See supra at II.B.1.a. and I.B.1.b. See also *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd., No. 08-CV 42, 2011 U.S. Dist. LEXIS 51330, 2011 WL 7053807, at *15*

*(E.D.N.Y. Jan. 4, 2011)* ("The argument that the grouped defendants joined the alleged conspiracies through their corporate affiliation is precisely the sort of 'legal conclusion couched as a factual allegation' that Twombly and Iqbal deemed insufficient to state a claim.")

Beyond the corporate structure argument, the Court agrees that Plaintiff has not set forth sufficient facts regarding the particular actions attributable to and claims against each of Defendant; instead Plaintiff refers to Defendants collectively throughout. This is problematic because it does not give Defendants sufficient notice of their individual liability. See *Am. Sales Co., Inc. v. AstraZeneca AB, No. 10 Civ. 6062, 2011 U.S. Dist. LEXIS 41182, 2011 WL 1465786, at *5 (S.D.N.Y. Apr. 14, 2011)* (stating that "[a] complaint should offer 'specification' **[*38]** as to the 'particular activities by any particular defendant'" and noting that *Rule 8(a)* "'requires that a complaint against multiple defendants indicate clearly the defendants against which relief is sought and the basis upon which relief is sought against the particular defendants.'")(quoting *In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007)*; *Martin v. City of N.Y., 07 Civ. 7384, 2008 U.S. Dist. LEXIS 33946, 2008 WL 1826483, *1 (S.D.N.Y. Apr. 23, 2008))*. It is possible that this information is particularly in the possession of Defendants, and that such information will only come to light through discovery. However, Plaintiff is still required to allege such facts upon information and belief, which it has not done here. *Arista Records, 604 F.3d at 120*. Only Defendants Kering and KAI have challenged the Amended Complaint on this basis. As to those Defendants, Claims Two through Eight cannot survive dismissal at this stage.

---

(1) the strength of the plaintiff's trade dress, (2) the similarity between the two trade dress, (3) the proximity of the products in the marketplace, (4) the likelihood that the prior owner will bridge the gap between the products, (5) evidence of actual confusion, (6) the defendant's bad faith, (7) the quality of defendant's product, and (8) the sophistication of the relevant consumer group.

*Fun-Damental Too, Ltd v. Gemmy Indus. Corp., 111 F.3d 993, 1002-03 (2d Cir. 1997)*.

[19]   Factors to be considered in the determination of whether consumers associate the mark with plaintiff include:

[whether] defendant intentionally associated its goods with those of the [plaintiff] in the minds of the public, such as public statements or advertising stating or implying a connection with the [plaintiff]; direct evidence, such as consumer surveys, indicating that consumers of defendant's goods or services believe them to be associated with the [plaintiff]; and evidence of actual overlap between customers of the [defendant] and the [plaintiff]."

*Id. at 480*.

Accordingly, Defendants Kering and KAI's Motion to Dismiss Claims Two through Eight is GRANTED without prejudice.

### D. Leave to Replead

When a complaint has been dismissed, permission to amend it "shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a)*. However, a court may dismiss without leave to amend when amendment would be "futile," or would not survive a motion to dismiss. *Hutchison v. Deutsche Bank Sec., Inc., 647 F.3d 479, 490-91 (2d Cir. 2011)*.

Plaintiff may file a Second Amended Complaint that presents **[*39]** adequate allegations regarding the corporate relationships and liabilities to the Agreements of the various Defendants, as well as specific facts supporting liability of each Defendant as to Counts Two through Eight.

### III. Plaintiff's Motion to Amend/Correct Order on Motion for Preliminary Injunction

Plaintiff moves for an amendment or correction to the September 30, 2014 Order on Motion for Preliminary Injunction on three bases: (1) the Court misinterpreted the terms and overall context of the Agreements; (2) the Court overlooked facts on the record demonstrating Defendants' illegal conduct; and (3) the Court overlooked or misapprehended Plaintiff's irreparable harm argument. Defendants filed a joint Opposition challenging all of Plaintiff's arguments.

### A. Legal Standard for *Rule 52(b)* and 59(e) Motions to Amend or Correct a Judgment

The standard for granting a motion to reconsider "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., 70 F.3d 255, 257 (2d Cir.1995)*; see also *Range Road Music, Inc. v. Music Sales Corp., 90 F.Supp.2d 390, 392 (S.D.N.Y. 2000)* (holding that a motion for reconsideration "is appropriate **[*40]** only where the movant demonstrates that the Court has overlooked controlling decisions or factual matters that were put before it on the underlying motion ... and which, had they been considered, might have reasonably altered the result before the court") (internal

quotation marks omitted). "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice. *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)* (citation omitted).

Furthermore, "[i]t is well-settled that *Rule 59* is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012)*, as amended (July 13, 2012) (citation omitted). A motion for reconsideration is not one in which a party may reargue "those issues already considered when a party does not like the way the original motion was resolved." *In re Houbigant, Inc., 914 F. Supp. 997, 1001 (S.D.N.Y. 1996)*. Moreover, the parties "may not address facts, issues or arguments not previously presented to the Court," *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 182 F.R.D. 97, 100 (S.D.N.Y. 1998)* (citations omitted), because a motion to reconsider should never act "as a substitute for appealing from a final judgment." *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 170 F.R.D. 111, 113 (S.D.N.Y. 1997)* (citation omitted).

### B. Interpretation **[*41]** of the Agreements

Plaintiff challenges the Court's finding on the likelihood of success on the merits, asserting that the Court's interpretation of the Agreements was incomplete and requires amendment. (Plf. Mot. to Amend 16.) The Court reiterates that the absence of irreparable harm, discussed infra, is dispositive, and thus analysis of the other prongs of the preliminary injunction standard is unnecessary at this juncture. *Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 68 (2d. Cir. 2007)*. However, insofar as the Court further analyzed the Agreements today to determine whether Plaintiff plead sufficient facts to state a claim for breach of contract, supra at II.B.3., that discussion is incorporated here.

While Plaintiff has stated a claim for breach of contract, Plaintiff has not met the more stringent standard of a clear showing of likelihood of success on the merits required for a preliminary injunction. *Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2007)*. On a motion for a preliminary injunction, the Court need not, and does not here, take Plaintiff's factual allegations as true. See, e.g., *Lawrence v. Town of Brookhaven Dep't of Hous., Cmty. Dev. & Intergov. Affairs, No. 07-CV-2243, 2007*

U.S. Dist. LEXIS 94947, 2007 WL 4591845, at *13 (E.D.N.Y. Dec. 26, 2007) ("[U]nlike a preliminary injunction motion, dismissal pursuant to Rule 12(b)(6) is not based on whether Plaintiff is likely to prevail, and all reasonable inferences must be viewed in a light most favorable to Plaintiff."). While Plaintiff [*42] may make out a breach of contract claim after more discovery in this case, neither Plaintiff's evidence on its original motion nor the "new" evidence it presents on its Motion to Amend makes the clear showing required on a motion for preliminary injunction.

C. Defendants' Use of "Saint Laurent" Alone

In its Motion to Amend, Plaintiff argues that the Court overlooked facts that indicate Defendants were in breach and therefore that Plaintiff demonstrated a likelihood of success on the merits. Plaintiff seeks to capitalize on the Court's interpretations of the Agreements, drawing attention to specific evidence that Defendants use "Saint Laurent" alone. This evidence includes online articles indicating that YSL allegedly directed the press to refer to the brand as "Saint Laurent," and Defendant LGI's application to register the trademark "Saint Laurent" alone in International Class 25. (Plf. Mot. to Amend 9-10.) Plaintiff also highlights "further proof" of Defendants' alleged unauthorized use, specifically the use of "Saint Laurent" alone on the YSL website. (Id. at 11-12.)

None of this evidence changes the Court's determination as to the appropriateness of a preliminary injunction. Plaintiff seeks to relitigate [*43] arguments and evidence that the Court considered and rejected. YSL's website cannot be considered newly discovered evidence, as it was available to Plaintiff at the time of the filing of the Amended Complaint and original Motion for Preliminary Injunction; indeed, Plaintiff referenced the website in the Amended Complaint, and Defendants Kering, KAI, and LGI attached screenshots of the website to their Opposition to the Motion for Preliminary Injunction. (See Am. Compl. ¶ 5; KAI Opp. to Mot. for Prelim. Injunc. 7, Exs. 7-10.) Because the Court's interpretation of the Agreements limits the use of "Saint Laurent" alone for certain products under certain trademarks but allows it for others, whether YSL's website constitutes a breach is a question of fact, and

Plaintiff has not made the clear showing required for a preliminary injunction.

With respect to the online articles, the 1982 Agreement unequivocally protects the Predecessor YSL Companies from liability "should any third party including . . . any newspaper, magazine, or other publication or media use 'Saint Laurent' on or in connection with" specified categories of goods. (1982 Agreement ¶ 6.) Thus, the articles alone, without evidence [*44] corroborating the alleged statements contained within them, is of little probative value here.

D. Irreparable Harm

Plaintiff contends that the Court misapprehended its irreparable harm argument, taking issue with the Court's analysis of irreparable harm in terms of whether there was trademark confusion or loss of goodwill even though the preliminary injunction was sought based on the contract claims. Plaintiff asserts that "[a]n injunction motion based on the breach of a settlement agreement is distinct from a motion based on federal or state infringement or unfair competition claims" and that under well-established law "a movant is not required to show actual or likely confusion to succeed on the irreparable harm issue where a specific performance remedy for breach is contained in the settlement agreement." (Plf. Mot. to Amend 7.) Plaintiff also points to "additional" authority it "discovered" after the filing of the Motion for Preliminary Injunction that it claims further supports its position. (Id. at 14-15.)

However, the Court's analysis was appropriate because Plaintiff itself framed its irreparable harm argument in terms of trademark infringement.[20] As explained below, in the absence of a clear showing [*45] of breach, Plaintiff was required to demonstrate irreparable harm. Plaintiff failed to do so, and thus the preliminary injunction was not warranted. Those findings remain untouched.

Plaintiff's argument that the Court misconstrued or overlooked relevant legal, authority in analyzing Plaintiff's irreparable harm argument is unavailing. (Id. at 7.) In eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006), the

---

[20]   In its Motion for Preliminary Injunction, Plaintiff described the "immediate and irreparable harm" as "the relevant market . . . becom[ing] swamped" and the "potential damage to Saint Laurie's goodwill and business generally." (Plf. Mot. for Prelim. Injunc. 15-16.) Plaintiff now claims that it raised those alleged harms to "highlight the need to invoke the specific performance remedy in order to stop the very conduct constituting the breach." (Plf. Mot. to Amend 13, n.3.)

Supreme Court held that a plaintiff seeking a permanent injunction under the Patent Act must fulfill the "traditional four-factor framework" governing injunctive relief by making a clear showing:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of [*46] hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id. at 391*. In interpreting eBay, the Second Circuit has explained,

> [i]n the context of copyright infringement cases, the harm to the plaintiff's property interest has often been characterized as irreparable . . . because 'to prove the loss of sales due to infringement is . . . notoriously difficult.' . . . After eBay, however, courts must not simply presume irreparable harm.

*Salinger v. Colting, 607 F.3d 68, 81-82 (2d Cir. 2010)*. Courts within this Circuit have extended these principles to trademark and breach of contract cases. See, e.g., *NYP Holdings v. New York Post Pub. Inc., No. 14-CV-8310 VM, 63 F. Supp. 3d 328, 2014 U.S. Dist. LEXIS 165632, 2014 WL 6603989, at *11 (S.D.N.Y. Nov. 17, 2014)* ("[A]lthough irreparable harm may not be presumed upon a showing of a likelihood of success, Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark. . . . Thus, it will often be the case that a party's demonstration of a likelihood of success on a trademark claim will also show a threat of irreparable harm.") (citing eBay and Salinger) (internal alterations omitted); *Marks Org., Inc. v. Joles, 784 F. Supp. 2d 322, 327 n.1, 334 (S.D.N.Y. 2011)* (applying Salinger to trademark claim); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 539-40 (S.D.N.Y. 2011)* (same); *FXDirectDealer, LLC v. Abadi, No. 12 Civ. 1796, 2012 U.S. Dist. LEXIS 49588, 2012 WL 1155139, at *3 (S.D.N.Y. Apr. 5, 2012)* (applying Salinger to contract claim).

Plaintiff relies [*47] primarily on two cases to support its contention that it need not have made a showing of irreparable harm where the contract provides for specific performance in the event of breach'. However, the cited cases predate eBay and Salinger and, in any case, deal exclusively with situations in which the plaintiff has already proven conduct that would constitute a breach of contract. See *Sterling Drug Inc. v. Bayer AG, 792 F. Supp. 1357, 1375 (S.D.N.Y. 1992)* aff'd in part, remanded in part, *14 F.3d 733 (2d Cir. 1994)* (court denied preliminary injunction, but issued injunction after trial proved trademark infringement, noting "even if [plaintiff]'s trademark rights were not violated, injunctive relief would be proper here because defendants' conduct violated its contractual obligations"); Montblanc-Simplo v. Aurora Due S.r.L., 363 F. Supp. 2d 467 (E.D.N.Y. 2005) (finding no trademark infringement but awarding nominal damages for breach of contract). Although Plaintiff is correct that those cases support the proposition that Plaintiff need not prove trademark infringement or unfair competition in order to succeed on its contract claim, Plaintiff must still prove that Defendants breached to be entitled to specific performance under the Agreements. See *Baker's Aid, a Div. of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987)* ("[T]he contractual language declaring money damages inadequate in the event of a breach does not control the question [*48] whether preliminary injunctive relief is appropriate.") ; see also *In re M.B. Int'l W.W.L., No. 12 CIV. 4945, 2012 U.S. Dist. LEXIS 110347, 2012 WL 3195761, at *12 (S.D.N.Y. Aug. 6, 2012)* ("Court may consider (contract provision] as an admission by [defendant] that any violation of [the contract] will cause irreparable harm, but the Court remains obliged to make an independent determination as to whether injunctive relief is appropriate.")

Plaintiff's "new" authority does not alter the Court's conclusion. All three of Plaintiff's cited cases come from courts outside of the Second Circuit and thus are not dispositive. Further, two of the three cases were decided in 2009, well before the filing of the original Motion for Preliminary Injunction. See *Am. Impex Corp. v. Int'l Ace Tex, Inc., No. CV 09-7082, 2009 U.S. Dist. LEXIS 113103, 2009 WL 3963791, at *3 (C.D. Cal. Nov. 16, 2009)*; *LNB Bancorp, Inc. v. Osborne, No. 1:09-CV-00643, 2009 U.S. Dist. LEXIS 32988, 2009 WL 936957, at *4 (N.D. Ohio Apr. 3, 2009)*. Plaintiff provides no reason why the Court should consider them at this late stage. Only *Mylan Inc. v. Smithkline Beecham Corp., 2014 U.S. Dist. LEXIS 96496, 2014 WL 3519102 (D.N.J. July 16, 2014)* was decided after Plaintiff's original motion. However, it does not represent a change in the controlling law of this case. Furthermore, the facts of Mylan are inapposite to the instant case because there, like in Sterling Drug and Montblanc, the plaintiff

2015 U.S. Dist. LEXIS 42621, *50

had already proven a breach of the relevant agreements when seeking the injunction.[21]

The Court finds today that Plaintiff has pled facts sufficient to avoid dismissal of its breach of contract claims, and recognizes the presence of specific performance as a remedy for breach pursuant to the Agreements. However, because Plaintiff has not demonstrated sufficiently that a breach has occurred (see Order on Mot. for Prelim. Injunc. 18; infra at III.C.), Plaintiff is not entitled to specific performance at this time, nor can irreparable harm be presumed. Without such showing of irreparable harm, Plaintiff's original Motion for Preliminary Injunction was denied, and Plaintiff's pending Motion to Amend similarly is DENIED.

III. CONCLUSION

For the foregoing reasons, Defendants LGI and YSL's Motions to Dismiss Claim One are DENIED. Defendant Kering's Motion to Dismiss is DENIED as to Count One and GRANTED as to Claims Two through Eight without prejudice. KAI's **[*50]** Motion to Dismiss all claims is GRANTED without prejudice.

Should Plaintiff choose to file a Second Amended Complaint, such pleading shall be filed within 45 days of the date of this Order. Defendants shall move to dismiss or Answer the Second Amended Complaint within 45 days of service.

SO ORDERED.

Dated: New York, New York

March 25, 2015

/s/ Deborah A. Batts

Deborah A. Batts

United States District Judge

---

[21]   In Mylan, the plaintiff sought an injunction after the defendant "continued to engage **[*49]** in the precise conduct that the jury found to be a breach" and after demonstrating "it suffered an irreparable injury and that monetary damages [we]re inadequate to compensate for such injury." 2014 U.S. Dist. LEXIS 96496, [WL] at *3. Here, Plaintiff has made no such showing and is instead arguing, without any relevant and authoritative case law, that it need not do so.

● Warning
As of: April 27, 2016 11:44 AM EDT

## *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*

United States District Court for the Southern District of New York

September 13, 2004, Decided ; September 14, 2004, Filed

00 Civ. 8720 (NRB)

**Reporter**
2004 U.S. Dist. LEXIS 18599; 2004 WL 2072501

LaSALLE BANK NATIONAL ASSOCIATION fka LaSALLE NATIONAL BANK) AS TRUSTEE FOR CERTIFICATE HOLDERS OF ASSET SECURITIZATION CORPORATION COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 1997-D5, BY AND THROUGH LEND LEASE ASSET MANAGEMENT, L.P., (Successor in Interest to AMRESCO MANAGEMENT, INC.) AS SPECIAL SERVICER, Plaintiff, - against - NOMURA ASSET CAPITAL CORPORATION and ASSET SECURITIZATION CORPORATION, Defendant.

**Subsequent History:** As Corrected, October 4, 2004. Related proceeding at *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 10 A.D.3d 845, 783 N.Y.S.2d 22, 2004 N.Y. App. Div. LEXIS 11080 (N.Y. App. Div. 1st Dep't, 2004)*
Affirmed in part and vacated in part by, Remanded by *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 2005 U.S. App. LEXIS 19775 (2d Cir. N.Y., 2005)*

**Prior History:** *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 180 F. Supp. 2d 465, 2001 U.S. Dist. LEXIS 15537 (S.D.N.Y., 2001)*

**Disposition:   [*1]**  Plaintiff's motion for summary judgment on all counts in the Amended Complaint denied and defendants' cross-motion for summary judgment granted.

## Core Terms

Warranty, Mortgage, notice, mortgage loan, underwriting, originated, rating, defendants', cure, agencies, Servicer, parties, breached, loans, Appraisal, securitization, repurchase, summary judgment, principally, representations, certificates, industry standard, reasonable belief, real property, Deposition, Securities, procedures, letters, pool, interest in real property

## Case Summary

### Procedural Posture

Plaintiff trustee sued defendants, the issuers of commercial mortgage pass-through certificates, for breach of warranties made in connection with securitization of the certificates. The parties filed cross-motions for summary judgment. The trust also sought to exclude expert testimony.

### Overview

The certificates represented beneficial interests in a trust fund of commercial mortgage-backed securities. The trustee elected to have the trust treated as a real estate mortgage investment conduit (REMIC) for tax purposes. Prior to closing the securitization transaction, one of the issuers obtained the advice of a REMIC expert, who concluded that each of the loans in the trust pool was REMIC-qualified. A dispute later arose as to whether one of the loans was REMIC-qualified. The trustee claimed that the issuers breached warranties in two agreements that the loan was qualified, that the borrower's real property had a value of at least 80 percent of the issue price, and that the loan was properly underwritten. The court found that notice of the alleged breach was sufficient under terms of the agreements, but the trustee failed to establish any breach of warranty. The issuers had a reasonable belief that the loan was qualified, so the loan fell within the REMIC safe harbor under *26 C.F.R. § 1.860G-2(a)(3)(i)*. The 80 percent warranty had no greater effect than the qualification warranty. It appeared that the underwriting of the loan met customary industry standards.

### Outcome

The trustee's motions to exclude expert testimony and for summary judgment were denied. The issuers' summary judgment motion was granted.

2004 U.S. Dist. LEXIS 18599, *1

## LexisNexis® Headnotes

Evidence > ... > Testimony > Expert Witnesses > General Overview

Evidence > ... > Expert Witnesses > Credibility of Witnesses > Impeachment

*HN1* Attempts to impugn an expert's skill and knowledge go to the weight and credibility, not the admissibility, of his or her testimony.

Civil Procedure > Discovery & Disclosure > Disclosure > Sanctions

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

*HN2* See *Fed. R. Civ. P. 37(a)*.

Evidence > Types of Evidence > Testimony > General Overview

Evidence > ... > Testimony > Expert Witnesses > General Overview

Evidence > Admissibility > Expert Witnesses

*HN3* Factual testimony does not constitute "an opinion" under *Fed. R. Evid. 702*, even if given by a person with particular expertise. The term "expert" in *Fed. R. Civ. P. 26* does not encompass a percipient witness who happens to be an expert. A witness's factual testimony remains admissible even if a court were to determine that he should have been identified as an expert, as only expert testimony, not fact testimony, should be excluded if deemed to be in the form of opinions.

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

Civil Procedure > ... > Summary Judgment > Supporting Materials > Discovery Materials

*HN4* Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. The Federal Rules of Civil Procedure mandate the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In reviewing the record, a court must assess the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

*HN5* In order to defeat a summary judgment motion, the nonmoving party must affirmatively set forth facts showing that there is a genuine issue for trial. An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

Real Property Law > Financing > Mortgages & Other Security Instruments > General Overview

Tax Law > Federal Estate & Gift Taxes > Nonresident Aliens > Imposition of Tax

Tax Law > Federal Taxpayer Groups > C Corporations > REITs, REMICs, RICs & FASITs

*HN6* *I.R.C. § 860G(a)(3) (1986)* provides generally that a "qualified mortgage" is any obligation which is principally secured by an interest in real property that is transferred to a real estate mortgage investment conduit (REMIC) trust within the three-month period starting on the REMIC's start-up day. There are two alternative tests that can be used to determine if an obligation is "principally secured" by an interest in real property. The "80 percent real property value test" requires that the fair market value of the real property securing the borrower's obligation under the terms of the loan must be at least equal to 80 percent of the adjusted issue price of the obligation at the time the obligation was

originated or at the time the sponsor contributes the obligation to the REMIC. *Treas. Reg. § 1.860G-2(a)(ii)*. The alternative "use of proceeds test" states that a loan is principally secured by an interest in real property if substantially all of the proceeds of the obligation were used to acquire or to improve or protect an interest in real property that, at the origination date, is the only security for the obligation. *Treas. Reg. § 1.860G-2(a)(ii)*.

Real Property Law > Financing > General Overview

Real Property Law > Financing > Mortgages & Other Security Instruments > General Overview

Tax Law > Federal Taxpayer Groups > C Corporations > REITs, REMICs, RICs & FASITs

**HN7** The real estate mortgage investment conduit (REMIC) regulations provide the sponsor of a REMIC a safe harbor with respect to the qualification of mortgage loans. If, at the time it contributes a mortgage loan to the REMIC, a sponsor reasonably believes that the loan is principally secured by an interest in real property, the loan is "deemed to be so secured" for purposes of determining whether it is a qualified mortgage. *26 C.F.R. § 1.860G-2(3)(i)*. A sponsor's reasonable belief may be based on representations and warranties made by the mortgage loan originator or evidence that the originator typically made such loans in accordance with an established set of parameters that would result in a loan meeting the principally secured test. *26 C.F.R. § 1.860G-2(3)(i)*. If, despite a sponsor's reasonable belief that the loan is principally secured by an interest in real estate at the time it contributes a mortgage loan to a REMIC, it is later discovers that the loan does not meet the test, the loan loses its status as a qualified mortgage 90 days thereafter. *26 C.F.R. § 1.860G-2(3)(iii)*.

Contracts Law > Contract Interpretation > General Overview

**HN8** Under New York law, contracts must be interpreted to give effect to the intent of the parties as expressed in the clear language of the contract. In interpreting the express provisions of the contract, a court recognizes that such interpretation is directed to discovering the meaning of the terms of the writing in light of the circumstances presented.

Contracts Law > Contract Interpretation > General Overview

Tax Law > Federal Taxpayer Groups > C Corporations > REITs, REMICs, RICs & FASITs

**HN9** An agreement's carve-out of *26 C.F.R. § 1.860G-2(f)(2)* does not preclude parties from claiming the protection of the safe harbor in *§ 1.860G-2(a)(3)(iii)*. Rather, the fact that the agreement makes specific mention of *§ 1.860G-2(f)(2)*, and could easily have done the same with respect to *§ 1.860G-2(a)(3)(iii)* (or any other specific regulation) but does not, confirms that the parties do not intend to limit the application of *§ 1.860G-2(a)(3)(iii)*. In fact, limiting the use of only *§ 1.860G-2(a)(3)(iii)* is sufficiently commercially reasonable to warrant giving effect to the agreement as written.

Tax Law > Federal Taxpayer Groups > C Corporations > REITs, REMICs, RICs & FASITs

**HN10** Where full disclosure is made to a professional expert, an issuer is entitled to rely on such expert's opinion.

Contracts Law > Breach > Breach of Contract Actions > General Overview

Contracts Law > Standards of Performance > General Overview

**HN11** In order for a notice to cure to comply with New York law, it must set forth the substance of each alleged default and specify the actions necessary to cure.

**Counsel:** For Plaintiff: Gary Cruciani, Esq., David Sochia, Esq., McKool Smith PC, Dallas, Texas.

For Defendant: Daniel C. Malone, Esq., Dechert Price & Rhoads, New York, NY.

**Judges:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**Opinion by:** NAOMI REICE BUCHWALD

# Opinion

**MEMORANDUM AND ORDER**

**NAOMI REICE BUCHWALD**

**UNITED STATES DISTRICT JUDGE**

Plaintiff LaSalle Bank National Association ("LaSalle" or "plaintiff")), as Trustee for the Certificateholders of Asset Securitization Corporation Commercial Mortgage Pass-Through Certificates Series 1997-D5, brings this

2004 U.S. Dist. LEXIS 18599, *1

action against defendants Asset Securitization Corporation ("ASC") and Nomura Asset Capital Corporation ("NACC") (collectively, "defendants"), alleging that defendants breached three representations and warranties made to LaSalle in connection with the Securitization of certain commercial mortgage loans. Both parties have moved for summary judgment on all claims. For the reasons stated below, plaintiff's motion is denied in its entirety and defendants' cross-motion is granted.

[*2] **BACKGROUND**

1

This action stems from the securitization of commercial mortgage pass-through certificates which were issued by defendants and which represented beneficial interests in a trust fund of commercial mortgage-backed securities ("CMBS") known as the "D5 Trust." The D5 Trust consists primarily of a pool of 156 fixed-rate mortgage loans secured by first liens on 220 commercial and multi-family properties. [2] The present dispute focuses on one of the 156 loans in the D5 portfolio, which was made to HPCH, LLC, an affiliate of Doctor's Hospital of Hyde Park, Inc. ("Doctor's Hospital"), an acute care facility in Hyde Park, Illinois.

The Doctor's Hospital Loan (the "DHL") was originated and underwritten [*3] by Nomura Asset Capital Corporation ("NACC"). NACC transferred the loan to Asset Securitization Corporation ("ASC") pursuant to a Mortgage Loan Purchase and Sale Agreement ("MLPSA"), which contained certain representations and warranties. After ASC transferred the DHL to the D5 Trust, it transferred the D5 Trust to LaSalle as Trustee, pursuant to a Pooling and Servicing Agreement ("PSA") among ASC, LaSalle and others. 3

**Loan Origination and Underwriting for CMBS**

The various classes of certificates that were issued out of the D5 Trust were rated by major credit rating agencies and received credit ratings ranging from "AAA," the equivalent of a United States Treasury [*4] bond, down to three non-rated subordinate classes. The role of the rating agencies is to protect CMBS investors by offering an independent review and opinion of the risks of the securities being offered. See Expert Report of Teresa F. Esquivel ("Esquivel Report"), attached to Affirmation of Joshua Krakowsky ("Krakowsky Affidavit") as Ex. B at 15. 4

[*5] In addition to evaluation by credit rating agencies, underwriting mortgage loans to be included in a CMBS pool requires an evaluation of whether a loan provides

1   To reference the following facts, see Plaintiff's Amended Complaint ("Compl."), except where otherwise noted.

2   One property also has a second lien thereon.

3   Citations herein to "PSA" refer to the Pooling and Servicing Agreement that is attached as Tab 18, Ex. 1, to the Affirmation of David Sochia, dated February 24, 2004 (the "Sochia Affidavit"). Citations herein to "MLPSA" refer to the Mortgage Loan Purchase and Sale Agreement that is attached as Tab 16, Ex. 20, to the Sochia Affidavit.

4   In order to protect senior bond investors, rating agencies tend to be conservative in their re-underwriting of loans, which typically results in the application of a downward adjustment, or a "haircut," to the loan originator's underwritten cash flows and property values. See Esquivel Report at 16.

Plaintiff has moved to exclude the expert testimony of Teresa Esquivel and any of her opinions that have been submitted by defendants in support of their cross-motion for summary judgment, alleging that she in unqualified and has proffered opinions based on unreliable methodology and insufficient data.

With respect to plaintiff's complaints about Ms. Esquivel's qualifications, *HN1* attempts to impugn an expert's skill and knowledge go to the weight and credibility, not the admissibility, of his or her testimony. See Katt v. City of New York, 151 F. Supp. 2d 313, 357 (S.D.N.Y. 2001). Accordingly, even if the criticisms of Ms. Esquivel's qualifications were well-founded, they would be an insufficient basis for a motion to strike. In any event, based upon her many years of experience in the relevant field, Ms. Esquivel appears well-qualified.

