IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| EAST POINT SYSTEMS, INC., et al. ) | CIVIL CASE NO. 3:13-cv-00215-VAB |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| vs. ) | |
| ) | |
| STEVEN MAXIM, et al. ) | |
| ) | |
| **Defendants.** ) | MAY 18, 2016 |

**MEMORANDUM IN OPPOSITION TO MOTION TO AMEND
FINDINGS AND JUDGMENT PURSUANT TO RULES 52(b) AND 59(e)**

Defendants Steven Maxim ("Maxim"), S2K, Inc. ("S2K"), Maxim Enterprises, Inc. ("MEI"), and Maxim Field Service Supply, Inc. ("MFSS") (collectively, "Maxim Defendants") hereby submit their memorandum in opposition to the Plaintiffs' motion for amended findings and to alter or amend judgment pursuant to Rules 52(b) and 59(e) of the Federal Rules of Civil Procedure, dated April 27, 2016 (Doc. 218) ("Motion").

None of Plaintiffs' requests is based on intervening changes in the law, the new availability of evidence, or the need to correct a clear error of law or prevent manifest injustice, as required for the Motion to be granted. Additionally, Plaintiffs' requests cannot be justified by the facts or law of this case. Plaintiffs' requests should, therefore, each be denied.

**I.      Standard of Review**

Rule 52(b) of the Federal Rules of Civil Procedure provides that on a party's motion, a court "may amend its findings—or make additional findings—and may amend the judgment accordingly." As is the case here, a Rule 52(b) motion is often accompanied by a motion under Rule 59(e) of the Federal Rules of Civil Procedure "to alter or amend a judgment," or, more commonly, a motion for reconsideration. "[M]otions under Rules 52(b) and 59(e) are reviewed under the same standard . . . ." Graham v. United States, No. CIV 3:01CV177(AHN), 2006 WL

1

3361752, at *1 n.1 (D. Conn. Nov. 16, 2006).

"The standard for granting a motion for reconsideration is strict in order to dissuade repetitive arguments on issues that have already been considered fully by the Court." Lauria v. United States, No. 3:01CV1893(PCD), 2007 WL 1064319, at *2 (D. Conn. Apr. 5, 2007) (citing Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)). "The only permissible grounds on which to grant a motion for reconsideration are: (1) an intervening change in the law; (2) the availability of new evidence not previously available; or (3) the need to correct a clear error of law or prevent manifest injustice." Martin v. Dupont Flooring Sys., Inc., No. Civ.A. 301CV2189(SRU), 2004 WL 1171208, at *1 (D. Conn. May 25, 2004) (citing Doe v. New York City Dep't of Soc. Servs., 709 F.2d 782, 789 (2d Cir.), cert. denied sub nom., Catholic Home Bureau v. Doe, 464 U.S. 864 (1983)).

"[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader, 70 F.3d at 257 (citations omitted). "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." Id.

## II. Plaintiffs fail to justify their request that the Court reconsider its ruling regarding the admissibility of Mr. Flaherty's testimony

Plaintiffs request that the Court enter an order granting additional testimony from a certified public accountant, Kevin Flaherty, or, in the alternative, that the Court amend the Opinion[1] to reflect the asserted fact that Plaintiffs have not waived their claim that Mr. Flaherty was improperly excluded. (Motion, 2-5.) Plaintiffs' arguments fail. Mr. Flaherty was offered to

---

[1] The Motion alternatively uses the terms opinion, judgment, and decision to refer to the Court's "Memorandum and Order" dated March 22, 2016 (Doc. 214). Maxim Defendants will adopt "Opinion" for purposes of this memorandum.

tell the Court what he read in inadmissible East Point documents that Mr. Flaherty did not prepare, which Plaintiffs contend was fact testimony. Any testimony by Mr. Flaherty describing the documents would have been irrelevant and barred by Rule 1002 of the Federal Rules of Evidence, also known as the best evidence rule. Mr. Flaherty might have offered relevant opinion testimony, but he was barred from doing so because he was never properly disclosed as an expert.