With regard to plaintiff's assertion that Ms. Esquivel relies only on the opinions of the rating agencies and forms no conclusions of her own, a review of her reports sufficiently refutes that position. In her expert report dated September 29, 2003, Ms. Esquivel states that she has reviewed copies of the files on the DHL that NACC sent S&P in 1997. See Esquivel Report at 18. She further offers her opinion that the DHL followed standard methodologies and was conservative with respect thereto. See id. at 19. Finally, her reliance on the rating agencies is strictly confirmatory, as is evidenced by such statements in her report as, "the actions and statements of S&P, one of the leading rating agencies, and Amresco, re-underwriting on behalf [of] the buyers of

2004 U.S. Dist. LEXIS 18599, *5

a reasonable level of return for its level of risk. See id. at 11. CMBS underwriting is more complex and considers more information than ordinary commercial underwriting, taking account of individual loans, as well as diversity of property type, geographic location and similar issues. See Rebuttal Report of Teresa Esquivel (attached to Krakowsky Aff.) at 3. To determine the creditworthiness of a mortgage (whether a property's cash flow is sufficient to pay the loan's debt service), the underwriter must review and adjust the collateral property's cash flow to derive a sustainable net operating income ("NOI"). See Esquivel Report at 14. Capital items are then deducted from NOI to produce net cash flow ("NCF"). See id. CMBS originators use the ratio of NCF to the annual debt service ("debt service coverage ratio" or "DSCR") as the principal benchmark for determining the creditworthiness of a proposed CMBS loan. See id.

**The D5 Underwriting**

NACC applied rating agency methods in its underwriting of [*6] the D5 Trust. See Deposition of Raymond Anthony ("Anthony Dep.") (Krakowsky Aff., Ex. 4) at 76:14-79:4; Deposition of Marlyn Marincas ("Marincas Dep.") (Krakowsky Aff., Ex. 1). The rating agencies concluded that NACC followed uniform and thorough procedures consistent with CMBS industry standards in underwriting D5. See Esquivel Report at 18. For example, in a pre-sale report concerning the D5 Trust, Standard & Poor's ("S&P") stated that NACC's underwriting "followed a consistent set of policies and procedures resulting in a 3% variance from Standard and Poor's cash flow." Id.; Declaration of Gale Scott ("Scott Decl.") (Krakowsky Aff., Ex. 5) Ex. A at 0002. S&P also cited to the D5 Trust's "strong geographical diversity," "better than average" quality assessment score and positive structural features, especially for loans greater than $ 20 million. Scott Decl., Ex. A at 0002.

Similarly, another rating agency, Fitch's Commercial Mortgage Group ("Fitch"), concluded with respect to D5 that, "the underwriting procedures in place [are] very

good." Declaration of Donna Daley Schneider ("Schneider Decl.") (Krakowsky Aff., Ex. 6) Ex. A at FI-NOMURA 006072. Fitch stated in its [*7] report that it based this assessment on, inter alia, "income verification procedures," "solid borrower review procedures in place," "good escrow/reserve policies," and "good loan structural features." Id. Fitch described the pool of loans in the D5 Trust as having strong DSCRs, with a variance of 4.3% between NACC's and Fitch's underwritten cash flow; "good loan features such as lock boxes, reserves, and management kickout provisions;" and "very good diversity across property types and geographic locations."Id. at FI-NOMURA 006066.

The NACC banking team that originated the DHL was led by Mr. Ray Anthony. Mr. Anthony engaged a specialized third-party consultant and appraiser with respect to Doctor's Hospital. See Anthony Dep. at 70:16-71:19. Specifically, NACC retained Coopers & Lybrand ("Coopers"), which specialized in acute care hospitals and the healthcare industry in general, to help Mr. Anthony underwrite the net income of Doctor's Hospital. See Affidavit of Perry Gershon ("Gershon Aff.") (Krakowsky Aff., Ex. 3) at P 9; Anthony Dep. at 115:3-116:17, 144:23-146:3. NACC also hired Valuation Counselors ("VC") to appraise the Doctor's Hospital property based on [*8] its experience in hospital appraisal. See Gershon Aff. P 9, Anthony Dep. at 190:21-191:15.

**NACC's Process for Originating REMIC-Qualified Mortgages**

LaSalle, as Trustee, elected to have the D5 Trust treated as a "REMIC" for tax purposes. [5] [*9] NACC and its affiliates received legal advice from the firm of Cadwalader, Wickersham & Taft ("Cadwalader"), including from Charles Adelman, a tax partner and REMIC expert at Cadwalader. Prior to the closing of the D5 transaction, NACC presented detailed information about the characteristics of each of the mortgages to be included in the D5 pool to Mr. Adelman. Based upon his review of these materials, Mr. Adelman concluded that

---

the riskiest B bonds, confirm my opinion that the Doctor's Hospital loan was properly originated and underwritten." Id. at 20. Accordingly, the testimony of Ms. Esquivel complies with **_Rules 702_** and 703 of the Federal Rules of Evidence and may properly be considered. Plaintiff's motion to strike is therefore denied.

[5]   "REMIC" stands for "real estate mortgage investment conduit." A REMIC-qualified mortgage is eligible to receive preferred tax treatment from the IRS in certain circumstances. For a more detailed explanation of the REMIC-related aspects of this case, see Section C of this opinion, infra, as well as the Court's opinion dated September 13, 2004 (and filed today as well) in the related case Steed Finance LDC v. Nomura Securities International, Inc., No. 00 Civ. 8058.

each of the loans in the D5 pool was REMIC-qualified. See Deposition of Charles Adelman ("Adelman Dep.") (Krakowsky Aff., Ex. 14) at 125:14-146:16. [6]

[*10] All loans in the D5 Trust have been treated as REMIC-qualifed by the Internal Revenue Service (the "IRS") since October 24, 1997, the closing date of the D5 Trust. In December 1997, the IRS listed the D5 Trust as a REMIC with a start date of October 24, 1997 and has not modified that listing. Similarly, LaSalle has continued, since its initial REMIC election, to claim in its tax filings as D5 Trustee that the DHL, along with all other loans in the D5 Trust, is a qualified mortgage for REMIC purposes. See Krakowsky Aff., Ex. 13 (LaSalle's Tax Returns from 1997-2001).

**Litigation Following the Default of the DHL**

On April 17, 2000, the operator of Doctor's Hospital filed a petition for relief under Chapter 11 of the United States Bankruptcy Code and the hospital closed immediately afterwards. As a result, on April 22, 2000, the DHL was transferred to special servicing. Representatives of the Class B certificate holders immediately made inquiries of Whitney Wheeler, the portfolio manager charged with the special servicing of the DHL at Lend Lease Asset Management, L.P. ("LLAM"), as to the handling of the DHL and its possible resolution. On May 25, 2000, Mr. Wheeler wrote [*11] to Dennis Winter, a representative of LASER Mortgage Management ("Laser"), one of the holders of subordinate D5 certificates, advising him that REMIC

counsel was investigating the possibility that the DHL was not REMIC-qualified. Mr. Wheeler also stated that this fact might enable the special servicer to "put back" the loan. See Deposition of Whitney Wheeler ("Wheeler Dep.") (Krakowsky Aff., Ex. 18) at 169:25-171:1.

On June 1, 2000, LLAM sent a letter to ASC stating that ASC had breached Section 2.03(b)(vi) of the PSA by virtue of LLAM's determination that the DHL was not REMIC-qualified. The letter further demanded that ASC cure the breach or repurchase the loan. In letters dated June 8, 2000 and June 16, 2000, ASC denied that it was in breach and provided reasons why the DHL was REMIC-qualified. On June 26, 2000, the law firm of Akin, Gump, Strauss, Hauer & Feld, L.L.P. ("Akin Gump"), on behalf of LLAM, requested that ASC provide it with support, in the form of a legal opinion, for the position that the DHL was REMIC-qualified. On June 30, 2000, ASC sent to Akin Gump an opinion letter furnished by Cadwalader and a letter from the original appraiser of Doctor's Hospital, providing [*12] detail about its original August 28, 1997 appraisal. See Wheeler Dep. Ex. 7. Having reviewed the appraisal letter, as well as the appraisal itself, Cadwalader expressed its opinion that the DHL was REMIC-qualified at the time that it was contributed to the D5 Trust and that it remained REMIC-qualified.

On July 26, 2000, Akin Gump, on behalf of LLAM, sent a letter to NACC stating that NACC was in breach of Sections 2(b)(xix), (xxix) and (xxxi) of the MLPSA, concerning REMIC qualifications and the propriety of

---

[6]  Plaintiff has moved to exclude the opinions of Mr. Adelman because defendants did not disclose Mr. Adelman as an expert pursuant to *Federal Rule of Civil Procedure 26(a) (2) (A)*. Defendants respond that they have not used Mr. Adelman's testimony as expert evidence under the Federal Rules of Evidence. In any event, argue defendants, the testimony offered by Mr. Adelman is factual and does not consist of impermissible legal opinions.

LaSalle relies on *Federal Rule of Civil Procedure 37(a)*, which states that *HN2* "if a party fails to make a disclosure required by *Rule 26(a)*, any other party may move to compel disclosure and for appropriate sanctions." *Fed. R. Civ. P. 37(a)*. However, LaSalle has offered no basis to conclude that defendants were required by *Rule 26* to disclose Mr. Adelman as an expert. Plaintiff has failed to demonstrate that Mr. Adelman was retained or specifically employed to offer expert testimony, or that his duties regularly include providing expert testimony. Indeed, Mr. Adelman's deposition was noticed by plaintiff, who apparently elicited all of the Adelman testimony on which both parties' papers rely. Additionally, a review of the record shows that Mr. Adelman's testimony is used to establish factual information, rather than to offer opinions. Such *HN3* factual testimony does not constitute "an opinion" under *Federal Rule of Evidence 702*, even if given by a person with REMIC expertise. See Gomez v. Rivera Rodriguez, 344 F.3d 103, 111-14 (1st Cir. 2003) (the term "expert" in *Rule 26* "does not encompass a percipient witness who happens to be an expert"). In any event, Mr. Adelman's factual testimony would remain admissible even if this Court were to determine that he should have been identified as an expert, as only expert testimony, not fact testimony, should be excluded if deemed to be in the form of opinions. See Wechsler v. Hunt Health Sys. Ltd., 198 F. Supp. 2d 508, 529 (S.D.N.Y. 2002) (where defendants maintained that accountant was a fact witness only and plaintiff did not have opportunity to depose witness as to any expert opinions, the Court struck only those statements that clearly contained opinions based upon his expert knowledge as a certified public accountant). As this Court is relying only on factual information provided by Mr. Adelman, plaintiff's motion to exclude his testimony is denied.

the D5 underwriting. The July 26, 2000 letter also enclosed and incorporated a July 25, 2000 letter from Akin Gump to ASC, which stated that NACC appeared to be in breach of the MLPSA. The July 26, 2000 letter demanded that NACC repurchase the DHL. Thereafter, on August 4, 2000, ASC sent a letter to Akin Gump stating that the determination of whether the DHL was REMIC-qualified should have been based on the fair market value of the real property, rather than on the data on which Akin Gump relied. That same day, NACC sent a letter to Akin Gump, denying any REMIC-related breaches and disputing Akin Gump's characterization.

Mr. Wheeler then sent an email to representatives of [*13] the subordinate certificate holders, soliciting from them a letter stating that they supported the special servicer's position as it related to repurchasing the loan. Mr. Wheeler received letters from both Laser and Steed Finance LDC ("Steed"), which together held a substantial majority of the subordinate certificates. He then transmitted these letters to various rating agencies, which disseminated information to D5 certificate holders.

LaSalle then filed the present lawsuit, alleging that defendants breached three representations and warranties that defendants made in the PSA and the MLPSA: (1) that the DHL was a "qualified mortgage" for purposes of REMIC treatment (the "Qualified Mortgage Warranty"); (2) that the Borrower's real property, as set forth in an August 1, 1997 appraisal, had a fair market value of at least 80% of the issue price at the time the obligation was originated (the "80% Warranty"); and (3) that the DHL was originated and underwritten in a proper and prudent manner in accordance with customary industry standards (the "Underwriting Warranty"). [7]

## [*14] DISCUSSION

### A. Summary Judgment Standard

**HN4** Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The Federal Rules

of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. In reviewing the record, we must assess "the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 957 (2d Cir. 1993)*. **HN5** In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue [*15] for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. An issue is "genuine … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. at 248* (internal quotation marks omitted).

### B. Notice and Opportunity to Cure

As a preliminary matter, defendants assert that plaintiff was required by the PSA and MLPSA to provide defendants with notice of any breach of warranty and with a ninety day period in which to cure the breach. Defendants assert that plaintiff failed to provide them with notice and/or the opportunity to cure with respect to all but one of the warranty claims asserted, and that plaintiff is thus barred from suing on the remaining claims. LaSalle responds that it gave proper notice of the alleged breaches to defendants and that notice is not a condition precedent to plaintiff's claims.

The PSA's notice and cure provision appears in Section 2.03(d) of the PSA:

> upon discovery by the … Special Servicer or Trustee of a breach of the representation and warranty set forth in Section 2.03(b)(vi) or that any Mortgage Loan otherwise fails to constitute [*16] a Qualified Mortgage, such Person shall give prompt notice to [ASC] and [ASC] shall correct such condition or repurchase or cause [NACC] to repurchase such Mortgage Loan … within 90 days ….

PSA § 2.03(d). The MLPSA contains a similar provision:

---

[7]   Shortly before LaSalle filed the present action, a related action was filed by Steed Finance LDC, who asserted various fraud and misrepresentation claims against the defendants here, as well as Nomura Securities International, Inc. See Steed Finance LDC v. Nomura Securities International, Inc., No. 00 Civ. 8058. The Court has today issued a Memorandum and Order in that case.

(a) Pursuant to the [PSA], NACC and ASC shall be given notice of … *any* breach of any representation or warranty contained in Section 2(b) … (xix), … (xxix), [or] (xxxi) ….

(b) Within 90 days of the receipt of the notice … of a breach provided for in clause (a), [NACC] shall either (i) repurchase the related Mortgage Loan … or (ii) promptly cure such breach in all material respects ….

MLPSA § 3(a)-(b).

The term "notice" is not defined in the PSA or MLPSA. Similarly, neither the PSA nor the MLPSA specifies anything about the form or content of acceptable notice. Black's Law Dictionary defines "notice" as "information, an advice, or written warning, in more or less formal shape, intended to apprise a person of some proceeding in which his interests are involved, or informing him of some fact which it is his right to know and the duty of the notifying party to communicate." 5 Black's **[*17]** Law Dictionary 957 (1979); see also *Markovits v. Venture Info Capital, Inc., 129 F. Supp. 2d 647, 654 (S.D.N.Y. 2001)* (using same definition of notice in absence of contractual definition).

As noted earlier, there was an exchange of letters between the parties following the transfer of the DHL to special servicing. Among these was a letter of July 26, 2000, which LaSalle sent to NACC, stating, "you are hereby notified that you are in breach of your representations and warranties under Section 2(b) (xix) [origination/underwriting warranty], (xxix) [80% warranty] and (xxxi) [qualified mortgage warranty] of the Mortgage Loan Purchase Agreement." See Wheeler Dep. Ex. 6 (Krakowsky Aff., Ex. 18). The letter then demanded repurchase of the DHL. See id. [8] Defendants

respond that this letter was insufficient to provide notice of the breaches alleged because it did not seek a cure, but only demanded repurchase of the loan. Contrary to defendants' assertion, however, the PSA nowhere states that in order for notice of a breach to be effective it must affirmatively seek a cure. Because the July 26, 2000 letter was more than adequate to apprise defendants "in more **[*18]** or less formal shape of the breaches complained of," *Markovits, 129 F. Supp. 2d at 654*, defendants' argument that notice was insufficient is without merit. [9]

**[*19]** In any event, Section 2.01 of the PSA specifically states:

> The Servicer, Special Servicer or the Trustee shall notify the Mortgage Loan Seller and the Depositor upon such party's becoming aware of any breach of the representations and warranties contained in this Agreement or the Mortgage Loan Purchase and Sale Agreement that gives rise to a cure or repurchase obligation; *provided,* that the failure of the Servicer, the Special Servicer or Trustee to give such notification shall not constitute a waiver of any cure or repurchase obligation.

PSA § 2.01. This provision clearly dictates that failure to give notice does not constitute a waiver of defendants' obligation to cure. Given the PSA language quoted above, as well as the fact that other provisions of the PSA and MLPSA expressly state when notice is a condition precedent to suit, [10] **[*20]** defendants' argument that LaSalle waived its rights under these agreements by failing to provide defendants with

---

[8]   As noted above, the July 26, 2000 letter also incorporated by reference a July 25, 2000 letter to ASC in which plaintiff's counsel stated, "it also appears that the Mortgage Loan Seller (your affiliate) has breached the representation and warranty contained in Section 2(b) (xix) of the Mortgage Loan Purchase Agreement [regarding the origination of the loan] …. A notice of this breach will be provided to the Mortgage Loan Seller simultaneously." Wheeler Dep. Ex. 5 (Krakowsky Aff., Ex. 18).

[9]   Plaintiff points to additional correspondence that it sent to ASC and/or NACC during June, July and August 2000 as evidence that it provided proper notice of the alleged breaches. These other letters, taken as a whole, might also constitute adequate notice. They are significantly less clear, however, than the July 26, 2000 letter. Because the July 26, 2000 letter is unambiguous in providing notice with respect to the three breaches alleged, it is unnecessary to make such a determination in connection with the additional letters.

[10]   For example, the PSA provides that: "No Certificateholder shall have any right to institute any suit, action or proceeding in equity or at law … unless such Holder previously shall have given to the Trustee a written notice of default … and the Trustee, for 60 days after its receipt of such notice, request and offer indemnity, shall have neglected or refused to institute any such action, suit or proceeding." PSA § 10.02.

Case 3:13-cv-00215-VAB   Document 218   Filed 04/27/16   Page 46 of 98

Page 9 of 12
2004 U.S. Dist. LEXIS 18599, *20

adequate notice is without merit. [11] Plaintiff's claims are not barred.

### [*21] C. The Qualified Mortgage Warranty

With respect to plaintiff's contention that defendants breached the Qualified Mortgage Warranty, defendants assert that, by operation of the REMIC regulations, the DHL was a "qualified mortgage" at the closing of the D5 securitization because at that time, ASC had a "reasonable belief" that the DHL was principally secured by an interest in real estate. LaSalle responds that defendants' "reasonable belief" is irrelevant and that the 1997 Appraisal shows that Doctor's Hospital had a real property value of $ 30,960,000 when a value of $ 40 million was required for it to qualify as a REMIC.

*Internal Revenue Code § 860G(a)(3)* **HN6** provides generally that a "qualified mortgage" is "any obligation … which is principally secured by an interest in real property" that is transferred to a REMIC trust within the three-month period starting on the REMIC's start-up day. See *I.R.C. § 860G(a)(3) (1986)*. There are two alternative tests that can be used to determine if an obligation is "principally secured" by an interest in real property. The "80% Real Property Value Test" requires that the fair market [*22] value of the real property securing the borrower's obligation under the terms of the loan must be "at least equal to 80 percent of the adjusted issue price of the obligation at the time the obligation was originated … [or] at the time the sponsor contributes the obligation to the REMIC." Treas. Reg. *§ 1.860G-2(a)(ii)*. The alternative "Use of Proceeds Test" states that a loan is principally secured by an interest in real property if "substantially all of the proceeds of the obligation were used to acquire or to improve or protect an interest in real property that, at the origination date, is the only security for the obligation." Treas. Reg. *§ 1.860G-2(a)(ii)*.

**HN7** The REMIC regulations also provide the sponsor of a REMIC a safe harbor with respect to the qualification of mortgage loans. If, at the time it contributes a mortgage loan to the REMIC, a sponsor reasonably believes that the loan is principally secured by an interest in real property, the loan is "deemed to be so secured" for purposes of determining whether it is a qualified mortgage. See *26 CFR § 1.860G-2(3)(i)*. A sponsor's reasonable [*23] belief may be based on representations and warranties made by the mortgage loan originator or evidence that the originator typically made such loans "in accordance with an established set of parameters" that would result in a loan meeting the principally secured test. See *26 CFR § 1.860G-2(3)(i)*. If, despite a sponsor's reasonable belief that the loan is principally secured by an interest in real estate at the time it contributes a mortgage loan to a REMIC, it is later discovered that the loan does not meet the test, the loan "loses its status as a qualified mortgage" 90 days thereafter. See *26 CFR § 1.860G-2(3)(iii)*.

Defendants contend that because they had a "reasonable belief" at the time of the securitization that the DHL was principally secured by an interest in real property, the DHL was within the REMIC qualification safe harbor and was thus deemed to be a qualified mortgage by operation of *26 CFR § 1.860G-2(a)(3)(i)*. Plaintiff, however, alleges that defendants are prevented from claiming the protection of the safe harbor because of the express language of the MLPSA, which states, "each [*24] Mortgage Loan constitutes a 'qualified mortgage' within the meaning of *Section 860G(a)(3)* of the Code (but without regard to the rule in Treasury Regulations *1.860G-2(f)(2)* that treats a defective obligation as a qualified mortgage, or any substantially similar successor provision) …." MLPSA § 2(b)(xxxi).

**HN8** Under New York law, contracts must be interpreted to give effect to the intent of the parties as expressed in the clear language of the contract. See *Andy Warhol Found. For The Visual Arts, Inc. v. Federal Ins. Co., 189 F.3d 208, 215 (2d Cir. 1999)* (stating that New York law requires contracts to "be construed to effectuate the

---

[11]   At oral argument on July 27, 2004 defendants challenged plaintiff's assertion that the 80% Warranty is distinct from the PSA's and MLPSA's REMIC-related representations. (We discuss the merits of this argument infra.) Defendants further contended that, if, as plaintiff argues, the 80% Warranty were not REMIC-related, then notice would be defective on the additional ground that plaintiff was not sufficiently specific in its allegations concerning how the 80% Warranty was breached in any respect other than as relating to the Trust's REMIC status. Because the Court finds that there is no basis to conclude that the 80% Warranty was distinct from the Qualified Mortgage Warranty, see Section D, infra, it is unnecessary for the Court to rule on defendants' argument. The Court notes, however, that the July 26, 2000 letter clearly stated that defendants were believed to be in breach of 2(b)(xxix) of the MLPSA. Even in the absence of Section 2.01 of the PSA, which states that failure to give notice does not constitute a waiver of rights, the notice with which plaintiff provided defendants with respect to the 80% Warranty was specific and adequate to alert defendants of the need to investigate such allegations further.

intent of the parties as derived from the plain meaning of the [contract]"). In interpreting the express provisions of the contract, the Court recognizes that such interpretation is directed to discovering "the meaning of the terms of the writing … in light of the circumstances [presented]." *Restatement (Second) Contracts § 212.*

Contrary to plaintiff's assertions, **HN9** the carve-out of *26 CFR § 1.860G-2(f)(2)* does not preclude defendants from claiming the protection of the safe **[*25]** harbor in *Section 1.860G-2(a)(3)(iii)*. Rather, the fact that the MLPSA makes specific mention of *Section 1.860G-2(f)(2)*, and could easily have done the same with respect to *Section 1.860G-2(a)(3)(iii)* (or any other specific regulation) but does not, confirms that the parties did not intend to limit the application of *Section 1.860G-2(a)(3)(iii)*. In fact, limiting the use of only *Section 1.860G-2(f)(2)* is sufficiently commercially reasonable to warrant giving effect to the MLPSA as written. Specifically, by carving out this section, the MLPSA dictates that absent a reasonable belief that the DHL met one of the principally secured tests, defendants could not rely on *Section 1.860G-2(f)(2)*'s provision that the subject mortgage loan would only cease to be a qualified mortgage ninety days after discovery of the defect.

The record supports the conclusion that defendants' belief that the DHL was REMIC-qualified at the time of the closing of the D5 Trust was indeed reasonable. In addition to conducting their own review, defendants had provided Mr. Adelman, their REMIC counsel, with all information that he had requested in connection with the D5 Trust. Mr. Adelman thereafter informed **[*26]** defendants that the DHL was REMIC-compliant. *See* Defendants' Rule 56.1 Statement ("Def. 56.1") PP 89-91. Under these circumstances, defendants are entitled to the defense of good faith reliance on the advice of counsel, and their belief as to the REMIC status of the Trust must be considered reasonable. *See*

*C.E. Carlson, Inc. v. S.E.C., 859 F.2d 1429, 1436 (10th Cir. 1988)* (stating that **HN10** where full disclosure is made to a professional expert, issuer is entitled to rely on such expert's opinion) (citing *S.E.C. v. Goldfield Deep Mines Co. of Nevada, 758 F.2d 459, 467 (9th Cir. 1985)* and *S.E.C. v. Savoy Industries, 215 U.S. App. D.C. 7, 665 F.2d 1310, 1314 n.28 (D.C. Cir. 1981)*).

Given that defendants did have a reasonable belief that the DHL satisfied the applicable REMIC tests, the Qualified Mortgage Warranty remains satisfied by virtue of the safe harbor. Accordingly, plaintiff's motion for summary judgment on the Qualified Mortgage Warranty claim is denied and defendants' cross-motion is granted. [12]

**[*27] D. The 80% Warranty**

In addition to the Qualified Mortgage Warranty, defendants represented in the PSA and MLPSA that the Borrower's real property had a fair market value of at least eighty percent of the principal amount of the mortgage loan. Plaintiff argues that this 80% Warranty is "separate and distinct" from the Qualified Mortgage Warranty and therefore that, regardless whether a given loan was REMIC-qualified, the loan must <u>actually</u> have been at least 80% secured by real property. Defendants respond that, prior to this litigation, the parties never treated the 80% Warranty as extending beyond the representations also contained in the Qualified Mortgage Warranty, and that to extend the 80% Warranty beyond the Qualified Mortgage Warranty would frustrate the intent of the PSA and MLPSA. The Court agrees with defendants.

The language of the PSA and MLPSA suggests that the parties intended to give the 80% Warranty no greater effect than the 80% real property requirement that already flowed from the Qualified Mortgage Warranty, see Section C, *infra.* For example, Section 2.03(d) of

---

[12]   Even if defendants were not protected by the safe harbor, plaintiff would not be able to prove a breach of the Qualified Mortgage Warranty, as defendants provided plaintiff with the cure requested in connection with this warranty. Akin Gump, plaintiff's counsel, asked defendants to provide factual support for its representation of June 8 and June 16 that the DHL was REMIC-qualified, stating that it would accept such support "in the form of a legal opinion as to the Mortgage Loan being a Qualified Mortgage Loan addressed to the Trustee." See Wheeler Dep. Ex. 5 (Krakowsky Aff., Ex. 18) at LLAM 1056. ASC complied with Akin Gump's request by securing and sending such a letter from Cadwalader, defendants' REMIC counsel.

**HN11** "In order for a notice to cure to comply with New York law, it must set forth the substance of each alleged default and specify the actions necessary to cure." *PacifiCorp, Inc. v. Tano, Inc., 877 F. Supp. 180, 185 (S.D.N.Y. 1995).* Akin Gump's June 26, 2000 letter specifically requested an opinion letter as a method of resolving the dispute with defendants as to whether the DHL was REMIC-qualified. As defendants provided the cure requested, and because the D5 Trust has continued to receive the tax benefits afforded REMICs, this Court deems the cure undertaken by ASC to be effective.

2004 U.S. Dist. LEXIS 18599, *27

the PSA characterizes a breach of the 80% Warranty as a condition that causes **[\*28]** a loan to "fail[] to constitute a Qualified Mortgage." Plaintiff even appears to concede in its opening papers that the 80% Warranty is "'subsumed' by the definition of a Qualified Mortgage." Plaintiff's Opening Br. at 14 n.11 (quoting deposition of Charles Adelman, Esq.).

Moreover, the parties' course of dealing establishes nearly conclusively that the intent all along was not to treat the 80% Warranty as distinct from the 80% real property representation already contained in the Qualified Mortgage Warranty. For example, the letters exchanged between the parties in Spring 2000 all characterize the real property value issue as relating only to the DHL loan's status as a "Qualified Mortgage Loan" and not to any separate or broader 80% Warranty. See, e.g., Krakowsky Aff., Ex. 18, Tab 1 (characterizing the alleged breach of PSA § 2.03(b)(vi) as "the Mortgage Loan's failure to be a Qualified Mortgage Loan"); id., Ex. 12, Tab 13 (stating that ASC is not in breach of § 2.03(d)(vi) because "the Mortgage Loan is indeed a Qualified Mortgage Loan"); id., Ex. 18, Tabs 5 (same), 6 (same), 7 (same), 9 (same), 15 (same); id., Ex. 12, Tabs 21 (same), 23 (same), 26 (same). Indeed, **[\*29]** plaintiff's counsel was unable at oral argument to direct the Court to any example in which the 80% Warranty had been construed by the parties as extending beyond what was already contained in the Qualified Mortgage Warranty. July 27, 2004 Hr'g Tr. 28-34.

Nor has plaintiff offered any evidence why, as a matter of custom or practice in the mortgage industry, a choice of exactly 80%, independent of REMIC considerations, is the appropriate level of real property security for loans included in the D5 Trust. After years of litigation and full discovery, plaintiff has chosen to proceed without presenting any expert opinion or factual evidence from which the Court could conclude that a level of 80% security has independent significance.

Accordingly, the Court finds that the 80% Warranty did not bind defendants to anything beyond what is contained in the Qualified Mortgage Warranty. The same analysis therefore applies to plaintiff's 80% Warranty claim as did to the Qualified Mortgage Warranty claim. Defendants' cross-motion on the 80% Warranty claim must be granted.

**E. The Underwriting Warranty**

Defendants also represented and warranted in the PSA and the MLPSA that the origination, **[\*30]** servicing and collection of all loans in the D5 securitization were "proper and prudent in accordance with customary industry standards." MLPSA § 2(b)(xix); PSA § 2.03(b)(v). Plaintiff asserts that because of the numerous red flags surrounding the DHL, NACC should have subjected the loan to more rigorous underwriting scrutiny than it did. Plaintiff also asserts that: (a) NACC did not receive the 1997 Appraisal until the date the DHL closed and thus defendants did not review the information contained therein in a timely fashion; (b) NACC lacked sufficient policies and procedures; and (c) NACC considered the wrong valuation issues in the underwriting of the loan.