### A. Plaintiffs repeat the same argument that they made both before and at trial

Plaintiffs request that the Court order further presentation of evidence in this case, specifically that Mr. Flaherty, a certified public accountant, be permitted to testify as a supposed fact witness. (Motion, 2.) Plaintiffs assert that Mr. Flaherty's testimony "would have been strictly constrained to a summary of the facts of damages in the case" and, therefore, should not be considered expert opinion testimony. (Motion, 3.) In making this argument, Plaintiffs repeat many of the same factual and legal assertions they made to the Court in their opposition to Defendants' motion in limine to preclude Mr. Flaherty's testimony, even using the exact same language at times. (Compare Motion, 2-3 with Doc. 218, 2-3.) "This attempt to take a second bite at the apple is beyond the scope of Rules 52(b) and 59." See Sims v. Mme. Paulette Dry Cleaners, No. 82 CIV. 5438 (MEL), 1986 WL 12511, at *1 (S.D.N.Y. Oct. 31, 1986).

### B. Plaintiffs did not lay a foundation for the testimony of Mr. Flaherty

In ruling on Maxim Defendants' motion in limine, the Court carefully considered Plaintiffs' contention that Flaherty should be permitted to testify as a fact witness.[2] The Court

---

[2] The Court stated: "Plaintiffs provided the Court with no authority for the proposition that a certified public accountant not employed by the plaintiff company, and who had no personal involvement with the plaintiff company or its financial records during the relevant time periods, may testify as a fact witness, following his review of the business's financial records, about financial losses (i.e., damages) allegedly suffered by the plaintiff company. The Court's independent research revealed that, in cases where accountants were allowed to testify as fact

then allowed the Plaintiffs an opportunity: "if Plaintiffs demonstrate that Mr. Flaherty has personal knowledge . . . Mr. Flaherty will be permitted to testify only about his personal knowledge." (Doc. 185, 5.) This ruling by the Court is consistent of Federal Rules of Evidence 602: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." As the Court noted, Plaintiffs chose not to take advantage of the opportunity to lay a foundation for the testimony of Mr. Flaherty. (Opinion, 17 n.3.) Plaintiffs instead relied on testimony from Paul Taff, the general manager of East Point, who claimed to have "personal knowledge concerning the revenues and any losses of the company." (Tr. 477:5-17.)

Oddly, Plaintiffs now contend that the Court, in explaining Plaintiffs' decision to question Mr. Taff, "indicat[ed] that the plaintiffs may have waived any claim as to the exclusion of Flaherty's testimony" and should amend the Opinion to make it clear that no waiver occurred. (Motion, 4.) There is no reason for the Court to amend the Opinion, as the recitation of facts referenced by Plaintiffs[3] is an accurate description of events relating to Mr. Flaherty and his non-

---

witnesses, the accountants were personally familiar with the relevant business's records, or the accounting of the transactions at issue." (See Doc. 185, 3-4.)

[3] Specifically, the relevant text of the Court's Memorandum appears to be as follows:

> Before trial, Plaintiffs disclosed a certified public accountant (the "CPA") as an expert to testify as to Plaintiffs' economic damages. However, Plaintiffs did not provide Defendants with an expert report as required by Fed. R. Civ. P. 26(a)(2)(B), or a summary of facts and opinions as required by Fed. R. Civ. P. 26(a)(2)(C). Accordingly, the Court precluded the CPA from testifying as an expert. Order at 5, ECF No. 185. Plaintiffs contended that, although they had initially disclosed him as an expert, the CPA actually would testify as a fact witness. The Court "allow[ed] Plaintiffs an opportunity to lay a foundation for [the CPA's] personal knowledge" to testify as a fact witness as to their damages, id., but Plaintiffs did not call the CPA to testify at trial.

(Opinion,17 n.3) Plaintiffs have not suggested any reason to believe they could have laid the necessary foundation. Mr. Flaherty's testimony would have been either irrelevant – who cares

4

participation at trial. Furthermore, to the extent that Plaintiffs' actions may have resulted in a waiver of any kind, such waiver had already occurred (a fact that will eventually become clear if this case is appealed): "It is the general rule . . . that a federal appellate court does not consider an issue not passed upon below." Singleton v. Wulff, 428 U.S. 106, 120 (1976).