Defendants respond that NACC originated the loan to meet rating agency standards, followed rating agency guidelines and consulted with the agencies when questions arose as to the appropriate treatment of the loan. Specifically, NACC consulted Fitch prior to signing any loan commitment to see how that agency, which defendants allege placed greater emphasis than other agencies on borrower issues, would view the proposed DHL. See Def. 56.1 P 68. It also hired an accounting firm and an appraiser with healthcare **[\*31]** experience to aid in the origination of the DHL. See id. at PP 70-72. Additionally, defendants argue that plaintiff has erroneously asserted that the Underwriting Warranty applied to each separate loan closing, rather than to the date that the D5 Trust as a whole closed.

The Underwriting Warranty clearly states that it is effective as of the "Closing Date." See MLPSA § 2(b)(xix). Although the MLPSA nowhere defines "Closing Date," the PSA, which is incorporated by reference into the MLPSA, defines "Closing Date" as October 24, 1997, the date that the D5 Trust closed. See PSA at 23. As plaintiff states in its brief, defendants received the Appraisal on August 28, 1997, approximately two months before the closing of the D5 Trust. Thus, plaintiff's argument that, based on the date of receipt of the Appraisal, defendants could not have adequately reviewed the DHL Appraisal prior to the Closing Date is without merit. Moreover, in the absence of any indication in the transaction documentation, plaintiff's argument that the Underwriting Warranty was intended to function on a loan-by-loan basis, as of the closing date of each individual loan, must be rejected.

With **[\*32]** respect to the other aspects of the underwriting, the reactions of the rating agencies to the D5 securitization are telling. S&P only gave a minor "haircut" to NACC's DSCR, an indication that it viewed

2004 U.S. Dist. LEXIS 18599, *32

NACC's underwriting as consistent with its own. In fact, S&P's underwriter said that the DHL "was a very good loan." Gershon Dep. (Krakowsky Aff., Ex. 8) at 432:15-433:8. As S&P is one of the rating agencies that sets CMBS industry standards, this endorsement weighs heavily in defendants' favor.

Moreover, plaintiff has failed to specify any action that was required by an industry standard that defendants should have taken with respect to the DHL but did not. The evidence shows that defendants made available to the rating agencies a broad range of information with respect to the D5 loans in general and the DHL in particular. Additionally, Ms. Esquivel, defendants' securitization expert, attested that the origination of the DHL met customary industry standards. <u>See</u> Esquivel Report at 18 ("Having reviewed copies of the files on the Doctor's Hospital that Nomura had sent S&P back in 1997, as well as other documents, it is my opinion that Nomura's general underwriting procedures were **[*33]** consistent with the CMBS industry's loan underwriting standards …."). [13] Based on the evidence, it appears

that the origination of the DHL was prudent and proper in accordance with customary industry standards. Accordingly, plaintiff's motion for summary judgment with respect to the Underwriting Warranty is denied and defendants' cross-motion is granted.

## CONCLUSION

Based on the foregoing, plaintiff's motion for summary judgment on all counts in the Amended Complaint is denied in its entirety and defendants' cross-motion for summary judgment is granted. [14] The Clerk of the Court is respectfully requested to close this case.

**[*34] IT IS SO ORDERED.**

DATED: New York, New York

September 13, 2004

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE

---

[13]   It will be recalled that plaintiff is proceeding without an expert of its own to counter Ms. Esquivel's position.

[14]   This Memorandum also resolves the two motions by defendants to exclude the testimony of plaintiff's experts, Arthur Gimmy and Michael Clabby. Because it was unnecessary to refer to the testimony of these individuals in deciding the instant motion, these motions are denied without prejudice. Similarly, because the Court did not rely on evidence submitted with defendants' reply papers, the Court does not rule on plaintiff's objections to the consideration of that evidence. Nor has the Court reviewed the hard copies of certain graphics that were displayed at oral argument. We do, however, agree that it was not appropriate for plaintiff to submit hard copies of material that was not presented in open Court.

No *Shepard's* Signal™
As of: April 27, 2016 11:46 AM EDT

# *Hamilton v. City of Peekskill Police Dep't*

United States District Court for the Southern District of New York

August 3, 2015, Decided; August 3, 2015, Filed

No. 13-cv-8138 (NSR)

**Reporter**
2015 U.S. Dist. LEXIS 101903

LEVAN HAMILTON, Plaintiff, -against- THE CITY OF PEEKSKILL POLICE DEPARTMENT, POLICE OFFICER MICHAEL AGOVINO, and POLICE OFFICER DANIEL LABODIN, Defendants.

## Core Terms

kicked, witness', deposition, preclusion, summary judgment motion, discovery, summary judgment, eyewitness, parties, material fact, weigh, nonmoving party, fail to comply, premotion, days, genuine dispute, reasonable jury, district court, instant motion, moving party, local rule, sanctions, battery

**Counsel:** **[\*1]** For Levan Hamilton, Plaintiff: Pat Edward Pirraglia, LEAD ATTORNEY, Pat E. Pirraglia, Esq., Mahopac, NY.

For The City of Peekskill Police Department, Defendant: Mark W Blanchard, LEAD ATTORNEY, White Plains, NY; Darius Patrick Chafizadeh, Harris Beach PLLC, White Plains, NY; Kristen Kelley Wilson, Harris Beach PLLC(WP), White Plains, NY.

For PO Michael Agovino, PO Daniel Labodin, Defendants: Darius Patrick Chafizadeh, LEAD ATTORNEY, Harris Beach PLLC, White Plains, NY.

**Judges:** NELSON S. ROMÁN, United States District Judge.

**Opinion by:** NELSON S. ROMÁN

## Opinion

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Before the Court is a motion for summary judgment filed by Defendants City of Peekskill Police Department,

Police Officer Michael Agovino, and Police Officer Daniel Labodin pursuant to *Rule 56 of the Federal Rules of Civil Procedure*. The Amended Complaint alleges an excessive force claim under *42 U.S.C. § 1983* and a claim for battery under New York common law. For the following reasons, the motion is DENIED.

### FACTUAL BACKGROUND

The facts are not in dispute except where noted. On August 15, 2012 at approximately 8:00 p.m., Plaintiff Levan Hamilton was walking along Park Street in Peekskill, NY. (*See* Defs.' R. 56.1 Stmt. Ex. J at 17, ECF No. 22-10.) At the same time, two **[\*2]** police officers, Defendants Michael Agovino and Daniel Labodin (collectively, "Individual Defendants"), were dispatched to a Walgreens drug store to investigate a theft. (Defs.' R. 56.1 Stmt. ¶ 19, ECF No. 22.) When responding to the call, Agovino observed Hamilton in the vicinity of the drug store. (*Id.*) After an investigation, Agovino attempted to arrest Hamilton. It is undisputed that Agovino used a taser on Hamilton, causing Hamilton to fall forward onto the ground. (*Id.* ¶¶ 20-21.) Hamilton testified that immediately thereafter, while he was on the ground, he was kicked in the head, rendering him unconscious. (*Id.* ¶ 22; *id.* Ex. L at 25, ECF No. 22-12 [hereinafter "Pl.'s Dep."].) Hamilton was unable to identify which officer kicked him because he was face down on the ground, looked to his right, and all he saw before losing consciousness was the boot of an unidentified officer coming toward his face. (Defs.' R. 56.1 Stmt. ¶¶ 22-26; Pl.'s Dep. at 23.) Vicki Sharrock-Garnett, a long-time acquaintance of the Plaintiff, witnessed the event and testified that she saw two officers repeatedly kicking Plaintiff "viciously as with

hatred."[1] (Pl.'s Mem. Law Opp'n Summ. J. Ex. 2, ECF No. 20-2.) [*3] Agovino and Labodin concede that they were at the scene during the arrest, but both testified that no one kicked Hamilton after he was tasered. (Defs.' R. 56.1 Stmt. ¶¶ 27-29.) Hamilton was then transported to the hospital. (*Id.* ¶ 30.) He had suffered fractures to his face and nose. (Pl.'s Mem. Ex. 1c.)

## STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Motions for summary judgment are governed by [*4] *Rule 56 of the Federal Rules of Civil Procedure.* "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* The moving party bears the initial burden of demonstrating the absence of any genuine dispute or issue of material fact by pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," *id.* 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* The moving party may support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." *Fed. R. Civ. P. 56(c)(1)(B).*

Once the moving party has fulfilled its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine dispute of material fact. *Id.* 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248;* accord *Benn v. Kissane, 510 F. App'x 34, 36 (2d Cir. 2013); Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc., 585 F.3d 662, 669 (2d Cir. 2009); Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008); Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005).* Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all

reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010)* (quoting *Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005)).* In reviewing the record, "the judge's function is not [*5] himself to weigh the evidence and determine the truth of the matter," *Anderson, 477 U.S. at 249; see also Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010)* ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact."), nor is it to determine a witness's credibility, *Anderson, 477 U.S. at 249.* Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id. at 250.*

In addition to the requirements of *Rule 56 of the Federal Rules of Civil Procedure,* parties must comply with Local Rule 56.1. This rule requires the moving party to submit a statement in numbered paragraphs "of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Rule 56.1(a). The nonmoving party must submit a correspondingly numbered response to each paragraph and failure to do so is construed as an admission that the fact is undisputed. Local Rule 56.1(b)—(c). "If a nonmoving party fails to comply with local rules governing summary judgment, a district court may rely on a moving party's statement of undisputed facts as long as those facts are supported by the record." *Manolis v. Brecher, 588 F. App'x 85, 87 (2d Cir. 2015)* (summary order); *see also Suares v. Cityscape Tours, Inc., 603 F. App'x 16, 18 (2d Cir. 2015)* (summary order) (holding that a district court has discretion to deem all facts in a moving party's Rule 56.1 statement of facts admitted where the nonmoving party fails to respond [*6] in accordance with the rule).

Here, Plaintiff has not filed an opposition statement under Local Rule 56.1(b) responding to Defendants' Rule 56.1 Statement of Facts. Defendants have asked the Court to deem all statements in their 56.1 statement admitted because of Plaintiff's failure to do so and argue that if the Court admits those statements, it must grant the instant motion. However, this is not the case. Even if the Court were to deem admitted all statements in

---

[1]   Sharrock-Garnett stated that she did not realize that the person being kicked was Hamilton when she witnessed the incident. (Pl.'s Mem. Law Opp'n Summ. J. Ex. 2.) Rather, she testified that she came to believe that the man she saw was Mr. Hamilton when her husband told her that he saw Hamilton at the hospital that evening. (*Id.*) Either way, Sharrock-Garnett testified to the specific date, time, and location of the event (*id.*), which is consistent with specific date, time, and location of Plaintiff's arrest. Furthermore, Hamilton testified that a woman named "Vicky" witnessed the incident. (Defs.' R. 56.1 Stmt., Ex. L at 23.) Accordingly, there is sufficient evidence in the record from which a reasonable jury could conclude that the person whom Sharrock-Garnett saw being kicked was, in fact, Plaintiff.

2015 U.S. Dist. LEXIS 101903, *6

Defendants' Rule 56.1 Statement of Facts, it would not change the analysis. Defendants' 56.1 Statement of Facts, for example, does *not* assert that Plaintiff *was not kicked as a matter of undisputed fact*; it instead asserts that Individual Defendants *testified* that Plaintiff was not kicked. Deeming this assertion as admitted does not require accepting Individual Defendants' version of events; it only requires accepting the fact that they testified to a certain version of events, which does not obviate the issue of fact.

## DISCUSSION

**I.** *Section 1983* Claim

*A. Legal Standard*

To prevail on a *§ 1983* claim, a plaintiff must show that the defendant, acting "under color of any statute . . . of any State . . . subject[ed] . . . any citizen of the United States or other person within the jurisdiction thereof **[*7]** to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." *42 U.S.C. § 1983; see also Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006)*. These claims are "governed by the general rule that summary judgment may be granted only if no issues of material fact exist and the defendant[] is entitled to judgment as a matter of law." *Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986)*.

It is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite for an award of damages." *Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)* (citation and internal quotation marks omitted). To defeat a motion for summary judgment, a plaintiff "need raise only a triable issue of fact as to whether [an officer] had any 'personal involvement' in the alleged violation of [a plaintiff]'s constitutional rights. *Djangmah v. Falcione, No. 08-cv-4027, 2013 U.S. Dist. LEXIS 13597, at *24 (S.D.N.Y. Jan. 18, 2013)*. "A police officer is personally involved in the use of excessive force if he [or she] either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he [or she] had a reasonable opportunity to do so." *Russo v. DiMilia, 894 F. Supp. 2d 391, 414 (S.D.N.Y. 2012)* (internal quotation marks

omitted); *see also Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997)*. "Of course, where the officer is a direct participant in the allegedly excessive use of force, the failure to intervene **[*8]** theory of liability is inapplicable." *Cuellar v. Love, No. 11-cv-3632, 2014 U.S. Dist. LEXIS 51622, at *23 (S.D.N.Y. Apr. 11, 2014)*.

*B. Defendants Are Not Entitled to Summary Judgment on the Merits*

Defendants argue that because Plaintiff cannot identify the particular officer who kicked him, he has not established that either officer was "personally involved." Although Plaintiff concedes that he cannot identify which officer kicked him, rendering him unconscious, this omission is not fatal. Sharrock-Garnett's affidavit, which Plaintiff has submitted with his opposition papers on the instant motion, states that Sharrock-Garnett saw two officers kicking Plaintiff "viciously as with hatred" while he "appeared lifeless or unconscious." Though she was unable to identify the officers, a reasonable jury could infer that Agovino and Labodin both perpetrated the attack because they conceded that they were the officers on the scene.[2] Because there is evidence from which a reasonable jury could conclude that both Individual Defendants directly participated in the alleged excessive force, the Plaintiff's failure to identify which officer kicked him first is immaterial. The Court also need not evaluate Individual Defendants' liability under the failure to **[*9]** intervene theory. Accordingly, summary judgment should be denied with respect to the *§ 1983* claim.

*C. Plaintiff's Eyewitness Affidavit is Admissible*

Defendant argues that Sharrock-Garnett's affidavit should be precluded pursuant to *Rule 37(c) of the Federal Rules of Civil Procedure* because her identity was disclosed only after the close of discovery, allegedly in violation of *Rules 26(a)* and *(e) of the Federal Rules of Civil Procedure*. The Court finds preclusion unwarranted and has considered the affidavit in evaluating the instant motion.

1. Legal Standard for Precluding Testimony from a Witness Disclosed After the Close of Discovery

---

[2]   Defendants argue that Hamilton's and Sharrock-Garnett's accounts are irreconcilable, but any seeming inconsistencies unravel under scrutiny. Hamilton testified that he was kicked once and then lost consciousness. Sharrock-Garnett testified that she saw him kicked multiple times. Of course, if Plaintiff was rendered unconscious by the first kick, no reasonable jury would expect him to remember the subsequent kicks to which Sharrock-Garnett testified.

2015 U.S. Dist. LEXIS 101903, *9

Parties must disclose, among other things, "the name . . . of each individual likely to have discoverable information . . . along with the subjects of that information." *Fed. R. Civ. P. 26(a)(1)(A)(i)*. The parties must also supplement this initial **[*10]** disclosure "in a timely manner" when "a party learns that in some material respect the disclosure . . . is incomplete" and the other does not know of the additional information. *Fed. R. Civ. P. 26(e)(1)(A)*. *Rule 37 of the Federal Rules of Civil Procedure* authorizes sanctions for failing to comply with discovery obligations. "If a party fails to provide information or identify a witness as required by *Rule 26(a)* or *(e)*, the party is not allowed to use that information or witness to supply evidence on a motion . . . unless that failure was substantially justified or harmless." *Fed. R. Civ. P. 37(c)(1)*. Despite this apparently self-executing penal language, in this District, "[t]he imposition of sanctions under *Rule 37(c)* for failure to comply with disclosure obligations is discretionary, and preclusion will be ordered only in rare cases." *E.g., Church Ins. Co. v. Trippe Mfg. Co., No. 04-cv-6111, 2005 U.S. Dist. LEXIS 33363, at *21 (S.D.N.Y. Dec. 19, 2005)* (internal quotation marks omitted); *see also Fed. R. Civ. P. 37(c)(1)* ("In addition to or instead of this [preclusion] sanction, the court . . . may impose other appropriate sanctions.").

Courts consider four factors to determine whether failing to comply with discovery obligations justifies precluding testimony:

> (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded **[*11]** witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

*Softel, Inc. v. Dragon Med. & Sci. Commc'ns., 118 F.3d 955, 961 (2d Cir. 1997)*; *accord Schiller v. City of New York, No. 04-cv-7922, 2008 U.S. Dist. LEXIS 79620, at *13 (S.D.N.Y. Oct. 9, 2008)*. In applying the *Softel* factors to the instant case, a court should be mindful that "the refusal to allow the plaintiff's eyewitnesses to testify" is "an extreme sanction in any case," *Outley v. New York, 837 F.2d 587 (2d Cir. 1988)*, and that a court "must consider less drastic responses," *id. at 591*.

## 2. Preclusion is Not Justified

The first factor is why the party failed to disclose the evidence. In evaluating whether a district court properly exercised discretion to exclude testimony proffered by a witness identified after the close of discovery, appellate courts have weighed this factor most heavily. *See Haas v. Del. & Hudson Ry. Co., 282 F. App'x 84, 86 (2d Cir. 2008)* (finding the district court's preclusion of testimony was not an abuse of discretion where plaintiff's counsel had no excuse for delay, even though the evidence was critical to proving plaintiff's claim); *see also Wolak v. Spucci, 217 F.3d 157, 161 (2d Cir. 2000)*. Hamilton first identified Sharrock-Garnett as an eyewitness in his deposition, stating that an acquaintance who he knew only by her first name "Vicky" had seen the incident. (Defs.' R. 56.1 Stmt., Ex. L at 23.) **[*12]** Plaintiff's counsel asked Hamilton to supplement his testimony with "Vicky's" surname and address if he obtained that information. Hamilton, however, did not follow up, likely in violation of his discovery obligations, and has provided no excuse for his failure to do so. But Defendants are not blameless, either. Considering how critical eyewitness testimony can be, it defies credulity that Defendants would rely on a verbal request buried in a deposition transcript rather than serve a formal, written discovery request. Defendants do not suggest that they even tried to follow up on the issue before the close of discovery 20 days later on October 27, 2014. Moreover, at the December 17, 2014 premotion conference concerning the instant motion, Plaintiff disclosed that they intended to oppose Defendants' motion relying on additional facts from a witness named "Vicky." Therefore, it is unclear that Plaintiff even violated Rule 26. *Glowczenski v. Taser Int'l, Inc., 928 F. Supp. 2d 564, 571 (E.D.N.Y. 2013)* aff'd in part, dismissed in part, *594 F. App'x 723 (2d Cir. 2014)* ("[T]o satisfy Rule 26, parties must make an unequivocal statement that they may rely upon an individual on a motion or at trial." (alteration in original)). Defendants at the conference responded that they wanted a deposition. The Court indicated **[*13]** that if Defendants wanted to reopen discovery to depose the witness, they would need to submit a formal application. Defendants never did so. Accordingly, Defendants had every opportunity to seek to depose Sharrock-Garnett, but instead moved for summary judgment without knowing what Sharrock-Garnett's testimony might be and now seek to preclude the testimony because it creates an issue of fact. This factor is neutral at best.

The second factor is the importance of the evidence to the plaintiff. Sharrock-Garnett's proffered testimony is highly relevant to the merits of this action. It corroborates Plaintiff's testimony and moots the issue of Plaintiff's inability to identify his assailant. Without her testimony, the Court would need to address the issue of whether

Plaintiff can proceed on a failure to intervene theory, which is uncertain. Thus, Hamilton would suffer extreme prejudice if Sharrock-Garnett's testimony were excluded. This factor weighs strongly against preclusion.

The third factor is the prejudice suffered by the defendants that would result from admitting the new testimony. Defendants were first put on notice of the existence of an eyewitness named "Vicky" on October 17, [*14] 2014, the date of Plaintiff's deposition. Defendants were again specifically notified that Plaintiff intended to rely on testimony of "Vicky" in opposition to their motion, but did not seek a deposition at that time. *See Matheson v. Kitchen, 515 F. App'x 21, 23 (2d Cir. 2013)* (summary order) (holding that a district court abused its discretion in precluding eyewitness testimony where a nonmoving party was on notice about an eyewitness's existence but "made no effort to locate or contact" him). Finally, because a trial is not imminent, lesser sanctions, such as providing Defendants with an opportunity to depose Sharrock-Garnett at Plaintiff's expense and, if necessary, supplement their motion for summary judgment, would cure any potential prejudice suffered by Defendants. *See Ocello v. White Marine, Inc., 347 Fed. Appx. 639, 641-42 (2d Cir. 2009)* (summary order). This factor weighs against preclusion.

The fourth factor is the possibility of a continuance. Allowing the defendants full opportunity to examine the veracity of Sharrock-Garnett's testimony would not require much additional time. Courts weigh this factor most heavily if additional witnesses come to light on the eve of trial, which is not the case here. *See, e.g., Patterson v. Balsamico, 440 F.3d 104, 118 (2d. Cir. 2005)* (affirming a district court's preclusion of testimony under *Rule 37(c)(1)* for failure to disclose [*15] witnesses' identities ten days before trial after four years of litigation, where the sanctioned party did not request a continuance). This factor weighs against preclusion.

On balance, this is not one of the rare cases warranting the harsh sanction of preclusion. Though Plaintiff has a weak excuse for failing to comply with *Rule 26(a)* and *(e)*, Defendants also bear fault, and this factor is outweighed by all other factors, which weigh strongly

against preclusion. In urging the Court to preclude Sharrock-Garnett's testimony, Defendants cite only *Glowczenski*, which is nonbinding and easily distinguishable. The *Glowczenski* court declined to consider a fact witness' affidavit in considering a summary judgment motion. *928 F. Supp. 2d at 570-71*. The plaintiff argued that the witness' identity had been disclosed because the plaintiff had produced a memo written by the witness in connection with an earlier summary judgment motion. *Id.* The court agreed with the defendants that it was unreasonable to expect defendants would be aware of the witness simply by dint of the fact that one document in a "mountain of exhibits" disclosed his identity. *Id.* The court declined to consider the affidavit for this reason and because the court found [*16] that the witness' testimony reflected facts not within the witness' personal knowledge as well as hearsay. *Id.* Here, by contrast, Plaintiff testified that "Vicky" was an eyewitness—her identity was not buried in a mountain of documents. Furthermore, Plaintiff at the premotion conference before the Court again disclosed his intention to rely on her testimony. Finally, the Sharrock-Garnett affidavit reflects facts within the witness' personal knowledge, and does not rely on hearsay, in contrast to the witness' affidavit in *Glowczenski*. Accordingly, *Glowczenski* is distinguishable.[3]

Accordingly, the Court may consider Sharrock-Garnett's affidavit [*17] and, as noted above, finds that a question of fact remains as to the *§ 1983* claim. Plaintiff is ordered to produce Vicki Sharrock-Garnett for a deposition within 30 days of the date of this Order, and if Defendants seeks to move for summary judgment on the basis of her testimony, Defendants shall submit a premotion letter within 14 days of her deposition.

## II. State-Law Battery Claim

"To recover damages for battery, a plaintiff must prove that there was bodily contact, that the contact was offensive, i.e., wrongful under all of the circumstances, and intent to make the contact without the plaintiff's consent." *Higgins v. Hamilton, 18 A.D.3d 436, 794 N.Y.S.2d 421, 422 (App. Div. 2005); accord Cunning-ham v. United States, 472 F. Supp. 2d 366, 383*

---

[3]   Defendants cite *Glowczenski* for a different holding that is even further afield. They explain that the court declined to consider an expert's slide presentation because the author was never disclosed as a potential witness except in opposition to the summary judgment motion. *928 F. Supp. 2d at 575*. Not so here. As explained above, Defendants are at least partly at fault for failing to depose Sharrock-Garnett, as her existence and her status as an eyewitness was first disclosed in Plaintiff's deposition, and then again in the premotion conference for the instant motion.

2015 U.S. Dist. LEXIS 101903, *17

*(S.D.N.Y. 2007)* (holding that a plaintiff is entitled to recover damages for common law battery by police "if the force used . . . was more than necessary under all the circumstances"). The sole basis for Defendants' motion with respect to the battery claim is Plaintiff's inability to identify which of the Individual Defendants kicked him. As explained above, Sharrock-Garnelt's affidavit obviates this argument. Accordingly, summary judgment as to this claim is denied.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is DENIED. The parties are directed to appear for **[*18]** an in-person pretrial conference on September 24, 2015 at 10:45 a.m. Plaintiff is ordered to produce Vicki Sharrock-Garnett for a deposition within 30 days of the date of this Order, and if Defendants elect to move for summary judgment on the basis of her testimony, Defendants shall submit a premotion letter within 14 days of her deposition setting forth the basis for the motion in accordance with the undersigned's individual rules and requesting that the Court convert the scheduled pretrial conference into a premotion conference. The Court respectfully directs the Clerk to terminate the motion at ECF No. 17.

Dated: August 3rd, 2015

White Plains, New York

SO ORDERED

/s/ Nelson S. Román

NELSON S. ROMÁN

United States District Judge

⬥ Positive
As of: April 27, 2016 11:47 AM EDT

# *Church Ins. Co. v. Trippe Mfg. Co.*

United States District Court for the Southern District of New York

December 19, 2005, Decided

04 Civ. 6111 (HB)

**Reporter**
2005 U.S. Dist. LEXIS 33363; 2005 WL 3462726

CHURCH INSURANCE COMPANY, Plaintiff, -against- TRIPPE MANUFACTURING COMPANY d/b/a TRIPP LITE, Defendant.

**Subsequent History:** Affirmed by *Church Ins. Co. v. Trippe Mfg. Co., 2007 U.S. App. LEXIS 23966 (2d Cir. N.Y., Oct. 12, 2007)*

**Prior History:** *Church Ins. Co. v. Trippe Mfg. Co., 2005 U.S. Dist. LEXIS 23764 (S.D.N.Y., Oct. 17, 2005)*

## Core Terms

insured, argues, defense counsel, industry standard, Manufacturing, surge, new trial, multi-strip, damages, fires, substitution, suppressor, named plaintiff, design defect, jury selection, ratification, uninsured, asserts, losses

## Case Summary

### Procedural Posture
Plaintiff insurer, as subrogee of its insured, brought a product liability lawsuit against defendant manufacturer based on damages to the insured's building from a fire. The day before jury selection, the insured settled its claim against the manufacturer for uninsured losses. The jury returned a verdict for the manufacturer, finding that its product was not defective. Pursuant to *Fed. R. Civ. P. 59*, the insurer moved for a new trial.

### Overview
The insurer raised several claims, but the court rejected each one. In particular, the insurer was properly substituted as the named plaintiff. After the insured settled its claim with the manufacturer, the insurer was the sole remaining party in interest. The manufacturer's motion was not strategically delayed, but made immediately after the settlement. The insurer was not prejudiced as it was permitted to voir dire prospective jurors regarding their feelings toward insurance companies. The insurer was also not prejudiced by the manufacturer's reference to a product safety recall. There was only a single such remark, and the court provided a curative instruction. Testimony regarding the manufacturer's compliance with industry standards was relevant to the product liability claim and was accompanied by a limiting instruction. Similarly, the manufacturer also properly provided evidence regarding the lack of other fires caused by its product, which was relevant to the insurer's claim. Although the manufacturer produced its expert late, preclusion of his testimony was not warranted, particularly as the insurer delayed its production of certain items for analysis by the expert.

### Outcome
The court denied the insurer's motion for a new trial.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

*HN1* A motion for a new trial pursuant to *Fed. R. Civ. P. 59* should be granted only if the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice. A new trial is necessary if the introduction of inadmissible evidence was a clear abuse of discretion and was so clearly prejudicial to the outcome of the trial that the jury reached a seriously erroneous result or the verdict was a miscarriage of justice. Evidentiary errors by the trial court are deemed harmless unless they render the jury's verdict contrary to the interests of "substantial justice."

Civil Procedure > Parties > Real Party in Interest > Subrogees

Insurance Law > Claim, Contract & Practice Issues > Subrogation > Proper Parties

2005 U.S. Dist. LEXIS 33363, *33363

**HN2** Generally, under New York law, an insurer may sue in the name of its insured when a subrogation receipt has been executed. However, in diversity cases federal law governs the issue of in whose name a lawsuit must be brought, even though state law controls the underlying substantive right of an insured to recovery. Under federal law, if an insurer has compensated an insured for an entire loss, the insurer is the only real party in interest and must sue in its own name; however, if the insured is only partially compensated by the insurer, both the insurer and the insured are real parties in interest.

Civil Procedure > Parties > Real Party in Interest > General Overview

**HN3** See *Fed. R. Civ. P. 17(a)*.

Civil Procedure > Parties > Real Party in Interest > General Overview

**HN4** A court has discretion to determine when ratification is permissible.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

**HN5** A party seeking a new trial on the basis of opposing counsel's improper statements to the jury faces a heavy burden, as rarely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal.

Evidence > Relevance > Relevant Evidence

Torts > Products Liability > General Overview

**HN6** The United States Court of Appeals for the Third Circuit has noted that the admission of evidence regarding lack of prior accidents in product liability cases is governed by federal law, specifically, *Fed. R. Evid. 401*, *402*, and *403*. These Rules provide that all relevant evidence is admissible, except that district courts may exclude relevant evidence if the probative value of that evidence is substantially outweighed by the danger of unfair prejudice. *Fed. R. Evid. 403*. Most courts admitting evidence of the absence of prior accidents in product liability cases have done so only where the testifying witness has testified that (a) a significant number of substantially identical products have been used in similar circumstances over a period

of time; (b) the witness would likely be aware of prior accidents involving these products; and (c) to the witness' knowledge, no such prior accidents have occurred.