    C.  The Court's ruling  was neither a clear error of law nor a manifest injustice

Plaintiffs now state that Mr. Taff was not "able to testify competently" and that they should not have been "deprived of the opportunity to present the evidence from their chosen witness." (Motion, 2.) Plaintiffs suggest that this deprivation is either a clear error of law or a manifest injustice, but do not make explain why that is the case. (Motion, 1.) The alleged loss of Mr. Flaherty cannot have resulted in a manifest injustice when Mr. Taff covered the exact same subject matter, even trying to rely on the same inadmissible exhibit that he tried to memorize.[4]

A clear error of law is similarly absent – there is no binding precedent within the Second Circuit that supports a conclusion in Plaintiffs' favor. In fact, in many of the cases Plaintiffs cite, the courts either found the witness to be an expert or limited the witness to testifying about facts within his personal knowledge. See, e.g., In re Fosamax Products Liability Litigation, 647 F. Supp. 2d 265, 280–81 (S.D.N.Y. 2009) (witness qualified as an expert); Guarnieri v. Pa. Fed'n Bhd. of Main. of Way Emples., 153 F. Supp. 2d 736, 745 (E.D. Pa. 2001) ("If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness . . .

---

what Mr. Flaherty read in inadmissible documents that he did not prepare? – or inadequately disclosed opinion testimony.
    [4] See Part III below for an explanation of why the Court's exclusion of Plaintiffs' Exhibit 23 was appropriate.

5

.").[5]

Plaintiffs admit that Mr. Flaherty's testimony would not be based on personal knowledge, but would rather be "a straightforward recitation of facts, set forth in exhibits." (Motion, 4.) This is a reference to Plaintiffs' Exhibit 23 and, as explained below, it was properly excluded from evidence.[6] Nor was Plaintiffs' Exhibit 23 created by Mr. Flaherty – as Mr. Taff explained, the exhibit reveals calculations done by Doriann Plant to project East Point's supposed losses. (Tr. 532:10-16.) So, when Plaintiffs state that Mr. Flaherty should have been "allowed to testify as to his factual findings" what they are actually saying is that Mr. Flaherty should have been allowed to testify as to his memorization of Ms. Plant's calculations.[7] (Motion, 4.) Plaintiffs also argue that Mr. Flaherty's testimony would have required "no synthesis of any data" (Motion, 3), despite the fact that the "findings" in question consisted of projected losses purportedly based on a secret formula (that may or may not have involved averaging), which are, by definition, syntheses of data. Therefore, the Court acted properly when it held that Mr. Flaherty could not testify as a fact witness as to the contents of the inadmissible exhibits without first demonstrating personal knowledge of the information contained therein.[8]

---

[5] As proof that we are retreading familiar terrain here, Plaintiffs also cited In re Fosamax (captioned Boles v. Merck & Co.) and Guarnieri in their response to Defendants' motion to preclude Flaherty's testimony. (Doc. 179, 3.)

[6] "[T]he information contained within exhibit 23, underlay the conclusions of Mr. Flaherty, and essentially conveyed substantially the same information." (Motion, 9.)

[7] Plaintiffs' reference to Flaherty's "factual findings" is puzzling. Fact witnesses do not make findings. They testify to their personal observations and knowledge.

[8] Plaintiffs appear to believe that Mr. Flaherty's asserted ability to "coherently and methodically respond to questions" makes him a permissible fact witness. (Motion, 2.) If this were the standard, attorneys would regularly hire talented actors to testify instead of their clients. Unfortunately for witnesses like Paul Taff, who struggled to remember his lines, such substitution is not permitted.

### III. Plaintiffs fail to justify their request that the Court reconsider its ruling regarding the admissibility of Plaintiffs' Exhibit 23 for identification

Plaintiffs request that the Court reconsider its ruling precluding the admission of Plaintiffs' Exhibit 23 for identification.[9] (Motion, 5-9.) Plaintiffs' arguments fail. The exhibit was not timely provided under Fed. R. Civ. P. 26(a)(3) and Plaintiffs should have expected that introduction of that document would be required by the best evidence rule.