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

**HN7** The imposition of sanctions under *Fed. R. Civ. P. 37(c)* for failure to comply with disclosure obligations is discretionary, and preclusion will be ordered only in rare cases.

**Counsel:** [*1]  For Cathedral Church of St. John The Divine in The City and Diocese of New York, Plaintiff: Christopher C. Fallon, Jr, Cozen O'Connor (Philadelphia), Philadelphia, PA; Michael J. Sommi, Cozen O'Connor, LLP (NYC), New York, NY; Finley T. Harckham, Anderson Kill & Olick, P.C., New York, NY.

For Trippe Manufacturing Company, doing business as Tripp Lite, Defendant: E. Gordon Haesloop, Bartlett, Mcdonough, Bastone & Monaghan, Mineola, NY.

**Judges:** Hon. Harold Baer, Jr., District Judge.

**Opinion by:** Hon. Harold Baer, Jr.

# Opinion

### OPINION & ORDER

**Hon. Harold Baer, Jr., District Judge:**

Plaintiff Church Insurance Company ("Church Insurance") brought this product liability action as subrogee of the Cathedral Church of St. John the Divine (the "Cathedral") against Trippe Manufacturing Company [1] ("Trippe"). The case was tried to a jury beginning on September 29, 2005. On October 14, 2005, the jury returned a verdict for the defendant. Plaintiff now moves for a new trial pursuant to *Rule 59 of the Federal Rules of Civil Procedure.* Oral argument was held on November 29, 2005. Plaintiff argues that this Court erred by: 1) granting defendant's motion [*2] to substitute Church Insurance for the Cathedral as named plaintiff in this action; 2) denying plaintiff's motion for a mistrial after defense counsel made an improper reference to a product safety recall during

---

[1]   The parties refer to the defendant alternately as "Trippe" or "Tripp" Manufacturing Company. Since the complaint named "Trippe Manufacturing Company," this Court will use that spelling.

cross-examination of one of plaintiff's experts; 3) denying plaintiff's motion to preclude evidence of compliance with industry standards; 4) permitting defendant to question witnesses regarding the frequency of fires caused by defendant's product; 5) denying plaintiff's motion to preclude defendant's liability expert for failing to timely provide expert disclosures; and 6) permitting defendant's damages expert to testify. For the foregoing reasons, plaintiff's motion is DENIED.

## I. BACKGROUND

This action stems from a fire that occurred on December 18, 2001 that severely damaged the Cathedral. Pursuant **[*3]** to the terms of a fire insurance policy, Church Insurance paid the Cathedral $ 41,500,000 to cover damage caused by the fire. (Plaintiff's Motion for a New Trial dated October 23, 2005 ("Pl.'s Mot.") P1). Church Insurance then initiated this subrogation action, in the name of the Cathedral, against Trippe. Church Insurance brought claims for negligence, breach of warranty, and strict products liability, alleging that a defective surge suppressor, manufactured by Trippe, caused the fire. However, Church Insurance withdrew its negligence and breach of warranty claims prior to trial. (Pl.'s Mot. P3 n.1). Originally, the Cathedral also asserted a claim against Trippe for uninsured losses. (Pl.'s Mot. P13). However, the day before jury selection, the Cathedral settled that claim. (Pl.'s Mot. P15). On October 14, 2005, the jury returned a verdict for the defendant, finding that Trippe's product was not defective. (Pl.'s Mot. P6).

## II. DISCUSSION

*HN1* A motion for a new trial pursuant to *Rule 59* should be granted only if "the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice." *Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005)* **[*4]** (internal quotation omitted). A new trial is necessary if "the introduction of inadmissible evidence was a clear abuse of discretion *and* was so clearly prejudicial to the outcome of the trial that . . . that the jury . . . reached a seriously erroneous result or . . . the verdict [was] a miscarriage of justice." *Id. at 399* (internal quotation omitted ) (emphasis in original). Evidentiary errors by the trial court are deemed harmless unless

they render the jury's verdict "contrary to the interests of 'substantial justice.'" Id. (quoting *Fed. R. Civ. P. 61*).

## A. Substitution of Church Insurance Company as Named Plaintiff

Immediately before jury selection began, defendant moved to substitute Church Insurance for the Cathedral as named plaintiff in this action. [2] (Pre-Trial Conference Transcript dated 9/29/05 ("PTC Tr.") 20). Defendant argued that, since the Cathedral had settled its claim for uninsured losses the day before, the sole remaining party in interest in the litigation was Church Insurance. I initially reserved decision on the motion, (PTC Tr. 24, 32-33), but then granted the motion during voir dire. **[*5]** (Trial Transcript "Tr." 3). [3] Plaintiff now argues that this Court erred in granting defendant's motion because plaintiff was entitled to bring this action in the name of the Cathedral, and that plaintiff was prejudiced by the substitution since it occurred shortly before the trial commenced.

*HN2* Generally, under New York law, an insurer may sue in the name of its insured when a subrogation receipt has been executed. See, e.g., *Solomon v. Consol. Resistance Co. of America, 97 A.D.2d 791, 468 N.Y.S.2d 532, 533 (2d Dep't 1983)*. However, "in diversity cases federal law governs the issue **[*6]** of in whose name a lawsuit must be brought, even though state law controls the underlying substantive right of an insured to recovery." *Brocklesby Transport v. Eastern States Escort Servs., 904 F.2d 131, 133 (2d Cir. 1990)*. *Rule 17(a) of the Federal Rules of Civil Procedure* provides that *HN3* "every action shall be prosecuted in the name of the real party in interest." "Under federal law, if an insurer has compensated an insured for an entire loss, the insurer is the only real party[]in[]interest and must sue in its own name; however, if the insured is only partially compensated by the insurer, both the insurer and the insured are real parties[]in[]interest." *Brocklesby, 904 F.3d at 133* (citing *United States v. Aetna Cas. & Surety Co., 338 U.S. 366, 380-82, 70 S. Ct. 207, 94 L. Ed. 171, 56 Ohio Law Abs. 33 (1949)*.

Plaintiff argues that the Cathedral remained a real party in interest because the Cathedral was not fully compensated by Church Insurance for its loss in the

---

[2]   Three days earlier, by letter dated September 26, 2005, defendant sought permission to join Church Insurance as a "necessary party in interest." (Def.'s Letter dated September 26, 2005). However, when this motion was argued, defendant instead sought to substitute Church Insurance as named plaintiff.

[3]   I re-affirmed my ruling, over plaintiff's renewed objection, after jury selection was completed. (Tr. 2-5).

2005 U.S. Dist. LEXIS 33363, *6

fire. However, plaintiff does not dispute the fact that the Cathedral settled its claim for uninsured losses the day before trial. (Pl's Mot. P15). After this **[*7]** settlement was effectuated, the Cathedral had no further interest in the litigation. Plaintiff further argues that the Court should have accepted a ratification agreement from Church Insurance in lieu of substitution. [4] Plaintiff relies on _Reliant Airlines, Inc. v. County of Broome, 1993 U.S. Dist. LEXIS 101100, 90 Civ. 537, 1993 WL 276747, *4 (N.D.N.Y. July 19, 1993)_ for the proposition that "_Rule 17(a)_ allows ratification to foreclose joinder _or_ substitution of the real party in interest." (emphasis in original). In _Reliant_, however, the insured sought "greater damages then that paid to it by" its insurer. _Id. 1993 U.S. Dist. LEXIS 101100 at *3._ See also _Prosperity Realty, Inc. v. Haco-Canon, 724 F. Supp. 254, 258 (S.D.N.Y. 1989)_ (declining to substitute insurer when insurer had submitted ratification agreement and had compensated insured for all but $ 1,000 of insured's loss). Here, after settling its claim for uninsured losses, the Cathedral retained no financial interest in the litigation. In any case, _HN4_ "[a] court has discretion to determine when ratification is permissible." _Pemex - Refinacion v. Tbilisi Shipping Co., 2004 A.M.C. 2424, 2004 U.S. Dist. LEXIS 17478, , 2004 WL 1944450, * 4 (S.D.N.Y. 2004)_ **[*8]** (Baer, J.). It was well within this Court's discretion to substitute Church Insurance for the Cathedral after the Cathedral's sole claim had been settled.

Plaintiff further argues that this Court should have refused to substitute Church Insurance because defendant's motion was made immediately before jury selection. However, the Cathedral had only just settled its claim for uninsured losses the day before. Plaintiff asserts that defendant strategically delayed settling the Cathedral's claim until the day before trial in order to substitute Church Insurance as named plaintiff. Plaintiff's theory is both purely speculative and illogical. Defendant could have made the same motion and achieved the same result had it settled with the Cathedral a month before trial. It is unclear why plaintiff would **[*9]** have suffered less prejudice had the substitution been made a few weeks earlier.

Plaintiff argues that its prejudice was compounded by the fact that the substitution occurred after voir dire had already begun, and that therefore the jury may have been confused by the switch. However, plaintiff

concedes that it was permitted to voir dire prospective jurors regarding their feelings toward insurance companies. (Plaintiff's Memorandum of Law, dated October 23, 2005 ("Pl.'s Mem.") at 8). It should also be noted that plaintiff made no motion for a mistrial and a new panel during jury selection, a request easily granted since it would have brought with it no appreciable delay at that early stage of the trial. Plaintiff also asserts that defense counsel's references to Church Insurance's payment to the Cathedral were prejudicial. (Tr. 21, 856). However, I instructed the jury that they could not consider the fact that this action was based on the right of subrogation in arriving at their verdict, and that they were "to consider this case no differently than . . . if the Cathedral . . . had no insurance on its property." (Tr. 911). Furthermore, the jury necessarily heard testimony regarding **[*10]** Church Insurance's payment to the Cathedral during the testimony on damages, since defendant argued that Church Insurance had overcompensated the Cathedral for its loss. Thus, plaintiff suffered no prejudice by the substitution of Church Insurance as named plaintiff. Finally, in today's world the danger of prejudice of this kind has eroded, that is, just about everyone and everything is insured and insurance no longer carries the same negative connotation it once did. Consequently, the mention of insurance does not signal the kind of prejudice it once signaled.

**B. Defense Counsel's Reference to a Product Safety Recall**

Throughout trial, defendant argued that the fire was caused not by Trippe's product, but rather by an unidentified "multi-strip" surge protector also recovered from the scene of the fire. During the cross-examination of one of plaintiff's experts, Howard DeMatties, defense counsel questioned DeMatties regarding DeMatties' efforts to identify the multi-strip product. Defense counsel asked DeMatties if he had procured an exemplar of a multi-strip product manufactured by "Sanshi," one of the possible manufacturers of the unidentified multi-strip product. (Tr. **[*11]** 267-269). After DeMatties testified that he had never procured an exemplar of the Sanshi product, defense counsel posed the following question: "And the reason you never found one is because they were recalled by the Product Safety Commision?" (Tr. 269). Plaintiff immediately objected and moved for a mistrial. I denied plaintiff's

---

[4]   Although plaintiff offered no such ratification agreement, plaintiff contends that Church Insurance was willing and able to provide an agreement that Church Insurance would be bound by the outcome of this litigation.

motion, but directed defense counsel to abandon that particular line of inquiry. (Tr. 270). By letter dated October 3, 2005, plaintiff renewed its request for a mistrial, which I again denied. However, after closing arguments, I instructed the jury as follows: "You are instructed to disregard any comment by the defense that the multi-strip product found in the fire was the subject of a recall by the Consumer Product Safety Commission. The multi-strip product found in the fire was not the subject of any such recall." (Tr. 914).

Plaintiff now argues, once again, that defense counsel had no good-faith basis for his question, that the question was therefore improper, and that plaintiff suffered substantial prejudice as a result. To counter these assertions, defense counsel has submitted an affidavit stating that, on the day he questioned DeMatties, he had received [*12] information from his experts which stated that "a product identical to, if not the Sanshi product, had been the subject of a [Consumer Products Safety Commission] recall." (Affidavit of Gordon Haesloop ("Haesloop Aff.") P4). [5] Plaintiff asserts that this statement is not credible since, just one week earlier, defendant's liability expert had testified at his deposition that he had been unable to identify the manufacturer of the multi-strip product or link that product to a safety recall. (Pl.'s Reply, Ex. A). Plaintiff further argues that, had defense counsel possessed evidence linking the multi-strip product to a safety recall, that evidence would have been introduced during defendant's case.

Whether appropriate or not, the question [*13] did not create prejudice sufficient to justify a new trial. *HN5* "[A] party seeking a new trial on the basis of opposing counsel's improper statements to the jury faces a heavy burden, as rarely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal." *Marcic v. Reinauer Transportation Companies, 397 F.3d 120, 124 (2d Cir. 2005)*. Defense counsel's single remark regarding the supposed recall, coupled with this Court's curative instruction, did not create substantial prejudice. [6]

[*14] **C. Admission of Evidence Regarding Compliance with Industry Standards**

By letter dated October 3, 2005, plaintiff moved to preclude defendant from introducing evidence that Trippe's surge suppressor complied with applicable industry standards. On October 6, 2005, I denied plaintiff's motion from the bench. On October 17th, I issued an opinion setting forth the reasons for that denial. See *Church Ins. Co. v. Trippe Mfg. Co., 2005 U.S. Dist. LEXIS 23764, 04 Civ. 6111, 2005 WL 2649332 (S.D.N.Y. Oct. 17, 2005)*. At trial, defendant introduced testimony that Trippe's surge protector complied with standards promulgated by Underwriter's Laboratories, Inc. ("UL"). (Tr. 540-41). When this testimony was presented, I cautioned the jury that, while the testimony was relevant, it was "simply part of what you will put together" in arriving at "a conclusion with respect to liability" and that it was "one aspect, but only one aspect, of the proof that we have heard." (Tr. 541). Then, after closing arguments, I instructed the jury as follows:

> You have heard testimony regarding standards of the industry. Compliance with industry standards does not necessarily mean that the defendant's product [*15] was reasonably safe but rather is simply a relevant aspect of your over all consideration of the issues. Your job is to determine whether the surge protector was defective after considering all of the relevant evidence.

(Tr. 924).

Plaintiff now argues, once again, that it was error to allow this testimony. Plaintiff asserts that compliance with industry standards is irrelevant in strict products liability actions where, as here, there is no parallel negligence claim. However, as is set forth in my October 17, 2005 Order, where plaintiff alleges a design defect, such evidence is admissible:

> While compliance with industry standards is certainly not dispositive of a design defect claim

---

[5]   Haesloop attests that he had been informed that "the Sanshi product was being manufactured by other companies in China as a private label manufacturing job and that the subject of the recall was in fact a Sanshi product bearing a different company's label." (Haesloop Aff. P4).

[6]   *Pappas v. Middle Earth Condominium Assoc., 963 F.2d 534 (2d Cir. 1992)*, upon which plaintiff relies, is not to the contrary. In *Pappas*, the Second Circuit reversed a defense verdict and remanded for a new trial based on defense counsel's improper arguments in summation. *Id.* Defense counsel had argued to the jury that plaintiff, who was injured in Vermont while visiting from New Jersey, was likely to be less careful than Vermont residents when confronted by ice and snow. *Id. 539*. In *Pappas*, unlike here, the court allowed defense counsel to pursue an improper line of argument over plaintiff's objection and did not give a curative instruction. *Id. at 540*.

grounded in strict products liability, and would also be insufficient to support summary judgment, such evidence should be admissible at trial. Compliance with industry standards may be relevant to the question of whether a product was reasonably safe as designed, and with respect to the feasibility of alternative designs. Thus, when accompanied by a proper limiting instruction, a jury may consider industry standards in determining the existence of a design defect. Not to permit such evidence [*16] would, it seems to me, unfairly limit a defendant's opportunity to provide the trier of fact with information that may be helpful in its assessment of liability.

*Church Ins. Co., 2005 U.S. Dist. LEXIS 23764, 2005 WL 2649332, at *2.* Plaintiff provides no reason to revisit this conclusion. [7]

**[*17]   D. Testimony Regarding the Lack of Other Fires Caused by Trippe's Product**

During the direct examination of Trippe's president, Barre Seid, defense counsel asked Seid whether he was "aware of any claims similar to this one in the Isobar 4 line." [8] (Tr. 546). Over plaintiff's objection, Seid answered that he was not. (Tr. 547). Later, during direct examination of defendant's liability expert, Dr. Andrew Neuhalfen, defense counsel asked Neuhalfen whether he, in his experience, ever "had an allegation of a fire outside this metal box" (referring to the Trippe surge suppressor). (Tr. 731). Plaintiff's objection was again overruled, and Neuhalfen responded that he had not. (Id.) [9] Plaintiff now argues that the admission of this testimony was error, and that error caused plaintiff substantial prejudice.

**[*18]   In** *Forrest v. Beloit Corp., 424 F.3d 344, 355 (3rd Cir. 2005),* **HN6** the Third Circuit noted that the

admission of evidence regarding lack of prior accidents in product liability cases is governed by federal law, specifically, *Federal Rules of Evidence 401, 402* and *403.* These Rules provide that all relevant evidence is admissible, except that district courts may exclude relevant evidence if "the probative value of that evidence is substantially outweighed by the danger of unfair prejudice." *Fed. R. Evid. 403.* "Accordingly, most courts admitting evidence of the absence of prior accidents in product liability cases have done so only where the testifying witness . . . has testified that (a) a significant number of substantially identical products have been used in similar circumstances over a period of time; (b) the witness would likely be aware of prior accidents involving these products; and (c) to the witness'[] knowledge, no such prior accidents have occurred." *Forrest, 424 F.3d at 355-56.*

Here, plaintiff argues **[*19]** that defendant failed to establish that the "Revision A" circuit board contained in the unit found in the fire was substantially identical to the "Revision B" circuit board contained in most units sold by Trippe. However, one of plaintiff's experts, David Powell, testified that the two types of boards "appear to have a similar layout, construction, and location." (Tr. 387). Furthermore, in response to a question posed by the Court, Powell testified that he was "unable to tell what the difference is" between the two boards, "because they're so close." (Tr. 389). Thus, testimony at trial had established that the Revision A and Revision B boards were sufficiently similar to justify the admission of testimony regarding the lack of prior fires in both types of units.

Furthermore, Seid, as Trippe's president since the mid 1960's, was in a position to know of other allegations of

---

[7]   Plaintiff argues that in my October 17th Order, I mischaracterized the court's holding in *Sanchez v. Fellows Corp., 1996 U.S. Dist. LEXIS 12949, 94 Civ. 1373, 1996 WL 507342 (E.D.N.Y. Sept. 4, 1996).* Sanchez involved both a design defect claim and a third party negligence action brought by the manufacturer of the product against plaintiff's employer. Plaintiff argues that the industry standard at issue in Sanchez concerned the employer's duty of care rather than the product's specifications. Sanchez addressed the relevance of industry standards in denying the manufacturer's motion for summary judgment on plaintiff's design defect claim. See *Sanchez, 1996 U.S. Dist. LEXIS 12949, 1996 WL 507342, *4* ("Although industry standards may provide relevant evidence in a design defect case, they are not dispositive."). While the industry standard at issue in Sanchez did involve the employer's duty to provide safe access to the product, the standard was offered by the manufacturer to show that the product was not defective. Id.

[8]   The Isobar 4 is the model of the surge suppressor alleged to have caused the fire at the Cathedral.

[9]   Earlier in the trial, during the cross examination of plaintiff's expert, Dr. John Duncan Glover, defense counsel asked Dr. Glover if he was aware of any other fires involving Trippe surge suppressors. (Tr. 497). Plaintiff did not object to the question, and Dr. Glover answered that he was not. (Id.)

2005 U.S. Dist. LEXIS 33363, *19

fires involving Trippe units. (Tr. 532). [10] As set forth above, Seid testified that he was unaware of any allegations of fires involving Isobar 4 surge suppressors. Thus, defendant established a proper foundation for testimony regarding the lack of prior fires involving Trippe surge suppressors. See *Forrest, 424 F.3d at 355-56.* [*20]

**E. Preclusion of Defendant's Liability Expert**

Plaintiff moved in limine to preclude defendant's liability expert, Dr. Neuhalfen, from testifying due to the late disclosure of his expert report. I denied plaintiff's motion prior to trial. Plaintiff now argues that my ruling was error. Pursuant to the Pre-Trial Scheduling Order, plaintiff's expert reports were due by August 15, 2005, and defendant's reports by September 2, 2005. Defendant did not submit Dr. Neuhalfen's report until September 9, 2005. In addition, defendant did not submit certain photographs and test results upon which the report was based until September 13, 2005. A list of Dr. Neuhalfen's testimony in other proceedings was not provided [*21] to plaintiff until September 16, 2005. To justify this late production, defendant contends that Dr. Neuhalfen did not receive from plaintiff certain items recovered from the fire which he was to analyze until August 29, 2005, thus endangering the delay.

*HN7* The imposition of sanctions under *Rule 37(c)* for failure to comply with disclosure obligations is discretionary, and "preclusion will be ordered only in rare cases." *Semi-Tech Litig., L.L.C., v. Bankers Trust Co., 219 F.R.D. 324, 325 (S.D.N.Y. 2004).* Dr. Neufeld's testimony was central to defendant's case, and I did not find preclusion to be warned. That finding was well within my discretion.

**F. Testimony of Defendant's Damages Expert**

Plaintiff claims I erred by allowing Kenneth Bucher to testify for the defendant on the damage to the Cathedral caused by the fire. Plaintiff argues that Bucher was not qualified to testify as an expert on the subject of damages, and that certain portions of his testimony concerning "actual cash value" should have been stricken, because plaintiff contends that concept was irrelevant to the calculation of damages in this case. I need not reach plaintiff's argument regarding the [*22] admissibility of Bucher's testimony because the jury did not reach the question of damages. The jury returned a verdict for the defendant based on their finding that Trippe's product was not defective. (Tr. 932).

**III. CONCLUSION**

For the reasons set forth above, plaintiff's motion for a new trial is DENIED. The Clerk of the Court is directed to close this motion and remove this case from my docket.

**SO ORDERED.**

**December 19, 2005**

**New York, New York**

**U.S.D.J.**

---

[10]   While Neuhalfen, who was not employed by Trippe, may not have been in such a position, any error in allowing Neuhalfen to respond to defense counsel's single question on the subject did not significantly prejudice plaintiff, particularly since Seid had already testified to the lack of prior fires.

Ⓐ Neutral

As of: April 27, 2016 11:48 AM EDT

# *United States v. District Council*

United States District Court for the Southern District of New York

September 8, 1993, Decided ; September 10, 1993, Filed

90 Civ. 5722 (CSH)

**Reporter**

1993 U.S. Dist. LEXIS 12597

UNITED STATES, v. DISTRICT COUNCIL OF NEW YORK CITY AND VICINITY OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, et. al., Defendants.

## Core Terms

depose, discovery

## Case Summary

### Procedural Posture

Defendant sought an order pursuant to *Fed. R. Civ. P. Rule 37(b)(2)(B)*, precluding the government from offering the testimony of a certain individual, who was described by the government as the former acting boss of an organized crime family, at trial.

### Overview

The government sought to offer the testimony of a certain individual, who was described by the government as the former acting boss of an organized crime family, at trial against defendant. Defendant, pursuant to *Fed. R. Civ. P. 37(b)(2)(B)*, sought an order to preclude the government from offering the individual's testimony because of the government's failure to identify that individual as a person with knowledge of the allegations made in the complaint until several months following the close of discovery. The government contended that it informed defendant that the individual was a potential witness as soon as it became aware that he had knowledge relevant to the litigation, and any prejudice to defendant stemmed from their failure and refusal to depose him over the last four months. On ruling, the court denied defendant's request for such an order. The court found defendant's arguments unpersuasive. The court noted that defendant was aware of the government's intention to offer the individual as a witness, and in the ensuing four-month period, it never

sought to depose him nor did it seek an order precluding his testimony.

### Outcome

The court denied defendant's request to preclude the testimony of a government witness.

## LexisNexis® Headnotes

Civil Procedure > Discovery & Disclosure > General Overview

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

*HN1* The district court has wide discretion in punishing failure to conform to the rules of discovery. In exercising that discretion, the district court should consider four factors: (1) the explanation, if any, for failure to name the witness; (2) the importance of the testimony of the witness; (3) the need for time to prepare to meet the testimony; and (4) the feasibility of a continuance.

**Judges:** [*1] Haight, Jr.

**Opinion by:** CHARLES S. HAIGHT, JR.

## Opinion

*MEMORANDUM OPINION AND ORDER*

*HAIGHT, District Judge:*

Defendant District Council seeks an order pursuant to *Rule 37(b)(2)(B), Fed. R. Civ. P.*, precluding the Government from offering the testimony of Alphonse D'Arco at trial.

Defendant argues that the testimony should be precluded, citing the Government's failure to identify D'Arco as a person with knowledge of the allegations

1993 U.S. Dist. LEXIS 12597, *2

made in the complaint until several months following the close of discovery. The Government contends that it informed the defendants that D'Arco was a potential Government witness as soon as it became aware that he had knowledge relevant to this litigation, and any prejudice to the defendants stems from their failure and refusal to depose him over the last four months.

*BACKGROUND*

D'Arco is described by the Government as the former Acting Boss of the Luchese Organized Crime Family. In September 1991, D'Arco became a cooperating witness for the Government, and entered the Federal Witness Protection Program. According to the Government, the Assistant United States Attorneys (the "AUSAs") handling this case sought to interview D'Arco in early 1992. They were informed **[*2]** that because of security considerations and D'Arco's testimony in a number of federal criminal cases, they could not have access to him at that time. Following repeated requests, the AUSAs on this case were permitted to interview D'Arco in March of 1993. After determining that D'Arco possessed knowledge relevant to this litigation, the AUSAs sought authorization to make D'Arco available to the defendants for a deposition. This authorization was granted in late April 1993. By letter dated April 30, 1993, the Government informed the defendants that D'Arco was a potential witness, and would be available for deposition.

District Council contends that the Government's designation of D'Arco as a potential witness in April 1993 came too late. In September 1992, District Council had served interrogatories requiring the Government to identify witnesses with knowledge of the allegations made in the complaint. The Government's response in October 1992 made no mention of D'Arco, nor did any of the Government's supplementary responses. Discovery was closed with the exception of a few minor issues in late December 1992.

District Council essentially makes two arguments in support of its motion for **[*3]** preclusion. First, it contends that the Government's failure to identify D'Arco prior to the close of discovery is not excusable. Since 1991, D'Arco was in the exclusive control of the Government as a cooperating witness; the AUSAs' inability to

interview him is attributable to the Government. "If someone at the Department of Justice decided that the instant case had a lower priority in terms of access to D'Arco than other cases, the Government must live by the natural consequences of that decision." District Council's Mem. of Law, at 6. And notwithstanding the difficulty in getting access to D'Arco, there was nothing preventing the Government from identifying D'Arco as a potential witness with knowledge, even before it interviewed him.

District Council also contends that the failure to identify D'Arco until late April 1993 severely prejudices them. Unlike other "late-identified" witnesses, D'Arco's testimony will go right to the heart of the allegations in the complaint -- whether the District Council is controlled by organized crime. The inability to question previously deposed witnesses about D'Arco and his allegations is highly prejudicial.

*DISCUSSION*

**HN1** The district court has **[*4]** wide discretion in punishing failure to conform to the rules of discovery. *Outley v. City of New York,* [1] *837 F.2d 587, 590 (2d Cir. 1988),* citing *National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639, 643, 49 L. Ed. 2d 747, 96 S. Ct. 2778 (1976).* In exercising that discretion, the district court should consider four factors: the explanation, if any, for failure to name the witness; the importance of the testimony of the witness; the need for time to prepare to meet the testimony; and the feasibility of a continuance. *Outley,* 837 F.2d at 590. Applying those factors to the case at bar, I conclude that D'Arco's testimony should not be precluded.

The Government **[*5]** has explained that it could not get access to D'Arco despite the fact that he was in custody. While this may reflect some poor decisions by D'Arco's "keepers", it does not demonstrate any bad faith on the part of the Government.

D'Arco also appears to be an important witness for the Government. District Council itself concedes that his testimony will "go to the heart of the Government's primary allegation -- that the District Council is controlled by organized crime." District Council's Mem. of Law at 6.

---

[1]   *Outley* actually involved the remedies for failure to comply with discovery pursuant to **Rule 26(e), Fed. R. Civ. P.**, rather than **Rule 37**. The *Outley* court, however, recognized the similarities between **Rules 26(e)** and **37**, and relied heavily on cases interpreting **Rule 37** in its analysis.

1993 U.S. Dist. LEXIS 12597, *5

The third factor, the need for time to prepare to meet the testimony, goes to the prejudice suffered by the opposing party. *Outley,* 837 F.2d at 591. The Government informed District Council of D'Arco's availability in late April 1993, before a trial date had even been set. District Council could have deposed D'Arco sometime in the four months between April and the filing of this preclusion motion. It chose not to do so for tactical reasons, preferring instead to rely on its theory of preclusion. *See* letter dated May 7, 1993, from counsel for the District Council to the Government. [2] The tactic backfired because it did not give sufficient consideration **[*6]** to the *Outley* factors.

While District Council would not have been able to query previously deposed witnesses about D'Arco and his knowledge, this prejudice is minimal, and certainly not enough to support preclusion.

The fourth factor, possibility of a continuance, is not implicated here, where the witness was identified more than four months prior to the start of trial.

District Council was aware of the Government's intention to offer D'Arco as a witness since April 1993. In the ensuing four month period, it never sought to depose him, nor did it seek an order precluding his testimony. I find District Council's arguments unpersuasive. Its motion to preclude D'Arco's testimony is denied.

It is SO ORDERED.

Dated: New York, New York

September 8, 1993

CHARLES S. HAIGHT, JR.

U.S.D.J.