A. <u>Plaintiffs repeat the same argument made at trial</u>

Plaintiffs argue that the Court has abused its discretion in precluding the admission of Plaintiffs' Exhibit 23 for identification by reviewing the following factors: (1) Plaintiffs' explanation for their failure to disclose the exhibit; (2) the importance of the evidence; (3) the prejudice to the Maxim Defendants; and (4) the possibility of a continuance. (Motion, 6, referencing <u>Patterson v. Balsamico</u>, 440 F.3d 104, 117 (2d Cir. 2006).) Not only is this an argument that can only properly be made on appeal, but in explaining the first consideration, Plaintiffs actually cite a portion of the trial transcript wherein the Plaintiffs made the <u>same argument</u> (revealing that they were hoping to ambush the Maxim Defendants and were surprised when that did not work). (<u>Id.</u>, 6-7.) The Court did not find this argument compelling the first time and Plaintiffs should not be heard to re-argue it here. See <u>Shrader</u>, 70 F.3d at 257.

B. <u>Plaintiffs' explanation for their failure to disclose the exhibit is flawed</u>

Plaintiffs argue that they did not expect to need to offer Plaintiffs' Exhibit 23 because they believed that Mr. Flaherty's testimony would have been sufficient to establish damages. (Motion, 6.) Plaintiffs explain that Mr. Flaherty's testimony would have been a "recitation" of the facts in Plaintiffs' Exhibit 23 (Motion, 3), but do <u>not</u> explain why they believe that Mr.

---

[9] The Court aptly described Plaintiffs' Exhibit 23 for identification as "a summary spreadsheet purportedly containing figures representing licensing and 'per click' revenue that East Point received, as well as projections of lost revenue." (Opinion, 18 n.3.)

7

Flaherty would have been permitted to memorize the document and then recite it when the best evidence rule requires that the "original writing" be produced in order to prove its content. See Fed. R. Evid. 1002. A recitation of the content is not permitted when the document itself is available. Plaintiffs refused to disclose Plaintiffs' Exhibit 23 even when they realized Mr. Taff was testifying, allegedly because they did not realize that the document would "not allow Taff to testify as to the plaintiffs' damages from personal knowledge." (Motion, 7.) This is a perplexing comment. Mr. Taff either had personal knowledge of Plaintiffs' damages, or he didn't. Plaintiffs' Exhibit 23 was never going to "allow him" to have personal knowledge. Both of these explanations are flawed and should be disregarded. Plaintiffs' intent was to ambush Maxim Defendants at trial, which the Court correctly prevented them from doing.

    C.  Plaintiffs' counts would have failed even if Plaintiffs' Exhibit 23 had been admitted

Plaintiffs argue that Plaintiffs' Exhibit 23 was critically important, stating that if it had been admitted, Plaintiffs "would have been able to prove their damages, thereby altering the outcome of the proceeding." (Motion, 8.) In reaching this conclusion, Plaintiffs failed to consider the questionable nature of Plaintiffs' Exhibit 23. (See Tr. 532:2-9 (Mr. Taff acknowledging mistakes in Exhibit 23.).) Nor did Plaintiffs acknowledge the fact that the Court found that Maxim Defendants were not the cause of these alleged damages. (Opinion, 17 ("Plaintiffs did not prove that their loss of customer revenue was caused by Steven Maxim's breach and not . . . CFS's licensing transactions with A&M and Berghorst in late 2011.")). For these reasons, Plaintiffs Exhibit 23, even if admitted, would not have supported a finding of fault against Maxim Defendants and, therefore, should not be considered critical.

    D.  Maxim Defendants would have suffered prejudice if forced to analyze "evidence" of damages for the first time on the third day of trial

Plaintiffs contend that ambushing Maxim Defendants with previously undisclosed

8

financial information on the third day of trial was not prejudicial. (Motion, 8-9.) They argue that Maxim Defendants were negligent[10] in not investigating Mr. Flaherty's findings after Plaintiffs "disclosed" Mr. Flaherty as an expert without offering a required written report or even summary of the facts and opinions to which he was expected to testify. (Id. at 9 and Ex. A.) Maxim Defendants acted properly in this regard. Secure in the knowledge that Mr. Flaherty would not be permitted to testify without first making a proper disclosure under Fed. R. Civ. P. 26(a)(2), Maxim Defendants were content to wait for that disclosure before deposing him. Plaintiffs never made that required disclosure. Therefore, Maxim Defendants had no notice of the details of any of Plaintiffs' alleged damages and would have suffered great prejudice had the Court allowed Plaintiffs' Exhibit 23 to be admitted, without any warning of its contents, more than halfway through trial.