---

[2]   Indeed, counsel for defendant Devine had initially planned to depose D'Arco, until he learned of District Council's position.

🛈 Cited
As of: April 27, 2016 11:49 AM EDT

## *Doe v. Hartford Roman Catholic Diocesan Corp.*

Superior Court of Connecticut, Judicial District of Waterbury, Complex Litigation Docket at Waterbury

May 9, 2014, Decided

X10UWYCV105015963

**Reporter**
2014 Conn. Super. LEXIS 1123

Jane Doe v. Hartford Roman Catholic Diocesan Corp.

**Notice:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

## Core Terms

conspiracy, servant, sexual, allegations, fiduciary duty, doctrine of respondeat superior, fiduciary, courts, summary judgment motion, summary judgment, material fact, matter of law, aided-in-agency

**Judges:** [*1] Kari A. Dooley, Judge.

**Opinion by:** Kari A. Dooley

## Opinion

*MEMORANDUM OF DECISION RE MOTION FOR SUMMARY JUDGMENT (#432)*

Preliminary Statement

This action arises out of the alleged sexual abuse of the plaintiff by a lay teacher at Our Lady of Mt. Carmel School when the plaintiff, now an adult, was in fifth grade. The school was operated by the defendant, the Church of Our Lady of Mount Carmel, which church is within the province of the defendant Hartford Roman Catholic Diocesan Corporation.[1] Counts one and two of the complaint, which are not at issue in this motion for summary judgment, allege both negligence and recklessness on the part of the defendants. The defendants move for summary judgment as to counts three through six which allege: (3) liability premised on

an "aided in agency" theory; (4) breach of fiduciary duty; (5) liability premised on a theory of respondeat superior; (6) conspiracy to commit fraud. The plaintiff has opposed the motion. Oral argument was held on January 16, 2014. For the reasons set forth below, the motion is GRANTED in part and DENIED, in part.

Standard of [*2]  Review

A party seeking summary judgment has the very heavy burden of demonstrating the absence of any genuine issue of material facts which, under applicable principles of law, entitle him to judgment as a matter of law. *PB §17-49*; *Appleton v. Board of Education, 254 Conn. 205, 757 A.2d 1059 (2000)*. Conversely, the party opposing such a motion must provide an evidentiary foundation to show the existence of a genuine issue of material fact. *Id*. This evidentiary foundation must be demonstrated with counter-affidavits and concrete evidence. *Pion v. Southern New England Telephone, 44 Conn.App. 657, 663, 691 A.2d 1107 (1997)*. A party's conclusory statements may not be sufficient to establish the existence of a disputed material fact, even if in affidavit form. *Gupta v. New Britain General Hospital, 239 Conn. 574, 583, 687 A.2d 111 (1996)*.

Discussion

Count Three—Liability Based upon an "Aided in Agency" Theory

An aided-in-agency theory of vicarious liability is a basis upon which to hold an employer liable for the acts of the employee. Here, plaintiff seeks to hold the defendants liable for the acts of J.I. In essence, the aided-in-agency theory of vicarious liability is an exception to the limits set on liability imposed under the doctrine of *respondeat superior*. Under the doctrine of *respondeat superior*, discussed *infra*., an employer may be held liable for the

---

[1]  The plaintiff also brought claims against the Daughters of Wisdom, an Order of nuns, many of whom were teachers at the school.

2014 Conn. Super. LEXIS 1123, *3

intentional acts of an employee if the employee was acting **[*3]** within the scope of his employment and the conduct in question was in furtherance of the employer's business. See, *A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 208, 579 A.2d 69 (1990)*. However, under the aided-in-agency theory, an employer may be held liable for the intentional acts of an employee, even if that employee is acting outside the scope of his or her employment or not in furtherance of the employer's business, if the employee "was aided in accomplishing the tort by the existence of the agency relation." *Restatement (Second) of Agency §219(2)(d)* (1958) ("A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless . . . (d) the servant . . . he was aided in accomplishing the tort by the existence of the agency relation").[2]

In the limited situation of a supervising employee committing an intentional tort against a subordinate employee, i.e. harassment, some courts have recognized liability even if the supervising employee was acting outside the scope of his employment or was not acting in furtherance of the employer's business. See, e.g., *Burlington Industries v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)*; *Motzer v. Global Associates, 2001 WL 811713 (Conn.Super. June 19, 2001) [30 Conn. L. Rptr. 25, 2001 Conn. Super. LEXIS 1691]*.[3] Connecticut courts have never, however, recognized an aided-in-agency **[*4]** theory of liability outside this narrow employment context and certainly have not recognized such liability under circumstances such as those presented here. Indeed, this court finds persuasive the well-reasoned decisions of several trial courts who have noted this fact and rejected these claims, as a matter of law. *Doe v. St. Francis Hospital, Dkt. No. X02 UWY CV 085008551, 2011 Conn. Super. LEXIS 3355, judicial district of Waterbury (June 2, 2011, Shaban, J.)*; *Jean-Charles v. Perlitz, 937 F.Sup.2d 276, 287 n.9 (D.Conn. 2013)*; *Lara v. Legionaries of Christ, judicial district of Hartford, Dkt. No. X03 CV 106016974, 2011 Conn. Super. LEXIS 2166 (August 30, 2011, Miller, J.)*. See also, *Doe v. Hartford Roman Catholic Diocesan Corp., 2014 Conn. Super. LEXIS 1137, judicial district of Hartford, Dkt. No. CV 115035749, (January 7, 2014, Peck, J.)* Dkt. Entry.

No. 127.86. The motion for summary judgment as to count three is therefore granted.

Count Four—Breach of Fiduciary Duty

The defendant seeks summary judgment as to count four on the grounds that, as a matter of law, the defendants **[*5]** owed no fiduciary duty to the plaintiff.

It is axiomatic that in order for there to be a breach of fiduciary duty, a fiduciary relationship must exist in the first instance. *Ahern v. Kappalumakkel, 97 Conn.App. 189, 194, 903 A.2d 266 (2006)*. A fiduciary relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other. *Dunham v. Dunham, 204 Conn. 303, 322, 528 A.2d 1123 (1987)*; *Worobey v. Sibieth, 136 Conn. 352, 359, 71 A.2d 80 (1949)*. While negligence implicates a duty of care, fiduciary duty implicates a duty of loyalty and honesty. *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin, 247 Conn. 48, 56-57, 717 A.2d 724 (1998)*. The superior position of the fiduciary affords him the opportunity to abuse the trust placed in him. *Dunham v. Dunham, supra*, citing, D. Dobbs, Remedies (1973) 10.4, p. 682.

Rather than defining a fiduciary relationship with precision and in such a manner to exclude new situations, the Supreme Court has left open the possibility of a fiduciary relationship being established in a variety of situations in which there is a justifiable trust confided on one side and a resulting influence on the other. *Elm City Cheese Co. v. Federico, 251 Conn. 59, 99, 752 A.2d 1037 (1999)*. See also, *Alaimo v. Royer, 188 Conn. 36, 41, 448 A.2d 207 (1982)*. Our appellate courts have not answered the question of whether, under appropriate circumstances, a school can be found to have a fiduciary duty to its students. As noted by Judge Arterton in 2010, "[t]he Court's **[*6]** research has not revealed a single case in any state or federal court within the Second Circuit holding or even suggesting that a secondary school—public or private, boarding or day-session—or its employees owe a fiduciary duty to its students." *Bass ex rel. Bass v. Miss*

---

[2]   The Restatement (Third) of Agency has since removed the aided-in-agency basis for an employer's liability altogether. See, Restatement (Third) of Agency, §7.08, comment b.

[3]   These decisions were premised upon an interpretation or discussion of the Restatement (Second) of Agency. The promulgation of the Restatement (Third) of Agency which removed the provision under discussion arguably renders them obsolete in modern agency jurisprudence.

2014 Conn. Super. LEXIS 1123, *6

*Porter's School, 738 F.Sup.2d 307, 330 (2010).* However, at least one case involving the sexual abuse of a minor by a teacher survived motions to strike such claims in order for the development of additional facts on the issue. *Doe v. Terwilliger, 2010 WL 2926168 (Conn.Super. June 8, 2010) [50 Conn. L. Rptr. 1, 2010 Conn. Super. LEXIS 1597].* In *Golek v. St. Mary's Hospital, Inc., Superior Court, complex litigation docket at Waterbury, No. X02 CV 08 5008961, 2010 Conn. Super. LEXIS 600 (March 12, 2010, Eveleigh, J.),* after reviewing several of the cases relied upon the parties in this action, the court noted that the courts attach significance to the fact that the plaintiff was a minor but concluded that "something more" than a student-teacher relationship was required. In affirming the trial court, the appellate court held: "[The evidence] does not suffice to establish anything other than a form of a student-teacher relationship. We know of no case, and the plaintiff has cited none, to support the proposition that such a relationship, without something more, was fiduciary in nature or that [the defendant] should be deemed to **[*7]** have undertaken a duty 'to act primarily for the benefit of the plaintiff.'" *Golek v. St. Mary's Hospital, Inc., 133 Conn.App. 182, 198, 34 A.3d 452 (2012).*

On this question, the court finds a genuine issue of material fact. The motion for summary judgment as to count four is denied.[4]

Count Five—Respondeat Superior for the acts of J.I.

In Count Five, the plaintiff alleges, at least in part, that the defendants are liable for the acts of the teacher who molested her under the doctrine of *respondeat superior.*

> Under the doctrine of respondeat superior, a master is liable for the wilful torts of his servant committed within the scope of the servant's employment and in furtherance of his master's business . . . The master is not held on any theory that he personally interferes to cause the injury. It is simply on the ground of public policy, which requires that he shall be held responsible for the acts of those whom he employs, done in and about his business, even though such acts are directly in conflict with the orders which he has given them on the subject . . . [I]n order to hold an employer liable for **[*8]** the intentional torts of his employee, the employee must be acting within the scope of his employment

and in furtherance of the employer's business . . . But it must be the affairs of the principal, and not solely the affairs of the agent, which are being furthered in order for the doctrine to apply. (Citations omitted; internal quotation marks omitted.) *Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480, 500-01, 656 A.2d 1009 (1995).*

*Cornelius v. Department of Banking, 94 Conn.App. 547, 557, 893 A.2d 472 (2006).* "'[I]n the course of his employment' means while engaged in the service of the master, and it is not synonymous with the phrase 'during the period covered by his employment' . . . Thus, it must be the affairs of the principal [or master], and not solely the affairs of the agent [or servant], which are being furthered in order for the doctrine to apply." (Citations omitted; internal quotation marks omitted.) *Matthiessen v. Vanech, 266 Conn. 822, 839 n.15, 836 A.2d 394, (2003).* "'Ordinarily, it is a question of fact as to whether a wilful tort of the servant has occurred within the scope of the servant's employment and was done to further the master's business . . . But there are occasional cases where a servant's digression from duty is so clear-cut that the disposition of the case becomes a matter of law.' (Citation omitted; internal quotation marks omitted.) *A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 207, 579 A.2d 69 (1990).*" *Mullen v. Horton, 46 Conn.App. 759, 765, 700 A.2d 1377 (1997).*

When an employee engages in sexual misconduct **[*9]** toward a minor or a ward, courts generally reject efforts to hold the employer liable under the doctrine of *respondeat superior* on the basis that the "sexual assaults . . . were repugnant to his employer's business and in utter contravention of the employer's aims and rules. Unlike a situation in which a servant performs the master's work poorly or misunderstands what the master wants done, the molestation of children is a total abdication of the master's work so that the [employee] can satisfy personal lust." *Doe v. Norwich Roman Catholic Diocesan Corp., 49 Conn. Supp. 667, 671, 909 A.2d 983 (2006).* The same can certainly be said about J.I.'s alleged conduct toward the plaintiff in this case. See also, *Gutierrez v. Thorne, 13 Conn.App. 493, 499, 537 A.2d 527 (1988)* (the department of mental retardation was not liable under *respondeat superior* when a person who was assigned to counsel mentally retarded clients regarding life skills sexually assaulted a client.); *Doe v. Norwich Roman Catholic Diocesan*

---

[4]   Nothing herein will preclude the defendants, upon completion of the plaintiff's case and after a full factual development of this issue, from seeking a directed verdict.

*Corp., 268 F.Sup.2d 139, 142 (D.Conn. 2003)*; *Nutt v. Norwich Roman Catholic Diocesan*, 921 F. Supp. 66, 71 (D.Conn. 1995); *Sparano v. Daughters of Wisdom, Inc., Superior Court, complex litigation docket at Stamford, Docket No. X08 CV 03 0199399 (July 1, 2004, Adams, J.) (37 Conn. L. Rptr. 422, 424, 2004 Conn. Super. LEXIS 1808, *2*; *Dumais v. Hartford Roman Catholic Diocese, Superior Court, complex litigation docket at Tolland, Docket No. X07 CV 01 0077631 (July 31, 2002, Sferrazza, J.) (32 Conn. L. Rptr. 693, 693, 2002 Conn. Super. LEXIS 2682, *2)*; *Doe v. Hartford Roman Catholic Diocesan Corp., 45 Conn. Supp. 388, 394-95, 716 A.2d 960 (23 Conn. L. Rptr. 34) (1998)*; *Doe v. Norwich Roman Catholic Diocesan Corporation, 1996 WL 409283 (June 27, 1996, Stengel, J.) [17 Conn. L. Rptr. 277, 1996 Conn. Super. LEXIS 1632]*.

The cases relied upon by the plaintiff are inapposite. To the extent that Count Five alleges liability against these **[*10]** defendants for the sexual misconduct of J.I., those claims fail, as a matter of law, for the reasons stated above. However, this court is of the view that "summary judgment" as to only a portion of the allegations in Count Five is not procedurally proper. The court therefore rules that the jury will not be charged and the plaintiff will be precluded from arguing that the defendants are vicariously liable for J.I.'s sexual misconduct under the doctrine of *respondeat superior*.

Count Six—Conspiracy

The plaintiff's sixth count alleges a wide reaching conspiracy to conceal acts of sexual abuse by priests and others employed by or associated with the Roman Catholic Church. Plaintiff argues that the count alleges a conspiracy to commit fraud and that genuine issues of material fact abound as to these allegations. The defendants challenge not only the sufficiency of the pleading but also aver that the plaintiff's proof is devoid of any connection between the purported conspiracy and the events surrounding this case or these defendants.

Civil Conspiracy is not an independent cause of action in tort. *Macomber v. Travelers Property and Casualty Corp., 277 Conn. 617, 636, 894 A.2d 240 (2006)*; *Laro-*

*bina v. McDonald, 274 Conn. 394, 408, 876 A.2d 522 (2005)*. A civil conspiracy claim is a mechanism for obtaining damages from those who knew about, joined **[*11]** in and furthered the commission of the injury producing tort. *Id.* ("The essence of a civil conspiracy . . . [is] two or more persons acting together to achieve a shared goal that results in injury to another"). Indeed, plaintiffs must establish: (1) a combination between two or more persons; (2) to do an unlawful act by unlawful means; (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of its object; and (4) damages. *Id. 635-36*. A claim for civil conspiracy must be joined with an allegation of a substantive tort. *Id.*; *Litchfield Asset Management Corp. v. Howell, 70 Conn.App. 133, 140, 799 A.2d 298 (2002)* (same).

Here, plaintiff avers that she has alleged a conspiracy to defraud the plaintiff (and others) by concealing her allegations of sexual abuse. She does not bring a substantive fraud count.[5] The evidence relied upon as it relates specifically to this case is the allegation that the abuse continued after she disclosed it to the defendants; they did not report it to anyone, to include parents or the police; they did not discipline or remove J.I. The inference to be drawn from this conduct, plaintiff avers, is that the defendants conspired to conceal it. She further relies upon purported policies and practices of the USCCB to conceal instances **[*12]** of abuse by clergy and others.[6] Plaintiff cites no evidence that any of the USCCB policies and practices were ever communicated to these defendants; that these defendants were aware of any such practices or policies; that the defendants here ever discussed the plaintiff's allegations with anyone at the USCCB. Further, failure to take action, as alleged, is not an adequate evidentiary basis upon which to infer the conspiracy to commit fraud alleged here. To conclude the existence of such a conspiracy from such evidence would require rampant speculation.

The motion for summary judgment as to count six is granted.

Kari A. Dooley, Judge

---

[5]   It is not clear to this court that the conspiracy count states a cause of action for conspiracy to commit fraud. For purposes of this decision, the court has accepted plaintiff's construction of the count.

[6]   The article submitted by plaintiff is not competent evidence and is therefore disregarded. Only evidence that would be admissible at trial may be used to support or oppose a motion for summary judgment. *Great Country Bank v. Pastore*, 241 Conn. 423, 436, 696 A.2d 1254 (1997).

ⓘ Cited
As of: April 27, 2016 11:50 AM EDT

# *Motzer v. Global Assocs.*

Superior Court of Connecticut, Judicial District of New Haven, at New Haven

June 19, 2001, Decided ; June 19, 2001, Filed

448495

**Reporter**
2001 Conn. Super. LEXIS 1691

Robin Motzer v. Global Associates

**Notice:** **[*1]** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**Disposition:** Motion to strike denied.

## Core Terms

alleges, agency relationship, motion to strike, Counts, amended complaint, harassment, sexual, intentional infliction of emotional distress, negligent infliction of emotional distress, affirmative defense, hostile environment, employment action, circumstances, victimized, tangible, REVISED, kitchen, remarks, servant, aided

## Case Summary

### Procedural Posture
Plaintiff employee sued defendant employer, alleging six counts arising out of sexual harassment by her supervisor. The employer moved to strike the counts alleging intentional and negligent infliction of emotional distress.

### Overview
The employee alleged that her immediate supervisor sexually harassed her. She alleged that she complained, but that she was repeatedly told that she shouldn't talk back to the supervisor. She also alleged that the employer had knowledge of the supervisor's offensive remarks but that it instructed her to remain working side-by-side with the supervisor. The court applied the Ellerth test, which allowed vicarious liability for an actionable hostile environment created by a supervisor with immediate authority over the employee.

### Outcome
The motion was denied.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Strike > General Overview

*HN1* On a motion to strike, the facts alleged in the amended complaint must be taken as true.

Business & Corporate Law > Agency Relationships > Agents Distinguished > General Overview

Business & Corporate Law > ... > Agents Distinguished > Independent Contractors, Masters & Servants > General Overview

Business & Corporate Law > ... > Agents Distinguished > Independent Contractors, Masters & Servants > Masters & Servants

Business & Corporate Law > ... > Duties & Liabilities > Authorized Acts of Agents > Liability of Principals

Business & Corporate Law > ... > Duties & Liabilities > Negligent Acts of Agents > General Overview

Business & Corporate Law > ... > Duties & Liabilities > Negligent Acts of Agents > Acts Outside Scope of Authority

Business & Corporate Law > ... > Duties & Liabilities > Negligent Acts of Agents > Liability of Principals

Labor & Employment Law > ... > Sexual Harassment > Scope & Definitions > General Overview

Torts > ... > Employers > Scope of Employment > General Overview

*HN2* In the context of a sexual harassment claim brought under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, liability is imposed on a master for the torts of his servants acting outside the scope of their employment if the servant was aided in accomplishing the tort by the existence of the agency relation.

2001 Conn. Super. LEXIS 1691, *1

Administrative Law > Agency Rulemaking > Rule Application & Interpretation > General Overview

Torts > Vicarious Liability > Agency Relationships > General Overview

**HN3** The agency relation rule most clearly applies when the supervisor in question uses tangible employment actions to bring the official power of the enterprise to bear on subordinates.

Labor & Employment Law > ... > Sexual Harassment > Defenses > General Overview

Labor & Employment Law > ... > Sexual Harassment > Defenses > Antiharassment Policy

Labor & Employment Law > ... > Sexual Harassment > Employer Liability > General Overview

Labor & Employment Law > ... > Sexual Harassment > Employer Liability > Harassment by Supervisors

Labor & Employment Law > ... > Harassment > Sexual Harassment > Hostile Work Environment

Torts > Vicarious Liability > Agency Relationships > General Overview

Torts > Vicarious Liability > Employers > General Overview

Torts > ... > Employers > Activities & Conditions > General Overview

**HN4** An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. There exists an affirmative defense that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior and, additionally, that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

**Judges:** Jon C. Blue, Judge of the Superior Court.

**Opinion by:** Jon C. Blue

# Opinion

MEMORANDUM OF DECISION RE DEFENDANT'S REVISED MOTION TO STRIKE (No. 106)

The motion to strike now before the court presents a narrow but important question of the law of agency. In a corporate setting, when a supervisor of a corporate employee intentionally or negligently inflicts emotional distress upon that employee, under what circumstances is the corporation itself liable for the tort? Following the lead of the Supreme Court in *Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998)*, I hold that the facts alleged here are sufficient to state a cause of action against the corporation.

Because the issue arises **HN1** on a motion to strike, the facts alleged in the amended complaint must be taken as true. The plaintiff, Robin Motzer, alleges that in 1998 and 1999 she was employed by the defendant, Global Associates ("Global"), as a cook. Global also employed one Frank **[*2]** Sacco as a kitchen manager and gave Sacco supervisory authority over Motzer. Motzer alleges that for a period of several months, Sacco subjected her to an unremitting barrage of explicit and highly offensive sexual remarks. She claims that she complained about this situation to higher level Global employees on numerous occasions only to be told "Don't talk back to Sacco." She further alleges that Global had "knowledge" that Sacco was making these remarks, "yet it instructed her to remain in the kitchen with Sacco . . . working [with him] side by side." Motzer additionally alleges that Global "failed to take any proactive steps to prevent said harassment."

Motzer commenced this action against Global on February 16, 2001 by service of process. Her Amended Complaint consists of six counts, but only the Fifth and Sixth Counts are in question here. The Fifth Count alleges that Global in the actions just recounted committed the tort of intentional infliction of emotional distress. The Sixth Count alleges that Global committed the tort of negligent infliction of emotional distress. On June 5, 2001, Global filed the revised motion to strike now before the court. The motion was heard **[*3]** on June 18, 2001.

The problem before the court was significantly refined at the hearing. Global concedes that Sacco's actions, if proven, were sufficiently egregious to satisfy the "extreme and outrageous" element of the torts of intentional and negligent infliction of emotional distress. The sole question is the extent to which Sacco's actions can be appropriately attributed to Global itself.

In *Burlington Industries, Inc. v. Ellerth, supra*, the Supreme Court confronted this problem **HN2** in the context of a sexual harassment claim brought under

2001 Conn. Super. LEXIS 1691, *3

Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* The Court analyzed the problem by reference to *RESTATEMENT (SECOND) OF TORTS § 219*. It drew particular attention to the provision of *§ 219(2)(d)* imposing liability on a master "for the torts of his servants acting outside the scope of their employment" if "the servant . . . was aided in accomplishing the tort by the existence of the agency relation." The court reasoned that in cases like *Ellerth*, "the Restatement's aided in the agency relation rule . . . appears to be the appropriate form of analysis." *524 U.S. at 760.* **[*4]**

**HN3** The agency relation rule most clearly applies when the supervisor in question uses tangible employment actions to bring the official power of the enterprise to bear on subordinates. *524 U.S. at 762.* Here as in *Ellerth*, however, no tangible employment action has occurred. The application of the agency relation rule in these circumstances "is less obvious." *Id. at 763.* The agency relation standard "is a developing feature of agency law." *Id. Ellerth* adopts the rule that **HN4** "an employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Id. at 765.* *Ellerth* then creates an affirmative defense that "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and, additionally, that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

*Ellerth* articulates the federal law of Title VII actions and does not, as a formal matter, **[*5]** govern state common law torts such as the intentional infliction of emotional distress. The genius of the common law, however, is its capacity to develop. See *Goodrich v. Waterbury Republican-American, Inc., 188 Conn. 107, 127, 448 A.2d 1317 (1982).* *Ellerth*, although nominally a statutory case, stands in the highest tradition of common law decision making, striking a fair balance between the interests of employees and employers in a developing area of the law. Its reasoning is fully applicable here. (It must be emphasized, however, that the motion now before the court offers no opportunity to consider the viability of *Ellerth*'s affirmative defense.)

The allegations of the Fifth and Sixth Counts of the Amended Complaint paint a vivid picture of a victimized employee forced by her knowing employer to continue to work in an aggressively hostile environment created by a supervisor with immediate authority over her. If the plaintiff's allegations are true, Global's knowing actions, forcing her to work in an environment of almost bestial depravity, were themselves sadistic. "Once conduct such as that [alleged] here becomes a regular pattern of behavior and **[*6]** continues despite the victim's objection and attempts to remedy the situation, it can no longer be tolerated." *GTE Southwest, Inc. v. Bruce, 998 S.W.2d 605, 617 (Tex. 1999).* Motzer's allegations in the Fifth and Sixth Counts easily satisfy the elements of the alleged torts and of the *Ellerth* test.

The motion to strike is denied.

Jon C. Blue

Judge of the Superior Court

ⓘ  Cited
As of: April 27, 2016 11:51 AM EDT

## *Doe v. St. Francis Hosp. & Med. Ctr., Inc.*

Superior Court of Connecticut, Complex Litigation Docket at Waterbury

June 2, 2011, Decided

DOCKET NO. X02 UWY CV 08 5008551

**Reporter**
2011 Conn. Super. LEXIS 3355

TIM DOE # 1, ET AL. v. ST. FRANCIS HOSPITAL AND MEDICAL CENTER, INC., ET AL.

**Notice:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

## Core Terms

fiduciary duty, aided-in-agency, genuine issue of material fact, argues, patient, summary judgment, parties, sexual abuse, special duty, fiduciary relationship, assurances, cases, alleges, custody, matter of law, breach of fiduciary duty, statute of limitations, sexual assault, appointments, internal quotation marks, summary judgment motion, respondeat superior, memorandum, provides, limitations period, judicial district, negligence claim, present motion, contends, courts

**Judges:**  [*1] Shaban, J.

**Opinion by:** Shaban

## Opinion

**MEMORANDUM OF DECISION**

**Re: Defendant's Motion for Summary Judgment #122**

On November 25, 2009, the plaintiff, Tim Doe #1, joined in the filing of an amended uniform complaint (the complaint) in the present matter.[1] The complaint alleges six claims against the defendant, St. Francis Hospital and Medical Center, Inc. (St. Francis), the first five of which are relevant to Doe. In this complaint, the plaintiff alleges that Dr. George Reardon (Reardon), who was an endocrinologist at St. Francis, sexually abused him and other plaintiffs in related cases under the guise of conducting a human growth study (the "growth study").[2] The first uniform claim alleges corporate negligence for a breach of St. Francis' duty to sufficiently supervise, monitor and investigate the activities of Reardon. The second uniform claim alleges a breach of a fiduciary duty owed to him by virtue of St. Francis' approval and support of Reardon's "growth study." The third uniform claim alleges a breach of a special duty of care owed to children. The fourth uniform claim alleges vicarious liability under the "aided-in-agency relation doctrine," because Reardon was aided in accomplishing such acts through the [*2] existence of an agency relationship with St. Francis. Finally, under the fifth uniform claim, Doe alleges that St. Francis breached a fiduciary duty

---

[1] The court will refer to the plaintiff hereinafter as "Doe." Pursuant to case management orders issued in *Roe v. St. Francis Hospital and Medical Center, Inc.*, Superior Court, complex litigation docket at Waterbury, Docket No. X02 CV 08 5008330, this matter was to have been simultaneously tried with the claims of three other plaintiffs. A uniform complaint had been filed by the plaintiffs encompassing the facts and the liability theories common to all of the cases against St. Francis. The complaint refers to each cause of action as a "uniform claim for relief." Upon motion by St. Francis (#358), the four matters were severed by the court for individual trial. The individual complaint originally filed by Doe under docket no. CV 08 5008551 survives for the purpose of alleging facts and damages specific to him.

[2] For purposes of this motion, St. Francis does not contest that Reardon sexually abused Doe. See footnote 4 of St. Francis' motion for summary judgment (#122).

2011 Conn. Super. LEXIS 3355, *4

owed to him by intentionally concealing Reardon's conduct.[3]

On December 10, 2010, prior to issuance of the court's order severing the consolidated trial, St. Francis filed the present motion for summary judgment (#122), which includes the claims of Tim Doe #1. In its motion, St. Francis argues that the first claim (corporate negligence) and third claim (special duty owed to children) are grounded in negligence, and therefore, the three year statute of limitations under *General Statutes § 52-584* is applicable, rather than the statute of limitations provided by *General Statutes § 52-577d*, which allows a claim involving sexual abuse to be brought thirty years from the date of the age of majority. St. Francis maintains that the statute of limitations has expired, and therefore, as a matter of law, the first and third claims are not viable. As to the second and fifth claims (fiduciary duty), St. Francis argues that there is no such duty owed by it to Doe, and that even if there were, there is no evidence that it has been breached. As to the third claim, St. Francis argues that it is entitled to a judgment as a matter of law because Connecticut does not recognize [*4] a special duty to children. Finally, as to the fourth claim (aided-in-agency relation doctrine), St. Francis argues that this theory is applicable under Connecticut law only to claims arising from an employment relationship, and therefore, as a matter of law, this matter does not come under the umbrella of the doctrine.

On January 14, 2011, Doe filed an objection to the motion for summary judgment, claiming that there remain genuine issues of material fact as to each of the five claims.[4] On January 28, 2011, St. Francis filed a reply memorandum (#139). Oral argument was held before the court on February 7, 2011.

A review of additional procedural history is also relevant [*5] and necessary to the court's consideration of the present motion. St. Francis had previously filed a motion to strike portions of the complaint on February 16, 2010. In that motion, St. Francis argued, inter alia, that Connecticut does not recognize the aided-in-agency doctrine; that Connecticut does not recognize a special duty to children; and that Doe's fiduciary duty and intentional concealment claims were insufficient to state cognizable causes of action. The motion to strike was denied by the court, *Cremins, J.*, on June 15, 2010.