   E. <u>Plaintiffs fail to address the possibility of continuance now, just as they failed at trial</u>

  Plaintiffs note that the fourth factor to consider when determining if the preclusion of evidence was an abuse of discretion is whether a continuance was possible. Plaintiffs fail to analyze this factor, perhaps because Plaintiffs did not request a continuance at trial (as they previously told the Court, it was important to Plaintiffs to finish the trial before the end of the 2015 calendar year). Plaintiffs never explained why Mr. Maxim should have been forced to travel from Ohio to Connecticut a second time to make up for Plaintiffs' failure to follow the rules. As Plaintiffs made a continuance impossible, this factor (like the other three) weighs in favor of Maxim Defendants.

---

  [10] This legal argument (that Maxim Defendants' alleged discovery negligence should impact whether the non-disclosed Plaintiffs' Exhibit 23 is precluded) is a new one. "Motions made under Fed. R. Civ. P. 52(b) . . . are not intended . . . to allow parties to present the case under new theories." <u>Wallace v. Brown</u>, 485 F. Supp. 77, 78 (S.D.N.Y. 1979).

23120.000/648976.2

**IV.     Plaintiffs' attempts to impute liability are flawed on multiple levels**

Plaintiffs request that the Court amend its Opinion at Parts II.A, II.C and II.F to find that Plaintiffs pierced the corporate veil and that, as a result, S2K should be found liable for breach of the Shareholder Agreement and the Confidentiality and Non-Competition Agreement, and that MEI should be found liable for breach of the Source Code Access and Indemnity Agreement, based not on their own failings, but on the alleged actions of Mr. Maxim. (Motion, 9-12.) This request should be rejected for a variety for reasons explained below.

   A.   The Connecticut Supreme Court is skeptical of reverse veil piercing

Plaintiffs' argument is reminiscent of "reverse veil piercing," a technique recognized in some states, such as New York, whereby a plaintiff "seeks to hold a corporation accountable for actions of its shareholders." Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997) (explaining New York law). This is not a technique that has been recognized by the Connecticut Supreme Court.[11] "The Connecticut Supreme Court has recently expressed skepticism regarding whether the reverse veil piercing doctrine is 'a viable theory in Connecticut.'" Lundstedt v. People's United Bank, No. 3:14-CV-01479 JAM, 2015 WL 540988, at *2 (D. Conn. Feb. 10, 2015) (citing Comm'r of Envtl. Prot. v. State Five Indus. Park, Inc., 304 Conn. 128, 142 (2012).) In State Five, the Connecticut Supreme Court "declined to express an opinion on the continued viability of Litchfield Asset Management Corp. v. Howell"[12] noting

---

[11] Connecticut law applies in this case. See Am. Fuel Corp., 122 F.3d at 134 ("where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry").

[12] The Connecticut Appellate Court adopted reverse piercing in response to an argument "that the assets of the corporate entities should be made available to pay the personal debts of an owner." Litchfield Asset Mgmt. Corp. v. Howell, 70 Conn. App. 133, 149 (2002), cert. denied, 261 Conn. 911 (2002).

10

that the "potential unfair effects of applying the reverse veil piercing doctrine can be addressed adequately, in the appropriate case, by recognition of the doctrine only when it is proven that it achieves its equitable purpose without harming third parties." Comm'r of Envtl. Prot. v. Farricielli, 307 Conn. 787, 798 (2013) (quotation marks omitted). The Connecticut Supreme Court has yet to address the reverse veil piercing doctrine beyond expressing these concerns.

    B.  Reverse veil piercing does not trump contract law

Even in the states in which it has been recognized, reverse veil piercing does not work in the manner suggested by Plaintiffs. For example, in a typical reverse veil piercing case, the State of New York attempted to enforce a tax lien upon a shareholder against that shareholder's corporation. State v. Easton, 169 Misc. 2d 282, 288-89, 647 N.Y.S.2d 904, 909 (Sup. Ct. 1995). New York failed in that case, but as a general concept reverse veil piercing simply allows a plaintiff to reach into funds belonging to the defendant's business in order to pay a debt. See Lundstedt v. People's United Bank, No. 3:14-CV-01479 JAM, 2015 WL 540988, at *2 (D. Conn. Feb. 10, 2015) ("at best [reverse veil piercing] allows a creditor of an individual to look to a business entity for satisfaction of the individual's debts").