Pursuant to an order of the court issued February 17, 2010, Doe had been selected as one of four plaintiffs allegedly abused by Reardon to join in a consolidated trial against St. Francis.[5] St. Francis filed a motion to reconsider the order of consolidation on March 9, 2010, and its motion was denied on March 16, 2010. Thereafter, on December 22, 2010, having reserved the right to object to the trial of multiple parties before a single jury under case management order #7, paragraph 4, St. Francis filed a motion to sever the consolidated trials. That motion was granted on February 22, 2011. Doe's matter has been scheduled for trial on June 14, 2011.

With respect to the present motion, the parties have submitted voluminous documentation as to Doe's claims for the court's consideration. St. Francis has submitted as exhibits to its motion for summary judgment: the "In re: Saint Francis Hospital Litigation Claim Form" completed by Doe (Def.'s Ex. 1); transcript pages from the June 11, 2010 deposition of Doe (Def.'s Ex. 2); and its records of Doe's inpatient admission for rheumatic fever, dated December 11, 1971 (Def.'s Ex. 3).

In support of his objection, Doe [*7] has submitted voluminous documents, including, but not limited to, an affidavit, hospital records, public agency records, federal

---

[3]   As noted, there is [*3] a sixth uniform claim, but it is not applicable to Tim Doe #1, and the court therefore will not address it in deciding the present motion.

[4]   The objection was filed as pleading #376 under docket no. CV 08 5008330 and was fashioned as an "omnibus" objection consolidating the arguments applicable to the four plaintiffs and two alternates originally chosen for the consolidated trial. The exhibits were set forth in successive filings. The court severed the matters subsequent to the filing of the objection. The court is mindful of this fact and will only consider the arguments and evidentiary exhibits relevant to Doe's claim in its resolution of the present motion.

[5]   Specifically, [*6] the order stated: "The number of cases to be tried in the first group starting March 7, 2011 shall be four (4) as previously ordered. The parties shall determine the cases to be tried in the first group starting March 7, 2011, two (2) selected by plaintiffs and two (2) selected by defendants. The cases selected for trial in the first group starting March 7, 2011 shall be determined and disclosed to the court and the other parties on or before October 15, 2010." A series of case management orders were entered under a master docket, docket no. CV 08 5008330, to address and manage the multitude of lawsuits against St. Francis that had been brought by approximately 140 plaintiffs.

2011 Conn. Super. LEXIS 3355, *7

statutes, publications, correspondence and other records, including some that were sealed by the court. These submissions include, but are not limited to: "Use of Humans in Research, General Assurance to Department of Health, Education and Welfare by St. Francis Hospital," dated August 22, 1975 (the 1975 assurances) (Pl.'s Ex. 1); an affidavit given by a woman who filed a complaint on behalf of her child against Reardon with the Hartford County Medical Association (HCMA) in 1970 (the 1970 complaint) (Pl.'s Ex. 4); "Institutional Assurance on Investigations Involving Human Research Subjects Including Clinical Research," dated April 25, 1967 (the 1967 assurances) (Pl.'s Ex. 22); the HCMA's record of complaints against Reardon (Pl.'s Ex. 39); a copy of a memorandum written by Dr. Joseph Sadowski (Pl.'s Ex. 40); a letter written by Reardon to the HCMA regarding the 1970 complaint (Pl.'s Ex. 41); a letter dated August 31, 1970 from Sadowski to Reardon, (Pl.'s Ex. 42); a letter dated October 6, 1970 from Sadowski to the attorney who represented the child who was [*8] the subject of the 1970 complaint (Pl.'s Ex. 45); and transcript pages from the June 11, 2010 deposition of Doe (Pl.'s Ex. 54).

With its reply memorandum, St. Francis has submitted additional exhibits, such as: a transcript page from the June 11, 2010 deposition of Doe (Def.'s Ex. 4); "Public Health Service Policy for the Protection of the Individual as a Subject for Investigation," issued by the U.S. Department of Health, Education and Welfare (Def.'s Ex. 6); transcript pages from the June 3, 2008 deposition of HCMA's executive director (Def.'s Ex. 7); an affidavit given by St. Francis' medical staff services manager on January 28, 2011 (Def.'s Ex. 8); transcript pages from the June 25, 2008 and July 16, 2008 depositions of the mother of the child who was the subject of the 1970 complaint (Def.'s Ex. 9); and a letter dated December 3, 1962 and written by the then-president of the HCMA (Def.'s Ex. 10).

DISCUSSION

I

Applicable Legal Standards

A

The Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a [*9] matter of law." *Practice Book § 17-49.* "In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue. . . . It is not enough, however, for [*10] the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under *Practice Book § [17-45].*" (Internal quotation marks omitted.) *Zielinski v. Kotsoris, 279 Conn. 312, 318-19, 901 A.2d 1207 (2006).*

"[S]ummary judgment is appropriate only if a fair and reasonable person could conclude only one way. . . . [A] summary disposition . . . should be on evidence which a jury would not be at liberty to disbelieve and which would require a directed verdict for the moving party. . . . [A] directed verdict may be rendered only where, on the evidence viewed in the light most favorable to the nonmovant, the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed." (Citations omitted; internal quotation marks omitted.) *Dugan v. Mobile Medical Testing Services, Inc., 265 Conn. 791, 815, 830 A.2d 752 (2003).* "In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact, but rather to determine whether any such issues exist." *Nolan v. Borkowski, 206 Conn. 495, 500, 538 A.2d 1031 (1988).*

B

2011 Conn. Super. LEXIS 3355, *10

The Law of the Case Doctrine

Doe contends that the court should not consider St. Francis' arguments regarding the cognoscibility of the second, third, fourth and fifth uniform claims because [*11] they were raised by St. Francis in its February 16, 2010 motion to strike and rejected by the court, *Cremins, J.*, in its June 15, 2010 denial of the motion. "Where a matter has been previously ruled upon interlocutorily, the court in a subsequent proceeding in the case may treat that decision as the law of the case, if it is of the opinion that the issue was correctly decided, in the absence of some new or overriding circumstance." *Breen v. Phelps, 186 Conn. 86, 99, 439 A.2d 1066 (1982)*. Nonetheless, "[a] judge is not bound to follow the decisions of another judge made at an earlier stage of the proceedings, and if the same point is again raised he has the same right to reconsider the question as if he himself made the original decision. . . . [O]ne judge may, in a proper case, vacate, modify, or depart from an interlocutory order or ruling of another judge in the same case, upon a question of law." (Internal quotation marks omitted.) *General Electric Capital Corp. of Puerto Rico v. Rizvi, 113 Conn. App. 673, 681, 971 A.2d 41 (2009)*.

Whereas Judge Cremins decided the motion to strike on the basis of the parties' arguments, the court will decide the present motion on the basis of not only the parties' arguments but also their evidentiary submissions. Cf. *Stein v. Lee, Superior Court, judicial district of New London, Docket No. CV 08 5009444, 2011 Conn. Super. LEXIS 65 (January 25, 2011, Martin, J.)* [*12] (concluding that "the denial of [a] motion to strike does not constitute the law of the case" in deciding motion for summary judgment); *Sound Post, LLC v. New Harvest Coffee Roasters, Inc., Superior Court, housing session at Bridgeport, Docket No. BRSP 056336, 2005 Conn. Super. LEXIS 1300 (May 6, 2005, Skolnick, J.)*. The court also notes that there is no articulation of Judge Cremins' order through a memorandum of decision denying the motion to strike. See *Righton v. Middletown, Superior Court, judicial district of Middlesex, Docket No. CV 07 5003336 (November 4, 2008, Jones, J.) (46 Conn. L. Rptr. 576, 2008 Conn. Super. LEXIS 2850)*. The court therefore does not consider itself bound by the prior decision and proceeds with considering the defendant's arguments regarding the cognoscibility of the second, third, fourth and fifth uniform claims.

II

Statute of Limitations as to:

First Uniform Claim: Corporate Negligence

Third Uniform Claim: Breach of Special Duty to Children

As to Doe's negligence claims, St. Francis argues that the three year limitations period applicable to negligence actions set forth in *§ 52-584*[6] applies to Doe's first and third uniform claims for relief and, thus, those claims are untimely. It argues that the extended limitations period for [*13] sexual abuse under *§ 52-577d* does not displace the three year limitations period found in *§ 52-584*. In support of its argument, St. Francis points to the language of *§ 52-577d*, which provides: "*Notwithstanding the provisions of [General Statutes §] 52-577*, no action to recover damages for personal injury to a minor, including emotional distress, caused by sexual abuse, sexual exploitation or sexual assault may be brought by such person later than thirty years from the date such person attains the age of majority.*" (Emphasis added.) St. Francis argues that, properly construed, *§ 52-577d* displaces the limitation period only for sex abuse claims that n would otherwise be governed by *§ 52-577*.[7]

Doe contends that his negligence claims were properly filed within the applicable limitations period. To support this conclusion, he points to a number of trial court decisions supporting application of the extended limitations period provided by *§ 52-577d* to negligence claims stemming from the sexual abuse of a minor. Doe argues that a plain reading of *§ 52-577d* supports a

[6]  Section 52-584 provides: "No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim [*14] may be interposed in any such action any time before the pleadings in such action are finally closed."

[7]  Section 52-577 provides: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

broad application of the extended limitations period to negligence claims predicated on sexual abuse of a minor and therefore that it is a "'harm-based' rule, not a 'form-of-action' based rule." He also argues that the doctrine of legislative acquiescence applies to the present matter because the application of *§ 52-577d* to supervisory negligence claims "has long been a matter of widespread public attention."

"Summary judgment may be granted where the claim is barred by the statute of limitations." *Doty v. Mucci, 238 Conn. 800, 806, 679 A.2d 945 (1996).* Summary judgment is appropriate on statute of limitations grounds when the "material facts concerning the statute **[*15]** of limitations [are] not in dispute." *Burns v. Hartford Hospital, 192 Conn. 451, 452, 472 A.2d 1257 (1984).*

In this instance, and for the purposes of this motion, there is no dispute that Doe was sexually abused by Reardon between the ages of eight and twelve, from approximately 1969 to 1972. St. Francis has not contested that, should *§ 52-577d* be applicable, Doe's claim would be within the statute of limitations. In the view of this court, a plain reading of *§ 52-577d* applies the extended limitations period to negligence claims predicated on sexual abuse. It is the nature of the harm that was done and not the form of the action that triggers the applicability of the statute. The court concurs with and adopts the reasoning of those trial courts interpreting *§ 52-577d* as applying to negligence claims arising out of the sexual abuse of a minor. See, e,g, *Lawson v. Lawson, Superior Court, judicial district of Litchfield, Docket No. CV 99 0080780, 2001 Conn. Super. LEXIS 132 (January 23, 2001, DiPentima, J.);* *Doe v. Norwich Roman Catholic Diocesan Corp., Superior Court, judicial district of Middlesex, Docket No. CV 93 69529, 1996 Conn. Super. LEXIS 1632 (June 26, 1996, Stengel, J.);* *Nutt v. Norwich Roman Catholic Diocese,* 921 F. Supp. 66 (D. Conn. 1995). Moreover, the court is not persuaded by St. Francis' argument that *§ 52-577d* creates an exception to only a single statute of limitations. "*Section 52-577* is the most general statute **[*16]** of limitations applicable to tort actions and provides the outside limitation of three years for all such actions, and this limitation is incorporated in *§ 52-584.* It is thus logical that *§ 52-577d* would only refer to the more general and maximum limitations period contained

in *§ 52-577,* and not to *§ 52-584." Almonte v. New York Medical College, 851 F. Supp. 34, 38 n.5 (D. Conn. 1994)* (applying *§ 52-577d* exception to *§ 52-584).* Here, although Doe's claims sound in negligent supervision, monitoring and retention of Reardon and breach of a special duty to protect Doe, those claims are based upon the underlying allegations of the sexual abuse of a minor (Doe) by Reardon as St. Francis' employee. Accordingly, the statute most logically applicable to the claims, which are predicated on sexual abuse, is *§ 52-577d.* As such, St. Francis' motion for summary judgment as to Doe's negligence claims under the first and third uniform claims, premised on the expiration of the statute of limitations, is denied.

III

Second Uniform Claim: Breach of Duties Based Upon a Fiduciary or Confidential Relationship

Fifth Uniform Claim: Breach of Fiduciary Duties and Intentional Concealment Activities

St. Francis moves for summary judgment on the second and fifth uniform claims, which sound in breach of fiduciary duty, on the ground that it is entitled **[*17]** to a judgment as a matter of law because no Connecticut court has held that a hospital owes a fiduciary duty to a patient. It further argues that even if this duty existed, it would not exist in the present action because Doe does not allege that he was abused by Reardon during any inpatient admission at St. Francis.[8] St. Francis argues in the alternative that there is no genuine issue of material fact that it breached any fiduciary duty that it owed to Doe because Doe has neither alleged nor presented evidence to show that St. Francis' conduct was dishonest or disloyal, which are necessary elements of a fiduciary duty claim.

Doe in turn objects to the motion, contending that St. Francis, as a research institution, owed a fiduciary duty to him not as a patient, but as **[*18]** a human research subject under Reardon's "growth study"; that the existence of a fiduciary duty is a question of fact that ought to be decided by a jury; and that he has alleged and presented evidence to show that St. Francis' conduct was disloyal because it prioritized its

---

[8]   The record provides that Doe was admitted as an inpatient at St. Francis twice when he was a child: once when he was eight or nine years old and once for rheumatic fever in December 1971. Doe remembers that he was brought to Reardon's office "on one of those occasions," but he does not claim that he was abused by Reardon during either inpatient admission. See Def.'s Ex. 2 at 248-51; Pl.'s Ex. 54 at 248-51; Def.'s Ex. 3.

2011 Conn. Super. LEXIS 3355, *18

institutional loyalty to Reardon over its duty to Doe. The basis for Doe's argument that he was owed a fiduciary duty as a human research subject is the drafting and/or submission of written assurances submitted by St. Francis to the federal government in 1967 and 1975, respectively, in which St. Francis promised to comply with federal regulations that pertained to the health, safety and well-being of persons who participated in research activities as subjects.[9] Pl.'s Ex. 1, 22. Because Doe's treatment history with Reardon ended in or around 1972, the court will not consider the 1975 assurances in addressing Doe's argument. Doe further contends that a breach of a fiduciary duty need not be a breach of a duty of honesty or loyalty in order to be cognizable.[10]

In its reply memorandum, St. Francis cites to *DiTeresi v. Stamford Health System, Inc., Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV 06 5001340, 2010 Conn. Super. LEXIS 3214 (December 14, 2010, Tierney, J.T.R.)*, which held that a hospital does not owe a fiduciary duty to a patient. St. Francis also disavows the applicability of the 1967 assurances for the reason that the assurances were specific to federally funded research, and since Reardon's "growth study" was not federally funded, it was not within the ambit of the assurances. St. Francis further challenges Doe's theory of a fiduciary duty owed by a research institution to a human research subject by noting not only the paucity of Connecticut law on the issue but also that the out-of-state **[*20]** case law relied upon by Doe provides that a research institution owes a duty of care, not a fiduciary duty, to a human research subject.

"'It is axiomatic that a party cannot breach a fiduciary duty to another party unless a fiduciary relationship exists between them. [A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other.' (Internal quotation marks omitted.) *Biller Associates v. Peterken, 269 Conn. 716, 723, 849 A.2d 847 (2004)*. 'The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed

in him. . . . Once a [fiduciary] relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary.' (Citation omitted; internal quotation marks omitted.) *Cadle Co. v. D'Addario, 268 Conn. 441, 455, 844 A.2d 836 (2004)*. Moreover, '[a]lthough we have not *expressly* limited the application of these traditional principles of fiduciary duty to cases involving only fraud, self-dealing or conflict of interest, the cases in which we have invoked them have involved such deviations.' (Emphasis in original.) *Murphy v. Wakelee, 247 Conn. 396, 400, 721 A.2d 1181 (1998)*. Finally, '[p]rofessional negligence alone . . . does not give rise automatically **[*21]** to a claim for breach of fiduciary duty. . . . [Thus] not every instance of professional negligence results in a breach of [a] fiduciary duty. . . . Professional negligence implicates a duty of care, while breach of a fiduciary duty implicates a duty of loyalty and honesty.' (Citations omitted.) *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin, 247 Conn. 48, 56-57, 717 A.2d 724 (1998)*." *Sherwood v. Danbury Hospital, 278 Conn. 163, 195-96, 896 A.2d 777 (2006)*.

In the second and fifth uniform claims, Doe alleges that he was owed a fiduciary duty by St. Francis as both a "child patient" and a "study subject," even though he argues in his memorandum that he was "owed a fiduciary duty not as [a patient] of the [h]ospital, but as [a] human research [subject] of the ongoing project conducted under the [h]ospital's auspices." Despite the limiting language of Doe's memorandum, the court will look to the more expansive language of the complaint and consider whether a fiduciary relationship existed between the parties by virtue of either their relationship as patient and hospital or under a relationship as human research subject and research institution.

A

The Fiduciary Relationship between a Hospital and a Patient

In *Sherwood v. Danbury Hospital*, the plaintiff patient, who had contracted the human immunodeficiency virus during a surgery performed on the defendant hospital's **[*22]** premises, appealed the trial court's decision that

---

[9]   At oral argument, St. Francis disputed whether it ever formally submitted the 1967 assurances to the federal government for approval, and the court's review of **[*19]** the evidence finds none.

[10]   In support of his opposition to the present motion with respect to the second and fifth uniform claims, Doe cites to and submits copies of Standard Jury Instructions (Civil) 3.8-2, which pertain to breach of fiduciary duty causes of action. The court notes that these instructions are categorized under the heading "Professional Malpractice." None of Doe's five claims allege professional malpractice against St. Francis.

2011 Conn. Super. LEXIS 3355, *22

the defendant had not owed her a fiduciary duty "to inform her of the risks associated with a blood transfusion from its blood supply." *Id., 195*. The Supreme Court affirmed the trial court's decision and held: "The plaintiff has provided scant reason to conclude that a hospital owes a patient the duty of a fiduciary." *Id., 196*. Doe contends that *Sherwood* is inapposite because its conclusion on the fiduciary issue is dicta and limited to the specific facts underlying the *Sherwood* plaintiff's claim. Doe's position disregards, however, how our trial courts have treated *Sherwood* to stand for the proposition that a fiduciary relationship between a hospital and a patient remains unrecognized by Connecticut courts.

In *DiTeresi v. Stamford Health System, Inc.*, the plaintiff patient alleged that she was sexually assaulted while she was an inpatient at the defendant hospital. The court granted the defendant's motion for summary judgment on, inter alia, the plaintiff's breach of fiduciary duty claim. It noted: "The plaintiff . . . is alleging that the hospital as an institution breached its fiduciary duty to [her] with regard to how it handled a sexual assault **[*23]** once it that sexual assault was discovered. Therefore the delays and cover up form the basis of the claimed breach of fiduciary duty and not the sexual assault itself." *DiTeresi v. Stamford Health System, Inc., supra, Superior Court, Docket No. CV 06 5001340, 2010 Conn. Super. LEXIS 3214*.

The *DiTeresi* court then discussed *Sherwood v. Danbury Hospital* and concluded: "The court knows of no trial or appellate court in Connecticut that has found a fiduciary relationship between a hospital and patient. The plaintiffs cite out of state cases to persuade this court that such a fiduciary duty exists. All the Connecticut courts that have decided this issue have concluded that there is no fiduciary duty relationship between a hospital and its patient." Id. (citing cases). Given the lack of appellate authority for a fiduciary relationship between a hospital and a patient, this court concurs with the *DiTeresi* court's approach to the fiduciary duty issue and therefore declines to recognize a fiduciary relationship between the parties in their respective capacities as patient and hospital, as a matter of law.

B

The Fiduciary Relationship between a Research Institution and a Human Research Subject

This court similarly declines to recognize a fiduciary relationship between the parties **[*24]** in their respective capacities as human research subject and research institution. Neither party has referenced any Connecticut appellate or trial court case that has addressed, let alone discussed, a fiduciary duty owed by a research institution to a human research subject. Nor has the court found such a case in its research. "The Connecticut Supreme Court has been disinclined to define a fiduciary relationship 'in precise detail and in such a manner as to exclude new situations' and has recognized 'the fiduciary relationship is not singular.' *Alaimo v. Royer, 188 Conn. 36, 41, 448 A.2d 207 (1982)*; *Konover Development Corp. v. Zeller, 228 Conn. 206, 222, 635 A.2d 798 (1994)*. However, perhaps recognizing that the lack of definition should not be employed to turn . . . tort . . . actions into breach of fiduciary duty claims with the concomitant significant shifts in the burden and level of proof required of a defendant, the Connecticut Supreme Court has cautioned more than once that '[a]lthough we have not expressly limited the application of these traditional principles of fiduciary duty to cases involving only fraud, self-dealing or conflict of interest, the cases in which we have invoked them have involved such deviations.' (Emphasis in original.) *Sherwood v. Danbury Hospital, supra, 278 Conn. at 196* . . . ." (Citation omitted.) *Southern Air, Inc. v. Raymond, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV 08 5007577, 2009 Conn. Super. LEXIS 433 (February 17, 2009, Adams, J.)*. **[*25]**

St. Francis has met its burden of establishing with evidence that there is no genuine issue of material fact as to the nonexistence of a fiduciary relationship between the parties as research subject and research institution, and therefore, as to any breach of a duty of honesty and loyalty, as alleged by Doe. There is nothing in the record to show that Doe expressly or impliedly placed his confidence and trust in St. Francis, as opposed to Reardon specifically, by virtue of its status as a research institution with superior expertise, knowledge and skill. According to Doe, he became involved in the "growth study" because his mother was solicited by "a doctor at, I think at St. Francis at the time," who referred Doe's mother to Reardon. Pl.'s Ex. 54 at 217-20. This is the only evidence in the summary judgment record before the court that potentially demonstrates any understanding by Doe of any connection between the "growth study" and St. Francis, as no documentation of Doe's participation in the "growth study" or St. Francis' awareness of the "growth study" has been provided. **[*26]** Even when this evidence is viewed in the light most favorable to Doe as

2011 Conn. Super. LEXIS 3355, *26

the nonmovant, it is only sufficient to establish that Doe understood, at the time of his participation in the "growth study," that a connection existed between the referring doctor and St. Francis, not between Reardon (and thus his "growth study") and St. Francis. The court further notes that the record contains no references to any communications between Doe and St. Francis regarding Reardon's abuse of Doe at any time. See Def.'s Ex. 2 at 121; Pl.'s Ex. 54 at 253-54.[11] Additionally, to the extent that Doe has expressed that he felt any confidence and trust with respect to his participation in the "growth study," such confidence and trust was directed towards Reardon and his representations regarding the value of the "growth study," not towards St. Francis. See Def.'s Ex. 1; Def.'s Ex. 2 at 267; Pl.'s Ex. 54 at 230, 232, 233, 235-36, 237.[12]

Doe has not met his burden on summary judgment to set forth sufficient evidence to establish that a genuine issue of material fact exists on this point, because he sets forth no evidence that is distinct and separate from that relied upon by St. Francis. He has also failed to provide any evidence to create a genuine issue of material fact on the issue of whether he understood St. Francis, as a research institution, to be under a duty pursuant to the 1967 assurances to represent his interests during his appointments with Reardon. There is no evidence to establish that Doe knew about, much less relied upon, **[*28]** the representations made by St. Francis in those assurances during his participation in Reardon's "growth study." Doe argues that St. Francis' fiduciary duty to him necessarily arose from the existence of the assurances, regardless of whether he

was aware of them. His contention, however, overlooks a basic tenet of the standard for determining the existence of a fiduciary duty. "The existence of a fiduciary duty is largely a factual determination and the extent of the duty and the resulting obligations may vary according to the nature of the relationship." (Internal quotation marks omitted.) *Doe v. Terwilliger, Superior Court, judicial district of New Haven, Docket No. CV 09 5024692 (June 8, 2010, Zoarski, J.T.R.) (50 Conn. L. Rptr. 1,1, 2010 Conn. Super. LEXIS 1597)*. A review of the evidence submitted by the parties finds none to put into issue whether Doe had such contact with St. Francis that he would have been aware of St. Francis' status as a research institution. Nor does the court find any that would create a genuine issue of material fact as to whether St. Francis' conduct was dishonest or disloyal, as it related to Doe. As noted above, the opposing party cannot meet its burden on summary judgment simply by asserting the existence of a disputed **[*29]** issue. Such assertions are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under *Practice Book § 17-45*. *Zielinski v. Kotsoris, supra, 279 Conn. 312, 318-19*. Accordingly, there is nothing to put into issue whether Doe understood the nature of his relationship with St. Francis to be one based on the assurances or one between a human research subject and a research institution.

Finally, the court's review of the evidence finds none that would create a genuine issue of material fact as to whether there existed a unique degree of trust and confidence between Doe and St. Francis. Based on all

---

[11]  For example:

• "Q. Did you ever contact anyone at St. Francis to tell them what Dr. Reardon had done to you?

A. I never contacted — the only people that I contacted were the original psychiatrist, Dr. Bemis, and the West Hartford PD, and Jason." Def.'s Ex. 2 at 121.

[12]  For example:

• "Q. **[*27]**  Did anything else happen on the second appointment that you recall?

A. Nothing remarkable other than, you know, we didn't leave that room to go to the exam room, we didn't, there was just, I remember there was the constant chatter that he had about, you know, how useful this is and how, you know, how — he didn't use the word confidential, we were eight — but how it would be all confidential, and your beautiful height and weight and your bones, the whole thing. I remember that as the photos were being taken, I remember that sort of, I guess, making us feel good." Pl.'s Ex. 54 at 236-37.

2011 Conn. Super. LEXIS 3355, *29

of the above, Doe lacks a factual predicate with which he can create a genuine issue of material fact that he was owed a fiduciary duty by St. Francis.

The court also notes that the fifth uniform claim specifically sounds in "breach of fiduciary duties and intentional concealment activities." As St. Francis argues, however, "the fraudulent concealment statute does not create a separate cause of action but rather serves as a basis for a reply or matter in avoidance of the affirmative defense of statute of limitations." *Sherwood-Armour v. Danbury Hospital, Superior Court, complex litigation docket at Waterbury, Docket No. X02 CV 96 0163786 (October 30, 2003, Schuman, J.) (35 Conn. L. Rptr. 659, 662, 2003 Conn. Super. LEXIS 3061)* [*30] . Doe has not addressed this contention in opposing the present motion. The court therefore also treats the fifth uniform claim as sounding in breach of a fiduciary duty.

For the foregoing reasons, the court grants St. Francis' motion for summary judgment on the second and fifth uniform claims.

IV

Fourth Uniform Claim: Liability Based Upon the Aided-in-the-Agency Relation Doctrine

St. Francis moves for summary judgment as to Doe's fourth claim on the ground that Doe's aided-in-agency claim does not "remotely fit the facts in the summary judgment record." In particular, St. Francis argues that Doe does not claim that Reardon was acting within the scope of his authority or in furtherance of St. Francis' interests when he engaged in sexual misconduct with Doe. Moreover, it contends that there is no evidence that its interests were furthered by Reardon's improper conduct, and that, under the facts presented, it did not aid Reardon through its agency relationship with him. Aside from its employment relationship with Reardon, St. Francis contends that it had no other relationship with Doe that would warrant application of the aided-in-agency [*31] relation doctrine to the facts presented. St. Francis further argues that allowing Doe's aided-in-agency claim to proceed would result in an "unprecedented expansion" of employer liability in

Connecticut, as the aided-in-agency doctrine "applies only in employment situations involving claims of misconduct by supervisors toward their subordinates."

In reply, Doe insists that St. Francis misstates the aided-in-agency doctrine and that its summary judgment argument "erroneously conflates two distinct legal concepts: respondeat superior and aided-in-agency." Moreover, contrary to St. Francis' assertion, the aided-in-agency doctrine is not limited in application to employment discrimination cases. Doe additionally proposes a "test" for establishing a viable aided-in-agency claim and contends that the facts presented satisfy the elements of such a test.

St. Francis replies that the aided-in-agency-relation doctrine is not a distinct legal concept as it "is merely a subspecies of respondeat superior liability." Pointing to *Gutierrez v. Thorne, 13 Conn. App. 493, 537 A.2d 527 (1988)*, in support of its position, St. Francis argues "there is no reason to believe that Connecticut courts that have rejected respondeat superior claims against employers for [*32] intentional torts of their employees meant to leave open an 'aided-in-agency' subspecies of the claim."

"Under the aided-in-agency theory, an employer may be held liable for the intentional torts of an employee acting outside the scope of his or her employment if the employee 'was aided in accomplishing the tort by the existence of the agency relation.'" *Ocana v. American Furniture Co., 2004 - NMSC 018, 135 N.M. 539, 552, 91 P.3d 58 (2004)* (quoting *Restatement (Second) of Agency § 219 (2) (d)* (1958)).[13] "However, an employment relationship itself is not enough to establish an aided in agency relation standard. This is because in a sense, most workplace tortfeasors are aided in accomplishing their tortious objective by the existence of the agency relation." (Internal quotations omitted.) *Juarez v. Utah Dept. of Health - Family Dental Plan, United States District Court, Docket No. 2:05CV0053PGC, 2006 U.S. Dist. LEXIS 69005 (D. Utah, September 11, 2006)*. Connecticut courts have yet to extend application of the aided-in-agency doctrine outside the context of employment claims, and the parties have provided to the court no Connecticut authority adopting aided-in-agency liability outside of

---

[13]   *Restatement (Second), Agency § 219 (2)* (1958) provides in relevant part: "A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless . . . (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation."

2011 Conn. Super. LEXIS 3355, *33

those confines.[14] In fact, at oral argument, Doe conceded that no Connecticut case has applied the doctrine outside of an employment relationship. In this case, **[*33]** the relationship between the parties, either as patient and hospital or as research subject and research institution, was clearly not one of an employment relationship.