Therefore, reverse veil piercing cannot be used to overrule traditional contract law. "Under Connecticut law, the elements of a breach of contract action are (1) formation of an agreement, (2) performance by one party, (3) breach of the agreement by the opposing party, and (4) damages." Young v. Citimortgage, Inc., No. 3:11-CV-01363-WWE, 2012 WL 4371532, at *2 (D. Conn. Sept. 24, 2012). Only a party to an agreement can be held liable for breaching that agreement. (Mr. Maxim was not a party to S2K's and MEI's contract. And even if Mr. Maxim were considered a party to S2K's and MEI's contracts under this novel theory, there can be no breach without damages, which Plaintiffs failed to establish.)

11

## C. Plaintiffs fail to produce evidence to warrant disregarding corporate structure

Likely in order to avoid a discussion of Connecticut's stance on reverse veil piercing, Plaintiffs never discuss their theory in those terms, and instead suggest that the corporate structure should be disregarded as long as three elements can be proved: (1) complete domination of the corporation; (2) that such control was used to commit a fraud, violate a statute, or dishonestly act against the complainant; and (3) the control and wrongful act must proximately cause the complainant's injury. (Motion, 10.) Even assuming that this legal analysis is correct (which it decidedly is not), Plaintiffs were not able to prove these three elements. Plaintiffs were unable to establish complete domination by Mr. Maxim of S2K and MEI, offering no evidence that either company failed to follow corporate formalities, commingled assets, or was inadequately capitalized. Nor were Plaintiffs able to establish that Mr. Maxim engaged in fraud (which was never even alleged in the Complaint; the word "fraud" never appears) or committed any wrongful act. Finally, as explained in greater detail below, none of the Maxim Defendants caused Plaintiffs' injuries.

## V. Plaintiffs fail to establish that there was sufficient evidence to prove that Maxim Defendants proximately caused Plaintiffs' injuries

Plaintiffs request that the Court amend its Opinion at Parts II.B, II.D, II.E.1, II.F, II.L.1, II.M.1 and II.N.1 to find that Plaintiffs established that their injuries were proximately caused by the actions of the Maxim Defendants. (Motion, 12-19.) In support of this request, Plaintiffs assert that they submitted evidence at trial "that elements from their Fieldcomm.net software was present in the Field Navigator product that Pajemola marketed to A&M and Berghorst." (Id. at 13.) Plaintiffs submitted no such evidence, as the Court notes: "Plaintiffs did not prove, as to the Maxim Defendants, that the software that CFS licensed to A&M and Berghorst contained any Field-Comm.net elements." (Opinion, 22 n. 5.) Even Plaintiffs admit that "there was no analysis

12

of Pajemola's Field Navigator, presented to Berghorst and A&M." (Motion, 14 (emphasis added).)

Just moments after admitting that the Berghorst and A&M products were <u>never analyzed</u>, Plaintiffs argue that "there was more than sufficient evidence to demonstrate that it is more likely than not, that the plaintiffs' code was contained within the Field Navigator product that was marketed and used by Berghorst and A&M." (<u>Id.</u>) This "evidence" consists of two distinct items. First, Plaintiffs suggest that the product that Mr. Maxim shared with Mr. Strickland during their merger discussions and the product later sold to A&M by Mr. Pajemola are the same product. (<u>Id.</u>) As Maxim Defendants demonstrated in their post-trial brief, Mr. Strickland testified that this was not the case, and there is no evidence to the contrary. (Doc. 204, 8-9.)[13] Second, Plaintiffs suggest that Berghorst and A&M switched over to their respective Pajemola products with ease and that this should be considered an indication of the products' contents. (Motion, 14-15.) The evidence at trial, however, revealed that Mr. Strickland did not know how long A&M's transition took. (Trial Ex. 506, 8:7-9[14].) Ms. Berghorst was similarly unaware of the timing of Berghorst Enterprises' transition to Pajemola's software, but knew that it was "more than one day for sure" (Trial Ex. 507, 45:2-6). There is no evidence that either transition was quick or easy. Plaintiffs' argument hinges on an ease of transition that is simply invented. Plaintiffs' argument must fail.