Nonetheless, because the foundation of the aided-in-agency doctrine is based on the principle of respondeat superior, the court has reviewed our case law relative to that principle as it relates to this case and finds that "the fundamental principles of the doctrine of respondeat superior are well established in Connecticut. Under the doctrine of respondeat superior, a master is liable for the wilful torts of his servant committed within the scope of the servant's employment and in furtherance of his master's business. . . . The master is not held on any theory that he personally interferes to cause the injury. It is simply on the ground of public policy, which requires that he shall be held responsible for the acts of those whom he employs, done in and about his business, even though such acts are directly in conflict with the orders which he has given them on the subject. . . . [I]n order to hold an employer liable for the intentional torts of his employee, the employee must be acting within the scope of his employment and in furtherance of the employer's business. . . . But it must be the affairs of the principal, and not solely the affairs of the agent, which are **[*35]** being furthered in order for the doctrine to apply. . . ." (Citation omitted; internal

quotation marks omitted.) *Cornelius v. Dept. of Banking, 94 Conn. App. 547, 557, 893 A.2d 472,* cert. denied, *278 Conn. 913, 899 A.2d 37 (2006).*[15]

"Often, the issue of whether or not an act is within the scope of one's employment is a question of fact for the jury to decide. In some situations, however, the acts of the servant are so clearly without the scope of his authority that the question is one of law. [*Gutierrez v. Thorne, supra, 13 Conn. App. 499.*] The test in Connecticut as to whether an employee is acting within the scope of his or her employment rests on whether the employee was furthering the employer's business. This standard has been applied to an employee's negligent acts, *Levitz v. Jewish Home for the Aged, Inc., 156 Conn. 193, 239 A.2d 490 (1968),* and to an employee's **[*36]** willful torts such as a fatal stabbing, *Cardona v. Valentin, 160 Conn. 18, 22, 273 A.2d 697 (1970).* The doctrine of respondeat superior focuses on the employee's conduct rather than on the employer's knowledge or approval of the conduct. *Belanger v. Village Pub I, 26 Conn. App. 509, 603 A.2d 1173 (1992).*" *Nutt v. Norwich Roman Catholic Diocese,* supra, 921 F. Sup. 70.

There is no issue of fact that the acts of sexual misconduct allegedly perpetrated by Reardon were outside the scope of his employment relationship with St. Francis.[16] See *Gutierrez v. Thorne, supra, 13 Conn. App. 499* ("[I]t is clear that [the defendant's employee] was not furthering the defendant's business interests

---

[14]   Doe points to a number of sister jurisdictions adopting the aided-in-agency doctrine outside of the Title VII employment context. See, e.g., *Doe v. Forrest, 176 Vt. 476, 853 A.2d 48 (2004)* (applying aided-in-agency to claim of sex abuse by police officer); *Costos v. Coconut Island Corp., 137 F.3d 46 (1st Cir. 1998)* (applying aided-in-agency where hotel employee sexually assaulted guest); *Ayuluk v. Red Oaks Assisted Living, Inc., 201 P.3d 1183 (Ak. 2009)* (applying aided-in-agency where assisted living home employee sexually assaulted facility tenant). St. Francis references out-of-state authority limiting the reach of aided in agency claims. See, e.g., *Doe v. Newbury Bible Church, 182 Vt. 174, 933 A.2d 196 (2007)* (declining to extend aided-in-agency where parishioner was sexually abused by priest); *Zsigo v. Hurley Medical Center, 475 Mich. 215, 716 N.W.2d 220 (2006)* (declining to apply the aided-in-agency theory where nursing assistant sexually assaulted **[*34]** a hospital patient).

[15]   "The doctrine of respondeat superior rests on common law agency principles of vicarious liability. Generally, the doctrine states that the master (employer) is responsible for the acts of his or her servant (employee) because the master controls the servant's actions. Restatement (Second) of Agency § 1, at 7. Central to the issue of liability under the doctrine is whether the employee was acting within the scope of his or her employment. If the employee was acting within the scope of his or her employment, the employer may be liable for the plaintiff's acts. Restatement (Second) of Agency, supra § 219, at 481." *Nutt v. Norwich Roman Catholic Diocese,* supra, 921 F. Sup. 70.

[16]   Doe appears **[*37]** to concede this fact in his opposition brief, wherein he states: "The cases cited by defendant make clear that an employer is not responsible under respondeat superior for the sexual assault of a third party by an employee because that employee could not have been acting within the scope of employment when committing that type of tort. That is why plaintiffs here brought their claims, not on a theory of respondeat superior, but under the aided-in-agency doctrine - which imposes liability where the employee is not acting within the scope of employment if the employee 'was aided in accomplishing the tort by the existence of the agency relation.'" Pl.'s memorandum in opposition at 66-67.

when he sexually assaulted the plaintiff."). No Connecticut appellate court has recognized or applied the aided-in-agency doctrine as an exception to the application of traditional principles of respondeat superior in a context analogous to the present. While the court is certainly cognizant of the powerfully disturbing allegations and evidence of the sexual abuse of a child, as well as the obligation to view those allegations and evidence in the light most favorable to the nonmovant, it nonetheless declines to extend the law into areas and/or under circumstances for which there is no Connecticut appellate authority. Accordingly, the court grants St. Francis' motion for summary judgment with regard to Doe's aided-in-agency claim.

V

Third Uniform Claim: Breach of the Defendant's Special Duty of Care Owed to Children

In Section II of this memorandum, the court addressed the applicability of the statute of limitations to the third uniform claim. The court now turns to St. Francis' argument that it is entitled to a judgment as a matter of law on that claim because Connecticut does not recognize a special duty to children. St. Francis is correct that Doe misinterprets the law upon which he relies in support of his argument that a breach [*38] of a special duty to children is a legally cognizable claim. Doe argues: "[T]he Supreme Court has specifically held that <u>children</u> are a class of persons subject to protection under the 'special relationship' doctrine." He bases his conclusion on *Murdock v. Croughwell, 268 Conn. 559, 572, 848 A.2d 363 (2004)*, in which the court noted that it "consistently has taken the position that children outside the supervision of their parents require special protection." Doe's reliance on *Murdock* is misplaced, however. In *Murdock*, the court held that the defendant police chief owed no special duty to protect the plaintiff police officer from the tortious conduct of another police officer when both officers were off-duty. The language relied upon by Doe prefaces the court's decision to distinguish *Murdock* from the cases in which it had held that special duties towards children existed because "all of the parties in [*Murdock* were] adults." Id. The proposition upon which Doe relies is therefore dicta taken out of context, not the basis for a binding statement of law.

Despite Doe's misplaced reliance on *Murdock*, there is sufficient Connecticut authority to make clear that our law recognizes there are circumstances where the special duty doctrine may apply to children. [*39] See, e.g., *Grady v. Somers, 294 Conn. 324, 984 A.2d 684 (2009)*; *State v. Miranda, 245 Conn. 209, 715 A.2d 680 (1998)*, overruled on other grounds by *State v. Courchesne, 296 Conn. 622, 998 A.2d 1 (2010)*; *Purzycki v. Fairfield, 244 Conn. 101, 708 A.2d 937 (1998)*. For the reasons set forth below, the court concludes that Doe has alleged facts sufficient to state a claim for a breach of a special duty to children.

In the alternative, St. Francis argues that it is entitled to a judgment as a matter of law because there is no genuine issue of material fact about whether Doe was ever under St. Francis' custody or control. Doe in turn objects to the motion by arguing that there is a genuine issue of material fact about whether he was ever under St. Francis' custody or control, because of his physical separation from his mother during his appointments with Reardon and the special relationship that existed between the parties as a research institution and a human research subject.[17] The court agrees with Doe that there is a genuine issue of material fact regarding St. Francis' custody over him at the time of his abuse. It therefore denies the motion for summary judgment with respect to the third uniform claim.

"Existing Connecticut precedents impose only a limited duty to take action to prevent injury to a third person. Our point of departure has been that absent a special relationship of custody or control, there is no duty to protect a third person from the conduct of another In any determination of whether even a special relationship should be held to give rise to a duty to exercise care to avoid harm to a third person, foreseeability plays an important role. Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific individuals to whom it is owed, are determined by the circumstances surrounding the conduct of the individual." (Citations omitted; internal quotation marks omitted.) *Fraser v. United States, 236 Conn. 625, 632-33, 674 A.2d 811 (1996)*.

"*Section 315 of the Restatement (Second) [of Torts]* provides in relevant part: 'There is no duty so to control

---

[17]   Because the custody issue is dispositive, the court need not address the issue of whether a special relationship existed between the parties by virtue of their respective positions as a human research [*40] subject and a research institution in deciding the motion with respect to the third uniform claim.

2011 Conn. Super. LEXIS 3355, *39

the conduct of a third person as to prevent him from causing physical harm to another unless . . . (b) a special relationship exists between the actor and the other which gives to the other a right of protection.' Although **[\*41]** *§ 315(b)* . . . is silent as to the definition of a special relationship, the accompanying comments . . . set forth those relationships that fall within the ambit of *§ 315(b)*. Thus, '[t]he relations between the actor and the other which require the actor to control the conduct of third persons for the protection of the other are stated in *§§ 314A* and *320*'. . . . *Section 320 of the Restatement (Second)* imposes a duty of care upon a person who takes custody of another person so as to deprive him of his normal powers of self-protection. As the comments to *§ 320* make clear, this rule is applicable to sheriffs, jailers, officials charged with the care of mentally impaired individuals, private schools and hospitals and public schools. . . . *Section 314A of the Restatement (Second)* imposes a duty upon common carriers, innkeepers and possessors of land who hold their land open to the public. It also contains a provision providing for care of those who have been taken into custody and deprived of their normal powers of self-protection." (Citations omitted.) *Murdock v. Croughwell, supra, 268 Conn. 570-71.*

"*Sections 314A*[18] and *320*[19] *of the Restatement (Second)* . . . list special relations which, if existing, require one party to render protection to the other. The most important and widely recognized relation of this kind is that between an adult and a child in his custody. The duty **[\*42]** of the adult to protect the child from harm is enhanced when the child is of tender years or is otherwise incapable of managing his own affairs. We learn this from comment b to *Section 320 of the Restatement,* which states that '[t]he actor who takes custody . . . of a child is properly required to give

him the protection of which the custody or manner in which it is taken has deprived him.' This understanding is confirmed by comment 1 to the proposed version of Section 40 of the Restatement (Third) of Torts, which as adopted (though not yet published) states that '[w]hat constitutes reasonable care is contextual — the extent and type of supervision required of young elementary school pupils is substantially different from reasonable care for college students.'" *Doe v. Talabi, Superior Court, judicial district of Hartford, Docket No. CV 07 5009974 (August 7, 2009, Sheldon, J.) (48 Conn. L. Rptr. 382, 384, 2009 Conn. Super. LEXIS 2126).*

In *Doe v. Talabi*, the plaintiff, a special education student, brought negligence causes of action against the defendant LogistiCare Solutions, LLC, which provided transportation monitoring **[\*44]** services to all special education children at the plaintiff's school. The plaintiff alleged that she was sexually assaulted by a school bus driver while being transported home and that the monitor on board the school bus, who was employed by the defendant, did nothing to prevent the incident. The court denied the defendant's motion for summary judgment and held that "there [was] at least a genuine issue of material fact as to whether the relationship between [the bus monitor] and [the defendant], on the one hand, and [the plaintiff] on the other, involved a custodial relation between an adult and a child of the sort that gives rise to a duty of care under the Restatement (Second) of Torts." *Id., 48 Conn. L. Rptr. 386, 2009 Conn. Super. LEXIS 2126.* In reaching its conclusion, the court noted: "While on the bus on the day of the incident, [the plaintiff] was under the supervision of [the bus monitor], an adult employee of [the defendant] whose own job description, as supplied by [the defendant], contemplated that he was on board the bus to insure the children's safety. . . . [The defendant

---

[18]  "*Section 314A of the Restatement (Second)*. . . provides: '(1) A common carrier is under a duty to its passengers to take reasonable action (a) to protect them against unreasonable risk of physical harm, and (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others. (2) An innkeeper is under a similar duty to his guests. (3) A possessor of land who **[\*43]** holds it open to the public is under a similar duty to members of the public who enter in response to his invitation. (4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.'" *Murdock v. Croughwell,* supra, 268 Conn. 571 n.19.

[19]  "Section 320 of the Restatement (Second). . . provides: 'One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor (a) knows or has reason to know that he has the ability to control the conduct of the third persons, and (b) knows or should know of the necessity and opportunity for exercising such control." *Murdock v. Croughwell,* 268 Conn. 570 n.18.

2011 Conn. Super. LEXIS 3355, *44

and the bus monitor] had stepped into the roles of parental proxies for [the plaintiff] and other special education students on the bus when they were **[*45]** being transported back and forth from school." *Id., 385, 2009 Conn. Super. LEXIS 2126*.

St. Francis argues that there is no genuine issue of material fact about whether Doe was ever under its custody or control, because Doe's mother "accompanied him to each of his appointments with Reardon" and no Connecticut court "has ever held that . . . special protection is required when the child's parents were in the waiting room of a doctor's office or hospital while the doctor examined their children." Doe has submitted evidence, however, showing that while his mother may have taken him to all his appointments at Reardon's office at St. Francis, his mother was not present during the examination, and he was unsure of her whereabouts, but she was "probably having lunch." Def.'s Ex. 2 at 223-24; Pl.'s Ex. 54 at 223-24. Further, Doe, in reference to whether his mother ever asked him or his sister what went on during the appointments, states that his parents in retrospect had made a misjudgment in "dropping us off" at the appointments with Reardon. Def.'s Ex. 2 at 252; Pl.'s Ex. 54 at 252. In fact, Doe states that before one appointment, his mother talked with Reardon in the waiting room "for a while, and then my mom left, and then I **[*46]** went in with Dr. Reardon." Pl.'s Ex. 54 at 236-37. Thus, St. Francis' argument discounts the times when Doe may have been unaccompanied by either of his parents during his appointments. The issue of custody and control of Doe is also put into issue through Doe's statements that during one unrelated hospital visit for rheumatic fever when he was eight or nine years old, he was taken to Reardon's office by an orderly of the hospital. Def.'s Ex. 2 at 248-49; Pl.'s Ex. 54 at 248-49. From the evidence presented, it is clear that Reardon dealt with Doe to the exclusion of others as he always examined the child without another hospital employee or a parent being present. Reardon's actions were affirmative acts which effectively prevented Doe's mother from executing her role as custodian. In so doing, Reardon became a proxy for the child's parent.

This evidence, when viewed in the light most favorable to Doe, the nonmovant, is sufficient to establish a genuine issue of material fact about whether Doe, particularly as a minor from the ages of approximately eight through twelve, felt deprived of his normal powers of self-protection during at least some of his appointments in Reardon's office **[*47]** on St. Francis'

premises. As a result, there is also a genuine issue of material fact as to whether St. Francis had custody over Doe. "As the plaintiff alleges, and will have to further develop at trial, it is not at all clear that there is no duty of care toward the plaintiff as a matter of law." *Doe v. Central Assembly of God, Inc., Superior Court, judicial district of New London, Docket No. 121003, 2001 Conn. Super. LEXIS 2753 (September 24, 2001, Hurley, J.T.R.)* (denying motion for summary judgment on ground that defendant church owed no duty to plaintiff child in action alleging sexual abuse by church youth group leader).

The court's inquiry, however, does not end with the custody issue. To determine if there is an issue as to the existence of a special duty of care to a child, the court must further consider the foreseeability of the harm. "Although . . . no universal test for [duty] ever has been formulated . . . our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant Thus, initially, if it is not foreseeable to a reasonable person in the defendant's position that harm of the type alleged would result from the defendant's actions to a particular **[*48]** plaintiff, the question of the existence of a duty to use due care is foreclosed, and no cause of action can be maintained by the plaintiff." (Internal quotation marks omitted.) *Fraser v. United States, supra, 236 Conn. 633*.

St. Francis has not established, in relation to the third uniform claim, that there is no genuine issue of material fact that it could not have foreseen the harm suffered by Doe. There is sufficient evidence to show that Reardon had seen Doe at least seven times, from approximately 1967-68 to 1972. Pl's Ex. 54 at 224, 251-52; Def.'s Ex. 1 ¶ 6 (d-f), Ex. 2 at 224, 251-52. Also, in opposing St. Francis' motion, Doe claims that St. Francis had actual or constructive notice of Reardon's misconduct from two complaints about Reardon, one of which accused him of sexually abusing minor patients, filed with the Hartford County Medical Association in 1964 and 1970, respectively. Pl.'s Ex. 4 and 39. The 1964 complaint was filed prior to Doe's first visit with Reardon, and the 1970 complaint, which contained specific allegations of sexual abuse by Reardon, was filed in the midst of Reardon's involvement with Doe. St. Francis argues that the evidence of the complaints is inadmissible and that there is no evidence to establish **[*49]** the defendant's knowledge of the complaints before or at the time of Doe's abuse. "To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact." (Internal

2011 Conn. Super. LEXIS 3355, *49

quotation marks omitted.) *Ramirez v. Health Net of the Northeast, Inc., 285 Conn. 1, 11, 938 A.2d 576 (2008)*. St. Francis' challenge to the admissibility of Doe's evidence, as well as its reliance upon the argued lack of evidence demonstrating its knowledge of the complaints, are best left to the crucible of trial, and if admitted, then to consideration by the trier of fact, who will have the ultimate responsibility to determine the factual truth about whether St. Francis foresaw, or could have foreseen, the harm suffered by Doe.

For the foregoing reasons, the court denies St. Francis' motion for summary judgment on the third uniform claim.

CONCLUSION

Before the court is St. Francis' motion for summary judgment on the first, second, third, fourth and fifth uniform claims of the uniform complaint, as they relate to Tim Doe #1. The motion is denied with respect to the first uniform claim, sounding in negligence, on the ground that the claim is not barred by the applicable statute of limitations. **[*50]** The motion is granted with respect to the second and fifth uniform claims, both sounding in breach of fiduciary duty. With respect to the relationship between St. Francis and Doe in their respective capacities as hospital and patient, the motion

is granted on the ground that a fiduciary relationship does not exist as a matter of law. With respect to the relationship between St. Francis and Doe in their respective capacities as research institution and human research subject, the motion is granted on the ground that there is no genuine issue of material fact regarding the absence of a fiduciary relationship between the parties. The motion is denied with respect to the third uniform claim, sounding in breach of a special duty to children, on the ground that there is a genuine issue of material fact about whether Doe was ever under St. Francis' custody or control during his appointments with Reardon at Reardon's office on St. Francis' premises. The motion is granted with respect to the fourth uniform claim, sounding in liability pursuant to the aided-in-agency doctrine, on the ground that St. Francis is entitled to a judgment as a matter of law because the doctrine has not been held in **[*51]** Connecticut to be applicable to circumstances such as those underlying Doe's claim.

So ordered.

BY THE COURT

/s/ Shaban

Shaban, J.

ⓘ Cited
As of: April 27, 2016 11:52 AM EDT

# *Lara v. Legionaries of Christ*

Superior Court of Connecticut, Judicial District of Hartford at Hartford

August 30, 2011, Decided; August 30, 2011, Filed

X03HHDCV106016974S

## Reporter

2011 Conn. Super. LEXIS 2166; 2011 WL 4347919

Jose Raul Gonzalez Lara v. Legionaries of Christ et al.

**Notice:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

## Core Terms

alleges, sexual, internal quotation marks, emotional distress, motion to strike, Counts, foreseeable, minors, priest, sexual abuse, supervise, severe, molested, servant, unreasonable risk, cause of action, Diocese, illness, infliction of emotional distress, negligent supervision, respondeat superior, bodily harm, defendants', memorandum, retention, vicarious

## Case Summary

### Overview

Defendants' motion to strike the reckless and negligent battery and reckless infliction of emotional distress counts based on a priest's sexual abuse of plaintiff, who was the priest's biological child, was granted. Plaintiff failed to plead that the alleged domestic abuse fell within the scope of the priest's authority or furthered defendants' religious mission. Since sexual abuse could not be said to further defendants' business or that the priest was acting within the scope of his employment, plaintiff could not proceed against defendants under respondeat superior.

### Outcome

Motion granted, in part, and denied, in part.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Strike > General Overview

*HN1* The purpose of a motion to strike is to contest the legal sufficiency of the allegations of any complaint to state a claim upon which relief can be granted. In ruling on a motion to strike, the court is limited to the facts alleged in the complaint. The trial court is limited to considering the grounds specified in the motion. The court construes the complaint in the manner most favorable to sustaining its legal sufficiency. Thus, if facts provable in the complaint would support a cause of action, the motion to strike must be denied. Moreover, what is necessarily implied in an allegation need not be expressly alleged. Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically. Nevertheless, a motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged.

Governments > Courts > Common Law

Torts > Vicarious Liability > Employers > General Overview

Torts > ... > Employers > Scope of Employment > General Overview

*HN2* Under the common-law principle of respondeat superior, an employer is vicariously liable for compensatory damages arising out of the tortious conduct of his employee when that conduct occurs during the course of the employee's employment. Vicarious liability is based on a relationship between the parties either by act or omission, of the one vicariously liable, under which it has been determined as a matter of public policy that one person should be liable for the act of another. Its true basis is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another.

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

Torts > Vicarious Liability > Employers > General Overview

Torts > ... > Employers > Scope of Employment > General Overview

*HN3* When vicarious liability is alleged, the injured plaintiff may look for reparation from either the employee or the employer. In order to hold an employer liable for the intentional torts of his employee, the employee must be acting within the scope of his employment and in furtherance of the employer's business. But it must be the affairs of the employer, and not solely the affairs of the employee, which are being furthered in order for the doctrine to apply. Ordinarily it is a question of fact as to whether a willful tort of the servant has occurred within the scope of the servant's employment and was done to further his master's business. There are occasional cases where a servant's digression from duty is so clear-cut that the disposition of the case becomes a matter of law.

Torts > ... > Employers > Scope of Employment > General Overview

*HN4* As a matter of law, the alleged sexual abuse of two altar boys cannot be said to further a church's business and therefore is outside of the scope of employment for respondeat superior purposes.

Torts > Vicarious Liability > Agency Relationships > Intentional Torts

Torts > ... > Employers > Activities & Conditions > Intentional Torts

Torts > ... > Employers > Scope of Employment > General Overview

*HN5* Restatement (Second), Agency has been superseded by Restatement (Third), Agency. Restatement (Second), Agency concludes with a further general basis for an employer's vicarious liability, which is whether an employee was aided in accomplishing the tort by the existence of the agency relation. Restatement (Third), Agency does not include "aided in accomplishing" as a distinct basis for an employer's (or principal's) vicarious liability.

Torts > ... > Types of Negligence Actions > Negligent Infliction of Emotional Distress > Elements

*HN6* To prevail on a claim of negligent infliction of emotional distress, the plaintiff must plead and prove the following: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional

distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress. Thus, the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm.

Torts > ... > Types of Negligence Actions > Negligent Infliction of Emotional Distress > Elements

Torts > ... > Causation > Proximate Cause > Foreseeability of Harm

*HN7* The foreseeability requirement in a negligent infliction of emotional distress claim is more specific than the standard negligence requirement that an actor should have foreseen that his tortious conduct was likely to cause harm. In order to state a claim for negligent infliction of emotional distress, the plaintiff must plead that the actor should have foreseen that her behavior would likely cause harm of a specific nature, i.e., emotional distress likely to lead to illness or bodily harm.

Torts > ... > Elements > Duty > General Overview

Torts > Negligence > Elements

*HN8* The essential elements of a cause of action in negligence are duty; breach of that duty; causation; and actual injury. Duty is a legal conclusion about relationships between individuals, made after the fact, and is imperative to a negligence cause of action. Thus, there can be no actionable negligence unless there exists a cognizable duty of care. A duty of care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act.

Torts > ... > Elements > Duty > General Overview

Torts > ... > Elements > Duty > Foreseeability of Harm

*HN9* Although it has been said that no universal test for duty ever has been formulated, the court's threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised.

Labor & Employment Law > Employer Liability > General Overview

Torts > Negligence > Types of Negligence Actions > General Overview

*HN10* Under Connecticut law, an employer may be held liable for the negligent supervision of employees. In order to plead a cause of action sounding in negligent supervision, a plaintiff must plead injury by an employee whom the defendant had a duty to supervise, failed to supervise and whom the defendant knew or should have known would cause the injury.

Labor & Employment Law > Employer Liability > General Overview

Torts > Negligence > Types of Negligence Actions > General Overview

*HN11* The claim of negligent retention has been recognized by the Connecticut Superior Court, but not by the Connecticut Appellate Court. It requires a plaintiff to plead and prove that an employer, during the course of employment, became aware of problems that indicate a lack of fitness for the position, that the unfitness was likely to cause the sort of harm incurred by the plaintiff, and that the employer failed to take action.

Labor & Employment Law > Employer Liability > General Overview

Torts > Negligence > Types of Negligence Actions > General Overview

Torts > ... > Elements > Duty > Foreseeability of Harm

*HN12* Whether the claim is for negligent hiring, negligent supervision or negligent retention, a plaintiff must allege facts that support the element of foreseeability. The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised. Defendants cannot be held liable for their alleged negligent hiring, training, supervision or retention of an employee accused of wrongful conduct unless they had notice of said employee's propensity for the type of behavior causing the plaintiff's harm. By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary person in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?

**Judges:**  [*1] Edmund H. Miller, Family Support Magistrate.

**Opinion by:** Edmund H. Miller

# Opinion

*MEMORANDUM OF DECISION ON MOTION TO STRIKE*

The defendants have moved to strike Counts One, Three, Five, Seven, Ten, Eleven and Twelve of the complaint on the grounds that plaintiff has failed to allege any facts to establish that his alleged sexual abuse was committed within the scope of Father Maciel's authority or in furtherance of the defendants' religious mission. Defendants further submit that the plaintiff has failed to allege facts through which he could establish that the defendants owed him a duty of care, and that the alleged harm was foreseeable to the defendants.

FACTS:

On June 21, 2010, the plaintiff, Jose Raul Gonzalez Lara, brought this action, alleging that Father Marcial Maciel Degollado (Father Maciel), who was the founder of the Legionaries of Christ and also the plaintiff's biological father, repeatedly sexually molested him. As a result, the plaintiff brought this action against various defendants, including the estate of Father Maciel, Legionaries of Christ (the Legionaries), Legion of Christ, Inc., Legion of Christ College, Inc. and Catholic World Mission, Inc. In his complaint, the plaintiff alleges that  [*2] Father Maciel, who died in 2008, was a Roman Catholic priest in charge of the Legionaries and its affiliates, including the defendants. At all relevant times, Father Maciel was an employee, agent of the Legionaries, a worldwide business, which conducts business through Legion of Christ College, Inc. in Connecticut. The defendants acted as joint venturers, co-conspirators, agents or apparent agents of each other and/or partners.

The plaintiff alleges that Father Maciel sexually molested numerous minor children, whom he recruited for the Legionaries, beginning in the 1940s and 1950s. Furthermore, he alleges that the Legionaries knew or should have known about his sexual abuse at least in the 1950s, if not sooner. Additionally, on October 26, 1976, Father Juan Vaca, the Legionaries' national

2011 Conn. Super. LEXIS 2166, *2

director, sent a letter to Father Maciel, accusing him of sexually abusing 20 Legionaries' seminarians. The plaintiff alleges that the Legionaries knew or should have known about this letter and Father Maciel's "deviant sexual pursuits." In 1976, Bishop John R. McGann, ordinary of the Rockville diocese, reported Father Maciel's behavior to the Vatican and Pope Paul VI, but the Vatican took no action, **[*3]** allowing Father Maciel to continue in his position of power with "unlimited access to children." In 1978, Bishop McGann sent the same letter to the Vatican and although the Vatican acknowledged receiving it, no action was taken.

In 1980, the plaintiff was born in Mexico, as the son of Blanca Gutierrez Lara and one Raul Rivas, an alias used by Father Maciel. It is further alleged that Father Maciel used the Legionaries' money and property to support the plaintiff, his mother and other children. The plaintiff alleges that the Legionaries knew or should have known that Father Maciel had a child, that he was using the Legionaries' funds to support the plaintiff and his family and that he was misrepresenting himself to his son. Plaintiff also alleges that the Legionaries knew or should have known that Father Maciel used its property to facilitate his abuse of the plaintiff.

The plaintiff further alleges that "from at least the 1950s until 2002, the Legionaries, Father Maciel, the presiding Pope, the Vatican and its officials engaged in a conspiracy to conceal their knowledge of Maciel's serial delicts, including the repeated sexual abuse of children." The plaintiff claims that other officials **[*4]** in the Legionaries knew of Father Maciel's misconduct. Father Maciel made all seminarians promise never to speak ill of the Legion, him or their superiors. Furthermore, the plaintiff alleges that Father Maciel and the Legionaries gained influence and protection from the Vatican through giving substantial money to Vatican officials and providing banquets, facilities and other benefits to them.

As a result, the plaintiff brought different causes of actions against various defendants in a twelve-count complaint. On January 20, 2011, the defendants filed a motion to strike, accompanied by a memorandum of law. The plaintiff filed his opposition to the motion to strike with a supporting memorandum of law on March 16, 2011. On April 15, 2011, the defendants filed a reply memorandum. The court heard oral argument on May 16, 2011.

DISCUSSION:

***HN1*** "The purpose of a motion to strike is to contest . . . the legal sufficiency of the allegations of any complaint

. . . to state a claim upon which relief can be granted." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. Alves, 262 Conn. 480, 498, 815 A.2d 1188 (2003)*. "In ruling on a motion to strike, the court is limited to the facts **[*5]** alleged in the complaint." (Internal quotation marks omitted.) *Faulkner v. United Technologies Corp., 240 Conn. 576, 580, 693 A.2d 293 (1997)*. The trial court is "limited to considering the grounds specified in the motion." *Meredith v. Police Commission, 182 Conn. 138, 140, 438 A.2d 27 (1980)*. The court construes "the complaint in the manner most favorable to sustaining its legal sufficiency . . . Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied . . . Moreover, [the court notes] that [w]hat is necessarily implied [in an allegation] need not be expressly alleged . . . Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Connecticut Coalition for Justice in Education Funding, Inc. v. Rell, 295 Conn. 240, 252-53, 990 A.2d 206 (2010)*. Nevertheless, "[a] motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. Alves, supra, 262 Conn. 498*.