Plaintiffs also argue that Maxim Defendants should be held liable for Mr. Pajemola's

---

[13] Plaintiffs have already made these arguments; Maxim Defendants have already responded to them; and the Court has already rendered a well-reasoned decision. "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." <u>Shrader,</u> 70 F.3d at 257.

[14] This citation refers to the docket entry page number and the <u>first</u> set of lines numbered 7-9 on that page (Plaintiffs failed to include the transcript page numbers when designating portions of Mr. Strickland's deposition).

13

actions because of "the agency relationship that was established at trial." (Motion, 15.) Plaintiffs fail to explain how this relationship was established at trial. Plaintiffs then quote from a recent case that defined the "aided-in-agency theory of vicarious liability," which is that "an employer may be held liable for the intention acts of an employee . . . if the employee was aided in accomplishing the tort by the existence of the agency relation." (Motion, 17 (quoting Doe v. Hartford Roman Catholic Diocesan Corp., No. X10UWYCV105015963, 2014 WL 2581049, at *1 (Conn. Super. Ct. May 9, 2014) (58 Conn. L. Rptr. 177)). Plaintiffs purposely refrained from quoting that court's subsequent (and critical) statement: "Connecticut courts have never, however, recognized an aided-in-agency theory of liability outside this narrow employment context [of a supervising employee committing an intentional tort against a subordinate employee, i.e. harassment]." Id. at *2. Mr. Pajemola was not even employed by any Maxim Defendant at the time he began selling his competing products to Plaintiffs' customers and he was certainly not harassing his subordinates. Therefore this theory of vicarious liability cannot be applied to Maxim Defendants.

Furthermore, Mr. Pajemola did not need any help from Maxim Defendants to carry out his alleged torts. He was already active as a talented programmer in the mortgage field services software industry, due to his time at Safeguard, and would have had the ability to compete with Plaintiffs, and the interest in doing so, regardless of his relationship with Mr. Maxim. (See Paj. Dep. 184:22-185:5.) In a similar vein, Plaintiffs blame Mr. Maxim for introducing Mr. Pajemola to Mr. Strickland[15] and then even attempt to blame Mr. Maxim for the fact that Mr. Pajemola was able to rely on the Software Access and Indemnity Agreement to assure Ms. Berghorst of his

---

[15] In fact, Plaintiffs indirectly introduced Mr. Pajemola to Mr. Maxim, by recommending a colleague of Mr. Pajemola to Mr. Maxim when the latter was in need of programming assistance. (617:18-24.)

14

legitimacy.[16] (Motion, 18.) None of these interactions with Mr. Maxim aided Mr. Pajemola in any notable or definable way. Even if the aid-in-agency theory worked as Plaintiffs' suggest (which it does not), an application of that theory would lead to the conclusion that Maxim Defendants cannot be held liable for Mr. Pajemola's alleged conduct.

Finally, Plaintiffs argue (without evidentiary support) that there was a "steady exodus" of A&M's subcontractors and that this somehow establishes that Maxim Defendants must be responsible for the (unproven) damages to East Point. (Motion, 18.) The only trial evidence remotely relevant to the issue of damages resulting from East Point's loss of clients that has not been stricken reveals simply that A&M began to pay Mr. Pajemola in July 2011 and that Berghorst began to pay Pajemola's company, CFS, in November 2011 – all well after the end of the relationship between Mr. Pajemola and Maxim Defendants. (Trial Exs. 15 and 18.)

This evidence relates only to Mr. Pajemola's unjust enrichment, not to monetary losses suffered by East Point. Plaintiffs attempted to offer evidence of such losses through Mr. Taff, but his testimony on this topic was stricken. (Opinion, 20 n. 4 ("The Court will, however, strike under Fed. R. Evid. 1002 those portions of Mr. Taff's testimony where he offered revenue figures and projections from the spreadsheet . . . . Mr. Taff did not have a present recollection . . . and by referring to the spreadsheet and reciting the figures, he was reading into evidence the contents of an excluded document.").)

Therefore, Maxim Defendants did not proximately cause Plaintiffs injuries because: (1) there is no evidence that any former clients of East Point, including A&M and Berghorst, used a product containing East Point software; (2) Pajemola had severed ties with the Maxim Defendants many months prior to transitioning any clients away from East Point (and was not

---

[16] This agreement, of course, is actually <u>between Mr. Pajemola and East Point</u>, so, if anything, East Point (not Mr. Maxim) aided Mr. Pajemola in this deception. (<u>See</u> Trial Ex. 6.)