In their memorandum, the defendants argue that Counts One, Three **[*6]** and Five should be stricken because the plaintiff has failed to plead that the alleged domestic abuse fell within the scope of Father Maciel's authority or furthered the defendants' religious mission. They also argue that Count Seven should be stricken because the plaintiff has failed to plead that it was foreseeable that the defendants' conduct posed an unreasonable risk of causing emotional distress to the plaintiff. Lastly, they argue that the court should strike Counts Ten, Eleven and Twelve because the plaintiff has failed to allege facts to establish that the defendants owed him a duty of reasonable care.

The plaintiff argues that he has sufficiently alleged that the Legionaries knew of Father Maciel's propensity to abuse children, and that it failed to act with reasonable care. He contends that the court should not strike the counts alleging negligent hiring and supervision because Father Maciel and the Legionaries were in an employer-employee relationship. Additionally, the plaintiff argues that under the "aided-in-agency doctrine," the defendants are liable for Father Maciel's actions. Similarly, he argues that because he pleaded sufficient facts to allege that his severe emotional

2011 Conn. Super. LEXIS 2166, *7

**[\*7]** distress caused by Father Maciel's sexual abuse was foreseeable, the Legionaries should be liable.

A

*Counts One, Three and Five—Reckless and Negligent Battery and Reckless Infliction of Emotional Distress*:

In the first count of his complaint, the plaintiff brings a reckless battery claim against the Legionaries by alleging that it knew or should have known that Father Maciel had a propensity to molest children, but he was allowed by the Legionaries to maintain his position, which enabled him to have access to and sexually abuse the plaintiff. The plaintiff further alleges that because the defendants failed to take action against Father Maciel, he was able to hold himself out as fit, qualified and competent in all respects to work with children. The Legionaries knew of Father Maciel's use of power and resources gained from the Legionaries to exercise undue influence over children, including the plaintiff. Between 1987 and 1998, while the plaintiff was a minor, Father Maciel sexually molested him repeatedly with the knowledge that this would have serious consequences for the minor plaintiff. As a result, the plaintiff has suffered severe pain, bodily intrusion and emotional distress, some **[\*8]** of which may be permanent. Consequently, the plaintiff has incurred and will continue to incur expenses related to counseling and therapy, lost wages and employment opportunities.

In the third count, the plaintiff alleges that due to Father Maciel's negligence and carelessness, he has suffered severe pain and bodily intrusion along with severe emotional injuries.

In Count Five, the plaintiff alleges that through Father Maciel's wrongful actions, he recklessly inflicted, or knew or should have known that such actions were likely to cause, severe emotional distress on the plaintiff. The plaintiff alleges that Maciel's conduct was extreme, outrageous and beyond the bounds of decency, and that it caused him severe emotional distress.

*HN2* "[U]nder the common-law principle of respondeat superior, an employer is vicariously liable for compensatory damages arising out of the tortious conduct of his employee when that conduct occurs during the course of the employee's employment." *Matthiessen v. Vanech, 266 Conn. 822, 839, 836 A.2d 394 (2003)*. Our Supreme Court has held that "[v]icarious liability is based on a relationship between the parties .

. . either by act or omission, of the one vicariously **[\*9]** liable, under which it has been determined as a matter of public policy that one person should be liable for the act of [another]. Its true basis is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another." (Internal quotation marks omitted.) *Jagger v. Mohawk Mountain Ski Area, Inc., 269 Conn. 672, 692 n.16, 849 A.2d 813 (2004)*.

*HN3* "When vicarious liability is alleged, the injured plaintiff may look for reparation from either the [employee] or the [employer]." *Colon v. City of New Haven, 60 Conn. App. 178, 188 n.4, 758 A.2d 900*, cert. denied, *255 Conn. 908, 763 A.2d 1034 (2000)*. The Connecticut Supreme Court has "long adhered to the principle that in order to hold an employer liable for the intentional torts of his employee, the employee must be acting within the scope of his employment and in furtherance of the employer's business . . . But it must be the affairs of the [employer], and not solely the affairs of the [employee], which are being furthered in order for the doctrine to apply." (Citations omitted; internal quotation marks omitted.) *A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 208, 579 A.2d 69 (1990)*. **[\*10]** "Ordinarily it is a question of fact as to whether a willful tort of the servant has occurred within the scope of the servant's employment and was done to further his master's business . . . [T]here are occasional cases where a servant's digression from duty is so clear-cut that the disposition of the case becomes a matter of law." (Citation omitted; internal quotation marks omitted.) *Id., 207*.

In *Nutt v. Norwich Roman Catholic Diocese*, 921 F.Sup. 66 (D.Conn. 1995), a federal district court granted summary judgment on all counts based on the doctrine of respondeat superior because it held that *HN4* as a matter of law, the alleged sexual abuse of two altar boys "cannot be said to further the defendant's business and therefore is outside of the scope of employment." *Id., 71*. The Appellate Court, discussing *Nutt v. Norwich Roman Catholic Diocese* in *Mullen v. Horton*, stated that the "facts of *Nutt* clearly represent[ed] a situation in which the priest wholly abandoned his pastoral duties. Thus, *Nutt* represent[ed] one of those exceptional cases in which the servant's digression from duty is so clear that the disposition of the case is a matter of law."

2011 Conn. Super. LEXIS 2166, *12

*Mullen v. Horton, 46 Conn.App. 759, 770-71, 700 A.2d 1377 (1997)*.[1]

"Clearly, [a priest's] sexual assaults on the plaintiff were repugnant to his employer's business and in utter contravention of the employer's aims and rules. Unlike a situation in which a servant performs the master's work poorly or misunderstands what the master wants done, the molestation of children is a total abdication of the master's work so that the pedophile priest can satisfy personal lust." *Doe v. Norwich Roman Catholic Diocese, 49 Conn.Sup. 667, 671, 909 A.2d 983 (2006)*.

In [*12] this case, the plaintiff alleges that Father Maciel "was an employee, agent or apparent agent of the defendant, Legionaries of Christ . . ." Although plaintiff does not allege specifically that Counts One, Three and Five against the Legionaries are brought pursuant to the doctrine of respondeat superior, these claims are clearly brought under that theory. These counts are based on allegations that Father Maciel sexually molested him. Since such sexual abuse cannot be said to further the defendants' business or that Father Maciel was acting within the scope of his employment, it is clear that plaintiff is not entitled to proceed against these defendants under respondeat superior.

The motion is granted as to counts One, Three and Five.[2]

Count Seven—Negligent Infliction of Emotional Distress:

The plaintiff brought the seventh count against the Legionaries alleging that it "should have realized that its conduct [*14] and negligence posed an unreasonable risk of causing Raul emotional distress, and that such distress might result in illness and/or bodily injury. The negligence of the Legionaries caused Raul emotional distress, resulting in illness and bodily harm . . ."

HN6 "To prevail on a claim of negligent infliction of emotional distress, the plaintiff must plead and prove the following: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress . . . Thus, [t]he plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." (Internal quotation marks omitted.) *Shenkman-Tyler v. Central Mutual Ins. Co., 126 Conn.App. 733, 744, 12 A.3d 613 (2011)*.

HN7 "The foreseeability requirement in a negligent infliction of emotional distress claim is more specific than the standard negligence requirement that [*15] an actor should have foreseen that his tortious conduct was likely to cause harm . . . In order to state a claim for negligent infliction of emotional distress, the plaintiff must plead that the actor should have foreseen that her

---

[1]   The [*11] Superior Court, however, in *Nelligan v. Norwich Roman Catholic Diocese*, denied the defendants' motion to strike a count based on the doctrine of respondeat superior by holding that if the court "accepts as true the allegation that the defendant [priest] was acting within the scope of employment, then this count does indeed state a claim for which relief may be granted . . ." *Nelligan v. Norwich Roman Catholic Diocese*, Superior Court, judicial district of Middlesex at Middletown, Docket No. CV 02 0099218 (March 5, 2004, Silbert, J.) [36 Conn. L. Rptr. 597, 2004 Conn. Super. LEXIS 476]. Although the *Nelligan* case involved allegations of sexual assault on the then minor plaintiff by a former Roman Catholic priest as well, the court notes that it is not bound by other Superior Court decisions.

[2]   In his opposition to the motion to strike, the plaintiff argues that under the aided-in-agency doctrine, "the defendants are liable for the actions of the pedophile priest, Maciel." "Under the aided-in-agency theory, an employer may be held liable for the intentional torts of an employee acting outside the scope of his or her employment if the employee 'was aided in accomplishing the tort by the existence of the agency relation.'" *Ocana v. American Furniture Co.*, 2004 NMSC 18, 135 N.M. 539, 552, 91 P.3d 58 (2004) [*13] (quoting Restatement (Second) of Agency §219(2)(d) (1958). Restatement (Second) of Agency §219(2)(d) (1958) provides in relevant part: "A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless . . . (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation."

The court notes, however, that HN5 Restatement (Second), Agency has been superseded by Restatement (Third), Agency. Section 7.08 of Restatement (Third), comment (b) (2006) states in relevant part: "Section 219(2)(d) [Restatement (Second), Agency] concludes with a further general basis for an employer's vicarious liability, which is whether an employee 'was aided in accomplishing the tort by the existence of the agency relation.' This Restatement does not include 'aided in accomplishing' as a distinct basis for an employer's (or principal's) vicarious liability."

2011 Conn. Super. LEXIS 2166, *15

behavior would likely cause harm of a specific nature, i.e., emotional distress likely to lead to illness or bodily harm." (Internal quotation marks omitted.) *Stancuna v. Schaffer, 122 Conn.App. 484, 490, 998 A.2d 1221 (2010)*.

Here, the plaintiff has failed to allege that the Legionaries' conduct created an unreasonable risk of causing emotional distress to the plaintiff, or that the Legionaries should have foreseen that its actions would cause the plaintiff's emotional distress severe enough that it might result in his illness or bodily harm. He has alleged nothing beyond mere conclusions of law that the Legionaries should have known that its negligence posed an unreasonable risk of causing his emotional distress. The motion to strike count seven is therefore granted.

Count Ten—Negligence:

In the tenth count, the plaintiff alleges that the Legionaries owed him a duty not to cause any injuries to him by one of its priests, employees or agents under its supervision. **[*16]** Additionally, he alleges that the Legionaries owed him duties to warn, "to not allow [Father Maciel] to misrepresent" and to make sure Father Maciel was not alone with children. Furthermore, he alleges that the Legionaries was careless and negligent in many ways as set forth in subparagraphs (a) through (m). As a result of the Legionaries' negligence, the plaintiff suffered injuries.

*HN8* "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury . . . Duty is a legal conclusion about relationships between individuals, made after the fact, and [is] imperative to a negligence cause of action . . . Thus, [t]here can be no actionable negligence . . . unless there exists a cognizable duty of care . . ." (Internal quotation marks omitted.) *Murdock v. Croughwell, 268 Conn. 559, 566, 848 A.2d 363 (2004)*. A duty of care "may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." (Internal quotation marks omitted.) *Pelletier v. Sordoni/ Skanska Construction, Co., 286 Conn. 563, 578, 945 A.2d 388 (2008)*.

*HN9* "Although **[*17]** it has been said that no universal test for [duty] ever has been formulated . . . our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised." (Citation omitted; internal quotation marks omitted.) *Perodeau v. Hartford, 259 Conn. 729, 754, 792 A.2d 752 (2002)*.

In subparagraphs 83(a) through 83(m), plaintiff alleges that the Legionaries knew or should have known that Father Maciel had a propensity to sexually batter minors but failed to take adequate steps to prevent the alleged sexual abuse of the plaintiff in various ways, including its failure to establish and enforce a policy of reporting, investigating and removing priests who allegedly engaged in sexual misconduct and its failure to warn and protect the plaintiff from the alleged sexual battery and exploitation. The plaintiff also alleges that the Legionaries systematically covered up sexual misconduct by its priests, including Father Maciel. The court finds that the plaintiff has alleged sufficient facts to establish the existence of **[*18]** a legal duty because these allegations are sufficient to suggest that the harm suffered by the plaintiff was foreseeable, thereby giving rise to a duty to use reasonable care by the Legionaries. The motion to strike Count Ten is therefore denied.

Counts Eleven and Twelve—Negligent Retention and Negligent Supervision:

In Count Eleven, the plaintiff alleges that the Legionaries had a duty to evaluate whether Father Maciel was fit and competent to work with children. He further alleges that defendant knew or should have known that Maciel was not fit to work with children or knew or should have known that he posed a threat of sexually assaulting minors, including the plaintiff.

In Count Twelve, plaintiff alleges that defendant had a duty to supervise the performance of Father Maciel in his duties, including his role in supervising minors and providing them with spiritual instruction, guidance and counseling. He alleges further that in its breach of this duty, defendant generally permitted and encouraged Father Maciel to work with minors even though it "knew or should have known of Maciel's sexual proclivities and prurient interests and potential for sexual battery of minors."

*HN10* "Under Connecticut **[*19]** law, an employer may be held liable for the negligent supervision of employees." *Seguro v. Cummiskey, 82 Conn.App. 186,*

2011 Conn. Super. LEXIS 2166, *19

*191, 844 A.2d 224 (2004).* "In order to plead a cause of action sounding in negligent supervision, a plaintiff must plead injury by an employee whom the defendant had a duty to supervise, failed to supervise and whom the defendant knew or should have known would cause the injury." (Internal quotation marks omitted.) *Hearn v. Yale-New Haven Hospital, Superior Court, Judicial District of New Haven, Docket No. CV 02 0466339, 2007 Conn. Super. LEXIS 2500 (April 2, 2007, Licari, J.).*

**HN11** "The claim of negligent retention has been recognized by the Superior Court, but not by the Appellate Court of the state . . . It requires a plaintiff to plead and prove that an employer, during the course of employment, became aware of problems that indicate a lack of fitness for the position, that the unfitness was likely to cause the sort of harm incurred by the plaintiff, and that the employer failed to take action." (Internal quotation marks omitted.) *Loglisci v. Stamford Hospital, Superior Court, Judicial District of Stamford-Norwalk at Stamford, Docket No. CV 08 5009309, 2011 Conn. Super. LEXIS 387 (February 22, 2011, Jennings, Jr., J.T.R.).*

**HN12** "Whether **[*20]** the claim is for negligent hiring, negligent supervision or negligent retention, a plaintiff must allege facts that support the element of [foreseeability]. The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised . . . It is well settled that defendants cannot be held liable for their alleged negligent hiring, training, supervision or retention of an employee accused of wrongful conduct unless they had notice of said employee's propensity for the type of behavior causing the plaintiff's harm." (Citations omitted; internal quotation marks omitted.) *Elbert v. Connecticut Yankee Council, Inc., Superior Court, Judicial District of New Haven, Docket No. CV 01 0456879, 2004 Conn. Super. LEXIS 1924 (July 16, 2004, Arnold, J.).* "By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?" (Internal quotation marks omitted.) *Allen v. Cox, 285 Conn. 603, 610, 942 A.2d 296 (2008).*

In **[*21]** Count Eleven, the plaintiff alleges that the Legionaries was negligent in retaining Father Maciel because it failed to perform an appropriate background investigation of Father Maciel, failed to perform psychiatric evaluation on Father Maciel or suppressed such results, failed to evaluate him during his tenure, and also failed to review his conduct during his time alone with minors when it knew or should have known that he was not fit and competent to work with minors and knew or should have known that he posed a threat of sexually molesting minors. The plaintiff alleges the Legionaries knew or should have known about Father Maciel's sexual abuse of "numerous minor children whom he recruited for the Legionaries of Christ" in the 1940s and 1950s. Additionally, the complaint contains other allegations, such as an alleged accusation by an older seminarian and priest-rector of the Legionaries that Father Maciel made "sexual advances on youths in the Legionaries' house in Mexico" and a letter sent to Father Maciel, which also accused him of sexually abusing 20 Legionaries' seminarians. The plaintiff alleges that the Legionaries knew of such accusations. The court therefore finds that **[*22]** plaintiff properly pleaded a negligent retention claim.

In Count Twelve, plaintiff alleges that the Legionaries had a duty to supervise the performance of Father Maciel in his duties, but breached this duty when it failed to take appropriate measures to prevent the plaintiff's injuries. He also alleges that defendant permitted and encouraged Father Maciel to work with minors even though it knew or should have known of his sexual proclivities and prurient interests and potential for child sexual abuse. In subparagraphs 96(a) to 96(e), the plaintiff alleges that the Legionaries was negligent in the following ways: it failed to properly monitor Father Maciel's conduct; it allowed him to have unsupervised contact with minors; it allowed him to be alone with minors when it knew or should have known that doing so posed a risk that he would sexually batter them; it allowed him to use funds of the Legionaries to travel around the world and support his children; and that it allowed him to misrepresent his identity to the plaintiff and other children. The court finds that plaintiff has properly stated a cause of action sounding in negligent supervision. The motion to strike Count Twelve is therefore **[*23]** denied.

To summarize: the motion is granted as to Counts One, Three, Five and Seven and denied as to Counts Ten, Eleven and Twelve. It is so ordered.

BY THE COURT

Miller, J.

ⓘ Cited
As of: April 27, 2016 11:53 AM EDT

## *Doe v. Catho*

Superior Court of Connecticut, Judicial District of Hartford at Hartford

January 7, 2014, Decided

HHDCV115035749S

**Reporter**
2014 Conn. Super. LEXIS 1137; 2014 WL 3511700

DOE, JOHN v. HARTFORD ROMAN CATHO

**Notice:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

## Core Terms

motion to strike, Diocese, internal quotation marks, cause of action, judicial district, respondeat superior, allegations, servant, counts, priest, punitive damages, attorney's fees, vicarious, sexual abuse, sexually, cases

**Judges:** [*1] Judge: A SUSAN PECK.

**Opinion by:** A SUSAN PECK

## Opinion

ORDER

ORDER REGARDING:

11/07/2012 127.00 MOTION TO STRIKE

All Counsel Present.

The foregoing, having been heard by the Court, is hereby:

ORDER:

"The purpose of a motion to strike is to contest . . . the legal sufficiency of the allegations of any [pleading] . . . to state a claim upon which relief can be granted." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. Alves, 262 Conn. 480, 498, 815 A.2d 1188 (2003)*. A motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court." (Internal quotation marks omitted.) *Simms v. Seaman, 308 Conn. 523, 529, 69 A.3d 880 (2013)*. "[I]t is fundamental that in determining the sufficiency of a [pleading] challenged by a [party's] motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted." (Internal quotation marks omitted.) *Coe v. Board of Education, 301 Conn. 112, 116-17, 19 A.3d 640 (2011)*. "The role of the trial court in ruling on a motion to strike is to examine the [pleading], construed in favor of the [pleading party], to determine whether the [pleading party has] stated a legally sufficient cause of action." (Internal quotation marks omitted.) *Id., 117*. "A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." [*2] (Internal quotation marks omitted.) *Santorso v. Bristol Hospital, 308 Conn. 338, 349, 63 A.3d 940 (2013)*.

The defendant Diocese moves to strike counts one through six of the revised complaint to the extent that these counts purport to allege a cause of action for vicarious liability under the doctrine of respondeat superior on the ground that these counts fail to allege that the sexual assault of the plaintiff was perpetrated in an attempt to further the interest of the defendant Diocese, his employer. Also, in its reply memorandum, the defendant Diocese also argues that the "aided-in-agency" theory propounded by the plaintiff, in his opposition to the motion to strike, is not a valid legal theory for imposing vicarious liability.

The Supreme Court has "long adhered to the principle that in order to hold an employer liable for the intentional torts of his employee, the employee must be acting within the scope of his employment and in furtherance of the employer's business. . . . But it must be the affairs of the [employer], and not solely the affairs of the [employee], which are being furthered in order for the doctrine to apply." (Citations omitted; emphasis added;

internal quotation marks omitted.) *A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 208, 579 A.2d 69 (1990)*. "The . . . Supreme Court has noted that the doctrine **[\*3]** of respondeat superior generally applies to the negligent conduct of employees to the same extent that it does to intentional torts. . . . " (Citation omitted.) *McColl v. Senski, Superior Court, judicial district of New London, Docket No. CV-09-5010862-S, 2009 Conn. Super. LEXIS 2853 (October 22, 2009*, Cosgrove, J.). See *Matthiessen v. Vanech, 266 Conn. 822, 840 n.16, 836 A.2d 394 (2003)*. "While a servant may be acting within the scope of his employment when his conduct is negligent, disobedient and unfaithful . . . that does not end the inquiry. Rather, the vital inquiry in this type of case is whether the servant on the occasion in question was engaged in a disobedient or unfaithful conducting of the master's business, or was engaged in an abandonment of the master's business. . . . Unless [the servant] was actuated at least in part by a purpose to serve a principal, the principal is not liable." (Citations omitted; internal quotation marks omitted.) *A-G Foods, Inc. v. Pepperidge Farm, Inc., supra, 210*. "Ordinarily it is a question of fact as to whether a wilful tort of the servant has occurred within the scope of the servant's employment and was done to further his master's business. . . . [T]here are occasional cases where a servant's digression from duty is so clear-cut that the disposition of the case becomes a matter of law." (Citation **[\*4]** omitted; internal quotation marks omitted.) *Id., 207*.

"A majority of courts that have considered the issue have rejected respondeat superior claims in cases alleging sexual abuse by priests." *Doe v. Norwich Roman Catholic Diocesan Corp., Superior Court, judicial district of Hartford, Complex Litigation Docket, Docket No. X07-CV-08-5029882-S, 2010 Conn. Super. LEXIS 2114 (September 2, 2010*, Berger, J.). "Cases of sexual abuse often represent such a strong deviation from furthering an employer's business. In most cases of alleged sexual abuse by priests, the courts have held that respondeat superior is not applicable to hold a church or diocese liable, because such acts by the priests are not in furtherance of the church's business." (Internal quotation marks omitted.) Id. Further, "[t]here are a number of cases holding that when an employee of a religious organization is alleged to have committed sexually abusive or assaultive behavior against another, such conduct, as a matter of law, is not within the scope of employment." *Sparano v. Daughters of Wisdom, Inc., Superior Court, judicial district of Stamford-Norwalk at Stamford, Complex Litigation Docket, Docket No. X08-*

*CV-03-0199399-S, 2004 Conn. Super. LEXIS 1808 (July 1, 2004, Adams, J.)*. See also *Lara v. Legionaries of Christ, Superior Court, judicial district of Hartford, Complex Litigation Docket, Docket No. X03-CV-10-6016974-S, 2011 Conn. Super. LEXIS 2166 (August 30, 2011*, Miller, J.) **[\*5]** (complaint against the defendants alleging reckless and negligent battery and reckless infliction of emotional distress based on theory of respondeat superior (although not specifically alleged), where a priest employed by the defendants allegedly sexually assaulted the plaintiff); *Doe v. Hartford Roman Catholic Diocesan Corp., 45 Conn. Supp. 388, 716 A.2d 960 (1998)* (motion to strike granted as to a vicarious liability count against the Hartford Roman Catholic Diocese and the Church of the Holy Spirit where minor alleged that a priest had sexually abused her during pastoral counseling); *Nutt v. Norwich Roman Catholic Diocese, 921 F. Supp. 66 (D.Conn.1995)*.

Because counts one through five, as set forth in paragraph 14, state only in conclusory fashion that the sexual abuse of the plaintiff occurred while the perpetrator "was acting in the scope of his duties as a Roman Catholic priest and/or as an agent, servant or employee of the Defendant Diocese," and adds only the additional conclusory statement in count six, "and in furtherance of . . . it[s] business purpose," these counts against the defendant Diocese, based on the theory of respondeat superior, fail as a matter of law. Although **[\*6]** the plaintiff argues, in the alternative, under the "aided-in-agency" theory, that the defendant Diocese may be held vicariously liable for the alleged sexual assault committed by perpetrator, this theory has not been recognized under either the Restatement (Third), Agency, or Connecticut courts, and this court concludes that it fails to state a valid cause of action. Accordingly, the motion to strike counts one through six to the extent they allege vicariously liability under the doctrine of respondeat superior against the defendant Diocese, is granted.

The defendant Diocese also moves to strike twelve of the thirteen subparagraphs of count seven, which seeks to allege a claim of negligent hiring, retention and supervision against the Diocese. Specifically, the defendant seeks to strike subparagraphs a, b, c, d, e, f, g, i, j, k, l, and m of paragraph 15 based on several grounds. Subparagraph 15 (h), is not included in the motion to strike. "[M]ost trial courts follow the rule that a single paragraph of a pleading is subject to a motion to strike only when it attempts to set forth all of the essential allegations of a cause of action or defense. . . . Arguably

Case 3:13-cv-00215-VAB   Document 218   Filed 04/27/16   Page 97 of 98

Page 3 of 4
2014 Conn. Super. LEXIS 1137, *6

under the present rules, a **[\*7]** motion to strike may properly lie with respect to an individual paragraph [or paragraphs] in a count. . . . However, the weight of authority in the Superior Court is that the motion does not lie, except possibly where the subject paragraph [or paragraphs] attempts to state a cause of action. . . . [O]nly an entire count of a counterclaim or an entire special defense can be subject to a motion to strike, unless the individual paragraph [or paragraphs] embodies an entire cause of action or defense." (Internal quotation marks omitted.) *Weingarden v. Milford Anesthesia Associates, P.C., Superior Court, judicial district of New Haven, Docket No. CV-11-6016353-S, 2013 Conn. Super. LEXIS 1239 (May 30, 2013*, Wilson, J.). See also *Fradera v. State Farm Mutual Automobile Ins. Co., Superior Court, judicial district of New Haven, Docket No. CV-11-6003104-S, 2013 Conn. Super. LEXIS 1705 (July 26, 2013, Fischer, J.)* (holding that it would be procedurally improper to strike subparagraphs of a Connecticut Unfair Trade Practices Act cause of action because each subparagraph did not constitute a separate cause of action); *Moltz v. Harry's Taxi, Superior Court, judicial district of New London, Docket No. CV-98-0547023-S, 1999 Conn. Super. LEXIS 2072 (August 5, 1999*, Martin, J.) (holding that the **[\*8]** subparagraphs of a special defense did not set forth all of the essential allegations of that defense and therefore were improper subjects of a motion to strike).

"[T]he essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." (Emphasis omitted; internal quotation marks omitted.) *Klein v. Norwalk Hospital, 299 Conn. 241, 256, 9 A.3d 364 (2010)*. "The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand. . . . [T]he test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case. . . . The first part of the test invokes the question of foreseeability, and the second part invokes the question of policy." (Internal quotation **[\*9]** marks omitted.) *Neuhaus v. DeCholnoky, 280 Conn. 190, 217-18, 905 A.2d 1135 (2006)*. Similarly, "[w]hether the claim is for negligent

hiring, negligent supervision or negligent retention, a plaintiff must allege facts that support the element of foreseeability." (Internal quotation marks omitted.) *Seda v. Maxim Healthcare Services, Superior Court, judicial district of Hartford, Docket No. CV-07-5010811-S, 2008 Conn. Super. LEXIS 916 (April 8, 2008, Elgo, J.)*. In subparagraph 15 (h), the plaintiff alleges that the defendant Diocese "failed to take appropriate steps to investigate and remove Rozint as a priest when [it] learned of his propensity for sexually abusing preteen boys and teenage boys," demonstrating the essential element of foreseeability. (Emphasis added.) In its memorandum of support, the defendant Diocese acknowledges that subparagraph 15 (h) provides this essential element, but separates out 15 (h) and seeks to strike the remainder of paragraph 15. Because subparagraph 15 (h) contains an allegation of foreseeability, an essential element of a claim of negligent hiring, negligent supervision, or negligent retention, the subparagraphs that the defendant Diocese seeks to strike cannot stand on their own as an independent causes of action. Accordingly, for the reason that the **[\*10]** twelve subparagraphs to which the motion to strike is directed do not separately state a claim, they are not proper subjects of a motion to strike. Therefore, the motion to strike count seven is denied. Finally, the defendant Diocese moves to strike paragraphs two and three of the prayer for relief seeking punitive damages and attorney's fees on the grounds that such damages are not available based on a claim of vicarious liability. "[T]he common law rule in Connecticut, also known as the American Rule, is that attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception." (Internal quotation marks omitted.) *Berzins v. Berzins, 306 Conn. 651, 657, 51 A.3d 941 (2012)*. "Attorney's fees may be awarded, however, as a component of punitive damages. . . . To furnish a basis for recovery of such [punitive] damages, the pleadings must allege and the evidence must show wanton or wilful malicious misconduct, and the language contained in the pleadings must be sufficiently explicit to inform the court and opposing counsel that such damages are being sought." (Citations omitted; internal quotation marks omitted.) *Farrell v. Farrell, 36 Conn. App. 305, 311, 650 A.2d 608 (1994)*. In the present case, the plaintiff has not alleged wanton, **[\*11]** wilful or malicious misconduct on the part of the defendant Diocese. Rather, the plaintiff's allegations in count seven (the only remaining count), sound in negligence. Further, the plaintiff stated at oral argument that he does not object to the motion to strike the claim for punitive

2014 Conn. Super. LEXIS 1137, *11

damages. Since the demand for attorney's fees under the common law is dependent on the availability of punitive damages, the demand for attorney's fees must be stricken.

For all the foregoing reasons, the defendant Diocese's motion to strike counts one through six and the demand for punitive damages and attorney's fees is hereby granted. The motion to strike count seven is hereby denied.

Judicial Notice (JDNO) was sent regarding this order.

412190

Judge: A SUSAN PECK