23120.000/648976.2

harassing anyone); and (3) Plaintiffs failed to establish any injuries for Maxim Defendants to have proximately caused.

**VI.     Plaintiffs should not succeed by waiting until <u>after</u> judgment to <u>first</u> contend that $33,000 is the proper valuation for S2K's shares of East Point**

Plaintiffs request that the Court amend its Opinion regarding the appropriate price for S2K sale of its East Point shares (from $57,700 to $33,000). (Motion 19-20.) Plaintiffs make this request regardless of the fact that Plaintiffs failed to assert that $33,000 was the appropriate price at trial, in their two post-trial briefs, or at the post-trial oral argument that Plaintiffs' requested.[17] Even when the Court specifically inquired at oral argument as to whether Plaintiffs' objected to the valuation of $57,700 offered by Maxim Defendants, Plaintiffs declined to object. Regardless, Plaintiffs <u>now</u> request that the Court consider the $33,000 valuation. Plaintiffs cannot appropriately raise arguments now that they should have been raised prior to the Court's ruling. <u>See</u> <u>Ruttkamp v. De Los Reyes</u>, No. 3:10-CV-392 SRU, 2012 WL 3596064, at *5 (D. Conn. Aug. 20, 2012) (quoting <u>Packer v. SN Servicing Corp.</u>, 250 F.R.D. 108, 112 (D.Conn. 2008)) ("Motions for reconsideration are not designed to allow parties to make arguments that they could have and should have made before the court ruled.").

Additionally, Plaintiffs fail to demonstrate that the Court did not consider the $33,000 valuation. In fact, the Court notes that Plaintiffs "retained an appraiser who valued the shares at $33,000." (Opinion, 10.) The Court also notes that Maxim Defendants attained a later appraisal, which Plaintiffs accepted at one time, and then concludes: "Plaintiffs briefing does not . . . explain why another price should apply. The Court orders S2K to sell its shares for $57,700." (<u>Id.</u>, 26.) The Court's logic is sound. Furthermore, Plaintiffs do not demonstrate that there has been a change in applicable law or a discovery of new evidence, or that that there is any need to

---

[17] <u>See also</u> Doc. 207 at 10, wherein Maxim Defendants argue that Plaintiffs waived any argument regarding the $33,000 appraisal.

16

correct a clear error of law or prevent manifest injustice. See Martin, 2004 WL 1171208, at *1. Therefore, the Court's ruling that S2K must return its shares of East Point in exchange for $57,700 should stand.

## VII. Conclusion

For the aforementioned reasons, Plaintiffs' unjustifiable requests are not based on intervening changes in the law, the new availability of evidence, or the need to correct a clear error of law or prevent manifest injustice. Plaintiffs "present a confused collection of arguments all of which they have either already presented or have had an ample opportunity to present." See Sims v. Mme. Paulette Dry Cleaners, No. 82 CIV. 5438 (MEL), 1986 WL 12511, at *1 (S.D.N.Y. Oct. 31, 1986). Plaintiffs' motion should be denied.

**Defendants Steven Maxim,  
S2k, Inc., Maxim Enterprises, Inc., and  
Maxim Field Service Supply, Inc.**

By: /s/ Mary Mintel Miller  
Brian O'Donnell  
Federal Bar No. ct16041  
Mary Mintel Miller  
Federal Bar No. ct28994  
Reid and Riege, P.C.  
One Financial Plaza  
Hartford, CT  06103  
P: 860-278-1150  
F: 860-240-1002  
bodonnell@rrlawpc.com  
mmiller@rrlawpc.com

17

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Motion was filed electronically on this 18th day of May, 2016.  Notice of filing was sent by electronic service to those parties receiving notices through the Court's CM/ECF system.  The undersigned further certifies the Motion was sent by regular U.S. mail, postage prepaid, to:

Mr. Edwin Pajemola and Cleveland Field Systems, LLC
4223 Morely Drive
Reminderville, OH  44202

                                        /s/ Mary Mintel Miller
                                        Mary Mintel Miller